## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| RICK HARTMAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>PATHMARK STORES, INC., WILLIAM J. BEGLEY, WARREN F. BRYANT, DANIEL H. FITZGERALD, EUGENE M. FREEDMAN, BRUCE HARTMAN, JAMES L. MOODY, JR., EILEEN R. SCOTT, AND FRANK G. VITRANO,<br><br>      Defendants. | Civil Action No. 05-403-JJF |

## OPENING BRIEF IN SUPPORT OF
### DEFENDANTS' MOTION TO DISMISS

MORRIS, NICHOLS, ARSHT & TUNNELL
William M. Lafferty (#2755)
Susan W. Waesco (#4476)
1201 N. Market Street
 Wilmington Delaware 19801
 (302) 658-9200
  *Attorneys for Defendants Pathmark Stores,*
  *Inc. William J. Begley, Warren F. Bryant,*
  *Daniel H. Fitzgerald, Eugene M.*
  *Freedman, Bruce Hartman, James L.*
  *Moody, Jr., Eileen R. Scott, and Frank G.*
  *Vitrano*

OF COUNSEL:

SHEARMAN & STERLING LLP
Richard F. Schwed
Alan S. Rabinowitz
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000

August 19, 2005

TABLE OF CONTENTS

Page

TABLE OF CITATIONS .................................................................................. ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF ALLEGED FACTS ........................................................... 2

ARGUMENT .................................................................................................. 8

I.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATIONS OF THE
      PROXY RULES. ..................................................................................... 8

      A.    Pathmark's Disclosures Were Accurate And Complete. .................... 9

      B.    The June Proposal Was Not Material. ............................................... 13

      C.    Plaintiff Has Suffered No Cognizable Injury .................................... 16

II.   PLAINTIFF HAS FAILED TO ALLEGE GROUNDS FOR SECTION 20(a)
      LIABILITY ............................................................................................. 19

III.  PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF
      FIDUCIARY DUTY ................................................................................ 21

      A.    Pathmark's Directors Did Not Violate Any Fiduciary Duties. ........... 21

      B.    Plaintiff's Claims Are Derivative And Demand Is Not Excused. ....... 25

CONCLUSION .............................................................................................. 28

<u>TABLE OF CITATIONS</u>

<u>Page(s)</u>

**Cases**

*Aegis Corp. v. Goldman*,
        523 F. Supp. 1273 (S.D.N.Y. 1981)                    9, 11

*Agostino v. Hicks*,
        845 A.2d 1110 (Del. Ch. 2004)                        27

*Arthur Children's Trust v. Keim*,
        994 F.2d 1390 (9th Cir. 1993)                        20

*Barkan v. Amsted Indus.*,
        567 A.2d 1279 (Del. 1989)                            22

*Dura Pharmaceuticals v. Broudo*,
        125 S. Ct. 1627 (2005)                               18

*Freedman v. Restaurant Assocs. Indus.*,
        1990 WL 135923 (Del. Ch. Sept. 21, 1990)             23

*Golden Cycle LLC v. Allan*,
        1998 WL 276224 (Del. Ch. May 20, 1999)               22

*Gould v. American-Hawaiian S.S. Co.*,
        535 F.2d 761 (3d Cir. 1976)                          16, 18

*Greenfield v. Heublein, Inc.*,
        575 F. Supp. 1325 (E.D. Pa. 1983), *aff'd*, 742 F.2d 751 (3d
        Cir. 1984)                                           11

*Herd v. Major Realty Corp.*,
        1990 WL 212307 (Del. Ch. Dec. 21, 1990)             23

*In re Anderson, Clayton S'holders' Litig.*,
        519 A.2d 669 (Del. Ch. 1986)                 11, 12, 13, 24

*In re DaimlerChrysler AG Sec. Litig.*,
        294 F. Supp. 2d 616 (D. Del. 2003)                   18

*In re Digital Island Sec. Litig.*,
        223 F. Supp. 2d 546 (D. Del. 2002)                   10

*In re Golden State Bancorp Inc.*,
        2000 WL 62964 (Del. Ch. Jan. 7, 2000)                22

<u>TABLE OF CITATIONS</u> (continued)

Page(s)

*In re KDI Corp. S'holders Litig.*,
    1990 WL 201385 (Del. Ch. Dec. 13, 1990)                     25

*In re Lukens Inc. S'holder Litig.*,
    757 A.2d 720 (Del. Ch. 1999), *aff'd*, 757 A.2d 1278 (Del.
    2000)                   2, 16

*In Re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002)                 6, 8

*In re Pennaco Energy, Inc.*,
    787 A.2d 691 (Del. Ch. 2001)                 28

*In re Tally Indus. S'holders Litig.*,
    1998 WL 191939 (Del. Ch. Apr. 13, 1998)            25

*In re Toys "R" Us, Inc. S'holder Litig.*,
    877 A.2d 975 (Del. Ch. June 20, 2005)          26, 27

*In re Tri-Star Pictures, Inc. Litig.*,
    634 A.2d 319 (Del. 1993)                  29

*In re Tyson Foods, Inc.*,
    2004 WL 1396269 (D. Del. June 17, 2004)          21

*In re Wheelabrator Techs. Inc. S'holders Litig.*,
    1992 WL 212595 (Del. Ch. Sept. 1, 1992)          25

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994)                 21

*Keyser v. Commonwealth Nat'l Fin. Corp.*,
    644 F. Supp. 1130 (M.D. Pa. 1986)          15, 17

*Lebhar Friedman, Inc. v. Movielab, Inc.*,
    1987 WL 5793 (S.D.N.Y. Jan. 13, 1987)          10

*Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*,
    729 A.2d 280 (Del. Ch. 1998)              12, 27

*McMillan v. Intercargo Corp.*,
    768 A.2d 492 (Del. Ch. 2000)              24, 26

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970)                     17

TABLE OF CITATIONS (continued)

Page(s)

*Mills v. Esmark, Inc.*,
    544 F. Supp. 1275 (N.D. Ill. 1982)        9

*Nemo v. Allen*,
    446 F. Supp. 192 (S.D.N.Y. 1979)        9

*Paramount Communications, Inc. v. QVC Network, Inc.*,
    637 A.2d 34 (Del. 1994)        23

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,
    506 A.2d 173 (Del. 1985)        passim

*Rochez Bros. Inc. v. Rhoades*,
    527 F.2d 880 (3d Cir. 1975)        21, 22

*Skeen v. Jo-Ann Stores, Inc.*,
    1999 WL 803974 (Del. Ch. Sept. 27, 1999), *aff'd*, 750 A.2d
    2270 (Del. 2000)        16, 17

