# EXHIBIT A
# Part 1 of 8



# PATHMARK STORES, INC.
**200 MILIK STREET**
**CARERET, NJ 07008**

**May 6, 2005**

Dear Stockholder:

Pathmark Stores, Inc. ("Pathmark" or the "Company") has entered into an agreement with certain investment funds (the "Investors") affiliated with The Yucaipa Companies LLC, a Los Angeles-based private equity firm ("Yucaipa"), under which the Investors will invest an aggregate of $150 million in cash in Pathmark. Pathmark will use the proceeds from the transaction to upgrade its existing store base and open additional stores, positioning the company for improved top line growth and profitability. Yucaipa has also executed a 5-year management agreement with Pathmark to provide consulting services on corporate strategy, marketing, operations, finance and retail development following the closing. In connection with the Investors' investment, and subject to certain terms and conditions, Pathmark has also agreed to appoint five individuals designated by the Investors to Pathmark's board of directors and to increase the size of the board to 11 directors. The six remaining directors will be independent directors not affiliated with or designated by Yucaipa.

You will be asked, at a special meeting of the Company's stockholders, to vote to approve, in exchange for the Investors' $150 million aggregate cash investment, the issuance to the Investors of: (i) 20,000,000 shares of the Company's common stock, (ii) Series A warrants, with an exercise price of $8.50, to purchase 10,060,000 shares of the Company's common stock and (iii) Series B warrants, with an exercise price of $15.00, to purchase 15,046,350 shares of the Company's common stock. **The board of directors believes that the proposal is in the best interests of Pathmark and its stockholders and, therefore, recommends that Pathmark's stockholders vote "FOR" the proposal at the special meeting.**

The time, date and place of the special meeting to consider and vote upon the proposal are as follows:

2:00 p.m. Eastern Daylight Time, June 9, 2005

Pathmark's corporate headquarters, 200 Milik Street, Carteret, New Jersey 07008

The proxy statement attached to this letter provides you with information about the proposed transaction and the special meeting of the Company's stockholders. We encourage you to read the entire proxy statement carefully. You may also obtain more information about the Company from documents we have filed with the Securities and Exchange Commission.

**Your vote is important regardless of the number of shares of the Company's common stock you own. Accordingly, you are requested to vote your shares by promptly completing, signing and dating the enclosed proxy card and returning it in the envelope provided, whether or not you plan to attend the special meeting. Alternatively, if your shares are held by a broker and your broker makes the following options available, you may grant a proxy to vote your shares over the Internet or by telephone. Voting by any of these methods available to you will ensure that we can vote your proxy at the special meeting even if you are not there in person.**

Voting by proxy will not prevent you from voting your shares in person if you subsequently choose to attend the special meeting.

Thank you for your cooperation and continued support.

Very truly yours,

*James L. Moody, Jr.*

James L. Moody, Jr.
Chairman of the Board of Directors

THIS PROXY STATEMENT IS DATED MAY 6, 2005
AND IS FIRST BEING MAILED TO STOCKHOLDERS ON OR ABOUT MAY 9, 2005.



# PATHMARK STORES, INC.
**200 MILIK STREET**
**CARTERET, NJ 07008**

## NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

## TO BE HELD ON JUNE 9, 2005

To the stockholders of Pathmark Stores, Inc.:

A special meeting of stockholders of Pathmark Stores, Inc., a Delaware corporation ("Pathmark" or the "Company"), will be held on June 9, 2005, at 2:00 p.m., Eastern Daylight Time, at Pathmark's corporate headquarters, 200 Milik Street, Carteret, New Jersey 07008, for the following purposes:

1. to approve the issuance to certain investment funds affiliated with The Yucaipa Companies LLC, for an aggregate cash purchase price of $150,000,000, of: (i) 20,000,000 shares of the Company's common stock, (ii) Series A warrants, with an exercise price of $8.50, to purchase 10,060,000 shares of the Company's common stock and (iii) Series B warrants, with an exercise price of $15.00, to purchase 15,046,350 shares of the Company's common stock; and

2. to transact such other business as may properly come before the special meeting or any adjournment or postponement thereof.

Only stockholders of record as of the close of business on May 6, 2005, are entitled to notice of and to vote at the special meeting and at any adjournment or postponement of the special meeting. All stockholders of record are cordially invited to attend the special meeting in person.

The issuance of the Company's common stock and Series A and Series B warrants requires the approval of a majority of the votes cast in person or by proxy at the special meeting. Even if you plan to attend the special meeting in person, we request that you complete, sign, date and return the enclosed proxy card and thus ensure that your shares will be represented at the special meeting if you are unable to attend. If you sign, date and return your proxy card without indicating how you wish to vote, your vote will be counted as a vote "FOR" the proposed transaction. If you hold your shares through a bank or brokerage firm, you should follow the instructions of your bank or brokerage firm regarding voting your shares.

Whether you attend the meeting or not, you may revoke a proxy at any time before we vote it at the meeting. You may do so by executing and returning a proxy card dated later than the previous one or by attending the special meeting and notifying the secretary of the special meeting in writing prior to the voting of your proxy of your intention to vote in person. If you hold your shares through a bank or brokerage firm, you should follow the instructions of your bank or brokerage firm regarding revocation of proxies. If your bank or brokerage firm allows you to vote by telephone or the Internet, you may be able to change your vote by voting again by the telephone or the Internet.

By order of the board of directors,

*Marc A. Strassler*

Marc A. Strassler
*Senior Vice President,*
*Secretary and General Counsel*

**Table of Contents**

|  | Page |
|---|---|
| QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE PROPOSED TRANSACTION | 1 |
| SUMMARY | 4 |
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION | 9 |
| CAUTIONARY STATEMENT CONCERNING REPRESENTATIONS AND WARRANTIES CONTAINED IN THE PURCHASE AGREEMENT OR IN THE ANCILLARY AGREEMENTS | 9 |
| THE PARTIES TO THE PROPOSED TRANSACTION | 10 |
| THE SPECIAL MEETING | 11 |
| Time, Place and Purpose of the Special Meeting | 11 |
| Record Date and Voting | 11 |
| Required Vote | 11 |
| Proxies; Revocation | 12 |
| Adjournments and Postponements | 12 |
| THE PROPOSED TRANSACTION | 12 |
| Description of the Proposed Transaction | 13 |
| Background of the Proposed Transaction | 13 |
| Reasons for the Proposed Transaction | 22 |
| Recommendation of the Company's Board of Directors | 23 |
| Financial Advisor's Opinion | 24 |
| Ownership Upon Closing | 31 |
| Use of Proceeds | 31 |
| Interests of the Company's Directors and Executive Officers in the Proposed Transaction | 31 |
| Regulatory Approvals | 33 |
| Special Considerations | 33 |
| Board of Directors Following the Closing | 34 |
| Federal Income Tax Matters | 34 |
| Absence of Appraisal Rights | 34 |
| THE PURCHASE AGREEMENT | 35 |
| Consideration to be Paid in the Proposed Transaction | 35 |
| Closing of the Proposed Transaction | 35 |
| Representations and Warranties of the Company and the Investors | 35 |
| Conduct of Our Business Pending the Closing | 37 |
| Stockholders' Meeting | 38 |
| No Solicitation of Transactions | 39 |
| Agreement to Take Further Action and to Use Reasonable Best Efforts | 40 |
| Credit Agreement | 41 |
| Composition of Board of Directors | 41 |
| Conditions to Closing | 41 |
| Termination | 43 |
| Termination Fee and Expenses | 44 |
| Indemnification | 45 |

i

|                                                                                    | Page |
|------------------------------------------------------------------------------------|------|
| THE STOCKHOLDERS' AGREEMENT                                                         | 46   |
| Board Representation                                                                | 46   |
| Approval by the Investors for Certain Actions                                       | 46   |
| Approval by the Independent Directors for Certain Actions                           | 47   |
| Standstill Provisions                                                               | 48   |
| Termination of Standstill Provisions                                                | 49   |
| Transfer Restrictions                                                               | 49   |
| Business Opportunities                                                              | 50   |
| Preemptive Rights                                                                   | 51   |
| Termination                                                                         | 51   |
| THE MANAGEMENT SERVICES AGREEMENT                                                   | 51   |
| Closing Fee                                                                         | 51   |
| Additional Services                                                                 | 52   |
| Term of the Agreement                                                               | 52   |
| Termination/Termination Fee                                                         | 52   |
| Indemnification                                                                     | 53   |
| THE REGISTRATION RIGHTS AGREEMENT                                                   | 53   |
| Demand Registrations                                                                | 53   |
| Piggyback Registrations                                                             | 54   |
| Shelf Registrations                                                                 | 54   |
| Expenses                                                                            | 54   |
| Indemnification                                                                     | 54   |
| Rule 144                                                                            | 55   |
| Termination                                                                         | 55   |
| THE WARRANT AGREEMENT                                                               | 55   |
| Series A Warrants                                                                   | 55   |
| Series B Warrants                                                                   | 55   |
| MARKET PRICE OF THE COMPANY'S COMMON STOCK                                          | 56   |
| SECURITY OWNERSHIP BY CERTAIN BENEFICIAL OWNERS AND MANAGEMENT                      | 56   |
| By Directors and Executive Officers                                                 | 56   |
| By Others                                                                           | 57   |
| MULTIPLE STOCKHOLDERS SHARING ONE ADDRESS                                           | 58   |
| SUBMISSION OF STOCKHOLDER PROPOSALS                                                 | 58   |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION                                           | 59   |

| ANNEX A | Fairness Opinion of Dresdner Kleinwort Wasserstein |
|---------|-----------------------------------------------------|
| ANNEX B | Securities Purchase Agreement, dated as of March 23, 2005, among the Investors, Yucaipa (as the Investors' representative) and Pathmark |
| ANNEX C | Form of Stockholders' Agreement among Pathmark and the Investors |
| ANNEX D | Management Services Agreement, dated as of March 23, 2005, by and between Yucaipa and Pathmark |
| ANNEX E | Form of Registration Rights Agreement among Pathmark and the Investors. |
| ANNEX F | Form of Warrant Agreement among Pathmark and the Investors |

