# EXHIBIT A
# Part 2 of 8

reasonably be expected to result in a superior proposal, as such term is defined in the Purchase Agreement, because the New Proposal: (i) was not accompanied by evidence of debt or equity financing; (ii) remained subject to the completion of Bidder No. 2's confirmatory due diligence; and (iii) was unlikely to be able to be completed for several months, while the proposed transaction with Yucaipa could, subject to the approval of the Company's stockholders, likely be completed by the middle of June. In making its determination, the board of directors also considered the recent trading prices of the shares of common stock. In addition, the board of directors reaffirmed its recommendation that the Company's stockholders vote in favor of the proposed transaction. As a result of the board of directors' determination, under the terms of the Purchase Agreement, the Company is not permitted to participate in discussions with Bidder No. 2 regarding the New Proposal.

**Reasons for the Proposed Transaction**

After careful consideration, the Company's board of directors has unanimously approved the Purchase Agreement and the ancillary agreements and determined to recommend the proposed transaction to its stockholders. In the course of reaching its decision to approve the proposed transaction, the Company's board of directors consulted with senior management and the Company's financial and legal advisors and considered a number of factors, including the following:

- the Company's business, operations, financial condition, strategy and prospects, as well as the risks involved in achieving those prospects, the nature of the supermarket industry, and general industry, economic and market conditions, both on an historical and on a prospective basis;

- the potential value that might result from other alternatives available to the Company, including the alternative of a business combination transaction, as well as the risks and uncertainties associated with those alternatives, including, in particular, the risk that employee attrition could jeopardize a successful closing;

- the extensive efforts made by the Company and its advisors over a period of many months to solicit interest on the part of potential acquirors of the Company, with the result that DrKW spoke to approximately 50 potentially interested parties;

- the publicity these efforts received—especially after the Company announced on December 2, 2004 that it was reviewing its strategic alternatives;

- the efforts made by the Company and its advisors to negotiate definitive transaction agreements with other parties for a business combination transaction in which all outstanding shares of common stock would have been acquired for cash;

- the financial and other terms and conditions of the Purchase Agreement and other ancillary agreements, as reviewed by our board of directors with our financial and legal advisors and the fact that they were the product of arm's-length negotiations between the parties;

- the fact that the consideration is all cash, so that the Company will be able to reduce its leverage and immediately use the invested funds in furtherance of the Company's capital expenditure plans (which could be augmented and accelerated as a result of the investment so that the pace of store renovations could be increased) with the goal of improving the Company's operating performance;

- the expectation that the market price of the Company's shares would increase significantly following announcement of the proposed transaction and allow existing stockholders to sell their shares at a premium to the then current market price;

- the fact that, notwithstanding the potential dilution caused by the exercise of the Series A and Series B warrants, a substantial portion of the Investors' upside was represented by the Series A warrants and the Series B warrants with exercise prices of $8.50 per share of common stock and $15.00 per share of common stock, respectively, thus giving the Investors an incentive to work to increase the Company's value, which would help align their interests with those of the remaining stockholders;

22

- the fact that the Company's stockholders would have the ability to share in any upside that might result from any future improved performance on the part of the Company;

- the generally successful record of Yucaipa's investment performance;

- the corporate governance and other protections provided for the Company's stockholders (other than the Investors) in the Stockholders' Agreement;

- the current and historical market prices of the common stock, including the market price of the common stock relative to those of other industry participants and general market indices, and the fact that the aggregate consideration of $7.50 per share (which includes fractional interests in both Series A and Series B warrants) represents a premium of approximately 60% to the closing price of the common stock (which does not include fractional interests in both Series A and Series B warrants) on March 22, 2005, the last trading day before the Company entered into the Purchase Agreement;

- the financial presentation of DrKW, including its opinion to the effect that, as of that date and based upon and subject to the assumptions and limitations stated in that opinion, the aggregate consideration of $150 million in cash to be received by the Company in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction is fair, from a financial point of view, to the Company (the full text of the written opinion, setting forth the assumptions made, matters considered and limitations in connection with the opinion, is attached as Annex A to this proxy statement; stockholders are urged to read the opinion in its entirety);

- the fact that the board of directors would be able to consider other proposals from third parties and would be able to provide information about the Company to such third parties and negotiate with such third parties, in each case subject to certain limitations;

- the fact that the Company could accept a superior proposal in accordance with the terms of the Purchase Agreement, but only after the special meeting has been held and the proposed transaction is not approved by the Company's stockholders and the Company has provided the Investors at least a three business day period to negotiate in good faith to agree to such adjustments to the Purchase Agreement so that the acquisition proposal no longer constitutes a superior proposal and upon the payment to the Investors of a $6.5 million termination fee and up to $2.0 million in expenses; and

- the risks and costs to the Company if the proposed transaction does not close, including the diversion of management and employee attention.

The foregoing discussion summarizes the material factors considered by our board of directors in its consideration of the proposed transaction, including factors that support the proposed transaction as well as those that may weigh against it. In view of the wide variety of factors considered by our board of directors, our board of directors did not find it practicable to quantify or otherwise assign relative weights to the foregoing factors. Our board of directors approved and recommends the proposed transaction based upon the totality of the information presented to and considered by it.

**Recommendation of the Company's Board of Directors**

After careful consideration, the Company's board of directors, by unanimous vote:

- has determined that the proposed transaction contemplated by the Purchase Agreement is in the best interests of the Company and its stockholders; and

- recommends that Pathmark's stockholders vote "FOR" the approval of the proposed transaction.

23

**Financial Advisor's Opinion**

Our board of directors retained DrKW as its exclusive financial advisor to render an opinion as to the fairness, from a financial point of view, to Pathmark of the $150.0 million cash consideration to be received by Pathmark, which we refer to as the "Purchase Price", in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction. At the March 23, 2005 meeting of our board of directors, DrKW delivered its oral opinion, which it later confirmed in a written opinion, dated March 23, 2005, to the effect that, based upon and subject to the various assumptions and limitations set forth therein, as of the date of such opinion, the Purchase Price to be received by Pathmark in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction is fair, from a financial point of view, to Pathmark.

The full text of DrKW's written opinion, dated March 23, 2005, which sets forth, among other things, the assumptions made, matters considered and limits on the review undertaken by DrKW in connection with the opinion, is attached as Annex A to this proxy statement and is incorporated herein by reference. You are urged to read the DrKW opinion in its entirety. The summary of the DrKW opinion set forth in this proxy statement is qualified in its entirety by reference to the full text of the DrKW opinion.

In connection with DrKW's role as financial advisor to Pathmark, and in arriving at its opinion, DrKW, among other things:

- reviewed drafts (dated March 22, 2005) of the Purchase Agreement, the Investor Warrant Agreement, the Management Agreement, the Registration Rights Agreement and the Stockholders' Agreement and assumed that the final forms of these documents would not differ in any material respect from the drafts provided to it;

- reviewed and analyzed certain publicly available business and financial information relating to Pathmark for recent years and interim periods to the date of its opinion;

- reviewed certain internal financial and operating information, including financial forecasts, analyses and projections prepared by or on behalf of Pathmark and the Investors and provided to DrKW for purposes of its analyses; and

- met with members of management of Pathmark to review and discuss the foregoing information and, among other matters, Pathmark's business, operations, assets, financial condition and future prospects, including alternatives available to Pathmark in the absence of the proposed transaction.

In addition, DrKW reviewed and considered:

- certain financial and stock market data relating to Pathmark, and compared that data with similar data for certain other companies, the securities of which are publicly traded, that DrKW believed may be relevant or comparable in certain respects to Pathmark; and

- the financial terms of certain recent minority investments, acquisitions and business combination transactions in the supermarket industry specifically, and in other industries generally, that DrKW believed may be reasonably comparable to the proposed transaction or otherwise relevant to its inquiry.

DrKW also performed such other financial studies, analyses and investigations and reviewed such other information as it considered appropriate for purposes of its opinion. In addition, over the six months preceding the date of its opinion, DrKW had been in contact with more than 50 parties to determine and solicit interest in acquiring all or a substantial part of Pathmark.

24

In its review and analyses and in formulating its opinion, DrKW assumed and relied upon the accuracy and completeness of all of the historical financial and other information provided to or discussed with it or publicly available, and DrKW did not assume any responsibility for independent verification of any such information. DrKW also assumed and relied upon the reasonableness and accuracy of the financial projections, forecasts and analyses provided to it, and assumed that such projections, forecasts and analyses were reasonably prepared in good faith and on bases reflecting the best currently available judgments and estimates of Pathmark's management or the Investors, as applicable. DrKW did not express any opinion with respect to such projections, forecasts and analyses or the assumptions upon which they are based. In addition, DrKW did not review any of the books and records of Pathmark, or assume any responsibility for conducting a physical inspection of the properties or facilities of Pathmark, or for making or obtaining an independent valuation or appraisal of the assets or liabilities of Pathmark, and no such independent valuation or appraisal was conducted by or provided to DrKW.

