# EXHIBIT A
# Part 3 of 8

- any authorization or issuance of equity securities or any securities convertible into or exercisable for our equity securities (other than options or warrants outstanding on the date of the Stockholders' Agreement or pursuant to employee or director stock option or incentive compensation or similar plans approved after the date of the Stockholders' Agreement, including by at least one of the directors designated by the Investors);

- any sale, lease, exchange, mortgage, pledge, transfer or other disposition by us or any of our subsidiaries of any of our or our subsidiaries' securities or assets which constitutes more than 10% of our and our subsidiaries' consolidated assets;

- any amendments to our certificate of incorporation or by-laws;

- any changes in the authorized number of directors of our board of directors or the abolition of any committee of our board of directors;

- any incurrence or repayment (prior to scheduled maturity) of indebtedness (including capitalized leases) in excess of $10 million (excluding borrowing under our credit agreement, as it may be amended or replaced from time to time with the Investors' prior written approval);

- any repurchase or redemption of our or our subsidiaries' equity securities;

- entry into any transaction that:

  - materially restricts the Investors' rights as stockholders, including any transaction that would impose material restrictions on the Investors based on the size of their security holdings, businesses in which they are engaged or other considerations applicable to any Investor and not to other stockholders, or

  - denies any material benefit to any Investor proportionately as a stockholder that is made available to our other stockholders;

- any declaration, setting aside or payment of any dividend or other distribution;

- any appointment or termination of any person as the Chief Executive Officer, President or Chief Financial Officer of the Company; and

- adopting or maintaining any stockholders' rights plan or similar plan or agreement.

## Approval by the Independent Directors for Certain Actions

Generally, with the exception of certain inter-company transactions, all actions of the Company's board of directors will require the approval of at least one Independent Director. However, if there are five or more Independent Directors on the board, then the Stockholders' Agreement will require the approval of at least two Independent Directors to approve any of the following actions:

- any amendments to our certificate of incorporation or by-laws;

- any changes in the authorized number of directors of our board of directors or the abolition of any committee of our board of directors;

- any merger, consolidation, or significant acquisition if the value of the consideration to be paid or received by us or any of our subsidiaries exceeds $100 million;

- any declaration, setting aside or payment of any dividend or other distribution;

- any incurrence of indebtedness (including capitalized leases) which, combined with other indebtedness reflected on our most recent consolidated balance sheet plus indebtedness incurred after the date of that balance sheet, would exceed $750 million; and

- any action to repurchase, retire, redeem or otherwise acquire any of our or our subsidiaries' equity securities to the extent that the aggregate payments made by the Company for such equity securities after the date of the Stockholders' Agreement exceed $100 million.

Any transaction between one of the Investors and the Company will require the prior approval of a majority of the Independent Directors then in office. The foregoing prohibition will not apply, however, to any transactions contemplated by the Stockholders Agreement or any of the ancillary agreements or to any transactions involving the purchase or sale of goods or services in the ordinary course of business which are consistent with guidelines adopted by the Company's board of directors from time to time and approved by a majority of the Independent Directors then in office. Additionally, the Investors may not execute any written consent with respect to any shares of common stock they beneficially own unless approved by a majority of the Independent Directors.

## Standstill Provisions

The Stockholders' Agreement imposes certain restrictions on the Investors. For a five-year period after the closing, unless earlier terminated pursuant to the Stockholders' Agreement, the Investors may not, without the prior approval of a majority of the Independent Directors: (i) purchase or otherwise acquire any shares of common stock, such that the Investors would, after such acquisition, own in excess of 49.9% (or such greater percentage as the Investors may own after exercise of the Series B warrants) of the outstanding shares of common stock, except pursuant to the exercise of the Series A or Series B warrants or pursuant to stock splits, stock dividends, reclassifications, recapitalizations or other similar distributions; (ii) take certain actions relating to the solicitation of proxies to vote any voting securities of the Company, other than solicitations exempted from the federal proxy rules promulgated under the Exchange Act; or (iii) except as set forth below in respect of Change of Control Proposals, submit to the board of directors any written proposal for or offer of any merger or similar extraordinary transactions with the Company.

None of the Investors will, without the prior approval of a majority of the Independent Directors then in office, submit a proposal to acquire a majority of the common stock owned by persons other than the Investors, which we refer to as a "Change of Control Proposal", to any person unless either of the following conditions are satisfied:

- the Change of Control Proposal contemplates either (i) a tender offer for all outstanding shares of common stock not owned by the Investors and must be conditioned upon a majority of such common stock not owned by the Investors being tendered, or (ii) a merger, combination, asset sale or other similar transaction conditioned upon the holders of a majority of the common stock not owned by the Investors present, in person or by proxy, at a meeting of stockholders, voting in favor of such transaction. In the case of either (i) or (ii), the same consideration must be offered to all of the Company's stockholders (other than the Investors); or

- the Change of Control Proposal contemplates that a special committee of the board of directors will be created consisting only of the Independent Directors, which we refer to as the "Special Committee", the Special Committee will retain a nationally recognized investment banking firm to advise the Special Committee with respect to the fairness of the Change of Control Proposal to the stockholders of the Company (other than the Investors), and the Change of Control Proposal will be approved by the Special Committee, which will not give its approval unless it has received an opinion from such investment banking firm that the Change of Control Proposal is fair, from a financial point of view, to the stockholders of the Company (other than the Investors).

**Termination of Standstill Provisions**

The standstill provisions of the Stockholders' Agreement will terminate without any further action by any party upon the earlier of:

- 180 days after such time as the Investors beneficially owns less than 10% of the outstanding common stock;

- such date as the Company's board of directors determines to solicit, or publicly announces its intention to solicit, an acquisition proposal;

- such date as the Company's board of directors publicly approves, accepts, authorizes or recommends to the Company's stockholders their approval of, or their conveyance of any common stock or other securities pursuant to, any acquisition proposal;

- such date that the Company or any of its affiliates enters into a letter of intent, agreement in principle, definitive agreement, or any other agreement with any party, with respect to an acquisition proposal;

- such date that any person or group, other than the Investors or any of its affiliates, acquire or announce its intention to acquire (including by commencement of a tender offer or exchange offer) beneficial ownership of 20% of the outstanding shares of common stock;

- such date as the Company, the Company's board of directors or any committee thereof takes any action, or fails to take appropriate action, which action, or failure to take action, results in a breach of any provision summarized above under "—Approval by the Investors for Certain Actions"; and

- such date as the Company breaches the Stockholders' Agreement in that the number of directors designated by the Investors on the Company's board of directors, any committee thereof or on any subsidiary board of directors or any committee thereof, is less than the number of directors to which the Investors is entitled, subject to notice from the Investors and the expiration of a 30-day period in which to cure such action or failure to act (if such action or failure to act is reasonably capable of being cured).

