# EXHIBIT A
# Part 5 of 8

*Recommendation*") and the matters to be considered at the Stockholders' Meeting or (ii) other than the Transactions contemplated by this Agreement, approve or recommend, or propose publicly to approve or recommend, any Acquisition Proposal. Nothing contained in this Section 6.04(d) shall prohibit the Company (x) from taking and disclosing to its stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) promulgated under the Exchange Act if the Board determines, in good faith, after consultation with outside counsel, it would otherwise constitute a breach of its fiduciary duty to stockholders to not take and disclose such position or (y) in the event that a Superior Proposal is made and the Board determines in good faith, after consultation with outside counsel, that it would otherwise constitute a breach of its fiduciary duty to stockholders, from withdrawing or modifying its recommendation of the Transactions contemplated by this Agreement no earlier than three business days following the day of delivery of written notice to the Investors of its intention to do so. Notwithstanding any actions that may be taken pursuant to this Section 6.04, the Company shall in all events comply with the provisions of Section 6.01.

SECTION 6.05.  *Further Action; Reasonable Best Efforts; Consents; Filings.*

(a)  Upon the terms and subject to the conditions hereof, each of the parties hereto shall use its reasonable best efforts to (i) take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions, (ii) obtain from any Governmental Authorities any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made by the Investors or the Company or any of their respective Subsidiaries, or to avoid any action or proceeding by any Governmental Authority (including, without limitation, those in connection with the HSR Act), in connection with the authorization, execution and delivery of this Agreement and each Ancillary Agreement and the consummation of the Transactions contemplated herein and therein, including, without limitation, the Transactions, and (iii) make promptly its respective filings, and thereafter make any other submissions, required under (x) the Exchange Act, and any other applicable federal or state securities Laws, (y) the HSR Act (in respect of which the parties will file a Notification and Report Form as soon as practicable but in no event later than ten (10) days after the date of this Agreement) and (z) any other applicable Law; *provided, however*, that the Investors and the Company shall cooperate with each other in connection with the making of all such filings, including providing copies of all such documents to the non-filing party and its advisors prior to filing and, if requested, to accept all reasonable additions, deletions or changes suggested in connection therewith.

(b)  The parties hereto shall cooperate and assist one another in connection with all actions to be taken pursuant to Section 6.05(a), including the preparation and making of the filings referred to therein and, if requested, amending or furnishing additional information thereunder, including, subject to applicable Law and the Confidentiality Agreement, providing copies of all related documents to the non-filing party and their advisors prior to filing, and to the extent practicable none of the parties will file any such document or have any communication with any Governmental Authority without prior consultation with the other parties. Each party shall keep the others apprised of the content and status of any communications with, and communications from, any Governmental Authority with respect to the Transactions. To the extent practicable and permitted by a Governmental Authority, each party hereto shall permit representatives of the other party to participate in meetings (whether by telephone or in person) with such Governmental Authority.

(c)  Each of the parties hereto agrees to cooperate and use its reasonable best efforts to defend through litigation on the merits any Action, including any administrative or judicial Action, asserted by any party in order to avoid the entry of, or to have vacated, lifted, reversed, terminated or overturned any decree, judgment, injunction or other order (whether temporary, preliminary or permanent) that in whole or in part restricts, prevents or prohibits consummation of the Transactions by August 31, 2005, including, without limitation, by vigorously pursuing all available avenues of administrative and judicial appeal.

(d) Notwithstanding any other provision of this Agreement to the contrary, the Investors agree to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any antitrust or trade regulation Law that may be asserted by any Governmental Authority or any other person with respect to the Transactions so as to enable the parties to consummate the Transactions by August 31, 2005, including, without limitation, proposing, negotiating and committing to and/or effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture or disposition of such assets or businesses of the Investors or the Company (including assets or businesses of a subsidiary of any Investor or the Company) as are required to be divested, or entering into such other arrangements as are required in order to avoid the entry of, or to effect the dissolution of, any decree, judgment, injunction (whether temporary, preliminary or permanent) or other order in any suit or proceeding, which would otherwise have the effect of preventing, restricting, restraining or prohibiting the consummation of the Transactions by August 31, 2005.

(e) From the date of this Agreement through the Closing, no Investor shall, nor shall it cause its affiliates to enter into any letter of intent (whether binding or non-binding), contract or other commitment of any kind relating to the acquisition by such Investor or such affiliate of any voting interest in any business related to the retail food or drug business, the effect of which would reasonably be expected to delay or prevent the consummation of the Transactions.

(f) The Company, the Subsidiaries and the Investors shall give any notices to third parties, and use all reasonable efforts to obtain any third party consents, (i) necessary, proper or advisable to consummate the Transactions contemplated in this Agreement and each Ancillary Agreement or (ii) required to be disclosed in the Disclosure Schedule. In the event that either party shall fail to obtain any third party consent described in the first sentence of this Section 6.05(f), such party shall use all reasonable efforts, and shall take any such actions reasonably requested by the other party hereto, to minimize any adverse effect upon the Company, the Subsidiaries and the Investors, and their respective businesses resulting, or which would reasonably be expected to result after the Closing, from the failure to obtain such consent.

(g) From the date of this Agreement until the Closing, the Company shall promptly notify the Investors in writing of any pending or, to the knowledge of the Company, threatened Action by any Governmental Authority or any other person (i) challenging or seeking material damages in connection with the Transactions or (ii) seeking to restrain or prohibit the consummation of the Transactions, which in either case would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect prior to or after the Closing.

SECTION 6.06. *Public Announcements.* The Investors and the Company agree that no public release or announcement concerning the Transactions shall be issued by either party without the prior consent of the other party (which consent shall not be unreasonably withheld), except as such release or announcement may be required by Law or the rules or regulations of Nasdaq, in which case the party required to make the release or announcement shall use its best efforts to allow the other party reasonable time to comment on such release or announcement in advance of such issuance.

SECTION 6.07. *Credit Agreement.* The Company shall use its reasonable best efforts to obtain from the required lenders under the Company's $250.0 million Amended and Restated Credit Agreement dated as of October 1, 2004, as in effect on the date of this Agreement (the "Credit Agreement") a permanent waiver or amendment of the applicable provisions of Section 2.12 and Article VII and any other applicable provisions of such Credit Agreement in order to permit the Company to retain the proceeds from the sale of the Purchased Securities (including any proceeds from the exercise of the Investor Warrants) and apply them for general corporate purposes and to permit the consummation of the Transactions and the performance by the Company of its obligations under this Agreement and the Ancillary Agreements. The Company shall also use its reasonable best efforts to obtain from such required lenders the amendments contemplated on Section 6.07 of the Disclosure Schedule and such other amendments to the Credit Agreement as the Company and the Investors shall mutually agree.

SECTION 6.08.   *Board Representation.*

(a)  Within 15 business days after the execution of this Agreement, the Investors shall notify the Board in writing of the names of five individuals (which may include one or more members of senior management of the Company) that the Investors designate as the individuals who shall be appointed to the Board immediately after the Closing (it being understood that YAAF and YAAF Parallel each shall have the right to designate one such person, and that Investors collectively shall designate the other three such persons). Prior to the mailing to Company Stockholders of the Proxy Statement, the Investors shall have the right to revise their list of five individuals, and the individuals so designated (the "*Investor Director Designees*") shall be disclosed in the Proxy Statement, and such individuals shall consent to serve if appointed. The Board shall have the right to consent to the Investor Director Designees designated by the Investors prior to the Closing, which consent shall not be unreasonably withheld.

(b)  Within 15 business days after execution of this Agreement, the Board shall notify the Investors in writing of the names of up to six individuals who are independent directors of the Company as of the date of this Agreement and who the Board designates as the directors who intend to remain as members of the Board following the Closing. Prior to the mailing to the Company Stockholders of the Proxy Statement, the Board shall have the right to revise or supplement its list of up to six individuals, and the individuals so designated (the "*Continuing Independent Directors*") shall be disclosed in the Proxy Statement, and such individuals shall consent to continue to serve as directors following the Closing.

