# EXHIBIT A
# Part 6 of 8

(d) take any action to declare, set aside, make or pay any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to any of its capital stock or enter into any agreement with respect to the voting of it's capital stock;

(e) any incurrence of indebtedness (including capitalized leases) which would, when combined with all other indebtedness of the Company and its subsidiaries then outstanding, as reflected on the most recent available consolidated balance sheet of the Company plus indebtedness incurred after the date of such balance sheet, exceed $750 million in the aggregate; and

(f) any action to repurchase, retire, redeem or otherwise acquire any equity securities of the Company or any subsidiary of the Company, pursuant to self-tender offers, stock repurchase programs, open market transactions, privately negotiated purchases or otherwise to the extent that the aggregate payments made by the Company therefor after the date of this Agreement exceed $100 million.

Notwithstanding the foregoing, no approval of any Independent Directors shall be required for the Board to approve or authorize (a) the payment of any dividend or the making of any other distributions by any subsidiary of the Company to the Company or another subsidiary of the Company, (b) the payment by any subsidiary of the Company of any indebtedness owed to the Company, (c) the making of any loans by, or advances from, any subsidiary of the Company to the Company, or (d) the transfer by any subsidiary of the Company of any of its property or assets to the Company.

## ARTICLE 3
## VOTING OF SHARES

SECTION 3.01  *Agreement with Respect to Voting of Common Stock.*   (a) In any election of directors at a meeting of the stockholders of the Company, the Yellowstone Group shall cause all shares of Common Stock held by them to be represented at such meeting either in person or by proxy and shall vote their shares of voting stock for all nominees nominated by the Independent Directors, in proportion to the votes cast by the holders of Common Stock (other than the Yellowstone Group); *provided, however,* that, in their sole and absolute discretion, the Yellowstone Group shall be permitted to cast a greater number of votes held by them in excess of such proportion in favor of the nominees nominated by the Independent Directors.

(b)  With respect to all matters submitted to a vote of holders of Common Stock (except as provided in Sections 3.01(a)), the Yellowstone Group may vote, or abstain from voting, or fail to vote, some or all shares of Common Stock held by them, in their sole and absolute discretion.

(c)  The Yellowstone Group shall not execute any written consent pursuant to Section 228 of the Delaware General Corporation Law as to any shares beneficially owned by them, except for any written consent approved by a majority of the Independent Directors.

## ARTICLE 4
## STANDSTILL, ACQUISITIONS
## OF SECURITIES AND OTHER MATTERS

SECTION 4.01  *Acquisitions of Common Stock.*   After the Closing and until the fifth anniversary thereof, without the prior approval of a majority of the Independent Directors then in office, the Yellowstone Group shall not purchase or otherwise acquire, directly or indirectly, beneficial ownership of any shares of Common Stock such that the aggregate beneficial ownership of the Yellowstone Group, after giving effect to any such acquisition, is in excess of 49.9% (or such greater percentage as the Yellowstone Group may beneficially own immediately following the exercise, in whole or in part, of the Series B Investor Warrants) of the Common Stock of the Company, except (i) by way of stock splits, stock dividends, reclassifications, recapitalizations, or other distributions by the Company to

C-12

holders of the Common Stock, (ii) pursuant to the exercise of the Investor Warrants in accordance with the terms thereof, (iii) by acquisition of any New Securities pursuant to Section 4.03, or (iv) pursuant to Section 4.04.

SECTION 4.02  *No Participation in a Group or Solicitation of Proxies.*  Except for actions permitted by, or taken in compliance with, Sections 4.01, 4.03 and 4.04 and its exercise of rights pursuant to the provisions of this Agreement, the Yellowstone Group agrees that, prior to the fifth anniversary of the Closing, it will not, without the prior approval of a majority of the Independent Directors then in office, directly or indirectly:

(a)  acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any securities or direct or indirect rights to acquire any securities of the Company or any subsidiary thereof, or of any successor to or person in control of the Company, or any assets of the Company or any division thereof or of any such successor or Controlling Person;

(b)  make or in any way participate, directly or indirectly, in any "solicitation" of "proxies" (as such terms are used in the rules of the Commission) to vote any voting securities of the Company or any subsidiary thereof; *provided, however,* that the prohibition in this Section 4.02(b) shall not apply to solicitations exempted from the proxy solicitation rules by Rule 14a-2 under the Exchange Act or any successor provision;

(c)  submit to the Board a written proposal for or offer of (with or without conditions), any merger, recapitalization, reorganization, business combination or other extraordinary transaction involving the Company or any subsidiary thereof or any of their securities or assets, or make any public announcement with respect to such a proposal or offer;

(d)  enter into any discussions, negotiations, arrangements or understandings with any third party (other than any person that would be a Permitted Transferee) with respect to any of the foregoing, or otherwise form, join or in any way engage in discussions relating to the formation of, or participate in, a group with any third party (other than any person that would be a Permitted Transferee), in connection with any of the foregoing; or

(e)  request the Company or any of its Representatives, directly or indirectly, to amend or waive any provision of this paragraph (including this sentence);

*provided, however,* that none of the foregoing (i) shall prevent, restrict, Encumber or in any way limit the exercise of the fiduciary rights and obligations of any Investor Designated Director as a director or prevent, restrict, Encumber or in any way limit the ability of any Investor Designated Director to vote on matters, influence officers, employees, agents, management or the other directors of the Company, take any action or make any statement at any meeting of the Board or any committee thereof, or otherwise to act in their capacity as directors; (ii) shall prevent any member of the Yellowstone Group from Selling any Covered Securities held by it or voting its Common Stock; (iii) shall apply to or restrict any discussions or other communications between or among directors, members, officers, employees or agents of any member of the Yellowstone Group or any affiliate thereof; (iv) shall prohibit any member of the Yellowstone Group from soliciting, offering, seeking to effect or negotiating with any person with respect to transfers of Covered Securities otherwise permitted by Section 5.01 or (v) restrict any disclosure or statements required to be made by any Investor Designated Director or the Yellowstone Group under applicable Law or Nasdaq Regulation.

SECTION 4.03  *Rights to Purchase New Securities.*  (a)  In the event that the Company proposes to issue New Securities, each member of the Yellowstone Group shall have the right to purchase, in lieu of the person to whom the Company proposed to issue such New Securities, in accordance with paragraph (b) below, a number of New Securities equal to the product of (i) the total number or amount of New Securities which the Company proposes to issue at such time and (ii) a fraction, the numerator of which shall be the total number of shares of Common Stock which such member owns at

such time on a Fully Diluted Basis, and the denominator of which shall be the total number of shares of Common Stock then outstanding on a Fully Diluted Basis.

