# EXHIBIT A
# Part 7 of 8

ANNEX E

# REGISTRATION RIGHTS AGREEMENT

Dated as of          , 2005

among

Pathmark Stores, Inc.

and

The Holders of Registrable Securities

## REGISTRATION RIGHTS AGREEMENT

THIS REGISTRATION RIGHTS AGREEMENT (this "*Agreement*") is made and entered into as of            , 2005 by and among Pathmark Stores, Inc., a Delaware corporation (the "*Company*"), and each of the holders of Registrable Securities (as hereinafter defined) executing this Agreement (each a "*Holder*" and collectively, the "*Holders*").

## RECITALS

WHEREAS, this Agreement is made pursuant to that certain Securities Purchase Agreement dated as of March 23, 2005 (the "*Purchase Agreement*") by and between the Company and the Holders, under which the execution and delivery of this Agreement is a condition to the closing of the transactions contemplated thereby.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the parties hereto agree as follows:

Section 1.1    *DEFINITIONS*.    Capitalized terms used herein and not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement. In addition, the following capitalized terms shall have the meanings ascribed to them below:

"*Affiliate*," as applied to any specified Person, shall mean any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person and, in the case of a Person who is an individual, shall include (i) members of such specified Person's immediate family (as defined in Instruction 2 of Item 404(a) of Regulation S-K under the Securities Act) and (ii) trusts, the trustee and all beneficiaries of which are such specified Person or members of such Person's immediate family as determined in accordance with the foregoing clause (i). For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Business Day*" means any day that is not a Saturday, Sunday or a day on which banking institutions in New York, New York or Los Angeles, California are not required to be open.

"*Closing Date*" means the date on which Company Common Stock and Warrants are first issued under the Purchase Agreement.

"*Company Common Stock*" means the common stock, par value $.01 per share, of the Company.

"*Deferral Period*" is defined in Section 2.1.

"*Demand Notice*" is defined in Section 2.1.

"*Demand Registration*" is defined in Section 2.1.

"*Demanding Holder*" means any Holder initiating a registration request in compliance with Section 2.1(a); provided that any action required or permitted to be taken under this Agreement by any Demanding Holders shall be taken by action of the holders of a majority of the Registrable Securities held by such Demanding Holders.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Holders*" means the holders of Company Common Stock and of the Warrants who have executed this Agreement, and the permitted transferees of each of them.

"*Person*" means an individual, partnership, corporation, limited liability company, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"*Piggyback Registration*" is defined in Section 2.2.

"*Piggyback Holder*" is defined in Section 2.2.

"*Prospectus*" means the prospectus included in a Registration Statement, as amended or supplemented by any prospectus supplement and by all other amendments thereto, including post-effective amendments, and all material incorporated by reference into such Prospectus.

"*Public Distribution*" shall mean any bona fide underwritten public distribution of Stock pursuant to an effective registration statement under the Securities Act or any other applicable law, or any bona fide public sale in an open market transaction under Rule 144 of the Securities Act (or any successor rule) if such sale is in compliance with the requirements of paragraphs (c), (d), (e), (f) and (g) of such Rule (notwithstanding the provisions of paragraph (k) of such Rule).

"*Public Offering*" shall mean any bona fide underwritten public distribution of Stock pursuant to an effective registration statement under the Securities Act or any other applicable law.

"*Registrable Securities*" means each share of Stock held by the Holders, or acquired by the Holders after the date hereof, until (i) it has been effectively registered under the Securities Act and disposed of by such Holders pursuant to an effective registration statement, or (ii) it is sold by such Holders pursuant to Rule 144 (or any similar provisions then in force) under the Securities Act. "Registrable Securities" shall include all shares of Company Common Stock issued or issuable upon exercise of the Warrants.

"*Registration Statement*" means any registration statement of the Company relating to a Demand Registration pursuant to Section 2.1, a Piggyback Registration pursuant to Section 2.2, or a Shelf Registration pursuant to Section 2.3, in each case, including the Prospectus included therein, all amendments and supplements thereto (including post-effective amendments) and all exhibits and material incorporated by reference therein.

"*SEC*" means the Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Holder*" means a Holder who sells or proposes to sell Registrable Securities pursuant to a Registration Statement under the Securities Act.

"*Shelf Registration*" or "*Shelf Registration Statement*" is defined in Section 2.3.

"*Stock*" means the following securities (i) the Company Common Stock or (ii) any security or other instrument (a) received as a dividend on, or other payment made to the holders of, the Company Common Stock (or any other security or instrument referred to in this definition) or (b) issued in connection with a split of the Company Common Stock (or any other security or instrument referred to in this definition) or as a result of any exchange or reclassification of the Company Common Stock (or any other security or instrument referred to in this definition), reorganization, consolidation, merger or recapitalization.

"*Underwritten Registration*" or "*Underwritten Offering*" means a registration in which Stock of the Company is sold to an underwriter for re-offering to the public.

"*Warrants*" means the Warrants issued pursuant to the Purchase Agreement.

E-3

**ARTICLE II**

**REGISTRATION RIGHTS**

SECTION 2.1 *DEMAND REGISTRATIONS*.

(a) *Request for Registration*. At any time and from time to time on or after the 180th day following the Closing Date the holders of at least 40% of the Registrable Securities held by the Holders may make three written requests of the Company for registration with the SEC, under and in accordance with the provisions of the Securities Act, of all or part (but not less than one million (1,000,000) shares of Registrable Securities) of their Registrable Securities (a *"Demand Registration"*) by giving written notice to the Company of such demand (a *"Demand Notice"*), provided that the Company shall be required to effect only one Demand Registration during any six-month period. Each such Demand Notice will specify the number of Registrable Securities proposed to be sold pursuant to such Demand Registration and will also specify the intended method of disposition thereof.

The Company shall give written notice, of any Demand Notice by any Holder, which request complies with this Section 2.1(a), within 5 days after the receipt thereof, to each Holder who did not initially join in such request. Within 10 days after receipt of such notice, any such Holder may request in writing that its Registrable Securities be included in such registration, and the Company shall include in the Demand Registration the Registrable Securities of each such Holder requested to be so included, subject to the provisions of Section 2.1(e). Each such request shall specify the number of shares of Registrable Securities proposed to be sold and the intended method of disposition thereof.

Promptly after receipt of any Demand Notice, but in no event later than 60 days after receipt of such Demand Notice, the Company shall file a Registration Statement with the SEC with respect to the Registrable Securities included in the Demand Notice and shall use its reasonable best efforts to have such Registration Statement declared effective as promptly as practicable; *provided*, *however*, that the Company may postpone the filing of such Registration Statement for a period of up to 90 days (the *"Deferral Period"*) if the Board of Directors reasonably determines that (i) such a filing would adversely affect any proposed financing, acquisition, divestiture or other material transaction by the Company or (ii) such a filing would otherwise represent an undue hardship for the Company. The Company shall not be entitled to request more than one such deferral (two in the case of events of the type described in clause (i) above) with respect to any Demand Registration within any 365-day period. If the Company does elect to defer any such Demand Registration, the Holders requesting such Demand Registration may, at their election by written notice to the Company, (i) confirm their request to proceed with such Demand Registration upon the expiration of the Deferral Period or (ii) withdraw their request for such Demand Registration in which case no such request for a Demand Registration shall be deemed to have occurred for purposes of this Agreement.

