# Tab 1

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

H
Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Glenn FREEDMAN, Harry Lewis, William Steiner, Arthur L. Monheit and Dorothy Monheit as Administrators of: the Estate of Charles Monheit, deceased and David Scheinfeld, Plaintiffs,
v.
RESTAURANT ASSOCIATES INDUSTRIES, INC., Martin Brody, Max Pine, Sidney Lester Klepper, Renee Brody Levow, Darwin C. Dornbush, Allan Goldring, Leonard Schecter, Morton A. Siegler, Alan Silverman, Robert Wechsler and Stephen A. Greyser, Defendants.
**CIV. A. No. 9212.**

Submitted: Feb. 27, 1990.
Decided: Sept. 19, 1990.
Revised: Sept. 21, 1990.

****1465** Kevin Gross , of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, for plaintiffs.
David C. McBride , and Bruce L. Silverstein , of Young, Conaway, Stargatt & Taylor, Wilmington, for Restaurant Associates, Industries, Inc., Martin Brody, Max Pine, Sidney Lester Klepper, Renee Brody Levow, Darwin C. Dornbush and Allan Goldring.
Edward P. Welch , and John G. Day , of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for all other defendants.
Karl Savryn , of Dornbush Mensch Mandelstam & Silverman , New York City, Henry P. Wasserstein , and Jeremy A. Berman , of Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel.

MEMORANDUM OPINION

ALLEN , Chancellor.

***1** Pending is a motion to dismiss the second amended complaint. The action was brought as a class action seeking to enjoin or rescind a management leveraged buyout (MBO) of public shares of Restaurant Associates Industries, Inc. ("RA"). The defendants, who constitute all of the directors of the company, fall into two classes, those who apparently have no financial interest as buyers directly or indirectly in the transaction and those that have such a conflicting financial interest. The interested directors, according to the allegations of the amended complaint, held six of the eleven director positions on the RA board and controlled directly and indirectly 48% of the company's outstanding stock.

****1466** On August 25, 1987, RA's chief executive officer and other officers announced their intention to take the company private. The board of directors of the company promptly established a committee composed of independent directors FN1 "to respond to the management group's leveraged buyout proposal." That committee seems to have gone to notable lengths to find and facilitate a higher competing offer, but it was without power to do what was required to keep the prospect of a higher deal alive. It did negotiate the original management offer from $14 per share to $16 per share and then to $18 per share before recommending the management proposal to the full board. The story of this leg of the case is laid out as it appeared on a preliminary injunction record in an opinion of October 16, 1987, denying a preliminary injunction against effectuation of the $18 MBO proposal. *See Freedman v. Restaurant Assocs. Inc.*, Del. Ch., C.A. No. 9212, Allen, C. (Oct. 16, 1987).

The company had by then, of course, signed an Agreement of Merger. However, on October 19, 1987, the New York Stock Exchange (and other exchanges around the world) experienced a severe price break. The management buyers almost immediately notified the Special Committee that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 2

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

they believed themselves excused from their obligations under the merger agreement because (as stated in an October 30 SEC filing) "financing for an acquisition of the Company at $18 per share could not be obtained on acceptable terms." The Special Committee then promptly renegotiated the merger agreement to $14.25 per share. On October 28, 1987, a revised merger agreement was signed.

Plaintiffs allege breaches of fiduciary duty on the part of the eleven directors in connection with the transaction, both in its pre- and post-crash phases, including allegations against the special committee for failing to shop the company. Defendants have moved to dismiss all of their claims because they fail to state a claim upon which relief may be granted. For the reasons that follow a motion to dismiss will be granted only with respect to those allegations directed specifically at an alleged failure of the special committee to shop the company at the pre-crash stage of the transaction and with respect to any allegations of breach of fiduciary duty in connection with the special committee's recommendation and the board's approval of the management group's pre-crash offer of $18 per share.

**1467** I.

*The parties*

*2 Restaurant Associates owns subsidiaries which operate and manage food service facilities and newsstands in New York, New Jersey, and California. It had more than 2,190,000 shares of Class A common and 2,930,000 shares of Class B common stock outstanding. The stock was traded on the American Stock Exchange.

The eleven individual defendants constituted the board of directors of RA. Plaintiffs allege that six of the individual director defendants (the " management group") were members of or "allied" with the group which proposed the management-led leveraged buyout described below. At the time of the proposal, according to plaintiffs, the management group controlled, directly or through familial relationships, 48% of the company's common stock. FN2 The group was comprised of six directors, including three company officers, a relative of one of those officers, the outside general counsel of RA, and an additional director. FN3

*Management's $14 bid*

On August 25, 1987, RA announced that the management group, led by defendants Brody and Pine, was considering the purchase**1468 of RA's publicly-held stock. On August 26, 1987, the management group announced that it intended to offer approximately $14 for each share. At that time, plaintiffs allege, the company was poised to enjoy significantly increased future earnings.

A special committee composed of defendants Siegler, Silverman, and Schecter was formed to respond to the leveraged buyout proposal. These directors are not alleged to have been interested as buyers in the transaction or as co-conspirators. The special committee retained independent legal and financial advisors. The special committee decided not to solicit third parties to submit bids for the company because the members of the special committee felt that the company was in play as a result of the August 26, 1987 announcement.

*Soliman's $16.50 bid and the management group's $16.00 counter-offer*

On September 3, 1987, AWR Acquisition Corporation, led by Anwar S. Soliman, a California restaurateur, proposed a bid of $16.50 for each RA share, subject to financing and due diligence. The special committee and its financial advisor soon thereafter concluded that the management group's $14 offer was inadequate.

The management group, however, *qua* shareholders, refused to negotiate or cooperate with Soliman, rejected publicly the possibility of doing any deal with him, and asserted that the management group's shares were not for sale. On September 8, 1987, the management group offered $16 per share and demanded that the special

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 3

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

committee immediately accept the offer. When such approval was not forthcoming by 9:00 a.m. on September 9, 1987, the management group withdrew its bid.

*Soliman's $19 offer*

Soliman increased his bid to $19 per share, again subject to financing and due diligence. The special committee sought to encourage Mr. Soliman to pursue his proposal despite the management group's assertion that it would not sell. After consulting with its legal and financial advisors, the committee concluded that Mr. Soliman should propose that RA's board offer him the option to purchase 1,000,000 authorized but unissued shares of Class B common stock at $19.00 per share. Further, the committee determined that if Soliman paid $19,000,000 within two days, the committee would be prepared to recommend board approval of Soliman's proposal to buy the company. Soliman refused, however, to pay $19,000,000 without an opportunity to inspect the company's books.

*3 ****1469** Soliman and the special committee then agreed in principle that the special committee would recommend that the board negotiate terms under which Soliman would pay a non-refundable $2,000,000 in exchange for an option to purchase at least 1,000,000 common stock treasury shares within ten days ("the dilution option"). The ten-day span would allow Soliman time to perform his due diligence.

The special committee then recommended the option agreement to the board. On September 9, 1987, the full board met to discuss Soliman's proposal and the special committee's recommendation. Soliman's proposal was rejected by a vote of six to five with the six management group directors voting against and the special committee and two other outside directors voting in favor of Soliman's offer.

Precluded by this board action from pursuing the Soliman alternative, the special committee recommended an improved management $18 per share offer. On September 12, 1987, the company approved a definitive merger agreement for a management buyout at $18 per share. The buyout was to be effected through a two-step process-a cash offer commencing by September 17, 1987, and then a cash-out merger. The board's decision was allegedly based upon the management group's refusal to sell its shares. The agreement was announced on September 14, 1987.

Soon after, Soliman reaffirmed his $19 per share cash offer subject as before to financing and to due diligence.

