# Tab 3





H
Not Reported in A.2d, 1990 WL 212307, Fed. Sec. L. Rep. P 95,772

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Joseph HERD, Plaintiff,
v.
MAJOR REALTY CORP., Alvin L. Lawing, Jr., Warren M. Cason, Jeffrey P. Jorissen, Stanley Weintraub, Charles L. Knight, Thomas E. Weaver, Garry K. Stolicker, Randon A. Samelson, Samelson Real Estate Partners, Inc., Major Acquisition Corp., and Stoneridge Resources, Inc., Defendants.
**Civ.A. No. 10707.**

Submitted: July 16, 1990.
Decided: Dec. 21, 1990.

Joseph A. Rosenthal of Morris, Rosenthal, Monhait & Gross, P.A. , Wilmington, and Stephen D. Oestreich , and Chet B. Waldman , of Wolf Popper Ross Wolf & Jones, New York City, for plaintiff.
Michael D. Goldman , and Stephen C. Norman , of Potter Anderson & Corroon, Wilmington, and Gallop, Johnson & Neuman, St. Louis, Mo., for defendant Alvin L. Lawing, Jr.
Charles F. Richards, Jr. , William J. Wade , Daniel A. Dreisbach , and Frederick L. Cottrell, III of Richards, Layton & Finger , Wilmington, and Steven B. Feirson , Arthur S. Gabinet , and James P. Weygandt , of Dechert Price & Rhoades, Philadelphia, Pa., for Major Realty Corporation, Stoneridge Resources, Inc., Samelson Real Estate Partners, Inc., Major Acquisition Corporation, Randon A. Samelson, Jeffrey P. Jorissen and Garry K. Stolicker.
Randolph K. Herndon , of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Warren M. Cason, Charles L. Knight and Thomas E. Weaver.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.
*1 Pending are defendants' motions to dismiss pursuant to Chancery Court Rule 12(b)(6). The underlying complaint of plaintiff Joseph Herd ("Herd") alleges that the various defendants breached their fiduciary duties of loyalty, care and candor in relation to the now consummated merger of defendant Major Realty Corporation ("Major Realty" or "Major") with Major Acquisition Corporation ("Major Acquisition") an affiliate of defendant Stoneridge Resources, Inc. ("Stoneridge").

Herd commenced the underlying action on March 22, 1989, shortly after Major announced that its board of directors had approved and entered into an agreement concerning the challenged merger. On June 23, 1989, Herd, along with Central Realty Investors, Inc. ("Central Realty"), a suitor for Major, requested a temporary restraining order to prohibit Major's planned sale of certain of its real estate. Following a hearing, this Court denied the temporary restraining order and granted plaintiff leave to file his first amended complaint. *Herd v. Major Realty Corp.,* Del. Ch., C.A. No. 10707, Chandler, V.C. (June 27, 1989). Next, on October 2, 1989, Herd requested a temporary restraining order to enjoin an October 6, 1989, special stockholders meeting called to approve the challenged merger. Herd's application, however, was withdrawn before a hearing date was set. Finally, on October 25, 1989, Herd sought leave to file his second amended complaint as well as a motion for a preliminary injunction seeking an order prohibiting Major from selling any of its assets by sale or otherwise outside the ordinary course of business. Herd's request to file his second amended complaint was unopposed. Concerning Herd's motion for preliminary relief, the Court found that the circumstances at that time-primarily that the motion did not identify any impending transactions-did not justify scheduling a hearing. This is the Court's decision on the present motions to dismiss. As required on a motion of this kind, the following factual recitation emanates from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Herd's second amended complaint (the "complaint" ).

I.

Major was a Delaware corporation with its principal executive offices in Orlando, Florida. Major developed, owned, leased and sold developed and undeveloped real estate directly and through joint ventures and partnerships. Shortly before the challenged transaction, Major had approximately 7.3 million shares of common stock outstanding, held by approximately 8,200 record holders. Major's common stock principally traded on the over-the-counter market where it was listed for trading on the NASDAQ National Market System.

Major's properties were in areas where residential, commercial or light industrial development was underway or contemplated. On March 1, 1989, Major owned approximately 378.5 acres of land in Orlando, Florida, in an area known as "Florida Center" as well as a 2,700 acre planned community which contained the new MCA Universal Studios/Florida studio complex and tourist attraction. Through various joint ventures and partnerships, Major held interests in approximately 269.6 additional acres located in Florida Center and approximately 11 acres located on the waterfront in downtown Tampa, Florida.

*2 Defendant Alvin L. Lawing, Jr. ("Lawing") was the president and co-chief executive officer of Major and was a director since 1978. On October 5, 1989, Lawing beneficially owned or controlled 1.6% of Major's outstanding common stock. Defendant Stanley Weintraub FN1 ("Weintraub") was co-chairman of the board of directors and had served as a director of Major since 1960. On October 5, 1989, Weintraub beneficially owned 4.2% of Major's outstanding common stock. Defendant Warren M. Cason ("Cason") was co-chairman of Major's board and was a director since 1972. Cason owned, on October 5, 1989, 1.5% of Major's outstanding common stock. Defendants Charles L. Knight ("Knight") and Thomas E. Weaver ("Weaver") were directors of Major since 1986 and 1971 respectively. Defendant Randon A. Samelson ("Samelson") is a director of Major, as well as the chairman of the board of directors and chief executive officer of defendant Stoneridge. On October 5, 1989, Samelson owned or controlled 25.3% of Major's outstanding common stock. Defendants Jeffrey P. Jorissen ("Jorissen") and Garry K. Stolicker (" Stolicker") were also directors of Major as well as officers of Stoneridge or Stoneridge affiliates. Herd has labeled Samelson, Jorissen and Stolicker as interested directors.

In June and September of 1989, representatives of Major are alleged to have met with representatives of Stoneridge to discuss general information about the respective companies as well as the possibility of engaging in business transactions. Exchanges of informal telephone calls and correspondence allegedly followed these meetings. In addition, Herd maintains that Major confidentially provided Stoneridge with certain information. During this same period, Stoneridge, through its affiliates, began purchasing Major common stock.

On June 30, 1987, defendant Samelson Real Estate Partners, Inc. ("SREPI"), a Stoneridge affiliate, acquired 505,000 shares of Major common stock. In SREPI's Schedule 13D filed in connection with the acquisition, it stated, among other things, that it would request a meeting with Major and might seek control of Major. SREPI continued to acquire Major common stock and purportedly, on August 17, 1987, owned 1,209,000 shares of such stock.

In October 1987, the Major board adopted a rights plan. The rights distributed to the stockholders gave each stockholder (with the exception of the triggering stockholder) the right to purchase, under certain circumstances, common stock or possibly other assets of Major having a value twice the right's exercise price. With the adoption of the rights plan, Major commenced litigation against SREPI and Stoneridge in Florida Federal District Court seeking a declaration that the plan was valid.