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004)        28, 29, 30

*Tracinda Corp. v. DaimlerChrysler AG*,
    364 F. Supp. 2d 362 (D. Del. 2005)        20

*TSC Indus. Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)        16

*Tse v. Ventana Med. Sys., Inc.*,
    297 F.3d 210 (3d Cir. 2002)        18, 19

*Wisconsin Inv. Bd. v. Bartlett*,
    2000 WL 238026 (Del. Ch. Feb. 24, 2000)        16

**Statutes**

15 U.S.C. § 78t(a)        19

8 *Del. C.* § 146        24

**Rules**

Delaware Court of Chancery Rule 23.1        27

## PRELIMINARY STATEMENT

This lawsuit is nothing more than a strike suit aimed at a corporation that, believing its stock to be undervalued, searched for and found a strategic transaction that has more than doubled the company's stock price. Pathmark Stores, Inc. ("Pathmark" or the "Company") diligently pursued various strategic transactions, eventually agreeing to a deal with The Yucaipa Companies LLC and certain of its affiliates (collectively "Yucaipa") whereby Yucaipa invested $150,000,000 in the Company in return for 20 million shares of common stock and additional warrants (the "Yucaipa Transaction"). After announcement of the deal, Pathmark's share price, which had fallen to as low as $3.20 per share on October 25, 2004, rose above $6 per share and closed yesterday at $10.75 per share.

Plaintiff's entire claim relates to a proposal made by another bidder within days before the vote on the Yucaipa Transaction. Plaintiff asserts that the Company violated Section 14(a) of the Securities and Exchange Act of 1934 by failing to disclose this proposal, and that the Board violated its fiduciary duties by not delaying the vote and continuing negotiations with the alternative bidder. As a starting point, plaintiff's Section 14(a) claim fails because he does not allege any facts supporting the most fundamental element of the claim: a material misrepresentation or omission in the proxy statement. A simple review of the proxy materials demonstrates that the allegedly undisclosed offer not only was disclosed within days of when it was made, but was almost identical to a previously disclosed offer by the same bidder. Moreover, the speculative proposal for a purchase of shares at a price *lower* than the then-prevailing market price simply could not have been material. In any event, plaintiff could not have

1

suffered damages because at any time in the last two months he could have sold his shares on the open market at a price higher than the allegedly undisclosed offer.

The breach of fiduciary duty claim is equally flawed. The Board of Directors – which is not alleged to be anything but entirely disinterested and independent – cannot be faulted for refusing to delay the vote on the Yucaipa Transaction in order to pursue an inferior and speculative bid that would have provided a negative premium to shareholders. To require directors in this situation to postpone the shareholders' meeting would be tantamount to giving outside bidders the power to postpone shareholder votes forever – and imperil beneficial transactions – by slightly modifying the terms of their offers on the eve of the vote on a competing transaction. The law cannot support this result.

Accordingly the complaint should be dismissed with prejudice.

## STATEMENT OF ALLEGED FACTS[1]

Pathmark is a regional supermarket chain that operates more than 140 supermarkets in the northeastern United States. (*See* D.I. #1, ¶ 7.) In May 2004, the Company announced its preliminary results for the first quarter of 2004 and revised downwards its earnings guidance for 2004. (Ex. A at 13-14.) Following this

---

[1] The factual references contained herein derive from either plaintiff's Complaint or the Company's disclosures in its proxy statement and the supplements thereto. This Court is permitted to consider the contents of the proxy because plaintiff has incorporated it by reference. *In re Lukens, Inc.*, 757 A.2d 720, 727 (Del. Ch. 1999) ("Moreover, the court may consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint, *e.g.*, in this case, the actual disclosures made in the proxy statement...."), *aff'd*, 757 A.2d 1278 (Del. 2000). A true and correct copy of Pathmark's proxy statement, dated May 6, 2005, is attached to the Declaration of Alan Rabinowitz as Exhibit A and will be cited as "Ex. A at __." True and correct copies of Pathmark's proxy supplements, dated May 26, 2005, May 31, 2005, June 2, 2005, June 3, 2005, and June 7, 2005, are attached to the Declaration of Alan Rabinowitz as Exhibits B, C, D, E, and F, respectively, and will be cited as "Ex __ at __."

announcement, the Company's stock price dropped 19% to $6.91 per share. (Ex. A at 14.) In light of those developments, the Board of Directors decided to explore strategic alternatives. After unsuccessfully approaching a national supermarket chain that had previously expressed interest in acquiring the Company, the Board of Directors decided to pursue a more formal process that might lead to a strategic transaction. (*Id.*)

In September 2004, the Company's financial adviser contacted more than twenty potential strategic and private equity purchasers to gauge their interest in a transaction. (*Id.*) In November, the Company received four written indications of interest and one oral indication of interest from private equity firms. (*Id.*) One of the written indications of interest was from Yucaipa, a private equity firm that had not been contacted previously. (*Id.*)

Between November 2004 and February 2005, the Board and its financial adviser engaged in discussions with six potential partners. (Ex. A at 14-17.) The Board entered into confidentiality agreements, made management presentations and provided access to an electronic data room. In addition, the Company entered into an expense reimbursement agreement with one sufficiently interested bidder who requested such agreement as a condition of continuing the process. (Ex. A at 15.)

During this period, the Company received firm proposals from a number of bidders, including Yucaipa. Bidder No. 2[2] repeatedly expressed its interest in acquiring the Company, but did not make a firm offer. Indeed, it was not until February 2005, four months into the process, that Bidder No. 2 orally identified a possible price

---

[2]    The identities of the bidders other than Yucaipa remain confidential. Accordingly, the proxy statement and this brief refer to bidders by number.

3

level for the bid. (Ex. A at 17.) By February 2005, Yucaipa had submitted a number of bids that involved a proposed investment of $150 million in return for 49% of the common stock and warrants to purchase more stock. During this time period, the Pathmark Board met at least seven times to discuss the status of the offers and provide direction to the Company's financial advisers. (Ex. A at 14-17.)