## QUESTIONS AND ANSWERS ABOUT THE SPECIAL MEETING AND THE PROPOSED TRANSACTION

The following questions and answers address briefly some questions you may have regarding the special meeting and the proposed transaction. These questions and answers may not address all questions that may be important to you as a stockholder of Pathmark Stores, Inc. Please refer to the more detailed information contained elsewhere in this proxy statement, the annexes to this proxy statement and the documents referred to or incorporated by reference in this proxy statement. In this proxy statement, the terms "Pathmark", "Company", "we", "our", "ours", and "us" refer to Pathmark Stores, Inc. and its subsidiaries.

**Q: What is the proposed transaction?**

A: The proposed transaction is the issuance by the Company to certain investment funds, referred to as the "Investors", who are affiliated with The Yucaipa Companies LLC, or "Yucaipa", for an aggregate cash purchase price of $150 million, of:

- 20,000,000 shares of the common stock, par value $0.01 per share, of Pathmark,

- Series A warrants to purchase 10,060,000 shares of common stock at an exercise price of $8.50 per share, and

- Series B warrants to purchase 15,046,350 shares of common stock at an exercise price of $15.00 per share.

The proposed transaction will be consummated pursuant to a Securities Purchase Agreement, dated as of March 23, 2005, among Pathmark, the Investors and Yucaipa as the Investors' representative, and which we refer to as the "Purchase Agreement".

In connection with the proposed transaction, we have also entered into or will, upon the closing of the proposed transaction, enter into certain other agreements with Yucaipa or the Investors, which are discussed in greater detail elsewhere in this proxy statement.

**Q: What will I receive in the proposed transaction?**

A: You will not receive any consideration in the proposed transaction. We are seeking your approval only so that we can sell to the Investors in the proposed transaction the securities described above in return for an investment of $150 million in cash by the Investors.

**Q: What percentage of the Company will the Investors own upon completion of the proposed transaction?**

A: As of the record date, there were 30,071,192 shares of common stock outstanding, plus outstanding options and warrants to purchase an additional 10,790,865 shares of common stock. Based upon the number of shares of common stock outstanding on the record date, and excluding any shares issuable upon the exercise of currently outstanding options or warrants, the 20,000,000 shares of common stock issued to the Investors at the closing will represent approximately 40% of the shares of common stock outstanding upon the closing. In the proposed transaction, the Investors will also be issued Series A warrants to purchase 10,060,000 shares of common stock and Series B warrants to purchase 15,046,350 shares of common stock. The Series A warrants expire in three years and are immediately exercisable upon the closing. The Series B warrants expire in ten years but are not exercisable until certain conditions are met, none of which are expected to be met by the closing. Based upon the number of shares of common stock outstanding on the record date, and excluding any other exercises of any other options or warrants:

- if the Investors were to exercise the Series A warrants in full at the closing, they would own approximately 49.9% of the shares of common stock outstanding upon the closing, and

1

- if the Series B warrants were exercisable at the closing and if the Investors were to exercise both the Series A warrants and the Series B warrants in full, for cash, at the closing, they would own approximately 60% of the shares of common stock outstanding upon the closing.

**Q:** **Where and when is the special meeting?**

**A:** The special meeting will take place at Pathmark's corporate headquarters, 200 Milik Street, Carteret, New Jersey 07008, on June 9, 2005, at 2:00 p.m. Eastern Daylight Time.

**Q:** **What vote is required to approve the proposed transaction?**

**A:** For us to complete the proposed transaction, a majority of the votes cast in person or by proxy at the special meeting must be voted "FOR" the approval of the proposed transaction.

**Q:** **How does the Company's board of directors recommend that I vote?**

**A:** Our board of directors unanimously recommends that our stockholders vote "FOR" the approval of the proposed transaction. You should read "The Proposed Transaction—Reasons for the Proposed Transaction" for a discussion of the factors that our board of directors considered in deciding to recommend the proposed transaction.

**Q:** **What do I need to do now?**

**A:** We urge you to read this proxy statement carefully, including its annexes, and to consider how the proposed transaction affects you. Then just mail your completed, dated and signed proxy card in the enclosed return envelope as soon as possible so that your shares can be voted at the special meeting of our stockholders.

**Q:** **What happens if I do not respond or if I respond and fail to indicate my voting preference or if I abstain from voting?**

**A:** If you fail to sign, date and return your proxy card, your shares of common stock will not be counted towards establishing a quorum for the special meeting, which requires holders representing a majority of the outstanding shares of common stock to be present in person or by proxy. If you respond and do not indicate your voting preference, we will count your proxy as a vote in favor of the approval of the proposed transaction. If you respond and abstain from voting, your proxy will have no effect on the vote for the proposed transaction.

**Q:** **If my shares are held in "street name" by my broker, will my broker vote my shares for me?**

**A:** Yes, but only if you provide instructions to your broker on how to vote. You should follow the directions provided by your broker regarding how to instruct your broker to vote your shares. Without those instructions, your shares will not be voted and will have no effect on the outcome of the vote on the proposed transaction.

**Q:** **Can I change my vote after I have mailed my proxy card?**

**A:** Yes. You can change your vote at any time before your proxy is voted at the special meeting. You may do so by notifying the Secretary of Pathmark in writing or by submitting a new proxy, in each case, dated after the date of the proxy being revoked. In addition, your proxy may be revoked by attending the special meeting and notifying the secretary of the special meeting in writing prior to the voting of your proxy of your intention to vote in person. However, simply attending the special meeting will not revoke your proxy. If you have instructed a broker to vote your shares, the above-described options for changing your vote do not apply and instead you must follow the instructions received from your broker to change your vote.

2

Q:  **Am I entitled to appraisal rights?**

A:  No. You will have no right under Delaware law to seek appraisal of your shares of common stock in connection with the proposed transaction.

Q:  **Who can help answer my other questions?**

A:  If you have more questions about the proposed transaction, you should contact Harvey Gutman, Senior Vice President, Retail Development and Investor Relations, at (732) 499-4327. If you have questions regarding voting, you should contact our proxy solicitation agent, Mellon Investor Services LLC, toll-free at (888) 509-7937. If your broker holds your shares, you should also call your broker for additional information.

## SUMMARY

The following summary highlights selected information from this proxy statement and may not contain all of the information that may be important to you. Accordingly, we encourage you to read carefully this entire proxy statement, its annexes and the documents referred to or incorporated by reference in this proxy statement. Each item in this summary includes a page reference directing you to a more complete description of that item.

**The Parties to the Proposed Transaction (Page 10)**

Pathmark Stores, Inc.
200 Milik Street
Carteret, NJ 07008
(732) 499-3000

Pathmark is a regional supermarket chain currently operating 142 supermarkets primarily in the New York-New Jersey and Philadelphia metropolitan areas. Pathmark's stores average approximately 52,400 square feet in size and include 129 in-store full service pharmacies and a wide array of financial services offered by 83 in-store banks. According to the 2004 Metro Market Guide, Pathmark achieved a number one or number two-market share in eight of its nine major metro markets. Additional information about Pathmark may be found at its website, *www.pathmark.com.*

Yucaipa Corporate Initiatives Fund I, L.P.
Yucaipa American Alliance Fund I, L.P.
Yucaipa American Alliance (Parallel) Fund I, L.P.
The Yucaipa Companies LLC
9130 W. Sunset Boulevard
Los Angeles, California 90069
(310) 789-7200

Yucaipa Corporate Initiatives Fund I, L.P., Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. were formed for the purpose of making strategic investments in undervalued and underperforming companies and, through a strategic relationship with Yucaipa, seek to work with management at the companies in which they invest to reposition businesses and implement operational improvements.

Yucaipa was formed in 1986. Since its formation, Yucaipa and its affiliates have completed mergers, acquisitions and strategic investments valued at more than $30 billion. Yucaipa is actively involved in acquisitions, mergers and the management of large retail and distribution entities. Specific investments by Yucaipa in the supermarket sector have included Food4Less, Dominick's, Ralphs, Smith's Food and Drug, and Fred Meyer.