The DrKW opinion is necessarily based on economic and market conditions and other circumstances as they existed and could be evaluated by DrKW as of March 23, 2005.

In the ordinary course of its business, DrKW and its affiliates may actively trade the debt and equity securities of Pathmark for their own accounts and for the accounts of their customers and, accordingly, may at any time hold a long or short position in such securities.

As our board of directors is aware, DrKW is acting as financial advisor to Pathmark in connection with the proposed transaction and will receive a fee for its services, a significant portion of which is contingent upon the consummation of the proposed transaction, as well as a fee for rendering its opinion. In addition, DrKW has performed various investment banking services for Pathmark from time to time in the past and has received customary fees for rendering such services. In particular, in 2000, DrKW acted as financial advisor to Pathmark during its reorganization under Chapter 11 of the U.S. Bankruptcy Code. Also, in 2002, DrKW acted as transaction coordinator and joint bookrunner in Pathmark's offering of $200 million 8.75% Senior Subordinated Notes due 2012.

Set forth below is a brief summary of certain financial analyses performed by DrKW in connection with its opinion and reviewed with Pathmark's board of directors at its meeting on March 23, 2005. Subsequent to March 23, 2005 and after further review, DrKW revised its analysis of the value of the Series A and Series B warrants. DrKW informed our board of directors of the impact of the revised analysis on the implied net purchase price for the 20 million shares of common stock and confirmed to the Company that such revised analysis, had it been available on March 23, 2005, would not have altered DrKW's opinion as of such date in respect of the proposed transaction. The summary set forth below does not purport to be a complete description of DrKW's analyses. The following summary includes information presented in tabular format. In order to understand fully the financial analyses used by DrKW, the tables must be read together with the text of each summary.

*Valuation of Series A and Series B Warrants.*

In determining the value of the cash consideration to be received by Pathmark for solely the 20 million shares of common stock, DrKW analyzed the value of the Series A and Series B warrants using the generally accepted Black-Scholes option valuation model. Based on an assumed volatility range of the common stock (based on, among other things, comparable companies' common stock volatilities and the terms of the Series A and Series B warrants), DrKW's revised analysis subsequent to March 23, 2005 yielded an implied net purchase price for the 20 million shares of common stock of $135.5 million to $143.4 million in the aggregate, or $6.77 to $7.17 per share.

*Premium Analysis.*

DrKW examined the premiums paid in minority purchases (where 20.0%-49.9% of the target company's equity interest was acquired) since 2000, excluding block trades, tender offers and other open market purchases, where the target company had a total enterprise value (defined as market capitalization plus net debt) between $500 million and $1.5 billion. DrKW derived a premiums-paid range of the closing stock price for each target company in the minority purchase transactions one day, one week and one month prior to the announcement of the acquisition. DrKW compared the premium implied by the purchase price for the 20 million shares of common stock and the Series A and Series B warrants of $150 million in cash in the aggregate ($7.50 per unit) as well as that implied by the estimated net purchase price for the 20 million shares of common stock (based on the mid-point of the assumed volatility range) of $139.6 million in the aggregate ($6.98 per share) with the premiums paid in the minority purchase transactions and observed that both the Purchase Price and the estimated net purchase price represent a larger premium over Pathmark's recent trading levels as compared to the premiums paid in those transactions. The following table sets forth the mean and median premiums paid in the minority purchases and those to be paid in the proposed transaction.

|  | Premiums Paid | | |
|  | 1 Day | 1 Week | 1 Month |
|---|---|---|---|
| Minority Purchases | | | |
|    Mean | 21.8% | 24.7% | 35.6% |
|    Median | 9.5% | 10.5% | 15.4% |
| Pathmark | | | |
|    Purchase Price ($7.50) | 59.9% | 53.4% | 46.8% |
|    Estimated Net Purchase Price ($6.98) | 48.8% | 42.8% | 36.6% |

*Comparable Company Analysis.*

DrKW reviewed and compared certain financial and operating information and commonly used valuation measurements for Pathmark to corresponding publicly available information and valuation measurements for a group of publicly traded supermarket chains in the United States. Specifically, DrKW compared Pathmark with a group of four "super-regional" supermarket chains (consisting of Albertson's, Delhaize, Kroger and Safeway) and four "regional" supermarket chains (consisting of Great A&P, Ingles Markets, Marsh Supermarkets and Weis Markets). Although none of these companies is directly comparable to Pathmark, these companies were chosen because they are publicly traded companies with operations that DrKW considered reasonably similar to the operations of Pathmark.

For each of these comparable companies, DrKW calculated and compared, among other things, the following public market multiples:

- enterprise value as a multiple of (1) sales for the last twelve months and estimated sales for 2005, (2) EBITDA (defined as earnings before interest, taxes, depreciation and amortization) for the last twelve months and estimated EBITDA for 2005 and (3) EBIT (defined as earnings before interest and taxes) for the last twelve months and estimated EBIT for 2005;

- market capitalization as a multiple of (1) net income for the last twelve months and estimated net income for 2005 and (2) book value as of the last quarter end;

- total debt as a multiple of EBITDA for the last twelve months;

- EBITDA as a multiple of (1) interest expense and (2) interest expense plus capital expenditure; and

- return on assets.

26

The following tables set forth some information concerning the mean and median multiples for the super-regional and the regional supermarket chains and the related multiples for Pathmark:

### Comparable Companies (Historical) Trading Multiples

| | Enterprise Value as a Multiple of | | | Market Capitalization as a Multiple of | |
| | LTM Sales | LTM EBITDA | LTM EBIT | LTM Net Income | Last Quarter End Book Value |
|---|---|---|---|---|---|
| Mean—Super-Regional . . . . . . . . . . . . | 0.38x | 6.0x | 10.0x | 13.1x | 1.8x |
| Median—Super-Regional . . . . . . . . . . . | 0.38x | 6.0x | 10.3x | 13.0x | 1.7x |
| Mean—Regional . . . . . . . . . . . . . . . . . | 0.28x | 6.5x | 12.3x | 15.4x | 1.4x |
| Median—Regional . . . . . . . . . . . . . . . | 0.28x | 6.1x | 12.9x | 15.4x | 1.5x |
| Pathmark . . . . . . . . . . . . . . . . . . . . . . | 0.20x | 5.4x | 13.2x | NM | 0.4x |

### Comparable Companies (Forward) Trading Multiples

| | Enterprise Value as a Multiple of | | | Market Capitalization as a Multiple of | 
| | 2005E Sales(1) | 2005E EBITDA(1) | 2005E EBIT(1) | 2005E Net Income(1) |
|---|---|---|---|---|
| Mean—Super-Regional . . . . . . . . . . . . . . . . . | 0.37x | 5.8x | 10.0x | 13.2x |
| Median—Super-Regional . . . . . . . . . . . . . . . | 0.36x | 5.8x | 10.3x | 13.2x |
| Mean—Regional . . . . . . . . . . . . . . . . . . . . . | 0.27x | 5.9x | NM | NM |
| Median—Regional . . . . . . . . . . . . . . . . . . . . | 0.27x | 5.9x | NM | NM |
| Pathmark . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.19x | 5.3x | 13.3x | NM |

(1) Estimates for Pathmark were provided by management, as reflected in its projections of Pathmark on a stand-alone basis provided to DrKW for this purpose. DrKW used research reports to calculate the multiples for the comparable companies.

In order to address factors deemed relevant to the common stock, DrKW focused on certain multiples of the comparable companies to derive a range of multiples. DrKW then applied this range of multiples to Pathmark's estimated sales, EBITDA, EBIT, and net income for, and book value as of the end of, fiscal year 2004 as well as Pathmark's estimated sales, EBITDA, EBIT and net income for fiscal year 2005 (as reflected in management's projections of Pathmark on a stand-alone basis provided to DrKW for this purpose), and derived a range of implied prices per share of the common stock. DrKW observed that the common stock price implied by these multiples ranged from a low of negative value to a high of $23.29 (applying a 35% acquisition premium). However, using the range of multiples based on EBITDA of the comparable companies, a commonly used multiple, DrKW observed that the common stock price implied by this multiple ranged from a low of $2.96 to a high of $9.71 (excluding a 35% acquisition premium) and a low of $4.00 to a high of $13.11 (applying a 35% acquisition premium).