**Transfer Restrictions**

In addition to the restrictions applicable to the Investors under the U.S. federal securities laws, the Stockholders' Agreement prohibits the Investors from selling the securities they receive in the proposed transaction for an initial 180-day period after the closing, except (i) for a sale to affiliates of the Investors who agree to be bound by the Stockholders' Agreement; (ii) pursuant to a sale of the Company that the Company board of directors has recommended (or with respect to a tender offer that the it has not recommended, but only after a majority of the shares of common stock (other than shares held by the Investors) have been tendered); (iii) in connection with swaps, hedges and similar arrangements; and (iv) for pledges of the securities they receive in the proposed transaction. After the initial 180-day restricted period, the Investors may sell or transfer the securities they receive in the proposed transaction (i) pursuant to any of the above methods; (ii) in compliance with the U.S. federal securities laws; (iii) to the Company or its subsidiaries; (iv) in an amount of 15% or less of the common stock (calculated on a fully diluted basis) to a person who agrees to be bound by the obligations of the Investors under the Stockholders' Agreement or (v) to a person that would, following the consummation of such sale, beneficially own more than 20% of the common stock, provided that, for so long as the Investors collectively own at least 25% of the common stock, such sale is conditioned upon such person acquiring or offering to acquire (on the same terms and conditions) from the other stockholders the same percentage of their shares of common stock as such person proposes to acquired from the Investors.

**Business Opportunities**

The Company may from time to time enter into and perform, one or more agreements (or modifications or supplements to pre-existing agreements) with one of the Investors pursuant to which the Company, on the one hand, and such Investor, on the other hand, agree to engage in transactions of any kind or nature with each other and/or agree to compete, or to refrain from competing or to limit or restrict their competition, with each other, including to allocate and to cause their respective representatives to allocate opportunities between or to refer opportunities to each other. No such agreement, or the performance thereof by the Company or any of the Investors, will, to the fullest extent permitted by law, be considered contrary to any fiduciary duty that any of the Investors may owe to the Company or to any stockholder of the Company.

Except as otherwise agreed in writing between the Company and the Investors or as provided below, each of the Investors will to the fullest extent permitted by law have no duty to refrain from serving as an officer or director of, or investing in, any person which is engaged in the same or similar business as the Company or doing business with any client, customer or vendor of the Company and such Investor will not, to the fullest extent permitted by law, be deemed to have breached its or his fiduciary duties, if any, to the Company solely by reason of engaging in any such activity.

Except as otherwise agreed in writing between the Company and the Investors or as provided below, in the event that any of the Investors acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both any of the Investors and the Company, such Investor will to the fullest extent permitted by law have no duty to communicate or offer such corporate opportunity to the Company and will not, to the fullest extent permitted by law, be liable to the Company or its stockholders for breach of any fiduciary duty as a stockholder of the Company by reason of the fact that such Investor acquires or seeks such corporate opportunity for itself, directs such corporate opportunity to another person or entity, or otherwise does not communicate information regarding such corporate opportunity to the Company, and the Company to the fullest extent permitted by law will renounce any interest or expectancy in such business opportunity and will waive any claim that such business opportunity constituted a claim that should have been presented to the Company.

Except as otherwise agreed in writing between the Company and the Investors or as provided below, in the event that a director or officer of the Company who is also an officer, director, member or employee of any of the Investors acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both the Company and any of the Investors, such director or officer will to the fullest extent permitted by law have fully satisfied and fulfilled his or her fiduciary duty with respect to such corporate opportunity, and the Company to the fullest extent permitted by law will renounce any interest or expectancy in such business opportunity and will waive any claim that such business opportunity constituted a corporate opportunity that should have been presented to the Company or any of its affiliates, if such director or officer acts in a manner consistent with the following policy:

- a corporate opportunity offered to any person who is an officer of the Company and who is also a director but not an officer of any of the Investors will belong to the Company, unless such opportunity is expressly offered to such person solely in his or her capacity as a director of any of the Investors, in which case such opportunity will belong to such Investor;

- a corporate opportunity offered to any person who is a director but not an officer of the Company and who is also a director or officer of any of the Investors will belong to the Company only if such opportunity is expressly offered to such person solely in his or her capacity as a director of the Company and otherwise will belong to such Investor; and

50

- a corporate opportunity offered to any person who is an officer of both the Company and Investors will belong to the Company unless such opportunity is expressly offered to such person solely in his or her capacity as an officer of any of the Investors, in which case such opportunity will belong to such Investor.

Without the approval of a majority of the Independent Directors then in office, no Investor nor any of their respective affiliates may, directly or indirectly, enter into, or agree or commit to enter into, any material investment in or otherwise exploit any business opportunity primarily related to, any person that derives at least 20% of its consolidated revenues from the operation by it of retail supermarkets which are located in the Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia and the District of Columbia (other than an investment in the shares of any public company representing less than 20% of such company's fully diluted common equity).

## Preemptive Rights

Subject to certain exceptions, upon a proposed issuance by us of new capital stock, the Stockholders' Agreement gives the Investors the right to purchase a pro rata portion of such new capital stock based on the Investors' percentage ownership of the total number of shares of common stock then outstanding.

## Termination

The Stockholders' Agreement will terminate upon the earlier of (i) the mutual agreement of the parties thereto; (ii) the Investors ceasing to beneficially own 10% or more of the common stock; (iii) the Investors becoming the beneficial owners of 90% or more of the common stock; and (iv) five years following the date of the closing.

## THE MANAGEMENT SERVICES AGREEMENT

On March 23, 2005, Yucaipa and the Company entered into a Management Services Agreement that will be effective only upon the closing of the proposed transaction. The summary of the material terms of the Management Services Agreement below and elsewhere in this proxy statement is qualified in its entirety by reference to the Management Services Agreement, a copy of which is attached to this proxy statement as Annex D and which we incorporate by reference into this document. This summary may not contain all of the information about the Management Services Agreement that is important to you. We encourage you to read carefully the Management Services Agreement in its entirety.

Under the Management Services Agreement, Yucaipa will provide us with general business and management consultation and advice regarding strategic planning and development, budgeting, capital expenditure strategy, store development plans, labor strategy, financing plans, general business and economic matters and such other similar management services as may be requested by our board of directors or our chief executive officer. For such services, we will pay Yucaipa an annual fee of $3 million (one half of which is a management fee and the other half an unallocated expense reimbursement), one-twelfth of which will be payable in advance on the first day of each calendar month, and reimburse Yucaipa on a monthly basis for expenses of up to $500,000 per annum. If the closing occurs on other than the first day of the then-current month, we will pay Yucaipa a pro-rated portion of the monthly fee for such partial month at the closing.

## Closing Fee

At the closing we have agreed to pay Yucaipa a $3 million closing fee and up to $3.2 million in reasonable, documented out-of-pocket costs, expenses and fees incurred or paid in connection with the

negotiation of the Purchase Agreement and the ancillary agreements and the effectuation of the transactions contemplated under such agreements.

## Additional Services

We may, but will not be obligated to, retain Yucaipa as a consultant in connection with any acquisition or disposition transaction by us and in connection with debt or equity financings or equipment lease arrangements or any other services not contemplated by the Management Services Agreement. In the event we decide to so retain Yucaipa, we must pay Yucaipa a cash fee for providing any such consulting services equal to 1% of the transaction value or amount of such financing, as the case may be, calculated as agreed upon by the parties.