(c)  In the event that, at any time prior to the mailing to the Company Stockholders of the Proxy Statement, the number of named Continuing Independent Directors shall be less than six, the Board and the Nominating Committee of the Board shall use all reasonable efforts to recruit additional individuals who meet the requirements of Section 2.01(a)(ii) of the Stockholders Agreement and who shall consent to serve as independent directors of the Company after the Closing (the "*New Independent Directors*"), *provided, however,* that immediately prior to the Closing, the aggregate number of named Continuing Independent Directors and New Independent Directors may be either less than or equal to six. The Investors shall have the right to consent to the New Independent Directors designated by the Board prior to the Closing, which consent shall not be unreasonably withheld.

(d)  Immediately prior to the Closing, the Company and the Board shall take all actions necessary to (i) increase the authorized number of directors to eleven, (ii) cause those directors of the Company who are not Continuing Independent Directors to resign from the Board, and (iii) effective as the Closing, appoint the Investor Director Designees and the New Independent Directors as directors of the Company.

SECTION 6.09.   *Cooperation.*   The Company and the Investors shall coordinate and cooperate in connection with (i) the preparation of the Proxy Statement and any Other Filings, (ii) determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Company Material Contracts, in connection with the consummation of the Transactions and (iii) seeking any such actions, consents, approvals or waivers or making any such filings, furnishing information required in connection therewith or with the Proxy Statement or any Other Filings and timely seeking to obtain any such actions, consents, approvals or waivers.

SECTION 6.10.   *Certain Notices.*   From and after the date of this Agreement until the Closing, each party shall promptly notify the other party of (i) the occurrence of any material adverse effect with respect to it, (ii) the occurrence, or non-occurrence, of any event or any breach or misrepresentation that would reasonably be expected to cause any condition to the obligations of such party to effect the Transactions not to be satisfied or (iii) the failure of such party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it pursuant to this

Agreement or any Ancillary Agreement that would reasonably be expected to result in any condition to the obligations of such party to effect the Transactions not to be satisfied; *provided, however*, that the delivery of any notice pursuant to this Section 6.10 shall not cure any breach of any representation or warranty requiring disclosure of such matter prior to the date of this Agreement or otherwise limit or affect the remedies available hereunder to the party receiving such notice.

SECTION 6.11.  *Investors' Representative.*  Except for the rights of YAAF and YAAF Parallel to designate persons to be appointed to the Board pursuant to Section 6.08 hereof, which rights shall be exercised only by YAAF and YAAF Parallel as set forth in Section 6.08, the parties acknowledge and agree that The Yucaipa Companies LLC shall be the designated representative of the Investors, or Investors' Representative, with the authority to make all decisions and determinations and to take all actions (including giving consents and waivers or agreeing to any amendments to this Agreement or to the termination hereof) required or permitted hereunder on behalf of the Investors, and any such action, decision or determination so made or taken shall be deemed the action, decision or determination of the Investors, and any notice, document, certificate or information required to be given to any Investor shall be deemed so given if given to the Investors' Representative.

## ARTICLE VII

## CONDITIONS

SECTION 7.01.  *Conditions to the Obligations of Each Party.*  The obligations of each party to effect the Transactions shall be subject to the satisfaction or waiver, at or prior to the Closing, of the following conditions:

(a)  *Stockholder Approval.*  The issuance of the Purchased Securities shall have been approved and adopted by the requisite affirmative vote of the stockholders of the Company in accordance with the DGCL, the Certificate of Incorporation of the Company and Nasdaq Rule 4350(i)(D);

(b)  *No Order.*  No Governmental Authority in the United States shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) which is then in effect and has the effect of making the Transactions illegal or otherwise restricting, preventing or prohibiting consummation of the Transactions;

(c)  *HSR Act.*  Any waiting period (and any extension thereof) applicable to the consummation of the Transactions under the HSR Act shall have expired or been terminated; and

(d)  *Court Proceedings.*  No Action shall be pending or threatened before any Governmental Authority wherein an unfavorable injunction, judgment, order, decree, ruling or charge would reasonably be expected to (A) (1) prevent consummation of any of the Transactions contemplated by this Agreement or any Ancillary Agreement, (2) cause any of the Transactions contemplated by this Agreement or any Ancillary Agreement to be rescinded following consummation thereof, (3) materially adversely affect the rights and powers of the Investors to own the Purchased Securities, and exercise all of their rights as stockholders of the Company and as parties to the Ancillary Agreements, and in each case, no such injunction, judgment, order, decree, ruling or charge shall be in effect or (B) cause or require the payment by the Company (including as the result of the acceleration, or other obligation to repay prior to scheduled maturity, any indebtedness) or, to the extent such Action relates to the Company or the Transactions contemplated by this Agreement or any Ancillary Agreement, the Investors, of damages, fines or other penalties or awards that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; *provided, however* that, in each case, any such threatened Action would reasonably be expected to be adversely determined against the Company, the Investors or their respective affiliates.

SECTION 7.02.  *Conditions to the Obligations of the Investors.*  The obligations of the Investors to consummate the Transactions are subject to the satisfaction or waiver of the following additional conditions:

(a)  *Representations and Warranties.*  Each of the representations and warranties of the Company contained in this Agreement and each Ancillary Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing as though made on and as of the Closing (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date), and all representations and warranties which are not so qualified shall be true and correct in all material respects (except that those representations and warranties which address matters only as of a particular date need only remain true and correct in all material respects as of such date).

(b)  *Agreements and Covenants.*  Each of the Company and each Subsidiary shall have performed, in all material respects, all obligations and complied with, in all material respects, its agreements and covenants to be performed or complied with by it under this Agreement and the Ancillary Agreements to which it is a party on or prior to the Closing.

(c)  *Officer Certificate.*  The Company shall have delivered to the Investors a certificate, dated the date of the Closing, signed by the President of the Company, certifying as to the satisfaction of the conditions specified in Sections 7.02(a), (b), (d), and (g).

(d)  *Material Adverse Effect.*  No Material Adverse Effect shall have occurred since the date of this Agreement.

(e)  *Ancillary Agreements.*  Each of the Ancillary Agreements to which the Company is a party shall have been duly executed and delivered by the Company,

(f)  *Payments Under Management Agreement.*  All amounts owing from the Company to the Investors' Representative at the Closing pursuant to the Management Agreement shall have been paid or provision for such payment shall have been made in form and substance that is satisfactory to the Investors.

(g)  *Credit Agreement.*  The waivers and amendments in respect of the Credit Agreement referred to in the first sentence of Section 6.07 shall have been obtained in form and substance reasonably satisfactory to the Investors. Immediately prior to the Closing, the Company's *"Excess Availability"* (as defined in the Credit Agreement) under the Credit Agreement, minus the amount of any Expenses (including amounts payable to the Investors' Representative under the Management Agreement) that are unpaid immediately prior to the Closing, shall be at least $20.0 million.

(h)  *Board Representation.*  The Investor Director Designees shall have been duly appointed, effective concurrently with the Closing, to the Board and to all applicable committees of the Board in accordance with the provisions of this Agreement and the Stockholders Agreement and the resignation of all directors who are neither Investor Director Designees nor Continuing Independent Directors shall have become effective.

(i)  *Opinion of Counsel.*  A favorable opinion of Shearman & Sterling LLP, counsel to the Company, dated as of the Closing Date, covering the matters attached hereto as Exhibit E-1 shall have been delivered to the Investors, and a favorable opinion of other counsel to the Company, dated as of the Closing Date, covering the matters attached hereto as Exhibit E-2 shall have been delivered to the Investors.