(b)  In the event that the Company proposes to undertake an issuance of New Securities, it shall give written notice (a "Notice of Issuance") of its intention to each of the members of the Yellowstone Group, describing the material terms of the New Securities, including the price thereof, and the material terms upon which the Company proposes to issue such New Securities. The members of the Yellowstone Group shall have 30 days from the date of receipt of the Notice of Issuance to agree to purchase all or a portion of such member's pro rata share of such New Securities (as determined pursuant to paragraph (a) above) for the same consideration, if such proposed consideration shall consist solely of cash, or, if such consideration consists of property or assets other than cash, for cash, Cash Equivalents or Marketable Securities having an equivalent value (as reasonably determined by a majority of the Independent Directors) to the consideration payable by the person to whom the Company proposes to issue such New Securities at the time of payment, and otherwise upon the terms specified in the Notice of Issuance by giving written notice to the Company and stating therein the quantity of New Securities to be purchased by such member of the Yellowstone Group and the allocation of such New Securities among the members. The rights given by the Company under this Section 4.03(b) shall terminate if unexercised within 30 days after receipt of the Notice of Issuance referred to in this paragraph (b).

(c)  The Company and each member of the Yellowstone Group, if it elects to purchase the New Securities to be sold by the Company, shall select a date not later than 20 days (or longer if required by Law) after the expiration of the 30-day notice period referenced in Section 4.03(b) for the closing of the purchase and sale of the New Securities. In the event any purchase by the members of the Yellowstone Group is not consummated, other than as a result of the fault of the Company, within the provided time period, the Company may issue the New Securities subject to purchase by such member free and clear from the restrictions under this Section 4.03. Any New Securities not elected to be purchased by such members may be sold by the Company to the person to which the Company intended to sell such New Securities on terms and conditions no less favorable to the Company than those offered to such members.

SECTION 4.04  *Takeover Proposals by the Yellowstone Group.*  No member of the Yellowstone Group shall, without the prior approval of a majority of the Independent Directors then in office, submit a proposal to acquire a majority of the Common Stock owned by persons other than the Yellowstone Group (a *"Change of Control Proposal"*) to any person unless either of the following conditions are satisfied:

(a)  The Change of Control Proposal shall contemplate either (i) a tender offer for all outstanding shares of Common Stock not owned by the Yellowstone Group and must be conditioned upon a majority of such Common Stock not owned by the Yellowstone Group being tendered, or (ii) a merger, combination, asset sale or other similar transaction which conditioned upon the holders of a majority of the Common Stock not owned by the Yellowstone Group present, in person or by proxy, at a meeting of stockholders, voting in favor of such transaction. In the case of either (i) or (ii), the same consideration must be offered to all of the Company's stockholders (other than the Yellowstone Group); or

(b)  The Change of Control Proposal shall contemplate that a special committee of the Board shall be created consisting only of the Independent Directors (the *"Special Committee"*), the Special Committee shall retain a nationally recognized investment banking firm to advise the Special Committee with respect to the fairness of the Change of Control Proposal to the stockholders of the Company (other than the Yellowstone Group), and the Change of Control Proposal shall be approved by the Special Committee, which shall not give its approval unless it has received an opinion from such investment banking firm that the Change of Control Proposal is

C-14

fair, from a financial point of view, to the stockholders of the Company other than any member of the Yellowstone Group.

SECTION 4.05  *Affiliate Transactions.*   No member of the Yellowstone Group shall engage in any transaction with the Company without the prior approval of a majority of the Independent Directors then in office; *provided, however,* that the foregoing provision shall not apply to any transactions contemplated by this Agreement or any of the Related Agreements or to any transactions involving the purchase or sale of goods or services in the ordinary course of business which are consistent with guidelines adopted by the Board from time to time and approved by a majority of the Independent Directors then in office.

SECTION 4.06  *Termination of Standstill Provisions.*   The provisions of Sections 4.01, 4.02 and 4.04 of this Agreement shall terminate without any further action by any party upon the earlier of:

(i) 180 days after such time as the Yellowstone Group beneficially owns less than 10% of the outstanding Common Stock of the Company;

(ii) such date as the Board determines to solicit, or publicly announces, whether by press release, filing with the Commission or otherwise, its intention to solicit, an Acquisition Proposal (as defined in the Securities Purchase Agreement);

(iii) such date as the Board publicly approves, accepts, authorizes or recommends to the Company's stockholders their approval of, or their conveyance of any Common Stock or other securities pursuant to, any Acquisition Proposal;

(iv) such date that the Company or any affiliate thereof has entered into a letter of intent, agreement in principle, definitive agreement, or any other agreement with any party, with respect to an Acquisition Proposal for the Company;

(v) such date that any person or group, other than the Yellowstone Group or any of its affiliates, shall have acquired or announced its intention to acquire, including by commencement of a tender offer or exchange offer) beneficial ownership of 20% of the Company's outstanding Common Stock;

(vi) such date as the Company, the Board or any committee of the Board takes any action, or fails to take appropriate action, which action, or failure to take action, results in a breach of any provision of Section 2.05; and

(vii) such date as the Company breaches this Agreement in that the number of Investor Designated Directors on the Board, any committee thereof or on any subsidiary Board or any committee thereof, is less than the number of directors to which the Yellowstone Group is entitled at such time pursuant to Article 2, subject to notice from the members of the Yellowstone Group and the expiration of a 30-day period in which to cure such action or failure to act (if such action or failure to act is reasonably capable of being cured).

## ARTICLE 5
## RESTRICTIONS ON TRANSFERABILITY OF SECURITIES

SECTION 5.01  *General.*   (a) Each member of the Yellowstone Group understands and agrees that the shares of Common Stock acquired pursuant to the Securities Purchase Agreement have not been registered and are restricted securities under the Securities Act. During the period ending six months after the Closing (the "*Initial Restricted Period*"), no member of the Yellowstone Group shall make or solicit any Sale of, or create, incur or assume any Encumbrance with respect to, the Units, the Investor Warrants or any shares of Common Stock now owned or hereafter acquired by it (collectively, the "*Covered Securities*"); *provided, however,* that members of the Yellowstone Group may, during the

Initial Restricted Period, make or solicit a Sale to a Permitted Transferee or as described in clauses (v), (vii) and (viii) below.