(b) *Effective Registration*. Except as provided in subsection (c) below, a registration will not be deemed to have been effected as a Demand Registration unless it has been declared effective by the SEC; provided that if, after it has become effective, the offering of Registrable Securities pursuant to such registration is or becomes the subject of any stop order, injunction or other order or requirement of the SEC or any other governmental or administrative agency, or if any court prevents or otherwise limits the sale of Registrable Securities pursuant to the registration (for any reason other than the acts or omissions of the Holders), such registration will be deemed not to have been effected. If (i) a registration requested pursuant to this Section 2.1 is deemed not to have been effected in accordance with the provisions of the preceding sentence or (ii) the registration requested pursuant to this Section 2.1 does not remain continuously effective for a period of at least 90 days beyond the effective date thereof (or such shorter period as is required to complete the distribution by the Holders of the Registrable Securities included in such registration statement) (the *"Demand Registration Statement"*), then such Demand Registration Statement shall not count as a Demand Registration that may be

E-4

requested by the Demanding Holder(s) and the Company shall continue to be obligated to effect a registration pursuant to this Section 2.1.

(c) *Withdrawal.* The Demanding Holders may withdraw all or any part of the Registrable Securities from a Demand Registration at any time (whether before or after the filing or effective date of the Demand Registration Statement), and if all such Registrable Securities are withdrawn, to withdraw the demand related thereto. If at any time a registration statement is filed pursuant to a Demand Registration, and subsequently a sufficient number of Registrable Securities are withdrawn from the Demand Registration so that such Demand Registration Statement does not cover at least the required amounts specified by Section 2.1(a), and an additional number of Registrable Securities is not so included, the Company may (or shall, if requested by the Demanding Holders) withdraw such Demand Registration Statement; provided that such withdrawn registration statement will count as a Demand Registration unless the Demanding Holders elect to bear the expenses associated with such withdrawn registration statement. If the Demanding Holders elect to bear such expenses, such expenses shall be borne by the Demanding Holder(s) whose withdrawal of Registrable Securities resulted in such Demand Registration Statement not covering the specified required amounts.

(d) *Selection of Underwriter.* If the Demanding Holders so elect, the offering of Registrable Securities pursuant to a Demand Registration shall be in the form of an Underwritten Offering. The Demanding Holders and the Company shall jointly select one or more nationally recognized firms of investment bankers to act as the managing underwriter or underwriters in connection with such offering and shall select any additional investment bankers and managers to be used in connection with such offering; provided that in the event that the Company and the Demanding Holders are unable to jointly agree on such investment bankers and managers, such investment bankers and managers shall be selected by the Demanding Holders and shall be reasonably satisfactory to the Company. The Company shall (together with all Holders of Registrable Securities proposing to distribute such Registrable Securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting in the manner set forth above.

(e) *Priority on Demand Registrations.* If, in any Demand Registration involving an Underwritten Offering the managing underwriter or underwriters thereof advise the Demanding Holders or the Company in writing that in its or their reasonable opinion the number of Registrable Securities proposed to be sold in such Demand Registration exceeds the number that can be sold in such offering or will adversely affect the success of such offering (including, without limitation, an impact on the selling price or the number of Registrable Securities that any participant may sell), the Company shall include in such registration only the number of Registrable Securities, if any, which in the opinion of such underwriter or underwriters can be sold without having an adverse effect on the success of the offering and in accordance with the following priority: (i) first, Registrable Securities held by Demanding Holders, allocated pro rata among such group (based upon the number of Registrable Securities requested to be included in such Demand Registration) and (ii) second, pro rata (based upon the number of Registrable Securities requested to be included in such registration by such Holders) among the other Holders of Registrable Securities who have requested to include Registrable Securities in such registration. If all Registrable Securities requested to be sold in the Underwritten Offering are included therein, the Company may include other shares of Stock in such offering in accordance with the following priority, but not to exceed the number recommended by the managing underwriter or underwriters: (x) first, pro rata among any other stockholders of the Company having piggyback or other similar registration rights and (y) second, shares of Stock proposed to be sold by or for the account of the Company.

Section 2.2  *PIGGYBACK REGISTRATIONS.*

(a) *Right to Participate in Registration.* If at any time the Company proposes to file a registration statement under the Securities Act with respect to an offering by the Company for its own account or

for the account of any holders of any class of common equity securities (other than (i) a registration statement on Form S-4 or S-8 (or any substitute form that may be adopted by the SEC) or (ii) a registration statement filed in connection with a Demand Registration or a Shelf Registration or (iii) a registration statement filed in connection with an offering of securities solely to the Company's existing securityholders), then the Company shall give written notice of such proposed filing to the Holders as soon as practicable (but in no event less than 20 days before the anticipated filing date), and such notice shall offer such Holder the opportunity to register such number of shares of Registrable Securities as each such Holder may request, which request shall specify the Registrable Securities intended to be disposed of by such Holder and the intended method of distribution thereof (or, if the offering is a proposed Underwritten Offering, that such Holder elects to have the number of Registrable Securities so specified included in such Underwritten Offering) (a *"Piggyback Registration"*).

The Company shall use its reasonable best efforts to cause the managing underwriter or underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested by the Holders thereof to be included in a Piggyback Registration (the *"Piggyback Holders"*) to be included on the same terms and conditions as any similar securities of the Company or any other securityholder included therein and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method of distribution thereof.

No registration effected under this Section 2.2 and no failure to effect a registration under this Section 2.2(a), shall relieve the Company of its obligations pursuant to Section 2.1, and no failure to effect a registration under this Section 2.2(a) and complete the sale of shares in connection therewith shall relieve the Company of any other obligation under this Agreement (including, without limitation, the Company's obligations under Sections 3.2 and 4.1).

(b) *Priority on Piggyback Registrations*. Unless the registration statement is being filed pursuant to a Demand Registration (in which case the priority of piggyback rights shall be as provided in Section 2.1(e) above), if the managing underwriter or underwriters advise the Company in writing that in its or their reasonable opinion the number of equity securities of the Company proposed to be sold in such registration (including Registrable Securities to be included pursuant to subsection (a) above) will adversely affect the success of such offering (including, without limitation, an impact on the selling price or the number of equity securities of the Company that any participant may sell), the Company shall include in such registration the number of equity securities of the Company, if any, which in the opinion of such underwriter or underwriters can be sold without having an adverse effect on the offering and in accordance with the following priority: (i) first, the securities the Company proposes to sell for its own account, and (ii) second, pro rata based on the number of Registrable Securities that each Holder or other Person having similar rights shall have requested to be included therein.

(c) *Withdrawal*. The Piggyback Holders may withdraw all or any part of the Registrable Securities from a Piggyback Registration at any time (before but not after the effective date of such registration statement), by delivering written notice of such withdrawal request to the Company, unless such Piggyback Registration is underwritten, in which case Registrable Securities may not be withdrawn after the effective date of the Registration Statement.

(d) *Termination of Registration by the Company*. If the Company shall determine for any reason (x) not to register or (y) to delay a registration which includes Registrable Securities pursuant to this Section 2.2, the Company may, at its election, give written notice of such determination to the Holders of the Registrable Securities and, thereupon (i) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the Registration Expenses (as defined below) in connection therewith), without prejudice, however, to the rights, if any, of any Holder or Holders of Registrable Securities to request that such registration be effected as a Demand Registration under Section 2.1; and (ii) in the

E-6

case of a delay in registering, shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other shares.