*The market crash and management's revised offer*

On October 19, 1987, the stock market dropped precipitously. Still outstanding was the $18 per share management tender offer. In response to the market crash, the management buyers repudiated the merger agreement and amended the outstanding tender offer on October 28, 1987, stating, apparently, that they could not arrange financing on acceptable terms. The special committee thereafter renegotiated the merger agreement. After consulting with its financial advisor, the special committee recommended the acceptance of a revised $14.25 offer. The independent directors apparently did not vote against the $14.25 deal. Nor did the special committee attempt in any way to enforce the original $18 merger agreement.

On October 30, 1987, a supplement describing the amended offer was filed with the Securities & Exchange Commission. The supplement stated " that the financing for an acquisition of the company at $18 per share could not be obtained on acceptable terms ..." The revised offer provided for a tender offer to purchase for ****1470** cash all the outstanding Class A and Class B shares of the company for $14.25 per share, to be followed by a merger in which each remaining share of RA would be converted into $14.25 cash.

II.

*Claims against the management group*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 4

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

Plaintiffs claim that the use of the controlling shareholder power constituted a breach of duty in several respects. First, they assert that that power arose in substantial part from the 1985 recapitalization that management originated and recommended. That recap, it is alleged, was justified to shareholders in part as a defensive device. The use of the enhanced management voting power to thwart opposition to management over acquisition of the company is said to be inconsistent with the use of that enhanced voting power authorized by the shareholders, and to constitute a wrong.

***4** Second, plaintiffs claim that the members of the management group breached fiduciary duties in their shareholder capacities by refusing to sell their shares to Soliman, who was a higher bidder, and in their capacity as directors by rejecting the dilution option recommended by the special committee, and by approving the management group's $18 offer.

Plaintiffs also allege breaches of fiduciary duty in connection with the $14.25 offer by the management group and that the supplement to the offer to purchase contained materially misleading disclosures.

*Claims against the special committee*

Plaintiffs claim that the members of the special committee breached a fiduciary duty under *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986), by failing to shop the company after the management's $14 bid was made. Plaintiffs allege that the decision not to shop the company was not a valid exercise of the business judgment because the special committee members knew that potential acquirors would form certain impressions about the availability of the company depending on whether the company announced it would be "shopped" or alternatively whether the board treated the company simply as being "in play." Plaintiffs assert that if the company had been shopped, potential acquirors would have understood that the management group was willing to sell its shares (which is, of course, inconsistent with other facts alleged, i.e., management****1471** was not willing to sell). When the company was seen as merely in play, however, according to plaintiffs, potential acquirors understood that someone had expressed interest in acquiring the company, not that the management group was willing to sell. Further, plaintiffs assert, since the management group itself expressed interest in buying the company and since the company was merely in play, potential acquirors must have assumed in the absence of the company being shopped, that the management group was not interested in selling its shares.

Finally, plaintiffs claim that the special committee members breached fiduciary duties by recommending management's $18 bid to the board, by failing to enforce the agreement under which management would pay $18 per share, and after the market drop, by recommending management's $14.25 bid.

III.

In order to sustain a motion to dismiss a complaint for failure to state a claim, the court must conclude, with reasonable certainty, that the plaintiff cannot prevail and would not be entitled to relief sought under any set of facts that could be proven to support her claims. *Rabkin v. Phillip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985) ; *Harman v. Masoneilan Int'l, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). All well-pleaded factual allegations will be accepted as true and deemed admitted, and all well-supported inferences will be construed in favor of the non-moving party. *Id.; Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d 1262, 1263-64 (1979). Mere conclusions of law and fact alone will not be accepted as true. *See, e.g., Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988) ; *Kleinhandler v. Borgia,* Del.Ch., C.A. No. 8334, slip op. at 5-6, Berger, V.C. (Mar. 31, 1987); *Lewis v. Straetz,* Del.Ch., C.A. No. 7859, slip op. at 13, Hartnett, V.C. (Feb. 12, 1986).

1. *The recapitalization claim*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 5

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

***5** Whether plaintiffs' allegations concerning the 1985 recapitalization are sufficient to withstand a motion to dismiss depends on the exact nature of the claims which is not entirely evident from the face of the complaint. Two alternative interpretations of the allegations contained in the complaint seem plausible: (1) that the management group knowingly misrepresented the purposes for acquiring the 48% block of stock in the proxy statement for the recapitalization as part of a larger scheme to take the company private or (2) that, ****1472** although the disclosures in the proxy statement were accurate when made, management later used the block of stock for purposes not envisioned by the shareholders or by management at the time of issuance and that use violated an implicit restriction or covenant that arose from the circumstances of the creation of the stock.

If premised on the latter, plaintiffs' allegations do not sufficiently state a claim in my opinion. A full and truthful disclosure of the purpose sought to be served by securing stockholder authorization does not, I think, implicitly limit the power authorized to that purpose. *See Berenstein v. Vestron, Inc.*, Del.Ch., C.A. No. 8404, Allen, C. (Mar. 11 , 1986). Where, for example, with stockholder concurrence, stock is issued or power conferred, those acts will have consequences indefinitely. Shareholders cannot reasonably assume, absent a formal restriction of some sort, that exercise of the power conferred by that act or by ownership of that stock will never be used for a purpose different from the purpose sought to be achieved by asking for the stockholders authorization. So long as the disclosures made were full and truthful when made, the action is authorized by law, and the vote is uninfected by coercion by the fiduciary, (*see Lacos Land Co. v. Arden Group, Inc.*, Del.Ch., 517 A.2d 271 (1986)), in my opinion, the power authorized cannot be said to be subject to an implicit restriction in its future use.

If, however, the allegation is that the managing directors did intend to use the increased voting power that the recapitalization made possible to assist in an MBO transaction, the failure to disclose such a fact would constitute a violation of the duty of candor. In a proxy solicitation, where management chooses to disclose its motives or the purposes of a transaction, it has an obligation to disclose those purposes honestly and candidly. *See Rubenstein v. IU International Corp.*, 506 F.Supp. 311, 315 (E.D.Pa.1980). If one takes this view of the amended complaint, it would survive the motion to dismiss. According appropriate presumptions to plaintiffs' pleading, I will therefore deny the motion with respect to this claim.

2. *The claim that the special committee breached " Revlon duties" by not conducting a public auction sale*

Plaintiffs claim that the management group controlled, 48% of RA's voting stock and represented six of the eleven RA board members. They allege that, notwithstanding the management group's apparently controlling position, the special committee had an obligation under ****1473***Revlon v. MacAndrews & Forbes, Inc.*, Del.Supr., 506 A.2d 173 (1986) to shop the company in response to the management group's $14 offer. Plaintiffs are, however, incorrect in their assumption that *Revlon* imposed an obligation to shop. The special committee had an obligation only to make an informed and reasonable business judgment in the best interests of the shareholders and to act reasonably in attempting to obtain the best deal for the shareholders. *Mills Acquisition Co. v. Macmillan,* Del.Supr., 559 A.2d 1261, 1286-87 (1988). Although a board of directors may fulfill its obligation to make an informed and reasonable business judgment in a sale context by conducting an auction sale, *e.g., RJR Nabisco,* and that may often be the most prudent way to proceed, an auction is not always necessary. *Barkan v. Amsted Industries, Inc.*, Del.Supr., 567 A.2d 1279, 1286 (1989) ("*Revlon* does not demand that every change in control of a Delaware corporation be preceded by a heated bidding contest"); *In re Fort Howard Corp. Shareholders Litigation,* Del.Ch., C.A. No. 9991, Allen, C. (Aug. 8, 1988); *In re Formica Shareholders Litig.*, Del.Ch., C.A. No. 10598, Jacobs, V.C. (Mar. 22, 1989).