On February 4, 1988, SREPI demanded the right to inspect approximately 17% of the common stock of Major. Representatives from Stoneridge and Major met and discussed the proposal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

These discussions purportedly resulted in Major entering into a standstill agreement with Stoneridge. In the standstill agreement Stoneridge agreed, among other things, not to engage in a proxy contest for the election of directors at Major's 1988 annual meeting. Stoneridge also agreed to not own more than 21% of Major's common stock. Major agreed to certain modifications to its defensive maneuvers (poison pill) that were favorable to Stoneridge. And, in addition, the agreement calls for changes to the composition of the Major board resulting in the placement of three Stoneridge nominees on the Major board (Samelson, Jorissen and Albert A. Savill).

***3** On around November 21, 1988, Major received an offer from a Florida real estate developer, Gulfstream Development Corporation ("Gulfstream" ). Gulfstream offered to purchase all of Major's outstanding common shares for $12.50 or at the option of Major's board, $10 in cash and $3.50 in 14% subordinated debentures of the surviving corporation. After some deliberation, Major's board announced on November 30, 1988, that it had rejected Gulfstream's offer.

After rejecting the Gulfstream offer, Major considered alternative methods of achieving value for its stockholders and developing the companies properties. In this regard, in early January, 1989, Major formed a special independent committee to study the possibility of converting Major into a real estate investment trust ("REIT").

On January 25, 1989, Gulfstream made a second offer, this time for $13 cash per share. The next day Major announced that its board instructed its advisers to begin negotiation of a definitive merger agreement with Gulfstream's advisers and called a special board meeting to consider Gulfstream's offer. In addition, the special committee recommended against electing REIT status. The board endorsed the committee's report.

Major announced on February 21, 1989, that Stoneridge was prepared to offer Major an alternative transaction. The transaction contemplated Stoneridge offering Major stockholders $13 per share or the opportunity to remain a shareholder of the entity resulting from a merger of Major and Stoneridge. The Major announcement stated that the Major board had directed its financial and legal advisers to continue negotiations with Gulfstream and to commence discussions with Stoneridge. The board also appointed a special committee to oversee the process. The special committee was chaired by Weaver and included Weintraub, Cason and Knight.

On March 14, 1989, Richard Collier ("Collier") of Peers & Co. ("Peers") informed defendant Knight that he was interested in purchasing Major. Apparently, Collier had previously been in contact with Major and had executed a confidentiality agreement. Concerning consideration, Collier allegedly indicated that his offer would be higher than Gulfstream's latest $13 per share offer. At its March 15, 1989, meeting the special committee considered the Peers' offer.

Thereafter, defendant Major Acquisition, a corporation formed by Stoneridge to accomplish the proposed merger, offered to increase the cash consideration to be paid in the proposed transaction from $13 to $13.40 per share if the proposed transaction were consummated after July 21, 1989. Major Acquisition also offered to obtain a written commitment from Stoneridge concerning financing. All negotiations and discussions were concluded prior to the March 15, 1989, special committee meeting.

At its meeting the special committee decided that the proposed merger with Major Acquisition was in the best interest of the Major shareholders. In that regard, the special committee recommended that the board authorize and approve the proposed merger agreement with Major Acquisition. The board subsequently determined that the proposed merger transaction with Major Acquisition was in the best interest of the shareholders. In addition, the board resolved to redeem Major's poison pill immediately prior to the consummation of the transaction with Major Acquisition.

***4** Under the merger agreement, Major Acquisition was to merge with and into Major Realty. Major Realty would be the surviving company. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

directors of Major Acquisition, selected by Stoneridge, were to become Major Realty's initial board of directors following completion of the merger. In essence, Major was to remain a publicly-held company only under new management. In addition, of course, Stoneridge-through Major Acquisition-had the opportunity to increase its holding in Major Realty. Major's stockholders were given the option to receive either $13.40 (or $13.50 if the transaction closed by a certain date) in cash for each Major common share or, alternatively, one share of common stock in the continuing corporation. The agreement contained fairly typical financing conditions, termination rights as well as provisions for expense payments. The agreement also contained a no-shop provision prohibiting Major and its officers, employees and agents from directly or indirectly encouraging, soliciting or initiating discussions or negotiations with any other entity or group concerning any possible acquisition of Major. The agreement additionally calls for the redemption of Major's poison pill rights plan as well as the termination of the standstill agreement between Major and the Stoneridge entities. The agreement does contain a modified standstill agreement much like the previous agreement except it includes no restriction on the ability of the Stoneridge entities to acquire additional common stock of Major.

In connection with the merger agreement, Herd alleges that Major made a series of material misrepresentations and omissions. These omissions and misrepresentations were allegedly made, among other places, in the press release announcing the merger, the 10K filed with the Securities and Exchange Commission as well as the merger agreement itself. The alleged misrepresentations included, among other things, the Stoneridge entities, through Major Acquisition, problems delivering a financing commitment.

On May 23, 1989, Peers, acting as a representative of Central Realty Investors, Inc. ("Central Realty"), requested through the special committee's advisers the opportunity to present a letter to the special committee regarding the possibility of an acquisition of Major by Central Realty. The letter allegedly represented that Central Realty was willing to offer a merger proposal in which the shareholders would receive a higher dollar amount than the Stoneridge $13.40 offer and would not be subject to financing.

Next, on May 30, 1989, Herd sent what he characterizes as a "shareholder demand letter" to the Major board. The gist of the letter is that Major should terminate its merger agreement with Major Acquisition because Major Acquisition had not yet procured the necessary financing commitments in the time allotted. Herd maintained, in the letter, that the agreement was deterring interested third parties from making offers for Major. Terminating the merger, Herd's letter asserts, would free Major, its directors and its financial advisers to solicit, receive and negotiate with interested third parties. Worth noting is the fact that Herd now maintains that this letter qualifies as a Rule 23.1 demand letter.

***5** Shortly thereafter, on June 1, 1989, Major Acquisition purportedly advised Major that it had withdrawn its $13.40 offer and was unwilling to proceed without a reduction in consideration. Herd maintains that Major Acquisition was interested in proceeding with a recapitalization transaction in which stockholders of Major would be given the opportunity to receive either $12.75 in cash per share or their common equity in Major. Major appears to have announced this development and that negotiations were ongoing. In regard to this development, the special committee is alleged to have determined that if satisfactory progress with Major Acquisition was not made, it would recommend that Major exercise its right to terminate the merger agreement.

At about the same time, Central Realty made their proposal. The proposal, subject to completion of due diligence and approval of another party, was purported to have a value of $13.50 per share. The special committee allegedly did not respond to or consider this proposal. Major did, however, publicly announce the proposal on June 7, 1989.

On June 13, 1989, after some discussion and negotiation, the special committee approved and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recommended to the Major board the so-called interim operating plan, the acceptance by Major of Major Acquisition's financing arrangements and the waiver by Major of its right to terminate the then existing merger agreement with Stoneridge. At its June 14 meeting, the Major board approved all of the above. Herd also maintains that the board decided not to respond to the Central Realty proposal. In addition, Herd alleges that the press release announcing the action taken was false and misleading.