On March 1, 2005, Yucaipa complained to the Company about the pace of negotiations and indicated that it would be willing to increase its offer but requested assurances that the process was moving forward. (Ex. A at 18.) By that time, only four bidders remained: Bidder No. 2, Bidder No. 4, Bidder No. 5[3] and Yucaipa. Despite the fact that Bidder No. 2 had been involved since November, it had not yet provided evidence of financing and, having done little due diligence, had said it was at least three to four weeks from being able to sign a definitive agreement. (*Id.*) At a March 4, 2005 Board meeting, the Board authorized Bidder No. 4 to talk with certain competitors of the Company and directed that a counterproposal be made to Yucaipa at $7.75 per share. (*Id.*) On March 5, Yucaipa responded that it would need a two-week exclusivity period to negotiate a definitive agreement and conditioned its response to the Board's proposal on being granted exclusivity. (*Id.*) In meetings with the Company's financial advisers, Yucaipa indicated that it would be prepared to pay $7.50 per share. (*Id.*) On March 8, the Board met, reviewed the status of negotiations with the various bidders and the various indications of interest, and decided to grant exclusivity to Yucaipa. (*Id.*) In reaching this decision, the Board considered, among other things (i) the fact that Bidder

---

[3]    Bidder No. 5, a late entrant to the process, had still to provide information regarding its financing.

No. 2 and Bidder No. 4 had indicated that they were several weeks away from being ready to sign an acquisition agreement; (ii) the favorable price level signaled by Yucaipa, and the fact that Yucaipa would not move forward without exclusivity; (iii) execution risks associated with other possible transactions; (iv) the absence of evidence of financing for Bidder No. 2 and unresolved questions regarding financing for Bidder No. 4; and (v) the relatively limited due diligence conducted by Bidder No 2. (*Id.*)

On March 9, the Company received a new indication of interest from Bidder No. 2 at $8.00 per share, subject to securing financing and completion of due diligence. (Ex. A at 19.)  The Board reviewed that proposal and determined that it remained in the best interest of the Company to move forward with granting exclusivity to Yucaipa.  Later that night, the Company signed a two-week exclusivity agreement with Yucaipa. (*Id.*)

After two weeks of intense negotiations, the Company entered into a securities purchase agreement with Yucaipa (the "Agreement").  (*Id.*)  Under the Agreement, the Company sold 20 million shares of common stock, approximately 10 million warrants exercisable at $8.50 per share, and approximately 15 million warrants exercisable at $15.00 per share to Yucaipa for a purchase price of $150 million. (*See* D.I. #1, ¶¶ 15-16.)  The Agreement allowed the Company to consider other proposals if the Board determined that the proposal would reasonably be expected to result in a proposal superior to Yucaipa's. (Ex. A at 19.)  The Agreement also required the Company to hold a shareholder vote regarding the Yucaipa Transaction. (*See* D.I. #1, ¶ 17.)  In return for this "force the vote" provision, Yucaipa had agreed to expand the post-closing powers of the independent directors, and thereby provide greater protection to Pathmark's

5

continuing public shareholders. (Ex. A at 19.) After announcement of the deal, Pathmark's share price, which had fallen to $3.20 per share on October 25, 2004, rose to about $6 per share. (*See* Ex. G.)[4]

On April 1, 2005, after the Yucaipa Transaction had become public, Bidder No. 2 sent another proposal to the Company with two different structuring options and accompanied by evidence of financing. (Ex. A at 20.) Yucaipa argued that neither option was superior to its proposal and that the Board therefore should not negotiate with Bidder No. 2. (*Id.*) Nevertheless, the Board determined that there was a reasonable possibility that Bidder No. 2's offer of $7.72 per share[5] might result in a superior proposal and entered into negotiations with Bidder No. 2. (*Id.*) Yucaipa asserted that negotiations with Bidder No. 2 were a breach of the Agreement. (*Id.*) Bidder No. 2 engaged in due diligence for the next several weeks. (Ex. A at 20-21.)

On May 3, 2005, Yucaipa threatened to sue for breach of the Agreement and stated that unless the Board reconfirmed its recommendation of the Yucaipa Transaction within three days, Yucaipa would have the right to terminate the Agreement. (Ex. A at 21.) Meanwhile, Bidder No. 2 informed the Company that it would need another ten days for due diligence. (*Id.*) On May 4, the Board met with its advisers to review the status of Bidder No. 2's proposal and determined that it was no longer likely to result in a superior proposal to the Yucaipa Transaction because, among other reasons, (1) it was an all-cash offer at a price that was below the stock's then-current trading price,

---

[4]    The court may take judicial notice of publicly available stock price data. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

[5]    Bidder No. 2 offered $8.00 per share less the termination fee and expenses payable to Yucaipa.

and (2) Bidder No. 2 was still months away from being able to conclude a deal despite having been a participant since early November. (*Id.*) The Board so informed Bidder No. 2 and terminated negotiations. (*Id.*)

On May 5, 2005, Bidder No. 2 responded by raising its offer to $8.25 per share. (*Id.*) On May 6, the Board reviewed the new proposal and determined that it was not likely to result in a superior proposal because, among other reasons, (1) there was no evidence of financing for the new proposal, (2) it was subject to a due diligence out, and (3) Bidder No. 2 was still months away from being able to conclude a deal. (Ex. A at 21-22.) All of the preceding history was disclosed by the Company in its May 6 proxy statement. (*See* D.I. #1, ¶ 21.) The shareholders' vote was scheduled for June 9, 2005. (*See* D.I. #1, ¶ 19.)

On May 8, 2005, Bidder No. 2 raised its proposal to $8.30 per share. That offer was also determined by the Board not to be reasonably likely to result in a proposal superior to the Yucaipa Transaction. (Ex. B at 2.) On May 19, Bidder No. 2 raised its proposal to $8.75 per share. (*See* D.I. #1, ¶ 22.) On May 24, that offer was also determined by the Board not to be reasonably likely to result in a proposal superior to the Yucaipa Transaction because (1) it was an all-cash offer at less than the shares' then trading price, (2) there were issues regarding financing, and (3) it would take extra months to complete. (Ex. B at 3-4.) These offers and the decisions by the Board were disclosed to shareholders on May 26. (*See* D.I. #1, ¶ 22.) Plaintiff does not challenge the accuracy or completeness of any of the Company's disclosures through May 26.