**The Special Meeting**

*Time, Place and Date (Page 11)*

The special meeting will be held on June 9, 2005, starting at 2:00 p.m., Eastern Daylight Time, at Pathmark's corporate headquarters, 200 Milik Street, Carteret, New Jersey 07008.

*Purpose (Page 11)*

You will be asked to consider and vote upon the proposed transaction, in which we would issue to the Investors, for an aggregate cash purchase price of $150 million:

- 20,000,000 shares of the common stock, par value $0.01 per share, of Pathmark;

- Series A warrants to purchase 10,060,000 shares of common stock at an exercise price of $8.50 per share; and

4

- Series B warrants to purchase 15,046,350 shares of common stock at an exercise price of $15.00 per share.

The persons named in the accompanying proxy will also have discretionary authority to vote upon other business, if any, that properly comes before the special meeting and any adjournments or postponements of the special meeting, including any adjournments or postponements for the purpose of soliciting additional proxies to approve the proposed transaction.

### Record Date and Voting (Page 11)

You are entitled to vote at the special meeting if you owned shares of common stock as of the close of business on May 6, 2005, the record date for the special meeting. You will have one vote for each share of common stock that you owned on the record date. There are 30,071,192 shares of common stock entitled to be voted.

### Vote Required (Page 11)

For us to complete the proposed transaction, a majority of the votes cast in person or by proxy at the special meeting must be voted "FOR" the approval of the proposed transaction.

### Share Ownership of Directors and Executive Officers (Page 11)

As of May 6, 2005, the directors and executive officers of Pathmark owned less than 1% of the shares of common stock entitled to vote at the special meeting. Each of them has advised us that he or she plans to vote all of his or her shares in favor of the approval of the proposed transaction.

### Voting and Proxies (Page 11)

Any Pathmark stockholder entitled to vote may vote by returning the enclosed proxy or by appearing at the special meeting. If your shares are held in "street name" by your broker, you should instruct your broker on how to vote your shares using the instructions provided by your broker.

### Revocability of Proxy (Page 12)

You may revoke your proxy at any time before it is voted in any one of the following ways:

- delivering to the Secretary of Pathmark, at or before the special meeting, a written notice of revocation that is dated a later date than the proxy;

- delivering a later-dated, properly executed proxy relating to the same shares to the Secretary of Pathmark, at or before the special meeting; or

- attending the special meeting and notifying the secretary of the special meeting in writing prior to the voting of the proxy of your intention to vote in person.

Simply attending the special meeting will not constitute revocation of a proxy. If you have instructed your broker to vote your shares, the above-described options for revoking your proxy do not apply and instead you must follow the directions provided by your broker to change these instructions.

## When Will the Proposed Transaction be Completed (Page 35)

We are working to complete the proposed transaction as soon as possible. We anticipate completing the proposed transaction in the summer of 2005, subject to receipt of stockholder approval and satisfaction of the other closing conditions.

## Recommendation of the Company's Board of Directors (Page 23)

After careful consideration, our board of directors, by the unanimous vote of the directors, recommends that Pathmark's stockholders vote "FOR" the approval of the proposed transaction.

5

**Financial Advisor's Opinion (Page 24)**

Dresdner Kleinwort Wasserstein Securities LLC, which we refer to as "DrKW" in this proxy statement, has delivered to the Company's board of directors its opinion, dated March 23, 2005, to the effect that, as of that date and based upon and subject to the assumptions and limitations stated in the opinion, the aggregate consideration of $150 million in cash to be received by the Company in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction is fair, from a financial point of view, to the Company. The full text of the written opinion, setting forth the assumptions made, matters considered and limitations in connection with the opinion, is attached as Annex A to this proxy statement. We recommend that you read the opinion in its entirety.

**Ownership Upon Closing (Page 31)**

Based upon the number of outstanding shares of common stock on the record date, and excluding any shares issuable upon the exercise of currently outstanding options or warrants, upon the closing, the Investors will own approximately 40% of the outstanding shares of common stock, making Yucaipa and its affiliates the largest stockholder of the Company. If the Investors were to exercise their Series A warrants in full at the closing, the Investors would own approximately 49.9% of the outstanding shares of common stock. If the Investors were to exercise their Series A and Series B warrants in full for cash at the closing (which, in the case of the Series B warrants, they will not be able to do), the Investors would own approximately 60% of the outstanding shares of common stock.

**Interests of the Company's Directors and Executive Officers in the Proposed Transaction (Page 31)**

Our directors and executive officers may have interests in the proposed transaction that are different from, or in addition to, yours, including the vesting of stock options and the entitlement to certain other benefits pursuant to their employment agreements and supplemental retirement agreements.

**No Solicitation of Transactions (Page 39)**

The Purchase Agreement contains restrictions on our ability to solicit or engage in discussions or negotiations with third parties regarding specified transactions involving the Company. Notwithstanding these restrictions, under certain circumstances, our board of directors may respond to an unsolicited written bona fide proposal for an alternative acquisition. After, among other things, the stockholders' meeting to approve the proposed transaction has been held and the proposed transaction has failed to obtain stockholder approval, we may also terminate the Purchase Agreement and enter into an agreement with respect to a superior proposal.

**Conditions to Closing (Page 41)**

Before we can complete the transactions contemplated under the Purchase Agreement and the ancillary agreements, a number of conditions must be satisfied. These include:

- the receipt of Company stockholder approval;

- the absence of any governmental orders that have the effect of making the proposed transaction illegal or that otherwise prohibit the closing;

- each of the representations and warranties that are qualified by materiality or material adverse effect must be true and correct and all representations and warranties which are not so qualified must be true and correct in all material respects;

- the performance, in all material respects, of the covenants and agreements in the Purchase Agreement;

6

- the absence of a material adverse effect on the Company;

- the directors designated by the Investors must have been duly appointed, effective concurrently with the closing, to the Pathmark board of directors and to all applicable committees and the resignation of all directors who are neither directors designated by the Investors nor continuing independent directors must have become effective; and

- certain waivers and amendments in respect of the Company's $250 million Amended and Restated Credit Agreement dated as of October 1, 2004 must have been obtained.

**Termination of the Purchase Agreement (Page 43)**

Pathmark and the Investors may agree in writing to terminate the Purchase Agreement at any time prior to completing the proposed transaction, even after the stockholders of Pathmark have voted on the proposed transaction. The Purchase Agreement may also be terminated at any time prior to completing the proposed transaction in certain other circumstances, including:

- by either the Investors or the Company if:

  - the closing has not occurred on or before August 31, 2005, so long as the failure to complete the proposed transaction is not the result of the failure of the terminating party to comply with the terms of the Purchase Agreement;

  - the Company's stockholders do not vote to approve the proposed transaction at the special meeting of the stockholders;

  - there is a breach by the non-terminating party of its representations, warranties, covenants or agreements in the Purchase Agreement such that the closing conditions would not be satisfied, which breach has not been cured within 20 days of notice being delivered by the terminating party; or

  - any governmental authority has issued or entered any order or injunction or other ruling or takes any other action which has the effect of making the consummation of the proposed transaction illegal or otherwise preventing or prohibiting completion of the proposed transaction;

- by the Investors, if

  - our board of directors withdraws, adversely modifies or fails to confirm its recommendation that the Company's stockholders vote to approve the proposed transaction;

  - our board of directors recommends or approves or determines to recommend that the stockholders approve another acquisition proposal;

  - a tender offer or exchange offer is commenced that would result in any person or group owning 20% or more of, or the voting power of, any class or series of the Company's equity securities and our board does not recommend within 10 days of that offer that the stockholders not tender their shares in the tender or exchange offer; or

  - since the date of the Purchase Agreement, there has been any event, development or change of circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Company and such material adverse effect is not cured within 20 days of the Company receiving written notice thereof from the Investors;

- by the Company, if the Company's board of directors has determined to accept a superior proposal in accordance with the terms of the Purchase Agreement, but only after the special meeting has been held and the proposed transaction is not approved by the Company's stockholders and the Company has provided the Investors at least a three business day period to

negotiate in good faith to agree to such adjustments to the Purchase Agreement such that the acquisition proposal no longer constitutes a superior proposal.

**Termination Fee and Expenses (Page 44)**

Under certain circumstances, in connection with the termination of the Purchase Agreement, the Company will be required to pay the Investors a termination fee of $6.5 million and reimburse the Investors for up to $2.0 million in expenses.

**Stockholders' Agreement (Page 46)**

Pursuant to the Purchase Agreement, the Company agreed to enter into a Stockholders' Agreement concurrently with the closing. The Stockholders' Agreement relates to, among other matters, the governance of the Company after the closing, including the Investors' representation on the Company's board of directors, a requirement that the Company obtain written consent from the Investors prior to engaging in certain actions and the Investors' ability to purchase or sell the securities of the Company.

**Management Services Agreement (Page 51)**

Concurrently with the execution of the Purchase Agreement, Pathmark and Yucaipa entered into a Management Services Agreement which will be effective only upon closing of the proposed transaction. Pursuant to the Management Services Agreement, Yucaipa will provide certain business and financial advice and management services to Pathmark. For such services, Pathmark will pay Yucaipa an annual fee of $3 million and reimburse Yucaipa for expenses of up to $500,000 per annum. In addition, at the closing, the Company will pay to Yucaipa a closing fee of $3 million and reimburse Yucaipa for up to $3.2 million of reasonable, documented out-of-pocket costs, expenses and fees incurred or paid.