None of the companies utilized for comparison are identical to Pathmark. Accordingly, DrKW believes that the analysis of publicly traded comparable companies is not simply mathematical. Rather, it involves complex considerations and qualitative judgments, reflected in DrKW's opinion, concerning differences in financial and operating characteristics of the comparable companies (such as size, scope and scale as well as the competitive environment in which the companies operate) and other factors that could affect the public trading value of the comparable companies.

27

*Comparable Acquisitions Analysis.*

DrKW selected merger and acquisition transactions in the supermarket industry since 1985, reviewed their transaction prices in terms of market capitalization and total enterprise value and calculated the following historical multiples:

- enterprise value as a multiple of (1) sales, (2) EBITDA and (3) EBIT; and

- market capitalization as a multiple of (1) net income and (2) book value.

DrKW observed that the data demonstrated that the supermarket industry consolidated in the 1990s and acquisition multiples increased substantially over time, with the larger operators, such as Ahold, Albertson's, Kroger and Safeway, paying significant EBITDA multiples for leading regional operators, but in recent years, the acquisition multiples paid for supermarket companies have generally been lower compared to that time period.

The following table sets forth the mean, median, high and low multiples for the comparable acquisitions:

| | Enterprise Value as a Multiple of(1) | | | Market Capitalization as a Multiple of(1) | |
| --- | --- | --- | --- | --- | --- |
| | Sales | EBITDA | EBIT | Net Income | Book Value |
| Mean | 0.37x | 7.9x | 13.7x | 20.9x | 3.3x |
| Median | 0.30x | 7.5x | 12.1x | 20.7x | 3.1x |
| High | 1.06x | 12.6x | 38.9x | 35.5x | 7.9x |
| Low | 0.11x | 4.4x | 6.7x | 3.5x | 0.8x |

(1)  Source: SDC, news reports and company financials, including estimates by DrKW.

In order to address factors deemed relevant to Pathmark's valuation, DrKW focused on certain multiples of the comparable acquisitions to derive a range of multiples. DrKW then applied these multiples to Pathmark and derived a range of imputed valuation for the common stock of negative value (based on comparable net income acquisition multiples) to $43.42 per share (based on comparable book value acquisition multiples).

Because the reasons for, and circumstances surrounding, each of the comparable acquisitions analyzed were so diverse, and due to the inherent differences between the operations and financial conditions of Pathmark and the companies involved in the comparable acquisitions, DrKW believes that a comparable acquisition analysis is not simply mathematical. Rather, it involves complex considerations and qualitative judgments, reflected in DrKW's opinion, concerning differences between the characteristics of these transactions and the proposed transaction that could affect the value of the subject companies and businesses and Pathmark.

*Discounted Cash Flow Analysis.*

DrKW performed a discounted cash flow analysis for Pathmark. DrKW calculated the discounted cash flow value for Pathmark as the sum of the net present values of (1) the estimated future cash flow that Pathmark will generate for fiscal years 2004 through 2009, plus (2) the estimated terminal value of Pathmark at the end of such period. The estimated future cash flows for fiscal years 2004 through 2007 were based on the financial projections prepared by Pathmark's management (as reflected in management's projections previously reviewed by our board of directors and in management's projections of Pathmark on a stand-alone basis provided to DrKW for this purpose) and those for fiscal years 2008 through 2009 were based on DrKW's estimates (calculated at constant growth rates and margins except for certain components, which were kept constant at estimated fiscal year 2007 levels). The terminal values of Pathmark were calculated based on projected EBITDA for 2009 and a range of

multiples from 4.0x to 8.0x. DrKW used discount rates ranging from 9.0% to 11.0%. DrKW used such discount rates based on its judgment of the estimated weighted average cost of capital of Pathmark, and used such multiples based on its review of the trading characteristics of the common stock of certain of the comparable companies. The following table presents the range of common stock price values implied by the resulting discounted cash flow analysis, based on each set of management's projections, utilizing terminal values based on an EBITDA exit multiple in the range of 4.5x to 5.5x (in the case of management's projections reviewed by our board of directors, which are identified as Case 1 in the table below) and 5.5x to 6.5x (in the case of management's projections of Pathmark on a stand-alone basis provided to DrKW for this purpose, which are identified as Case 2 in the table below), which were discounted at a range of rates from 9.0% to 11.0%.

|  | DCF Analysis Price Range | |
| --- | --- | --- |
|  | Case 1 | Case 2 |
| Implied Pathmark Stock Price .................... | $1.15-$6.82 | $6.99-$12.74 |

While the foregoing summary describes the analyses and factors that DrKW deemed material in its presentation to our board of directors, it is not a comprehensive description of all analyses and factors considered by DrKW or its presentation to our board of directors. The preparation of a fairness opinion is a complex process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to particular circumstances and, therefore, such an opinion is not readily susceptible to partial analyses or summary description. DrKW believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all factors and analyses, would create an incomplete view of the evaluation process underlying its opinion. In arriving at its opinion, DrKW considered the results of all of the analyses as a whole.

The analyses were prepared solely for the purpose of DrKW providing its opinion to our board of directors as to the fairness, from a financial point of view, to Pathmark of the Purchase Price to be received by Pathmark in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction and do not purport to be appraisals or to necessarily reflect the prices at which businesses or securities actually may be sold. In performing its analyses, DrKW made numerous macroeconomic, operating and financial assumptions with respect to industry performance, general business, regulatory and economic conditions and other matters, many of which are beyond the control of Pathmark. Analyses based on forecasts and estimates of future results are not necessarily indicative of actual values or future results, which may be more or less favorable than those suggested by such analyses. Because such assumptions, forecasts and estimates are inherently subject to uncertainty, DrKW does not assume any responsibility for their accuracy.

DrKW did not attribute any particular weight to any analysis or factor considered by it, nor, except as set forth above, did it derive any value from, or draw any conclusion with respect to fairness based on any particular analysis. Rather, DrKW made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of the analyses.

DrKW concluded that, in its judgment, including the full range of its analyses described above, the Purchase Price to be received by Pathmark in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction was, as of the date of its opinion, fair, from a financial point of view, to Pathmark. As discussed above, DrKW's opinion to our board of directors was one of a number of factors taken into account by our board of directors in making its determination to approve the proposed transaction.

DrKW is an investment banking firm engaged in, among other things, the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and valuations for

corporate and other purposes. We selected DrKW as a financial advisor because DrKW is an internationally recognized investment banking firm, and members of DrKW have substantial experience in transactions such as the proposed transaction and in the valuation of companies.

The DrKW opinion was for the benefit and use of Pathmark's board of directors in its consideration of the proposed transaction, and does not constitute a recommendation to any stockholder with respect to how such stockholder should vote with respect to the proposed transaction or any other matter.

The DrKW opinion addresses only the fairness, from a financial point of view, to Pathmark of the Purchase Price to be received by Pathmark in exchange for the issuance and sale of the 20 million shares of common stock and the Series A and Series B warrants in the proposed transaction, and does not express any views on any other terms (financial or otherwise) of the proposed transaction or the other transactions contemplated by the Purchase Agreement or the ancillary agreements or any term of the Purchase Agreement or the ancillary agreements. Specifically, the DrKW opinion does not address Pathmark's underlying business decision to effect the proposed transaction or Pathmark's proposed use or uses of the proceeds of the proposed transaction. DrKW assumed, with the permission of our board of directors, that the Purchase Price would not be reduced by any amounts payable from and after the closing of the proposed transaction to the Investors pursuant to the Purchase Agreement or any of the ancillary agreements. DrKW did not express any opinion as to the prices at which the common stock would trade following the announcement or the consummation of the proposed transaction, whether the Series A and Series B warrants would be exercised at any point in the future or what the value of the Series A and Series B warrants or the shares of the common stock issuable upon exercise of the Series A and Series B warrants actually would be when (and if) issued as contemplated by the Purchase Agreement or the Warrant Agreement, as applicable, which all might vary depending upon, among other factors, changes in interest rates, market conditions, general economic conditions and other factors that generally influence the price of securities.