## Term of the Agreement

The initial term of the agreement is for five years, and will thereafter be renewed annually for successive one-year terms unless we provide written notice of non-renewal to Yucaipa at least ninety days prior to the expiration of the initial term or any renewal term.

## Termination/Termination Fee

The Management Services Agreement may be terminated by us:

- at any time following a determination of our board of directors to effect such a termination by giving Yucaipa at least ninety days' written notice of such termination;

- if Yucaipa fails to reasonably perform any material covenant, agreement, term or provision of the Management Services Agreement and such failure continues for a period of sixty days after written notice from us; or

- at any time if, in connection with the performance of its duties under the Management Services Agreement, Yucaipa or any of its representatives commits any act of fraud, dishonesty or gross negligence which is materially detrimental to our business or our reputation.

The Management Services Agreement may be terminated by Yucaipa:

- if we fail to reasonably perform any material covenant, agreement, term or provision of this Agreement and such failure continues for a period of sixty days after written notice thereof from Yucaipa;

- if we fail to make any payment due to Yucaipa under the Management Services Agreement, if such payment is not made in full within thirty days after written notice of such failure; or

- at any time upon giving us at least ninety days' written notice of such termination.

The Management Services Agreement may be terminated by either party upon a change of control of the Company. A change of control is defined as the acquisition by any party of 51% or more of our then outstanding voting stock or the sale of all or substantially all of the assets of the Company in a transaction or series of related transactions.

During its initial five-year term, if the Management Services Agreement is terminated by us without cause, by Yucaipa if we breach the agreement or fail to pay Yucaipa or by either party due to a change of control, then a termination fee of $10 million must be paid by us to Yucaipa. If the termination occurs after the initial 5-year term, then Yucaipa will receive a payment equal to that portion of the annual fee that would have been paid to Yucaipa during the remaining portion of such renewal period.

**Indemnification**

We have agreed to indemnify Yucaipa, from and against all losses, claims, damages, liabilities or obligations of any kind resulting from any existing or threatened claim by any person which arises out of the performance of the services to be provided under the Management Services Agreement, and will reimburse them for all reasonable out-of-pocket costs and expenses (including reasonable counsel fees and disbursements) incurred in connection with investigating or defending any such claim.

We will not be liable for any indemnification in respect of any losses which are determined, in a final judgment by a court having jurisdiction, to have resulted from the gross negligence or willful misconduct or any material breach by Yucaipa of its obligations under the Management Services Agreement or for any settlement effected by Yucaipa without our written consent.

## THE REGISTRATION RIGHTS AGREEMENT

Pursuant to the Purchase Agreement, the Company agreed to enter into a Registration Rights Agreement concurrently with the closing. The summary of the material terms of the Registration Rights Agreement below and elsewhere in this proxy statement is qualified in its entirety by reference to the Registration Rights Agreement, a copy of which is attached to this proxy statement as Annex E and which we incorporate by reference into this document. This summary may not contain all of the information about the Registration Rights Agreement that is important to you. We encourage you to read carefully the Registration Rights Agreement in its entirety.

The Registration Rights Agreement provides the Investors with certain rights to cause Pathmark to register shares of common stock held at the closing or thereafter acquired by the Investors, which we refer to as "registrable securities".

**Demand Registrations**

At any time on or after the 180th day following the closing, holders owning not less than 40% of the registrable securities may make up to three written requests that anywhere between 1,000,000 and all of the registrable securities they hold be registered with the Securities and Exchange Commission, which we refer to as the "SEC", provided that the Company will be required to effect only one such registration during any six-month period. Each such request must specify the amount of registrable securities proposed to be sold pursuant to such demand and the method by which they are to be sold. Within 60 days of such request, the Company must file a registration statement with the SEC and use its reasonable best efforts to ensure that the registration statement becomes effective. Pathmark may defer a demand registration for up to 90 days, though no more than twice per 365-day period, if the Company's board of directors reasonably determines that such a registration would (i) adversely affect any proposed financing, acquisition, divestiture or any other material transaction or (ii) would otherwise represent an undue hardship for the Company.

If in any demand registration involving an underwritten offering the managing underwriter or underwriters advise the demanding holders or the Company in writing that in their reasonable opinion the number of registrable securities proposed to be sold in such demand registration exceeds the number that can be sold in such offering or will adversely affect the success of such offering, the Company will include in such registration only the number of registrable securities, if any, which in the opinion of such underwriter or underwriters can be sold without having an adverse effect on the success of the offering and in accordance with the following priority: (i) first, registrable securities held by demanding holders, allocated pro rata among such group and (ii) second, pro rata among the other holders of registrable securities who have requested to include registrable securities in such registration. If all registrable securities requested to be sold in the underwritten offering are included therein, the Company may include other shares of common stock in such offering in accordance with the following priority, but not to exceed the number recommended by the managing underwriter or underwriters:

(x) first, pro rata among any other stockholders of the Company having piggyback or other similar registration rights and (y) second, shares of common stock proposed to be sold by or for the account of the Company.

**Piggyback Registrations**

If at any time the Company proposes to file a registration statement with the SEC relating to any class of common equity securities (other than (i) a registration statement on Form S-4 (for securities offered in certain business combination transactions) or S-8 (for securities offered to employees pursuant to employee benefit plans), (ii) a registration statement filed in connection with a demand registration or a shelf registration or (iii) a registration statement filed in connection with an offering of securities solely to the Company's existing securityholders), the Company must give the holders of registrable securities at least 20 days' notice and must offer such holders the opportunity to register such number of registrable securities as the holders may request. The Company must use its reasonable best efforts to cause the underwriters of a proposed underwritten offering to include those registrable securities requested by the holders on the same terms and conditions as any similar securities.

Unless the registration statement is being filed pursuant to a demand registration (in which case the priority of piggyback rights shall be as described above), if the managing underwriter or underwriters advise the Company in writing that in their reasonable opinion the number of equity securities of the Company proposed to be sold in such registration will adversely affect the success of such offering, the Company will include in such registration the number of equity securities of the Company, if any, which in the opinion of such underwriter or underwriters can be sold without having an adverse effect on the offering and in accordance with the following priority: (i) first, the securities the Company proposes to sell for its own account, and (ii) second, pro rata based on the number of registrable securities that each holder or other person having similar rights shall have requested to be included.

**Shelf Registrations**

Upon the request of the demanding holders at any time after the 180th day following the closing, the Company will cause to be filed with the SEC within 90 days, a shelf registration statement pursuant to Rule 415 under the Securities Act, which shall provide for resales of all registrable securities held by holders who have provided the Company with certain information regarding such holders and their registrable securities. The Company will use its reasonable best efforts to have such shelf registration declared effective and to keep such shelf registration statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for at least two years for resales of registrable securities. A demand for a shelf registration statement by the holders of registrable securities will count as one of the three demand registrations described above.

**Expenses**

All registration and filing fees, printing fees and certain other associated expenses incident to the Company's compliance with the Registration Rights Agreement will be paid by the Company.

**Indemnification**

The Company and the Investors each agree to hold harmless and pursuant to customary indemnification provisions, indemnify the other with respect to any liability or loss arising out of any material misstatement or omission for which such party is responsible in a registration statement or prospectus.