(j)  *Certified Resolutions.*  Certified copies of resolutions duly adopted by the Board and stockholders of the Company authorizing the execution, delivery and performance of this Agreement, the Ancillary Agreements to which it is a party and the Transactions.

(k) *Incumbency Certificate.* A certificate of the Secretary of the Company, as to the incumbency of the officer(s) (who shall not be such Secretary) executing this Agreement, the Ancillary Agreements to which the Company is a party and the other instruments, documents, certificates and agreements contemplated hereby or thereby.

(l) *Good Standings.* A short form certificate of good standing of each of the Company and each Subsidiary, certified by the Secretary of State or Clerk of the State Corporation Commission of each state or commonwealth in which it is incorporated or organized or qualified to do business, in each case as of a date not more than two business days prior to the Closing.

(m) *Consents and Approvals.* All consents, approvals and authorizations of any person with respect to the Transactions set forth on Section 7.02(m) of the Disclosure Schedule shall have been obtained (and a copy delivered to the Investors).

SECTION 7.03. *Conditions to the Obligations of the Company.* The obligations of the Company to consummate the Transactions are subject to the satisfaction or waiver of the following additional conditions:

(a) *Representations and Warranties.* Each of the representations and warranties of each Investor contained in this Agreement and each Ancillary Agreement that are qualified by materiality or material adverse effect shall be true and correct as of the date hereof and as of the Closing as though made on and as of the Closing (except that those representations and warranties which address matters only as of a particular date need only be true and correct as of such date), and all representations and warranties which are not so qualified shall be true and correct in all material respects (except that those representations and warranties which address matters only as of a particular date need only remain true and correct in all material respects as of such date).

(b) *Agreements and Covenants.* The Investors shall have performed, in all material respects, all obligations or complied with, in all material respects, all agreements and covenants to be performed or complied with by it under this Agreement on or prior to the Closing.

(c) *Officer Certificate.* Each Investor shall have delivered to the Company a certificate, dated the date of the Closing, signed by the President or any Vice President of such Investor, certifying as to the satisfaction of the conditions specified in Sections 7.03(a) and 7.03(b).

(d) *Ancillary Agreements.* Each of the Ancillary Agreements to which any Investor is a party shall have been duly executed and delivered by such Investor.

(e) *Opinion of Counsel.* A favorable opinion of counsel to the Investors, dated as of the Closing Date, covering the matters attached hereto as Exhibit F shall have been delivered to the Company.

## ARTICLE VIII

## TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01. *Termination.* This Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing, whether or not the Stockholder Approval has been obtained (the date of any such termination, the "Termination Date"):

(a) By mutual written consent of the Investors and the Company (the Company's consent being duly authorized by the Board); or

(b) By either the Investors or the Company if (i) the Closing shall not have occurred on or before August 31, 2005; *provided, however,* that the right to terminate this Agreement under this Section 8.01(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before

such date or (ii) any Governmental Authority in the United States shall have enacted, issued, promulgated, enforced or entered any order, decree, judgment, injunction or ruling which is then in effect and is final and nonappealable and has the effect of making consummation of the Transactions illegal or otherwise preventing or prohibiting consummation of the Transactions; *provided, however* that the party seeking to terminate this Agreement shall have fulfilled its obligations pursuant to Section 6.05 of this Agreement to lift such injunction, order, decree or ruling; or

(c)  By the Investors or the Company if the Stockholder Approval is not obtained at the Stockholders' Meeting;

(d)  By the Investors if (i) the Board shall have withdrawn, or adversely modified, or failed within three business days after the Investors request to reconfirm the Company Recommendation (or determined to do so), (ii) the Board shall have determined to recommend to the stockholders of the Company that they approve an Acquisition Proposal other than that contemplated by this Agreement or shall have determined to accept a Superior Proposal, (iii) a tender offer or exchange offer that, if successful, would result in any person or group becoming a beneficial owner of 20% or more of the outstanding shares of any class or series (or the voting power of any class or series) of equity securities of the Company, is commenced (other than by an Investor or an affiliate of an Investor) and the Board fails within ten days after such commencement to recommend that the stockholders of the Company not tender their shares in such tender or exchange offer or (iv) for any reason the Company fails to call or hold the Stockholders' Meeting by August 26, 2005;

(e)  By the Company, if the Board determines to accept a Superior Proposal, but only after the Company, (i) holds the Stockholders' Meeting and has failed to obtain the Stockholder Approval required for the consummation of the Transactions, (ii) provides the Investors with not less than three business days advance written notice of its determination to accept such Superior Proposal (including all material terms thereof) and within such three business day period has in good faith negotiated, and has caused its, directors, officers, financial and legal advisors to negotiate with the Investors to make such adjustments to the terms and conditions of this Agreement such that such Acquisition Proposal would no longer constitute a Superior Proposal, and (ii) fulfills its obligations under Section 8.03 hereof immediately prior to (and as a pre-condition to) such termination, *provided, however* that the Company's right to terminate this Agreement under this Section 8.01(e) shall not be available if the Company is then in breach of Section 6.04, until such time as such breach shall have been cured;

(f)  By the Investors, if since the date of this Agreement, there shall have been any event, development or change of circumstance that constitutes, has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and such Material Adverse Effect is not cured within 20 days after the Company receives written notice thereof from the Investors; or

(g)  By the Investors, if (i) the Company shall have breached any representation, covenant or agreement set forth in this Agreement, (ii) such breach or misrepresentation is not cured within 20 days after the Company receives written notice thereof from the Investors and (iii) such breach or misrepresentation would cause the conditions set forth in Section 7.02(a) or Section 7.02(b) not to be satisfied.

(h)  By the Company, if (i) any Investor shall have breached any representation, covenant or agreement set forth in this Agreement, (ii) such breach or misrepresentation is not cured within 20 days after any such Investor receives written notice thereof from the Company and (iii) such breach or misrepresentation would cause the conditions set forth in Section 7.03(a) or Section 7.03(b) not to be satisfied.

SECTION 8.02.  *Effect of Termination.*  In the event of the termination of this Agreement pursuant to Section 8.01, this Agreement shall forthwith become void, and there shall be no liability or obligation on the part of any party hereto, except (i) with respect to Article VIII and Article IX, which shall survive any such termination and remain in full force and effect and (ii) with respect to any liabilities or damages incurred or suffered by a party as a result of the material breach by the other party of any of its representations, warranties, covenants or other agreements set forth in this Agreement or any Ancillary Agreement.

SECTION 8.03.  *Fees and Expenses.*

(a)  *Expenses.*  Except as set forth in this Section 8.03 or as provided in the Management Agreement, all Expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such Expenses, whether or not the Transactions are consummated, *provided, however* that the Company shall pay all of the Expenses related to printing, filing and mailing the Proxy Statement and all SEC and other regulatory filing fees incurred. The Investors and the Company agree that if this Agreement is terminated pursuant to Sections 8.01(b), 8.01(c), 8.01(d) or 8.01(e), then the Company shall pay the Investors an amount equal to the sum of the Investors' Expenses up to an amount equal to $2 million. Payment of Expenses pursuant to this Section 8.03 shall be made not later than two business days after delivery, from time to time, to the Company of notice of demand for payment and a documented itemization setting forth in reasonable detail the Expenses of the Investors.