(b) After the Initial Restricted Period (other than with respect to clauses (v), (vii) and (viii) below which may occur at any time), each member of the Yellowstone Group agrees that neither it nor any of its affiliates will make any Sale of, or create, incur or assume any Encumbrance with respect to, any of the Covered Securities except for a Sale:

(i) in compliance with Rule 144 under the Securities Act;

(ii) (x) pursuant to a bona fide public offering registered under the Securities Act, or

(y) in one or more block trades or privately negotiated transactions exempt from the registration requirements of the Securities Act;

*provided, however,* that in each case no Sale under this clause (ii) is made, to the actual knowledge of such member of the Yellowstone Group (without inquiry in the case of a Sale pursuant to the preceding clause (x)) to any person or group that, after giving effect to such Sale, would have beneficial ownership of Common Stock representing more than 5% of the voting power of the Company's outstanding capital stock (except that, in the case of a transfer to a person specified in Rule 13d-1(b)(1)(ii) promulgated under the Exchange Act that would be eligible based on such person's status and passive intent with respect to the ownership, holding and voting of such Covered Securities to report such person's ownership of Covered Securities on Schedule 13G (assuming such person owned a sufficient number of such Covered Securities to require such filing), no Sale under this clause (ii) is made to any such person that, after giving effect to such Sale, would have beneficial ownership of Covered Securities representing 10% or more of the voting power of the Company's outstanding capital stock); and, *provided, further,* that in the case of any Sale in an underwritten public offering pursuant to clause (x) above, the members of the Yellowstone Group shall be deemed to have fulfilled their obligations hereunder if they have instructed the underwriter(s) of such offering to use their reasonable efforts to prevent any purchase of Covered Securities in such offering by any person or group that would, upon such purchase, exceed the foregoing thresholds, as applicable;

(iii) to Permitted Transferees in accordance with Section 5.01(c) hereof;

(iv) of 15% or less of the Common Stock on a Fully Diluted Basis to any person, other than any person which is a Restricted Person in a Sale in which the certificates representing such Covered Securities issued to the transferee (x) bear the legend provided in Section 5.03(a), if required by such Section and (y) the transferee (if not already a party hereto) has executed and delivered to the Company, as a condition precedent to such Sale, an instrument or instruments, reasonably acceptable to the Company, confirming that such transferee agrees to be bound by the obligations of such member of the Yellowstone Group under this Agreement.

(v) transfers (i) pursuant to any business combination, tender or exchange offer to acquire Common Stock or other extraordinary transaction that the Board has recommended, or (ii) pursuant to a tender or exchange offer that the Board has not recommended but only after such time as a majority of the shares of Common Stock outstanding (other than those owned by the Yellowstone Group) have been tendered into such offer and after all material conditions with respect to such offer (including any financing condition, any minimum condition with respect to number of shares tendered and any condition with respect to removal of any anti-takeover protections) have been satisfied or irrevocably waived by the offeror; *provided, however,* that no Yellowstone Group securities shall be tendered into any tender offer or exchange offer not recommended by the Board prior to the time all such material conditions (other than any such condition that can be satisfied only at the closing of such offer) have been satisfied or irrevocably waived by the offeror;

(vi) transfers to the Company or a subsidiary of the Company;

(vii) swaps, exchanges, hedges or other similar agreements or arrangements designed to protect against fluctuations in the value of the equity securities of the Company and not entered into with the purpose of circumventing the provisions of this Section 5.01;

(viii) pledges of Covered Securities in connection with any margin loan or other extensions of credit from a broker-dealer, bank or other financial institution and not entered into with the purpose of circumventing the provisions of this Section 5.01; or

(ix) in accordance with and subject to Section 5.04.

(c) No Sale of Covered Securities to a Permitted Transferee shall be effective until such time as such Permitted Transferee has executed and delivered to the Company, as a condition precedent to such Sale, an instrument or instruments, reasonably acceptable to the Company, confirming that such Permitted Transferee agrees to be bound by all obligations of the Yellowstone Group hereunder. The Yellowstone Group shall not transfer control of a Permitted Transferee to any person that is not also a Permitted Transferee if a direct sale of Covered Securities to such person would violate the provisions of Section 5.01 of this Agreement.

SECTION 5.02  *Improper Sale or Encumbrance.*  Any attempt not in compliance with this Agreement to make any Sale of, or create, incur or assume any Encumbrance with respect to, any Covered Securities shall be null and void and of no force and effect, the purported transferee shall have no rights or privileges in or with respect to the Company, and the Company shall not give any effect in the Company's stock records to such attempted Sale or Encumbrance.

SECTION 5.03  *Restrictive Legends.*  (a) Each certificate evidencing the Covered Securities shall be stamped or otherwise imprinted with legends in substantially the following form (in addition to any legends required by agreement or by applicable state securities Laws):

(i) THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. SUCH SECURITIES GENERALLY MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SAID ACT.

(ii) THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS UNDER THE TERMS OF THE STOCKHOLDERS' AGREEMENT DATED          , 2005, AS AMENDED FROM TIME TO TIME, BETWEEN THE ISSUER AND THE HOLDER HEREOF AND MAY NOT BE OFFERED, SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH THE TERMS OF THAT AGREEMENT.

(b) Each certificate evidencing any shares of Common Stock or other securities of the Company acquired by any member of the Yellowstone Group other than the Covered Securities shall be stamped or otherwise imprinted with legends in substantially the following form (in addition to any legends required by agreement or by applicable state securities Laws):

THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS UNDER THE TERMS OF THE STOCKHOLDERS' AGREEMENT DATED          , 2005, AS AMENDED FROM TIME TO TIME, BETWEEN THE ISSUER AND THE HOLDER HEREOF AND MAY NOT BE OFFERED, SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT IN ACCORDANCE WITH THE TERMS OF THAT AGREEMENT.

(c)  Each member of the Yellowstone Group consents to the Company making a notation on its records and giving instructions to any transfer agent of its capital stock in order to implement the restrictions on transfer established in this Agreement.

(d)  The Company shall, at the request of a holder of Purchased Securities, remove from each certificate evidencing Purchased Securities transferred in compliance with the terms of Section 5.01 and with respect to which no rights or obligations under this Agreement shall transfer, the legend described in Sections 5.03(a)(ii) and (b), and shall remove from each certificate evidencing such Purchased Securities the legend described in Section 5.03(a)(i) if, at the request of the Company, such requesting holder provides, at its expense, an opinion of counsel satisfactory to the Company that the securities evidenced thereby may be transferred without the imposition of such legend.

SECTION 5.04  *Sales of Significant Interests.*  Each member of the Yellowstone Group may Sell Covered Securities to a person that would, following the consummation of such Sale, beneficially own more than 20% of the Common Stock; *provided, however,* that, in the event that such Sale is not otherwise permitted to be made pursuant to Section 5.01 above, such member of the Yellowstone Group conditions such Sale by them to such person upon such person contemporaneously therewith acquiring, or offering to acquire, on the same price and other financial terms and conditions as are applicable to such member of the Yellowstone Group in such Sale, a number of shares of Common Stock owned by stockholders of the Company other than the Yellowstone Group equal to the product of (A) the aggregate number of shares of Common Stock owned by stockholders of the Company other than the Yellowstone Group, multiplied by (B) a fraction, the numerator of which is the number of shares of Common Stock (including Common Stock issuable upon the exercise of warrants) proposed to be Sold by such member of the Yellowstone Group to such person, and the denominator of which is the aggregate number of shares of Common Stock (including shares of Common Stock issuable upon the exercise of warrants) owned by such member of the Yellowstone Group on a Fully Diluted Basis on the date of such Sale. In order for the conditions in the preceding proviso to be satisfied, (A) such person shall make such offer in compliance with applicable Law, including, if applicable, Section 14(d)(1) of the Exchange Act and Regulation 14D promulgated thereunder and (B) if as a result of such Sale, such person would, following such Sale, beneficially own shares of Common Stock representing in the aggregate more than 20% of the Common Stock but less than 90% of the shares of Common Stock then outstanding, such person must, in connection with the closing of such transaction, agree to be bound by the obligations of the Yellowstone Group under this Agreement. The provisions of this Section 5.04 shall only apply for as long as the Yellowstone Group beneficially owns at least 25% of the shares of Common Stock.