Section 2.3   *SHELF REGISTRATION.*

(a)  *Filing and Effectiveness.*   Upon the request of the Demanding Holders at any time after the 180th day following the Closing Date, the Company shall cause to be filed with the SEC as promptly as practicable after such request, but in no event later than 90 days thereafter, a shelf registration statement pursuant to Rule 415 under the Securities Act (a *"Shelf Registration"* or a *"Shelf Registration Statement"*), which Shelf Registration Statement shall provide for resales of all Registrable Securities held by Holders who shall have provided the information required pursuant to Section 3.1(b). The Company shall use its reasonable best efforts to have such Shelf Registration declared effective, subject to Section 2.3(c) below, and to keep such Shelf Registration Statement continuously effective, supplemented and amended to the extent necessary to ensure that it is available for resales of Registrable Securities by such Holders, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the SEC as announced from time to time, for a period of at least two (2) years following the date on which such Shelf Registration Statement becomes effective under the Securities Act. A request of the Demanding Holders under this Section 2.3(a) shall be deemed to be a request for a Demand Registration under Section 2.1 above.

(b)  *Effective Registration.*   A registration will not be deemed to have been effected as a Shelf Registration unless it has been declared effective by the SEC and the Company has complied in all material respects with its obligations under this Agreement with respect thereto; provided that if, after it has become effective, the offering of Registrable Securities pursuant to such registration is or becomes the subject of any stop order, injunction or other order or requirement of the SEC or any other governmental or administrative agency, or if any court prevents or otherwise limits the sale of Registrable Securities pursuant to the registration (for any reason other than the acts or omissions of the Holders), such registration will be deemed not to have been effected. If (i) the Shelf Registration is deemed not to have been effected in accordance with the provisions of the preceding sentence or (ii) the Shelf Registration does not remain continuously effective for the period described in subsection (a) above, then such Shelf Registration Statement shall not count as a Shelf Registration and the Company shall continue to be obligated to effect a registration pursuant to this Section 2.3.

(c)  *Suspension.*   With respect to any Shelf Registration that has been declared effective (i) the Company may suspend use of such Shelf Registration at any time if the continued effectiveness thereof would require the Company to disclose a material financing, acquisition or other corporate transaction, which disclosure the Board of Directors of the Company shall have determined in good faith is not in the best interests of the Company and its stockholders, and (ii) the Company may suspend use of such Shelf Registration during any period if each of the Company and the holders of a majority of the Registrable Securities included in such Self Registration consents in writing to such suspension for such period.

## ARTICLE III

## REGISTRATION PROCEDURES

SECTION 3.1  *REGISTRATION PROCEDURES.*

(a)  *General Provisions.*   In connection with any Registration Statement and any related Prospectus required by this Agreement to permit the sale or resale of Registrable Securities, the Company shall:

(1)  prepare and file with the SEC a registration statement with respect to such Registrable Securities within the time periods specified herein, make all required filings with the NASD and use its best efforts to cause such registration statement to become effective as promptly as

practicable (subject to the Company's right to withdraw the registration statement under the circumstances described in Sections 2.1(c) or 2.2(d));

(2) promptly prepare and file with the SEC such amendments and post-effective amendments to the Registration Statement as may be necessary to keep the Registration Statement effective for the applicable period set forth in Sections 2.1, 2.2 or 2.3, as applicable, or such shorter period as will terminate when all Registrable Securities covered by such Registration Statement have been sold (subject to Section 2.3(c)); cause the Prospectus to be supplemented by a required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 under the Securities Act, and to comply fully with the applicable provision of Rules 424 and 430A under the Securities Act in a timely manner; and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during the applicable period in accordance with the intended method or methods of distribution by the sellers thereof set forth in such Registration Statement or supplement to the Prospectus;

(3) use its reasonable best efforts to keep such Registration Statement continuously effective and provide all requisite financial statements for the period specified in Sections 2.1, 2.2 or 2.3, as applicable (subject to Section 2.3(c)); upon the occurrence of any event that would cause any such Registration Statement or the Prospectus contained therein (A) to contain a material misstatement or omission or (B) not to be effective and usable for resale of Registrable Securities during the period required by this Agreement, the Company shall file as promptly as practicable an appropriate amendment to such Registration Statement, in the case of clause (A), correcting any such misstatement or omission, and, in the case of either clause (A) or (B), use its reasonable best efforts to cause such amendment to be declared effective and such Registration Statement and related Prospectus to become usable for their intended purposes(s) as soon as practicable thereafter;

(4) provide (A) the Holders of Registrable Securities participating in the registration, (B) the underwriters (which term, for purposes of this Agreement, shall include a Person deemed to be an underwriter within the meaning of Section 2(11) of the Securities Act), if any, of the Registrable Securities to be registered, (C) the sale or placement agent therefor, if any, (D) counsel for such underwriters or agent, and (E) counsel for the Holders thereof, as selected by Holders of a majority of the Registrable Securities covered by such registration statement, the opportunity to participate in the preparation of such registration statement, each prospectus included therein or filed with the SEC, and each amendment or supplement thereto, and for a reasonable period prior to the filing of such registration statement, and throughout the period specified in Section 3.4(b) hereof, make available for inspection by the parties referred to in (A) through (E) above such financial and other information and books and records of the Company, provide access to properties of the Company and cause the officers, directors, employees, counsel and independent certified public accountants of the Company to respond to such inquiries as shall be reasonably necessary to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act;

(5) advise the underwriters, if any, and Selling Holders promptly and, if requested by such Persons, to confirm such advice in writing, (A) when the Prospectus or any Prospectus supplement or post-effective amendment has been filed, and, with respect to any Registration Statement or any post-effective amendment thereto, when the same has become effective, (B) of any request by the SEC for amendments to the Registration Statement or amendments or supplements to the Prospectus or for additional information relating thereto, (C) of the issuance by the SEC of any stop order suspending the effectiveness of the Registration Statement under the Securities Act or of the suspension by any state securities commission of the qualification of the Registrable Securities for offering or sale in any jurisdiction, or the initiation of any proceeding for any of the preceding purposes, (D) of the existence of any fact or the happening of any event that makes any statement of a material fact made in the registration Statement, the Prospectus, any amendment or

supplement thereto, or any document incorporated by reference therein untrue, or that requires the making of any additions to or changes in the Registration Statement or the Prospectus in order to make the statements therein not misleading. If at any time the SEC shall issue any stop order suspending the effectiveness of the Registration Statement, or any state securities commission or other regulatory authority shall issue an order suspending the qualification or exemption from qualification of the Registrable Securities under state securities or Blue Sky laws, the Company shall use its reasonable best efforts to obtain the withdrawal or lifting of such order at the earliest possible time;

(6)  furnish to each Selling Holder named in any Registration Statement or Prospectus and each of the underwriter(s) in connection with such sale, if any, such number of copies of any Registration Statement or Prospectus included therein or any amendments or supplements to any such Registration Statement or Prospectus (including all documents incorporated by reference after the initial filing of such Registration Statement and all exhibits filed therewith), reasonably requested by such Person;