***6** The obligation of the directors where a transaction is a non-conflict one, is to exercise due

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 6

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

care in the good faith pursuit of legitimate goals. *Barkan,* 567 A.2d at 1286. When that transaction is a sale of the enterprise an additional level of inquiry-reasonableness-is required. *Mills Acquisition Co. v. Macmillan,* Del.Supr., 559 A.2d at 1286 (1988). This test will be applicable to the outside directors in this instance (accepting the allegations of the complaint as true). They had no obligation to auction the company. Plaintiffs have chosen to cast one claim of their complaint precisely in terms of such a duty. That claim does not assert a matter upon which relief can be given. It shall therefore be dismissed.

3. *The claims that the management group's actions in response to Soliman's proposals breached fiduciary duties*

According to plaintiffs, the members of the management group breached their fiduciary duties by refusing to sell their shares to Soliman. It is readily apparent that this is not the law in Delaware. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840 (1987). As the Supreme Court explained in *Bershad:*

Clearly, a stockholder is under no duty to sell its holdings in a corporation, even if it is a majority shareholder, merely because the sale would profit the minority.

535 A.2d at 845. Thus, a shareholder, even a majority shareholder, has discretion as to when to sell his stock and to whom, and I find ****1474** no basis for holding the management group liable to plaintiffs for exercising that discretion *qua* shareholder.

Plaintiffs also allege that the management group members breached their fiduciary duties as directors by rejecting the dilution option. This claim is quite different then the previous matter because the rejection of the dilution option was accomplished by the management group as directors in aid of a transaction in which they were personally interested. Directors have fiduciary obligations to act in the best interests of the corporation. When voting, they are required to put aside their personal interests and instead consider only the benefit of the company (and in a cash-out sale contest of all shareholders as a class). Directors who are also shareholders usually have interests as shareholders that coincide with the best interests of the company. Occasionally, however, a director's interests as a shareholder conflict with the company's interests. When such a conflict arises, the director must ignore her personal interests as a shareholder and attend to the corporation's interests. *Cf. Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 628 (1977).

Technically perhaps, the board's rejection of the dilution option did not involve self-dealing because it did not involve a transaction between the interested directors and the company. The rejection of the dilution option was rather a refusal to have the company engage in a transaction with an outsider, Soliman. Nonetheless, only a wooden understanding of the law of self-dealing would deny that the concerns underlying that law are present here, where the directors who are also controlling shareholders and officers are seeking to buy the company. The fate of the interested directors' bid depended heavily on the board's decision with respect to the dilution option. The rejection of the dilution option, in effect, made the management deal possible. I, thus, analyze the management directors' action under section 144 of the Delaware Corporation Code.

***7** Section 144 states that a self-dealing transaction is not void by virtue of self-dealing if the transaction is approved by vote of the shareholders, or if the transaction was fair when authorized. 8 *Del.C.* § 144. The dilution option was not rejected by the disinterested directors or by the shareholders. Thus, the board's decision will be upheld only if it was fair. Further, the defendants bear the burden of proving fairness. *See Guth v. Loft,* Del.Ch., 5 A.2d 503 (1939), *aff'd,* Del.Supr., 19 A.2d 721 (1941) ; *Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976). Plaintiffs, thus, state a cause of action on this score.

****1475** 4. *The claims arising from the recommendation and approval of the management*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 7

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

*group's $18 per share offer*

Plaintiffs also claim that both the management group defendants and the special committee defendants breached their fiduciary duties in connection with the board's acceptance of the $18 per share proposal. I conclude, however, that these claims arising out of the $18 per share transactions are moot. While the facts surrounding this transaction may be quite relevant to an assessment of the claims of liability arising from the transaction that was accomplished, they state no independent claim upon which relief may be granted. In short, plaintiffs have suffered no injury from any alleged breach of duty in recommending or approving the $18 per share transaction because that deal was never consummated.

5. *The claims arising from the revised $14.25 management group offer*

Because the management group is alleged to constitute a controlling group and is composed of directors of the corporation, these directors would (apart from the effect of the special committee) bear the burden of proving at trial the entire fairness of the transaction that was consummated. The special committee, is a device, however, that when fully and effectively implemented can lift this burden. *Citron v. E.I. duPont de Nemours & Co., Inc.*, Del.Ch., C.A. No. 6219, Jacobs, V.C. (June 29, 1990). Nevertheless, this will only be the case where there is a fully functional special committee. *See In re TWA Shareholders Litig.*, Del.Ch., C.A. No. 9844, Allen, C. (Oct. 21, 1988), slip op. at 16-17. Where a special committee is passive or its charter from the board unduly restricts it, the work of the committee may be accorded no effect.

In this instance, facts are alleged that would establish that this special committee was not given the opportunity to select from among the range of alternatives that an independent, disinterested board would have had available to it; it was, in effect, " hemmed in" by the management group's actions. Under these circumstances, where, according to the allegations contained in the amended complaint, the management group could (and did) veto any action of the special committee that was not agreeable to the conflicted interests of the management directors it would be formalistically perverse to afford the special committee's action the effect of burden shifting of which that device is capable. Thus, I conclude that the complaint alleges in effect, a self-interested transaction that will require the interested directors**1476 to prove the entire fairness of that transaction to the minority shareholders.

*8 The outside directors stand in a different relation to the transaction. As they appear to have been financially disinterested in the sale transaction, the scope of their duty is that referred to in *Mills Acquisition Co. v. Macmillan,* 559 A.2d at 1288. While the special committee has no *per se* duty to shop the company, it did have a duty to proceed reasonably to maximize shareholder value. The plaintiffs, in alleging that the special committee did not shop the company and agreed to the sale of the company at a point in time, immediately following the October 1987 market break, when its stock price was particularly depressed (and given what preceded that agreement) have alleged circumstances that, if true, might support a conclusion that the special committee did not act reasonably. These allegations, therefore, may not be dismissed at this time.

6. *The disclosure claims*

Plaintiffs also allege that the Supplement sent to the shareholders in connection with the revised offer was materially misleading in disclosing management's motivation in revising the offer. The Supplement indicated that the management bid was being lowered because financing for an offer at $18 per share could not be obtained "on acceptable terms" after the crash. Plaintiffs, on the other hand, contend that the management group was not really concerned with the availability of financing, but rather was taking advantage of the market crash to get more equity in the company for a lower price.

Although management may have no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 8

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

the offer, it had an obligation to do so truthfully and candidly. *Rubenstein v. IU International Corp.,* 506 F.Supp. at 315. Just what, in fact, was the motivation of the management group is a question that must await later testimony, and thus, it is inappropriate to dispose of this disclosure claim in a motion to dismiss. The circumstances alleged, taken together, render this allegation more than ' mere conclusions' in my opinion.

I cannot agree with defendants in their assertion that plaintiffs have no standing to bring the disclosure claims because they did not tender. In my opinion a nontendering shareholder may suffer an injury, and therefore may state a claim upon which relief will be granted, when, as alleged, "false information and omissions ... led others to tender their shares." ****1477***Plaine v. McCabe,* 790 F.2d 742, 746 (9th Cir.1986). FN4 This is surely true when a change in control occurs in the tender offer. A realistic evaluation of the difference between owning stock in a widely held firm and owning a part of a small public minority position must recognize the real differences that those circumstances create. *See, e.g., Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 946 (2d Cir.1969) (Friendly, J.). Thus, fraudulent or incorrect statements made in such a tender offer will have an effect upon a non-tendering shareholder, if relied upon by other shareholders. Whether it is true that a non-tendering shareholder may be injured by misrepresentations in a tender offer made by an offeror who already has control is a different matter. Here, however, while the management defendants plainly (as alleged) had a blocking position and (as alleged) actual control over the board, at 48% they did not have the voting power to cash plaintiffs out of the corporation. They needed to acquire more votes to cash-out plaintiffs and did so in the tender offer. Thus, in this circumstance, the reasoning of *Electronic Specialty* and other federal securities cases that confer standing on non-tendering shareholder should be followed here as well.