The Major board, also at the June 14, 1989 meeting, approved the sale of various Major real estate holdings. These holdings included Major's interest in the Republic Square Shopping Center, the Major Park Plaza Office Building and approximately seven acres of land located in the International/Republic Drive area of the Florida center. Herd alleges that these properties were sold for $21.5 million (allegedly $2 million less than the fair market value of the properties) to assist Stoneridge's financing of the merger. In this regard, Herd maintains that defendant Lawing dissented to the sale due to this alleged purpose and because the consideration received for the property was inadequate.

Next, Major issued its registration statement and proxy dated September 9, 1989. With the registration statement and proxy, Major sent a letter to its stockholders inviting them to a special meeting scheduled to take place on October 6, 1989. At the special meeting the stockholders were to be asked to approve and adopt the merger agreement. Herd claims that many of the stockholders did not receive the registration statement and proxy until September 25, 1989, and later. In addition, Herd claims that the proxy contained material omissions and misleading statements.

On September 13, 1989, Central Realty delivered what Herd characterizes as the "second Central Realty proposal," in which Central Realty offered to acquire all of the outstanding shares in a merger transaction. Each Major Realty share would be converted into the right to receive $7 in cash and convertible exchangeable preferred stock having a purported value of $7.50 making the total acquisition price $14.50 per share. It is undisputed that the special committee considered and recommended that Major Realty's board reject the proposal. The board, thereafter, rejected the second Central Realty proposal.

***6** Major supplemented its proxy statement on September 28 and again on September 29, 1989. The supplemental proxies included disclosures concerning: (1) the second Central Realty proposal; (2) the Major-Pru joint venture/Universal Studios Florida Area properties; (3) certain litigation in which the company was involved; and (4) a revision of certain financial information. Herd maintains, however, that many, if not most, of Major Realty's shareholders did not receive the supplemental proxies until after the October 6 special meeting. Moreover, Herd alleges that the supplemental proxies contained material misrepresentations.

On October 5, 1989, Herd sent what he characterizes as his "second shareholder demand letter." The letter demands that Major Realty postpone its special shareholders meeting, for two or three weeks, to give the shareholders time to receive and digest the information contained in the second supplemental proxy. Herd maintains that this letter, along with his earlier letter, qualifies as a 23.1 demand letter.

The special meeting was held on October 6, 1989, where the shareholders overwhelmingly approved the merger 5,389,627 to 619,084. The companies subsequently consummated the merger and announced its completion on October 12, 1989. Major Realty remains basically the same as it did before the merger. The total number of shares of Major Realty common stock outstanding decreased from 7,345,910 to 6,927,655. Stoneridge's percentage ownership increased from 25.3% to 26.8% as a result of the merger.

## II.

Each named defendant (some in groups of similarly situated defendants) has moved to dismiss Herd's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

second amended class action complaint (the " complaint") for failure to state a claim upon which relief can be granted pursuant to Chancery Court Rule 12(b)(6). To grant a motion to dismiss for failure to state a claim, the Court must conclude, with reasonable certainty, that a plaintiff would not be entitled to relief under any set of facts that could be proven under the allegations made. *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985) ; *Porter v. Texas Commerce Bancshares, Inc.*, Del. Ch., C.A. No. 9114, slip op. at 9, Allen, C. (Oct. 12, 1989).

If a complaint could be dismissed for being an incomprehensible jumble of allegations, the complaint at issue would be dismissed without further comment. Unfortunately this Court is charged with trying to determine whether a given plaintiff would be entitled to relief under any set of facts that could be proven under the allegations made. Herd's 92 pages of allegations, however, make this task especially difficult. It is with this caveat that I proceed.

Herd appears to make four substantive allegations. The first allegation, stated in counts I and II, is that the defendants (or various subgroups of them) breached their fiduciary duties of loyalty (count I) and care (count II) by engineering a merger designed to divest Major's public stockholders of the full value of their stock in order to deliver the company to Stoneridge cheaply (the unfair merger claim). The second allegation, also contained within counts I and II, is that defendants usurped corporate opportunities and committed various acts of waste and mismanagement at the expense of and to the detriment of the public shareholders (the derivative claims). The third allegation, sprinkled throughout the complaint, is that defendants failed to conduct an auction or at least engage in a meaningful market check in carrying out their duty to maximize shareholder value once it was determined that the company was up for sale (the " *Revlon* and market check claim"). And finally, Herd's fourth allegation, stated in count III, is that certain of the defendants breached their duty of candor by providing the stockholders inadequate and inaccurate information in connection with the merger (the "disclosure claim").

*7 A. *The Unfair Merger Claim*

The central thrust of Herd's unfair merger claim is that defendants engaged in a plan to allow Stoneridge to acquire, or at least increase its ownership of, Major Realty by unfairly depriving the Major Realty shareholders of their equity investment. In furtherance of this plan, Herd alleges that defendants acted to conceal the true value of Major Realty so as to justify an unconscionable, unfair and grossly inadequate offer. In addition, defendants are alleged to have discouraged interested parties other than Stoneridge.

Defendants contend that Herd's unfair merger claim boils down to an allegation that defendants' conduct, including the failure to provide adequate disclosure, injured the class members by divesting them of their stock at an inadequate price. In support, defendants point to paragraph 202 of the complaint, which states:

As a result of defendants' unlawful actions, plaintiff and the other members of the Class have not received their fair proportion of the value of Major Realty's assets and business and have been prevented from obtaining the real value of their common stock as well as being deprived of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement of the Supplemental Proxies.

There is no getting around the fact that Herd's unfair merger claim amounts to the allegation that certain of Major Realty's shareholders were cashed out unfairly through the merger transaction.

Defendants seek dismissal on the ground that Herd lacks standing to assert a cause of action based on his being unfairly deprived of his holding in Major Realty. The sole, and quite obvious, reason for this ground is that Herd elected to retain his Major Realty stock and therefore was not deprived of his holding. Thus, the argument goes, Herd did not suffer the actionable injury of being unfairly deprived of his holding. That an actionable injury exist, of course, is a necessary prerequisite of any valid cause of action. *See* 12B C. Van Swearingen, *Fletcher Cyclopedia of the Law of Private*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corporations,* § 5909 (1984 rev. ed.) (for a court to entertain a stockholder suit, there must "be an actionable injury damnatory of plaintiff's rights"). For this reason, I agree that Herd lacks standing to assert his unfair merger claim.

B. *The Derivative Claims*

Although the complaint is entitled "Second Amended Class Action Complaint," Herd maintains, in his brief in opposition to defendants' motion to dismiss, that his complaint asserts several derivative causes of action. The problem for the Court is that Herd has been rather coy in identifying which claims he considers derivative. Again, I will do my best to flesh out the purported derivative claims.