On June 1, 2005, Bidder No. 2 provided yet another proposal, which it then modified by successive letters on June 2, June 3, and during the night of June 4 (the

"June Proposal"). (*See* D.I. #1, ¶ 23.) The June Proposal retained the same $8.75 per share price but eliminated the due diligence out and made further representations regarding financing. (*See* D.I. #1, ¶ 23.) At meetings on Friday June 3 and Monday June 6, the Board reviewed the proposal and determined that it was not superior to the Yucaipa Transaction. (Ex. F. at 2-4.) The June Proposal was disclosed to shareholders in an SEC filing the next morning, on June 7, 2005. Since nothing regarding the June Proposal had materially affected the Yucaipa Transaction, the Company went forward with the scheduled shareholder vote on June 9 and the Yucaipa Transaction was approved by an overwhelming majority of the shareholders. (*See* D.I. #1, ¶¶ 24-26.) Immediately prior to the closing, Pathmark's share price was about $8.60 per share. (*See* Ex. G.) Following announcement of the closing, the price rose to $ 8.86 per share and it continues to trade to this day well above the $8.75 per share offered by Bidder No. 2 on May 19 and in the June Proposal. (*See* Ex. G.)

## ARGUMENT

### I.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR VIOLATIONS OF THE PROXY RULES.

In order to state a claim for a proxy violation, plaintiff must allege a material misrepresentation or omission that caused him injury. *See In Re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1329 (3d Cir. 2002). Plaintiff does not meet either of these requirements. The alleged failure to disclose the June Proposal could not have been a material omission because (1) the June Proposal *was* disclosed in the June 7 proxy supplement; (2) it represented only a slight modification of Bidder No. 2's previously disclosed proposal; and (3) it involved an all-cash offer to buy all the outstanding shares of Pathmark for less than the then-current share price.

8

In addition to these infirmities, plaintiff's claim fails because plaintiff is seeking money damages and has failed to show any manner in which he has suffered loss due to the allegedly deficient disclosure. The Company's shares continue to trade at prices higher than the $8.75 per share offered in the June Proposal. Accordingly, plaintiff could not have suffered any injury.

### A.    Pathmark's Disclosures Were Accurate And Complete.

Plaintiff does not allege any misstatements or omissions in the May 6 proxy statement as issued. Plaintiff's only complaint goes to the timing of the disclosure of an after-occurring event – the June Proposal. Whether or not a proxy statement is misleading, however, is measured at the time it is made. *See Mills v. Esmark, Inc.*, 544 F. Supp. 1275, 1293 (N.D. Ill. 1982) ("Plaintiffs thus have failed to allege a violation of Rule 14a-9 which prohibits only those misrepresentations or omissions which are false or misleading at the time and in the light of the circumstances under which they are made.") (internal citations and quotations omitted); *Nemo v. Allen*, 446 F. Supp. 192, 195 (S.D.N.Y. 1979) (events occurring after proxy statement do not render proxy statement misleading).

Since there can be no question that the proxy statement was accurate when issued, plaintiff must rest his case on whether Pathmark fulfilled its obligation to update that disclosure as new events unfolded. *See Aegis Corp. v. Goldman*, 523 F. Supp. 1273, 1280 (S.D.N.Y. 1981) ("proxy solicitor's obligation to disclose is a continuing one"). As one court put it:

> Although a proxy solicitor is not required to disclose
> information in an original proxy which was either not in
> existence or of which the solicitor was unaware on the date

> that the proxy was issued, if new information becomes
> available before the shareholder vote which is material and
> whose omission would render the existing statement false
> or misleading, it is the solicitor's obligation to disclose that
> information before the vote.

*Lebhar Friedman, Inc. v. Movielab, Inc.*, 1987 WL 5793, at *4 (S.D.N.Y. Jan. 13, 1987).

As will be discussed in further detail below, the information regarding the June Proposal

was not material since the proposal was substantially the same as Bidder No. 2's prior

proposal and was for a lower share price than could be obtained on the open market.

Furthermore, the receipt of the June Proposal did not render the Company's prior

disclosures false or misleading. In the original proxy statement, Pathmark disclosed that

it had been in negotiations with Bidder No. 2 for several months, including negotiations

after announcement of the deal with Yucaipa. (*See* D.I. #1, ¶ 21; Ex. A. at 20-22.) On

May 26, Pathmark disclosed that it had received a new proposal from Bidder No. 2 at

$8.75 per share. (*See* D.I. #1, ¶ 22; Ex. B at 3.) On June 2, Pathmark publicly reaffirmed

its openness to receiving proposals and reaffirmed that the Board might change its

recommendation to shareholders if it received a proposal that was superior to Yucaipa's.

(Ex. D at 3-4.) None of those disclosures is rendered false or misleading by information

regarding a revision to Bidder No. 2's proposal, a proposal that the Board still considered

not superior to Yucaipa's offer. *See In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546,

551 (D. Del. 2002) ("[C]laims alleging material omissions of fact should be dismissed if

they fail to specify each statement alleged to have been misleading due to any material

omission, and the reason or reasons why the statement is misleading.") (internal

quotations and citations omitted).

Moreover, even assuming *arguendo* that the Company had an obligation to disclose Bidder No. 2's latest modification of its proposal, the Company fulfilled that obligation as soon as possible. The Company received the last modification of the June Proposal during the night of Saturday, June 4. The Board reviewed the proposal on Monday, June 6, and determined that it was not reasonably likely to lead to an offer superior to Yucaipa's offer. The Company disclosed the details of the proposal and the Board's recommendation on Tuesday morning, June 7 – two days before the shareholder vote on the Yucaipa Transaction. Thus, there can be no claim that the Company withheld information from its shareholders. *Cf. Aegis*, 523 F. Supp. at 1280 (proxy solicitor changed his declared purpose after obtaining proxies). Indeed, disclosure on June 2 or June 3 would have been premature because Bidder No. 2 continued to modify its proposal on June 2, June 3 and June 4. *See Greenfield v. Heublein, Inc.*, 575 F. Supp. 1325, 1336 (E.D. Pa. 1983) ("[P]remature disclosure of such [preliminary] discussions may in itself be misleading, and do more harm than good to a corporation's shareholders."), *aff'd*, 742 F.2d 751 (3d Cir. 1984).

Admittedly, there have been cases where parties have sought and courts have ordered temporary postponements of shareholder meetings to allow time to assimilate new material information but those cases arise in the context of new information that rendered prior disclosures potentially misleading. *See, e.g., Aegis*, 523 F. Supp. at 1280 (proxy solicitor who had claimed that he sought no seats on the board of directors changed his mind the day before the vote and declared an intent to nominate candidates); *In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669, 676 (Del. Ch. 1986) (new offer was 25% higher than offer under consideration, implying that prior

valuations may have been too low). To penalize Pathmark solely because it received a new offer from Bidder No. 2 less than ten days before the scheduled shareholders' meeting would be to imply a new requirement to postpone transactions whenever a company receives a new offer. "[D]irectors of a Delaware corporation[, however,] have no duty to delay an otherwise appropriate transaction just because at the last minute a possible alternative arises." *Anderson*, 519 A.2d at 676; *see also Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280, 292 (Del. Ch. 1998) (same).