**Registration Rights Agreement (Page 53)**

Pursuant to the Purchase Agreement, the Company agreed to enter into a Registration Rights Agreement concurrently with the closing. The Registration Rights Agreement provides the Investors with certain rights to cause Pathmark to register shares of common stock held at the closing or thereafter acquired by the Investors.

**Warrant Agreement (Page 55)**

Pursuant to the Purchase Agreement, the Company agreed to enter into a Warrant Agreement concurrently with the closing. The Warrant Agreement will govern the terms of the Series A and Series B warrants which we will issue to the Investors.

**Market Price of Pathmark Stock (Page 56)**

The common stock is traded on the Nasdaq National Market, which we refer to as "Nasdaq", under the trading symbol "PTMK". On March 22, 2005, which was the last trading day before we entered into the Purchase Agreement, the closing price of the common stock was $4.60 per share. On May 5, 2005, which was the last trading day before this proxy statement was finalized, the closing price of the common stock was $8.11 per share.

8

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION

This proxy statement, and the documents to which we refer you in this proxy statement, contain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. These statements appear in a number of places in this proxy statement and include statements regarding our intent, belief and current expectations with respect to, among other things, the expected completion and timing of the proposed transaction, the use of proceeds from the proposed transaction, competitive advantages and other information related to the transactions contemplated under the Purchase Agreement and the ancillary agreements. The words "anticipate", "believe", "expect", "forecast", "guidance", "intend", "may", "plan", "project", "will" and other similar expressions generally identify forward-looking statements. While these forward-looking statements and the related assumptions are made in good faith and reflect our current judgment regarding the proposed transaction and the other transactions contemplated under the Purchase Agreement and the ancillary agreements as well as the direction of our business, actual results will almost always vary, sometimes materially, from any estimates, predictions, projections, assumptions or other future performance suggested herein. These statements are based upon a number of assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which are beyond our control and reflect future business decisions which are subject to change. Some of these assumptions inevitably will not materialize, and unanticipated events will occur which will affect our results. Some important factors (but not necessarily all factors) that could negatively affect our revenues, growth strategies, future profitability and operating results, or that otherwise could cause actual results to differ materially from those expressed in or implied by any forward-looking statement, include the following:

- the risk that the proposed transaction is not completed;
- changes in business and economic conditions and other adverse conditions in our markets;
- unanticipated environmental damages;
- increased competition;
- increased labor and labor related (e.g., health and welfare and pension) costs and/or labor disruptions;
- reliance on third-party suppliers;
- our ability to successfully implement our marketing, renovation and expansion strategies; and
- natural disasters.

## CAUTIONARY STATEMENT CONCERNING REPRESENTATIONS AND WARRANTIES CONTAINED IN THE PURCHASE AGREEMENT OR IN THE ANCILLARY AGREEMENTS

You should not rely upon the representations and warranties in the Purchase Agreement or in any of the ancillary agreements or the descriptions of such representations and warranties in this proxy statement as statements of factual information about Pathmark, the Investors or Yucaipa. These representations and warranties were made only for purposes of the Purchase Agreement and the ancillary agreements, were made solely to us or to the other parties to the Purchase Agreement or the ancillary agreements as of the dates indicated therein and are subject to modification or qualification by other disclosures made by us in negotiating the terms of such agreements. The representations and warranties are reproduced and summarized in this proxy statement solely to provide information regarding the terms of such agreements and not to provide you with any other information regarding Pathmark, the Investors or Yucaipa. Information about Pathmark can be found elsewhere in this proxy statement and in other public filings we make with the SEC. Information about the Investors and Yucaipa can also be found elsewhere in this proxy statement.

9

## THE PARTIES TO THE PROPOSED TRANSACTION

Pathmark Stores, Inc.

Pathmark Stores, Inc. was incorporated in Delaware in 1987 and is the successor by merger to a business established in 1966. In October 1987, our predecessor companies were acquired in a leveraged buyout pursuant to which substantial indebtedness was incurred. While our core supermarket operations remained sound following this leveraged buyout, the additional indebtedness and associated interest expense ultimately led us and our then parent companies to file a prepackaged plan of reorganization in the U.S. Bankruptcy Court in Delaware on July 12, 2000. On September 7, 2000, the Court entered an order confirming our plan of reorganization, which became effective on September 19, 2000, at which time we formally exited Chapter 11. As part of the plan of reorganization, approximately $1 billion of our subordinated debt was cancelled, with the holders receiving 100% of our common stock. Our principal executive office is located at 200 Milik Street, Carteret, NJ 07008. Our telephone number is: (732) 499-3000.

We are a leading supermarket chain, operating as a single segment, in the densely populated New York—New Jersey and Philadelphia metropolitan areas, operating 142 stores. We pioneered the development of the large supermarket/drugstore format in the Northeast, opening our first store of this kind in 1977. Operating in the New York—New Jersey and Philadelphia metropolitan areas for over 38 years, we have successfully developed a leading supermarket franchise with strong brand name recognition and customer loyalty. We believe we are the largest supermarket chain operating under a single banner in our market area in terms of sales. We focus our operations on this market area, where we believe we can maintain and build upon our strong market presence and achieve additional operating economies. All of our stores are located within 100 miles of our corporate office in Carteret, New Jersey and of our company-operated and outsourced distribution facilities. Proximity of these distribution facilities to our stores assists us in in-stock conditions and distribution costs. Our market area includes some of the most densely populated regions of the United States, representing approximately 10% of the U.S. population and encompassing two of the five largest U.S. metropolitan areas by population, namely New York and Philadelphia. We believe that the high population density in our markets coupled with the geographic concentration of our stores provide substantial opportunities for economies of scale.

Yucaipa Corporate Initiatives Fund I, L.P.
Yucaipa American Alliance Fund I, L.P.
Yucaipa American Alliance (Parallel) Fund I, L.P.
The Yucaipa Companies LLC

Yucaipa Corporate Initiatives Fund I, L.P., Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. are Delaware limited partnerships formed in 2001, 2002 and 2005, respectively, for the purpose of making strategic investments in undervalued and underperforming companies. The Investors, through a strategic relationship with The Yucaipa Companies LLC, seek to work with management at the companies in which they invest to reposition businesses and implement operational improvements. The mailing address of the principal executive offices of each of the Investors is c/o The Yucaipa Companies LLC, 9130 W. Sunset Boulevard, Los Angeles, California 90069. The telephone number for each of the Investors is (310) 789-7200.

The Yucaipa Companies LLC, a Delaware limited liability company, was formed in 1986. Since its formation, Yucaipa and its affiliates have completed mergers, acquisitions and strategic investments valued at more than $30 billion. Yucaipa is actively involved in acquisitions, mergers and the management of large retail and distribution entities. Specific investments by Yucaipa in the supermarket sector have included Food4Less, Dominick's, Ralphs, Smith's Food and Drug, and Fred Meyer. The mailing address of the principal executive offices of Yucaipa is 9130 W. Sunset Boulevard, Los Angeles, California 90069. Yucaipa's telephone number is (310) 789-7200.

10

## THE SPECIAL MEETING

### Time, Place and Purpose of the Special Meeting

This proxy statement is being furnished to our stockholders as part of the solicitation of proxies by our board of directors for use at the special meeting to be held on June 9, 2005, starting at 2:00 p.m., Eastern Daylight Time, at Pathmark's corporate headquarters, 200 Milik Street, Carteret, New Jersey 07008. The purpose of the special meeting is for our stockholders to consider and vote upon a proposal to approve the proposed transaction. Our stockholders must approve this proposal for the proposed transaction to occur. If the stockholders fail to approve this proposal, the proposed transaction will not occur. This proxy statement and the enclosed form of proxy are first being mailed to our stockholders on or about May 9, 2005.

### Record Date and Voting

The holders of record of shares of common stock as of the close of business on May 6, 2005, the record date for the special meeting, are entitled to receive notice of, and to vote at, the special meeting. On the record date, there were 30,071,192 outstanding shares of common stock.

The holders of a majority of the outstanding shares of common stock on May 6, 2005, represented in person or by proxy, will constitute a quorum for purposes of the special meeting. A quorum is necessary to hold the special meeting. For purposes of determining the presence of a quorum, abstentions will be included in determining the number of shares present and voting at the meeting; however, broker non-votes will not be included in the number of shares present and voting at the meeting. Any shares of common stock held in treasury by Pathmark or by any of its subsidiaries are not considered to be outstanding for purposes of determining a quorum. Once a share is represented at the special meeting, it will be counted for the purpose of determining a quorum at the special meeting and any adjournment or postponement of the special meeting. However, if a new record date is set for the adjourned special meeting, then a new quorum will have to be established.