On March 21, 2005, another bidder submitted a proposal to acquire all of the common stock for cash, which we refer to as the "Alternative Proposal". The form of merger agreement submitted with the Alternative Proposal was not in a form capable of being executed by Pathmark immediately, and the Alternative Proposal was not accompanied by evidence of financing, such as executed commitment letters, reflecting the transaction structure that the bidder had proposed to Pathmark during prior negotiations. Our board of directors informed DrKW that it had concluded that the proposed transaction represented the best value reasonably available to the stockholders of Pathmark. With the permission of our board of directors, in rendering its opinion, DrKW did not address the relative merits of the proposed transaction, any other agreements or other matters provided for or contemplated by the Purchase Agreement or the ancillary agreements or any other transaction that may be or might have been available as an alternative to the proposed transaction (including the Alternative Proposal), whether or not any such alternative could be or have been achieved, or the terms upon which any such alternative transaction could be or have been achieved.

As compensation for DrKW's services relating to its fairness evaluation in connection with the proposed transaction, Pathmark agreed to pay DrKW a customary fee, which was payable on March 23, 2005, the date on which DrKW rendered its opinion. In addition, Pathmark agreed to reimburse DrKW for its reasonable out-of-pocket expenses related to its engagement, including the fees, disbursements and other charges of counsel. Pathmark also has agreed to indemnify DrKW and specified related persons against specific liabilities relating to or arising out of its engagement or the proposed transaction, including certain liabilities under the federal securities laws.

**Ownership Upon Closing**

Set forth below is a table depicting the ownership of the common stock upon the closing of the proposed transaction, based on the following assumptions:

- that the number of outstanding shares of common stock is based upon the number outstanding as of the record date of May 6, 2005;
- that the Series A warrants are exercised in full at the closing;
- that the Series B warrants could be immediately exercised at the closing (even though they will not be exercisable at the closing) and are exercised in full for cash at the closing; and
- that no options or warrants for the purchase of common stock will be exercised, other then the Series A and Series B warrants.

| Name | Number of Shares Owned | Number of Shares Assuming Exercise of All Series A Warrants | Number of Shares Assuming Exercise of All Series B Warrants | Percent of Outstanding Shares Assuming No Exercise of Warrants | Percent of Outstanding Shares Assuming Exercise of All Series A Warrants | Percent of Outstanding Shares Assuming Exercise of All Series B Warrants |
|---|---|---|---|---|---|---|
| Investors/Yucaipa . . . . . . . . . . . | 20,000,000 | 30,060,000 | 45,106,350 | 39.94% | 49.99% | 60.00% |
| Other Shareholders . . . . . . . . . . | 30,071,192 | 30,071,192 | 30,071,192 | 60.06% | 50.01% | 40.00% |
| Total . . . . . . . . . . . . . . . . . . . | 50,071,192 | 60,131,192 | 75,177,542 | 100.00% | 100.00% | 100.00% |

**Use of Proceeds**

Pathmark will initially use the proceeds from the transaction to temporarily reduce its borrowings under its current bank credit agreement before implementing plans to upgrade its existing store base and open additional stores, positioning the Company for improved top line growth and profitability.

**Interests of the Company's Directors and Executive Officers in the Proposed Transaction**

*Company Stock Options*

As of the record date, there were approximately 5,472,538 shares of common stock reserved for issuance upon the exercise of stock options granted to our executive officers and directors under our stock option plans, of which approximately 850,000 are attributable to each of Ms. Scott and Mr. Vitrano. Under the terms of our stock option plans, all such stock options will become immediately vested and exercisable effective as of a "change in control," which is defined to include the acquisition by any person or "group" (within the meaning of Section 13(d)(3) of the Exchange Act) of 35% or more of the then outstanding shares of common stock. Because the Investors comprise such a "group" and will own approximately 40% of the outstanding shares of common stock upon the closing, the proposed transaction will be a "change in control" under our stock option plans.

*Employment Agreements*

As of October 16, 2002, Pathmark entered into employment agreements with each of Ms. Scott, as Chief Executive Officer, and Mr. Vitrano, as President and CFO. Pathmark has also entered into employment agreements with each of Messrs. Whitney, Joyce, Gutman, Strassler, Kramer, Adelhardt and Derderian. Each of the employment agreements has a two-year term, which renews automatically each year for an additional one-year term unless proper notice is provided by either party to the other of such party's desire to terminate the agreement. Each of the employment agreements provides for an annual base salary that will be reviewed at the discretion of the Compensation Committee, but may not be reduced. Each of the employment agreements also provides that the executive will be entitled to participate in our Executive Incentive Plan and will be provided the opportunity to participate in pension and welfare plans, programs and arrangements that are generally made available to executives of Pathmark, or as may be deemed appropriate by the Compensation Committee. The employment agreements contain agreements by the executives not to compete with Pathmark as long as they are receiving payments under the employment agreement. The employment agreement with Ms. Scott

provides that Pathmark will take all responsible steps to assure that Ms. Scott is elected or appointed to Pathmark's board of directors.

In the event of the "involuntary termination" of any of the above named executives, that executive is entitled to receive his or her base salary and continued coverage under health and insurance plans for a period of two years from the date of such "involuntary termination". As used in the employment agreements, "involuntary termination" means termination of the executive's employment by Pathmark other than for "cause" or termination by the executive for "good reason". Termination of the executive's employment for "cause" is defined generally as termination because of a felony conviction, perpetration by the executive of a material dishonest act or fraud against Pathmark, the executive's material breach of the employment agreement or willful and repeated failure to perform material duties of employment. Termination by the executive for "good reason" is defined generally as resignation because of Pathmark's failure to pay a material amount of the executive's compensation or other material breach of the employment agreement and Pathmark's failure to extend the term of the employment agreement. In addition, termination for "good reason" is also defined as resignation because of a material, adverse reduction or diminution in the executive's title, duties, positions or responsibilities with Pathmark.

### Supplemental Retirement Agreements

Pathmark has entered into a supplemental retirement agreement with each of Ms. Scott and Messrs. Vitrano, Joyce, Whitney, Gutman, Strassler, Kramer, Derderian and Adelhardt, which provides that each executive will be paid upon termination of employment after attainment of age 60 a supplemental pension benefit in such an amount as to assure him or her an annual amount of pension benefits payable under the agreement and certain of Pathmark's retirement plans equal to the lesser of (i) 30% of his or her final average compensation based on ten years of service with Pathmark and increasing 1% per year for each year of service thereafter, to a maximum of 40%, of his or her final average compensation, or (ii) $250,000, which we refer to as the "Cap", with respect to Ms. Scott and Messrs. Vitrano, Joyce, Kramer and Derderian, $150,000 with respect to Mr. Gutman and $100,000 with respect to Messrs. Strassler and Adelhardt. The supplemental retirement agreements provide that on a change of control (including as a result of the transactions contemplated under the Purchase Agreement and the ancillary agreements), with respect to Messrs. Kramer and Derderian, the executive will become immediately vested under the agreement and, with respect to Ms. Scott and Messrs. Vitrano, Strassler and Adelhardt, the Cap will be increased to $480,000 with respect to Ms. Scott, $440,000 with respect to Mr. Vitrano and $150,000 with respect to Messrs. Strassler and Adelhardt.

### Continuing Service on the Board of Directors

Prior to the closing of the proposed transaction, Ms. Scott and Mr. Vitrano will resign from the Company's board of directors. It is currently expected that Messrs. Begley, Bryant, Fitzgerald, Freedman, Hartman and Moody will remain on the Company's board of directors following the closing. As a continuing non-employee member on the Company's board of directors, Messrs. Begley, Bryant, Fitzgerald, Freedman, Hartman and Moody will be entitled to receive customary retainers based on an annualized rate of $50,000 a year. Messrs. Begley, Bryant, Fitzgerald, Freedman, Hartman and Moody will also receive $2,500 for each board meeting attended ($1,250 for a telephonic meeting) and $2,000 for each committee meeting attended ($1,000 for a telephonic meeting). In addition, Messrs. Begley and Fitzgerald will each receive a retainer of $5,000 per year for serving as Chairman of the Compensation and Governance Committees, respectively and Mr. Freedman will receive a retainer of $10,000 for serving as Chairman of the Audit Committee. As the Chairman of the board of directors, Mr. Moody will receive an additional retainer of $50,000 per year.

In addition, each member of the board of directors who has not been an employee of the Company or any of its subsidiaries for at least one year prior to the date of grant automatically receives a non-qualified option to purchase 5,000 shares on the date of each annual meeting of stockholders, pursuant to the 2000 Non-Employee Directors Equity Plan. The option price for each option granted is the fair market value of the common stock on the date of grant. Options, vest and become exercisable in three equal annual installments beginning on the first anniversary of the grant date, and expire five years after the date of grant (subject to earlier termination if the director ceases to serve as a director).