54

**Rule 144**

The Company agrees it will file in a timely manner all reports required to be filed by it pursuant to the Securities Act and the Exchange Act and the rules and regulations thereunder and will take such further action as any holder of registrable securities may reasonably request in order that such holder may effect sales of registrable securities without registration within the limitations of the exemptions provided by Rule 144 under the Securities Act or any similar rule or regulation hereafter adopted by the SEC.

**Termination**

The registration rights agreement will terminate upon the earlier to occur of (i) the mutual agreement by the parties, (ii) with respect to any holder, such holder ceasing to own any registrable securities, or (iii) the tenth anniversary of the closing.

## THE WARRANT AGREEMENT

Pursuant to the Purchase Agreement, the Company agreed to enter into a Warrant Agreement concurrently with the closing. The summary of the material terms of the Warrant Agreement below and elsewhere in this proxy statement is qualified in its entirety by reference to the Warrant Agreement, a copy of which is attached to this proxy statement as Annex F and which we incorporate by reference into this document. This summary may not contain all of the information about the Warrant Agreement that is important to you. We encourage you to read carefully the Warrant Agreement in its entirety.

The Warrant Agreement will govern the terms of the Series A and Series B warrants which we will issue to the Investors in the proposed transaction.

**Series A Warrants**

The Series A warrants grant the Investors the right to purchase 10,060,000 shares of common stock and are exercisable at a price of $8.50 per share, subject to customary anti-dilution adjustments. The exercise period of the Series A warrants commences at the date of the closing and continues for three years following that date. During this period the Investors may exercise the Series A warrants in full or in part on a cash-only basis.

It at any time during the Series A Warrant exercise period, the exercise of the outstanding Series A warrants would result in a "Change of Control Event" as defined in the indenture governing the Company's 8¾% Senior Subordinated Notes due 2012 (defined as any person becoming, directly or indirectly, the beneficial owner of a majority of the voting power of the Company), then that number of outstanding Series A warrants which would cause such a Change of Control Event will immediately prior to such event become unexercisable. These Series A warrants will become exercisable again at such time as their exercise will not constitute such a "Change of Control Event".

**Series B Warrants**

The Series B warrants grant the Investors the right to purchase 15,046,350 shares of common stock and are exercisable at a price of $15.00 per share, subject to customary anti-dilution adjustments. The exercise period of the Series B warrants commences on the earlier of:

- none of the Company's 8¾% Senior Subordinated Notes due 2012 remaining outstanding;

- the price of the Company's stock equaling or exceeding the exercise price of the Series B warrants; or

- any event constituting a "Change of Control Event" as defined in the indenture governing the Company's 8¾% Senior Subordinated Notes due 2012.

The Series B warrants expire 10 years from the date of the closing. During the Series B warrant exercise period the Investors may exercise the Series B warrants in full or in part on a cash or cashless basis. The cashless exercise will allow the Investors to receive a number of shares of common stock equal to the number of shares that the Investors otherwise would receive upon the exercise of the Series B warrants less that number of shares that have a fair market value equal to the aggregate exercise price.

## MARKET PRICE OF THE COMPANY'S COMMON STOCK

The common stock is traded on the Nasdaq under the symbol "PTMK". The following table sets forth the high and low daily closing sales prices per share of common stock on the Nasdaq for the periods indicated.

### Market Information

| | Common Stock | |
| --- | --- | --- |
| | High | Low |
| **Fiscal Year 2003:** | | |
| 1st Quarter | $ 7.48 | $ 4.53 |
| 2nd Quarter | $ 8.25 | $ 6.72 |
| 3rd Quarter | $ 9.07 | $ 6.26 |
| 4th Quarter | $ 8.19 | $ 6.65 |
| **Fiscal Year 2004:** | | |
| 1st Quarter | $ 9.19 | $ 7.40 |
| 2nd Quarter | $ 8.83 | $ 6.45 |
| 3rd Quarter | $ 7.43 | $ 3.50 |
| 4th Quarter | $ 5.97 | $ 4.37 |
| **Fiscal Year 2005:** | | |
| 1st Quarter | $ 8.12 | $ 4.48 |
| 2nd Quarter (through May 5, 2005) | $ 8.36 | $ 7.60 |

The common stock is traded on the Nasdaq under the trading symbol "PTMK". On March 22, 2005, which was the last trading day before we entered into the Purchase Agreement, the closing price of the common stock was $4.60 per share. On May 5, 2005, which was the last trading day before this proxy statement was finalized, the closing price of the common stock was $8.11 per share.

## SECURITY OWNERSHIP BY CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

### By Directors and Executive Officers

The following table sets forth the number of shares of common stock beneficially owned (as of May 6, 2005 unless otherwise indicated) by current directors of the Company and the named executive officers, and all directors and executive officers as a group. Percentage of ownership is calculated using

the number of shares outstanding as of May 6, 2005, the record date, plus the number of shares the individual or group had the right to acquire within 60 days, as indicated in note (1) following the table.

| Beneficial Owner | Shares of Common Stock Beneficially Owned(1) | Percentage of Ownership |
|---|---|---|
| Directors: | | |
| Eileen R. Scott | 601,500 | 2.0 |
| Frank G. Vitrano | 610,020 | 2.0 |
| William J. Begley | 25,000 | |
| Warren F. Bryant | — | * |
| Daniel H. Fitzgerald | 30,000 | * |
| Eugene M. Freedman | 25,000 | * |
| Bruce Hartman | — | * |
| James L. Moody, Jr. | 5,000 | * |
| Other Named Executive Officers: | | |
| Robert J. Joyce | 365,600 | * |
| Art Whitney | 181,021 | * |
| Harvey M. Gutman | 127,198 | * |
| All Directors and Officers as group (15 persons) | 2,415,751 | 8.0 |

\* Less than 1% of outstanding shares.

(1) Includes shares which directors and executive officers have, or will have, within 60 days, the current right to acquire upon exercise of options under the EEP or Directors Plan, as applicable: Ms. Scott and Mr. Vitrano, 600,000 shares each; Mr. Joyce, 365,000 shares; Mr. Whitney, 180,999 shares; Mr. Gutman, 124,214 shares; Messrs. Begley, Fitzgerald and Freedman, 25,000 shares each; Mr. Moody, 5,000 shares; and all directors and executive officers as a group, 2,390,809 shares. Also includes with respect to Mr. Vitrano, 202 shares of common stock which Mr. Vitrano has a right to acquire upon the exercise of 202 Warrants at an exercise price of $22.31 per share and 4,000 shares held by his wife.