(b)  *Termination Fee.*  In addition to any payment required by the foregoing provisions of this Section 8.03:

(i)  in the event that this Agreement is terminated pursuant to Section 8.01(d) or Section 8.01(e), then the Company shall pay to the Investors immediately prior to such termination, in the case of a termination by the Company, or within two business days thereafter, in the case of a termination by the Investors, a termination fee of $6.5 million,

(ii)  in the event that this Agreement is terminated pursuant to Section 8.01(c) and within 12 months of the termination of this Agreement, the Company or any Subsidiary enters into an agreement concerning a transaction that constitutes an Acquisition Proposal, or otherwise consummates an Acquisition Proposal, then immediately prior to (and as a pre-condition to) entering into any such agreement or consummating such transaction, the Company shall pay the Investors a termination fee of $6.5 million; and

(iii)  in the event that this Agreement is terminated pursuant to Section 8.01(b)(i) and within 12 months of the termination of this Agreement, the Company or any Subsidiary enters into an agreement concerning a transaction that constitutes an Acquisition Proposal, or otherwise consummates an Acquisition Proposal, then immediately prior to (and as a pre-condition to) entering into any such agreement or consummating such transaction, the Company shall pay the Investors a termination fee of $6.5 million.

(c)  *Payments.*  All payments under this Section 8.3 shall be made by wire transfer of immediately available funds (in U.S. dollars) to an account designated in writing by the Investors.

(d)  *Costs of Enforcement.*  The Company acknowledges that the agreements contained in this Section 8.03 are an integral part of the Transactions contemplated by this Agreement. In the event that the Company shall fail to pay any amounts required by this Section 8.03 when due, the Company shall reimburse the Investors for all reasonable fees and expenses incurred by the Investors and their affiliates (including fees and expenses of counsel) in connection with the collection under and enforcement of this Section 8.03.

SECTION 8.04.  *Amendment.*  This Agreement may be amended by the parties hereto by action taken by or on behalf of their respective Boards of Directors at any time prior to the Closing; *provided, however,* that, after the Stockholder Approval is obtained, no amendment may become effective that would by Law require approval of the stockholders of the Company, without approval of such stockholders. This Agreement may not be amended except by an instrument in writing signed by the parties hereto.

SECTION 8.05.  *Waiver.*  At any time prior to the Closing, any party hereto may (i) extend the time for the performance of any obligation or other act of any other party hereto, (ii) waive any inaccuracy in the representations and warranties contained herein or in any document delivered pursuant hereto and (iii) waive compliance with any agreement or condition contained herein. Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

ARTICLE IX

GENERAL PROVISIONS

SECTION 9.01.  *Survival of Representations and Warranties; Indemnification.*

(a)  All representations and warranties contained in this Agreement shall be deemed made at the Closing as if made at such time and shall survive the Closing for 18 months, except that (i) with respect to claims asserted pursuant to this Section 9.01 before the expiration of the applicable representation or warranty, such claims shall survive until the date they are finally liquidated or otherwise resolved, (ii) Section 3.15 shall survive until 30 days after the end of the applicable statute of limitations and (iii) Section 3.01, 3.02, 3.03, 3.04, 3.05(a)(i) shall survive indefinitely. A claim shall be made or commenced hereunder by the Indemnified Party delivering to the Indemnifying Party a written notice specifying in reasonable detail the nature of the claim, the amount claimed (if known or reasonably estimable), and the factual basis for the claim.

(b)  The Company agrees to indemnify and hold harmless each Investor, its partners, affiliates, officers, directors, employees and duly authorized agents and each of their affiliates and each other person controlling any Investor or any of its affiliates within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act and any partner of any of them from and against all losses, claims, damages, diminution in value of the Purchased Securities, expenses (including reasonable counsel fees and disbursements) or liabilities ("*Losses*") which are related to or arise out of (1) any breach by the Company of any of its representations or warranties in this Agreement and (2) failure to perform any of the covenants or agreements made by the Company in this Agreement. The term "Losses" as used in this Section 9.01 is not limited to matters asserted by third parties against an Indemnified Party, but includes Losses incurred or sustained by an Indemnified Party in the absence of third party claims, and shall be net of any Tax benefit available to the Indemnified Party.

(c)  The Investors agree to indemnify and hold harmless each Company, its Subsidiaries and each of their respective officers, directors, employees, duly authorized agents and affiliates from and against all Losses which are related to or arise out of (1) any breach by any Investor of any of its representations or warranties in this Agreement and (2) failure to perform any of the covenants or agreements made by the Investors in this Agreement.

(d)  Notwithstanding anything to the contrary contained in this Agreement: (i) an Indemnifying Party shall not be liable for any claim for indemnification pursuant to this Section 9.01 with respect to any breach of any representation or warranty, unless and until the aggregate amount of indemnifiable Losses which may be recovered from the Indemnifying Party equals or exceeds $2.5 million, after which the Indemnifying Party shall be liable only for those Losses in excess of $2.5 million; (ii) no Losses may be claimed under Section 9.01 by any Indemnified Party or shall be included in calculating the

B-41

aggregate Losses set forth in clause (i) above other than Losses in excess of $50,000 resulting from any single claim or aggregated claims arising out of the same facts, events or circumstances; (iii) with respect to any breach of any representation or warranty, the maximum amount of indemnifiable Losses which may be recovered from an Indemnifying Party arising out of or resulting from the causes set forth in Section 9.01 shall be an amount equal to the Purchase Price; and (iv) neither party hereto shall have any liability under any provision of this Agreement or any Ancillary Agreement for any punitive damages.

(e)  A party claiming indemnification under this Agreement (an *"Indemnified Party"*) with respect to any claims asserted against the Indemnified Party by a third party (*"Third Party Claim"*) that would give rise to a right of indemnification under this Agreement shall promptly (i) notify the party from whom indemnification is sought (the *"Indemnifying Party"*) of the Third Party Claim, and (ii) transmit to the Indemnifying Party a written notice (*"Claim Notice"*) describing in reasonable detail the nature of the Third Party Claim, a copy of all papers served with respect to such claim (if any), and the basis of the Indemnified Party's request for indemnification under this Agreement. Failure to provide such Claim Notice shall not affect the right of the Indemnified Party's indemnification hereunder, except to the extent the Indemnifying Party demonstrates actual and material prejudice as a result of such failure. The Indemnifying Party shall have the right to defend the Indemnified Party against such Third Party Claim provided that such Indemnifying Party has acknowledged in writing its obligation to fully indemnify the Indemnified Party with respect to such Third Party Claim pursuant to this Section 9.01.

(f)  If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party elects to assume the defense of the Third Party Claim, then the Indemnifying Party shall have the right to defend such Third Party Claim with counsel selected by the Indemnifying Party, who is reasonably acceptable to the Indemnified Party, by all appropriate proceedings, which proceedings shall be prosecuted reasonably diligently by the Indemnifying Party to a final conclusion or settled at the discretion of the Indemnifying Party in accordance with this Section 9.01(d). The Indemnifying Party shall have full control of such defense and proceedings, including, any compromise or settlement thereof, *provided, however* that the Indemnifying Party shall not consent to the entry of a judgment or enter into any settlement with respect to the matter (i) which does not contain a complete release of the Indemnified Party, contains a finding of responsibility or liability on the part of the Indemnified Party or the violation of any applicable legal requirement, provides any material sanction or material restriction upon the conduct of any business by the Indemnified Party, or provides for any relief other than monetary damages which are paid in full by the Indemnifying Party, or (ii) without the prior written consent of the Indemnified Party, which consent shall not be unreasonably conditioned, withheld or delayed. If requested by the Indemnifying Party, the Indemnified Party agrees, at the sole cost and expense of the Indemnifying Party, to cooperate with the Indemnifying Party and its counsel in contesting any Third Party Claim which the Indemnifying Party elects to contest, including the making of any related counterclaim against the Person asserting the Third Party Claim or any cross complaint against any person. The Indemnified Party may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Indemnifying Party pursuant to this Section 9.01, and the Indemnified Party shall bear its own costs and expenses with respect to such participation; *provided, however*, if in the opinion of counsel of the Indemnified Party there is a reasonable likelihood of a conflict of interest between the Indemnifying Party and the Indemnified Party, the Indemnifying Party shall bear the reasonable costs and expenses of one counsel to the Indemnified Party in connection with such defense. Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume the defense of any Third Party Claim if the Third Party Claim seeks an order, injunction or other equitable relief or relief for other than money damages against the Indemnified Party that the Indemnified Party reasonably determines, after conferring with its outside counsel, cannot be separated from any related claim for money damages.