# ARTICLE 6
## CORPORATE OPPORTUNITIES AND RELATED MATTERS

SECTION 6.01  *Similar Activities or Lines of Business.*

(a)  The Company may from time to time enter into and perform, one or more agreements (or modifications or supplements to pre-existing agreements) with a member of the Yellowstone Group pursuant to which the Company, on the one hand, and such member, on the other hand, agree to engage in transactions of any kind or nature with each other and/or agree to compete, or to refrain from competing or to limit or restrict their competition, with each other, including to allocate and to cause their respective Representatives (including any who are directors, officers or employees of both) to allocate opportunities between or to refer opportunities to each other. Subject to this Section 6.01, no such agreement, or the performance thereof by the Company or the members of the Yellowstone Group, shall, to the fullest extent permitted by Law, be considered contrary to (i) any fiduciary duty that a member of the Yellowstone Group may owe to the Company or to any stockholder of the Company by reason of the Yellowstone Group being a controlling or significant stockholder of the Company or participating in the control of the Company or (ii) any fiduciary duty of any director or

officer of the Company who is also a director, officer, member or employee of a member of the Yellowstone Group to the Company or to any stockholder thereof. Subject to this Section 6.01, to the fullest extent permitted by Law, a member of the Yellowstone Group, as a stockholder of the Company, or as a participant in control of the Company, shall not have or be under any fiduciary duty to refrain from entering into any agreement or participating in any transaction referred to above and no director, officer or employee of the Company who is also a director, officer or employee of a member of the Yellowstone Group shall have or be under any fiduciary duty to the Company, to refrain from acting on behalf of the Company or of a member of the Yellowstone Group in respect of any such agreement or transaction or performing any such agreement in accordance with its terms.

(b)  Except as otherwise agreed in writing between the Company and the Yellowstone Group or as provided in paragraph (d) below, each member of the Yellowstone Group shall to the fullest extent permitted by Law have no duty to refrain from serving as an officer or director of, or investing in, any person which is (i) engaged in the same or similar business as the Company or (ii) doing business with any client, customer or vendor of the Company and such member of the Yellowstone Group shall not, to the fullest extent permitted by Law, be deemed to have breached its or his fiduciary duties, if any, to the Company solely by reason of engaging in any such activity. Except as otherwise agreed in writing between the Company and the Yellowstone Group or as provided in paragraph (d) below, in the event that any member of the Yellowstone Group acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both a member of the Yellowstone Group and the Company, such member of the Yellowstone Group shall to the fullest extent permitted by Law have no duty to communicate or offer such corporate opportunity to the Company and shall not, to the fullest extent permitted by Law, be liable to the Company or its stockholders for breach of any fiduciary duty as a stockholder of the Company by reason of the fact that such member of the Yellowstone Group acquires or seeks such corporate opportunity for itself, directs such corporate opportunity to another person or entity, or otherwise does not communicate information regarding such corporate opportunity to the Company, and the Company to the fullest extent permitted by Law shall renounce any interest or expectancy in such business opportunity and shall waive any claim that such business opportunity constituted a claim that should have been presented to the Company.

(c)  Except as otherwise agreed in writing between the Company and the Yellowstone Group or as provided in paragraph (d) below, in the event that a director or officer of the Company who is also an officer, director, member or employee of a member of the Yellowstone Group acquires knowledge of a potential transaction or matter which may be a corporate opportunity for both the Company and a member of the Yellowstone Group, such director or officer shall to the fullest extent permitted by Law have fully satisfied and fulfilled his or her fiduciary duty with respect to such corporate opportunity, and the Company to the fullest extent permitted by Law shall renounce any interest or expectancy in such business opportunity and shall waive any claim that such business opportunity constituted a corporate opportunity that should have been presented to the Company or any of its affiliates, if such director or officer acts in a manner consistent with the following policy: (i) a corporate opportunity offered to any person who is an officer of the Company and who is also a director but not an officer of a member of the Yellowstone Group shall belong to the Company, unless such opportunity is expressly offered to such person solely in his or her capacity as a director of a member of the Yellowstone Group, in which case such opportunity shall belong to such member of the Yellowstone Group; (ii) a corporate opportunity offered to any person who is a director but not an officer of the Company and who is also a director or officer of a member of the Yellowstone Group shall belong to the Company only if such opportunity is expressly offered to such person solely in his or her capacity as a director of the Company and otherwise shall belong to such member of the Yellowstone Group; and (iii) a corporate opportunity offered to any person who is an officer of both the Company and Yellowstone Group shall belong to the Company unless such opportunity is expressly offered to such person solely in his or her capacity as an officer of a member of the Yellowstone Group, in which case such opportunity shall belong to such member of the Yellowstone Group.

C-19

(d)  No member of the Yellowstone Group nor any of their respective affiliates (other than the Company or their respective subsidiaries) shall, directly or indirectly, enter into, or agree or commit to enter into, any material investment, in or otherwise exploit any business opportunity primarily related to, any Restricted Person (other than an investment in the shares of any public company representing less than 20% of such company's fully diluted common equity) except with the approval of a majority of the Independent Directors then in office.

(e)  As used in this Section 6.01, the term "Company" includes all of its subsidiaries, and the term "Yellowstone Group" includes all of its affiliates (other than the Company).

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES

SECTION 7.01  *Representations of the Company.*  The Company hereby represents and warrants to the Yellowstone Group that:

(a)  The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby are within the Company's power and authority and have been duly authorized by all necessary corporate action. This Agreement constitutes a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

(b)  The execution, delivery and performance by the Company of this Agreement requires no action by or in respect of, or filing with, any governmental body, agency, official or authority, other than (i) compliance with any applicable requirements of the federal securities Laws; and (ii) compliance with any applicable foreign or state securities or blue sky Laws.

(c)  The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby do not and will not (i) contravene or conflict with the Certificate of Incorporation or the By-Laws, and (ii) assuming compliance with the matters referred to in Section 7.01(b), contravene or conflict with or constitute a violation of, provision of any Law applicable to the Company.

SECTION 7.02  *Representations of the Members of the Yellowstone Group.*  Each member of the Yellowstone Group hereby represents, jointly and severally, that:

(a)  The execution, delivery and performance by such member of the Yellowstone Group of this Agreement and the consummation by such member of the Yellowstone Group of the transactions contemplated hereby are within each such member's power and authority and have been duly authorized by all requisite action on the part of such member. This Agreement constitutes a valid and binding agreement of each member of the Yellowstone Group, enforceable against such member of the Yellowstone Group in accordance with its terms.