(7)  if requested by any selling Holders or the underwriter(s) in connection with such sale, if any, promptly include in any Registration Statement or Prospectus, pursuant to a supplement or post-effective amendment if necessary, such information as such selling Holders and such underwriter(s), if any, may reasonably request to have included therein, including, without limitation, information relating to the "Plan of Distribution" of the Registrable Securities, information with respect to the principal amount of Registrable Securities being sold to such underwriter(s), the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering, and make all required filings of such Prospectus supplement or post-effective amendment as soon as practicable after the Company is notified of the matters to be included in such Prospectus supplement or post-effective amendment;

(8)  deliver to each Selling Holder and each of the underwriter(s), if any, without charge, as many copies of the Prospectus (including each preliminary prospectus) and any amendment or supplement thereto as such Persons reasonably may request; the Company hereby consents to the use of the Prospectus and any amendment or supplement thereto by each of the Selling Holders and each of the underwriter(s), if any, in connection with the offering and the sale of the Registrable Securities covered by the Prospectus or any amendment or supplement thereto;

(9)  in connection with any Underwritten Offering pursuant to a Demand Registration, enter into an underwriting agreement with one or more underwriter designated in accordance with this Agreement, such agreement to be of the form, scope and substance as is customary in underwritten offerings, and take all such other actions as are reasonably requested by the managing underwriter(s) in order to expedite or facilitate the disposition of such Registrable Securities and in such connections (i) make such representations and warranties to the underwriters in form, scope and substance as are customarily made by issuers to underwriters in underwritten offerings with respect to the business of the Company; (ii) obtain opinions of counsel to the Company and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriter(s)) addressed to the managing underwriter(s) covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by the underwriters; (iii) obtain "comfort" letters and updates thereof from the Company's independent certified public accountants addressed to the underwriters, such "comfort" letters to be in customary form and covering matters of the type customarily covered in "comfort" letters in connection with underwritten offerings; (iv) deliver such documents and certificates as may be reasonably requested by the managing underwriter(s) to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company. The above shall be done at each closing under such underwriting or similar agreement;

E-9

(10) prior to any public offering of Registrable Securities, cooperate with the Selling Holders, the underwriter(s), if any, and their respective counsel in connection with the registration and qualification of the Registrable Securities under the securities or Blue Sky laws of such jurisdictions as the Selling Holders or underwriter(s), if any, may request and do any and all other acts or things necessary or advisable to enable the disposition in such jurisdictions or the Registrable Securities covered by the applicable Registration Statement; *provided, however,* that the Company shall not be required to register or qualify as a foreign corporation where it is not now so qualified or to take any action that would subject it to the service of process in suits or to taxation, except as is required as a result of the Registration Statement, in any jurisdiction where it is not now so subject;

(11) in connection with any sale of Registrable Securities that will result in such securities no longer being Registrable Securities, cooperate with the Selling Holders and the underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends; and to register such Registrable Securities in such denominations and such names as the Selling Holders or the underwriter(s), if any, may request at least two Business Days prior to such sale of Registrable Securities;

(12) if requested by the Selling Holders, provide a CUSIP number for all Registrable Securities not later than the effective date of the Registration Statement covering such Registrable Securities and provide the Company's transfer agent(s) and registrar(s) for the Registrable Securities with printed certificates for the Registrable Securities;

(13) cooperate and assist in any filings required to be made with the NASD and in the performance of any due diligence investigation by any underwriter (including any "qualified independent underwriter") that is required to be retained in accordance with the rules and regulations of the NASD), and use their best efforts to cause such Registration Statement to become effective and approved by such governmental agencies or authorities as may be necessary to enable the Selling Holders or underwriters, if any, to consummate the disposition of such Registrable Securities;

(14) otherwise use its best efforts to comply with all applicable rules and regulations of the SEC, and make generally available to its security holders, as soon as practicable, a consolidated earnings statement meeting the requirements of Rule 158 under the Securities Act (which need not be audited) covering a period of at least twelve month periods, but not more than eighteen months, beginning with the first month of the Company's first quarter commencing after the effective date of the Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act; and

(15) cause all Registrable Securities covered by the Registration Statement to be listed on each securities exchange on which securities of the same class issued by the Company are then listed if requested by the Selling Holders holding a majority of the Registered Securities or the managing underwriter(s), if any.

Each Selling Holder, upon receipt of any notice from the Company of the happening of any event described in subsection (5)(B), (C), or (D) of Section 3.1(a) or in Section 2.3(c) (a "*Suspension Notice*"), shall forthwith discontinue disposition of the Registrable Securities pursuant to the Registration Statement relating thereto until such Selling Holder receives copies of the supplemented or amended Prospectus contemplated hereby or until it is advised in writing (the "*Advice*") by the Company that the use of the Prospectus may be resumed, and has received copies of any additional or supplemented filings that are incorporated by reference in the Prospectus, and, if so directed by the Company, such Selling Holder will, or will request the managing underwriter or underwriters, if any, to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Selling Holder's possession, of the Prospectus covering such Registrable Securities current at the

time of receipt of such notice. The period from the date on which any Holder receives a Suspension Notice to the date on which any Holder receives either the Advice or copies of the supplemented or amended Prospectus contemplated hereby relating to such notice shall hereinafter be referred to as the "*Suspension Period*." If the Company shall give any Suspension Notice, (i) the Company shall use its reasonable best efforts and take such actions as are reasonably necessary to render Advice and end the Suspension Period as promptly as practicable and (ii) the time periods for which a Registration Statement is required to be kept effective pursuant to Sections 2.1, 2.2 or 2.3, as the case may be, shall be extended by the number of days during the period from and including the date of the giving of such Suspension Notice to and including the date when each Selling Holder shall have received (A) the copies of the supplemented or amended Prospectus contemplated by Section 3.1 (a) or (B) the Advice.

(b) *Provision by Holders of Certain Information.* No Holder of Registrable Securities may include any of its Registrable Securities in any Registration Statement pursuant to this Agreement unless and until such Holder furnishes to the Company in writing, within 20 days after receipt of a request therefor, such information as the Company may reasonably request specified in item 507 of Regulation S-K under the Securities Act for use in connection with any Registration Statement or Prospectus or preliminary Prospectus included therein. Each Holder as to which any Registration Statement is being effected agrees to furnish promptly to the Company all information required to be disclosed in order to make the information previously furnished to the Company by such Holder not materially misleading.

SECTION 3.2   *REGISTRATION EXPENSES.*

(a) All expenses incident to the Company's performance of or compliance with this Section 3.2 will be paid by the Company, regardless of whether any registration statement required hereunder becomes effective, including, without limitation:

(1) all registration and filing fees;

(2) fees and expenses of compliance with securities or blue sky laws (including, without limitation, reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters or Holders of Registrable Securities being sold may designate);

(3) printing (including, without limitation, expenses of printing or engraving certificates for the Registrable Securities in a form eligible for trading on the Nasdaq or for deposit with the Depository Trust Company and of printing prospectuses), messenger, telephone and delivery expenses;

(4) reasonable fees and disbursements of counsel for the Company;

(5) reasonable fees and disbursements of all independent certified public accountants of the Company (including, without limitation, the expenses of any special audit and "cold comfort" letters required by or incident to such performance);

(6) fees and expenses of other Persons retained by the Company; and

(7) fees and expenses associated with any NASD filing required to be made in connection with the registration of the Registrable Securities, including, if applicable, the reasonable fees and expenses of any "qualified independent underwriter" (and its counsel) that is required to be retained in accordance with the rules and regulations of the NASD (all such expenses being herein called "*Registration Expenses*").