***9** The parties shall confer with respect to an implementing form of order. Failing agreement, each party may submit a proposed form of order.

FN1. Three of the five disinterested directors, Siegler, Silverman, and Schecter, were appointed to the special committee.

FN2. The management group acquired the 48% block as part of a recapitalization effected two years earlier which increased the management group's equity position in the company by 11%, from 37% to 48%. Plaintiffs apparently assert that the recapitalization was fraudulently effected based on material misrepresentations or that the equity block given the management group was fraudulently used for purposes not envisioned by the shareholders when they approved the recapitalization.

FN3. Defendant Martin Brody was Chairman of the Board and Chief Executive Officer of Restaurant. He owned 15.6% of the company's Class A stock and approximately 24% of its Class B stock. Defendant Max Pine was President, Chief Operating Officer and a director of Restaurant. He owned approximately 5% of the company's Class A stock and approximately 8% of its Class B stock. Defendant Sidney Lester Klepper was an Executive Vice President and a director of Restaurant. He owned 1.95% of its Class A common stock and 2.67% of Restaurant's Class B common stock. Defendant Renee Brody Levow, the daughter of defendant Martin Brody, had been a director of Restaurant since 1984. Defendant Darwin C. Dornbush, a director of Restaurant, was a member of the law firm which acted as general counsel to Restaurant. Defendant Allan Goldring, a director of Restaurant, had expressed a desire to become a member of the buyout group.
The individual director defendants who were not members of the management group were Leonard Schecter, Morton Siegler, Alan Silverman, Robert Wechsler, and Stephen Greyser.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 9

Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462
**(Cite as: Not Reported in A.2d)**

FN4. *See also Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 596 (5th Cir.1974), *cert. denied*, 419 U.S. 873 (1974) ; *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 946 (2d Cir.1969); *Hundahl v. United Benefit Life Ins. Co., 465 F.Supp. 1349, 1368 (N.D.Tex.1979); In re Commonwealth Oil/Tesoro Corp. Securities Litig.*, 467 F.Supp. 227, 242 (W.D.Tex.1979) ; *Blanchette v. Providence & Worcester Co.*, 428 F.Supp. 347, 353 (D.Del.1977) ; *Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149, 160 (W.D.Mo.1977) ; *McCloskey v. Epko Shores, Inc.*, 391 F.Supp. 1279, 1282-83 (E.D.Pa.1975) ; *Gerste v. Gamble-Skogmo, Inc.*, 298 F.Supp. 66, 96 (E.D.N.Y.1969).

Del.Ch.,1990.
Freedman v. Restaurant Associates Industries, Inc.
Not Reported in A.2d, 1990 WL 135923, Fed. Sec. L. Rep. P 95,617, 16 Del. J. Corp. L. 1462

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 2

H

Not Reported in A.2d, 1998 WL 276224
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
GOLDEN CYCLE, LLC a Pennsylvania limited liability company, Plaintiff,
v.
Lionel M. ALLAN, James J. Kelly, Jr., Joseph F. Keenan, Joseph Piazza, Sr. and Global Motorsport Group, Inc., Defendants.
**No. CIV.A. 16301.**

May 20, 1998.

David J. Margules , Esquire (argued) and Todd C. Schiltz , Esquire, of Wolf, Block, Schorr and Solis-Cohen LLP , Wilmington, Delaware; M. Norman Goldberger , Esquire and Matthew A. White , of Wolf, Block, Schorr and Solis-Cohen LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiff.
John H. Small , Esquire, Bruce E. Jameson , Esquire, of Prickett, Jones, Elliot, Kristol & Schnee , Wilmington, Delaware; of Counsel: Wayne Smith , Esquire (argued), of Gibson, Dunn & Crutcher, LLP, Irvine, California, Attorneys for Defendants.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION

*1 On April 7, 1998, the plaintiff, Golden Cycle LLP ("Golden Cycle"), brought this action against the defendants, Global Motorsport Group, Inc. (" Global" or the "Company"), FN1 a Delaware corporation, and the members of its board of directors (the Board"), for declaratory and injunctive relief and damages in connection with Golden Cycle's attempt to solicit written consents to replace the board of directors with its own nominees, as well as Golden Cycle's ongoing tender offer to acquire 100 percent of Global's common stock. On April 9, 1998, Golden Cycle moved for a preliminary injunction: (i) barring application to its consent solicitation of the March 30 record date established by the Board; (ii) requiring defendants to redeem Global's rights plan or, in the alternative, to exempt plaintiff's $18 tender offer from the effects of the rights plan, and to exempt it from the provisions of 8 *Del. C.* § 203; (iii) requiring defendants to provide plaintiff access to the same information being provided to other actual or potential bidders; and (iv) requiring defendants to make curative disclosures in their Schedule 14D-9. For the following reasons the motion for preliminary injunction is denied.

FN1. Global is the nation's largest independent marketer of aftermarket parts and accessories used to customize Harley-Davidson motorcycles.

II. BACKGROUND

A. *Board of Directors*

Global's Board of Directors consists of the four individual defendants: Joseph Piazza, Sr., Lionel M. Allan, James J. Kelly, Jr. and Joseph F. Keenan. FN2 The Board does not have a majority of outside directors. Defendant Piazza is Global's CEO. He receives an annual salary of $300,000. Defendant Kelly is Global's CFO. He receives an annual salary of $175,000. Defendant Allan, although not employed by Global, functions as its chief legal advisor. Pursuant to a consulting agreement, Allan is paid $6,750 per month and receives a $1,000 per month office allowance. In return, Allan devotes approximately 40 hours per month to Global's affairs. As a non-employee director of the Company, Allan also receives an annual fee of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$25,000, plus 2,500 stock options per year. Defendant Keenan, also a non-employee director, receives an annual fee of $25,000, plus 2,500 stock options per year. Keenan also serves as Global's non-executive Chairman of the Board, for which he is paid an additional $25,000 per year.

FN2. At the November 5, 1997 annual stockholder meeting five directors were elected. The fifth director was Ignatius J. Panzica. Panzica was the CEO at the time of the election. At the November 5, 1997 Board meeting held immediately following the annual stockholder meeting, Panzica was terminated as President and CEO. The Board named defendant Piazza as his replacement. Plaintiff contends that Panzica was terminated when, in the presence of defendant Kelly, he announced his intention to terminate defendant Allan's consulting arrangement. Kelly denies this allegation.

Several other relevant facts are also important to note. The Board is not classified, or staggered. There are no charter restrictions preventing shareholder action by written consent. The common stock ownership of the Company is concentrated in the hands of a small number of institutional investors not affiliated with the Company. These factors combine to give the common stockholders of Global an unusual degree of practical control over the outcome of this contest.

B. *Composition of Stockholders*

As of April 24, 1998, the Company had approximately 268 holders of record and approximately 5,161,136 shares outstanding. Golden Cycle began acquiring Global stock in January 1998 and is currently the Company's largest stockholder, owning approximately 10% of Global's shares. Ownership of a majority of the remaining shares is concentrated in the hands of relatively few institutional investors. According to a recent Board presentation, 47% of the common shares (or approximately 52% of the shares held by persons other than Global) is held by eleven institutional investors and another 19% by arbitrageurs. The Board of Directors beneficially owns in the aggregate only approximately 4.7% of the Company's stock, nearly all of which consists of shares which may be acquired upon the exercise of options.