Of the "number of derivative claims" allegedly asserted in the complaint, Herd does identify two. The first purported derivative claim is for waste of corporate assets in connection with certain fees to be paid to Stoneridge. These fees are for certain services performed by Stoneridge affiliates in connection with the merger transaction. Although these fees are actually an obligation incurred by Major Acquisition, Herd claims that Major Realty will really pay by operation of the merger. Herd's second purported derivative claim is for bypassing corporate opportunities. There appears to be two allegations underlying this claim. The first allegation is that Major Realty's consideration of adopting REIT status caused Major to lose opportunities in the market place. The second allegation is that as part of the interim operating plan, Major Realty's operations were dismantled.

***8** While these purported derivative claims are not well developed and therefore difficult to follow, it is unnecessary to speak to their assumed substance for the simple reason that the complaint contains none of the allegations required under Chancery Court Rule 23.1, *i.e.,* a derivative complaint must allege with particularity the efforts made by the plaintiff to obtain the action desired and the reasons for failing to obtain the action or for not making the effort. Herd, of course, maintains that he fully complied with Rule 23.1.

First, Herd claims that he made demand upon the Major Realty directors, to pursue the purported derivative claims, in two letters he sent the directors. The first so-called demand letter is dated May 30, 1989. This letter, as it appears in the complaint, does not demand that the directors pursue any cause of action on behalf of Major Realty. The letter merely argued that Major Acquisition was in breach of the merger agreement. The letter concludes as follows:

Thus, on behalf of our client, we hereby demand that the Board of Directors of Major, pursuant to section 6.1(d) of the Merger Agreement, terminate the Merger Agreement by furnishing MAC the required five (days) written notice of such action.

The second letter, dated October 5, 1989, is similar except it demands that the board postpone the stockholders' meeting at which the merger was to be considered.

While Herd clearly demanded corporate action in both instances, he did not demand that the directors take action to remedy the alleged corporate injury for which derivative relief is now sought. *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). Requests that the merger agreement be terminated and that the stockholders' meeting be postponed are different from Herd's purported derivative claims relating to the sale of real estate at less than fair market value, the payment of undeserved and excessive fees and the bypassing of corporate opportunities.

Herd's argument that demand would have been futile-and thus excused-also fails. It is well established that when a derivative plaintiff asserts futility of demand, Rule 23.1 requires that the derivative plaintiff demonstrate "with particularity ... the reasons" why demand would have been futile. *See Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 808 (1984). Herd fails to do this and, in fact, makes allegations that seem to indicate that a majority of Major's board was disinterested. Any derivative claims are therefore dismissed pursuant to Chancery Court Rule 23.1.

C. *The Revlon and Market Check Claim*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Herd maintains that the complaint clearly alleges that the director defendants and Stoneridge failed to: (a) conduct an unbiased auction between the Samelson entities (Major Acquisition) and Gulfstream; (b) conduct an auction between Central Realty and Major Acquisition after Major Acquisition's $13.40 offer had been withdrawn; and (c) engage in a meaningful market check both before the Gulfstream offer was rejected and after the Samelson entities withdrew their $13.40 offer.

*9 Defendants first challenge whether Herd has even plead a *Revlon* and market check claim. Indeed, after a careful reading of the complaint it is hard to tell. Whether the claim has been plead is, however, not terribly important in light of the fact that the complaint's allegations do not assert a claim upon which relief can be granted.

While directors undoubtedly have duties in the context of the merger transaction at issue, they have no duty to employ a specific device such as the auction or market check mechanism. *See Freedman v. Restaurant Associates Industries, Inc.*, Del. Ch., C.A. No. 9212, Allen, C., slip op. at 12, 13 (Sept. 21, 1990). The so-called *Revlon* duty to conduct an auction appears to arise in a very limited situation not present here. This Court has held that *Revlon* duties arise when it is inevitable that the company will be sold and stockholders' interests terminated. *City Capital Associates v. Interco,* Del. Ch., 551 A.2d 787, 802-3 (1988). A recent case has stated that the duty arises in the more narrow context where "the dissolution or break-up of the corporate entity [is] inevitable." *Paramount Communications, Inc. v. Time Incorporated,* Del.Supr., 571 A.2d 1147, 1150 (1990). Indeed, in the case from which the duty emanates the company was to be sold, and the stockholders' interests converted into cash or otherwise terminated. *Revlon, Inc. v. MacAndrews & Forbes Holding,* Del.Supr., 506 A.2d 173 (1986). *Revlon* certainly does not, as Herd seems to argue, require that every change of control of a Delaware corporation be preceded by a heated bidding contest, some type of market check or any other prescribed format. *Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279, 1286 (1989). Herd's *Revlon* and market check allegations therefore do not assert a claim upon which relief can be granted.

D. *The Disclosure Claims*

Finally, Herd alleges (count III of the complaint) that the director defendants and Major Realty have breached their duty of candor by disseminating various statements, press releases and documents which contained material misrepresentations and omissions. It is not clear, however, in what way Herd was injured by these purported violations of the duty of candor. The only clue is found in ¶ 202 which reads in whole:

*As To All Counts*

202. As a result of defendants' unlawful actions, plaintiff and the other members of the Class have been damaged in that they have not received their fair proportion of the value of Major Realty's assets and business and have been prevented from obtaining the real value of their common stock as well as being deprived of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement or the Supplemental Proxies.

Directors of Delaware corporations clearly have a duty of candor when disclosing information to shareholders. Breach of the duty results in uninformed decisions on the part of shareholders. Herd intimates that the alleged breach by defendants caused him to be deprived of his equity investment in Major Realty. The problem, of course, is that Herd was not deprived of his equity investment because he elected to retain his Major Realty common stock. In other words, defendants argue, Herd lacks standing to raise this claim. For this reason, the argument goes, the Court need not address whether the relevant disclosures were accurate and timely. Defendants, however, fail to point out that Herd also alleges that the challenged disclosures "deprived [him] of the opportunity to make an informed judgment as to the issues contained in the Registration/Proxy Statement or the Supplemental Proxies." Compl. at ¶ 202. As a shareholder at the time of the transaction, Herd does have standing to complain about the accuracy of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information afforded in connection with a shareholder vote.

Defendants' fiduciary obligation to disclose all material facts in an atmosphere of complete candor is well established. *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, Del. Ch., 532 A.2d 1324, 1338 (1987) (citing *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985)). The appropriate legal test as articulated in *Rosenblatt, supra,* requires disclosure of those facts deemed material. A fact is material if there is a "substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt, supra* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1979)).

***10** Herd's candor claim has three parts. First, Herd alleges that the proxy statement itself is misleading. Second, plaintiff alleges that the supplemental proxy statements were misleading and were not mailed in a timely fashion. Third, plaintiff alleges that three of Major's press releases and its 1988 Form 10k were misleading. FN2

The alleged misrepresentations and omissions within the proxy statement are broken into five specific allegations. The first such allegation, found at ¶ 165(a) of the complaint, is as follows:

The Proxy fails to state that there has been no formal approval or discussion of the over $2.1 million in fees to be paid to defendant Stoneridge and related entities in connection with the Merger by either the Board or the Special Committee, and that these payments represent solely the unilateral intent of Stoneridge.