Moreover, delay in this situation would not have been cost-free to Pathmark's shareholders. Yucaipa had already threatened once to sue the Company if it continued to entertain proposals that were not superior to Yucaipa's and had asserted its contractual right to terminate the Agreement if the Board did not reaffirm its positive recommendation. Postponing the shareholders' meeting to allow further time to consider a proposal that was not materially different from a prior rejected proposal and was already judged by the Board to be not superior to Yucaipa's transaction could have cost the Company the Yucaipa Transaction. Certainly, nothing in the proxy rules could ever be intended to provide a third-party bidder an effective veto on a transaction through the simple expedient of endlessly modifying its bid up to the date of the shareholders' meeting and thereby endlessly postponing that meeting.

Comparison with the situation in *Anderson* is particularly instructive. In *Anderson*, the company had been pursuing a recapitalization plan that would result in shareholders receiving cash and securities believed to be worth approximately $43 to $47 per share. A week before the shareholder meeting, the company received a completely new cash offer of $54 per share. The company supplemented its proxy with information

12

about the offer, stating that the offer was subject to various contingencies and that the company was still negotiating with the new offeror. The shareholders approved the recapitalization plan and plaintiffs moved to enjoin consummation of it. The court held that, in fact, the directors did not pursue the new offer, meaning that the proxy supplement contained "a species of inaccuracy on a material aspect of the matter that flaws the vote," and temporarily enjoined the recapitalization. *Anderson*, 519 A.2d at 677. Most notably the court held that if the company's supplemental disclosure had clearly stated that despite the new offer the company was committed to the original transaction, it would not have enjoined the transaction:

> Thus, had the board in the proxy supplement said that even were the [new] proposal a firm offer, it would reject it because on its view the recapitalization presented better value to the shareholders, shareholder approval of the recapitalization, in those circumstances, would likely end this matter.

*Id.* at 677. Since Pathmark's disclosure was quite clear that its Board did not feel that the June Proposal was likely to result in a transaction that was superior to that offered by Yucaipa, under *Anderson*, Pathmark's disclosure was sufficient.[6]

**B.    The June Proposal Was Not Material.**

The fact that Bidder No. 2 renewed its proposal in June was not material. Pathmark had already disclosed in the May 6 proxy statement that it had been in

---

[6] The *Anderson* court also addressed the timing of the company's supplemental disclosure. The court stated that "in these circumstances the extraordinarily short time afforded to shareholders to receive, consider and act upon new information very material to this important transaction itself establishes a likelihood of ultimate success on this issue." *Anderson*, 519 A.2d 679 (emphasis added). In this case, the June Proposal was not material, let alone "very material." Accordingly, receipt of the proposal within ten days of the shareholders' meeting and its disclosure two days before the meeting did not interfere with a shareholder's ability to cast an informed vote.

13

negotiations with Bidder No. 2 since November 2004. (Ex. A at 14-15.) The May 6 proxy statement also disclosed that Bidder No. 2 had made several proposals to Pathmark after the Yucaipa Transaction was announced, the last such proposal just days before the May 6 proxy statement was issued. (*Id.* at 20-21.) The May 6 proxy statement stated that the Board had determined that Bidder No. 2's most recent proposal was not "reasonably … expected to result in a superior proposal" to the Yucaipa Transaction but did not state that Bidder No. 2 had abandoned its interest in Pathmark.  Indeed, Bidder No. 2 submitted new proposals on May 8 and May 19, which were disclosed on May 26. (Ex. B at 2-3.) Accordingly, Pathmark's shareholders were well aware that Bidder No. 2 was interested in acquiring the Company and the basic terms under which it was willing to proceed.

As even plaintiff tacitly acknowledges, the June Proposal was quite similar to Bidder No. 2's prior proposal. (*See* D.I. #1, ¶¶ 22-23.) Both proposals were for 100% of the Company's outstanding common stock at a price of $8.75 per share, below the then trading price for Pathmark's shares.  According to the Complaint, the difference between the two offers is that the June Proposal was "no longer subject to any due diligence." (*See* D.I. #1, ¶ 23.)[7]  A due diligence requirement, however, relates mainly to the firmness of an offer, not its value to shareholders.  Accordingly, the main thing shareholders learned from the June 7 supplement was that Bidder No. 2 had renewed its proposal and that the Board considered the revised proposal to be not superior to the Yucaipa Transaction.

---

[7]    Plaintiff has accurately identified the main difference between the proposals.  In addition to removing a request for four to five days to complete due diligence, the June Proposal also changed certain details regarding financing. (*See* Ex. F at 2-3.)

Plaintiff has not shown, and cannot show, why a shareholder would have considered information about a slight change in a proposal not under consideration in the upcoming vote to be material. Absent such showing, plaintiff fails his initial burden. *See Keyser v. Commonwealth Nat'l Fin. Corp.*, 644 F. Supp. 1130, 1140 (M.D. Pa. 1986) ("To succeed upon a Section 14(a) claim, plaintiffs must demonstrate that those facts omitted by defendants are material."). Information about the June Proposal was simply not material. The well-settled standard for materiality states:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote…. [T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

It is well-settled law that the details of a transaction's negotiating history are not material. A company simply need not provide every detail regarding its negotiations and decision-making process in a proxy statement. *See, e.g., Wisconsin Inv. Bd. v. Bartlett*, 2000 WL 238026, at *8 (Del. Ch. Feb. 24, 2000) ("One cannot conclude that a failure to disclose the details of negotiations gone south would be either viably practical or material to shareholders in the meaningful way intended by our case law."); *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974, at *7 (Del. Ch. Sept. 27, 1999) ("[S]hareholders are not entitled to a 'play-by-play' description of merger negotiations."), *aff'd*, 750 A.2d 2270 (Del. 2000); *In re Lukens Inc. S'holder Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999) ("[R]equiring disclosure of every material event that occurred *and* every

decision not to pursue another option would make proxy statements so voluminous that they would be practically useless."), *aff'd*, 757 A.2d 1278 (Del. 2000).