### Required Vote

Each outstanding share of common stock on May 6, 2005 entitles the holder to one vote at the special meeting. Completion of the proposed transaction requires the approval of the proposed transaction by the affirmative vote "FOR" the approval of the proposed transaction by a majority of the votes cast in person or by proxy at the special meeting. In order for your shares of common stock to be included in the vote, you must vote your shares by completing, signing, dating and returning the enclosed proxy or by voting in person at the special meeting.

As of May 6, 2005, the directors and executive officers of Pathmark owned, in the aggregate, 24,740 shares of common stock, or less than 1% of the outstanding shares of common stock. The directors and executive officers have informed Pathmark that they intend to vote all of their shares of common stock "FOR" the approval of the proposed transaction.

If your shares are held in "street name" by your broker, you should instruct your broker how to vote your shares using the instructions provided by your broker. If you have not received such voting instructions or require further information regarding such voting instructions, contact your broker and they can give you directions on how to vote your shares. Under the Nasdaq rules, brokers who hold shares of common stock in "street name" for customers without investment discretion over a customer's account pursuant to an advisory contract and who have not been designated in writing by the customer to vote proxies may not exercise their voting discretion in respect of the proposed transaction. Accordingly, absent specific instructions from the beneficial owner of such shares, brokers are not empowered to vote such shares at the special meeting. These non-voted shares are referred to as "broker non-votes". Because approval of the proposed transaction requires the affirmative vote "FOR" the approval of the proposed transaction by a majority of the votes cast in person or by proxy

11

at the special meeting, abstentions and broker non-votes will have no effect on the outcome of the vote on the proposed transaction.

**Proxies; Revocation**

If you vote your shares of common stock by properly completing, signing and dating a proxy, your shares will be voted at the special meeting as you indicate on your proxy card. If no instructions are indicated on your signed and dated proxy card, your shares of common stock will be voted "FOR" the approval of the proposed transaction at the special meeting.

You may revoke your proxy at any time before the vote is taken at the special meeting. To revoke your proxy, you must properly advise our Secretary in writing, deliver a proxy dated after the date of the proxy you wish to revoke or attend the special meeting and notify the secretary of the special meeting in writing prior to the vote of your proxy that you intend to vote your shares in person. Attendance at the special meeting will not by itself constitute revocation of a proxy.

If you have instructed your broker to vote your shares, the above-described options for revoking your proxy do not apply and instead you must follow the directions provided by your broker to change these instructions.

Pathmark does not expect that any matter other than the proposal to approve the proposed transaction will be brought before the special meeting. If, however, such a matter is properly presented at the special meeting or any adjournment or postponement of the special meeting, the persons appointed as proxies will have discretionary authority to vote the shares represented by duly executed proxies in accordance with their discretion and judgment.

Pathmark will pay the cost of this proxy solicitation. In addition to soliciting proxies by mail, directors, officers and employees of Pathmark may solicit proxies personally and by telephone, facsimile or other electronic means of communication. These persons will not receive additional or special compensation for such solicitation services. Pathmark will, upon request, reimburse brokers, banks and other nominees for their expenses in sending proxy materials to their customers who are beneficial owners and obtaining their voting instructions. Pathmark has retained Mellon Investor Services LLC to assist it in the solicitation of proxies for the special meeting and will pay Mellon Investor Services LLC a fee of approximately $7,500, plus reimbursement of out-of-pocket expenses.

**Adjournments and Postponements**

Although it is not expected, the special meeting may be adjourned or postponed for the purpose of soliciting additional proxies. Any adjournment or postponement may be made without notice, other than by an announcement made at the special meeting, by approval of the holders of a majority of the outstanding shares of common stock present in person or represented by proxy at the special meeting, whether or not a quorum exists. Any signed proxies received by Pathmark will be voted in favor of an adjournment or postponement in these circumstances. Any adjournment or postponement of the special meeting for the purpose of soliciting additional proxies will allow Pathmark stockholders who have already sent in their proxies to revoke them at any time prior to their use.

## THE PROPOSED TRANSACTION

The proposed transaction and the other transactions contemplated under the Purchase Agreement and the ancillary agreements are summarized below. A more complete description of each document is contained herein starting on page 35. This summary does not purport to be complete and is qualified in its entirety by reference to: (i) the Purchase Agreement, dated as of March 23, 2005, among the Investors, Yucaipa (as the Investors' representative) and Pathmark; (ii) the Form of Stockholders' Agreement among Pathmark and the Investors; (iii) the Management Services Agreement, dated as of March 23, 2005, by and between Yucaipa and Pathmark; (iv) the Form of Warrant Agreement among

Pathmark and the Investors; and (v) the Form of Registration Rights Agreement among Pathmark and the Investors.

## Description of the Proposed Transaction

Under the terms of the Purchase Agreement and subject to the approval of Pathmark's stockholders, Pathmark agreed to issue, for an aggregate purchase price of $150 million in cash:

- 20,000,000 shares of common stock;
- Series A warrants, the terms of which will be governed by a warrant agreement between Pathmark and the Investors, to purchase 10,060,000 shares of common stock at an exercise price of $8.50 per share (in cash); and
- Series B warrants, the terms of which will also be governed by the Warrant Agreement, to purchase 15,046,350 shares of common stock at an exercise price of $15.00 per share (cash or cashless).

The cashless exercise provisions of the Series B warrants will allow the Investors to receive a number of shares of common stock equal to the number of shares that the Investors otherwise would receive upon the exercise of the Series B warrants less that number of shares that have a fair market, as determined in accordance with the Warrant Agreement, equal to the aggregate exercise price.

Based upon the number of outstanding shares of common stock on the record date, and excluding any shares issuable upon the exercise of currently outstanding options or warrants, the initial issuance of the 20,000,000 shares of common stock to the Investors will represent approximately 40% of the outstanding shares of common stock and make Yucaipa and its affiliates the largest stockholder of the Company. Upon consummation of the proposed transaction, the shares of common stock and the Series A and Series B warrants will be sold to the Investors in a transaction exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof and Rule 506 of Regulation D thereunder, as the sale will constitute a private placement transaction with accredited investors.

In connection with the proposed transaction and concurrently with the execution of the Purchase Agreement, Pathmark and Yucaipa entered into a Management Services Agreement. The Management Services Agreement will become effective only upon the closing of the proposed transaction. Pursuant to the Management Services Agreement, Yucaipa will provide certain business and financial advice and management services to Pathmark in connection with the operation of its business. For such services, Pathmark will pay Yucaipa an annual fee of $3 million and reimburse Yucaipa for expenses of up to $500,000 per annum.

Pursuant to the Purchase Agreement, the Company agreed to enter into a Stockholders' Agreement, a Registration Rights Agreement and a Warrant Agreement concurrently with the closing of the proposed transaction. The Stockholders' Agreement relates to, among other matters, the governance of the Company after the closing, including the Investors' representation on the Company's board of directors, a requirement that the Company obtain written consent from the Investors prior to engaging in certain actions and the Investors ability to purchase or sell the securities of the Company. The Registration Rights Agreement provides the Investors with certain rights to cause Pathmark to register shares of common stock held at the closing or thereafter acquired by the Investors. The Warrant Agreement will govern the terms of the Series A and Series B warrants which we will issue to the Investors.

## Background of the Proposed Transaction

On May 12, 2004, the Company announced its preliminary first quarter results and revised downwards its earnings guidance for 2004. The first quarter results were negatively affected by sales and gross profit pressures caused by steep inflation in certain categories, unproductive sales promotions

and increases in medical costs. Following this announcement, the Company's share price fell approximately 19% to close at $6.91 on May 13. In light of these developments, at a meeting on May 20, the Company's board of directors determined that it should explore strategic alternatives for the Company.

The board of directors met on June 29 and received presentations from the Company's financial advisor, DrKW, and from the Company's outside counsel, Shearman & Sterling LLP. These presentations reviewed issues and opportunities associated with the Company remaining independent, with its making a significant acquisition or engaging in a merger and with its being sold. Following these presentations, the board of directors decided that, to assist the board of directors in weighing the Company's strategic alternatives, DrKW should be instructed to approach, on an unofficial basis, one national supermarket chain which had, in prior years, indicated its interest in possibly acquiring the Company.

At a meeting held on July 27, the board of directors reviewed a long-range plan prepared by the Company's management on the basis of the Company's remaining independent. The board of directors also received a report on DrKW's unofficial conversations with the previously identified national supermarket chain. In these conversations, the national supermarket chain indicated that, due to other demands on its management, it was not a good time for it to be pursuing a strategic transaction with the Company but that it would like to be notified should the Company decide to begin any formal process. Following this presentation, the board of directors directed that DrKW should approach the national supermarket chain on an official basis to determine if the chain would be interested in making a proposal to acquire the Company before any further steps were taken regarding the Company's possible sale.

On August 11, the board of directors held a meeting at which DrKW reported that the national supermarket chain had indicated that it was not prepared to make a proposal to acquire the Company at that time but that it would still like to be informed should the Company begin a more formal process that might lead to a strategic transaction. The board of directors determined that the Company should continue to explore potential next steps.

During the remainder of August into early September, DrKW and Company management worked to prepare a confidential information memorandum about the Company, which could be provided to parties interested in pursuing a possible strategic transaction with the Company.