**Regulatory Approvals**

The Hart-Scott-Rodino Antitrust Improvements Act of 1976 and related rules provide that transactions such as the proposed transaction may not be completed until certain information has been submitted to the Federal Trade Commission and the Antitrust Division of the U.S. Department of Justice and specified waiting period requirements have been satisfied. On April 1, 2005, the Company and Yucaipa Corporate Initiatives Fund I, L.P. each filed a Notification and Report Form with the Antitrust Division and the Federal Trade Commission and requested an early termination of the waiting period. On April 14, 2005, the Company and Yucaipa Corporate Initiatives Fund I, L.P. received early termination of the waiting period.

Under the Purchase Agreement, the Company and the Investors have agreed to use their reasonable best efforts to obtain all required governmental approvals in connection with the completion of the proposed transaction. In addition, the Company and the Investors have agreed to cooperate and use their reasonable best efforts to defend through litigation on the merits any action, including administrative or judicial, in order to avoid the entry of an injunction or other order that restricts, prevents, or prohibits the completion of the proposed transaction by August 31, 2005 including by vigorously pursuing all available avenues of administrative and judicial appeal.

Except as noted above with respect to the required filings under the Hart-Scott-Rodino Act at or before the closing of the proposed transaction, we are unaware of any material federal, state or foreign regulatory requirements or approvals required for completion of the proposed transaction.

**Special Considerations**

The presence of a significant stockholder may affect the ability of a third party to acquire Pathmark. Based upon the number of outstanding shares of common stock on the record date, and excluding any shares issuable upon the exercise of currently outstanding options or warrants, if the proposed transaction is completed, the Investors will acquire shares equal to approximately 40% of the outstanding shares of common stock, and Series A and Series B warrants. If the Investors were to exercise their Series A warrants in full at the closing, the Investors would own approximately 49.9% of the outstanding shares of common stock. If the Investors were to exercise their Series A and Series B warrants in full for cash at the closing (which, in the case of the Series B warrants, they will not be able to do), the Investors would own approximately 60% of the outstanding shares of common stock. These shares will be subject to the Stockholder's Agreement between Pathmark and the Investors. Under the Stockholder's Agreement, the Investors will generally be entitled to appoint a number of directors that is one less than a majority of the Company's board of directors. Although these directors will not make a majority, they may exercise influence over the decisions of the Company's board of directors. In addition, the Stockholders' Agreement grants veto rights to the Investors with respect to mergers, consolidations, asset sales and certain other actions.

The existence of a significant stockholder of Pathmark may have the effect of making it more difficult for a third-party to acquire, or for the Independent Directors (defined below) to discourage a third-party from seeking to acquire, a majority of the outstanding shares of common stock. As to the latter, the Investors have agreed, however, that they will not enter into any arrangements or understandings with a third-party with respect to any offer to purchase the Company's securities until five years after the closing (or earlier upon certain termination events), unless such offer is approved by a majority of the Independent Directors. Additionally, the Investors may not tender into any offer that the Company's board of directors has not recommended, unless a majority of the shares of common stock (other than shares held by the Investors) have been tendered. For a more detailed description of the relationship between the Company and the Investors, see the "Stockholders' Agreement" starting on page 46.

## Board of Directors Upon Closing

It is currently expected that Messrs. Begley, Bryant, Fitzgerald, Freedman, Hartman and Moody will remain on the Company's board of directors following the closing and will constitute the Independent Directors. In addition, Yucaipa has indicated that it currently expects to designate the following five individuals to serve on our board of directors as the Investors' appointees:

*Tom Dahlen.*   Mr. Dahlen, a Partner at Yucaipa, has over 35 years of experience in the supermarket industry. Prior to joining Yucaipa, Mr. Dahlen was Executive Vice President and President of Fleming Retail and Corporate Marketing. Prior to his work with the Fleming Companies, Mr. Dahlen was Chairman, President and CEO of Furr's Supermarkets, Executive Vice President of Ralphs Grocery Company and Executive Vice President of Food 4 Less Inc., where he was instrumental in growing Food 4 Less from a handful of stores to over 100 stores and becoming a leading Southern California supermarket chain.

*Mike Duckworth.*   Mr. Duckworth is a Partner at Yucaipa. Mr. Duckworth joined Yucaipa in 2004 and has been associated with the firm since 1989. Prior to joining Yucaipa in 2004, Mr. Duckworth was Head of West Coast Financial Sponsor Coverage and Leveraged Finance for Merrill Lynch, where he managed Merrill Lynch's relationships with private equity firms throughout the region, focusing on leveraged finance and merger and acquisition transactions. Prior to Merrill Lynch, Mr. Duckworth was a Managing Director at Bankers Trust/Deutsche Bank Alex. Brown where he maintained a similar emphasis on working with financial sponsors and leveraged finance.

*Gregory Mays.*   Mr. Mays is currently the Chief Financial Officer of Simon Worldwide, Inc. and a Director of Source Interlink Companies Inc. and Simon Worldwide. Mr. Mays has held numerous executive and financial positions in the supermarket industry during his career. Most recently, Mr. Mays was Executive Vice President of Ralphs Grocery Company from 1995 to 1999. Prior to that, Mr. Mays was Executive Vice President of Food 4 Less Inc. and Chief Executive Officer and President of Almacs' Supermarkets.

*Tony Schnug.*   Mr. Schnug is the Chief Executive Officer of Americold Realty Trust and a Director of Americold Realty Trust, Digital On-Demand, Inc. and Source Interlink Companies Inc. Mr. Schnug has extensive experience in the supermarket industry, serving Executive Vice President of Corporate Operations at Fred Meyer and Senior Vice President of Administration at Food 4 Less, Inc. Mr. Schnug was also an executive at Ralphs Grocery Company where he oversaw post-merger integrations with both Food 4 Less and Fred Meyer.

*Ira Tochner.*   Mr. Tochner, a Partner at Yucaipa, has been affiliated with Yucaipa since 1988. Mr. Tochner has substantial experience in the supermarket industry, serving as Director of Financial Reporting for Food 4 Less, Inc. and as an Audit Manager at Arthur Andersen & Co. specializing in retail and food processing businesses. At Yucaipa, Mr. Tochner is responsible for all aspects of the deal process and has actively participated in all of Yucaipa's transactions in the supermarket industry since joining the firm.

## Federal Income Tax Matters

For U.S. federal income tax purposes, no income, gain or loss will be recognized by the Company's stockholders in connection with the proposed transaction.

## Absence of Appraisal Rights

The Company is incorporated in the State of Delaware and, accordingly, subject to the Delaware General Corporation Law, or the "DGCL". The Company's stockholders are not entitled to appraisal rights under the DGCL with respect to the proposed transaction.

## THE PURCHASE AGREEMENT

On March 23, 2005, the Investors, Yucaipa (as representative for the Investors) and the Company entered into the Purchase Agreement. The summary of the material terms of the Purchase Agreement below and elsewhere in this proxy statement is qualified in its entirety by reference to the Purchase Agreement, a copy of which is attached to this proxy statement as Annex B and which we incorporate by reference into this document. This summary may not contain all of the information about the Purchase Agreement that is important to you. We encourage you to read carefully the Purchase Agreement in its entirety.

### Consideration to be Paid in the Proposed Transaction

Upon the terms and conditions contained in the Purchase Agreement, we will issue to the Investors, for an aggregate cash purchase price of $150 million, 20,000,000 investment units that consist in aggregate of: (i) 20,000,000 shares of common stock; (ii) Series A warrants to purchase 10,060,000 additional shares of common stock; and (iii) Series B warrants to purchase 15,046,350 additional shares of common stock.

### Closing of the Proposed Transaction

Unless the parties agree otherwise, the proposed transaction will close two days after the satisfaction or waiver of all the conditions in the Purchase Agreement. The parties expect to close the proposed transaction in the summer of 2005.