## By Others

Management of the Company knows of no person, except as set forth below, who is the beneficial owner of more than 5% of the Company's issued and outstanding common stock as of May 6, 2005, the record date:

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned | Percentage of Ownership |
|---|---|---|
| FMR Corp. | 5,113,423(1) | 16.5 |
| David J. Greene and Company, LLC | 2,603,870(2) | 8.7 |
| Hotchkis and Wiley Capital Management, LLC | 2,579,600(3) | 8.6 |
| Dimensional Fund Advisors, Inc. | 2,193,021(4) | 7.3 |
| Lampe, Conway & Co., LLC | 1,928,612(5) | 6.4 |

(1) Information regarding FMR Corp. and its affiliates ("FMR") is based on information disclosed in the amended Schedule 13G/A filed on February 14, 2005 by FMR Corp., Edward C. Johnson, III and Abigail P. Johnson (the "FMR Schedule 13G"). The FMR Schedule 13G indicates that, at December 31, 2004, (i) Fidelity Management & Research Company, a wholly owned subsidiary of FMR Corp., was the beneficial owner of 4,845,257 (including 747,828 Warrants) shares of common

stock as a result of acting as investment advisor to various investment companies; (ii) Fidelity Advisors High Yield Fund, one such investment company, was the beneficial owner of 2,766,706 shares of common stock; (iii) Fidelity Management Trust Company, a bank that is wholly owned by FMR Corp., was the beneficial owner of 268,166 (including 198,332 Warrants) shares of common stock as a result of its serving as investment managers of institutional account(s); and (iv) FMR Corp. and Edward C. Johnson, III each has sole dispositive power of over 5,113,423 shares of common stock and sole voting power over 202,726 shares of common stock. The address for FMR is 82 Devonshire Street, Boston, MA 02109.

(2) Information regarding David J. Greene and Company, LLC ("Greene") is based on information disclosed in the Schedule 13G/A filed on February 2, 2005 by Greene (the "Greene Schedule 13G"). The Greene Schedule 13G indicates that at December 31, 2004, Greene was the beneficial owner of 2,603,870 shares of common stock and had sole voting and dispositive power with respect to 50,000 shares of common stock and shared voting and dispositive power with respect to 1,534,195 shares of common stock. The address for Greene is 599 Lexington Avenue, New York, NY 10022.

(3) Information regarding Hotchkis and Wiley Capital Management, LLC ("Hotchkis and Wiley") is based on the Schedule 13G filed on February 14, 2005 by Hotchkis and Wiley (the "Hotchkis and Wiley Schedule 13G"). The Hotchkis and Wiley Schedule 13G indicates that as of December 31, 2004, Hotchkis and Wiley had sole voting power as to 1,849,800 shares of common stock and sole dispositive power as to all shares shown. The address for Hotchkis and Wiley is 725 South Figueroa Street, 39th Floor, Los Angeles, CA 90017.

(4) Information regarding Dimensional Fund Advisors, Inc. ("Dimensional") is based on the Schedule 13G/A filed on February 9, 2005 by Dimensional (the "Dimensional 13G"). The Dimensional Schedule 13G indicates that as of December 31, 2004, Dimensional had sole voting power and sole dispositive power as to all shares shown. The address of Dimensional is 1299 Ocean Avenue, 11th Floor, Santa Monica, CA 90401.

(5) Information regarding Lampe, Conway & Co., LLC and its affiliates ("LCC") is based on the Schedule 13D filed on November 12, 2004 by LCC (the LCC Schedule 13D"). The LCC Schedule 13D indicates that as of October 29, 2004, LCC had shared voting and dispositive power as to all shares shown. The address for LCC is 680 Fifth Avenue, Suite 1202, New York, NY 10019.

## MULTIPLE STOCKHOLDERS SHARING ONE ADDRESS

In accordance with Rule 14a-3(e)(1) under the Securities Exchange Act of 1934, as amended, one proxy statement will be delivered to two or more stockholders who share an address, unless Pathmark has received contrary instructions from one or more of the stockholders. Pathmark will deliver promptly upon written or oral request a separate copy of the proxy statement to a stockholder at a shared address to which a single copy of the proxy statement was delivered. Requests for additional copies of the proxy statement, and requests that in the future separate proxy statements be sent to stockholders who share an address, should be directed to Pathmark Stores, Inc., 200 Milik Street, Carteret, New Jersey 07008, Attention: Investor Relations. In addition, stockholders who share a single address but receive multiple copies of the proxy statement may request that in the future they receive a single copy by contacting Pathmark at the address and phone number set forth in the prior sentence.

## SUBMISSION OF STOCKHOLDER PROPOSALS

To be considered for inclusion in this year's annual proxy statement, any proposal of an eligible stockholder must be in writing and received by the Secretary of the Company at its principal executive offices located at 200 Milik Street, Carteret, New Jersey 07008.

For any proposal that is not submitted for inclusion in this year's annual proxy statement, but is instead sought to be presented directly at the 2005 annual meeting, under our Bylaws, certain procedures are provided which a stockholder must follow to nominate persons for election as directors or to introduce an item of business at an annual meeting of stockholders. These procedures provide that recommendations for director nominees, and/or an item of business to be introduced at an annual meeting of stockholders, must be submitted in writing to the Secretary of the Company at 200 Milik Street, Carteret, New Jersey 07008. A notice of intention to propose an item of business must set forth as to each proposal (i) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (ii) the proposing stockholder's name and address, (iii) the class and number of shares of the Company's stock which are beneficially owned by the stockholder, and (iv) any material interest of the stockholder in such business. A notice of recommendation to nominate a candidate for director must include certain information required by the Bylaws of the Company regarding the potential nominee and contain the potential nominee's consent to serve if elected.

A notice of recommendation for nomination or proposed item of business at the Company's 2005 annual meeting must be received by the Company by the tenth day following the date of public disclosure of the date of the annual meeting. The Company currently expects to hold its annual meeting in October 2005.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

The Company files annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any reports, proxy statements or other information that we file with the SEC at the following location of the SEC:

Public Reference Room
450 Fifth Street, N.W.
Room 1024
Washington, D.C. 20549

Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. You may also obtain copies of this information by mail from the Public Reference Section of the SEC, 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549, at prescribed rates. The Company's public filings are also available to the public from document retrieval services and the Internet website maintained by the SEC at *www.sec.gov*.

Any person, including any beneficial owner, to whom this proxy statement is delivered may request copies of reports, proxy statements or other information concerning us, without charge, by written or telephonic request directed to us at Pathmark Stores, Inc., 200 Milik Street, Carteret, NJ 07008, Attention: Investor Relations. If you would like to request documents, please do so by May 26, 2005, in order to receive them before the special meeting.

All documents that we file pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this proxy statement and prior to the date of the special meeting shall be deemed to be incorporated by reference in this proxy statement and to be a part of this proxy statement from the respective dates of filing of these documents. Any statement contained in this proxy statement or in a document incorporated or deemed to be incorporated by reference in this proxy statement shall be deemed to be modified or superseded for purposes of this proxy statement to the extent that a statement contained in any subsequently filed document that also is or is deemed to be incorporated by reference in this proxy statement modifies or supersedes that statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this proxy statement.

No persons have been authorized to give any information or to make any representations other than those contained in this proxy statement and, if given or made, such information or representations must not be relied upon as having been authorized by us or any other person. This proxy statement is dated May 6, 2005. You should not assume that the information contained in this proxy statement is accurate as of any date other than that date, and the mailing of this proxy statement to stockholders shall not create any implication to the contrary.