B-42

(g)  If the Indemnifying Party fails to notify the Indemnified Party within the thirty (30) days after receipt of any Claim Notice that the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 9.01(f), or if the Indemnifying Party elects to defend the Indemnified Party pursuant to Section 9.01(f) but fails to reasonably diligently defend or settle the Third Party Claim, then the Indemnified Party shall have the right to defend the Third Party Claim by all appropriate proceedings, which proceedings shall be promptly and vigorously defended by the Indemnified Party to a final conclusion or settled (with the reasonable costs and expenses of such defense borne by the Indemnifying Party). The Indemnified Party shall have full control of such defense and proceedings; *provided, however,* that the Indemnified Party may not enter into any compromise or settlement of such Third Party Claim if indemnification is to be sought hereunder, without the Indemnifying Party's consent, which shall not be unreasonably withheld or delayed. The Indemnifying Party may participate in, but not control, any defense or settlement controlled by the Indemnified Party pursuant to this Section 9.01(g), and the Indemnifying Party shall bear its own costs and expenses with respect to such participation.

(h)  In the event any Indemnified Party should have a claim against any Indemnifying Party hereunder which does not involve a Third Party Claim, the Indemnified Party shall promptly transmit to the Indemnifying Party a written notice (the "*Indemnity Notice*") describing in reasonable detail the nature of the claim, the Indemnified Party's best estimate of the amount of Losses attributable to such claim and the basis of the Indemnified Party's request for indemnification under this Agreement. If the Indemnifying Party does not notify the Indemnified Party within thirty (30) days from its receipt of the Indemnity Notice that the Indemnifying Party disputes such claim (the "*Dispute Notice*"), the Indemnifying Party shall be deemed to have accepted and agreed with such claim. If the Indemnifying Party has disputed such claim, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution to such dispute. If the Indemnifying Party and the Indemnified Party cannot resolve such dispute in thirty (30) days after delivery of the Dispute Notice, such dispute shall be resolved by litigation in an appropriate court of competent jurisdiction.

(i)  The parties agree to treat all indemnification payments made under this Section 9.01 or otherwise under this Agreement as an adjustment to the Purchase Price or as capital contributions for Tax purposes.

SECTION 9.02.  *Notices.*  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by telecopy, by a recognized overnight courier service or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02):

if to the Investors:

c/o The Yucaipa Companies LLC
9130 W. Sunset Boulevard
Los Angeles, California 90069
Attention: Robert P. Bermingham

with a copy to:

Latham & Watkins LLP
633 West Fifth Street, Suite 4000
Los Angeles, California 90071
Telecopy No.: (213) 891-8763
Attention: Thomas C. Sadler

B-43

if to the Company:

Pathmark Stores, Inc.
200 Milik Street
Carteret, New Jersey 07008
Attention: Marc A. Strassler

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Telecopy No.: (212) 848-7179
Attention: W. Jeffrey Lawrence

SECTION 9.03.  *Severability.*  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 9.04.  *Entire Agreement; Assignment.*  This Agreement and the Ancillary Agreements constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede, except as set forth in Section 6.03(b), all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof and thereof. This Agreement shall not be assigned by operation of law or otherwise; *provided, however,* that each Investor may assign its right, title and interest under this Agreement to one or more subsidiaries, or to any corporation, partnership or limited liability company that is an affiliate of such Investor; *provided, further,* that no such assignment shall relieve any such Investor of any of its obligations hereunder.

SECTION 9.05.  *Parties in Interest.*  This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 9.06.  *Specific Performance.*  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

SECTION 9.07.  *Governing Law.*  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in any New York state or federal court, in each case sitting in the Borough of Manhattan. The parties hereto hereby (a) submit to the exclusive jurisdiction of any New York state or federal court, in each case sitting in the Borough of Manhattan, for the purpose of any Action arising out of or relating to this Agreement brought by any party hereto, and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this

B-44

Agreement or the Transactions contemplated hereby may not be enforced in or by any of the above-named courts.

SECTION 9.08.    *Waiver of Jury Trial.*    Each of the parties hereto hereby waives to the fullest extent permitted by applicable Law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the Transactions contemplated hereby. Each of the parties hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce that foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement and the Transactions contemplated hereby, as applicable, by, among other things, the mutual waivers and certifications in this Section 9.08.

SECTION 9.09.    *Attorneys' Fees.*    If any legal action is brought by reason of any breach of any covenant, condition or agreement of the parties in this Agreement or the Ancillary Agreements, the prevailing party shall be entitled to recover from the other party to the action all costs and expenses of suit, including attorneys' fees.

SECTION 9.10.    *Headings.*    The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 9.11.    *Counterparts.*    This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Investors, the Company and the Investors' Representative (solely for the purposes of Section 6.11 of this Agreement) have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

YUCAIPA CORPORATE INITIATIVES FUND I, L.P.

By: Yucaipa Corporate Initiatives Fund I, LLC
Its: General Partner

By: /s/ ROBERT P. BERMINGHAM
    Name: Robert P. Bermingham
    Title:  Vice President

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.

By: Yucaipa American Alliance Fund I, LLC
Its: General Partner

By: /s/ ROBERT P. BERMINGHAM
    Name: Robert P. Bermingham
    Title:  Vice President

YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.

By: Yucaipa American Alliance Fund I, LLC
Its: General Partner

By: /s/ ROBERT P. BERMINGHAM
    Name: Robert P. Bermingham
    Title:  Vice President

Solely for the Purpose of Section 6.11 of this Agreement

THE YUCAIPA COMPANIES LLC

By: /s/ ROBERT P. BERMINGHAM
    Name: Robert P. Bermingham
    Title:  Vice President

PATHMARK STORES, INC.

By: /s/ FRANK VITRANO
    Name: Frank Vitrano
    Title:   President and Chief Financial Officer

B-46

ANNEX C

STOCKHOLDERS' AGREEMENT

Dated as of          , 2005

among

Pathmark Stores, Inc.

and

The Investors Identified on the Signature Pages Hereto

## Table of Contents

### ARTICLE 1
### CERTAIN DEFINITIONS

SECTION 1.01   Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-4

### ARTICLE 2
### CORPORATE GOVERNANCE

SECTION 2.01   Composition of the Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-8
SECTION 2.02   Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-9
SECTION 2.03   Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-10
SECTION 2.04   Certificate of Incorporation and By-Laws to Be Consistent . . . . . . . . . . . . . .   C-10
SECTION 2.05   Approval of the Yellowstone Group Required for Certain Actions . . . . . . . .   C-10
SECTION 2.06   Approval of Independent Directors Required for Certain Actions . . . . . . . . . .   C-11

### ARTICLE 3
### VOTING OF SHARES

SECTION 3.01   Agreement with Respect to Voting of Common Stock . . . . . . . . . . . . . . . . . .   C-12

### ARTICLE 4
### STANDSTILL, ACQUISITIONS OF SECURITIES AND OTHER MATTERS

SECTION 4.01   Acquisitions of Common Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-12
SECTION 4.02   No Participation in a Group or Solicitation of Proxies . . . . . . . . . . . . . . . . . .   C-13
SECTION 4.03   Rights to Purchase New Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-13
SECTION 4.04   Takeover Proposals by the Yellowstone Group . . . . . . . . . . . . . . . . . . . . . . . .   C-14
SECTION 4.05   Affiliate Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-15
SECTION 4.06   Termination of Standstill Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-15