(b)  The execution, delivery and performance by such member of the Yellowstone Group of this Agreement require no action by or in respect of, or filing with, any governmental body, agency, official or authority, other than (i) compliance with any applicable requirements of the federal securities Laws; and (ii) compliance with any applicable foreign or state securities or blue sky Laws.

(c)  The execution, delivery and performance by such member of the Yellowstone Group of this Agreement and the consummation by such member of the Yellowstone Group of the transactions contemplated hereby do not and will not (i) contravene or conflict with the organizational documents of such member, and (ii) assuming compliance with the matters referred to in Section 7.02(b), contravene or conflict with or constitute a violation of, provision of any Law.

C-20

## ARTICLE 8
## CONFIDENTIALITY

SECTION 8.01  *Confidentiality.*  (a) Unless otherwise agreed to in writing by the Company, each member of the Yellowstone Group, on behalf of itself and its Representatives, agrees (i) except as required by Law, to keep confidential and not to disclose or reveal any Confidential Information (as defined below) to any person (other than such member's Representatives), (ii) not to use Confidential Information for any purpose other than in connection with its ownership of Company securities and not in any way detrimental to the Company or its stockholders and (iii) except as required by Law, not to disclose to any person (other than such member's Representatives) any Confidential Information. In the event that any member of the Yellowstone Group or its Representatives are requested pursuant to, or required by, Law to disclose any Confidential Information, such member of the Yellowstone Group agrees that it will provide the Company with prompt notice of such request or requirement in order to enable the Company to seek an appropriate protective order or other remedy (and if the Company seeks such an order, such person will provide such cooperation as the Company shall reasonably request) or to consult with such member with respect to the Company taking steps to resist or narrow the scope of such request or legal process.

(b)  *"Confidential Information"* means all information about the Company furnished by the Company, whether furnished before or after the date hereof, whether oral or written, and regardless of the manner or form in which it is furnished, including, without limitation, all notes, analyses, compilations, studies, forecasts, interpretations or other documents prepared by any member of the Yellowstone Group or its Representatives which contain, reflect or are based upon, in whole or in part, the information furnished to any member of the Yellowstone Group or its Representatives. Confidential Information does not include, however, information which (i) is or becomes generally available to the public other than as a result of a disclosure by any member of the Yellowstone Group or its Representatives in violation of this Agreement, the Confidentiality Agreement or other obligation of confidentiality, (ii) was available to any member of the Yellowstone Group on a non-confidential basis prior to its disclosure by the Company to such member, or (iii) becomes available to any member of the Yellowstone Group on a non-confidential basis from a person (other than the Company) who is not prohibited from disclosing such information to any member of the Yellowstone Group by a legal, contractual or fiduciary obligation to the Company.

(c)  Notwithstanding anything to the contrary contained in this Agreement, any Investor Designated Director shall be permitted to provide to members of the Yellowstone Group and their Representatives information concerning the Company that such individuals receive in their capacity as directors; *provided, however,* that with respect to any such information provided, the Yellowstone Group and its Representatives shall be bound by the same restrictions on disclosure and use of confidential information as apply to such Investor Designated Directors in their capacity as directors, in addition to any applicable restrictions under this Article VIII.

(d)  As used in this Article VIII, the term "Company" includes the Company and all of its subsidiaries, and the term "Yellowstone Group" includes the members of the Yellowstone Group and all of their respective affiliates (other than the Company).

SECTION 8.02  *Furnishing of Information.*  The Company shall furnish or make available to each member of the Yellowstone Group and its Representatives any documents filed by the Company pursuant to each of Sections 13, 14 and 15(d) of the Exchange Act and all annual, quarterly or other reports furnished to the Company's public security holders and all such other information concerning the Company and its subsidiaries as such member of the Yellowstone Group may reasonably request. The Company shall provide each member of the Yellowstone Group and its Representatives with reasonable access to the books and records of the Company and its subsidiaries during normal business

C-21

hours upon reasonable notice, including without limitation, financial data (including projections) and operating data covering each of such entities, their businesses, operations and financial performance.

## ARTICLE 9
## MISCELLANEOUS

SECTION 9.01    *Termination.*    This Agreement shall terminate upon the earliest to occur of:

(i) written agreement to that effect, signed by all parties hereto or all parties then possessing any rights hereunder;

(ii) the Yellowstone Group ceasing to beneficially own at least 10% of the Common Stock on a Fully Diluted Basis; *provided* that prior to such termination the Investor Designated Directors shall have resigned if required to do so under Section 2.01(b) of this Agreement;

(iii) the Yellowstone Group becoming the beneficial owner of 90% or more of the Common Stock on a Fully Diluted Basis; and

(iv) on the date that is the fifth anniversary of the date of this Agreement;.

*provided* that no termination of this Agreement pursuant to this Section 9.01 shall affect the right of any party to recover damages for any breach of the representations, warranties or covenants herein that occurred prior to such termination; and, *provided, further,* that the provisions of Article VIII shall continue in effect for a period of 18 months following any such termination.

SECTION 9.02    *Notices.*    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by telecopy or by recognized overnight courier service to the respective parties at the following addresses (or at such other address for a party as shall be specified by notice given in accordance with this Section 9.02):

(a)  if to the Company:

Pathmark Stores, Inc.
200 Milik Street
Carteret, New Jersey 07008
Attention: Marc A. Strassler

with a copy to:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
Telecopy No.: (212) 848-7179
Attention: W. Jeffrey Lawrence

(b)  if to any member of the Yellowstone Group:

9130 W. Sunset Boulevard
Los Angeles, California 90069
Attention: Robert P. Bermingham

with a copy to:

Latham & Watkins LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007
Telecopy No.: (213) 891-8763
Attention: Thomas C. Sadler

C-22

SECTION 9.03  *No Third Party Beneficiaries.*  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and, to the extent permitted by this Agreement, their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 9.04  *Expenses.*  Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs or expenses.

SECTION 9.05  *Governing Law.*  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York, except as to matters governed by the internal corporation Laws of the State of Delaware. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in any New York state or federal court, in each case sitting in the Borough of Manhattan. The parties hereto hereby (a) submit to the exclusive jurisdiction of any New York state or federal court, in each case sitting in the Borough of Manhattan, for the purpose of any action or proceeding arising out of or relating to this Agreement brought by any party hereto, and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the action or proceeding is brought in an inconvenient forum, that the venue of the action or proceeding is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any of the above-named courts.

SECTION 9.06  *Waiver of Jury Trial.*  Each of the parties hereto hereby waives to the fullest extent permitted by applicable Law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby. Each of the parties hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce that foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement and the transactions contemplated hereby, as applicable, by, among other things, the mutual waivers and certifications in this Section 9.06.