(b) The Company will, in any event, pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense

E-11

of any annual audit, the fees and expenses incurred in connection with the listing of the Registrable Securities to be registered on Nasdaq or on each national securities exchange on which similar securities issued by the Company are then listed and the fees and expenses of any Person, including special experts, retained by the Company.

SECTION 3.3  *PARTICIPATION IN UNDERWRITTEN REGISTRATIONS.*  No Holder may participate in any Underwritten Registration hereunder unless such Holder (i) agrees to sell its Registrable Securities on the basis provided in any underwriting arrangements approved by the Persons entitled hereunder to approve such arrangements and (b) completes and executes all reasonable questionnaires, powers of attorney, underwriting agreements, hold-back agreements letters and other documents customarily required under the terms of such underwriting arrangements. Notwithstanding the foregoing, (x) no Selling Holder shall be required to make any representations or warranties except those which relate solely to such Holder and its intended method of distribution, and (y) the liability of each such Holder to any underwriter under such underwriting agreement will be limited to liability arising from misstatements or omissions regarding such Holder and its intended method of distribution and any such liability shall not exceed an amount equal to the amount of net proceeds such Holder derives from such registration; *provided, however,* that in an offering by the Company in which any Holder requests to be included in a Piggyback Registration, the Company shall use its best efforts to arrange the terms of the offering such that the provisions set forth in clauses (x) and (y) of this Section 3.3 are true. Nothing in this Section 3.3 shall be construed to create any additional rights regarding the registration of Registrable Securities in any Person otherwise than as set forth herein.

SECTION 3.4  *HOLD-BACK AGREEMENTS.*

(a)  *Restrictions on Public Distribution by Holder of Registrable Securities.*  Upon the written request of the managing underwriter or underwriters of a Public Offering, each Holder of Registrable Securities shall not effect any Public Distribution of such securities, or any securities convertible into or exchangeable or exercisable for such securities, including a sale pursuant to Rule 144 under the Securities Act (except as part of such Public Offering), during the 14-day period prior to, and during the 90-day period following, the offering date for each Public Offering made pursuant to such registration statement (as identified by such underwriter or underwriters or the Company in good faith). The foregoing provisions shall not apply to any Holder that is prevented by applicable statute or regulation from entering into any such agreement; *provided, however,* that any such Holder shall undertake not to effect any Public Distribution of the class of securities covered by such registration statement (except as part of such Underwritten Offering) during such period unless it has provided 60 days' prior written notice of such Public Distribution to the managing underwriter.

(b)  *Restrictions on Public Distribution by the Company and Others.*  The Company agrees and it shall use its reasonable best efforts to cause its Affiliates (other than Persons who are Holders hereunder) to agree: (1) not to effect any Public Distribution of any securities being registered in accordance with Article II hereof, or any securities convertible into or exchangeable or exercisable for such securities, during the 14-day period prior to, and during the 90-day period following, the offering date for each Public Offering made pursuant to a registration statement filed under Article II hereof, if requested in writing by the managing underwriters (except as part of such Public Offering or pursuant to registrations in connection with mergers, acquisitions, exchange offers, subscription offers, dividend reinvestment plans or stock options or other employee benefit plans); and (2) to use its reasonable best efforts to cause each Holder of its privately placed Registrable Securities that are issued by the Company at any time on or after the date of this Agreement to agree not to effect any Public Distribution, including a sale pursuant to Rule 144 under the Securities Act, of any Registrable Securities during the period set forth in clause (1) above (except as part of such Public Offering, if and to the extent permitted).

## ARTICLE IV

## INDEMNIFICATION AND CONTRIBUTION

SECTION 4.1  *INDEMNIFICATION BY THE COMPANY.*  The Company agrees to indemnify and hold harmless each Selling Holder, each person, if any, who controls such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) (hereinafter referred to as a "controlling person"), the respective officers, directors, partners, employees, representatives and agents of any Holder or any controlling person, solely in their capacities as such (each an *"Indemnified Holder"*), to the fullest extent lawful, from and against any and all losses, claims, damages, liabilities, judgments, actions and expenses (including without limitation and as incurred, reimbursement of all reasonable costs of investigating, preparing, pursuing or defending any claim or action, or any investigation or proceeding by any governmental agency or body, commenced or threatened, including the reasonable fees and expenses of counsel to any Indemnified Holder) directly or indirectly caused by, related to, based upon, arising out of or in connection with any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or Prospectus (or any amendment or supplement thereto), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, liabilities or expenses are caused by an untrue statement or omission or alleged untrue statement or omission that is made in reliance upon and in conformity with information relating to any of the Holders furnished in writing to the Company by any of the Holders expressly for use therein.

SECTION 4.2  *INDEMNIFICATION BY HOLDERS OF REGISTRABLE SECURITIES.*  Each Selling Holder agrees, severally and not jointly, to indemnify and hold harmless the Company and its directors, officers and any person controlling (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Company and its respective officers, directors, partners, employees, representatives and agents of each such person, to the same extent as the foregoing indemnity from the Company to each of the Indemnified Holders, but only with respect to losses, claims, damages, liabilities, judgments, actions and expenses (including without limitation and as incurred, reimbursement of all reasonable costs of investigating, preparing, pursuing or defending any claim or action, or any investigation or proceeding by any governmental agency or body, commenced or threatened, including the reasonable fees and expenses of counsel to the Company) directly or indirectly caused by, related to, based upon, arising out of or in connection with any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or Prospectus (or any amendment or supplement thereto), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that such untrue statement or omission is contained in any information relating to such Holder furnished in writing by such Holder expressly for use in any Registration Statement or Prospectus. In case any action or proceeding shall be brought against the Company or its directors or officers or any such controlling person in respect of which indemnity may be sought against a Holder of Registrable Securities, such Holder shall have the rights and duties given the Company, and the Company or its directors or officers or such controlling person shall have the rights and duties given to each Holder by the preceding paragraph. Each Selling Holder also agrees to indemnify and hold harmless each other Selling Holder or underwriters participating in the distribution on substantially the same basis as that of the indemnification of the Company provided in this Section 4.2. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. The Company shall be entitled to receive indemnities from underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, to the same extent as provided above with respect to information so

E-13

furnished in writing by such Persons specifically for inclusion in any Registration Statement or Prospectus.

SECTION 4.3  *CONDUCT OF INDEMNIFICATION PROCEEDINGS.*  Any Person entitled to indemnification hereunder (an "*Indemnified Party*") will (i) promptly give notice of any claim, action or proceeding (including any governmental or regulatory investigation or proceeding) or the commencement of any such action or proceeding to the Person against whom such indemnity may be sought (an "*Indemnifying Party*"); *provided* that the failure to give such notice shall not relieve the Indemnifying Party of its obligations pursuant to this Agreement except to the extent that such Indemnifying Party has been prejudiced in any material respect by such failure, and (ii) permit the Indemnifying Party to assume the defense of such claim with counsel reasonably satisfactory to such Indemnified Party; *provided* that the Indemnified Party shall have the right to employ separate counsel and participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Indemnifying Party has agreed to pay for such fees and expenses, or (b) the Indemnifying Party shall have failed to assume the defense of such claim and employ counsel reasonably satisfactory to such Indemnified Party or (c) in the reasonable judgment of such Indemnified Party, based upon advice of its counsel, a conflict of interest may exist between such Indemnified Party and the Indemnifying Party with respect to such claims. If such defense is not assumed by the Indemnifying Party, the Indemnifying Party will not be subject to any liability for any settlement of any such claim effected without the Indemnifying Party's prior written consent, which consent shall not be unreasonably withheld. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Party agrees to indemnify and hold harmless any Indemnified Party from and against any loss, claim damage, liability or expense by reason of any settlement of any such claim or action. No Indemnifying Party shall, without the prior written consent of each Indemnified Party, settle or compromise or consent to the entry of judgment in or otherwise seek to terminate any pending or threatened action, claim, litigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Party is a party thereto), unless such settlement, compromise, consent or termination includes an unconditional release of each Indemnified Party from all liability arising out of such action, claim, litigation or proceeding. An Indemnifying Party who is not entitled to, or elects not to, assume the defense of the claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such Indemnifying Party with respect to such claim, unless in the reasonable judgment of any Indemnified Party a conflict of interest may exist between such Indemnified Party and any other such Indemnified Parties with respect to such Claim, in which event the Indemnifying Party shall be obligated to pay the fees and expenses of such additional counsel.