C. *Recent Stock Price History*

***2** Over the past two years the market price of Global's stock has been declining. During the period February 1, 1996 to April 30, 1996, the stock traded in a range of between $24.00-$27.50. By the fiscal quarter ending January 31, 1997, the stock traded in a range of between $18.25-$21.375. By the end of 1997 and the beginning of 1998, the stock traded at a high of only $13.25 and a low of $11.00. Immediately prior to the announcement of the tender offer, Global stock was trading at approximately $14.00-$15.00. Since mid-April the stock has been trading at or above $20.00.

D. *Stockholder Rights Plan*

In 1996 the Company adopted a Stockholders Rights Plan (“Rights Plan” or “Poison Pill”). The Rights Plan is of the type normally adopted by corporations wishing to protect against unsolicited and unwanted takeover attempts. The Rights Plan has both “flip-in” and “flip-over” features and has a 15% acquisition trigger. Global's Board of Directors can redeem the Rights for $0.001 each, or can amend the plan to make the rights inapplicable to a proposed acquisition.

E. *Golden Cycle's Proposal to Purchase Global*

On March 23, 1998, Golden Cycle sent Global a letter proposing to purchase all of the outstanding stock of Global at $18 per share in cash, a 26% premium over market. In its letter, Golden Cycle informed Global's CEO, Joseph Piazza, Sr., that, if the Board did not wish to proceed with negotiations or to provide Golden Cycle with an opportunity to conduct due diligence, Golden Cycle would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consider attempting to seek control of Global through a consent solicitation to replace the Board and elect directors committed to selling the Company for the highest price reasonably available. One day later, on March 24, Golden Cycle filed preliminary consent solicitation materials with the Securities and Exchange Commission (SEC). FN3 Those materials cleared the SEC on April 14.

FN3. On April 2, 1998, Global filed a lawsuit in a San Francisco federal court alleging disclosure violations in Golden Cycle's preliminary proxy materials. As of the date of the preliminary injunction hearing the complaint in that action had not yet been served. On April 6, 1998, Golden Cycle filed suit against the Company and the Board in Delaware federal court alleging that they set the record date for the written consent solicitation in contravention of the rules promulgated under the Securities and Exchange Act of 1934. Additionally, on March 26, 1998, a class action lawsuit was filed in this Court on behalf of Global's stockholders against the Company, each of the members of the Board of Directors and Panzica, alleging that each of the defendants breached his fiduciary duties to the Company's stockholders by failing adequately to consider Golden Cycle's March 23, 1998 offer to purchase the Company, or to negotiate with Golden Cycle and/or other potential acquirors. On March 30, 1998, after Golden Cycle filed its consent solicitation materials with the SEC, a second class action lawsuit was filed in this Court against the same defendants asserting virtually identical claims.

On March 27, Golden Cycle sent a second letter to Global stating its disappointment that Global refused to meet with Golden Cycle to negotiate the terms of the transaction. On March 31, Global sent Golden Cycle a letter acknowledging receipt of Golden Cycle's March 23 and 27 letters and stating that before responding to the offer the Board needed to gather information. The letter further stated that the Company had retained an investment banking firm as well as a law firm in order adequately to evaluate Golden Cycle's offer. On April 4, Golden Cycle commenced a tender offer for all of the outstanding shares of Global at $18 per share in cash.

F. *Board's Response*

1. *Board sets record date*

On March 30, 1998, the Board passed a resolution, pursuant to 8 *Del. C.* § 213(c), setting March 30 as the record date for Golden Cycle's announced consent solicitation. FN4 A press release announcing this action was distributed on April 1, 1998. Depositions taken in connection with the preliminary injunction application show that the Board acted in setting the record date without a meeting, by unanimous written consent. The directors deposed in connection with this application testified that they signed the consent (i) on the advice of counsel; (ii) in order to start the clock running on the solicitation; and (iii) with the understanding that Golden Cycle had already begun to solicit consents.

FN4. An effort had been made to sign the resolution as early as March 26, however, the Company was unable to obtain all of the required directors' signatures, so the resolution was recirculated.

*3 Plaintiff claims that the March 30 record date is interfering with its right to solicit consents in at least two ways. First, that some number of persons who bought shares in response to news of the March 23 proposal have been disenfranchised by the early record date. Second, that the Board's failure to give notice of its action setting the record date until April 1 caused substantial confusion among nominees who lacked notice of the need to run lists of beneficial owners as of March 30 and are unable completely to reconstruct such lists after the fact. To support their position, the plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

submitted the affidavit of Alan Miller, Co-Chairman of Innisfree M & A Inc., a proxy solicitation service. Miller avers that the after-the-fact notice of the March 30 record date has caused some confusion and uncertainty among nominees, brokerage firms, and their agents, such as Automatic Data Processing Investor Communication Services ("ADP"). No doubt that confusion has the potential to interfere with the plaintiff's consent solicitation. FN5

FN5. Defendants respond with the affidavit of Daniel H. Burch, President of MacKenzie Partners, Inc., another proxy solicitor. Burch states that it is generally the case in consent solicitations that nominees do not receive advance notice of record dates. He states that "as a practical matter" he believes that most of ADP's clients (*i.e.* most brokerage houses) can provide accurate information regarding their beneficial holders as of the March 30 record date.

2. *Board rejects $18 tender offer*

In response to the plaintiff's March 23 letter, the Board retained counsel and engaged the investment banking firm of Cleary, Gull, Reiland, & McDevitt ( "Cleary Gull") to provide it with financial advice. Between March 23 and April 9, the Company's management provided Cleary Gull with information for it to prepare a financial evaluation of the Company and of various possible alternatives to maximize stockholder value for the immediate future as well as the long-term.

The Board met on April 9 and again on April 11 to consider Golden Cycle's tender offer. Among other things, the Board heard a report from Cleary Gull. At the conclusion of these meetings, consistent with the advice received from Cleary Gull, the Board determined that the $18 tender offer was inadequate and should be opposed. The Board also determined, purportedly without making any decision to sell the Company or to engage in a business combination with another Company, to explore alternatives available to it to maximize stockholder value. The Board thereafter caused to be filed and disseminated to the Company's stockholders its Schedule 14D-9, containing a description of the directors' actions and the factors considered by them in reaching their conclusions and recommendations.

3. *Cleary Gull financial analysis*

In connection with the financial presentation made to the Board, Cleary Gull prepared a five-year financial analysis of the Company. At the time Cleary Gull began its analysis, the Company did not have a final budget for fiscal year 1999. The 1999 estimates used by Cleary Gull in conducting this analysis, therefore, where derived from an earlier analysis performed by it in connection with Global's fall 1997 acquisition of Chrome Specialties, Inc. Cleary Gull's analysis produced expected earnings per share ("EPS") of $1.50 for fiscal 1999. FN6 The 1999 numbers were then used to project results for fiscal year 2000-2003, by applying an 11.1% rate growth to 1999 budgeted net sales. At the same time, management completed work on its 1999 budget which resulted in an anticipated 1999 EPS of $1.60. This work was later incorporated into a presentation made to certain stockholders. Plaintiff claims that the presentation was materially misleading in failing to disclose to those stockholders that the 1999 EPS figure considered by the Board was only $1.50. The record reflects, however, that those stockholders were made aware that lower estimates existed and that they knew that management had failed to meet budgeted earnings in recent years.

FN6. Plaintiff points out that, at the same time, the Cleary Gull analyst who follows Global was predicting 1999 EPS of $1.40. Most of this difference is accounted for by estimated costs of responding to Golden Cycle's offer including this litigation, which costs are taken into account only in the $1.40 estimate.