I agree with defendants that there is no factual basis for this allegation. Indeed, the following excerpt from page 5 of the proxy statement illustrates this point:

While the obligation to make the above-described payments is an obligation incurred by [MAC] and will become an obligation of the Company [Major] by operation of the Merger, stockholders should be aware that the current Board of Directors of the Company has not specifically considered and has neither approved nor disapproved the above-described payments.

In addition, I do not accept Herd's argument that even if the disclosure is not wrong it is nevertheless misleading. The proxy is adequate in its disclosure of the fees paid to Stoneridge and related entities. Furthermore, I have serious doubts as to whether the information at issue would significantly alter the total mix of information in any regard.

Herd's second allegation that the proxy contains omissions and misleading statements, found at ¶ 165(b) of the complaint, is as follows:

The Proxy fails to state that the sale of the three properties, approved by the Board on June 14, 1989 (discussed *supra* ), was done to facilitate the financing of the Merger by MAC.

This allegation, as I understand it, is that the proxy statement is false because defendants did not disclose their actual motive in selling Major Park Plaza, Republic Square and some associated vacant land. The motive, according to Herd, was the allegedly improper motive of aiding Stoneridge's financing of the merger. Defendants hotly dispute the allegation that the properties were sold in order to facilitate MAC's financing. Nevertheless, defendants point out, disclosure of improper motives is not required under Delaware law. *See Nomad Acquisition Corp. v. Damon Corp.*, [1988-89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94, 040 at 90, 874 (Del. Ch.1988).

While conceding that the general rule is that alleged motives need not be disclosed, Herd argues that the present situation falls within the exception to the rule. In support of this argument, Herd cites *Eisenberg v. Chicago Milwaukee Corp.*, [1987-1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93, 544 at 92, 444-45 (Del. Ch.1987). Herd's present allegation of omission, however, is wholly distinguishable from the alleged false disclosure at issue in *Eisenberg*. Presently Herd argues that defendants failed to disclose the motive underlying the sale of certain assets. This is in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sharp contrast to *Eisenberg* that involved the alleged false disclosure of the purpose of the transaction on which the stockholders were voting. The rationale behind making an exception for the false disclosure in *Eisenberg* is not hard to fathom.

***11** Defendants' alleged nondisclosure in the present situation, however, is quite the opposite. For one, the transaction presently at issue is one typically in the ordinary course of Major's business. In addition, the transaction is not even subject to a stockholder vote and occurred several months before the merger. For these and other reasons I do not find the present situation worthy of an exception to the general rule against requiring directors to disclose alleged improper motives.

Herd's third allegation that the proxy contains omissions and misleading statements, found at ¶ 165(c) of the complaint, is as follows:

The Background of the Merger section of the Proxy is distorted in many ways.

Such an allegation, devoid of allegations of specific fact to support its conclusion, is a conclusory allegation. Unable to comment further, the allegation must be dismissed.

Next, Herd complains that the proxy contains omissions and misleading statements concerning the value of the Superblock. The specific allegation, found at ¶ 165(d) of the complaint alleges:

The Superblock has 'substantially' increased in value since 1987 when such property was last appraised while the Proxy states that it 'is possible' the development of that asset will have a significant impact.

In addition, Herd alleges that at least one director believed that the superblock has increased in value since the 1987 appraisal. After careful review of the proxy materials, I am convinced that there is no basis in fact for Herd's allegation. The proxy fully discloses that Mr. Lawing (the former director referred to by Herd) believed that the superblock had significantly increased in value and that additional disclosures to that effect should have been made. In fact, the proxy contains several disclosures concerning the significant development activity adjoining the superblock. What the proxy does not contain and what it appears Herd wants, is an updated appraisal or other opinion as to the present day value of the superblock. The problem with such an opinion, defendants point out, is that it is as likely to be misleading as it is helpful. Disclosing all of the relevant facts, on the other hand, allows a shareholder to form his own opinion without directing that opinion. Following this latter course in no way makes the proxy materials misleading.

Herd's final assertion concerning the proxy statement, found at ¶ 165(e), alleges:

The Proxy, on page 34, incorrectly states that 1.07 acre parcel that the City has agreed to purchase was included in the property that was the subject of the Tampa appraisal.

I agree with defendants that, in light of the fact that Major's real estate assets have a total appraisal value of close to $190 million, the inclusion or exclusion of 1.07 acres is immaterial as a matter of law. In other words, it would not significantly alter the "total mix" of information relevant to the merger.

Herd next claims that defendants breached their duty of candor by way of the alleged untimely and inaccurate supplemental proxies. The supplemental proxies, dated September 28 and 29, 1989, include disclosures concerning: (1) the second Central Realty proposal; (2) the Major-Pru joint venture/Universal Studios Florida Area properties; (3) certain litigation in which the company was involved; and (4) a revision of certain financial information.

***12** After reviewing the supplemental proxies, and the attendant facts, I am troubled by both the accuracy and timeliness of these disclosures. Concerning accuracy, I am especially troubled by defendants' characterization of the consideration offered in Central Realty's second proposal. Defendants characterized the stock component of the Central offer to have a purported value of $7.50.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants go on to state that the actual value of the stock component is probably under $6.50 and could be in the range from $3.27 to $7.43, with $5.00 being the most reasonable estimate. This is troubling because Central's proposal states that the financial advisers of Major were to participate in the determination of the final terms of the stock component so that both Major and its financial advisers will be satisfied that the stock component have a value of $7.50.

Of equal concern is the timeliness of the supplemental proxies. Herd alleges that the supplemental proxies were in fact useless because they reached shareholders shortly before or after the October 6 shareholder meeting. The record seems to indicate that the supplements were mailed no longer than a week before the October 6, 1989, shareholder meeting. The record does not indicate, however, any reason for such a last minute mailing. All of the information disclosed in the supplements, including the Central offer, was known well before the October 6 shareholder meeting. I am left wondering why the defendants waited until one week before the shareholders meeting to disclose information they felt was worthy of a supplemental proxy. With such concerns, I am unable to dismiss Herd's disclosure claim concerning the supplemental proxies. All other disclosure claims are dismissed for the reasons stated.

III.

Defendants' motion to dismiss pursuant to Chancery Court Rule 12(b)(6) is granted in part. Defendants' motion to dismiss those duty of candor claims concerning the supplemental proxies is denied.

IT IS SO ORDERED.

FN1. Defendant Weintraub's dismissal has been stipulated to by the parties pursuant to Chancery Court Rules 23(a) and 41(a).

FN2. Plaintiff appears to have dropped the candor claims involving the press releases and Form 10K. If not, I find such claims inadequate because the duty of candor requires disclosure of all material facts only in connection with a transaction on which shareholders are asked to vote. *See Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 279 (1977).