Moreover, a company need not disclose other offers that it declined to pursue unless they are more favorable than the one endorsed by management. *See Keyser*, 644 F. Supp. at 1140; *Skeen*, 1999 WL 803974, at *7 (company did not have to disclose details of proposals they opted not to pursue). Since Bidder No. 2 was proposing an all-cash transaction at less than the then-current trading price of the shares – in effect a negative premium for their shares – and the Board had determined not to pursue the proposal, the June Proposal was immaterial as a matter of law. Pathmark would have been within its rights to refrain from supplementing its May 6 proxy statement at all. *A fortiori*, Pathmark's chosen path – to supplement its disclosures on May 26 and June 7 – certainly satisfied the disclosure requirements.

**C.    Plaintiff Has Suffered No Cognizable Injury.**

Plaintiff in this action did not seek to postpone the shareholders' meeting and does not now seek to undo the Yucaipa Transaction. Indeed, that transaction, with an increase in the share price from $4.48 just before its signing to $8.60 just before closing to $10.75 per share as of yesterday, has manifestly benefited the Company and its shareholders. Instead, plaintiff seeks monetary damages for the alleged inadequate disclosure of the June Proposal. Plaintiff, however, was not harmed and is therefore not entitled to damages. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389 (1970) ("[D]amages should be recoverable only to the extent that they can be shown."); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 782 (3d Cir. 1976) (noting that it is normally

16

"difficult to measure the damages resulting from a lost opportunity"). Absent such harm, the Complaint must be dismissed.

Plaintiff has not alleged any property interest injured by the supposed deficiency in Pathmark's disclosures, let alone the manner of that supposed injury. Plaintiff has not suffered any actual loss; he still owns his shares and those shares have increased in value. Accordingly, plaintiff must be alleging that he has lost an opportunity for a different transaction – *i.e.*, that had there been more time to consider the June Proposal, a majority of shareholders would have voted against the Yucaipa Transaction, forcing the Company to accept the June Proposal. *See Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 218 (3d Cir. 2002). If that had happened, however, plaintiff would have received $8.75 per share, less than he could have received, and can still receive, by selling his stock on the open market. Moreover, this speculation is counterfactual. Since plaintiff allegedly has refrained from selling his shares of Pathmark stock on the open market at prices much higher than $8.75, we cannot assume that plaintiff would have voted to accept a proposal offering even less than the then trading price.

Alternatively, plaintiff may be claiming that if there had been more time for shareholders to consider the information regarding the June Proposal, the shareholders would have voted against the Yucaipa Transaction and the Company would have somehow managed to obtain an even better deal than had been offered by any bidder throughout the Company's long course of soliciting bids. Under Third Circuit law, however, asserting such a "highly speculative chain of events" precludes a plaintiff from recovering monetary damages:

> The highly speculative chain of events that the plaintiffs ask us to infer for the evidence they have presented – in particular, that [the target] would have rejected the [acquirer's] offer and could have negotiated a more favorable merger deal – appears to be what *Gould* was referring to when it stated that we should not apply the "lost opportunity" theory of causation in a situation where the loss is "wholly speculative."

*Tse*, 297 F.3d at 223 (quoting *Gould*, 535 F.2d at 781-82); *see also In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 627 (D. Del. 2003) (same).

It is also worth noting that the Third Circuit is hardly out of step on this issue. In the recently decided case of *Dura Pharmaceuticals v. Broudo*, 125 S. Ct. 1627 (2005), the Supreme Court firmly held that a plaintiff cannot recover in securities fraud cases unless he can prove injury. Under *Dura*, a plaintiff must show more than "had he known the truth he would ... have acted [differently]." 125 S. Ct. at 1632. A plaintiff must also demonstrate how his purported loss was proximately caused by the challenged statements. *Id.* at 1633-34. Such demonstration is impossible here.

Additionally, the Supreme Court held that a plaintiff must allege his theory of damages with some specificity:

> We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forego giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid.

*Id.* at 1634. Since plaintiff in this case has failed to provide any indication whatsoever of the nature of the harm he has allegedly suffered, let alone how such harm was proximately caused by defendants' conduct, this case must be dismissed.

## II.    PLAINTIFF HAS FAILED TO ALLEGE GROUNDS FOR SECTION 20(a) LIABILITY.

Plaintiff seeks to hold the directors of Pathmark individually liable for the alleged omissions in Pathmark's proxy statement under the "controlling person" standard of Section 20(a) of the 1934 Act. Under the circumstances of this case, there are no grounds to support such a claim. Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a); *see Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 388 (D. Del. 2005) (holding that plaintiff must prove primary violation, control of primary violator, and culpable participation in violation).

As a starting point, plaintiff's Section 20(a) claim must fail because there is no primary violation of Section 14(a). *See In re Tyson Foods, Inc.*, 2004 WL 1396269, at *13 (D. Del. June 17, 2004) ("As the court has granted summary judgment as to primary liability of each defendant, there is not a predicate primary violation of federal securities law to sustain a claim under § 20(a)."). Accordingly, Count II must be dismissed for the same reasons Count I must be dismissed.

Moreover, plaintiff has failed to allege facts showing (1) that the defendants are "controlling persons" within the meaning of the statute, *see Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) ("A director is not automatically liable as a controlling person.") (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396-97

(9th Cir. 1993); or (2) that any of the defendants culpably participated in the alleged primary violation, *see Rochez Bros. Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975). Under Third Circuit law, the plaintiff bears the burden of demonstrating that an alleged controlling person culpably participated in the purported deception. *See Tyson*, 2004 WL 1396269, at *13 ("Third Circuit precedent requires that a plaintiff prove culpable participation, *i.e.*, 'deliberate and intentional[ ]' action or inaction by the defendant 'to further the fraud.'") (quoting *Rochez Bros.*, 527 F.2d at 890) (alterations in original). Plaintiff has not alleged direct participation by any individual defendant in the issuance of allegedly deceptive proxy materials. (*See* D.I. #1, ¶ 8 (alleging mere group knowledge or reckless disregard of nondisclosures).) Accordingly, his claim must fail. *See Digital Island*, 223 F. Supp. 2d at 562 ("Mere access to information cannot then sustain an allegation of a Section 20(a) violation.").

Moreover, plaintiff cannot show culpable participation because, at its core, the Complaint does not allege that Pathmark made misleading statements in its proxy disclosures but rather that Pathmark failed to update those disclosures in a timely manner. In such a situation, the most that can be alleged as to any individual is that he or she failed to act quickly enough to prevent shareholders from being misled. Inaction, however, is not sufficiently culpable conduct unless plaintiff can demonstrate that the defendant intended to further another's fraud through his own action. *See Tyson*, 2004 WL 1396269, at *13 ("While deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another."). Such demonstration of "intent to further the fraud" is obviously impossible in this case because

it is clear that defendants authorized a supplemental disclosure as soon as was practicable.