On September 9, the Company announced its second quarter results, which included a loss of $1.6 million, and reduced its earnings guidance for 2004 for a second time. Following this announcement, the Company's share price fell by more than 18% to a 52-week low of $5.85.

During the second half of September, DrKW contacted more than 20 potential strategic and private equity purchasers to ask if they would be interested in signing a confidentiality agreement and receiving a confidential information memorandum regarding the Company. Yucaipa was not among those initially approached. Those parties who signed confidentiality agreements (all of whom were private equity investors) were invited to submit by November 11 preliminary, non-binding indications of interest to acquire the Company.

On October 25, the Company announced that, due to lower than expected sales in the third quarter, it was reducing its earnings guidance for 2004 for a third time. Following this announcement, the Company's share price fell to a new 52-week low of $3.20.

In November, four written indications of interest and one oral indication of interest were received. The written indications of interest included one from Yucaipa which suggested that it would be prepared to invest $150 million for 49% of the common stock of the Company (or approximately 30 million shares at a price of approximately $5.00 per share). Yucaipa's indication of interest also contemplated that, through a management contract, Yucaipa would be responsible for the day-to-day operations of the Company and report to the Company's board of directors and that Yucaipa would

14

receive a warrant for the upside above $15 per share. Yucaipa submitted an indication of interest, although it had not signed a confidentiality agreement and therefore had not received the confidential information memorandum.

The board of directors met on November 15 and was briefed by DrKW on the four written indications of interest and on one oral indication of interest that had been received. The board of directors instructed DrKW and Company management to contact all five groups that had expressed interest and to schedule management presentations for each group. Of the five groups, four scheduled presentations by Company management, but Yucaipa indicated that it was not prepared to move forward unless either it was granted exclusivity or it was reimbursed for up to $1 million in expenses. During the latter part of November and thereafter, DrKW also received unsolicited inquiries from a number of other parties expressing an interest in possibly acquiring the Company.

Management presentations were given to the four remaining participants during the latter part of November and the first part of December. At the same time, the four participants were told that their final, definitive proposals should be submitted by December 20. During this period, the four participants were also granted access to an electronic data room containing additional confidential information regarding the Company and were supplied with a draft acquisition agreement prepared by the Company's outside counsel, Shearman & Sterling LLP.

On December 2, the Company announced its third quarter results and announced that it had retained DrKW to aid in reviewing strategic alternatives, which could result in a decision to sell itself.

On December 20, three of the four remaining participants submitted letters indicating varying degrees of interest in moving forward, but none submitted a definitive proposal. On December 21, a new consortium that included competitors of the Company sent a letter indicating its interest in a possible transaction. The board of directors met on December 23 to review the indications of interest with management, DrKW and Shearman & Sterling LLP. Of the four indications of interest, one, from a private equity group, which we refer to as "Bidder No. 1", had indicated a price level of $6.00 per share for an acquisition of the Company but required exclusivity through January 31, 2005 to conduct due diligence, negotiate definitive documentation and arrange for financing. Two indicated continuing interest but did not state a price and indicated that they needed more time. One of these was a second private equity group, which we refer to as "Bidder No. 2", that had been among the four groups that had submitted written indications of interest in mid-November. The fourth, on the part of the new group, which we refer to as "Bidder No. 3", was based solely on publicly available information and indicated a price in the range of $5.00-$6.00 per share for an acquisition of the Company. In lieu of an exclusivity agreement, the board of directors authorized management to attempt to negotiate an expense reimbursement agreement of up to $1 million with Bidder No. 1. The board of directors also directed that efforts be made to continue discussions with two of the three other interested parties, including Bidder No. 2, but that discussions not be continued with Bidder No. 3 because its consortium included competitors of the Company.

On December 28, 2004, the Company entered into an expense reimbursement agreement, capped at $500,000, with Bidder No. 1. On January 1, 2005, Bidder No. 1's counsel sent to Shearman & Sterling LLP a mark-up reflecting their comments on the draft acquisition agreement previously prepared by Shearman & Sterling LLP. In addition, Bidder No. 1's counsel and other advisors began intensive due diligence on the Company.

On January 5, 2005, a quasi-strategic purchaser, which we refer to as "Bidder No. 4", submitted an indication of interest at $7.50 per share for an acquisition of the Company, subject, among other things, to Bidder No. 4 due diligence review, its receipt of financing and the negotiation of a definitive acquisition agreement.

The Company's board of directors met on January 7 and reviewed with DrKW the status of the negotiations with Bidder No. 1 and the indication of interest from Bidder No. 4. In light of the

15

progress made with Bidder No. 1 and to keep them involved in the process, the board of directors authorized the Company to increase the amount of Bidder No. 1's expense reimbursement to $1 million. In light of Bidder No. 4's indication of interest and statements made by Bidder No. 4 to DrKW to the effect that Bidder No. 4 was prepared to operate a supermarket business, the board of directors also directed that the Company enter into a confidentiality agreement with Bidder No. 4 and allow Bidder No. 4 to conduct due diligence on the Company. Following this meeting, the Company amended Bidder No. 1's expense reimbursement agreement to increase the maximum amount the Company would reimburse to $1 million. In addition, the Company entered into confidentiality agreements with Bidder No. 4 and with Yucaipa, which had continued to express its interest in pursuing an investment in the Company. Bidder No. 4 then commenced its due diligence, and Bidder No. 1 continued with its due diligence and the negotiation of an acquisition agreement. Yucaipa also commenced its due diligence and attended a presentation by Company management on January 14.

The Company's board of directors met on January 17, 2005 to again review progress. DrKW informed the board of directors that Bidder No. 1 had indicated that, contrary to their originally expressed plan of keeping the Company's business largely intact, they could confirm their $6.00 per share price only on the basis of selling Company stores following an acquisition. As a result, Bidder No. 1 had requested permission to speak with certain competitors of the Company about purchasing Company stores following an acquisition of the Company by Bidder No. 1. Contrary to its earlier statements about operating a supermarkets business, Bidder No. 4 had also requested permission to speak with certain Company competitors about purchasing Company stores following an acquisition by Bidder No. 4. Due to competitive concerns, the board of directors determined to allow Bidder No. 1 and Bidder No. 4 to speak to only specific possible purchasers and to share with them only limited information. Thereafter, negotiations continued with both Bidder No. 1 and Bidder No. 4, and Bidder No. 4 continued to conduct intensive diligence on the Company.

On January 18, the Company received an indication of interest from a new consortium, which we refer to as "Bidder No. 5", that had not entered into a confidentiality agreement and which therefore had not received confidential information from the Company. On January 20, the Company received a letter from Yucaipa, together with a proposed term sheet and a form of exclusivity agreement. The term sheet proposed an investment of $150 million by Yucaipa in return for newly issued shares of common stock representing 49% of the Company's common stock immediately following such issuance and warrants for an additional 20% of the Company's common stock (calculated on a fully diluted basis) and with an exercise price of $15.00 per share. The term sheet contemplated a management agreement and a registration rights agreement and also contemplated that Yucaipa would have the right to purchase 19.9% of the Company's common stock upon execution of a definitive acquisition agreement.

On January 24, the Company received a mark-up from Bidder No. 4's counsel reflecting Bidder No. 4's comments on the draft acquisition agreement prepared by Shearman & Sterling LLP, after which negotiations began with Bidder No. 4 and its counsel on the terms of the acquisition agreement.

The Company's board of directors met on January 28 and received a report from DrKW regarding the status of discussions with the various interested parties. They reported that Bidder No. 1 had asked to increase the amount of its expense reimbursement from $1.0 million to $1.5 million. In addition, Bidder No. 1 had asked to speak with Bidder No. 4 and with a competitor of the Company. The board of directors determined not to increase the amount of the expense reimbursement and not to allow Bidder No. 1 to speak with Bidder No. 4 or the Company competitor. DrKW also reported that Bidder No. 2 was meeting with industry consultants and that Bidder No. 5 was in the process of negotiating a confidentiality agreement. It was also reported that Bidder No. 4 had reconfirmed its indication of interest of $7.50 per share and that it did not plan on entering into any agreements to sell Company stores before it had acquired the Company so that there should be no closing risk for the Company as a result of Bidder No. 4's resale efforts.

16

On February 3, Yucaipa sent a letter to the Company advocating Yucaipa's prior proposal and requesting the opportunity to make a presentation to the Company's board of directors. Also on February 3, Bidder No. 1 informed DrKW that it was terminating its consideration of a possible acquisition of the Company.

On February 8, Ron Burkle and other representatives of Yucaipa met with members of the Company's board of directors. At the meeting, the Yucaipa representatives made a presentation in support of Yucaipa's prior proposal and suggested that it represented a value of $12.00 per Company share on a present value basis (based on Company-provided projections and assuming that Yucaipa would be involved in the management of the Company). Mr. Burkle also indicated that Yucaipa would be flexible in negotiating the final terms of any transaction with the Company.