### Representations and Warranties of the Company and the Investors

In the Purchase Agreement the Company makes various customary representations and warranties. Our representations and warranties relate to, among other things:

- our and our subsidiaries' proper organization, good standing and corporate power to operate our businesses;

- our certificate of incorporation and bylaws and those of our subsidiaries;

- our capitalization, including in particular the number of shares of common stock, warrants and stock options outstanding;

- our corporate power and authority to enter into the Purchase Agreement and the ancillary agreements and to consummate the proposed transaction;

- the absence of any violation of or conflict with our organizational documents, applicable law or certain agreements as a result of entering into the Purchase Agreement and the ancillary agreements and consummating the proposed transaction;

- required consents and approvals of governmental entities as a result of the proposed transaction;

- our possession of all licenses and permits necessary to operate our properties and carry on our business;

- our SEC filings since February 1, 2002 and the financial statements contained therein;

- the absence of certain changes and events since January 31, 2004;

- the absence of litigation or outstanding court orders against us;

- employment and labor matters affecting us, including matters relating to our employee benefit plans;

- the accuracy and completeness of information supplied by us in this proxy statement;

35

- real property owned and leased by us and title to assets;

- our intellectual property;

- taxes;

- environmental matters;

- material contracts;

- the absence of agreements with or for the benefit of any person who is a holder of more than 5% of our outstanding equity securities;

- our insurance arrangements;

- our implementation of certain internal controls over financial reporting and a system of disclosure controls as required by the Securities Exchange Act of 1934, as amended, or the "Exchange Act", and the Sarbanes-Oxley Act;

- the absence of any sale of securities by us or our subsidiaries that would subject the proposed transaction to the registration provisions of the Securities Act of 1933, as amended, or the "Securities Act";

- the required vote of our stockholders in connection with the approval of the proposed transaction;

- the absence of any application of section 203 of DGCL or other state takeover laws;

- receipt by us of a fairness opinion from DrKW; and

- the absence of undisclosed broker's fees.

In the Purchase Agreement, the Investors make various customary representations and warranties. Their representations and warranties relate to, among other things:

- their proper organization and good standing;

- their corporate power and authority to enter into the Purchase Agreement and the ancillary agreements and to consummate the proposed transaction;

- the absence of any violation of or conflict with any of their organizational documents, applicable law or certain agreements as a result of entering into the Purchase Agreement and the ancillary agreements and consummating the proposed transaction;

- their investment purpose for acquiring the securities in the proposed transaction;

- their understanding of the status, limitations on transfers and other restrictions of the securities they will receive in the proposed transaction;

- their status as "accredited investors";

- the sufficiency of their available funds at closing to consummate the proposed transaction;

- the accuracy and completeness of information supplied by them in this proxy statement;

- the ownership by them and their affiliates of our capital stock as of the date of the Purchase Agreement; and

- the absence of any broker's fees.

36

For the purposes of the Purchase Agreement, "material adverse effect" means any event, circumstance, change or effect that, either individually or combined with all other events, circumstances, changes or effects:

- has or would have a material adverse effect on the business, operations, assets, liabilities (including contingent liabilities), financial condition or results of operations of the Company and its subsidiaries, taken as a whole; or

- materially impairs or would materially impair the ability of the Company to consummate the proposed transaction and perform its other obligations under the Purchase Agreement and the ancillary agreements.

A "material adverse effect" will not be deemed to have occurred, however, as a result of any event, circumstance, change or effect arising out of or attributable to:

- any decrease in the market price of the common stock, but not any event, circumstance, change or affect underlying such decrease to the extent that it would otherwise constitute a material adverse effect;

- any events, circumstances, changes or effects that affect the supermarket business generally and that do not disproportionately impact the Company and its subsidiaries;

- any changes in the securities markets generally that do not disproportionately impact the Company and its subsidiaries;

- any changes in general economic, legal, regulatory or political conditions in the geographic regions in which the Company and its subsidiaries operate that do not disproportionately impact the Company and its subsidiaries.

## Conduct of Our Business Pending the Closing

Under the Purchase Agreement, we have agreed that, subject to certain exceptions, between March 23, 2005 and the closing we and our subsidiaries will:

- conduct our business in the ordinary course of business consistent with past practice;

- use our reasonable efforts to preserve substantially intact our and our subsidiaries' business organization, to keep available the services of our and our subsidiaries' current officers, employees and consultants and to preserve our and our subsidiaries' current relationships with customers, suppliers and other persons with which we have significant business relations.

We have also agreed that during the same time period, and again subject to certain exceptions or unless the Investors give their prior written consent, we and our subsidiaries will not:

- amend or otherwise change our organizational documents;

- issue, sell or encumber any of our or our subsidiaries' securities, real property or tangible or intangible assets;

- declare or pay any dividends or other distributions with respect to our common stock;

- reclassify, combine, split, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of our or our subsidiaries' equity interests;

- acquire any business, corporation, partnership, other business organization or any division thereof;

- incur any indebtedness, make loans or grant security interests in any assets, other than borrowings in the ordinary course of business under the Company's existing credit facility;

37

- terminate, enter into or materially change any material contracts;

- make or authorize any capital expenditure or purchases of fixed assets other than as set forth in our capital expenditure plan;

- increase, adopt, terminate or amend compensation, retention, severance or benefit plan arrangements;

- make, change or rescind any material tax election, file any amended tax return, enter into any closing agreement relating to taxes, waive or extend the statute of limitations in respect of taxes, or settle or compromise any material U.S. federal, state or local income tax liability, audit, claim or assessment, or surrender any right to claim for a tax refund;

- take any action, other than actions required by Generally Accepted Accounting Principles, or "GAAP", or in the ordinary course of business, with respect to accounting policies or procedures;

- pre-pay any long term debt in excess of $2 million in the aggregate;

- accelerate or delay collection of accounts receivable or notes;

- accelerate or delay payment of accounts payable or notes;

- release, waive, assign, settle or compromise any material claims or litigation that involves the payment of amounts, or assumption of liabilities, in excess of $2 million or results in material restrictions on our properties or the conduct of our business;

- adopt, or propose to adopt, or maintain any stockholders' rights plan, "poison pill" or other similar plan or agreement;

- modify, amend, terminate, or release or assign any material rights or claims with respect to any confidentiality or standstill agreement;

- write up, write down or write off the book value of any material assets, other than in the ordinary course of business consistent with past practice or except as required by GAAP applied on a consistent basis throughout such period;

- take any action to make any person (other than the Investors) exempt from or not subject to the provisions of Section 203 of the DGCL or any other state takeover law or state law that purports to limit or restrict business combinations or the ability to acquire or vote shares; or

- announce an intention, enter into any agreement or otherwise make a commitment to do any of the foregoing.

## Stockholders' Meeting

We have agreed to duly call, give notice of, convene and hold a special meeting of our stockholders as promptly as practicable after the date of the Purchase Agreement for the purpose of considering, taking action on, and voting on the proposed transaction and, subject to certain exceptions described in the No Solicitation of Transactions section below, to include in this proxy statement the recommendation of the board of directors that the stockholders of the Company approve the proposed transaction and use all reasonable efforts to obtain such approval. Additionally, we have agreed to call, give notice of, convene and hold the special meeting and submit the proposed transaction to a vote of our stockholders, regardless of the commencement, disclosure, announcement or submission to it of any acquisition proposal (whether or not a superior proposal), any furnishing of information, discussions or negotiations with respect thereto, or any decision or action by the board of directors to change, withhold or withdraw its recommendation in respect of the proposed transaction. We will also not

submit to the vote of our stockholders any acquisition proposal (whether or not a superior proposal), other than the proposed transaction prior to any termination of the proposed transaction.

**No Solicitation of Transactions**

We have agreed that neither we nor any of our subsidiaries or representatives will, directly or indirectly:

- encourage, solicit, initiate or facilitate any acquisition proposal;

- enter into any agreement with respect to any acquisition proposal or any other agreement, arrangement or understanding that would require us to abandon, terminate or fail to consummate the proposed transaction or any other transaction contemplated by the Purchase Agreement; or

- participate in discussions or negotiations regarding, or furnish any information in connection with, or take any other action to facilitate any inquiries or the making of any proposal that constitutes or would reasonably be expected to lead to, any acquisition proposal.

For the purposes of the Purchase Agreement, "acquisition proposal" means any proposal or offer from any person relating to any direct or indirect:

- sale, lease or other disposition directly or indirectly by merger, consolidation, business combination, share exchange, joint venture or otherwise of assets of the Company or any subsidiary representing 20% or more of the consolidated assets of the Company and its Subsidiaries (other than sales of inventory in the ordinary course of business and consistent with past practice);

- issuance, sale or other disposition, directly or indirectly (including, without limitation, by way of merger, consolidation, business combination, share exchange, joint venture or any similar transaction), of securities (or options, rights or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing 20% or more of any class of equity securities of the Company;

- tender offer or exchange offer as defined pursuant to the Exchange Act that, if consummated, would result in any person beneficially owning 20% or more of any class or series (or the voting power of any class or series) of equity securities of the Company or any other transaction in which any person will acquire beneficial ownership or the right to acquire beneficial ownership, of 20% or more of any class or series (or the voting power of any class or series) of equity securities;

- merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company or any subsidiary representing 20% or more of the consolidated assets of the Company and its subsidiaries; or

- combination of the foregoing.