ANNEX  A

 Dresdner Kleinwort Wasserstein

Dresdner Kleinwort Wasserstein Securities LLC
1301 Avenue of the Americas
New York, NY 10019-6163

Telephone: (212) 969 2700
www.drkw.com

March 23, 2005

Board of Directors
Pathmark Stores, Inc.
200 Milik Street
Carteret, NJ  07008

Members of the Board:

You have asked us to advise you with respect to the fairness, from a financial point of view, to Pathmark Stores, Inc. (the "Company") of the cash consideration to be received by the Company in exchange for the issuance and sale of securities (the "Transaction") contemplated by the Securities Purchase Agreement among Yucaipa American Alliance (Parallel) Fund I, LP, Yucaipa American Alliance Fund I, LP and Yucaipa Corporate Initiatives Fund I, LP (collectively, the "Investors") and the Company (the "Securities Purchase Agreement"). Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Securities Purchase Agreement. Pursuant to the Securities Purchase Agreement, among other things, the Investors will receive the Purchased Securities, which consist of (i) 20,000,000 shares of Company Common Stock, (ii) 10,060,000 Series A Investor Warrants, and (iii) 15,046,350 Series B Investor Warrants, and the Company will receive, in consideration thereof, $150,000,000 in cash (the "Purchase Price"). The terms of the Investor Warrants are set forth in the Investor Warrant Agreement, and the terms and conditions of the Transaction are set forth in more detail in the Securities Purchase Agreement.

In connection with rendering our opinion, we have reviewed drafts (at March 22, 2005) of the Securities Purchase Agreement, the Investor Warrant Agreement, the Management Agreement, the Registration Rights Agreement and the Stockholders' Agreement and for purposes hereof, we have assumed that the final forms of these documents will not differ in any material respect from the drafts provided to us. We have also reviewed and analyzed certain publicly available business and financial information relating to the Company for recent years and interim periods to date, as well as certain internal financial and operating information, including financial forecasts, analyses and projections prepared by or on behalf of the Company and the Investors and provided to us for purposes of our analysis, and we have met with management of the Company to review and discuss such information and, among other matters, the Company's business, operations, assets, financial condition and future prospects, including alternatives available to the Company in the absence of the Transaction.

We have reviewed and considered certain financial and stock market data relating to the Company, and we have compared that data with similar data for certain other companies, the securities of which are publicly traded, that we believe may be relevant or comparable in certain respects to the Company, and we have reviewed and considered the financial terms of certain recent minority investments, acquisitions and business combination transactions in the supermarket industry specifically, and in other industries generally, that we believe to be reasonably comparable to the Transaction or otherwise relevant to our inquiry. We have also performed such other financial studies, analyses, and investigations and reviewed such other information as we considered appropriate for purposes of this opinion. In addition, over the past six months, we have been in contact with more than 50 parties to determine and solicit interest in acquiring all or a substantial part of the Company.

In our review and analysis and in formulating our opinion, we have assumed and relied upon the accuracy and completeness of all of the historical financial and other information provided to or discussed with us or publicly

Member of the New York Stock Exchange

Board of Directors
Pathmark Stores, Inc.
March 23, 2005
Page 2

available, and we have not assumed any responsibility for independent verification of any of such information. We have also assumed and relied upon the reasonableness and accuracy of the financial projections, forecasts and analyses provided to us, and we have assumed that such projections, forecasts and analyses were reasonably prepared in good faith and on bases reflecting the best currently available judgments and estimates of the Company's management or the Investors, as applicable. We express no opinion with respect to such projections, forecasts and analyses or the assumptions upon which they are based. In addition, we have not reviewed any of the books and records of the Company, or assumed any responsibility for conducting a physical inspection of the properties or facilities of the Company, or for making or obtaining an independent valuation or appraisal of the assets or liabilities of the Company, and no such independent valuation or appraisal was conducted by or provided to us. We also have assumed that the transactions described in the Securities Purchase Agreement and the Ancillary Agreements will be consummated without waiver or modification of any of the material terms or conditions contained therein by any party thereto. Our opinion is necessarily based on economic and market conditions and other circumstances as they exist and can be evaluated by us as of the date hereof.

In the ordinary course of our business, we may actively trade the debt and equity securities of the Company for our own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

As the Board of Directors is aware, we are acting as financial advisor to the Company in connection with the proposed Transaction and will receive a fee for our services, a significant portion of which is contingent upon the consummation of the Transaction, as well as a fee for rendering this opinion. In addition, we have performed various investment banking services for the Company from time to time in the past and have received customary fees for rendering such services. In particular, in 2000, we acted as financial advisor to the Company during its reorganization under Chapter 11 of the U.S. Bankruptcy Code. Also, in 2002, we acted as transaction coordinator and joint bookrunner in the Company's offering of $200 million 8.75% Senior Subordinated Notes due 2012.

Our opinion addresses only the fairness, from a financial point of view, to the Company of the Purchase Price to be received by the Company in exchange for the issuance and sale of the Purchased Securities in the Transaction, and we do not express any views on any other terms (financial or otherwise) of the Transaction or the other transactions contemplated by the Securities Purchase Agreement or the Ancillary Agreements or any term of the Securities Purchase Agreement or the Ancillary Agreements. Specifically, our opinion does not address the Company's underlying business decision to effect the Transaction or the Company's proposed use or uses of the proceeds of the Transaction, and we have assumed, with your permission, that the Purchase Price will not be reduced by any amounts payable from and after the Closing to the Investors pursuant to the Securities Purchase Agreement or any of the Ancillary Agreements. We are not expressing any opinion as to the prices at which the Company Common Stock will trade following the announcement or the consummation of the Transaction, whether the Investor Warrants will be exercised at any point in the future or what the value of the Investor Warrants or the shares of Company Common Stock issuable upon exercise of the Investor Warrants actually will be when (and if) issued as contemplated by the Securities Purchase Agreement or the Investor Warrant Agreement, as applicable, which all may vary depending upon, among other factors, changes in interest rates, market conditions, general economic conditions and other factors that generally influence the price of securities.

As you know, on March 21, 2005, another bidder submitted a proposal to acquire all of the Company Common Stock for cash (the "Alternative Proposal"). The form of merger agreement submitted with the Alternative Proposal was not in a form capable of being executed by the Company immediately, and the Alternative Proposal was not accompanied by evidence of financing, such as executed commitment letters, reflecting the transaction structure that the bidder had proposed to the Company during prior negotiations. You have informed us that the Board of Directors of the Company has concluded that the Transaction represents the best value reasonably available to the stockholders of the Company. With your permission, in rendering our opinion, we did not address the relative merits of the Transaction, any other agreements or other matters provided for or contemplated by the Securities Purchase Agreement or the Ancillary Agreements or any other transaction that may be or might have been available

Board of Directors
Pathmark Stores, Inc.
March 23, 2005
Page 3

as an alternative to the Transaction (including the Alternative Proposal), whether or not any such alternative could be or have been achieved, or the terms upon which any such alternative transaction could be or have been achieved.