### ARTICLE 5
### RESTRICTIONS ON TRANSFERABILITY OF SECURITIES

SECTION 5.01   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-15
SECTION 5.02   Improper Sale or Encumbrance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-17
SECTION 5.03   Restrictive Legends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-17
SECTION 5.04   Sales of Significant Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-18

### ARTICLE 6
### CORPORATE OPPORTUNITIES AND RELATED MATTERS

SECTION 6.01   Similar Activities or Lines of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-18

### ARTICLE 7
### REPRESENTATIONS AND WARRANTIES

SECTION 7.01   Representations of the Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-20
SECTION 7.02   Representations of the Members of the Yellowstone Group . . . . . . . . . . . . . .   C-20

### ARTICLE 8
### CONFIDENTIALITY

SECTION 8.01   Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-21
SECTION 8.02   Furnishing of Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   C-21

**ARTICLE 9**
**MISCELLANEOUS**

| | | |
|---|---|---|
| SECTION 9.01 | Termination | C-22 |
| SECTION 9.02 | Notices | C-22 |
| SECTION 9.03 | No Third Party Beneficiaries | C-23 |
| SECTION 9.04 | Expenses | C-23 |
| SECTION 9.05 | Governing Law | C-23 |
| SECTION 9.06 | Waiver of Jury Trial | C-23 |
| SECTION 9.07 | Specific Performance | C-23 |
| SECTION 9.08 | Counterparts | C-23 |
| SECTION 9.09 | Entire Agreement | C-23 |
| SECTION 9.10 | Assignment | C-23 |
| SECTION 9.11 | Amendment | C-24 |
| SECTION 9.12 | Waiver | C-24 |
| SECTION 9.13 | Severability | C-24 |
| SECTION 9.14 | No Partnership | C-24 |
| SECTION 9.15 | Public Announcements | C-24 |
| SECTION 9.16 | Cumulative Remedies | C-24 |
| SECTION 9.17 | Interpretation; Headings | C-24 |
| SECTION 9.18 | Construction | C-24 |
| SECTION 9.19 | Director Duties | C-25 |
| SECTION 9.20 | Investors Rights | C-25 |

## STOCKHOLDERS' AGREEMENT

This Stockholders' Agreement (this "*Agreement*") is made as of            , 2005, among Pathmark Stores, Inc., a Delaware corporation (the "*Company*"), and the Investors identified on the signature pages hereto (collectively, the "*Investors*").

### RECITALS

WHEREAS, the Company and the Investors have entered into the Securities Purchase Agreement dated as of March 23, 2005 (the "*Securities Purchase Agreement*");

WHEREAS, upon consummation of the transactions contemplated by the Securities Purchase Agreement, the Investors will own an aggregate of 20,000,000 investment units ("*Units*"), consisting of an aggregate of 20,000,000 shares (the "*Shares*") of common stock, par value $0.01 per share, of the Company (the "*Common Stock*"), 10,060,000 Series A warrants (the "*Series A Investor Warrants*") to purchase additional shares of Common Stock and 15,046,350 Series B warrants (the "*Series B Investor Warrants*"; together with the Series A Investor Warrants, the "*Investor Warrants*") to purchase additional shares of Common Stock (the Units, Shares and the Investor Warrants are collectively referred to herein as the "*Purchased Securities*");

WHEREAS, the parties hereto wish to enter into this Agreement to set forth their agreement as to the matters set forth herein; and

WHEREAS, the execution and delivery of this Agreement is a condition to the obligations of the Investors and the Company under the Securities Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1
### CERTAIN DEFINITIONS

SECTION 1.01    *Certain Definitions.*    As used in this Agreement, the following terms shall have the following respective meanings:

"*affiliate*" means, with respect to a specified person, a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified person.

"*beneficial owner*" (and the related terms "*beneficially owned*", "*beneficial owner*" and "*beneficial ownership*") has the meaning ascribed to such term in Rule 13d-3 under the Exchange Act.

"*Board*" means the Board of Directors of the Company.

"*By-Laws*" means the Amended and Restated By-Laws of the Company, effective April 16, 2004, as they may hereafter be amended from time to time.

"*Cash Equivalents*" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest

rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Service, Inc., (c) commercial paper maturing not more than one year from the date of issuance thereof and, at the time of acquisition, having the highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Service, Inc., (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the Laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) demand deposit accounts maintained with any bank organized under the Laws of the United States or any state thereof so long as the amount maintained with any individual bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation and (f) investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.

"*Certificate of Incorporation*" means the Amended and Restated Certificate of Incorporation of the Company, dated as of September 19, 2000, as it may hereafter be amended from time to time.

"*Closing*" means the closing of the issuance, purchase and sale of the Units contemplated by the Securities Purchase Agreement.

"*Commission*" means the Securities and Exchange Commission.

"*Confidentiality Agreement*" means the Confidentiality Agreement, dated as of January 7, 2005, between an affiliate of the Investors and the Company.

"*control*" (including the terms "*controlled by*" and "*under common control with*") means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, as trustee or executor, by contract, credit agreement or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such person.

"*Discriminatory Transaction*" means any corporate action that would (a) impose material limitations on the legal rights of any member of the Yellowstone Group as a holder of a class of voting stock, including any action that would impose material restrictions that are based on the size of security holding, any business in which a security holder is engaged or any other considerations applicable to any member of the Yellowstone Group and not to holders of the same class of voting stock generally, or (b) deny any material benefit to any member of the Yellowstone Group proportionately as a holder of any class of voting stock that is made available to other holders of that same class of voting stock generally.

"*Encumbrance*" (including correlative terms such as "*Encumber*") means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, hypothecation, violation, condition or restriction of any kind or other encumbrance of any kind.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Fair Market Value*" means, for any applicable measurement date, the closing price of the Common Stock on Nasdaq or, in the event that trading hours on Nasdaq are extended past 4:00 p.m. New York Time, the last sale price at 4:00 p.m. New York Time.

"*Fully Diluted Basis*" means, in respect of the Common Stock or warrants to purchase shares of Common Stock, the method of calculating the number of shares of Common Stock outstanding on an applicable measurement date, pursuant to which the following shares shall be deemed to be outstanding: (i) all shares of Common Stock outstanding on such measurement date and (ii) all shares of Common Stock issuable pursuant to any stock options of the Company or warrants

C-5

outstanding at such time which are or may become exercisable (assuming all other conditions to or limitations on such exercise were satisfied) for shares of Common Stock at an exercise price at or below the then current Fair Market Value of the Common Stock.

"*Geographic Region*" means the States of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland and Virginia and the District of Columbia.

"*group*" means a "group" within the meaning of Section 13(d)(3) of the Exchange Act.

"*Independence Standard*" means the standard of independence necessary for a director to qualify as an "Independent Director" as such term (or any replacement term) is used under the rules and listing standards of Nasdaq as such rules and listing standards may be amended from time to time.

"*Investor Designated Director*" means such person as is so designated by the Investors prior to the Closing, or the Yellowstone Group after the Closing, from time to time in accordance with this Agreement, to serve as a member of the Board and who is elected or appointed to serve as a member of the Board pursuant to Section 2.01 hereof.

"*Law*" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or other order issued or promulgated by any national, supranational, state, federal, provincial, local or municipal government or any administrative or regulatory body with authority therefrom with jurisdiction over the Company or any member of the Yellowstone group, as the case may be (including any requirements under the Exchange Act).

"*Management Agreement*" means the Management Agreement dated as of March 23, 2005, between the Company and an affiliate of the Investors, as it may hereafter be amended from time to time.

"*Marketable Securities*" means securities that are (a) (i) securities of or other interests in any person that are traded on a United States national securities exchange or quoted on the Nasdaq Stock Market or (ii) debt securities on market terms of an issuer that has debt or equity securities that are so traded or so reported on and in which Marketable Securities a nationally recognized securities firm has agreed to make a market, and (b) not subject to restrictions on transfer as a result of any applicable contractual provisions or the provisions of the Securities Act or, if subject to such restrictions under the Securities Act, are also subject to registration rights reasonably acceptable to the person receiving such Marketable Securities as consideration in a transaction pursuant to Section 4.03.