SECTION 9.07  *Specific Performance.*  The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties hereto shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.

SECTION 9.08  *Counterparts.*  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

SECTION 9.09  *Entire Agreement.*  This Agreement and the Related Agreements constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, (including, without limitation the Confidentiality Agreement and that certain Exclusivity Agreement dated as of March 9, 2005), among the parties, or any of them, with respect to the subject matter hereof and thereof.

SECTION 9.10  *Assignment.*  This Agreement shall not be assigned by operation of Law or otherwise without the express written consent of the parties hereto (which consent may be granted or withheld in the sole discretion of any party) and any such assignment or attempted assignment without such consent shall be void.

C-23

SECTION 9.11 *Amendment.* This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Company and each member of the Yellowstone Group or (b) by a waiver in accordance with Section 9.12.

SECTION 9.12 *Waiver.* Any party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other party or (c) waive compliance with any of the agreements of the other party or conditions to such party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

SECTION 9.13 *Severability.* If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 9.14 *No Partnership.* No partnership, joint venture or joint undertaking is intended to be, or is, formed among the parties hereto or any of them by reason of this Agreement or the transactions contemplated herein.

SECTION 9.15 *Public Announcements.* Except as required by Law, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or otherwise communicate with any news media without the prior written consent of the other parties, and the parties shall cooperate as to the timing and contents of any such press release or public announcement.

SECTION 9.16 *Cumulative Remedies.* The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by Law or otherwise.

SECTION 9.17 *Interpretation; Headings.* Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. Unless otherwise specified, all references herein to "Articles", "Sections" and paragraphs shall refer to corresponding provisions of this Agreement. The descriptive headings and subheadings in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement or any provision hereto.

SECTION 9.18 *Construction.* Each party hereto acknowledges and agrees it has had the opportunity to draft, review and edit the language of this Agreement and that no presumption for or against any party arising out of drafting all or any part of this Agreement will be applied in any controversy, claim or dispute relating to, in connection with or involving this Agreement. Accordingly, the parties hereto hereby waive the benefit of any rule of Law or any legal decision that would require, in cases of uncertainty, that the language of a contract should be interpreted most strongly against the party who drafted such language.

SECTION 9.19  *Director Duties.*  Notwithstanding anything to the contrary in this Agreement, no provision hereof shall prevent, restrict, Encumber or in any way limit the exercise of the fiduciary rights and obligations of any Investor Designated Director as a director, or his or her ability to vote on matters, influence management or the other directors or otherwise to discharge their fiduciary or other duties as directors. The Company shall not approve or recommend to its stockholders any transaction or resolution, or approve, recommend or take any other action (other than those expressly contemplated by this Agreement) that would restrict the right of any Investor Designated Director to vote on any matter as such director believes appropriate in light of his or her duties as a director or the manner in which an Investor Designated Director may participate in his or her capacity as a director in deliberations or discussions at meetings of the Board or any committee thereof.

SECTION 9.20  *Investors Rights.*  For purposes of this Agreement, all actions which the Investors or members of the Yellowstone Group are permitted to take shall be effected by the Investors or such members, as the case may be, holding a majority of the Purchased Securities then held by all the Investors or such members, as the case may be. In addition, the rights of the Investors under this Agreement shall be allocated among them in such manner as they shall agree from time to time. Notwithstanding the foregoing, the parties hereto acknowledge and agree that, for so long as the Yellowstone Group has the right to nominate two or more Investor Designated Directors, Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. shall each be entitled to designate one of such Investor Designated Directors and to fill any vacancies created if such director designated by it ceases to serve for any reason, and any additional Investor Designated Directors shall be designated by the members of the Yellowstone Group holding a majority of the Purchased Securities then held by all of such members.

*(signature page follows)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**COMPANY:**

PATHMARK STORES, INC., a Delaware corporation

By: _____

Name:

Title:

C-26

**INVESTORS:**

YUCAIPA CORPORATE INITIATIVES FUND I, L.P., a
Delaware limited partnership

By:    Yucaipa Corporate Initiatives Fund I, LLC
Its:    General Partner


By:    _____


YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., a Delaware limited partnership

By:    Yucaipa American Alliance Fund I, LLC
Its:    General Partner


By:    _____


YUCAIPA AMERICAN ALLIANCE FUND I, L.P., a
Delaware limited partnership

By:    Yucaipa American Alliance Fund I, LLC
Its:    General Partner


By:    _____

C-27

**ANNEX D**

MANAGEMENT SERVICES AGREEMENT

Dated as of March 23, 2005

between

Pathmark Stores, Inc.

and

The Yucaipa Companies LLC

## MANAGEMENT SERVICES AGREEMENT

THIS MANAGEMENT SERVICES AGREEMENT (this *"Agreement"*) by and between The Yucaipa Companies LLC, a Delaware limited liability company (*"Yucaipa"*), and Pathmark Stores, Inc., a Delaware corporation (the *"Company"*), is made and entered into as of March 23, 2005 and effective as of the closing of the Purchase Agreement (as defined below).

### RECITALS

A.  The Company is in the business of operating supermarkets in Delaware, New Jersey, New York and Pennsylvania;

B.  The Company and certain affiliates of Yucaipa have entered into a Securities Purchase Agreement of even date herewith (the *"Purchase Agreement"*) providing for the purchase by affiliates of Yucaipa of investment units consisting of shares of common stock and warrants for the purchase of shares of common stock of the Company (the *"Investment"*);

C.  Yucaipa is experienced in the management of supermarket companies and has the ability to provide certain general business and financial advice and management services to the Company in connection with the operation of its business following the consummation of the Investment and the Company wishes to obtain the benefits of such advice and services.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties hereto and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned parties agree as follows:

Section 1.  *Management Services.*

Subject to the provisions of this Agreement, and subject to the supervision of the Board of Directors of the Company (the *"Board of Directors"*), Yucaipa, through its members, employees or other designated representatives or agents (*"Representatives"*); shall provide the Company with general business and management consultation and advice regarding strategic planning and development, budgeting, capital expenditure strategy, store development plans, labor strategy, financing plans, general business and economic matters and such other similar management services as may be requested by the Board of Directors or the Company's Chief Executive Officer from time to time. As used herein, the Company refers to the Company and its subsidiaries, as the context requires.

Section 2.  *Management Fees; Unallocated Expense Reimbursement.*

Commencing on the date of the Closing, the Company shall pay to Yucaipa an aggregate annual fee, in consideration of the services rendered by Yucaipa pursuant to Section 1 above, equal to $3,000,000 (the *"Annual Fee"*), which fee shall be comprised of a management fee equal to $1,500,000 and an unallocated expense reimbursement of $1,500,000 (the *"Expense Reimbursement"*), which Expense Reimbursement shall be in addition to the monthly expense reimbursement payable to Yucaipa pursuant to Section 3 of this Agreement. One-twelfth (1/12th) of the Annual Fee shall be payable in advance on the first day of each calendar month; *provided* that a prorated portion of such fee will be payable in advance on the Closing of the Purchase Agreement for the partial month beginning on the Closing and ending on the last day of the then-current month.