SECTION 4.4  *CONTRIBUTION.*  If the indemnification provided for in this Article IV is unavailable to an Indemnified Party (other than by reason of exceptions provided in those Sections) in respect of any losses, claims, damages, liabilities or expenses referred to therein, then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall have a joint and severable obligation to contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and of the Indemnified Party, on the other, in connection with the statements or omissions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party, on the one hand, and of the Indemnified Party, on the other, shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include,

E-14

subject to the limitations set forth in the second paragraph of Section 4.1, any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4.4 were determined by pro rata allocation (even if the Holders were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities or expenses referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 4.4, none of the Indemnified Holders shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds received by such Holder with respect to the Registrable Securities exceeds the greater of (A) the amount paid by such Holder for its Registrable Securities and (B) the amount of any damages which such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Holders' obligation to contribute pursuant to this Section 4.4 are several in proportion to the respective number of Registrable Securities held by each of the Holders hereunder and not joint.

For purposes of this Article IV, each controlling person of a Holder shall have the same rights to contribution as such Holder, and each officer, director, and person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20(a) of the Exchange Act shall have the same rights to contribution as the Company, subject in each case to the limitations set forth in the immediately preceding paragraph. Any party entitled to contribution will, promptly after receipt of notice of commencement of any action, suit or proceeding against such party in respect of which a claim for contribution may be made against another party or parties under this Article IV, notify such party or parties from whom contribution may be sought, but the omission to so notify such party or parties shall not relieve the party or parties from who contribution may be sought from any obligation it or they may have under this Article IV or otherwise except to the extent that it has been prejudiced in any material respect by such failure. No party shall be liable for contribution with respect to any action or claim settled without its written consent; *provided, however,* that such written consent was not unreasonably withheld.

SECTION 4.5 *ADDITIONAL INDEMNITY.* The indemnity, contribution and expense reimbursement obligations under this Article IV shall be in addition to any liability each Indemnifying Party may otherwise have; *provided, however,* that any payment made by the Company which results in an Indemnified Party receiving from any source(s) indemnification, contribution or reimbursement for an amount in excess of the actual loss, liability or expense incurred by such Indemnified Party, shall be refunded to the Company by the Indemnified Party receiving such excess payment.

## ARTICLE V

## MISCELLANEOUS

SECTION 5.1 *RULE 144.* The Company agrees it will file in a timely manner all reports required to be filed by it pursuant to the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and will take such further action as any Holder of Registrable Securities may reasonably request in order that such Holder may effect sales of Registrable Securities without registration within the limitations of the exemptions provided by Rule 144, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the

SEC. At any reasonable time and upon the request of a Holder of Registrable Securities, the Company will furnish such Holder with such information as may be necessary to enable the Holder to effect sales of Registrable Securities pursuant to Rule 144 under the Securities Act and will deliver to such Holder a written statement as to whether it has complied with such information and requirements.

SECTION 5.2  *SPECIFIC PERFORMANCE.*  Each Holder, in addition to being entitled to exercise all rights provided herein or granted by law, including recovery of liquidated or other damages, will be entitled to specific performance of its rights under this Agreement. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

SECTION 5.3  *OTHER AGREEMENTS.*  The Company will not on or after the date of this Agreement enter into any agreement with respect to its securities that is inconsistent with the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof.

SECTION 5.4  *CHARTER AMENDMENTS AFFECTING THE COMPANY'S COMMON STOCK.* The Company will not amend its Certificate of Incorporation in any respect that would materially and adversely affect the rights of the Holders hereunder.

SECTION 5.5  *AMENDMENTS AND WAIVERS.*  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to or departures from the provisions hereof may not be given unless the Company has obtained the written consent of.Holders of a majority of the outstanding shares of Registrable Securities.

SECTION 5.6  *NOTICES.*  Unless otherwise provided herein, any notice, request, instruction or other document to be given hereunder by any party to the others shall be made in writing, by hand-delivery, telegraph, telex, telecopier, registered first-class mail or air courier guaranteeing overnight delivery as follows:

> if to the Company, to:

> > Pathmark Stores, Inc.
> > 200 Milik Street
> > Carteret, New Jersey 07008
> > Attention: Marc A. Strassler

> if to any Holder:

> > to the address specified below such Holder's name on the signature pages hereto;

or to such other place and with such other copies as any party hereto may designate as to itself by written notice to the others. All such notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; when receipt acknowledged, if telecopied: and on the next Business Day if timely delivered to an air courier guaranteeing overnight delivery.

SECTION 5.7  *SUCCESSORS AND ASSIGNS.*  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties, including without limitation and without the need for an express assignment, subsequent holders of Registrable Securities or of the Warrants, *provided* that the Company may not assign its rights or obligations under this Agreement to any other person or entity without the written consent of a majority of the outstanding shares of Registrable Securities.

E-16

SECTION 5.8  *COUNTERPARTS*.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 5.9  *HEADINGS*.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

SECTION 5.10  *GOVERNING LAW*.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law provisions thereof.

SECTION 5.11  *SEVERABILITY*.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be affected or impaired thereby. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 5.12  *ENTIRE AGREEMENT*.  This Agreement is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein with respect to the registration rights granted by the Company with respect to the Registrable Securities. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

SECTION 5.13  *PRONOUNS*.  Whenever the context may require, any pronouns used herein shall be deemed also to include the corresponding neuter, masculine or feminine forms.

SECTION 5.14  *ATTORNEY'S FEES*.  In any action or proceeding brought to enforce any provision of this Agreement, the successful party shall be entitled to recover reasonable attorney's fees in addition to its costs and expenses and any other available remedy.

SECTION 5.15  *SECURITIES HELD BY THE COMPANY OR ITS SUBSIDIARIES*.  Whenever the consent or approval of Holders of a specified percentage or Registrable Securities is required hereunder, Registrable Securities held by the Company or its Subsidiaries shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage.

SECTION 5.16  *FURTHER ASSURANCES*.  Each party shall cooperate and take such action as may be reasonably requested by another party in order to carry out the provisions and purposes of this Agreement and the transactions contemplated hereby.

SECTION 5.17  *TERMINATION*.  Unless sooner terminated in accordance with its terms or as otherwise herein provided, including specifically in Section 2.3(a), this Agreement shall terminate upon the earlier to occur of (i) the mutual agreement by the parties hereto, (ii) with respect to any Holder, such Holder ceasing to own any Registrable Securities, or (iii) the tenth anniversary of the Closing.