*4 Cleary Gull also presented a "comparable companies" analysis, intended to permit a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d Page 5

Not Reported in A.2d, 1998 WL 276224
**(Cite as: Not Reported in A.2d)**

comparison of various stock price ratios for Global and similar companies. The companies used for the comparison were chosen by Cleary Gull, and the Board relied on the expertise of its investment bankers in making the selections. Plaintiff contends that the companies chosen did not present a useful comparison.

4. *The April 13 disclosure*

On April 13, in a press release, Global publicly announced that its Board had rejected Golden Cycle's $18 offer as inadequate and that the Board had authorized its management and advisors to explore alternatives to maximize stockholder value " including entering into discussions with other parties who have expressed an interest in acquiring the Company at a more attractive price" than $18 per share. In its Schedule 14D-9, filed April 13, 1998, Global reiterated the statements made in the press release stating that the Board "has received expressions of interest from other parties which may have an interest in acquiring the Company at a more attractive price than that offered by Golden Cycle." The 14D-9 also stated that Golden Cycle has not obtained financing for its offer.

To date, the Board has taken no action to redeem the Rights, or to render the Rights Plan inapplicable to Golden Cycle's offer. The Board has, however, indefinitely extended the date when the Rights separate from the shares. Further, the Board has taken no action to exempt the offer from the operation of 8 *Del. C.* § 203.

G. *Standstill Agreement*

Global is now engaged in a process of permitting persons expressing an interest in acquiring the Company to perform due diligence. All such persons have been asked to sign a form Confidentiality and Standstill Agreement ("Standstill "), providing, *inter alia,* that for a period of two years neither that person nor any of its affiliates will, unless invited by the Board: (i) acquire or offer to acquire Global stock; (ii) make or solicit proxies or consents; (iii) participate in a "group" with regard to Global securities; (iv) assist anyone in any of the prohibited activities; or (v) request that Global waive the provisions of the Standstill. Global offered to make the same information available to Golden Cycle on the condition that it enter into the Standstill, which Golden Cycle, for obvious reasons, is unwilling to do.

On May 1, 1998, counsel for Global wrote to Golden Cycle's counsel proposing certain modifications to the Standstill making its terms less onerous to Golden Cycle. As of the date of the preliminary injunction hearing, the parties had failed to agree on mutually acceptable terms.

H. *The Status Quo*

The present state of affairs is as follows:

- Golden Cycle's $18 cash tender offer, originally set to expire at the end of April, is now set to expire on May 29.
- The market price for Global shares remains above $20 per share.
- ***5** As of the date of the preliminary injunction hearing only 4,250 shares had been tendered.

The record does not reflect that Golden Cycle has obtained any written consents in response to its solicitation.

Not only have the Global stockholders not tendered their shares or executed written consents, they also have not provided any written support for Golden Cycle's preliminary injunction motion. The absence of such support is particularly notable because a majority of the shares are held by a few institutional investors and arbitragers whose identities Golden Cycle either knows or can readily ascertain. The stockholders' lack of individual or collective action to date, at a minimum, suggests their willingness to permit management a further opportunity to pursue alternatives to Golden Cycle's $18 offer.

I. *Plaintiff's Arguments*

Plaintiff's preliminary injunction application seeks relief as to the following: (i) the setting of March 30 as the record date for the consent solicitation; (ii)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the refusal to eliminate the Rights Plan or Section 203 as obstacles to the $18 offer; (iii) the demand that Golden Cycle agree to the restrictive Standstill as the price of gaining access to valuation information; and (iv) the defendants' dissemination of allegedly false and misleading disclosures in opposition to the consent solicitation and $18 tender offer.

1. *The record date*

Golden Cycle contends that the evidence demonstrates the action setting the March 30 record date was taken by a self-interested, uninformed board seeking to entrench itself in office. By acting hastily to set the March 30 record date, Golden Cycle argues, the Board eliminated a large number of voters and created obstacles to identifying others. Citing *Blasius Ind. v. Atlas Corp.,* Del. Ch., 564 A.2d 651 (1998), Golden Cycle argues that the Company's action constitutes an inequitable and illegal manipulation of the corporate voting machinery.

2. *Refusal to redeem the Rights*

Plaintiff contends that because the $18 offer is all cash, for all shares, and is not structurally coercive, there is no justification for keeping the Rights Plan in place. Moreover, Golden Cycle argues, two-thirds of the Company's shares are held by institutional investors and arbitragers, having the sophistication needed to evaluate the relative merits of the $18 offer, the Company's business plan and any alternative transaction that might be proposed. Thus, there is no threat of "substantive coercion." Golden Cycle further argues that due to the composition of the Board (two employees and two non-employees with arguably material financial connections to the Company) the Board's actions are not entitled to the presumption of the business judgment rule, but rather, the Board must demonstrate that their rejection of Golden Cycle's offer was entirely fair.

3. *Refusal to provide information absent Standstill*

Relying on *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182 (1986) , Golden Cycle contends that the Board's dealings with actual and potential bidders must be evaluated by whether they are reasonably calculated to maximize stockholder value in the sale of the Company. As a result, Golden Cycle argues that the Standstill demanded of it as the price for access to financial and valuation information would sterilize its fundamental stockholder rights for a significant period of time, and as such is unreasonably onerous and precluded by *Revlon.*

4. *Disclosures claims*

***6** Plaintiff points to four disclosures which it asserts are materially misleading: (i) that other parties "have" expressed an interest in acquiring the Company at a more attractive price; (ii) that Golden Cycle has not obtained financing for the offer; (iii) the dissemination to stockholders of inflated projections that are different from those the Board reviewed in reaching its conclusions; and (iv) the Company's failure fully to disclose the compensation received by Global's directors.

III. DISCUSSION

The parties have briefed and argued a broad array of issues relating both to the standard of review appropriate to this application and the substance of the Board's response to the consent solicitation and the tender offer. For example, much has been written and said about the status of defendants Piazza and Kelly as officers and employees of the Company, as well as the financial connections between the Company and its two purportedly disinterested directors, Allan and Keenan. Plaintiff, which would apply a standard of entire fairness or strict scrutiny to the defendants' actions, paints all four individual defendants as highly compensated insiders fighting to entrench themselves in office to protect their positions and perquisites. Defendants, in contrast, strive to show that the financial interests of the individual defendants are closely aligned with those of the Company's stockholders, as a result of their stock option positions, and argues that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Board's actions are entitled to the protection of the business judgment rule.

It is neither necessary nor appropriate for me to address many of these issues at this time. For the reasons discussed briefly, *infra,* no standard of review applied by this Court, however strict, would warrant relief on the existing record with regard to either the record date, the Board's failure to redeem the Rights, or its failure to exempt Golden Cycle's $18 tender offer from the provisions of Section 203. There is no basis on which to conclude that the record date, the Rights Plan or Section 203 are having any impact on Golden Cycle's efforts to attract tenders and consents, much less a material impact amounting to irreparable harm. Moreover, there is every reason to conclude that the stockholders are fully empowered to remedy any one of those perceived problems as soon as they determine to accept Golden Cycle's offer. They have the immediately exercisable power (not shown to be materially impacted by any action taken by the Board) to remove the directors and replace them with others committed to redeeming the Rights and exempting Golden Cycle's offer from the operation of Section 203. No injunction is needed to accomplish these objectives once the stockholders decide it is in their best interest so to act. Finally, for the reasons discussed, *infra,* I am unpersuaded that injunctive relief is available at this time to address either the access to information issue raised or the state of defendants' disclosures.