Del.Ch.,1990.
Herd v. Major Realty Corp.
Not Reported in A.2d, 1990 WL 212307, Fed. Sec. L. Rep. P 95,772

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 4

**C**
Not Reported in A.2d, 2000 WL 62964
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Re: In re GOLDEN STATE BANCORP INC. Shareholders Litigation
**No. CIV.A. 16175.**

Jan. 7, 2000.

Joseph A. Rosenthal , Rosenthal Monhait Gross & Goddess, Wilmington.
Arthur N. Abbey , Abbey, Gardy & Squitieri, LLP, New York, NY.
Robert K. Payson , Potter Anderson & Corroon LLP, Wilmington.
Rodman Ward, Jr. , Skadden Arps Slate Meagher & Flom, Wilmington.

CHANDLER , Chancellor.
*1 Dear Counsel:

This is my decision on the pending motion to approve a proposed settlement of this shareholder class action lawsuit. Also pending is class counsel's application for fees and expenses. For the reasons that follow, I approve the proposed settlement, but I award reduced fees and expenses in the aggregate amount of $500,000.

On December 14, 1999, counsel appeared before this Court and requested approval of the proposed settlement including the payment of fees to plaintiffs' counsel in the amount of $1.325 million. Defendants did not object, and have agreed to pay any fee awarded up to that amount. Mr. L. Cooper Rutland, Jr., filed an objection that focused primarily on the form of the notice to Golden State Bancorp, Inc. shareholders. After this objection was filed, plaintiffs' counsel spoke with Rutland and explained the settlement procedure. As a result, Rutland withdrew his objection. FN1 Rutland did not attend the settlement hearing.

FN1. I presume Rutland thought the notice was deficient because it did not explain the remuneration the shareholders were to receive from the settlement. Quite understandably, he questioned what plaintiffs' counsel did to support their claim for $1.325 million in fees. At the hearing, plaintiffs' counsel assured me that they adequately explained the therapeutic benefits of the settlement to Rutland, and that he then withdrew his objection.

Golden State is a Delaware corporation with its principal executive offices in Glendale, California. Golden State was the holding company for Glendale Federal, a federally chartered savings bank and one of the largest savings institutions in the United States. California Federal Bank ("CalFed") FN2 was a privately-owned federal stock savings bank and was one of the largest thrift institutions in the United States.

FN2. References made to CalFed also include its following affiliates: Defendant First Nationwide Holdings, Inc., a savings and loan holding company organized under Delaware law, and First Nationwide (Parent) Holdings, a savings and loan holding company that served as CalFed's parent, owning 80% of CalFed.

During the late 1990s, the banking and thrift industries experienced significant consolidation. As a moderately-sized institution, Golden State feared losing its ability to compete if it did not find a suitable merger partner. In hopes of achieving that goal, Golden State began discussions with CalFed in January 1997. On February 5, 1998, after many months of negotiations, Golden State announced

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that it and CalFed had entered into an Agreement and Plan of Merger.

According to this Agreement, the indirect owners of CalFed, Ron Perelman and Gerald Ford, were to receive Golden State common stock, to be determined by a formula, that would constitute between 42% and 45% of the combined company's outstanding common stock. Golden State shareholders would receive between 55% and 58% of the new company, which would retain the Golden State name but operate CalFed branches. CS First Boston provided an oral fairness opinion on the proposed merger.

One week after the merger's announcement, plaintiffs brought this action, claiming that defendants failed to explore alternative transactions that may have maximized shareholder value as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings. Inc.* FN3 Plaintiffs also alleged that disclosure was incomplete. The Court consolidated other actions arising from this same transaction. FN4

FN3. Del.Supr., 506 A.2d 173 (1986).

FN4. The following actions were consolidated by this Court's February 12, 1998 Order: *Appel v. Trafton,* C.A. No. 16175, *Singh v. Trafton,* C.A. No. 16176, *Rudd v. Golden State Bancorp* ., C.A. No. 16177, and *Miller v. Trafton,* C.A. No. 16182. *Levinson v. Trafton,* C.A. No. 16203 was added to the consolidated action by a Supplemental Order of Consolidation. In addition, similarly situated plaintiffs filed suits containing substantially similar claims against defendants in the Superior Court of California, County of Los Angeles. These " California Actions" have been stayed pending the ultimate disposition of the present action. Importantly, the California Actions are incorporated in the proposed settlement, which is the subject of this decision.

As to the *Revlon* claim, plaintiffs soon realized there was little likelihood of success. Golden State's CEO testified in his deposition that outside interest in Golden State "was basically zero." FN5 No other potential bidders for Golden State existed; Golden State was fortunate to close the deal with CalFed. It also was debatable whether a change of control triggering *Revlon* duties occurred, as Golden State shareholders still owned the majority of the combined entity's stock.

FN5. Stephen Trafton, dep. at 11.

***2** As for the disclosure claims, plaintiffs arguably occupied stronger ground. Before and after Golden State issued the proxy statement in connection with the CalFed merger, stock prices of many savings and loan institutions, including Golden State, plunged due to concerns over prevailing low interest rates. Between June 9, 1998 and August 17, 1998 (the date of the shareholder vote on the proposed merger) Golden State's stock price dropped from $35.5625 to $21.75. FN6 Further, several insiders, including Golden State's Chairman and CEO, exercised a considerable number of options held on Golden State shares. Plaintiffs contended that Golden State should have disclosed these facts to its shareholders, and that recent developments had rendered CS First Boston's oral fairness opinion outdated and insufficient.

FN6. Luckily for Golden State's shareholders, the terms of the merger included a collar that served to make the proposed merger appear better for Golden State's shareholders as Golden State's stock dropped.

Within three or four months, the parties had agreed in principle to settle this litigation, both here and in California. The September 25, 1998 Memorandum of Understanding required Golden State to provide its shareholders with its most current available unaudited financial information (an additional quarter of financials), together with an updated written fairness opinion by CS First Boston (taking into account the decline in stock price and other recent developments). During the settlement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hearing, plaintiffs' counsel also represented that the settlement provided Golden State shareholders with financials from privately-held CalFed, information they would not have had access to otherwise. In August of 1998, Golden State shareholders overwhelmingly approved the merger, which became effective on September 11, 1998.

Plaintiffs' counsel claim to have settled because, after weighing the likelihood of success on the merits against the costs of further litigation, they considered the settlement the optimal resolution for Golden State's shareholders. Plaintiffs' counsel admits the *Revlon* claim became progressively weaker as discovery continued. As such, plaintiffs' attorneys easily justified compromising their *Revlon* claim. As the disclosure claims had more merit, the plaintiffs presumably used these claims to leverage the settlement. FN7

FN7. Of course, this is not to be read to exclude the possibility that defendants settled merely for "nuisance value," after weighing the costs associated with continued litigation against the costs of the proposed settlement.

The important question then is, was the alleged benefit in this matter worth anything to Golden State's shareholders? More specifically, was the initial exclusion of information, which Golden State later disclosed in accordance with the settlement terms, a material omission? And if the disclosure provided shareholders a benefit, did the benefit conferred warrant the compromise of all plaintiffs' claims?