### III. PLAINTIFF HAS FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY.

Plaintiff alleges that Pathmark's directors violated their duties of loyalty by agreeing to a "force the vote" provision, by not pursuing additional offers after receiving the June Proposal, and by not postponing the shareholder vote. (D.I. #1, ¶ 40.) Plaintiff alleges that these decisions amounted to a "refusal to continue [other] negotiations" and "favor[ing] the interests of Yucaipa over that of Pathmark stockholders." (*Id.*) Plaintiff, however, has not alleged how any of the challenged conduct demonstrates a violation of the duty of loyalty, has not alleged conflicts of interest among the Board of Directors, and has not alleged any reason excusing his failure to make a demand on the Board.

In other words, plaintiff does not challenge the process undertaken by the Board but instead challenges the Board's ultimate determination that the Yucaipa Transaction was in the best interest of the Company and that the June Proposal was not reasonably likely to lead to a superior proposal. Plaintiff, however, has not alleged any reason why the Court should substitute its own judgment for that of the Board and since there is no allegation that can be reasonably construed as questioning the fact that the Board of Directors fulfilled its duties, this claim must be dismissed.

### A. Pathmark's Directors Did Not Violate Any Fiduciary Duties.

Under Delaware law, directors of a corporation entering into a transaction involving change in control of the corporation are obligated to attempt to conclude a

transaction securing the best value reasonably available for shareholders. *See Revlon,*

*Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1985) (once board has

determined to sell, it is obligated to secure best deal reasonably available); *Paramount*

*Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del. 1994) (same).  Since

the Board never ceded its control over the process and Yucaipa acquired less than a

majority of the common stock of the Company, *Revlon* duties arguably do not apply.  *See*

*In re Golden State Bancorp Inc.*, 2000 WL 62964 (Del. Ch. Jan. 7, 2000) ("It also was

debatable whether a change of control triggering *Revlon* duties occurred, as Golden State

shareholders still owned the majority of the combined entity's stock.").  Because the

Complaint fails to allege any conduct by Pathmark's directors that failed to meet even

this higher standard, however, the Court need not address the applicability of *Revlon*.

      The standard to which directors are held under *Revlon* is one of

reasonableness, not perfection.  As the Delaware Supreme Court has held, "[i]f a board

selected one of several reasonable alternatives, a court should not second-guess that

choice even though it might have decided otherwise or subsequent events may have cast

doubt on the board's determination.   Thus, courts will not substitute their business

judgment for that of the directors, but will determine if the directors' decision was, on

balance, within a range of reasonableness." *QVC*, 637 A.2d at 45.  Moreover, Delaware

courts have consistently held that there is "no single blueprint" for directors to follow to

fulfill their duties under *Revlon*.  *Barkan v. Amsted Indus.*, 567 A.2d 1279, 1286 (Del.

1989); *see also McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000); *Golden*

*Cycle LLC v. Allan*, 1998 WL 276224 (Del. Ch. May 20, 1999); *In re Tally Indus.*

*S'holders Litig.*, 1998 WL 191939 (Del. Ch. Apr. 13, 1998).  Indeed, the Court of

Chancery often has dismissed *Revlon* claims because the facts alleged did not fall outside the range of reasonableness. *See, e.g., In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *8 (Del. Ch. Sept. 1, 1992); *Herd v. Major Realty Corp.*, 1990 WL 212307, at *9 (Del. Ch. Dec. 21, 1990); *In re KDI Corp. S'holders Litig.*, 1990 WL 201385, at *3-5 (Del. Ch. Dec. 13, 1990); *Freedman v. Restaurant Assocs. Indus.*, 1990 WL 135923, at *6 (Del. Ch. Sept. 21, 1990). The Pathmark Board's decision to accept Yucaipa's offer – the best offer available after months of soliciting bids – and to decline to pursue subsequent inferior proposals at less than the trading price of the stock from another bidder that had proven itself dilatory was certainly not outside the range of reasonableness. As the Chancery Court held in a case much like this one:

> In contrast to the usual *Revlon/Unocal* case involving defendants who have resisted a sale, this complaint attempts to state a claim against a board with a disinterested majority that engaged an investment banker to search for strategic buyers, that consummated a merger agreement with a third-party purchaser, and that put up no insuperable barriers to a better deal. For all these reasons, the allegations of the complaint fail to state a claim that defendants breached their so-called *Revlon* duties ….

*McMillan*, 768 A.2d at 507.

In fulfilling its duty to attempt to achieve the best reasonably available value, Delaware does not "prevent [a board] from offering bidders deal protections, so long as its decision to do so was reasonably directed to the objective of getting the highest price." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975 (Del. Ch. June 20, 2005). Moreover, Delaware law does not preclude directors from agreeing to provisions obligating the corporation to submit the transaction to shareholder vote even if the board withdraws its recommendation. In fact, such "force the vote" provisions are specifically

authorized under Delaware law. *See* 8 *Del. C.* § 146 ("A corporation may agree to submit a matter to a vote of its stockholders whether or not the board of directors determines at any time subsequent to approving such matter that such matter is no longer advisable and recommends that the stockholders reject or vote against the matter.").

Similarly, nothing in Delaware law requires companies to postpone shareholder votes every time another bidder modifies its expression of interest. *Anderson*, 519 A.2d at 676 ("[D]irectors of a Delaware corporation have no duty to delay an otherwise appropriate transaction just because at the last minute a possible alternative arises."); *see also Matador Capital Mgmt.*, 729 A.2d at 292 (same). To conclude otherwise would give disgruntled bidders who have been rejected by the board of directors the power to endlessly interfere with the shareholder voting process by making minor amendments to their offers up to the day of the shareholders' meeting and delay it until the winning bidder leaves in frustration.