During the month of February, Bidder No. 4 continued to conduct due diligence on the Company, and Bidder No. 4 and the Company continued to negotiate the terms of an acquisition agreement. Bidder No. 4 also continued to press for permission to share confidential information with potential purchasers who were also competitors of the Company, which the Company resisted pending greater progress with the negotiation of the acquisition agreement with Bidder No. 4. On February 16, senior management of the Company and representatives of DrKW spoke by telephone with Ron Burkle and other representatives of Yucaipa to review Yucaipa's preliminary draft business plan for the Company.

The Company's board of directors met on February 18. The board of directors reviewed the status of discussions with Yucaipa and instructed DrKW to tell Yucaipa that, among other things, its per share purchase price needed to be higher and that the Company would require corporate governance protections for its public stockholders, as well as a standstill agreement on the part of Yucaipa. The board of directors also determined, on the basis of an indication of interest letter and a mark-up of the draft acquisition agreement, that Bidder No. 5 should be allowed to continue to participate in the process. The board of directors also determined that Bidder No. 2, which had only recently orally indicated a price level of $6.00 per share (although it had first submitted an indication of interest in November 2004), should not be offered the $500,000 expense reimbursement it had requested in order to proceed with its due diligence.

Following this meeting, DrKW contacted Yucaipa to convey the messages directed by the Company's board of directors. On February 21, Yucaipa sent a letter to the board of directors offering to increase its purchase price by 20% to $6.00 per share but also suggesting that the exercise price for the warrants should be reduced to $12.00 per share from $15.00 per share. Yucaipa stated that it recognized "the need for certain shareholder protections" and that it was willing to negotiate a standstill agreement and to agree not to sell its Company shares for 90 days following the closing of a transaction. In its letter, Yucaipa also requested exclusivity if it were to move forward or, "at a minimum", reimbursement of its expenses and again contemplated that Yucaipa would have the right to acquire 19.9% of the Company's common stock upon execution of a definitive purchase agreement.

The Company's board of directors met on February 24 to review the status of the discussions that had been continuing with each of Yucaipa, Bidder No. 4, Bidder No. 2 and Bidder No. 5. Bidder No. 5 was proceeding with its due diligence. Bidder No. 2 had orally indicated a willingness to increase its indication of interest from $6.00 per share to an unspecified amount but also indicated that it would need another four weeks before it would be in a position to sign a definitive agreement. The board of directors received a report on the status of the negotiations with Bidder No. 4. A number of significant issues remained unresolved, including Bidder No. 4's willingness to accept antitrust risk, the size of the break-up fee, the structure of the acquisition and the status and terms of Bidder No. 4's financing arrangements. Bidder No. 4 also continued to indicate that it needed to share confidential information with potential third party purchasers and would require four weeks from the time it was given permission to do so until it would be able to sign a definitive acquisition agreement. The board of directors also received an update on DrKW's discussions with Yucaipa. Yucaipa had indicated a willingness to further increase the price it would pay per share but would require an offsetting reduction in the exercise price of its warrants. Yucaipa was also signaling an unwillingness to proceed without some comfort that the board of directors was willing to pursue a transaction with Yucaipa. The

17

board of directors instructed DrKW to continue to engage with Yucaipa in an effort to increase its price. However, the board of directors also determined that it was not, at that time, prepared to offer exclusivity or expense reimbursement to Yucaipa.

Thereafter, negotiations continued with Bidder No. 4 on the terms of an acquisition agreement. On February 28, an article appeared in a New York newspaper reporting that the Company was in talks with Bidder No. 4. This article provoked significant negative comment among Company employees, including those at the store level, who expressed concern that Bidder No. 4 would be reselling the stores. As a result, the board of directors became concerned that the Company's business could be adversely affected by employee departures following the announcement of a transaction with Bidder No. 4 but before such transaction could close.

On March 1, Ron Burkle of Yucaipa sent a letter to the Company's board of directors expressing dissatisfaction with the pace of negotiations. Mr. Burkle's letter also indicated that Yucaipa would be prepared to increase its per share price but first wanted assurances about the process for moving forward.

The Company's board of directors met on March 4 to again review the status of the discussions with each of the interested parties. DrKW reported that Bidder No. 5 had still to provide information regarding its financing. They also reported that Bidder No. 2 had restarted its due diligence efforts and was aiming to submit a mark-up of the draft acquisition agreement prepared by Shearman & Sterling LLP by early in the following week and to confirm a price above $6.00 per share. However, Bidder No. 2 had also said that it would not be in a position to sign a definitive agreement for another three to four weeks and had not yet provided evidence of its financing. The board of directors received a report on the status of the negotiations with Bidder No. 4 and directed that Bidder No. 4 be allowed to share confidential store-by-store information with potential third party purchasers only if it was prepared to accept the Company's position on the allocation of antitrust risk. The board of directors also received an update on DrKW's discussions with Yucaipa and directed that a counterproposal be made to Yucaipa calling for a per share purchase price of $7.75 and warrants with an exercise price of $15.50 per share and emphasizing that other economic terms and appropriate governance provisions and stockholder protections would need to be extensively discussed.

On March 5, DrKW conveyed the board of directors' counterproposal to Yucaipa. Yucaipa responded that it would require a two-week exclusivity period before it would be able to sign a definitive agreement. Yucaipa also stated that it would not provide a response to the board of directors' counter-proposal, unless the board of directors first indicated that it would be willing to grant exclusivity if the response was otherwise acceptable.

On March 7, Bidder No. 4 confirmed that it was prepared to accept the Company's position on the allocation of antitrust risk. As a result, Bidder No. 4 was given permission to share certain confidential store-by-store information with specified potential third party purchasers.

The Company's board of directors met on March 8 and received a report on DrKW's conversations with Yucaipa. In these conversations, Yucaipa had indicated that it would be prepared to invest $150 million in return for (i) 20 million shares of Common Stock, (ii) warrants, with an exercise price of $8.50 per share, to purchase a further 9.9% of the Common Stock, and (iii) warrants, with an exercise price of $15.00 per share, to purchase a further 10% of the Common Stock. Excluding the warrants, this represented a purchase price of $7.50 per share. The board of directors determined to grant a two-week exclusivity agreement to Yucaipa, in light of (i) the fact that Bidder No. 4 and Bidder No. 2 had both indicated that they were several weeks away from being ready to sign a definitive acquisition agreement, (ii) the price-level signaled by Yucaipa (which represented a significant increase from its initial indication of interest) and the fact that Yucaipa was refusing to move forward without exclusivity, (iii) the execution risks associated with the other possible transactions, including the risk that employee departures in reaction to a possible break-up of the business would make it difficult to maintain the Company's business intact until closing, (iv) the absence of evidence of financing for Bidder No. 2 and a number of unresolved questions regarding the financing for Bidder No. 4, and (v) the relatively limited due diligence conducted by Bidder No. 2.

18

On March 9, representatives of the Company negotiated the terms of an exclusivity agreement with representatives of Yucaipa. Also on March 9, Bidder No. 2 submitted a new indication of interest to acquire the Company at $8.00 per share. However, this indication of interest was not accompanied by evidence of financing and was subject to the satisfactory completion of due diligence. The Company's board of directors met that evening and determined to go forward with granting exclusivity to Yucaipa. Later that night, the Company entered into a two-week exclusivity agreement with Yucaipa.

Beginning on March 10, Yucaipa and its representatives began intensive due diligence on the Company with numerous meetings and telephone calls with members of the Company's management. In addition, Shearman & Sterling LLP and Latham & Watkins LLP, counsel to Yucaipa, began exchanging drafts of the various transaction agreements.

During the week of March 14, Yucaipa and its representatives continued their due diligence on the Company. In addition, Yucaipa and its representatives began negotiations of the various transaction agreements with the Company and its representatives. On March 15, Bidder No. 2 sent a letter to the Company reiterating its interest in the Company and on March 18, it delivered to the Company a commitment letter from its lead source of financing. The Company's board of directors met on March 18 to receive an update on the status of the negotiations with Yucaipa. Shearman & Sterling LLP and the members of the Company's senior management who had participated in the negotiations outlined the structure of the proposed transaction and the key terms of, and issues under, each of the transaction agreements. The members of the board of directors expressed their views that, of the issues still under discussion with Yucaipa, the most important one for the Company's negotiators to focus on was to seek to maximize the powers of the Company's independent directors so that they would be better able to protect the interests of the Company's public stockholders following the closing of the contemplated transaction.

Following the board of directors meeting, the Company and its representatives continued to meet with Yucaipa and its representatives through the weekend to negotiate the final terms of the transaction agreements. These meetings continued into the early part of the week of March 21. There were extensive discussions of the so-called "force the vote" provision which was insisted upon by Yucaipa as a condition to its being prepared to enter into the transaction. (This provision in the Purchase Agreement requires the Company to hold a stockholders' meeting to vote on the transaction even if the Company's board of directors withdraws its recommendation in favor of the transaction.) There also were extensive discussions of the extent of the veto powers the Company's independent directors would have following a Yucaipa investment. In return for expanding these powers, the Company's negotiators agreed to accept the force the vote provision requested by Yucaipa.