Prior to the special meeting, however, we and our board of directors are permitted to engage in discussions or negotiations with, or provide any information to, a third party in connection with an unsolicited bona fide written acquisition proposal, if and only to extent that:

- such acquisition proposal constitutes a superior proposal or our board of directors determines in good faith that such acquisition proposal proposes consideration that is more favorable to us and

39

our stockholders than the transactions contemplated by the Purchase Agreement and which would reasonably be expected to result in a superior proposal in all other respects; and

- after consultation with its advisors, our board of directors believes in good faith that it is required to engage in discussions or provide information to the third party to comply with its fiduciary duties under applicable law.

For purposes of the Purchase Agreement, "superior proposal" means any bona fide acquisition proposal:

- concerning the sale of 50% or more of the consolidated assets of the Company or any issuance, sale, disposition, tender offer, exchange offer, acquisition of ownership or other transfer of 50% or more of the voting power of the Company made by any person (other than any of the Investors and their affiliates) which was not solicited by the Company, any subsidiary, any director, officer, employee, accountant, consultant, legal counsel, advisor, agent or other representatives of the Company or any subsidiary or any other affiliates and

- which, in the good faith judgment of our board of directors (taking into account the various legal, financial and regulatory aspects of the proposal (including whether or not such a proposal is subject to a financing contingency), and the identity of the person making the proposal)

  - if accepted, is reasonably expected to be consummated and, if applicable, financed, and

  - if consummated would, based upon the advice of the Company's financial advisor, result in a transaction that is more favorable to the Company and to the Company's stockholders, from a financial point of view, than the proposed transaction.

We have agreed to notify the Investors as promptly as possible (and in no event later than one business day) after receipt of any acquisition proposal, potential acquisition proposal or inquiry regarding any acquisition proposal. In our notice to the Investors, we have agreed to inform them of the material terms of any proposal or inquiry, including the identity of the person and its affiliates making such proposal or inquiry, that we may receive in respect of any such acquisition proposal, potential acquisition proposal, or inquiry, or of any information requested from us or of any negotiations or discussions being sought to be initiated with us. We have also agreed to furnish to the Investors a copy of any such proposal or inquiry, if it is in writing, or a reasonably accurate written summary of any such proposal or inquiry, if it is not in writing, and to keep the Investors informed on a reasonably prompt basis with respect to any developments with respect to the foregoing.

**Agreement to Take Further Action and to Use Reasonable Best Efforts**

Subject to the terms and conditions of the Purchase Agreement, each party has agreed to use its reasonable best efforts to take all appropriate action and to do all things necessary, proper or advisable to complete and to make effective the transactions contemplated under the Purchase Agreement and the ancillary agreements. Among other things, each party has committed to use such efforts to cooperate with each other to obtain all necessary consents, approvals and authorizations from governmental authorities and third parties.

In addition, we have agreed that, in the event that we fail to obtain any required third party consents, we will use our reasonable efforts and take all such actions reasonably requested by the Investors in order to minimize any adverse effect on the Company and the Investors and their respective businesses as a result of the failure to obtain such consents.

40

The Investors have agreed to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any antitrust or trade regulation law that may be asserted by any governmental authority or any other person with respect to the transactions contemplated under the Purchase Agreement and the ancillary agreements so as to enable the parties to consummate such transactions by August 31, 2005, including, without limitation, proposing, negotiating and committing to and/or effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of such assets or businesses of the Investors or the Company or any of their subsidiaries as are required to be divested, or entering into such other arrangements as are required in order to avoid the entry of any order which would prevent the consummation of such transactions by August 31, 2005.

**Credit Agreement**

We have agreed that we will use our reasonable best efforts to obtain from the required lenders under the our Amended and Restated Credit Agreement, a permanent waiver or amendment of the applicable provisions to permit us to retain the proceeds from the proposed transaction (including any proceeds from the exercise of the Series A or Series B warrants) and apply them for general corporate purposes and to permit the consummation of the transactions contemplated under the Purchase Agreement and the ancillary agreements.

**Composition of Board of Directors**

We have further agreed that prior to closing we will take the following actions:

- we will provide the Investors with the names of up to six Independent Directors who will be remaining on our board of directors after the closing;

- we will increase the size of the board of directors to eleven; and

- we will, immediately prior to the closing, cause the resignation of all those directors who will not be remaining on the board of directors after the closing.

**Conditions to Closing**

The respective obligations of the Investors and the Company to complete the transactions contemplated under the Purchase Agreement and the ancillary agreements are subject to the satisfaction or waiver, at or prior to the closing, of the following conditions:

- the proposed transaction has been approved by the stockholders;

- no governmental authority of the United States has issued any order or law which makes the consummation of the transactions contemplated under the Purchase Agreement and the ancillary agreements illegal or otherwise prohibiting the closing;

- the waiting period under the Hart-Scott-Rodino Antitrust Improvement Act has expired or been waived; and

- no action is pending or threatened before any governmental authority that might reasonably be expected to prevent the consummation of the transactions contemplated under the Purchase Agreement and the ancillary agreements or materially impair the rights of any of the parties.

The obligations of the Investors to complete the proposed transaction are subject to the satisfaction or waiver of the following conditions:

- each of the representations and warranties made by us in the Purchase Agreement and each ancillary agreement that are qualified by materiality or material adverse effect must be true and correct as of the date of the Purchase Agreement and on the date of the closing (except that those representations and warranties which address matters only as of a particular date need

41

only remain true and correct as of such date) and all representations and warranties which are not so qualified must be true and correct in all material respects as of the date of the Purchase Agreement and on the date of the closing (except that those representations and warranties which address matters only as of a particular date need only remain true and correct in all material respects as of such date);

- we have complied, in all material respects, with all covenants and agreements under the Purchase Agreement and each ancillary agreement;

- we have delivered a certificate from the President of the Company certifying that our representations and warranties are true, that we have complied with all of our covenants and agreements and that the proper waivers under the Credit Agreement have been obtained;

- no material adverse effect has occurred;

- we have executed and delivered each of the Warrant Agreement, the Registration Rights Agreement, the Management Services Agreement and the Stockholders' Agreement;

- we have paid, or made provision for, all payments required under the Management Agreement;

- all of the required waivers and amendments to our Credit Agreement have been obtained and that our "Excess Availability" as defined under that agreement is at least $20 million;

- the persons designated by the Investors must have been duly appointed, effective concurrently with the closing, to our board of directors and to all applicable committees and the resignation of all directors who are neither directors designated by the Investors nor continuing independent directors must have become effective;

- Shearman & Sterling LLP and other Company counsel have delivered favorable opinions as of the closing;

- we have delivered to the Investors certified resolutions of our board of directors and our stockholders authorizing the execution, delivery and performance of the Purchase Agreement and the ancillary agreements;

- we have delivered certificates to the Investors as to:

  - the incumbency of the officers executing the Purchase Agreement and the ancillary agreements;

  - our good standing;

- all consents and approvals required under the Purchase Agreement have been obtained.

The obligations of the Company to complete the transactions contemplated under the Purchase Agreement and the ancillary agreements are subject to the satisfaction or waiver of the following conditions:

- that each of the representations and warranties made by the Investors in the Purchase Agreement and each ancillary agreement that are qualified by materiality or material adverse effect must be true and correct as of the date of the Purchase Agreement and on the date of the closing (except that those representations and warranties which address matters only as of a particular date need only remain true and correct as of such date) and all representations and warranties which are not so qualified must be true and correct in all material respects as of the date of the Purchase Agreement and on the date of the closing (except that those representations and warranties which address matters only as of a particular date need only remain true and correct in all material respects as of such date);

42

- that the Investors have complied with all covenants and agreements under the Purchase Agreement and each ancillary agreement;

- that the Investors have delivered a certificate from the President or any Vice President of each Investor certifying that the Investors' representations and warranties are true and that the Investors have complied with all of their covenants and agreements;

- that each of the Warrant Agreement, the Registration Rights Agreement, the Management Services Agreement and the Stockholders' Agreement has been executed and delivered by any Investor who is a party to such agreement; and

- that counsel to the Investors has delivered a favorable opinion as of the closing.