It is understood that this letter is for the benefit and use of the Board of Directors of the Company in its consideration of the Transaction, and except for inclusion in its entirety in any proxy statement of the Company required to be circulated to stockholders of the Company relating to the Transaction, may not be quoted, referred to or reproduced at any time or in any manner without our prior written consent. This opinion does not constitute a recommendation to any stockholder with respect to how such holder should vote with respect to the Transaction or any other matter.

Based upon and subject to the foregoing, including the various assumptions and limitations set forth herein, it is our opinion that as of the date hereof, the Purchase Price to be received by the Company in exchange for the issuance and sale of the Purchased Securities in the Transaction is fair, from a financial point of view, to the Company.

Very truly yours,

Dresdner Kleinwort Wasserstein
Securities LLC

A–3

ANNEX B
EXECUTION COPY

SECURITIES PURCHASE AGREEMENT

Dated as of March 23, 2005

among

Yucaipa Corporate Initiatives Fund I, L.P.

Yucaipa American Alliance Fund I, L.P.

Yucaipa American Alliance (Parallel) Fund I, L.P

The Yucaipa Companies LLC (As Investors' Representative)

and

Pathmark Stores, Inc.

## TABLE OF CONTENTS

### ARTICLE I
### DEFINITIONS

SECTION 1.01. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-5

### ARTICLE II
### PURCHASE AND SALE

SECTION 2.01. Purchase and Sale of the Purchased Securities. . . . . . . . . . . . . . . . . . . . . . . . . . B-11

SECTION 2.02. Purchase Price. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11

SECTION 2.03. Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11

SECTION 2.04. Closing Deliveries by the Company. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11

SECTION 2.05. Closing Deliveries by the Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-11

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

SECTION 3.01. Organization and Qualification; Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-12

SECTION 3.02. Certificate of Incorporation and By-laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-12

SECTION 3.03. Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-12

SECTION 3.04. Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-13

SECTION 3.05. No Conflict; Required Filings and Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . B-14

SECTION 3.06. Permits; Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-14

SECTION 3.07. SEC Filings; Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-15

SECTION 3.08. Absence of Certain Changes or Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-16

SECTION 3.09. Absence of Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-17

SECTION 3.10. Employee Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-17

SECTION 3.11. Labor Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-19

SECTION 3.12. Proxy Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-19

SECTION 3.13. Property and Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-19

SECTION 3.14. Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-20

SECTION 3.15. Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-21

SECTION 3.16. Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-23

SECTION 3.17. Contracts; Debt Instruments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-23

SECTION 3.18. Related Party Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-24

SECTION 3.19. Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-24

SECTION 3.20. Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-25

SECTION 3.21. Private Offering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-25

SECTION 3.22. Vote Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-25

SECTION 3.23. Section 203 of the DGCL; Takeover Statute . . . . . . . . . . . . . . . . . . . . . . . . .     B-25

SECTION 3.24. Fairness Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-25

SECTION 3.25. Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-26

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF INVESTORS

SECTION 4.01. Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-26

SECTION 4.02. Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-26

SECTION 4.03. No Conflict; Required Filings and Consents . . . . . . . . . . . . . . . . . . . . . . . .     B-26

SECTION 4.04. Investment Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-27

SECTION 4.05. Status of Shares; Limitations on Transfer and Other Restrictions . . . . . . . . . . .     B-27

SECTION 4.06. Sophistication and Financial Condition of the Investors . . . . . . . . . . . . . . . . .     B-27

SECTION 4.07. Available Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-27

SECTION 4.08. Proxy Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-27

SECTION 4.09. Ownership of Company Capital Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-27

SECTION 4.10. Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-28

### ARTICLE V
### CONDUCT OF BUSINESS PENDING THE CLOSING

SECTION 5.01. Conduct of Business by the Company Pending the Closing . . . . . . . . . . . . . . .     B-28

SECTION 5.02. No Contrary Agreements or Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-30

### ARTICLE VI
### ADDITIONAL AGREEMENTS

SECTION 6.01. Stockholders' Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-30

SECTION 6.02. Proxy Statement; Other SEC Filings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-31

SECTION 6.03. Access to Information; Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-31

SECTION 6.04. No Solicitation of Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-32

SECTION 6.05. Further Action; Reasonable Best Efforts; Consents; Filings . . . . . . . . . . . . . .     B-33

SECTION 6.06. Public Announcements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-34

SECTION 6.07. Credit Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-34

SECTION 6.08. Board Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-35

SECTION 6.09. Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-35

SECTION 6.10. Certain Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-35

SECTION 6.11. Investors' Representative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     B-36

### ARTICLE VII
### CONDITIONS

SECTION 7.01. Conditions to the Obligations of Each Party . . . . . . . . . . . . . . . . . . . . . . . . . .     B-36

SECTION 7.02. Conditions to the Obligations of the Investors . . . . . . . . . . . . . . . . . . . . . . . . .   B-37

SECTION 7.03. Conditions to the Obligations of the Company  . . . . . . . . . . . . . . . . . . . . . . .   B-38

**ARTICLE VIII**
**TERMINATION, AMENDMENT and WAIVER**

SECTION 8.01. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-38

SECTION 8.02. Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-40

SECTION 8.03. Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-40

SECTION 8.04. Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-41

SECTION 8.05. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-41

**ARTICLE IX**
**GENERAL PROVISIONS**

SECTION 9.01. Survival of Representations and Warranties; Indemnification . . . . . . . . . . . . . .   B-41

SECTION 9.02. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-43

SECTION 9.03. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-44

SECTION 9.04. Entire Agreement; Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-44

SECTION 9.05. Parties in Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-44

SECTION 9.06. Specific Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-44

SECTION 9.07. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-44

SECTION 9.08. Waiver of Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-45

SECTION 9.09. Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-45

SECTION 9.10. Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-45

SECTION 9.11. Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   B-45

EXHIBITS

Exhibit A Investor Warrant Agreement

Exhibit B Management Agreement

Exhibit C Registration Rights Agreement

Exhibit D Stockholders Agreement

Exhibit E Form of Opinion of Counsel to Company

Exhibit F Form of Opinion of Counsel to Investors

SCHEDULE I Investor Unit Allocation

SECURITIES PURCHASE AGREEMENT, dated as of March 23, 2005 (this *"Agreement"*), between Yucaipa Corporate Initiatives Fund I, L.P., a Delaware limited partnership (*"YCI"*), Yucaipa American Alliance Fund I, L.P., a Delaware limited partnership (*"YAAF"*), Yucaipa American Alliance (Parallel) Fund I, L.P., a Delaware limited partnership (*"YAAF Parallel"* and, together with YCI and YAAF, the *"Investors"*), The Yucaipa Companies LLC, a Delaware limited liability company (*"Investors' Representative"*) (which is a party to this Agreement solely with respect to Section 6.11 hereof), and Pathmark Stores, Inc., a Delaware corporation (the *"Company"*).