"*Nasdaq*" means The Nasdaq Stock Market, Inc.

"*Nasdaq Regulation*" means the rules and regulations of Nasdaq or any other applicable securities exchange on which the Common Stock is then listed.

"*New Securities*" means any capital stock of the Company, whether now authorized or not, and rights, options or warrants to purchase such capital stock, and securities of any type whatsoever (including, without limitation, convertible debt securities) that are, or may become, convertible into or exchangeable or exercisable for capital stock of the Company; *provided* that the term "New Securities" does not include (i) capital stock or rights, options or warrants to acquire capital stock of the Company issued to the employees, consultants, officers or directors of the Company, or which have been reserved for issuance, pursuant to employee stock option, stock purchase, stock bonus plan, or other similar compensation plan or arrangement approved by the Board, (ii) securities of the Company issued to all then-existing stockholders in connection with any stock split, stock dividend, reclassification or recapitalization of the Company, (iii) securities of the Company issued upon the exercise of warrants that are outstanding as of the date of this

Agreement, (iv) securities of the Company issued in connection with a transaction of the type described in Rule 145 under the Securities Act, and (v) securities of the Company issued pursuant to a bona fide underwritten public offering.

"*Permitted Transferee*" means, with respect to a specified person, any affiliate of such person, *provided* that such person is not a Restricted Person.

"*person*" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including, without limitation, a "person" or "group" within the meaning of Section 13(d)(3) of the Exchange Act), trust, association, or entity or government, political subdivision, agency or instrumentality of government.

The terms "*register*," "*registered*" and "*registration*" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act and the declaration or ordering of the effectiveness of such registration statement by the Commission.

"*Related Agreements*" means the Securities Purchase Agreement and the Management Agreement, together with that certain Registration Rights Agreement and that certain Warrant Agreement among the parties hereto and dated as of the date hereof.

"*Representative*" means, as to any person, such person's affiliates and its and their directors, officers, employees, agents, advisors (including, without limitation, financial advisors, counsel and accountants) and such person's financing sources.

"*Restricted Person*" means any person that derives at least 20% of its consolidated revenues from the operation by it of retail supermarkets which are located in the Geographic Region.

"*Rule 144*" means Rule 144 (or any successor provisions) under the Securities Act.

"*Sale*" means, in respect of any Common Stock, Investor Warrants, or any other voting capital stock, any sale, assignment, transfer, distribution or other disposition thereof or of a participation therein, or other conveyance of legal or beneficial interest therein, or any short position in a security or any other action or position otherwise reducing risk related to ownership through hedging or other derivative instruments, whether voluntarily or by operation of Law.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Sell*" and "*Sold*" means to complete a Sale.

"*subsidiary*" or "*subsidiaries*" of any person means any corporation, partnership, limited liability company, joint venture, association or other legal entity of which such person (either alone or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

A "*Substantial Portion*" of any person means, as of any date of determination, more than 10% of the total consolidated assets of such person and its subsidiaries as of the end of its most recent fiscal quarter ending prior to the date of such determination.

"*Yellowstone Group*" means the Investors and any Permitted Transferee of the Investors that has become a party to this Agreement in accordance with the provisions of Section 5.01(c) hereof.

Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Change of Control Proposal | 4.04 |
| Common Stock | Recitals |
| Company | Preamble |
| Confidential Information | 8.01(b) |
| Covered Securities | 5.01(a) |
| Credit Facility | 2.05(f) |
| Independent Directors | 2.01(a) |
| Initial Restricted Period | 5.01(a) |
| Investor Warrants | Recitals |
| Investors | Preamble |
| Notice of Issuance | 4.03(b) |
| Purchased Securities | Recitals |
| Securities Purchase Agreement | Recitals |
| Series A Investor Warrants | Recitals |
| Series B Investor Warrants | Recitals |
| Shares | Recitals |
| Special Committee | 4.04(b) |
| Subsidiary Board | 2.01(f) |
| Units | Recitals |

## ARTICLE 2
## CORPORATE GOVERNANCE

SECTION 2.01  *Composition of the Board.*  (a) Immediately after the Closing, the By-Laws shall be amended to provide that the authorized number of directors comprising the Board shall be eleven, unless changed in accordance with the provisions of this Agreement and the By-Laws. The Board shall initially be composed of (i) five directors, who shall be designated by the Investors prior to the Closing in accordance with Section 6.08 of the Securities Purchase Agreement and Section 9.20 of this Agreement, and (ii) up to six directors, who shall be designated by the Board prior to the Closing in accordance with Section 6.08 of the Securities Purchase Agreement and who are individuals who comply with the Independence Standards (together with their successors elected in accordance with Section 2.02, the *"Independent Directors"*). In the event that, immediately after the Closing, there are less than six Independent Directors, the vacancies shall be filled in the manner set forth in Section 2.02, except that the individual(s) selected shall be subject to the consent of the Yellowstone Group, which consent shall not be unreasonably withheld. The Investor Designated Directors and the Independent Directors shall serve in a manner consistent with the terms of the Certificate of Incorporation and By-Laws.

(b) From and after the Closing, the parties hereto shall use all reasonable efforts under applicable Law and Nasdaq Regulations to cause there to be (i) so long as the Yellowstone Group beneficially owns 30% or more of the Common Stock, a number of Investor Designated Directors that is one less than the majority of the number of then-authorized directors of the Board; (ii) so long as the Yellowstone Group beneficially owns less than 30% but 20% or more of the Common Stock, a number of Investor Designated Directors that is two less than the majority of the number of then-authorized directors of the Board; and (iii) so long as the Yellowstone Group beneficially owns less than 20% but 10% or more of the Common Stock, a number of Investor Designated Directors that is three less than a majority of the number of then-authorized directors of the Board. In the event that, at any time, the number of Investor Designated Directors then in office exceeds the number set forth in the preceding

sentence, at the request of the majority of the Independent Directors then in office, an appropriate number of Investor Designated Directors shall resign from office. In the event the Yellowstone Group beneficially owns less than 10% of the Common Stock, the Yellowstone Group shall have no right to designate any Investor Designated Director, and, at the request of a majority of the Independent Directors then in office, shall cause any Investor Designated Directors then in office to resign immediately upon such event. For purposes of the calculations of the percentages set forth in this Section 2.01(b), any shares of voting equity securities issued after the date of this Agreement (other than shares of Common Stock issued upon exercise of the Investor Warrants) shall not be included in the computations of beneficial ownership for purposes of this Section 2.01(b).

(c)  At each stockholders' meeting at which directors will be elected, the Yellowstone Group shall be entitled, any time prior to the mailing of the applicable proxy statement of the Company, to propose and nominate that number of Investor Designated Directors as set forth in Section 2.01(b) as members of the Board. The Independent Directors to be nominated and elected at any such stockholders' meeting shall be nominated by a majority of the Independent Directors then in office. The Company and the Board will include the persons so nominated by the members of the Yellowstone Group and the Independent Directors in each slate of directors proposed, recommended or nominated for election by the Company or the Board and will recommend and use all reasonable efforts to cause the election of such persons nominated. The Company agrees to use all reasonable efforts to solicit proxies for such nominees for director from all holders of voting stock entitled to vote thereon. Such nominees shall serve in a manner consistent with the terms of the Certificate of Incorporation and By-Laws.

(d)  To the extent required by Nasdaq Regulations, those members of the Board that are not Investor Designated Directors shall at all times satisfy the Independence Standard.