Section 3.  *Reimbursement of Expenses.*

The Company shall reimburse Yucaipa for all of its reasonable documented out-of-pocket costs and expenses incurred in connection with the performance of its obligations under this Agreement; *provided*, that expenses incurred by Yucaipa for airplane travel shall be reimbursed at rates no greater

than standard "business class" fares; *provided, further,* that the Company shall not be obligated to reimburse more than $500,000 of such expenses annually. Yucaipa shall bill the Company for the amount of all such costs and expenses monthly.

Section 4.    *Closing Fee; Transaction Expenses.*

As an added inducement to Yucaipa to enter into this Agreement, at the Closing, the Company shall (i) pay to Yucaipa a closing fee equal to $3,000,000 and (ii) reimburse Yucaipa for up to $3,200,000 of reasonable, documented out-of-pocket costs, expenses and fees incurred or paid in connection with the negotiation of the Purchase Agreement and the Ancillary Agreements and the effectuation of the Transactions.

Section 5.    *Additional Services.*

The Company may, but shall not be obligated to, retain or employ Yucaipa as a consultant in connection with any acquisition or disposition transaction by the Company and in connection with debt or equity financings or equipment lease arrangements or any other services not contemplated by the Section 1 above. The Company shall pay to Yucaipa a cash fee for providing any consulting services in connection with acquisition or disposition transactions or debt or equity financings or other services referenced above, equal to 1% of the transaction value or amount of such financing, as the case may be, calculated as agreed upon by the parties.

Section 6.    *Term of Agreement.*

The initial term of this Agreement shall commence on the Closing and continue for a period of five (5) years, and shall thereafter be renewed annually for successive one (1) year terms (each, a *"Renewal Term"*) unless the Company provides written notice of non-renewal to Yucaipa at least ninety (90) days prior to the expiration of the initial term or any Renewal Term, as applicable.

Section 7.    *Termination.*

7.1    *Termination by the Company.*    The Company may elect to terminate this Agreement:

(a)    at any time following a determination of the Board of Directors of the Company to effect such a termination by giving Yucaipa at least ninety (90) days' written notice of such termination;

(b)    if Yucaipa shall fail to reasonably perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by it (other than any failure or alleged failure occasioned by or resulting from force majeure, directly or indirectly) and such failure shall continue for a period of sixty (60) days after written notice thereof from the Company, which notice shall describe the alleged failure with particularity; or

(c)    at any time if, in connection with the performance of its duties hereunder, Yucaipa or any of its Representatives commits any act of fraud, dishonesty or gross negligence which is materially detrimental to the business or reputation of the Company as reasonably determined by the Board of Directors.

7.2    *Termination by Yucaipa.*    Yucaipa may elect to terminate this Agreement:

(a)    if the Company shall fail to reasonably perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by it (other than any failure or alleged failure occasioned by or resulting from force majeure, directly or indirectly) and such failure shall continue for a period of sixty (60) days after written notice thereof from Yucaipa, which notice shall describe the alleged failure with particularity;

(b)    if the Company shall fail to make any payment due to Yucaipa hereunder, if such payment is not made in full within thirty (30) days after written notice of such failure; or

D-3

(c) at any time upon giving the Company at least ninety (90) days' written notice of such termination.

7.3 *Termination for Change of Control.* This Agreement may be terminated, at the election of either Yucaipa or the Company, if during the term hereof there shall have been a change in control of the Company, which for purposes of this Agreement shall be deemed to have occurred upon any of the following events: (a) the acquisition after the Closing, in one or more transactions, of "beneficial ownership" (within the meaning of Rule 13d-3(a)(1) under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")) by any person (other than Yucaipa or any of its members or affiliates) or any group of persons (excluding any group which includes Yucaipa or any of its members or affiliates) who constitute a group (within the meaning of Section 13(d)(3) of the Exchange Act) of any securities of the Company such that, as a result of such acquisition, such person or group beneficially owns (within the meaning of Rule 13d-3(a)(1) under the Exchange Act) 51% or more of the Company's then outstanding voting securities entitled to vote for a majority of the Board of Directors; or (b) the sale of all or substantially all of the assets or capital stock of the Company (including, without limitation, by way of merger, consolidation, lease or any other transfer) in a transaction or series of related transactions (excluding any sale to Yucaipa or any of its members or affiliates). For purposes of this Section, "affiliate" shall mean any person controlled by, or under common control with, the specified person.

7.4 *Payments upon Termination.*

(a) In the event of any termination pursuant to Section 7.1(a), Section 7.2(a), Section 7.2(b) or Section 7.3, the Company shall pay, or cause to be paid, to Yucaipa a cash termination payment of $10,000,000 (the "*Termination Fee*"); provided, however, that if such termination shall occur during any Renewal Term, in lieu of the Termination Fee, the Company shall pay, or cause to be paid, to Yucaipa a cash payment equal to that portion of the Annual Fee that would have been paid to Yucaipa under Section 2 hereof during the remaining portion of such Renewal Term.

(b) The amounts, if any, which shall be due Yucaipa pursuant to Section 7.4(a) in the event of any such termination shall be due and payable to Yucaipa, in full, as of the date of such termination. The parties intend that, should the foregoing payments be determined to constitute liquidated damages, such payments shall in all events be deemed reasonable.

7.5 *Effect of Termination.* Upon any such termination of this Agreement the obligations of the parties hereunder shall also terminate, except (i) the Company shall continue to be obligated to Yucaipa for any payments to be received pursuant to Section 7.4(a), and for any unpaid costs, fees or expenses incurred prior to any such termination, (ii) the Company's obligations under Section 8 hereof shall survive any such termination; and (iii) the provisions of Section 9 shall survive any such termination.

Section 8. *Indemnification.*

(a) The Company (the "*Indemnifying Party*") agrees to indemnify and hold harmless Yucaipa and each of its affiliates, members, officers, agents and the employees of each of them (each an *Indemnified Party*" and collectively, the "*Indemnified Parties*"), from and against all losses, claims, damages, liabilities or obligations of any kind or nature (whether accrued or fixed, absolute or contingent, "*Losses*") resulting from any existing or threatened claim, lawsuit or other proceeding by any person to which any Indemnified Party may become subject which arises out of the performance of the services to be provided hereunder, and will reimburse any Indemnified Party for all reasonable out-of-pocket costs and expenses (including reasonable counsel fees and disbursements) incurred by such Indemnified Party in connection with investigating or defending any such claim. Each Indemnifying Party further agrees that the indemnification and reimbursement commitments herein shall apply whether or not such Indemnified Party is a formal party to any such lawsuit, claim or other proceeding. The foregoing

D-4

provision is expressly intended to cover reimbursement of reasonable legal and other expenses incurred in a deposition or other discovery proceeding.