(signature page follows)

E-17

IN WITNESS HEREOF, the parties hereto have executed and delivered this Agreement as of the date first written above.

COMPANY:

PATHMARK STORES, INC., a Delaware corporation

By: _____

Name:

Title:

E-18

**HOLDERS:**

YUCAIPA CORPORATE INITIATIVES FUND I, L.P., a
Delaware limited partnership

By: Yucaipa Corporate Initiatives Fund I, LLC
Its: General Partner

_____
By:

YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., a
Delaware limited partnership

By: Yucaipa American Alliance Fund I, LLC
Its: General Partner

_____
By:

AMERICAN ALLIANCE FUND I, L.P., a Delaware limited
partnership

By: Yucaipa American Alliance Fund I, LLC
Its: General Partner

_____
By:


Address for Notices to the Investors:

9130 W. Sunset Boulevard
Los Angeles, California 90069
Attention: Robert P. Bermingham

E-19

**WARRANT AGREEMENT**

**Dated as of          , 2005**

**among**

**Pathmark Stores, Inc.**

**and**

**The Investors Identified on Annex I Attached Hereto**

## WARRANT AGREEMENT

WARRANT AGREEMENT (the "*Agreement*") dated as of                , 2005 among Pathmark Stores, Inc. a Delaware corporation (the "*Company*"), and the investors identified on Annex I attached hereto, or their registered permitted assigns (the "*Investors*").

### RECITALS

WHEREAS, the Company proposes to issue to the Investors two series of warrants, as hereinafter described (the "*Warrants*"), to purchase an aggregate of 10,060,000 shares and 15,046,350 shares respectively (subject to adjustment), of the Common Stock, $.01 par value per share (the "*Common Stock*") of the Company (the shares of Common Stock issuable on exercise of the Warrants being referred to herein as the "*Warrant Shares*") pursuant to that certain Securities Purchase Agreement dated as of March 23, 2005 by and among the Company and the Investors (the "*Purchase Agreement*"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

SECTION 1.   *Warrant Certificates.*   The Company will issue and deliver certificates evidencing the Warrants (the "*Warrant Certificates*") to the Investors pursuant to the terms of the Purchase Agreement. Warrants to purchase an aggregate of 10,060,000 shares of Common Stock will be issued as "*Series A Warrants*" in the form of Exhibit A hereto and Warrants to purchase an aggregate of 15,046,350 shares of Common Stock will be issued as "*Series B Warrants*" in the form of Exhibit B hereto. The Warrant Certificates may have such notations, legends and endorsements as required by law, rules and regulations of applicable stock exchanges or usage. Such certificates shall be in registered form only and shall be substantially in the applicable forms set forth as Exhibits A and B attached hereto. Warrant Certificates shall be dated the date of issuance by the Company.

SECTION 2.   *Execution of Warrant Certificates.*   Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board or its Chief Executive Officer, President or a Vice President. Each such signature upon the Warrant Certificates may be in the form of a facsimile signature of the present or any future Chairman of the Board, Chief Executive Officer, President or Vice President, and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any person who shall have been Chairman of the Board, Chief Executive Officer, President or Vice President, notwithstanding the fact that at the time the Warrant Certificates shall be delivered or disposed of he shall have ceased to hold such office. Each Warrant Certificate shall also be manually signed on behalf of the Company by its Secretary or an Assistant Secretary under its corporate seal. The seal of the Company may be in the form of a facsimile thereof and may be impressed, affixed, imprinted or otherwise reproduced on the Warrant Certificates.

SECTION 3.   *Registration.*   The Company shall number and register the Warrant Certificates in a register as they are issued. The Company may deem and treat the registered holder(s) of the Warrant Certificates (the "*Holders*") as the absolute owner(s) thereof (notwithstanding any notation of ownership or other writing thereon made by anyone) for all purposes and shall not be affected by any notice to the contrary. The Warrants shall be registered initially in such name or names as the Investors shall designate.

SECTION 4.  *Restrictions on Transfer; Registration of Transfers and Exchanges.*  The Warrants (and any Warrant Shares issued upon the exercise of the Warrants) shall not be transferable except in accordance with the terms of this Agreement.

Prior to any proposed transfer of the Warrants or the Warrant Shares, the transferring Holder will deliver to the Company a Certificate of Transfer in the form attached to the Warrant Certificate and, if so requested by the Company, such other information relating to the proposed transfer and the identity of the proposed transferee as the Company may reasonably request in order to confirm that the Warrants or Warrant Shares, as applicable, may be sold or otherwise transferred in the manner proposed. Upon original issuance thereof, and until such time as the same shall have been registered under the Securities Act or sold pursuant to Rule 144 promulgated thereunder (or any similar rule or regulation) each Warrant Certificate and any certificates evidencing Warrant Shares shall bear any legend required pursuant to that certain Stockholders' Agreement of even date herewith by and among the Investors and the Company (the *"Stockholders' Agreement"*) unless, in the opinion of qualified counsel, such legend is no longer required by the Securities Act.

The Company shall from time to time, subject to compliance with the applicable provisions of the Stockholders' Agreement, register the transfer of any outstanding Warrant Certificates in a Warrant register to be maintained by the Company upon surrender thereof accompanied by a written instrument or instruments of transfer in form satisfactory to the Company, duly executed by the registered Holder or Holders thereof or by the duly appointed legal representative thereof or by a duly authorized attorney. Upon any such registration of transfer, a new Warrant Certificate shall be issued to the transferee(s) and the surrendered Warrant Certificate shall be canceled and disposed of by the Company.

Warrant Certificates may be exchanged at the option of the Holder(s) thereof, when surrendered to the Company at its office for another Warrant Certificate or other Warrant Certificates of like series and tenor and representing in the aggregate a like number of Warrants. Warrant Certificates surrendered for exchange shall be canceled and disposed of by the Company.

SECTION 5.  *Warrants; Exercise of Warrants.*  Subject to the terms of this Agreement, each Holder shall have the right, which may be exercised at any time or from time to time during the applicable Exercise Period (as defined below) to receive from the Company the number of fully paid and nonassessable Warrant Shares (and such other consideration) which the Holder may at the time be entitled to receive upon the exercise of such Warrants and payment of the Series A Exercise Price or Series B Exercise Price, as applicable, then in effect for such Warrant Shares. In the alternative, each Holder of Series B Warrants (but not Series A Warrants) may exercise its right, during the Series B Exercise Period, to receive Warrant Shares on a net basis, such that, without the exchange of any funds, the Holder receives that number of Warrant Shares (and such other consideration) otherwise issuable (or payable) upon exercise of its Series B Warrants less that number of Warrant Shares having an aggregate Current Market Value (as defined in Section 9) at the time of exercise equal to the aggregate Series B Exercise Price that would otherwise have been paid by the Holder for the Warrant Shares. Each Warrant not exercised during the Exercise Period shall become void and all rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time. No adjustments as to dividends will be made upon exercise of the Warrants, except as otherwise expressly provided herein.