A. *Preliminary Injunction Standard*

*7 On this application for a preliminary injunction, Golden Cycle has the burden of demonstrating a reasonable probability of success on the merits of its claims, that irreparable harm will result if an injunction is not granted, and that the balance of equities favors issuance of the injunction. *Unitrin, Inc. v. American General Corp .,* Del.Supr., 651 A.2d 1361, 1371 (1995). Moreover, a preliminary injunction is an extraordinary remedy which will not issue unless it has been earned and will be denied where the remedy sought is excessive in relation to and, indeed, unnecessary to prevent, the injury threatened. *Ivanhoe Partners v. Newmont Mining Corp.,* Del. Ch., 533 A.2d 585, 600, *aff'd* Del.Supr., 535 A.2d 1334 (1987).

B. *The Record Date*

The parties agree that the Board has the statutory power to set the record date for the consent solicitation. Section 213(b) of the DGCL vests " primary authority to fix a record date with the board of directors." *Empire of Carolina, Inc. v. Deltona Corp.,* Del.Supr., 514 A.2d 1091, 1095 (1986) (stating that authority of directors to fix record date is "consistent with the fundamental principle of Delaware Corporate Law that duly elected directors manage the business and affairs of the corporation").

The parties disagree over whether the action taken by the Board in fixing the March 30 record date is reviewable under the *Blasius* "compelling justification" standard, the "enhanced duty" standard of *Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr ., 493 A.2d 946 (1985), or the normal business judgment rule analysis. As the Supreme Court stated in *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1376 (1996) : "*Blasius'* burden of demonstrating a 'compelling justification' is quite onerous, and is therefore applied rarely." The situation presented by the Board's action in fixing the March 30 record date is critically different than the action under attack in *Blasius.* In that case, the Court found that the Board's actual purpose in adding two new directors was to *preclude* "the stockholders of a majority of [Atlas'] shares from placing a majority of new directors on the board through Blasius' consent solicitation." *Id.* at 655. It was the preclusive character of the directors' action that caused Chancellor Allen to hold the directors' action to be an unintended violation of their duty of loyalty. *Id.* at 663.

There is nothing about the action taken here remotely comparable to the action taken in *Blasius.* The record suggests that the early and unannounced setting of the record date has had some effect (i) in disenfranchising persons who purchased shortly before or after March 30, and (ii) in creating some confusion among nominee holders over the identity of their beneficial holders as of that date. However,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there is no suggestion in the record that these problems will preclude or even substantially interfere with the ability of the Global stockholders to remove and replace the entire board, should they choose to do so. For these reasons, the application of the *Blasius* standard to this case is unwarranted.

***8** The *Unocal* standard applies when a "board of directors, unilaterally (*i.e.,* without stockholder approval), adopts defensive measures in reaction to a perceived threat." *Williams,* 671 A.2d at 1377. It is an interesting question whether the act of fixing a record date, essentially a ministerial act, should be examined under *Unocal* 's enhanced duty standard. While there is reason to doubt that it should be, FN7 I find it unnecessary to decide the question because there is no basis in the record before me on which to conclude that the March 30 record date is materially interfering with the stockholders' franchise or Golden Cycle's ability to solicit consents. Moreover, the significantly concentrated ownership of Global's common stock strongly suggests that whatever effects the setting of the March 30 record date may have, it will not, as a practical matter, interfere with the ability of the stockholders as a whole to remove the directors.

> FN7. I note, however, that the haste with which the Board acted to fix the record date and the Company's failure to give prompt notice of its establishment do suggest that the director defendants, or their advisers, thought their actions would limit or interfere with Golden Cycle's ability to solicit consents. The fact remains, however, that a record date was needed, the Board had the power to fix it, and there is an insufficient record from which to conclude that the date actually fixed will interfere with Golden Cycle's consent solicitation in a material respect.

C. *Disclosures*

To state a claim for violation of the fiduciary duty of disclosure:

> [a] plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the " total mix" of information made available.

*Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 143 (1997). Plaintiff's claimed violations do not measure up to this standard.

*1. Third party interest at greater than $18 per share.*

Plaintiff first attacks statements or suggestions by the defendants that Global has received indications of interest at prices higher than $18 per share. The statements were made in defendants' Schedule 14D-9 and an accompanying press release, both disseminated on April 13, 1998. The press release referred to "other parties who *have* expressed an interest in acquiring the Company at a more attractive price." (emphasis supplied). The Schedule 14D-9 made reference to "other parties which *may have* an interest in acquiring the company at a more attractive price than that offered by Golden Cycle." (emphasis supplied). Plaintiff argues that these statements are belied by the April 24, 1998 testimony of defendant Keenan. In answer to the question whether "anybody [has] ... expressed a willingness to or interest in making a bid over $18?, " Keenan responded "[w]e are not at that portion of the inquiry with any of these prospective buyers at this time."

Considering all of the evidence presented, I conclude that the defendants' statements were unlikely to have misled Global stockholders. The record, including specifically other testimony by defendant Keenan, shows that, before April 13, Global and Cleary Gull were contacted by third parties who, in response to news of Golden Cycle's hostile acquisition proposal, expressed some interest in exploring a possible competing transaction with Global. Global has since entered into confidentiality and standstill agreements with some number of these parties, all signed after the Board publicly announced its determination that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Golden Cycle's $18 per share cash offer is inadequate. Some number of those parties are now engaging in due diligence and continue to express an interest in acquiring the Company with knowledge that the Board has already determined that $18 per share is not an adequate price. Based on all of these facts, defendants argue that it was fair to infer by April 13 that the third parties who had expressed some interest in competing with Golden Cycle's proposal understood that a price in excess of that offered by Golden Cycle would be necessary. I agree this is a fair inference and, for that reason, conclude that the statements made by the defendants on April 13 were not misleading or deceptive.

*2. Plaintiff's financing*

*9 In response to Item 4(b) of Schedule 14D-9, Global listed the significant factors considered by the Board in reaching its conclusion and recommendation as to the tender offer. Among other things, the Schedule 14D-9 refers to the fact that the consummation of Golden Cycle's offer is conditioned on:

(a) Purchaser obtaining, prior to the expiration of the Offer, on terms satisfactory to Purchaser, in its sole discretion, sufficient financing to enable the consummation of the Offer and the Proposed Merger (the "Financing Condition"), with regard to which the Board noted that the required financing has not yet been obtained and is itself subject to a variety of conditions.

Plaintiff does not claim that this disclosure is not true or that Golden Cycle has firmly committed financing for its offer. Rather, it alleges that the Schedule 14D-9 disclosure "misleadingly states the Golden Cycle had not obtained financing for the Offer," and refers to the deposition of Roger Grass, taken April 8, 1998, in which Mr. Grass testified that two banks had advised Golden Cycle that they would finance the Offer and that Golden Cycle needed only to execute a letter to secure this financing.

The fact remains that, on April 13 and continuing until today, Golden Cycle has not secured firm financing for its offer. Thus, the statement found in the Schedule 14D-9 was true. Plaintiff's Offer to Purchase, also disseminated to Global's stockholders contains a detailed description of the tentative arrangements made by Golden Cycle to finance its offer. Defendants were under no obligation to repeat that information in itemizing the factors they considered in reaching their decision to reject Golden Cycle's $18 proposal. That information was available in the "total mix" of information available to Global's stockholders. *Loudon,* 700 A.2d at 143.

*3. Financial projections*

Plaintiff complains that the estimates of fiscal 1999 earnings per share have changed since the Golden Cycle offer was made, from $1.50 to $1.60. More particularly, Cleary Gull used the $1.50 estimate in connection with its Board presentation, while an investor presentation prepared contemporaneously (attached as Exhibit 8(a)(1) to Amendment No. 1 to defendants' Schedule 14D-9) incorporates a budget and projections based on a $1.60 per share estimate for fiscal 1999. Golden Cycle argues that the stockholders to whom this later presentation was made were not told that lower estimates had been used in the presentation to the Board. Golden Cycle also points out that the Cleary Gull analyst who follows Global's stock has published and recently reaffirmed a $1.40 per share estimate for fiscal 1999. FN8

FN8. See *supra,* note 6.