Materiality turns on whether "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." FN8 For purposes of this motion, it is enough that a reasonable Golden State stockholder might have considered the additional financials, especially those of privately-held CalFed, of some interest in deciding how to vote. The same can be said of CS First Boston's updated fairness opinion, although the most recent written fairness opinion did not differ substantially from the earlier issued opinion. Both opinions found that the proposed merger was fair. The later opinion did evaluate the most recent developments, but those recent developments, most notably the declining Golden State stock price, only served to make the proposed merger more attractive-a fact that would not have escaped a reasonably intelligent Golden State shareholder. Despite its somewhat limited impact, the more current, written fairness opinion, coupled with the additional financials, may have made Golden State's shareholders feel more secure and informed when casting their votes. Recognizing that, I conclude plaintiffs' counsel obtained the disclosure of additional, arguably material information.

FN8. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 944 (1985), *citing TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). *See also Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270, 1277 (1994).

***3** It is also true, however, that I cannot label this settlement as a magnificent shareholder victory. Plaintiffs' attorneys achieved a quite modest benefit for Golden State's shareholders. Even plaintiffs' counsel acknowledge that plaintiffs' claims had only a limited chance of success on the merits. This Court, nonetheless, has noted in similar circumstances that "even a meager settlement that affords some benefit for stockholders is adequate to support its approval." FN9 Accordingly, I approve the proposed settlement.

FN9. *In re Dr. Pepper/Seven Up Cos., Inc. Shareholders Litig.*, Del. Ch., C.A. No. 13109, 1996 WL 74214, at *4, Chandler, V.C. (Feb. 9, 1996, as corrected Feb. 27, 1996), *aff'd*, Del.Supr., 683 A.2d 58 (1996)
.

Turning to the request for attorneys fees, I first note that Delaware has no set method or fixed formula to assess an application for attorneys fees. FN10 As a result, Delaware courts examine the totality of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances when deciding whether a fee is appropriate. In cases like the present one involving therapeutic benefits, this Court typically examines the value of the benefit conferred, the complexities of the litigation, the skills applied by counsel, the contingent nature of the fee arrangement, time limitations, and the standing of counsel. FN11 Of those factors, the Court has given the size of the benefit conferred the greatest weight. FN12 Likewise, my analysis of the pending fee request will focus on the benefit conferred, as I find the remaining criteria to be typical in cases of this type and, therefore, not particularly helpful.

FN10. *Goodrich v. E.F. Hutton Group. Inc.,* Del.Supr., 681 A.2d 1039, 1046 (1996).

FN11. *Dr. Pepper,* 1996 WL 74214, at *5.

FN12. *See, e.g., In re Appraisal of Shell Oil,* Del. Ch., C.A. No. 8080 (consol.), Hartnett, V.C., 1992 LEXIS 228 , *11-*12 (Oct. 30, 1992); *In re Anderson Clayton Shareholders Litig.,* Del. Ch., C.A. No. 8387, ltr. op. at 3, 7, Allen, C. (Sept. 19, 1988); *Dr. Pepper,* 1996 WL 74214, at *5.

In order to justify the award of fees, the benefit generally must be specific and substantial. FN13 This Court has at times awarded fees even after concluding that the benefit created by the litigation was meager or speculative. In such cases, however, the Court often discounts the fees accordingly. FN14

FN13. *See Chrysler Corp. v. Dann,* Del. Ch., 223 A.2d 384 (1966).

FN14. *See, e.g., Zlotnick v. Metex Inc.,* Del. Ch., C.A. No. 9781, 1989 Del. Ch. LEXIS 159, at *3-*4, Hartnett, V.C. (Nov. 14, 1989) (court awarded only $60,000 in fees despite fact that value conferred was approximately $2.5 million. Special committee played larger role in causing benefit and plaintiff's counsel's contribution was "meager." Court called the $60,000 awarded "generous").

In the context of a therapeutic benefit case, fee awards are minimized where the benefit is intangible or limited in duration. FN15 Oftentimes, when this Court determines fee awards in a therapeutic benefit case, it uses a *quantum meruit* analysis. Under such an analysis, the Court adds a premium to the plaintiffs' attorneys typical noncontingency fee in proportion to the benefit the plaintiffs' attorneys achieved for their clients. FN16 But Delaware courts do not focus on hours expended as the essential inquiry. FN17

FN15. *Friedman v. Baxter Travenol Labs., Inc.,* Del. Ch., C.A. No. 8209, 1986 Del. Ch. LEXIS 367, at *14 -*15, Jacobs, V.C. (Feb. 18, 1986) (reduced fee to $200,000 plus out-of-pocket expenses despite request to award $385,000 because therapeutic value was questionable).

FN16. *Dr. Pepper,* 1996 WL 74214, at *5; *see also Chrysler Corp. v. Dann,* Del. Ch., 223 A.2d 384, 389 (1966) (applying *quantum meruit* analysis); *Sugarland Indus., Inc. v. Thomas.* Del.Supr., 420 A.2d 142, 152 (1980) (applying *quantum meruit* analysis); *Gilmartin v. Adobe Resources Corp.,* Del. Ch., C.A. No. 12467, Jacobs, V.C. (Order at 4) (June 29, 1992).

FN17. *Dr. Pepper,* 1996 WL 74214, at *5.

In cases generating nonquantifiable, nonmonetary benefits, this Court has juxtaposed the case before it with cases in which attorneys have achieved approximately the same benefits. FN18 The plaintiffs' attorneys in this case have requested a vastly higher fee than the typical fee this Court has awarded for settlements providing only therapeutic benefits. FN19 Recognizing that fact, as well as acknowledging the limited benefit the additional disclosures provided to Golden State shareholders, I find the proposed fee amount to be greater than the amount warranted by the benefit conferred.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN18. *Id.*

FN19. *Id.* (awarding $300,000 despite request for $690,000 in case in which plaintiffs settled disclosure claims in return for marginally material disclosures); *In re Chicago and Northwestern Transportation Co. Shareholders Litig.,* Del. Ch., C.A. No. 14109 (consol.), Chandler, V.C. (June 26, 1995) (awarding $300,000 despite request for $525,000 in case in which plaintiffs settled claims in return for the " disclosure of three possibly material facts" ); *Tandycrafts, Inc. v. Initio Partners,* Del.Supr., 562 A.2d 1162 (1989) (affirming award of $180,000 for therapeutic benefit); *Eisenberg v. Chicago Milwaukee Corp.,* Del. Ch., CA. No. 9374, Jacobs, V.C. (Oct. 25, 1988) (awarding $300,000 for therapeutic benefit); *In re Vitalink Communication Corp.,* Del. Ch., C.A. No. 12085, Chandler, V.C. (Nov. 8, 1991) (awarding $275,000 for therapeutic benefit).