Fundamentally, the decision whether to proceed with the Yucaipa Transaction or to abandon it in pursuit of other possible transactions was a business judgment made by Pathmark's Board after consulting with its advisers and after engaging in months of effort to secure the best possible transaction for Pathmark and its shareholders. Plaintiff has not alleged a single conflict of interest, a single failure of diligence, or a single occurrence that would lead a shareholder or this Court to question the process by which the Board fulfilled its duties. Instead, plaintiff simply states his disagreement with several of the Board's ultimate decisions without even stating a reason for his disagreement. That is not the basis for a challenge to a director's good faith in fulfilling his fiduciary duties. *See In re Toys "R" Us*, 877 A.2d 975 ("The central

purpose of *Revlon* is to ensure the fidelity of fiduciaries.   It is not a license for the judiciary to set arbitrary limits on the contract terms that fiduciaries acting loyally and carefully can shape in the pursuit of their stockholders' interest.").   As the Delaware courts have held repeatedly, the court's role is not to substitute its judgment for that of the board but rather to "examine whether the directors have undertaken reasonable efforts to fulfill their obligation to secure the best available price, and not to determine whether the directors have performed flawlessly." *In re Pennaco Energy, Inc.*, 787 A.2d 691, 705 (Del. Ch. 2001).

Finally, plaintiff cannot claim to have been damaged by the Yucaipa Transaction.  In effect, the course of events has proven Pathmark's directors to have been right in rejecting the June Proposal and shown how singularly inappropriate it would be to substitute plaintiff's judgment or the Court's judgment for that of the directors.  Since the closing of the Yucaipa Transaction, Pathmark's shares have traded for a substantial premium over the $8.75 per share offered in the June Proposal and closed at $10.35 per share on August 17, 2005.  Given that history, the Board might have been facing a much more serious shareholder lawsuit if it had pursued the June Proposal to the derogation of the Yucaipa Transaction.  *Cf. Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (suit for recovery of time value of money lost by delay in closing merger).  At a minimum, plaintiff could not have suffered any injury as a result of any alleged breach of fiduciary duty.  *See* Point I.C, *supra*.

**B.    Plaintiff's Claims Are Derivative And Demand Is Not Excused.**

Plaintiff asserts that the directors' "continued support of the Yucaipa Transaction and refusal to continue negotiations represented a breach of the duty of

loyalty, as they favored the interests of Yucaipa over that of Pathmark stockholders."

(D.I. #1, ¶ 40.)   More concretely, plaintiff argues that Pathmark's Board agreed too

quickly to a transaction with Yucaipa and failed to pursue sufficiently other possible

transactions.   The Yucaipa Transaction, however, was not a merger and did not result in

cashing out the interests of the shareholders.   In the transaction, Yucaipa invested $150

million in the Company in return for 20 million shares of stock and additional warrants.

Accordingly, the alleged "injury" was to the Company for failing to secure a sufficiently

large investment in return for its stock.   This allegation is a classic derivative claim made

on behalf of the Company and all shareholders.

Until the Delaware Supreme Court's recent decision in *Tooley v.*

*Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), a plaintiff claiming a

direct injury had to show that he suffered a "special injury" differing from that suffered

by all other shareholders. *See, e.g., In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 330

(Del. 1993) ("It is well settled that the test used to distinguish between derivative and

individual harm is whether the plaintiff suffered 'special injury.'  A special injury is

established where there is a wrong suffered by plaintiff that was not suffered by all

stockholders generally....") (citations omitted).   Although that inquiry still has some

relevance, the *Tooley* court revised that analysis by focusing on the distinction between

harms to the stockholder and harms to the corporation. *Tooley*, 845 A.2d at 1038-39.

Accordingly, a claim is derivative unless the plaintiff can claim that "he or she can

prevail without showing an injury to the corporation." *Id.*

The Delaware Chancery Court, in an opinion cited approvingly by the

*Tooley* court, has already held that an allegation that a corporation entering into an

26

agreement that precluded it from seeking better offers – exactly what is alleged here – states a derivative rather than direct claim. *See Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004). In *Agostino*, the Court of Chancery held:

> Even if I were to assume for the sake of argument that an alternative transaction was a reality, that the warrants were exercised, and [the warrant holder] used its majority control to block the transaction, the plaintiff has not demonstrated that he can prevail on this issue without showing an injury to [the company]. These series of events as described would have harmed the Company because the Company would have been precluded from entering into a transaction that would have maximized the return on its assets. The plaintiff has advanced no argument as to why all shareholders would not be affected equally by such an occurrence. Nor is there any claim that the preclusion of alternative, value-maximizing transactions implicates a contractual right of plaintiff. In my opinion, the nature of this claim is nothing more than a claim of mismanagement that if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders. As such, the wrong alleged is entirely derivative in nature.

*Agostino*, 845 A.2d at 1123 (internal quotations omitted). Since the injury alleged herein is one to the Company, the claim is derivative.

Plaintiff has not alleged a single specific instance of self-dealing or of conflict of interest between the directors and the shareholders. Plaintiff has failed to allege a demand upon the Company and has failed to allege a *single* reason why demand should be excused. Accordingly, Count III of the Complaint must be dismissed. *See* Del. Ch. Ct. Rule 23.1 ("In a derivative action … [, the] complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.").

## CONCLUSION

For the foregoing reasons, defendants respectfully ask this Court to dismiss the Complaint with prejudice.

MORRIS, NICHOLS, ARSHT & TUNNELL

William M. Lafferty (#2755)
Susan W. Waesco (#4476)
1201 N. Market Street
Wilmington Delaware 19801
(302) 658-9200
 *Attorneys for Defendants Pathmark Stores,
Inc. William J. Begley, Warren F. Bryant,
Daniel H. Fitzgerald, Eugene M.
Freedman, Bruce Hartman, James L.
Moody, Jr., Eileen R. Scott, and Frank G.
Vitrano*

OF COUNSEL:

SHEARMAN & STERLING LLP
Richard F. Schwed
Alan Rabinowitz
599 Lexington Ave.
New York, NY 10022
(212) 848-4000


August 19, 2005

28

## CERTIFICATE OF SERVICE

I, William M. Lafferty, hereby certify that on August 19th, 2005 I electronically filed the **Opening Brief In Support Of Defendants' Motion To Dismiss,** with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

> Elizabeth M. McGeever
> Prickett, Jones & Elliott, P.A.
> 1310 King Street
> Wilmington, DE 19801

I also certify that copies were caused to be served on August 19th, 2005 upon the following in the manner indicated:

**BY HAND:**

Elizabeth M. McGeever
Prickett, Jones & Elliott, P.A.
1310 King Street
Wilmington, DE 19801

MORRIS, NICHOLS, ARSHT & TUNNELL

William M. Lafferty (#2755)
1201 N. Market Street
Wilmington, Delaware 19801
(302) 658-9200
wlafferty@mnat.com
Attorneys for Defendants

August 19, 2005