On March 21, Bidder No. 4 sent a letter to the Company stating that it was prepared to discuss a revised draft of the acquisition agreement which had been sent to the Company by Bidder No. 4's counsel on March 18 and that Bidder No. 4 expected to be able to sign the agreement after several days of discussions. Bidder No. 4 also confirmed its prior per share purchase price of $7.50 and stated that Bidder No. 4 had the necessary financing, although no evidence of the financing was provided with the letter. On March 22, Bidder No. 2 sent a letter to the Company repeating its prior indication of interest and expressing its dismay that the Company had not been responding during the Yucaipa exclusivity period. In its letter, Bidder No. 2 also formally extended its earlier proposal until 11:00 a.m. on March 24.

By the morning of March 23, the Yucaipa and Company negotiators had largely completed their work on the transaction agreements. In the afternoon, the Company's board of directors met to review the transaction and consider the various transaction agreements. Following a presentation by Shearman & Sterling LLP on the terms of the various transaction agreements (near final drafts of which had been sent to each of the board of directors members earlier in the week) and a presentation by DrKW on the financial aspects of the transaction, including a discussion of DrKW's fairness opinion, the board of directors voted unanimously in favor of the proposed transaction and to recommend it to the Company's stockholders. Later that night, representatives of the Company and Yucaipa signed the various transaction agreements.

On March 25, Bidder No. 2 sent a letter to the Company, expressing Bidder No. 2's disappointment at learning that the Company had entered into the Purchase Agreement with Yucaipa. The letter stated that Bidder No. 2 was prepared to offer $8.00 in cash per share to the Company's stockholders but did not constitute a formal proposal.

On April 1, after the Purchase Agreement and the ancillary agreements had become publicly available, Bidder No. 2 sent to the Company another letter proposing two alternative transactions. The first structure, "Option A", was, in some respects, similar to the structure of the proposed transaction. Option A contemplated that the Company would issue to a newly formed affiliate of Bidder No. 2 (i) 20,000,000 newly issued shares of common stock at $7.50 per share and Series A warrants to purchase 11,300,000 shares of common stock at an exercise price of $8.50 per share. Under Option A, the Company would be able to require Bidder No. 2 to exercise the Series A warrants concurrently with the closing of the sale of the shares of common stock, with the Company to use the proceeds from the warrant exercise to commence a tender offer for up to 11,340,674 shares of common stock at $7.72 per share and to pay the $6.5 million termination fee to Yucaipa and to reimburse up to $2 million of Yucaipa's expenses as contemplated by the Purchase Agreement. Option A did not contemplate, in contrast to the proposed transaction, the issuance of the Series B warrants to purchase 15,046,350 shares of common stock at an exercise price of $15.00 per share. The second proposed structure, "Option B", contemplated that a newly formed affiliate of Bidder No. 2 would acquire 100% of the outstanding common stock from the Company's stockholders for $8.00 per share in cash less the termination fee and expenses payable to Yucaipa, which were expected to be $0.28 per share, resulting in a net purchase price of $7.72 per share. Bidder No. 2's letter was accompanied by a letter from Bidder No. 2's lead source of debt financing confirming, in the context of Bidder No. 2's new proposals, the commitment letter previously delivered to the Company on March 18.

On April 4, Yucaipa sent a letter to the Company stating that Yucaipa did not believe that either Option A or Option B described in Bidder No. 2's April 1 letter was more favorable to the Company than the proposed transaction. The letter further stated that Yucaipa did not believe that either Option A or Option B was reasonably capable of being consummated and that the board of directors would not be in breach of its fiduciary duties if it failed to provide information to, or enter into discussions with, Bidder No. 2. The letter included a detailed analysis to support Yucaipa's conclusions.

The Company's board of directors met on April 7 for a regularly scheduled board meeting. At the meeting, Shearman & Sterling LLP, DrKW and members of the Company's senior management reviewed Bidder No. 2's proposals with the board of directors. After extensive discussion, the Company's board of directors determined that Option B would reasonably be expected to result in a superior proposal, as such term is defined in the Purchase Agreement, and that the Company should participate in discussions with, and furnish information to, Bidder No. 2 in respect of Option B. After the delivery of notice of such determination to Yucaipa, Bidder No. 2 and its advisors were informed of the board of directors' determination and were granted access to an electronic data room containing confidential information regarding the Company.

On April 8, Yucaipa sent a letter to the Company indicating that Yucaipa was extremely concerned about the actions taken by the Company and objecting to the Company's decision to proceed with discussions with Bidder No. 2. The letter further alleged that the Company would be in breach of the Purchase Agreement if it proceeded with such discussions. Also on April 8, Bidder No. 2 informed the Company that a majority of the equity financing for Bidder No. 2's proposed transaction would be provided by a pension plan that was also an investor in Bidder No. 2's investment fund, or the "co-investor". From April 11 until May 4, Bidder No. 2 conducted due diligence on the Company, which included numerous conference calls and meetings between the Company and Bidder No. 2 and their respective advisors. On April 12, the Company sent a letter responding to Yucaipa's letter dated April 8, in which the Company confirmed its intention to comply with its obligations under the Purchase Agreement and denied that the Company was in breach of the Purchase Agreement. On April 15, the Company received letters from Bidder No. 2 and the co-investor confirming their respective proposed equity commitments. On April 22, Bidder No. 2 delivered to the Company a draft

20

merger agreement. The Company, Shearman & Sterling LLP and DrKW met with Bidder No. 2 and its outside counsel on April 28 to discuss the draft merger agreement.

On April 29, a representative of Yucaipa sent a letter to a representative of the Company, emphasizing his concern that the Company was still engaging in discussions with Bidder No. 2.

On May 2, after waiting for Bidder No. 2 to make more progress on its due diligence, Shearman & Sterling LLP sent to Bidder No. 2's outside counsel comments on the draft merger agreement received from Bidder No. 2 on April 22. Also on May 2, the SEC confirmed that it would not be reviewing the Company's preliminary proxy statement for the proposed transaction. Shearman & Sterling LLP then spoke with Latham & Watkins LLP, counsel to Yucaipa, to request that the Company be allowed additional time to set a record date for the special meeting and to finalize the proxy statement in order to allow time for the ongoing discussions with Bidder No. 2 to be brought to a definitive conclusion.

On May 3, a representative of Yucaipa telephoned DrKW and stated that it had engaged litigation counsel and unless the Company terminated its discussions with Bidder No. 2 by 5:00 p.m. the next day, Yucaipa would instruct its litigation counsel to pursue all rights and remedies available to Yucaipa. Also on May 3 and soon after the telephone call to DrKW, the General Counsel of Yucaipa sent a letter to the General Counsel of the Company. In this letter, Yucaipa repeated the allegations made earlier by telephone that the Company's continuing discussions with Bidder No. 2 represented a breach of the Company's obligations under the Purchase Agreement and reiterated that Yucaipa had retained special litigation counsel to aggressively pursue all of Yucaipa's rights and remedies. In addition, Yucaipa requested that a record date for the meeting of the Company's stockholders to vote on the proposed transaction be set immediately and that the related proxy materials be mailed by Friday, May 6. Yucaipa also requested that the board of directors reconfirm its recommendation of the proposed transaction within three business days and noted that a failure to do so would give Yucaipa a right to terminate the Purchase Agreement.

Also on May 3, Bidder No. 2 sent a letter to the Company indicating that Bidder No. 2 would need until May 11 or May 13 to complete its due diligence.

The Company's board of directors met on May 4 to receive an update from the Company's advisors regarding the status of the discussions with Bidder No. 2 and its due diligence as well as the recent communications from Yucaipa. After Shearman & Sterling LLP and DrKW reviewed these matters with the board of directors, and after extensive discussion among the directors, the board of directors determined that Bidder No. 2's proposed Option B no longer would reasonably be expected to result in a superior proposal, as such term is defined in the Purchase Agreement. Among the factors considered by the board of directors in reaching this decision were the fact that the shares of the Company's common stock were and, in recent weeks, had been trading at prices in excess of the price proposed by Bidder No. 2, the fact that Bidder No. 2 had been a participant in the process that had led to the proposed transaction with Yucaipa since early November of 2004 and the fact that it would be possible to complete the proposed transaction with Yucaipa as early as the middle of June, while any transaction with Bidder No. 2 would require several months to complete. In addition, the board of directors determined to reconfirm its recommendation of the proposed transaction to the Company's stockholders. Following the meeting, Bidder No. 2 was informed of the decision of the board of directors, and, in accordance with the terms of the Purchase Agreement, further discussions with Bidder No. 2 were terminated.

On May 5, Bidder No. 2 sent a letter to the Company confirming Bidder No. 2's Option A proposal (as described in Bidder No. 2's letter dated April 1) and setting forth a new proposal, the "New Proposal", pursuant to which Bidder No. 2 would increase the net consideration to be paid to the Company's stockholders in cash under Option B (as described in Bidder No. 2's letter dated April 1) from $7.72 per share to $8.25 per share. The New Proposal was contingent upon the Company permitting Bidder No. 2 to complete its remaining confirmatory due diligence, which the letter stated Bidder No. 2 expected to complete on the timetable described in its letter dated May 3.

The Company's board of directors met on May 6 to consider the New Proposal described in Bidder No. 2's letter dated May 3. The board of directors determined that the New Proposal would not

21