**Termination**

Pathmark and the Investors may agree in writing to terminate the Purchase Agreement at any time prior to completing the proposed transaction, even after the stockholders of Pathmark have voted on the proposed transaction. The Purchase Agreement may also be terminated at any time prior to completing the proposed transaction in certain other circumstances, including:

- by either the Investors or the Company if:

  - the closing has not occurred on or before August 31, 2005, so long as the failure to complete the proposed transaction is not the result of the failure of the terminating party to comply with the terms of the Purchase Agreement;

  - the stockholders do not vote to approve the proposed transaction at the special meeting of the stockholders;

  - there is a breach by the non-terminating party of its representations, warranties, covenants or agreements in the Purchase Agreement such that the closing conditions would not be satisfied, which breach has not been cured within 20 days of notice being delivered by the terminating party;

  - any governmental authority has issued or entered any order or injunction or other ruling or takes any other action which has the effect of making the consummation of the proposed transaction illegal or otherwise preventing or prohibiting completion of the proposed transaction;

- by the Investors, if

  - the Company's board of directors withdraws, adversely modifies or fails to confirm its recommendation that the Company's stockholders vote to approve the proposed transaction;

  - the Company's board of directors recommends or approves or determines to recommend that the stockholders approve another acquisition proposal or accepts a superior proposal;

  - a tender offer or exchange offer is commenced that would result in any person or group owning 20% or more of, or the voting power of, any class or series of the Company's equity securities and the Company's board of directors does not recommend within 10 days of that offer that the stockholders not tender their shares in the tender or exchange offer;

  - if the Company fails to call or hold the stockholders' meeting to consider approval of the proposed transaction by August 26, 2005;

  - since the date of the Purchase Agreement, there has been any event, development or change of circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Company and such material adverse

43

effect is not cured within 20 days of the Company receiving written notice thereof from the Investors; or

- by the Company, if the Company's board of directors has determined to accept a superior proposal in accordance with the terms of the Purchase Agreement, but only after the special meeting has been held and the proposed transaction is not approved by the Company's stockholders and the Company has provided the Investors at least a three business day period to negotiate in good faith to agree to such adjustments to the Purchase Agreement such that the acquisition proposal no longer constitutes a superior proposal.

## Termination Fee and Expenses

A termination fee of $6.5 million, plus expenses in an amount up to $2 million, is payable immediately by the Company to the Investors if the Purchase Agreement is terminated:

- by the Investors because the Company's board of directors withdraws, adversely modifies or fails to confirm its recommendation that the Company's stockholders vote to approve the proposed transaction or recommends another acquisition proposal or accepts a superior proposal;

- by the Investors because a tender offer or exchange offer is commenced that would result in any person or group owning 20% or more of, or the voting power of, any class or series of the Company's equity securities and the Company's board of directors does not recommend within 10 days of that offer that the stockholders not tender their shares in the tender or exchange offer;

- by the Company because the Company's board of directors has determined to accept a superior proposal in accordance with the terms of the Purchase Agreement, but only after the special meeting has been held and the proposed transaction is not approved by the Company's stockholders and the Company has provided the Investors at least a three business day period to negotiate in good faith to agree to such adjustments to the Purchase Agreement such that the acquisition proposal no longer constitutes a superior proposal;

- by the Investors because the Company fails to call or hold the stockholders' meeting to consider approval of the proposed transaction by August 26, 2005; or

- by the Investors or the Company because stockholder approval is not obtained at the stockholders' meeting or the closing has not occurred by August 31, 2005 and within 12 months following such termination, the Company enters into a transaction that constitutes an acquisition proposal (although regardless of whether the Company enters into a transaction that constitutes an acquisition proposal with 12 months, expenses in an amount up to $2 million will be payable).

In addition, expenses in an amount up to $2 million are payable by the Company to the Investors if the Purchase Agreement is terminated by either the Investors or the Company if any governmental authority has issued or entered any order or injunction or other ruling or takes any other action which has the effect of making the consummation of the proposed transaction illegal or otherwise preventing or prohibiting completion of the proposed transaction. The Purchase Agreement provides, however, that such a termination by either the Investors or the Company may occur only if the party seeking to terminate the Purchase Agreement has fulfilled its obligations under the Purchase Agreement to lift such order, injunction or other ruling.

44

**Indemnification**

We will indemnify the Investors for all losses which arise out of any breach of a representation or warranty by us or the failure by us to perform any of the covenants or agreements in the Purchase Agreement.

All representations and warranties contained in the Purchase Agreement will survive the closing for 18 months, except that:

- with respect to claims asserted pursuant to the indemnification provisions before the expiration of the applicable representation or warranty, such claims will survive until the date they are finally liquidated or otherwise resolved;

- our representations which relate to taxes will survive until 30 days after the end of the applicable statute of limitations; and

- the following representations will survive indefinitely:

  - our and our subsidiaries' proper organization, good standing and corporate power to operate our businesses;

  - our certificate of incorporation and bylaws and those of our subsidiaries;

  - our capitalization, including in particular the number of shares of common stock, warrants and stock options outstanding;

  - our corporate power and authority to enter into the Purchase Agreement and the ancillary agreements and to consummate the proposed transaction; and

  - the absence of any violation of or conflict with our organizational documents.

The Investors will indemnify us for all losses which arise out of any breach of a representation or warranty by the Investors or the failure of the Investors to perform any of the covenants or agreements in the Purchase Agreement.

No party will be liable for any claim for indemnification with respect to any breach of any representation or warranty, unless and until the aggregate amount of indemnifiable losses which may be recovered equals or exceeds $2.5 million, after which the indemnifying party will be liable only for those losses in excess of $2.5 million. No losses may be claimed or included in calculating the aggregate losses other than losses in excess of $50,000 resulting from any single claim or aggregated claims arising out of the same facts, events or circumstances. The maximum amount of indemnifiable losses which may be recovered is $150 million with respect to any breach of any representation or warranty. Neither party will be liable under any provision of the Purchase Agreement or the ancillary agreements for any punitive damages.

## THE STOCKHOLDERS' AGREEMENT

Pursuant to the Purchase Agreement, the Company agreed to enter into a Stockholders' Agreement concurrently with the closing. The summary of the material terms of the Stockholders' Agreement below and elsewhere in this proxy statement is qualified in its entirety by reference to the Stockholders' Agreement, a copy of which is attached to this proxy statement as Annex C and which we incorporate by reference into this document. This summary may not contain all of the information about the Stockholders' Agreement that is important to you. We encourage you to read carefully the Stockholders' Agreement in its entirety.

The Stockholders' Agreement relates to, among other matters, the governance of the Company after the closing, including the Investors' representation on the Company's board of director, as well as the Investors ability to purchase or sell the securities of the Company.

### Board Representation

Under the terms of the Stockholders' Agreement, we will increase the size of our board of directors to 11 and it will consist of five directors designated by the Investors and up to six directors, who we refer to as the "Independent Directors", who are either current directors or new directors who are designated by the current independent directors on our board of directors and who meet the standard of independence necessary to qualify as an independent director within the meaning of the Nasdaq rules. If, however, there are less than six Independent Directors upon the closing, a majority of the Independent Directors will nominate an individual or individuals, as the case may be, to serve as an Independent Director, subject to the consent of the Investors, which consent may not be unreasonably withheld. Thereafter, the Independent Directors will have the right to nominate their successors and the Investors will have the right to designate (i) so long as they beneficially own 30% or more of the common stock, a number of directors that is one less than the majority of the number of then-authorized directors on the board; (ii) so long as the Investors beneficially own less than 30% but 20% or more of the common stock, a number of directors that is two less than the majority of the number of then-authorized directors on the board; and (iii) so long as the investors beneficially own less than 20% but 10% or more of the common stock, a number of directors that is three less than a majority of the number of then-authorized directors on the board. In the event that, at any time, the number of Investor-designated directors then in office exceeds the number set forth in the preceding sentence, at the request of the majority of the Independent Directors then in office, an appropriate number of Investor-designated directors must resign from office. In the event the Investors beneficially own less than 10% of the common stock, the Investors will have no right to designate any director, and, at the request of a majority of the Independent Directors then in office, must cause any Investor-designated directors then in office to resign immediately upon such event.

In any election of directors at a meeting of the stockholders of the Company, the Investors will cause all shares of common stock held by them to be represented at such meeting either in person or by proxy, and will vote their shares for all nominees nominated by the Independent Directors in proportion to the votes cast by the holders (other than the Investors) of shares of common stock. The Investors may, in their discretion, vote a greater number of shares held by them in excess of such proportion in favor of the nominees nominated by the Independent Directors.

### Approval by the Investors for Certain Actions

The Stockholders' Agreement will require the prior written approval of the Investors before we engage in the following actions:

- any merger, consolidation or acquisition if the value of the consideration to be paid or received is more than 10% of our and our subsidiaries' consolidated assets;

46