## RECITALS

WHEREAS, the Company desires to sell to the Investors, and the Investors desire to purchase from the Company, pursuant to the terms and conditions set forth in this Agreement, an aggregate of 20,000,000 investment units (*"Units"*), which consist in the aggregate of (i) 20,000,000 shares (the *"Shares"*) of the common stock, par value $0.01 per share, of the Company (the *"Company Common Stock"*), (ii) 10,060,000 Series A warrants (the *"Series A Investor Warrants"*), the terms of which shall be governed by a warrant agreement between the Company and the Investors in the form attached hereto as Exhibit A (the *"Investor Warrant Agreement"*), to purchase additional shares of Company Common Stock and (iii) 15,046,350 Series B warrants (the *"Series B Investor Warrants"*; together with the Series A Investor Warrants, the *"Investor Warrants"*), the terms of which shall also be governed by the Investor Warrant Agreement, to purchase additional shares of Company Common Stock (the Units, the Shares and the Investor Warrants are collectively referred to herein as the *"Purchased Securities"*);

WHEREAS, each one Unit will consist of one Share, 0.503 Series A Investor Warrants, and 0.7523175 Series B Investor Warrants;

WHEREAS, concurrently with execution of this Agreement the Company will enter into a management agreement with the Investors' Representative in the form attached hereto as Exhibit B (the *"Management Agreement"*), and concurrently with the closing of the sale and purchase of the Purchased Securities contemplated by this Agreement, the Company will enter into (i) the Investor Warrant Agreement, (ii) a registration rights agreement with the Investors with respect to the Shares and shares of Company Common Stock issuable upon exercise of the Investor Warrants, in the form attached hereto as Exhibit C (the *"Registration Rights Agreement"*) and (iii) a stockholders' agreement with the Investors, in the form attached hereto as Exhibit D (the *"Stockholders Agreement"*).

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Investors and the Company hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01.  *Definitions.*

(a)  For purposes of this Agreement:

"*Acquisition Proposal*" means any proposal or offer from any person relating to any direct or indirect (i) sale, lease or other disposition directly or indirectly by merger, consolidation, business combination, share exchange, joint venture or otherwise of assets of the Company or any Subsidiary representing 20% or more of the consolidated assets of the Company and its Subsidiaries (other than sales of inventory in the ordinary course of business and consistent with past practice); (ii) issuance, sale or other disposition, directly or indirectly (including, without limitation, by way of merger, consolidation, business combination, share exchange, joint venture or

any similar transaction), of securities (or options, rights or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing 20% or more of any class of equity securities of the Company; (iii) tender offer or exchange offer as defined pursuant to the Exchange Act that, if consummated, would result in any person beneficially owning 20% or more of any class or series (or the voting power of any class or series) of equity securities of the Company or any other transaction in which any person shall acquire beneficial ownership or the right to acquire beneficial ownership, of 20% or more of any class or series (or the voting power of any class or series) of equity securities; (iv) merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company, or any Subsidiary representing 20% or more of the consolidated assets of the Company and its Subsidiaries; or (v) combination of the foregoing (in each case, other than the Transactions).

"*affiliate*" of a specified person means a person who, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

"*Ancillary Agreements*" means the Investor Warrant Agreement, the Registration Rights Agreement, the Management Agreement and the Stockholders Agreement.

"*beneficial owner*" (and related terms such as "*beneficially owned*" or "*beneficial ownership*") has the meaning ascribed to such term under Rule 13d-3 of the Exchange Act.

"*By-Laws*" means the Amended and Restated By-Laws of the Company effective April 16, 2004.

"*business day*" means any day on which the principal offices of the SEC in Washington, D.C. are open to accept filings, or, in the case of determining a date when any payment is due, any day on which banks are not required or authorized to close in New York City.

"*Board*" means the Board of Directors of the Company.

"*Certificate of Incorporation*" means the Amended and Restated Certificate of the Company, dated as of September 19, 2000.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*contracts*" means any agreement, contract, lease, power of attorney, note, loan, evidence of indebtedness, purchase order, letter of credit, settlement agreement, franchise agreement, undertaking, covenant not to compete, employment agreement, license agreement, instrument, obligation, commitment, understanding, policy which constitutes an executory obligation, purchase and sales order, quotation which constitutes an executory commitment, and other executory commitments to which a person is a party or to which any of the assets of such person are subject, whether oral or written, express or implied.

"*control*" (including the terms "*controlled by*" and "*under common control with*") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, as trustee or executor, by contract, credit arrangement or otherwise; including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such person.

"*Data Site Index*" means the index at Section 1.01(a)(1) of the Disclosure Schedule listing those items in the Electronic Data Room.

"*DGCL*" means the General Corporation Law of the State of Delaware.

B-6

"*Electronic Data Room*" means those documents included on an Internet site as of the date hereof, which has been made available to the Investors.

"*Environmental Laws*" means any United States federal, state, local or foreign Laws in existence on the date hereof relating to pollution or the protection, investigation or restoration of the environment or human health due to exposure to Hazardous Substances.

"*Equity Interest*" means any share, capital stock, partnership, member or similar interest in any person, and any option, warrant, right or security (including, without limitation, debt securities) convertible, exchangeable or exercisable therefor.

"*Expenses*" includes all reasonable and documented out-of-pocket costs, fees and expenses (including, without limitation, all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation and execution of this Agreement and the Ancillary Agreements and the performance of the Transactions contemplated by this Agreement, including, without limitation, all expenses incurred to obtain all consents, approvals and authorizations of any third party with respect to the Transactions.

"*Hazardous Substances*" means (i) those substances defined in or regulated under the following federal statutes and their state counterparts, as each may be amended from time to time, and all regulations thereunder: the Hazardous Materials Transportation Act, the Solid Waste Disposal Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Occupational Health and Safety Act, and the Clean Air Act; (ii) petroleum and petroleum products, including crude oil and any fractions thereof; (iii) natural gas, synthetic gas, and any mixtures thereof; (iv) polychlorinated biphenyls, asbestos and radon; and (v) any substance, material, or waste defined as toxic or hazardous or as a pollutant or contaminant, or regulated by any Governmental Authority pursuant to any Environmental Law.

"*Intellectual Property*" means United States and non-United States (a) inventions and discoveries (whether or not patentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, invention disclosures, and other rights of invention, worldwide, including without limitation any reissues, divisions, continuations, continuations-in-part, provisionals, reexamined patents or other applications or patents claiming the benefit of the filing date of any such application or patent; (b) trademarks, service marks, trade names, trade dress, logos, Internet domain names, product names and slogans, including any common law rights, registrations, and applications for registration for any of the foregoing, and the goodwill associated with all of the foregoing, worldwide; (c) copyrightable works, all rights in copyrights, including moral rights, copyrights, website content, packaging design and art work, and other rights of authorship and exploitation, and any applications, registrations and renewals in connection therewith, worldwide; (d) confidential and proprietary information, including without limitation, customer and supplier lists and related information, pricing and cost information, business and marketing plans, research and development, advertising statistics, any other financial, marketing and business data, technical data, databases, specifications, designs, drawings, methods, schematics and know-how (collectively, "*Trade Secrets*"); (e) to the extent not covered by subsections (a) through (d), above, software and website content; (f) all claims, causes of action and rights to sue for past, present and future infringement, misappropriation or unconsented use of any of the Intellectual Property, the right to file applications and obtain registrations, and all products, proceeds and revenues arising from or relating to any and all of the foregoing, throughout the world; and (g) the rights to use the names and likenesses of natural persons and