(e)  The Board shall take all necessary action, including amending the By-Laws, to provide that at every meeting of the Board, a majority of the directors constituting all of the then-authorized total number of directors shall constitute a quorum.

(f)  At any time after the Closing, upon the request of the Yellowstone Group, the Company and the Board shall take all actions necessary so that the composition of the board of directors, general partner, managing member (or controlling committee thereof) or any other board or committee serving a similar function with respect to each of the Company's subsidiaries (each a "*Subsidiary Board*") and each committee of each Subsidiary Board shall be proportionate to the composition requirements of the Board and of each committee thereof such that members of the Yellowstone Group shall have the same proportional representation (rounded to the nearest whole number of directors, but in no event less than one) on each Subsidiary Board and committee thereof as the members of the Yellowstone Group have the right to designate to the Board and committees thereof. The quorum and action requirements of each Subsidiary Board and of each committee of each Subsidiary Board shall, to the extent requested by the Yellowstone Group, be the same as the quorum and action requirements of the Board and each committee thereof.

SECTION 2.02  *Vacancies.*  In the event of any vacancy for any reason in any Board seat reserved for Investor Designated Directors, the Yellowstone Group shall have the sole right to nominate another individual to serve as an Investor Designated Director. In the event of any vacancy for any reason in any Board seat reserved for Independent Directors, a majority vote of the Independent Directors then in office shall have the sole right to nominate another individual to serve as an Independent Director, so long as he or she complies with the Independence Standard, and such new director, when appointed or elected, shall be an Independent Director for purposes of this Agreement. In each case, to the extent permitted by the Certificate of Incorporation and By-Laws, the Board shall elect each such person so nominated as soon as possible after the occurrence of the nomination to fill such vacancy. No Investor Designated Director shall be removed as a director of the

C-9

Company without cause, without the approval of a majority of the other Investor Designated Directors then in office. No Independent Director shall be removed as a director of the Company without cause, without the approval of a majority of the other Independent Directors then in office.

SECTION 2.03  *Committees.*  (a) At Closing, the Board shall have such committees as may be required by Law or Nasdaq Regulation, and such other committees as the Board may from time to time establish. Each such committee and the Board shall take all actions necessary so that each such committee shall be comprised of not less than three directors. To the extent permitted by Nasdaq Regulation, and subject to Section 2.03(b), a number of Investor Designated Directors equal to one less than a majority of all directors serving on each committee shall be appointed to such committee.

(b)  To the extent that no Investor Designated Director is permitted under Nasdaq Regulations to serve on a particular committee of the Board, the Company and the Board shall take all necessary action to permit at least one Investor Designated Director to attend each meeting of such committee as a non-voting observer, in each case to the extent permitted by such Nasdaq Regulation, and such observer shall be provided with such notice of the meeting and information regarding the meeting as is provided to members of such committee.

SECTION 2.04  *Certificate of Incorporation and By-Laws to Be Consistent.*  The Board shall take or cause to be taken all lawful action necessary or appropriate to ensure that none of the Certificate of Incorporation or the By-Laws or any of the corresponding constituent documents of the Company's subsidiaries contain any provisions inconsistent with this Agreement or which would in any way nullify or impair the terms of this Agreement or the rights of the Company or of the Yellowstone Group hereunder.

SECTION 2.05  *Approval of the Yellowstone Group Required for Certain Actions.*  In addition to any approval by the Board required by the Certificate of Incorporation, the By-Laws, applicable Law or Nasdaq Regulation, the prior written approval of the Yellowstone Group shall be required in order for the Board to validly approve and authorize any of the following:

(a)  the entry by the Company or any of its subsidiaries into any merger or consolidation, or the acquisition (whether by merger, consolidation, purchase of assets or stock or otherwise) by the Company or any of its subsidiaries of any business or assets, if the value of the consideration to be paid or received by the Company and/or its stockholders in any such individual transaction, or in such transaction when added to the aggregate value of the consideration paid or received by the Company and/or its stockholders in all other such transactions approved by the Board during the preceding 12 months, exceeds a Substantial Portion of the Company;

(b)  the authorization or issuance of any equity securities or any securities convertible into or exercisable for equity securities of the Company or any subsidiary of the Company (other than options or warrants outstanding on the date of this Agreement or pursuant to employee or director stock option or incentive compensation or similar plans approved by the Board or a duly authorized committee of the Board after the date of this Agreement, including by at least one of the Investor Designated Directors on such Board or committee);

(c)  any sale, asset exchange, lease, exchange, mortgage, pledge, transfer or other disposition by merger or otherwise by the Company or any of its subsidiaries (in one transaction or a series of related transactions) of any securities or assets of the Company or any subsidiary thereof which constitutes a Substantial Portion of the Company;

(d)  any amendment to the Certificate of Incorporation or By-Laws, or the adoption of or amendment to the certificate of incorporation or by-laws of any subsidiary of the Company;

(e)  any change in the authorized number of directors of the Board of the Company or the establishment or abolition of any Board Committee;

C-10

(f) any incurrence or repayment (prior to scheduled maturity) of indebtedness (including capitalized leases) in an aggregate amount greater than $10,000,000, except for borrowings under the Company's existing amended and restated credit facility dated as of October 1, 2004 (the "*Credit Facility*") as such Credit Facility may be amended, restated, refinanced or replaced, in whole or in part, from time to time with the prior written approval of the Yellowstone Group;

(g) any action to repurchase, retire, redeem or otherwise acquire any equity securities of the Company or any subsidiary of the Company, pursuant to self-tender offers, stock repurchase programs, open market transactions, privately-negotiated purchases or otherwise;

(h) the entry by the Company or any of its subsidiaries into any Discriminatory Transaction;

(i) take any action to declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or enter into any agreement with respect to the voting of its capital stock;

(j) any appointment or termination of any person as the Chief Executive Officer, President or Chief Financial Officer of the Company; or

(k) any action to adopt, propose to adopt, or maintain any shareholders' rights plan, "poison pill" or other similar plan or agreement (or any other plan or arrangement that could reasonably be expected to disadvantage any stockholder on the basis of the size or voting power of its shareholding).

The Company shall not, and shall not permit any of its subsidiaries to, take any of the actions specified above without the Yellowstone Group approvals required above. Notwithstanding the foregoing, no approval of the Yellowstone Group shall be required for the Board to approve or authorize (a) the payment of any dividend or the making of any other distributions by any subsidiary of the Company to the Company or another subsidiary of the Company, (b) the payment by any subsidiary of the Company of any indebtedness owed to the Company, (c) the making of any loans by, or advances from, any subsidiary of the Company to the Company, or (d) the transfer by any subsidiary of the Company of any of its property or assets to the Company.

SECTION 2.06  *Approval of Independent Directors Required for Certain Actions.*  In addition to any approval by the Board required by the Certificate of Incorporation, the By-Laws, applicable Law or Nasdaq Regulations, the vote of at least one of the Independent Directors then in office shall be required in order for the Board to approve and authorize any action; *provided, however,* that, at any time when the number of Independent Directors then in office on the Board is five or more, the vote of at least two of the Independent Directors then in office shall be required in order for the Board to approve and authorize any of the following actions:

(a) any amendment to the certificate of incorporation or by-laws, or the adoption of or amendment to the certificate of incorporation or by-laws of any subsidiary of the Company (other than to file any amendment that would increase the amount of the Company's authorized Common Stock or one or more certificates of designation to establish one or more series of preferred stock);

(b) any change in the authorized number of directors of the Board or the establishment or abolition of any Board committee;

(c) the entry by the Company or any of its subsidiaries into any merger or consolidation, or the acquisition (whether by merger, consolidation, purchase of assets or stock or otherwise) by the Company or any of its subsidiaries of any business or assets, if the value of the consideration to be paid or received by the Company and/or its subsidiaries and/or the Company's stockholders in any such transaction exceeds $100 million;