Notwithstanding the foregoing, the Indemnifying Party shall not be liable to any Indemnified Party (a) in respect of any Losses to an Indemnified Party to the extent the same is determined, in a final judgment by a court having jurisdiction, to have resulted from the gross negligence or willful misconduct of such Indemnified Party or any material breach by such Indemnified Party of its obligations under this Agreement or (b) for any settlement effected by such Indemnified Party without the written consent of such Indemnifying Party, which consent shall not be unreasonably withheld.

In the event of the assertion against any Indemnified Party of any such claim or the commencement of any such action or proceeding, each Indemnifying Party shall be entitled to participate in such action or proceeding and in the investigation of such claim and, after written notice from such Indemnifying Party to such Indemnified Party, to assume the investigation or defense of such claim, action or proceeding with counsel of the Indemnifying Party's choice at the Indemnifying Party's expense; *provided, however,* that such counsel shall be reasonably satisfactory to the Indemnified Party. Notwithstanding anything to the contrary contained herein, the Indemnifying Party may retain one firm of counsel to represent all Indemnified Parties in such claim, action or proceeding; *provided* that the Indemnified Party shall have the right to employ a single firm of separate counsel (and any necessary local counsel) and to participate in the defense or investigation of such claim, action or proceeding, and the Indemnifying Party shall bear the expense of such separate counsel (and local counsel, if applicable), if (i) in the written opinion of counsel to the Indemnified Party use of counsel of the Indemnifying Party's choice could reasonably be expected to give rise to a conflict of interest, (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the assertion of any such claim or institution of any such action or proceeding or (iii) the Indemnifying Party shall authorize the Indemnified Party to employ separate counsel at the Indemnifying Party's expense.

(b)  If for any reason (other than the gross negligence or willful misconduct of an Indemnified Party referred to above) the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold it harmless as and to the extent contemplated by the preceding paragraph (a), then the Indemnifying Party shall contribute to the amount paid or payable by the Indemnified Party as a result of such Loss in such proportion as is appropriate to reflect the relative benefits received by the Indemnifying Party and its affiliates, on the one hand, and the Indemnified Party, as the case may be, on the other hand, as well as any other relevant equitable considerations.

Section 9.  *Notices.*

All notices, demands, requests, consents or approvals required or permitted to be given hereunder or which are given with respect to this Agreement shall be in writing and shall be personally served and mailed, registered or certified, return receipt requested, postage prepaid (or by a substantially similar method), or delivered by a reputable overnight courier service with charges prepaid, or transmitted by hand delivery, telegram, telex or facsimile, addressed as set forth below, or such other address as such party shall have specified most recently by written notice. Notice shall be deemed given or delivered on the date of service or transmission if personally served or transmitted by telegram, telex or facsimile. Notice otherwise sent as provided herein shall be deemed given or delivered on the third business day

following the date mailed or on the next business day following the delivery of such notice to a reputable overnight courier service.

If to Yucaipa:     The Yucaipa Companies LLC
                   9130 W. Sunset Boulevard
                   Los Angeles, California 90069
                   Attention: Robert P. Bermingham

If to the Company:     Pathmark Stores, Inc.
                       200 Milik Street
                       Carteret, New Jersey 07008
                       Attention: Chairman of the Board

with a copy to the General Counsel of the Company at the same address.

Section 10.  *Miscellaneous*.

10.1  *Entire Agreement; Amendments*.  This Agreement contains all of the terms and conditions agreed upon by the parties hereto in connection with the subject matter hereof. This Agreement may not be amended, modified or changed except by written instrument signed by all of the parties hereto.

10.2  *Assignment; Successors*.  This Agreement shall not be assigned and is not assignable by any party without the prior written consent of each of the other parties hereto; *provided, however,* that Yucaipa may assign, without the prior consent of the Company, its rights and obligations under this Agreement to any partnership or limited liability company controlled by, or under common control with, Yucaipa, except that no such assignment shall relieve Yucaipa of any of its obligations hereunder, and *provided further,* that Yucaipa may assign the right to receive any payment hereunder (but not its duties and obligations hereunder) to any other person or entity. Subject to the preceding sentence, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns.

10.3  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to the choice of law principles thereof.

10.4  *Attorneys' Fees*.  If any legal action is brought concerning any matter relating to this Agreement, or by reason of any breach of any covenant, condition or agreement referred to herein, the prevailing party shall be entitled to have and recover from the other party to the action all costs and expenses of suit, including attorneys' fees.

10.5  *Relationship*.  Nothing in this Agreement shall constitute or be construed to be a partnership or joint venture between the Company and Yucaipa. To the extent appropriate to the duties and obligations hereunder, Yucaipa shall be an independent contractor and none of its employees shall be deemed employees of the Company by reason of this Agreement or the performance of its duties hereunder. This Agreement is for the benefit of the Company and Yucaipa and shall not create third party beneficiary rights.

10.6  *Construction and Interpretation*.  This Agreement shall not be construed for or against either party by reason of the authorship or alleged authorship of any provision hereof or by reason of the status of the respective parties. This Agreement shall be construed reasonably to carry out its intent without presumption against or in favor of either party. The natural persons executing this Agreement on behalf of each party have the full right, power and authority to do and affirm the foregoing warranty on behalf of each party and on their own behalf. The captions on sections are provided for purposes of convenience and are not intended to limit, define the scope of or aid in interpretation of any of the provisions hereof. References to a party or parties shall refer to the Company or Yucaipa, or both, as the context may require. All pronouns and singular or plural references as used herein shall be

D-6

deemed to have interchangeably (where the sense of the sentence requires) a masculine, feminine or neuter, and/or singular or plural meaning, as the case may be.

10.7 *Severability*.   If any term, provision or condition of this Agreement is determined by a court or other judicial or administrative tribunal to be illegal, void or otherwise ineffective or not in accordance with public policy, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and shall be construed in such manner so as to preserve the validity hereof and the substance of the transactions herein contemplated to the extent possible.

10.8 *Counterparts*.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

10.9 *Effectiveness*.   This Agreement shall not be effective, and the rights and obligations of the respective parties hereto shall not commence, until the Closing, and in the event that, for any reason, the Closing shall not occur or the Purchase Agreement shall be terminated, this Agreement shall immediately thereupon be null, void and of no force and effect.

10.10 *Certain Definitions*.   Capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Purchase Agreement.

(*signature page follows*)

D-7

IN WITNESS WHEREOF, the parties hereto have caused this Management Services Agreement to be duly executed as of the date first above written.

THE YUCAIPA COMPANIES LLC, a Delaware limited liability company

By:    /s/ ROBERT P. BERMINGHAM
       Name:  Robert P. Bermingham
       Title:    Vice President

D-8

PATHMARK STORES, INC., a Delaware
corporation

By:     /s/ FRANK VITRANO
　　　　Name: Frank Vitrano
　　　　Title:　President and Chief Financial Officer

D-9