The period during which the Series A Warrants shall be exercisable (the *"Series A Exercise Period"*) shall commence on the date hereof and expire at 5:00 p.m., New York time, on            , 2008; *provided, however,* that if at any time or from time to time, for any reason, whether as a result of any action or inaction by the Company, any Investor or Investors or any other person, the current exercisability of any Series A Warrants would, but for this paragraph, result in a Change of Control Event as defined under the indenture dated as of January 29, 2002 (*"Indenture"*) governing the Company's 8¾% Senior Subordinated Notes due 2012 (*"2012 Notes"*) (a *"Control Trigger Event"*),

F-3

(including, without limitation, because an Investor or Investors, or any other "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) that is an Affiliate of, or a member of a group with, any of the Investors (an *"Investor Group Member"*) would become the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of a majority of the voting power of the Voting Stock (as defined in the Indenture) of the Company (any such person or group, a *"Controlling Holder"*), then that number of Series A Warrants (the *"Affected Series A Warrants,"* which number of Affected Series A Warrants shall be apportioned among the Investor Group Members in the sole and absolute discretion of the Investors' Representative) the exercisability of which would, but for this paragraph, result in such Change of Control Event shall, automatically (without any action on the part of any person) and immediately prior to the occurrence of such Control Trigger Event, cease to be exercisable, and shall only become exercisable 61 days after the date on which any Holder sends written notice to the Company of its intent to exercise any such Affected Series A Warrants (an *"Affected Warrant Exercise"*); *provided, further,* that the number of Affected Series A Warrants shall increase automatically and immediately prior to the occurrence of any subsequent Control Trigger Event that would result in such a Change of Control Event, and decrease automatically and immediately after the occurrence of any other action, inaction, event, circumstance or other condition that has the effect of decreasing the number of Series A Warrants the current exercisability of which would result in such a Change of Control Event, so that the number of Affected Series A Warrants shall at all times prior to any Affected Warrant Exercise equal only that number of Series A Warrants the current exercisability of which would result in such a Change of Control Event.

The period during which the Series B Warrants shall be exercisable (the *"Series B Exercise Period"* and, together with the Series A Exercise Period, an *"Exercise Period"*) shall (A) commence on the first to occur of (i) such time as none of the Company's 2012 Notes remain outstanding or such time as the Series B Warrants may become exercisable without obligating the Company to make a Change of Control Offer as defined under the Indenture; (ii) 61 days after the date on which any Holder sends written notice to the Company of its intent to exercise such Warrants, if, on or prior to the date on which such notice is sent, the closing price per share of the Common Stock as quoted on the Nasdaq National Market equals or exceeds the per share exercise price of the Series B Warrants, as adjusted from time to time; or (iii) upon the occurrence of any event constituting a Change of Control Event as defined in the Indenture and (B) expire at 5:00 p.m., New York time, on _____, 2015.

The price at which each Series A Warrant shall be exercisable (the *"Series A Exercise Price"*) shall initially be $8.50 per share, subject to adjustment pursuant to the terms hereof. The price at which each Series B Warrant shall be exercisable (the "Series B Exercise Price") shall initially be $15.00 per share, subject to adjustment pursuant to the terms hereof.

A Warrant may be exercised upon surrender to the Company (at its office address set forth in Section 12 hereof) of the Warrant Certificate or Certificates to be exercised with the form of election to purchase attached thereto duly filled in and signed, and upon payment to the Company of the Exercise Price for the number of Warrant Shares in respect of which such Warrants are then exercised. Payment of the aggregate Exercise Price shall be made in cash or by certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated by the Company, or, with respect to the Series B Warrants, in the manner provided in the first paragraph of this Section 5.

Subject to the provisions of Section 6 hereof, upon such surrender of Warrant Certificates and payment of the Exercise Price, the Company shall issue and cause to be delivered with all reasonable dispatch to or upon the written order of the Holder and in such name or names as such Holder may designate a certificate or certificates for the number of full Warrant Shares issuable upon the exercise of such Warrants (and such other consideration as may be deliverable upon exercise of such Warrants) together with cash for fractional Warrant Shares as provided in Section 10. Such certificate or

F-4

certificates shall be deemed to have been issued and the person so named therein shall be deemed to have become a holder of record of such Warrant Shares as of the date of the surrender of such Warrant Certificates and payment of the Exercise Price, irrespective of the date of delivery of such certificate or certificates for Warrant Shares.

Each Warrant shall be exercisable during the Exercise Period, at the election of the Holder thereof, either in full or from time to time in part and, in the event that a Warrant is exercised in respect of fewer than all of the Warrant Shares issuable on such exercise at any time prior to the date of expiration of the Warrants, a new certificate evidencing the remaining Warrant or Warrants will be issued and delivered pursuant to the provisions of this Section and of Section 2 hereof.

All Warrant Certificates surrendered upon exercise of Warrants shall be cancelled and disposed of by the Company. The Company shall keep copies of this Agreement and any notices given or received hereunder available for inspection by the Holders during normal business hours at its office.

SECTION 6.  *Payment of Taxes*.  The Company will pay all documentary stamp taxes and other governmental charges (excluding all foreign, federal or state income, franchise, property, estate, inheritance, gift or similar taxes) in connection with the issuance or delivery of the Warrant Certificates hereunder, as well as all such taxes attributable to the initial issuance or delivery of Warrant Shares upon the exercise of Warrants and payment of the Exercise Price. The Company shall not, however, be required to pay any tax that may be payable in respect of any subsequent transfer of the Warrants or any transfer involved in the issuance and delivery of Warrant Shares in a name other than that in which the Warrants to which such issuance relates were registered, and, if any such tax would otherwise be payable by the Company, no such issuance or delivery shall be made unless and until the person requesting such issuance has paid to the Company the amount of any such tax, or it is, established to the reasonable satisfaction of the Company that any such tax has been paid.

SECTION 7.  *Mutilated or Missing Warrant Certificates*.  If any Warrant Certificate or certificate evidencing Warrant Shares shall be mutilated, lost, stolen or destroyed, the Company shall issue, in exchange and substitution therefor and upon cancellation of the mutilated Warrant Certificate or other certificate, or in lieu of and substitution for the Warrant Certificate or other certificate lost, stolen or destroyed, a new Warrant Certificate or other certificate of like tenor and representing an equivalent number of Warrants or Warrant Shares.

SECTION 8.  *Reservation of Warrant Shares*.  The Company shall at all times reserve and keep available, free from preemptive rights, out of the aggregate of its authorized but unissued Common Stock or its authorized and issued Common Stock held in its treasury, for the purpose of enabling it to satisfy any obligation to issue the Warrant Shares upon exercise of the Warrants, the maximum number of shares of Common Stock which may then be deliverable upon the exercise of all outstanding Warrants.

The Company or, if appointed, the transfer agent for the Common Stock and each transfer agent for any shares of the Company's capital stock issuable upon the exercise of any of the Warrants (collectively, the *"Transfer Agent"*) will be irrevocably authorized and directed at all times to reserve such number of authorized shares as shall be required for such purpose. The Company shall keep a copy of this Agreement on file with the Transfer Agent. The Company will supply the Transfer Agent with duly executed certificates for such purposes and will provide or otherwise make available all other consideration that may be deliverable upon exercise of the Warrants. The Company will furnish such Transfer Agent a copy of all notices of adjustments and certificates related thereto, transmitted to each Holder pursuant to Section 11 hereof.

Before taking any action which would cause an adjustment pursuant to Section 9 hereof to reduce the Exercise Price below the then par value of the Warrant Shares, the Company shall take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may

F-5