Defendants respond that the differences between $1.50 and $1.60 are immaterial, that the $1.60 estimate was developed while Cleary Gull was putting together its presentation to the Board, and that the Board was advised that management had developed a higher number in finalizing the fiscal 1999 budget. They also make the obvious but persuasive point that the Board's conclusion that $18 per share is inadequate was based on the lower, not the higher, estimate. Thus, the existence of the higher estimate was immaterial to the Board's determination. Finally, the Cleary Gull representative testified that the investors to whom

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presentations were made were told that: (i) there " had been a range of earnings estimates within the company, some lower and some higher than the $1.60," (ii) those investors were told that the $1.60 number "is what management was representing ... to their board as to what their current estimate for the year was," and (iii) those stockholders were aware that management "have not met their earnings targets" in the last few years.

***10** The differences between the budget resulting in earnings per share of $1.50 and the revised $1.60 per share budget are not immaterial as a matter of law. As plaintiff points out, the two budgets vary 4.9% in revenue, 23.4% in EBITDA, 8.8% in earnings per share and 8.5% in free cash flow. These differences are not *de minimis,* but substantial. Nevertheless, the record before me does not support an inference or conclusion that the higher budget was prepared in bad faith or with a lack of care. The fact that the Cleary Gull presentation was based on the lower estimate does not support the inference that either Cleary Gull or the Board was unwilling to rely on the higher budget. Moreover, I cannot conclude on the record presented that any of the stockholders to whom presentations were made was misled by management's presentation.

*4. Board compensation issues*

Finally, Golden Cycle contends that there has been a failure fully to disclose compensation arrangements between Global and its directors. In particular, plaintiff attacks the failure to disclose the consulting arrangement by which defendant Allan renders legal services to Global (including payments in years past), the current salaries paid to Piazza and Kelly, and the amount of director's fees paid to Allan and Keenan.

Defendants respond that their disclosures about director compensation have consistently complied with the detailed requirements of the federal securities laws. As of today, items of this disclosure can be found in the defendants' Schedule 14D-9 and the Company's Annual Report on Form 10-K, filed with the Securities and Exchange Commission on or about May 8, 1998. Moreover, information about the amount of compensation paid to the directors was disseminated by Golden Cycle in its tender offer materials. For example, Amendment No. 2 to Golden Cycle's Schedule 14D-1 contains the text of a letter dated April 14, 1998 from Roger Grass to Mr. Keenan. That letter contains a detailed recitation of the "facts" about the compensation of the individual defendants, including the very information Golden Cycle would now have the Court order disclosed by the defendants.

Information bearing on the interest of directors is, of course, of interest to stockholders when they are asked to rely on the recommendation of those directors to resist a takeover effort. This would seem to be particularly true in the case of a board of directors lacking a majority of outside, independent members. Thus, for example, I agree with the plaintiff that information about the consulting arrangement between Global and defendant Allan, and details of Allan's compensation as a director, are material facts. Similarly, the stockholders should be informed about all compensation arrangements between Global and defendant Keenan. These two are the only directors not directly employed by Global. The full scope of their not insubstantial financial relationships with the Company are undoubtedly relevant to the stockholders' decision-making processes. On the present record, however, I am unable to conclude that this information is not now before the stockholders as a result of the Company's filings. Thus, I cannot conclude that the entry of an order requiring the Company to disseminate supplemental materials making all of the disclosures Golden Cycle seeks would "significantly alter[ ] the 'total mix' of information made available." *Loudon,* 700 A.2d at 143.

D. *Standstill Agreement*

***11** Plaintiff contends that a sale of the Company is inevitable, therefore, the Board's duty has " change[d] from the preservation of [the Company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit." *Revlon,* 506 A.2d at 182. In this context,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the plaintiff states, dealings with actual and potential bidders are evaluated by whether they are reasonably calculated to maximize the sale price. *Equity-Linked Investors v. Adams,* Del. Ch., 705 A.2d 1040, 1055 (1997). Golden Cycle contends that Global's refusal to provide information unless Golden Cycle first executes the Standstill is preventing the maximization of stockholder value, and as such is precluded by *Revlon.*

In Delaware, it is the well established that there "is no single blueprint" that a board must follow, in the context of a sale of the company, in order fulfill its fiduciary duties. *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1286 (1989). "Rather a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule." *Id.* (Citing *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954-55 (1985)).

Even assuming the plaintiff is correct and *Revlon* duties are implicated at this time, the plaintiff is still not entitled to the relief it requests. The record before me is insufficient to establish that the directors have breached their fiduciary duties by not providing the plaintiff with the information it seeks. FN9 Currently, the Board, in the face of what it perceives to be an inadequate offer, is engaged in a process of examining alternatives to Golden Cycle's $18 offer. In connection with this, it has refused to give Golden Cycle access to valuation information unless and until it signs the Standstill on such terms as the parties may mutually agree. Again, assuming, arguendo, that *Revlon* duties apply in the current situation, as long as the Board acts with care and in the good faith pursuit of shareholder interest, it may tilt the playing field, and, at least for some period of time, keep Golden Cycle at arms-length. *In re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del. Ch., Cons.C.A. No. 9991, Allen, C. (Aug. 8, 1988).

> FN9. Defendants argue that the *Revlon* duties have not been implicated, rather, that the Board's actions should be measured under the business judgment standard. At this stage of the proceedings a decision on which standard is appropriately applied to the Board's actions is not necessary.

The decision to deny the injunctive relief the plaintiff requests in this regard is, of course, based on the premise that the Board is acting in good faith. FN10 To date, there has been only limited discovery into the facts surrounding the Board's exploration of alternatives to Golden Cycle's $18 offer. The information in the record regarding the process is comprised principally of the Company's public disclosures and representations made by the defendants' counsel. As events unfold, closer examination into these issues may become necessary and appropriate.

> FN10. Plaintiff attempts to cast on the defendants the burden of establishing the entire fairness of the process the Board is currently engaged, which is to explore alternative offers to Golden Cycle's $18 offer. In the absence of evidence of bad faith on the part of the Board, placing this burden on the defendants while this process is ongoing would be inconsistent with the interests of the Company, and potentially destructive of stockholder interest in value maximization.

E. *The Rights Plan*

***12** Finally, Golden Cycle seeks preliminary injunctive relief requiring the directors to redeem the Rights or to render the Rights Plan inapplicable to Golden Cycle's tender offer and requiring the directors to exempt that offer from the operation of Section 203. Because the relief requested is wholly unwarranted and unnecessary at this time, it will be denied. As discussed, *supra,* the market price of Global's common stock remains more than $2.00 higher than Golden Cycle's tender offer and, as a result of this fact, virtually no shares have been tendered into Golden Cycle's offer. In the circumstances, there is no basis on which I could conclude that the Rights Plan (or the threatened application of Section 203) is having any effect on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 12

Not Reported in A.2d, 1998 WL 276224
**(Cite as: Not Reported in A.2d)**

Golden Cycle's ability to attract tenders. Nor will it do so unless Golden Cycle raises its offer, or unless changes in market conditions render its $18 offer competitive.

IV. CONCLUSION

For all the foregoing reasons, the plaintiff's application for a preliminary injunction is, in all respects, denied. IT IS SO ORDERED.

Del.Ch.,1998.
Golden Cycle, LLC v. Allan
Not Reported in A.2d, 1998 WL 276224

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.