In their brief in support of the settlement and proposed fee, plaintiffs cite four cases for the proposition that this Court has awarded attorneys fees for litigative efforts that lead to updated fairness opinions and enhanced disclosure to shareholders. Pls.' Br. at 26. They, however, fail to note the fees awarded in even those cases were substantially less than the fee proposed here. *See In re Transco Energy Company Shareholders Litig.,* Del. Ch., C.A. No. 13918, Jacobs, V.C. (July 24, 1995) (awarding $125,000 in fees); *Parnes v. Cook,* Del. Ch., C.A. No. 14357, Chandler, V.C. (March 19, 1996) (awarding $325,000 in fees); *Kwalburn v. Carreker,* Del. Ch., C.A. No. 15657, Balick, V.C. (June 17, 1998) (awarding $350,000 in fees); *In re Associated Natural Gas Corporation Shareholders Litig.,* Del. Ch., C.A. No. 13791, Chandler, V.C. (Jan. 24, 1995) (awarding $400,000 plus actual expenses).

In my opinion, an award of $500,000 is generous in the circumstances of this case. This reflects a modest risk premium over the compensation that plaintiffs' attorneys command in a noncontingency undertaking. A risk premium accounts for the contingent nature of the case and the intense effort required over a short time period by skilled lawyers, even though that effort produced a modest benefit. Plaintiffs' counsel represented that they invested " over 1000" hours in litigating this case, which includes the California cases. Multiplying this amount of time by $500 (which incorporates at least a 25% risk premium multiple) yields a reasonable fee (in my opinion) of $500,000. I have not awarded as large a risk premium as the plaintiffs' attorneys might have requested because plaintiffs' attorneys have not achieved as substantial a benefit for the shareholders as other attorneys have achieved in cases where I have granted the full attorneys fee request. In addition, the premium I have awarded in this case is commensurate with that awarded in similar, therapeutic benefit cases.

***4** The proposed settlement is approved. Plaintiffs' counsel are awarded fees and reimbursement of expenses in the amount of $500,000. An Order and Final Judgment has been entered.

ORDER AND FINAL JUDGMENT

The Stipulation and Agreement of Compromise, Settlement and Release, dated August 27, 1999 (the "Stipulation"), of the above-captioned lawsuit (the " Consolidated Action"), having been presented at the Settlement hearing on December 14, 1999, pursuant to the Scheduling Order for Approval of Settlement of Class Action entered herein on October 8, 1999 (the "Scheduling Order"), which Stipulation was joined and consented to by all parties to the Consolidated Action and which (along with the defined terms herein) is incorporated herein by reference; and the Court having determined that notice of said hearing was given in accordance with the Scheduling Order to members of the Class as certified by the Court in the Scheduling Order and that said notice was adequate and sufficient; and the parties having appeared by their attorneys of record; and the attorneys for the respective parties having been heard in support of the settlement of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Consolidated Action, and an opportunity to be heard as provided in the notice; and the entire matter of the Settlement having been considered by the Court;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, this 7th day of January, 2000, as follows:

1) The Notice of Pendency of Class Action, Temporary and Proposed Class Action Determination, Proposed Settlement of Class Action, Settlement Hearing and Right to Appear (the "Notice") has been given to the Class (as defined hereinafter), pursuant to and in the manner directed by the Scheduling Order, proof of the mailing of the Notice to the Class was filed with the Court by counsel for Defendants and full opportunity to be heard has been offered to all parties, the Class and persons in interest. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Delaware Court of Chancery Rule 23, and it is further determined that all members of the Class are bound by the Order and Final Judgment herein.

2) Pursuant to Court of Chancery Rules 23(a) , 23(b)(1) and 23(b)(2):

a) The Court finds that (i) the Class, as defined below, is so numerous that joinder of all members is impracticable, (ii) there are questions of law and fact common to the Class, (iii) the claims of the Plaintiffs are typical of the claims of the Class, (iv) plaintiffs will fairly and adequately protect the interests of the Class, and (v) questions of law and fact common to the members of the Class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy;

b) The Court finds that Plaintiffs and their counsel have adequately represented the interests of the Class with respect to the Consolidated Action and the claims asserted therein;

***5** c) The Court finds that the requirements of Court of Chancery Rules 23(b)(1) and (2) have been satisfied;

d) The Consolidated Action is hereby certified as a class action on behalf of all shareholders of Golden State Bancorp Inc. (the "Company") other than defendants and their immediate families who bought or held shares of Golden State on or after February 5, 1998, including the legal representatives, heirs, successors in interest, transferees or assigns of all such foregoing holders and owners, immediate and remote (the "Class"); and

e) Plaintiffs are hereby certified as Class representatives and their respective counsel are certified as Class counsel.

3) The Settlement and all transactions preparatory or incident thereto are found to be fair, reasonable and adequate and in the best interests of the Class, and it is hereby approved pursuant to Chancery Court Rule 23(e). The parties to the Stipulation are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Register in Chancery is directed to enter and docket this Order and Final Judgment in the Consolidated Action.

4) The Order and Final Judgment shall not constitute any evidence or admission by and party herein that any acts of wrongdoing have been committed by any of the parties to the Consolidated Action and should not be deemed to create any inference that there is any liability therefor.

5) The Consolidated Action and any and all claims, rights, causes of action, suits, matters and issues, known or unknown, liquidated or unliquidated, contingent or absolute, state or federal (including, without limitation, claims arising under the federal securities laws and the rules and regulations thereunder), in law or equity, that have been, could have been, or in the future could be asserted in the Consolidated Action or in any court, tribunal or proceeding by or on behalf of any member of the Class (as defined below), either directly, indirectly, derivatively, or in any other capacity, against the Director Defendants, Golden State, Cal Fed, First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Nationwide, MacAndrews & Forbes Holdings Inc., Ronald O. Perelman and Gerald Ford, or against any of their respective present or former directors, officers, agents, employees, attorneys, accountants, representatives, advisers, investment bankers, commercial bankers, trustees, parents, affiliates, subsidiaries, general and limited partners, heirs, executors, personal representatives, administrators, successors and assigns, or anyone else (collectively the “Released Parties”), in connection with, or arising out of or relating to, directly or indirectly, the subject matter of the Consolidated Action, or any of the acts, facts, transactions or occurrences alleged in any pleading filed by any party in the Consolidated Action, or which could have been asserted against any of the Released Parties in connection with the Consolidated Action are hereby compromised, settled, withdrawn, retracted, released and forever discharged and dismissed with prejudice.

***6** 6) Plaintiffs' attorneys are hereby awarded fees and expenses in the aggregate amount of $500,000 in connection with the Consolidated Action, which fees and expenses the Court finds to be fair and reasonable and which shall be paid to plaintiffs' attorneys in accordance with the terms of the Stipulation.

7) Without affecting the finality of this Order and Final Judgment in any way, this Court reserves jurisdiction over all matters relating to the administration and consummation of the Settlement.

Del.Ch.,2000.
In re Golden State Bancorp Inc. Shareholders Litigation
Not Reported in A.2d, 2000 WL 62964

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.