Tab 5



Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

**(Cite as: 1990 WL 201385 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.
In re KDI CORPORATION SHAREHOLDERS
LITIGATION.
**Civ. A. No. 10278.**

Submitted: Aug. 29, 1990.
Decided: Dec. 13, 1990.

Joseph A. Rosenthal, and Kevin Gross, of Morris,
Rosenthal, Monhait & Gross, P.A., Wilmington, of
counsel: Abbey & Ellis, New York City, Kohn,
Savett, Klein & Graf, P.C., Berger & Montague,
P.C., Philadelphia, Pa., Strauss & Troy, Cincinnati,
Ohio, and Wolf, Popper, Ross, Wolf & Jones, New
York City, for plaintiffs.

Edward P. Welch, Andrew J. Turezyn, and Stuart
M. Grant, of Skadden, Arps, Slate, Meagher &
Flom, Wilmington, of counsel: Taft, Stettinius &
Hollister, Cincinnati, Ohio, for defendant Eugene
A. Cafiero.

Allen M. Terrell, Jr., and Anne C. Foster, of
Richards, Layton & Finger, Wilmington, for
defendants KDI Corp. and the Remaining
Individual Defendants.

*MEMORANDUM OPINION*

BERGER, Vice Chancellor.

**\*1** This is the decision on a motion to dismiss a
purported class action brought by stockholders of
KDI Corporation ("KDI"), attacking a management
leveraged buyout of KDI. The Consolidated
Amended Complaint (hereafter the "Complaint"),
names as defendants, among others, KDI, its board
of directors and Ariadne Australia Ltd. ("Ariadne"),

KDI's largest stockholder. The Complaint alleges
that defendants breached their fiduciary duties of
care, loyalty and candor during the course of the
merger negotiations by: (i) favoring the
management group's bid and thereby preventing a
fair auction for KDI; (ii) failing to reasonably
inform themselves as to the best available
transaction; and (iii) failing to make full disclosure
in the Offer to Purchase.

Plaintiffs' motion for a preliminary injunction was
denied on November 1, 1988 for failure to establish
a likelihood of success on the merits. *See In re
KDI Corp. Shareholders Litigation,* Del.Ch., Civil
Action No. 10,278 Consolidated, Berger, V.C.
(November 1, 1988). Plaintiffs made no effort to
amend their complaint after taking discovery in
connection with the preliminary injunction
application and, for many of the same reasons as
expressed in the preliminary injunction decision, I
conclude that the Complaint should be dismissed
without leave to amend.

The relevant facts may be summarized as follows.
[FN1] KDI and its subsidiaries manufacture and
sell pyrotechnic ammunition components, precision
timing mechanisms and other electrical and
electronic components. As of June 30, 1988, KDI
had approximately 9.7 million shares of common
stock outstanding and 49.7% of that stock was
owned by Ariadne and its affiliates. Ariadne is an
Australian based investment company that, early in
1988, wrote down approximately $A500 million in
assets. During the three years before these actions
were filed, KDI stock traded on the New York
Stock Exchange at prices ranging from a high of
$19.63 during the third quarter of 1987 to a low of
$8.50 during the fourth quarter of 1987. As of
June 7, 1988, the last trading date prior to the
events described hereafter, the closing price was
$11.65 per share.

At all relevant times, there were nine directors on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

**(Cite as: 1990 WL 201385 (Del.Ch.))**

KDI's board. Eugene A. Cafiero ("Cafiero") was President, Chief Executive Officer and Chairman of the Board of KDI. In addition, during the first six months of 1988, he was also Chief Executive Officer of Ariadne. Cafiero is a principal of Holdings, the corporation formed to effectuate the merger described hereafter. Messrs. Edwards, Maloney, Strange and Corlett are the other directors of KDI that plaintiffs claim are interested. Their interest arises, according to plaintiffs, from the fact that they are officers or directors of Ariadne or affiliated companies.

On June 8, 1988, Ariadne informed KDI's directors that it had decided to explore alternatives to maximize the value of its investment in KDI, including the possible sale of its 49.7% block of stock. At the same time, Cafiero advised the board that he was considering making a proposal to purchase the company. In response to these developments, the board appointed a special committee (the "Special Committee") to evaluate alternatives that would maximize stockholder value, including the possible sale of KDI. A press release describing these events was issued on the same day.

*2 The Special Committee originally included all of the KDI directors except Cafiero and Maloney (then the chairman of an Ariadne affiliate). However, several members of the Special Committee expressed concern about the presence of Corlett, Edwards and Strange on the committee because of their affiliation with Ariadne. In response to those concerns, the board reconstituted the Special Committee at its meeting on July 7, 1988, making Edwards and Strange alternates for Corlett.

Over the next few weeks the Special Committee retained legal counsel and a financial adviser, Salomon Brothers, Inc. ("Salomon"). On August 3, 1988, Cafiero proposed a procedure pursuant to which he would be willing to make an acquisition offer to the Special Committee. The procedure called for a commitment on the part of KDI that the company would not solicit any other offers. The Special Committee rejected Cafiero's proposed procedure. A few days later, Cafiero advised the

Special Committee that he would be willing to make an offer to acquire all of the outstanding shares of KDI through a tender offer and follow-up merger at $18.00 per share. The Special Committee and Salomon considered that offer at a meeting on August 10, 1988. Corlett told the Special Committee that the price being offered was unacceptable to Ariadne and the Special Committee rejected the Cafiero offer. At that meeting the Special Committee also directed Salomon to continue its preparation for the solicitation of bids for the company.

For about one month, beginning in mid-August, 1988, Salomon contacted approximately 100 potential purchasers and provided follow-up information to those that expressed interest and executed confidentiality agreements. On September 13, 1988, the Special Committee met to consider both Salomon's report on the solicitation of bids and Cafiero's new offer of $19.00 per share. After Salomon expressed the view that negotiations with Cafiero should be pursued, the Special Committee authorized Salomon to do so. On September 19, 1988, KDI announced that the Special Committee was engaged in talks concerning the possible acquisition of the company by Cafiero at $19.00 per share. Two days later, after the Special Committee unanimously determined that the offer was fair (based in part on Salomon's opinion to that effect), KDI entered into the Merger Agreement with Holdings and Acquisition.

Pursuant to the terms of the Merger Agreement, Acquisition was to commence a tender offer for all shares of KDI at $19.00 per share. The offer was to be open for at least 25 business days and was to begin five days after the announcement of the transaction. The Merger Agreement expressly allowed KDI to furnish confidential information to and participate in discussions and negotiate with any entity interested in a merger or other similar transaction. The only limitation was that neither KDI nor the Special Committee could solicit such interest. If a better offer materialized, the directors of KDI were free, under the Merger Agreement, to withdraw their recommendation in favor of the tender offer and merger and thereby terminate the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

**(Cite as: 1990 WL 201385 (Del.Ch.))**

Merger Agreement.

**\*3** In connection with the Merger Agreement, Ariadne and its affiliates entered into a Stock Purchase Agreement with Holdings and Acquisition. Under the terms of that agreement, Ariadne was to receive $19.00 per share plus what plaintiffs call an "override" equal to one-half of the difference between $19.00 per share and any higher price that Holdings might receive if it were to sell the stock it was acquiring from Ariadne within one year after closing. In consideration for the payment and the override, Ariadne agreed not to vote its stock in favor of any alternative merger plan. The Stock Purchase Agreement would have terminated if the Merger Agreement had been terminated in accordance with its terms.

On September 27, 1988, Acquisition commenced a tender offer to purchase all outstanding shares of KDI common stock. That offer was set to expire on November 1, 1988 and, presumably, the merger was consummated shortly thereafter.

Plaintiffs complain that the Special Committee breached its fiduciary duties of care and loyalty in carrying out its assignment to explore alternatives to maximize stockholder value. The due care argument seems to be that the Special Committee favored management and took certain steps that improperly tilted the playing field. As a result, according to plaintiffs, the Special Committee never undertook a fair auction and never learned or obtained the highest possible price for KDI.

In order to establish a breach of the duty of care, plaintiffs must plead and prove that the directors were not reasonably informed. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). The directors' lack of information must amount to gross negligence in order to be actionable. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 873 (1985). In the context of a change of control, "there is no single blueprint that a board must follow to fulfill its duties." *Barkan v. Amsted Indus., Inc.,* Del.Supr., 567 A.2d 1279, 1286 (1989). There is *no* requirement that there be a bidding contest or even an active market survey. Unquestionably, the

directors must be informed if their decision is to be upheld. However, there is no special method that must be followed to satisfy the duty of due care. *Id.* at 1287.

According to plaintiffs, the Special Committee failed in its duty of due care by (i) waiting until Cafiero made his first offer before seeking other bidders; (ii) failing to pursue expressions of interest by third parties who might have paid more than management; and (iii) in connection with the Merger Agreement, approving the Ariadne Stock Purchase Agreement, which "locked up" 49.5% of KDI's stock and agreeing not to pursue alternative transactions. These allegations cannot sustain a due care claim in light of the other facts alleged in the Complaint and set forth in the Offer to Purchase.

Plaintiffs acknowledge, for example, that KDI was publicly "for sale" as of June 8, 1988 and that the Special Committee sought bidders for KDI after Cafiero's first offer in August. Complaint, ¶ 18. The Merger Agreement was not executed until September 21, 1988. Complaint, ¶ 22. Thus, the Complaint alone establishes that the company was in play for more than three months and that the Special Committee was seeking third party bidders for at least the last month of that time frame.

**\*4** The Offer to Purchase provides greater detail on the question of whether the Special Committee was adequately informed as to the value of KDI. As noted earlier, the Special Committee retained Salomon and that firm contacted approximately 100 potential purchasers in addition to advising the Special Committee as to the fairness of Cafiero's second offer. Given these facts, it cannot be said that the Special Committee was uninformed as to the value of KDI.

The limitations contained in the Stock Purchase Agreement and Merger Agreement, likewise, provide no basis for a claim that the Special Committee breached its duty of care. First, those agreements were not executed until the process of selling KDI was at a close. Second, although those agreements, while in effect, would have precluded an alternative transaction, the agreements could

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

**(Cite as: 1990 WL 201385 (Del.Ch.))**

have been terminated if a higher offer had been made. Third, the Merger Agreement refutes the general allegation that the Special Committee failed to pursue possible higher offers. By its terms, the Merger Agreement permits the Special Committee to provide confidential information to and negotiate with any possible higher bidder. In sum, while the Special Committee may not have taken all of the steps plaintiffs would have preferred, the Complaint itself negates any inference that the Special Committee acted without due care.

Plaintiffs' second claim is that the Special Committee breached its duty of loyalty by favoring management at the expense of KDI's stockholders. The duty of loyalty claim turns on plaintiffs' view that Ariadne was "interested" in this transaction. Using this as a premise, plaintiffs argue that five of the nine KDI directors were interested--Cafiero because he was a member of the buyout group and Corlett, Edwards, Strange and Maloney because they were appointed by Ariadne.

No one disputes the fact that Cafiero stood on both sides of the transaction and, thus, was interested. *Aronson,* 473 A.2d at 812. However, the fact that four other directors were affiliated with or appointed by Ariadne does not, without more, constitute a conflict. *Yanow v. Scientific Leasing, Inc.,* Del.Ch., Civil Action Nos. 9536 and 9561, Jacobs, V.C. (February 5, 1988) at 13. Plaintiffs argue that Ariadne was not simply a major stockholder that, like the other stockholders, would want to obtain the best possible value for its stock. The Complaint alleges that Ariadne was in "disastrous financial condition" at the beginning of 1988 (Complaint, ¶ 13) and wanted to quickly liquidate its holdings in KDI in order to obtain cash for a possible restructuring. Complaint, ¶ 32. Based upon these allegations, plaintiffs argue that Ariadne was willing to unload its stock, even at an unfair price, in order to satisfy other pressing financial needs.

Here, again, the Complaint itself refutes any inference that Ariadne was so motivated. For example, plaintiffs allege that by the summer of 1988, Ariadne's financial condition had stabilized.

Complaint, ¶ 13. In addition, although Ariadne announced its decision to consider the sale of its KDI shares in early June, 1988, the Stock Purchase Agreement was not executed until three months later and there is nothing in the Complaint to suggest that Ariadne was pressing for a quick sale. To the contrary, Ariadne apparently was willing to hold out for the right price since it is alleged that Ariadne (through Corlett) rejected Cafiero's $18.00 per share offer. Complaint, ¶ 20. Reading all of the relevant allegations together, I conclude that they do not support an inference that the Ariadne board members were conflicted or interested by virtue of Ariadne's alleged desire to sell at any price.

**\*5** Finally, plaintiffs claim that defendants breached their duty of candor by failing to disclose certain material facts in the Offer to Purchase. These disclosure claims, set forth in one paragraph of the Complaint, were considered and rejected in connection with plaintiffs' motion for a preliminary injunction. *See In re KDI Corp. Shareholders Litigation,* Del.Ch., Civil Action No. 10,278 (Consolidated), Berger, V.C. (November 1, 1988). Little more needs to be added in the context of this motion to dismiss. Although some non-disclosure allegations may not be susceptible to resolution on a motion to dismiss, it does not follow that all non-disclosure allegations fall in that category. For an omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TCS Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976), quoted with approval in *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985). Plaintiffs offered no reasons, either in their Complaint or their brief, why a reasonable stockholder would find it significant, for example, to know why there was a 60% minimum as a condition to the tender offer. Disclosure claims do not survive a motion to dismiss simply because they are inserted in the Complaint. There must be some basis from which this Court can infer that the non-disclosures were material and plaintiffs have offered none in this case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

**(Cite as: 1990 WL 201385 (Del.Ch.))**

Based upon the foregoing, defendants' motion to dismiss is granted. *IT IS SO ORDERED.*

> FN1. The facts are drawn from the Complaint and the following documents that were referred to and relied upon in the Complaint--the KDI Acquisition Corp. ("Acquisition") Offer to Purchase dated September 27, 1988 (the "Offer to Purchase") and two exhibits thereto, the Agreement and Plan of Merger dated September 21, 1988 (the "Merger Agreement") and the Stock Purchase Agreement dated September 21, 1988 (the "Stock Purchase Agreement") between Ariadne and its affiliates, Acquisition and KD Holdings Corp. ("Holdings"). *See Lewis v. Straetz,* Del.Ch., Civil Action No. 7859, Hartnett, V.C. (February 12, 1986).

Not Reported in A.2d, 1990 WL 201385 (Del.Ch.), Fed. Sec. L. Rep. P 95,727

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 6



Not Reported in A.2d                                                                                     Page 1

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

**c**
Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re TALLEY INDUSTRIES, INC. SHAREHOLDERS LITIGATION
No. Civ.A. 15961.

Date Submitted: March 20, 1998
Date Decided: April 9, 1998
April 13, 1998.

Joseph A. Rosenthal , and Norman M. Monhait , of Rosenthal, Monhait, Gross & Goddess, P.A. , Wilmington, Delaware, of counsel, Robert I. Harwood , and Jeffrey M. Haber , of Wechsler Harwood Halebian & Feffer LLP , New York City, Stanley D. Bernstein , Sandy A. Liebhard and Mary U. Hoover , of Bernstein Liebhard & Lifshitz, New York City, for plaintiff.
Martin P. Tully , Alan J. Stone and David J. Teklits , of Morris, Nichols, Arsht & Tunnell , Wilmington, Delaware, Jack C. Crim , Alex Stamatakis , Donald J. Ulrich , Paul L. Foster , Joseph A. Orlando , Fred Israel , John W. Stodder , David Victor and Talley Industries, Inc., for defendants.
Wayne N. Elliott and Samuel D. Brickley, II , of Prickett, Jones, Elliott, Kristol & Schnee , Wilmington, Delaware, of counsel, James E. Tolan and Catherine A. Duke , of Dechert Price & Rhoads, New York City, for Score Acquisition Corporation and Carpenter Technology Corporation.
Arthur G. Connolly, Jr. and Arthur G. Connolly, III , of Connolly, Bove, Lodge & Hutz , Wilmington, Delaware, Matthew J. Ferretti , of Richards, Layton & Finger , Wilmington, Delaware, of counsel, Robert M. Krasne , George A. Borden and Stacey M. Bosshardt , of Williams & Connolly, Washington, D.C., for Saad A. Alissa and Ralph A. Rockow.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

**I. INTRODUCTION**

*1 This consolidated litigation arises out of the recently completed two-step acquisition of Talley Industries, Inc. ("Talley") by Carpenter Technology Corporation ("Carpenter") and its wholly owned subsidiary, Score Acquisition Corporation, all Delaware corporations. In both the tender offer and the second step merger, the common stockholders of Talley received $12.00 per share in cash for their Talley stock.

The initial complaint in this matter was filed on September 26, 1997, the day the transaction was announced. During the course of expedited discovery proceedings undertaken in anticipation of a motion for preliminary injunction, the parties reached an agreement in principal to settle the claims asserted. Following further discovery, that agreement was incorporated into the January 23, 1998 Stipulation and Agreement of Compromise, Settlement and Release, which is now before the Court for approval.

Two large stockholders of Talley, Saad A. Alissa and Ralph A. Rockow (who was also a director of Talley) (together "Objectors"), appearing through counsel, have raised objections to the proposed settlement, both in writing and orally at the hearing held March 20, 1998 to consider the settlement proposed. For the reasons discussed herein, I conclude that the objections raised are not well-founded and must be overruled. Moreover, I conclude that the settlement proposed is fair, reasonable and adequate and in the best interests of the class; for these reasons it should be approved in the form submitted. Finally, I conclude that the plaintiffs' application for attorneys' fees and costs is reasonable and appropriate and should be approved.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

## II. BACKGROUND

Talley is, or was, a Delaware corporation with its principal place of business in Phoenix, Arizona. Talley is a diversified manufacturer of a wide range of proprietary and other specialized products for defense, industrial and commercial applications.

### A. *The 1997 Annual Meeting Contest*

Objector Saad Alissa first began to accumulate shares of Talley common stock in 1994. Eventually, his holdings exceeded 5 percent of the class of common shares; thus, he became obligated to report his holdings on Schedule 13D. In early 1997, Mr. Alissa, as the head of a dissident group of Talley stockholders calling itself the Shareholders' Committee to Remove Entrenched and Arrogant Management ("SCREAM"), announced publicly that it was considering engaging in a proxy contest to elect directors at the Tally 1997 Annual Meeting. In early February, Mr. Alissa notified Talley that he intended to nominate at least two candidates, including Messrs. Robert Craig and Ralph Rockow, and further intended to present a series of shareholder proposals recommending that the Talley board take certain actions (including the hiring of an investment banking firm for the purpose of evaluating the Company) designed to weaken or eliminate the Company's antitakeover protections.

The 1997 Annual Meeting was held on May 8, 1997, at which Mr. Alissa's two nominees, Craig and Rockow, were elected. Their election was certified on May 27, 1997, at which time it was also announced that all of the precatory proposals sponsored by Mr. Alissa and SCREAM had been approved by the stockholders.

### B. *The Mallender Settlement*

**\*2** On June 3, 1997, Mr. William Mallender, who had been defeated for reelection, resigned as Chairman and Chief Executive Officer of Talley. Admiral Paul L. Foster, a member of the Board of Directors, was named Chairman and CEO.

Thereafter, the Executive Committee of the Talley board undertook to negotiate a settlement of Mr. Mallender's compensation package with him. The minutes of the June 16, 1997 meeting of that committee, of which Rockow was a member, reflect the wide variety of issues considered by its members. Ultimately, the Executive Committee recommended a settlement package to the Board of Directors which considered that recommendation at a special meeting held on June 18-19, 1997. The minutes of the meeting of the Board of Directors also reflect a wide range of subjects considered in regard to the Mallender settlement. The board voted 8 to 2 to approve the recommendation made by the Executive Committee. Messrs. Craig and Rockow specifically expressed their agreement with the financial terms of the recommended severance package but voted against the Executive Committee's recommendation solely because "they did not agree that there should be a mutual release between the Company and Mr. Mallender."

### C. *The Board's Search for Alternatives*

At its meeting on March 4, 1997, the Talley board of directors unanimously determined to retain the services of an investment banking firm for the purpose of providing the company strategic advice. After some investigation, the board retained J.P. Morgan Securities Inc. ("J.P.Morgan") as its banker. The board specifically instructed J.P. Morgan to investigate all alternatives available to Talley at the time for a new strategic direction, including, *inter alia,* a "sale, merger, consolidation, joint venture, or any other business combination or extraordinary transaction, in one or a series of transactions, involving all or a material portion of the stock, assets, or business of the Company."

On June 19, 1997, J.P. Morgan presented its initial findings to the Board. J.P. Morgan described various alternatives including a "stay the course" strategy, a sale or spin-off of certain of the Company's businesses, or the sale or liquidation of the Company. The directors postponed until their next meeting a decision on how best to proceed. Meanwhile, on June 12, 1997, the Company received an indication of interest in the purchase of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

Page 3

one of the Company's subsidiaries in the government service and products segment. The Company responded to the person making the proposal, stating that it would not consider any proposals until it had concluded its strategic review.

The Board of Directors met again on July 22 and 23, 1997 to resume its consideration of strategic alternatives and to hear further from J.P. Morgan about the results of its work. The Board of Directors unanimously determined to pursue a sale of the Company as a whole and voted to retain J.P. Morgan to explore such a transaction and to advise the directors in connection therewith. Alternative proposals to sell one or more units were rejected because tax and other considerations made them less valuable and attractive than a sale of the Company as a whole. Craig and Rockow, Alissa's two board designees, participated in these meetings and agreed with the determination that a sale of Talley as a whole was the value maximizing alternative.

*3 On August 1, 1997, Talley received from Carpenter a non-binding indication of interest to purchase all of Talley's outstanding common stock for $10 per share, including a stated willingness to increase the proposed price after receipt of additional information about one segment of Talley's business. Following consultation with the Board of Directors, J.P. Morgan and senior management, Admiral Foster rejected this offer but agreed to enter into a confidentiality agreement with Carpenter for the purpose of sharing non-public information about Talley. On August 7, 1997, having reviewed additional information, Carpenter raised its offer to $12 per share, subject to further due diligence. Talley agreed to Carpenter's request for a 45 day due diligence period and to a limited form of exclusivity during that time. The confidentiality agreement provided that Talley would not initiate, solicit, or encourage other offers for Talley during this period, but that Talley was free to participate in discussions or negotiations with, and provide confidential information to third parties if Foster determined in good faith, after receiving advice from J.P. Morgan, that such third party had submitted a *bona fide* proposal or indication of interest that was, or could reasonably

be expected to lead to, an acquisition proposal that was financially superior to Carpenter's $12 per share proposal.

During the month of August and until the execution of the merger agreement on September 25, 1997, Talley and J.P. Morgan received a number of inquiries from third parties concerning possible transactions involving Talley as a whole, or certain of its businesses. None of these contacts ripened into a proposal superior to the $12 per share Carpenter proposal.

**D. *The Board of Directors Accepts Carpenter's Merger Proposal***

On September 25, 1997, the Board of Directors met to consider the terms of the proposed transaction with Carpenter. Craig and Rockow made a motion at the meeting to adjourn for two weeks to afford additional time to review and consider the Carpenter proposal. They also delivered a written memorandum to the Board of Directors (" September 25 Memorandum"), setting forth the reasons for their motion and, thus, their opposition to the Carpenter transaction. The motion to adjourn was defeated by a vote of 8 to 2. Thereafter, J.P. Morgan delivered its oral opinion to the Board that the proposed Carpenter transaction was fair to the stockholders of Talley from a financial point of view. The transaction was then approved by a vote of 8 to 2, Craig and Rockow dissenting.

Craig and Rockow voted against the transaction for the reasons expressed in the September 25 Memorandum. On October 1, 1997, Mr. Rockow's Arizona attorneys wrote to Admiral Foster raising concerns about the disclosures already made in connection with the public announcement of the merger with Carpenter and to be made in a tender offer or proxy soliciting materials. That letter concluded by stating that, if adequate disclosure was made (including the reasons he and Craig dissented on the vote approving the merger) Mr. Rockow "is willing to let the stockholders decide whether to accept the Carpenter terms."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 4

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
(Cite as: Not Reported in A.2d)

### E. *The Litigation*

**\*4** The Board's approval of the Carpenter merger proposal was announced on September 26, 1997. Carpenter began its first step, any and all cash tender offer on October 2, 1997. The defendants' Schedules 14D-1 and 14D-9 were disseminated to Talley stockholders at that time.

The first of the six lawsuits to challenge the merger was filed September 26, 1997. After their receipt and review of the tender offer materials, the plaintiffs updated and expanded their allegations of wrongdoing in an amended complaint filed October 8, 1997. Among other things, the amended complaint alleges that the defendant directors failed to fulfill their fiduciary duty to act reasonably to maximize value in the sale of the Company and that the tender offer materials were false and misleading, *inter alia,* in their failure to disclose the reasons given by Craig and Rockow (in the September 25 Memorandum) for voting against the merger.

After filing their amended complaint, the plaintiffs moved for a preliminary injunction and began discovery, obtaining documents from the defendants and J.P. Morgan. According to the March 16, 1998 affidavit of the plaintiffs' lead counsel, Stanley D. Bernstein ("Bernstein Affidavit"), plaintiffs also sought from Alissa, Craig and Rockow any information that would help in prosecuting the case. In a conversation held on October 7, 1997, Robert Krasne, of Williams & Connolly, Alissa's lawyers, told Bernstein that the Board of Directors of Talley had improperly favored a sale of the Company as a whole, rather than a division by division transaction, in order to insulate themselves from liability for past conduct. When Bernstein inquired about the facts supporting this claim, Krasne pointed only to the terms of the merger agreement dealing with the continuation for a period of six years of Talley's directors and officers liability insurance coverage and associated provisions in Talley's charter and bylaws, which he claimed were unusual and suggested an improper motivation on the part of the Talley directors . FN1 Based on his prior experience, Bernstein told Krasne that such provisions are commonplace and do not suggest any improper motivation on the part of directors.

FN1. The record before the Court establishes that the merger agreement terms regarding, exculpation, indemnification and insurance are typical of those commonly found in transactions of this type. The Talley Certificate of Incorporation contained a provision exculpating Talley directors from personal liability to Talley or its stockholders to the fullest extent authorized by 8 *Del.C.* § 102(b)(7). The Talley bylaws also contained provisions mandating indemnification of the Talley directors "to the fullest extent permitted or authorized by the General Corporation Law of the State of Delaware." There also existed between Talley and each of its directors, contractual provisions regarding the procedures for claiming a right to indemnification.
Section 5.5 of the Talley/Carpenter merger agreement requires the surviving corporation to assume the pre-existing exculpation and indemnification obligations of Talley to its officers and directors, to honor those obligations for a period of six years and (subject to a cost limitation) to maintain directors and officers liability insurance on terms and amounts no less favorable than those preexisting the merger.

Bernstein contacted counsel for Rockow in an effort to learn whether or not there were facts to support Alissa's suggestion that a division by division transaction would yield greater value. Rockow's attorney advised Bernstein that Rockow's goal was for Talley's shareholders to be advised of the substance of his opposition to the Carpenter transaction, as set forth in the September 25 Memorandum. FN2

FN2. The September 25 Memorandum is Exhibit B to the Bernstein Affidavit. In addition to expressing concerns about the timing of the Board's consideration of the Carpenter merger proposal, that memorandum also complained, at page 2,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

as follows:

the entire Board has not been advised about, or had the opportunity to evaluate, other inquiries which might result in superior proposals for Talley and the stockholders and we are concerned that the $6 million termination fee could create a significant impediment to other viable proposals.

Craig was interviewed on the record on October 15, 1997. In his interview, he stated that he and Rockow were displeased "with the pace at which [the Board] was proceeding," and felt that it would be better to "stay the course" in order to realize the long term values in the Company. Craig stated, in his interview, that these were the only two objections either he or Rockow had to the merger with Carpenter. Rockow resisted appearing.

**\*5** On October 16, 1997, the plaintiffs entered into a memorandum of understanding providing for substantial additional disclosure by the defendants in connection with the tender offer and merger. Importantly, the supplemental disclosure includes the content of the September 25 Memorandum, together with information concerning other possible bidders for Talley, including the dollar amounts of other proposals, and an analysis of the liquidation value of Talley. Plaintiffs tentatively agreed to settle the action in consideration of this additional disclosure after their initial discovery raised serious questions about the validity of their claims attacking the process followed by the Board of Directors in reaching the agreement to merge with Carpenter.

After the memorandum of understanding was signed, plaintiffs' counsel undertook further, limited discovery to assure themselves that the terms of the proposed settlement were fair, reasonable and adequate. In this regard, they continued to press for Rockow's testimony. On October 29, 1997, Rockow's lawyer rejected a request that Rockow, who resides in Arizona, appear in response to a subpoena issued out of this Court. Rather, Rockow's counsel wrote seeking to delay Rockow's appearance until an arrangement could be made for the payment by Talley of his attorneys' fees and expenses. This same letter acknowledges an awareness that the deposition was needed to confirm the adequacy of the proposed settlement. Finally, on November 11, 1997, Rockow's attorney wrote Bernstein as follows:

With respect to your request for a telephonic interview or deposition of Ralph Rockow, please be advised that, at this point, *he is disinterested in the lawsuit or perpetuating the litigation.* You should reconsider whether you need his deposition. (emphasis added)

### F. *The Settlement*

Plaintiffs' counsel then concluded their confirmatory discovery and entered into the final stipulation and agreement of settlement on January 23, 1998. The supplemental disclosures, made in accordance with the terms of the memorandum of understanding, form the essence of the consideration flowing to the class as a result of the settlement of the action. The class is proposed to be certified pursuant to Rules 23(b)(1) and (b)(2), as is usual in actions challenging the exercise of fiduciary responsibility in corporate merger transactions, and does not contemplate the ability of class members to "opt out." *See Hynson v. Drummond Coal Co.,* Del.Ch., 601 A.2d 570, 575 (1991). Moreover, as is usual in matters of this sort where no other litigation is pending in any federal or state court, the terms of the settlement provide for the dismissal of the action and the release of all claims which have been or could have been asserted in the action, or which arise from or relate to the events described in the action. Thus, if the settlement is approved, the proposed judgment would preclude all members of the class from litigating in any other court claims arising out of the merger, including claims arising under the Securities Exchange Act of 1934 ("1934 Act") over which the federal courts have exclusive jurisdiction. *Matsushita Electrical Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

### III. THE OBJECTION

### A. *The Threat of Litigation*

Not Reported in A.2d                                                        Page 6

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
(Cite as: Not Reported in A.2d)

**\*6** Before turning to an analysis of their legal merit, I find it necessary to discuss events leading to the lodging of the objections by Alissa and Rockow. Alissa claims that he is entitled to be reimbursed by Talley for more than $700,000 in fees and expenses incurred by him in connection with the 1997 proxy contest. The record before me strongly suggests that the decision to lodge objections to the Settlement was related to Alissa's efforts to force the payment or settlement of that claim. For the reasons discussed herein, this suggested connection necessarily colors the Court's consideration of the objections.

In accordance with this Court's order of January 26, 1998, directing the giving of notice of the proposed settlement, all objections thereto were to be filed by March 10, 1998. On February 26, 1998, Mr. Krasne, of Williams & Connolly, Alissa's counsel, wrote to John R. Welty, Vice President, General Counsel and Secretary of Carpenter as follows:

This firm represents Saad A. Alissa, an individual who has been a shareholder in Talley Industries, Inc. ("Talley"). As you may be aware, Mr. Alissa held discussions with the former management and Board of Talley over an extended period of time concerning a variety of issues that he identified concerning the operations and management of Talley. After being rebuffed repeatedly by Talley's management, Mr. Alissa took his case to the shareholders of Talley, who, in conjunction with the 1997 Talley Annual Meeting, voted to end the reign of William Mallender as Talley's Chairman and chief executive officer. FN\*

FN\* Indeed, in conjunction with that proxy contest, Mr. Alissa announced his intention to place a number of proposals before the Talley shareholders, including the question of whether Talley should engage an investment banker to review Talley's circumstances. That announcement prompted Talley to engage J.P. Morgan and began a series of events that ultimately led to the sale of Talley.

Mr. Alissa has repeatedly requested that Talley reimburse him for the expenses he incurred in conjunction with the 1997 Talley proxy contest. Notwithstanding suggestions to the contrary, we are aware of no meaningful action taken by the Talley Board to address his request. Mr. Alissa believes that the actions he took with respect to the proxy contest inured to the benefit of Talley and its shareholders. Because no action has been taken concerning his request for reimbursement of his proxy expenses, he feels compelled to file the enclosed draft complaint.

Mr. Alissa also has concerns about the conduct of Talley's Board, and, in particular, its failure to disclose adequately a variety of significant issues and decisions of import to the Talley shareholders. The Talley Board's disclosure failures give rise to liability for which we understand the Board is indemnified by Carpenter Technology Corporation ("Carpenter") under the terms of the Talley/Carpenter merger agreement. Because Carpenter may ultimately be responsible for these matters under the terms of Talley's merger with Carpenter, Mr. Alissa is advising you of his intention to file the two enclosed complaints and to pursue his lawful remedies. FN\*\* If Carpenter or Talley are aware of any reason why Mr. Alissa should not File these complaints, please contact me within the next ten days to advise me of the basis for such belief.

FN\*\* In addition, Mr. Alissa has directed me to advise you of his intention to file with the Delaware Chancery Court objections to the proposed agreement. Mr. Alissa also intends to be represented at the March 20 hearing.

**\*7** Very truly yours,
Robert M. Krasne

Attached to this letter were drafts of the two complaints Alissa was said to "intend" to file, although, at least as of the March 20 hearing, neither complaint had been filed. FN3 The first of these drafts is captioned in the United States District Court for the District of Arizona and relates only to Alissa's claimed entitlement to reimbursement of his proxy expenses. Talley is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

only named defendant. That draft complaint is of relevance to the Court's consideration of the proposed settlement and the objections because it reveals an ulterior motive behind the objection to the settlement and contradicts a fundamental premise of the objection by repeatedly and strenuously alleging that the Talley/Carpenter merger was a substantial benefit to the Talley shareholders. For example, the following is alleged:

> FN3. Only the second of these draft complaints, purporting to allege substantive claims against the Board regarding the Talley/Carpenter merger, is attached to the Notice of Intent to Appear and Object filed by Alissa and Rockow in this Court.

• Alissa's 1997 proxy solicitation "directly led to a change in management and subsequently to the sale of the Company for the benefit of all shareholders...." (¶ 1)
• Talley "would not have entertained any offers for the sale of its stock, nor entered an agreement to permit the acquisition of the Company if plaintiff had not been successful in his proxy contest." (¶ 34)
• The expenses Alissa incurred "accrued benefit to the shareholders and the Company by directly and/or indirectly causing and/or enabling Carpenter to offer and the Company to accept the merger proposal whereby shareholders were able to surrender their stock for $12.00 per share." (¶ 42)
• Alissa's proxy solicitation activities "provided substantial benefit to the Company and its shareholders by directly and/or indirectly leading to the acquisition of the Company by Carpenter." ( ¶ 52)

The second draft complaint reflects a rather different view of the Talley/Carpenter merger. This draft is captioned in the United States District Court for the District of Delaware and purports to make claims against Talley directors (other than Craig and Rockow) under the federal securities laws and Delaware fiduciary duty law. The complaint is a hodgepodge of allegations of mismanagement or misconduct by Mallender or the Talley Board. The complaint claims that the Schedule 14D-9 and the merger proxy statement, both of which were issued after Craig and Rockow had been directors for some months, were false and misleading as the result of the omission or misrepresentation of the information about this alleged misconduct and that, as a result, Alissa was "forced to sell his shares at a price substantially below" their true value. (¶ 101)

The gist of this draft complaint is found in a series of allegations that Mallender, during his tenure as Chairman and Chief Executive Officer, engaged in illegal or fraudulent conduct (including alleged insider trading) which, eventually, became known to the Board of Directors and which is said to have violated the terms of Mallender's employment agreement. The draft complaint alleges in conclusory terms that the directors: (i) failed to initiate action against Mallender on account of his misdeeds, but rather authorized the expenditure of corporate funds in opposition to Alissa's proxy contest and in support of Mallender's reelection, (ii) improperly authorized the settlement of Mallender's severance compensation claims when, it is alleged, they knew that Mallender was in breach of his employment contract and that no amounts were due thereunder, (iii) failed to disclose either Mallender's misdeeds or their own misconduct in either the Schedule 14D-9 disseminated in connection with the tender offer or the merger proxy statement. It is alleged that the Board "knew of Mallender's liability (and their own) prior to issuing the Schedule 14D-9 on October 2, 1997." (¶ 98h) And, it is further alleged that "[b]y concealing a cause of action on behalf of Talley of which they knew, and which would be extinguished by ratification of the merger agreement, [the defendant directors] failed to disclose an asset of Talley worth $6,000,000 [roughly the amount of the Mallender severance payment] of which they were aware." (¶ 99)

**\*8** Surprisingly, in light of Alissa and Rockow's lack of cooperation with the plaintiffs' counsel in this case, the draft complaint (¶¶ 66-67) claims that the charges against Mallender of alleged insider trading were communicated to Admiral Foster on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

July 7, 1997 by a person acting on behalf of Alissa with an explicit threat "to sue the Board in connection with these allegations." The draft then makes the following conclusory allegations without acknowledging or discussing Rockow and Craig's agreement to the financial terms of the Mallender severance agreement:

> 68. Despite this information, the Board did nothing to recover the handsome severance package that had been given to Mallender, or to inform shareholders of Talley that the company had a potential cause of action worth at least $6,000,000.
> 69. Instead, motivated by the threat of litigation, the Directors negotiated to sell the company whole and to obtain from the purchaser-Carpenter-an indemnification clause in the sales contract that would ensure their own immunity from suits arising from their breaches of their fiduciary duties.

Ultimately, the only claims asserted in the draft complaint are for alleged failures of disclosure variously alleged as violations of Sections 14(a) and 14(e) of the 1934 Act and of the defendants' Delaware law based disclosure duties.

### B. *The Asserted Grounds for Objection*

The nub of the objection to the settlement is the argument, advanced on page 8 of the Objectors' legal memorandum, and purportedly substantiated by their second draft federal court complaint, as follows:

> As established in *In re MCA, Inc. Shareholders Litig.,* Del.Ch., 598 A.2d 687 (1991), a settlement should not be approved where, for minimal consideration, it would cut off meritorious federal-law claims that were not raised in Chancery court. That is precisely the situation here. The defendants are getting their broad release far too cheaply.

The Objectors also make a series of attacks on the adequacy and thoroughness of the work undertaken by plaintiffs' counsel. Finally, as previously discussed, the Objectors argue that the Talley directors did not adequately consider a sale of the individual subsidiaries because they wished to obtain some greater right to indemnification and insurance coverage from the sale of the Company to Carpenter as a whole.

## IV. DISCUSSION

Delaware courts have long favored the voluntary settlement of contested issues. *Kahn v. Sullivan,* Del.Supr. 594 A.2d 48 (1991) ; *Rome v. Archer,* Del.Supr. 197 A.2d 49 (1964). "However, the settlement of a class action is unique in that, ' because of the fiduciary character of a class action, the Court of Chancery must participate in the consummation of a settlement to the extent of determining its intrinsic fairness.' " *Polk v. Good,* Del.Supr., 507 A.2d 531, 535-36 (1986) (quoting *Rome,* 197 A.2d at 53). In reviewing a settlement, this Court plays a special role. As the Delaware Supreme Court said in *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279, 1283 (1989):

> **\*9** The [Court of Chancery] must balance the policy preference for settlement against the need to insure that the interests of the class have been fairly represented. *Rome v. Archer,* Del.Supr., 197 A.2d 49, 53 (1964). Thus, the Court of Chancery must carefully consider all challenges to the fairness of the settlement but without actually trying the issues presented. 'Under *Rome,* the [C]ourt's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors.'

(quoting *Polk,* 507 A.2d at 535).

### A. *Class Certification Issues*

Before examining the merits of the proposed settlement, I must first determine whether this action is maintainable as a class action under Chancery Court Rule 23. *Prezant v. De Angelis,* Del.Supr., 636 A.2d 915 (1994). Plaintiffs move for class certification pursuant to Rule 23(b)(1) and (2) , thus, in addition to determining whether the requirements of Rule 23(a) have been satisfied, I must also determine whether the plaintiff has satisfied the class certification requirements

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

encompassed in one of these subsections.

Rule 23(a) sets out four general requirements for a class to be certified: (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy of class representatives. Alissa and Rockow have raised objections to class certification only with regard to the adequacy of the class representation, and, in particular, the adequacy of the litigation efforts undertaken by class counsel. As I find that the other elements are readily satisfied, the focus of the discussion will be directed toward this element.

### 1. Numerosity, Commonality and Typicality

As of June 30, 1997, Talley had in excess of 14 million shares outstanding, which are owned by hundreds of stockholders. As such, it would not be practical to join all potential plaintiffs before the court. *See Leon N. Weiner & Assoc., Inc. v. Krapf,* Del.Supr., 584 A.2d 1220, 1225 (1991) (stating test is not impossibility of joinder but rather practicality). Accordingly, the plaintiffs satisfy the numerosity requirement of Rule 23(a). As to the commonality requirement, class certification is proper if the plaintiffs have questions of law and fact in common. *Weiner,* 584 A.2d at 1225. The amended complaint alleges that the defendants breached their fiduciary duties in connection with the Talley/Carpenter merger to the detriment of the class and/or aided and abetted in such wrongs. As this question similarly affects each stockholder, the commonality requirement is also satisfied. *See id .* (stating requirement satisfied where question of law linking class members is substantially related to resolution of litigation even though class members are not identically situated). In order to satisfy the typicality requirement, the representative plaintiffs' claims must be the same as those of other Talley stockholders. Because all Class members face the same injury flowing from the defendants' conduct in connection with the merger, the typicality requirement is satisfied. *See id.* at 1226 (stating representative's claim sufficient if it arises from same event or course of conduct giving rise to claims of other class members and is based on same legal theory).

### 2. Adequacy of Class Plaintiffs

**\*10** The record before the Court contains affidavits of several named plaintiffs establishing that they owned Talley common stock on September 26, 1997 (the same day the merger was announced) and continued to own the stock through the date of the merger. Moreover, the record shows the absence of a conflict of interest between those named plaintiffs and other Class members. For these reasons I find that the representative plaintiffs are adequate Class representatives.

### 3. Adequacy of Class Counsel

The Objectors' argument against class certification seems to be based primarily on two grounds. First, the Objectors assert that the plaintiffs' counsel engaged in grossly inadequate discovery when prosecuting this action, and further, that after entering into the memorandum of understanding with the defendants, class counsel undertook only a small amount of pro forma discovery. Second, the Objectors assert that class counsel ignored certain disclosure violations giving rise to federal and state claims, *viz,* (i) Mallender's misconduct and the defendants' complicity with the wrongful conduct, (ii) the circumstances surrounding Mallender's severance package, and (iii) the board's alleged desire for an indemnification provision, all of which, the Objectors contend, give rise to breach of fiduciary duty claims.

I am satisfied from my review of the record that class counsel diligently and thoroughly prosecuted this action, and that they are adequate class representatives. The record is devoid of any facts evincing a failure on the part of class counsel to either (i) adequately prosecute this action, or (ii) to engage in meaningful discovery. To the contrary, the record, including the Bernstein Affidavit, shows that class counsel undertook appropriate discovery into the claims asserted in the amended complaint and sought information relating to those and other potential claims in evaluating the claims and the proposed settlement terms. Among other things, class counsel made repeated attempts to obtain testimony from Rockow. These efforts only ceased

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 10

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

when Rockow's counsel sent a letter stating "please be advised that, at this point, [Rockow] is disinterested in the lawsuit or perpetuating the litigation." Thus, there is more than a little irony in Rockow's attack on the plaintiffs' litigation efforts.

The adequacy of class counsels' efforts is also evidenced by the fact that the "claims" Objectors now propose to litigate all appear to be makeweight, asserted only to add force to Alissa's demands to be paid his $700,000 in proxy expenses. The substance of these claims will be addressed, *infra.* At this point, I only note in passing that plaintiffs' counsel cannot be faulted for not having addressed these claims earlier in the litigation. The record is replete with evidence demonstrating class counsel's attempts to procure information from Alissa and Rockow giving rise to any potential claims which could be asserted against Talley, or any reasons why the settlement should not proceed. Apart from suggesting implausibly that the indemnification provisions of the merger agreement, by themselves, suggested improper motivation, neither Alissa nor Rockow was forthcoming. FN4 In the circumstances, their attacks on class counsels' diligence ring hollow.

> FN4. The assertion that the board improperly sought a sale of the company as a whole rather than in parts because of its desire to obtain an indemnification provision in order to protect themselves from liability is particularly jejune. The indemnification provisions evince no sinister motive on the part of the board. Rather, they are of the type normally found in these situations. The mere existence of this provision without substantial additional evidence is insufficient even to raise an inference that the defendants acted with an improper purpose.

#### *4. Rule 23(b) Requirements*

**\*11** Having concluded that the requirements of Rule 23(a) have been satisfied, I turn to an analysis of whether class certification is proper under Rule 23(b). This Court has held that actions challenging

the exercise of fiduciary responsibility in corporate merger transactions are properly certified under Rules 23(b)(1) and (2). *See Hynson,* Del.Ch., 601 A.2d at 575. Because this action challenged the board's action regarding the sale of the company, it satisfies the requirements of (b)(1) and (2).

The record before me supports the conclusion that this action is maintainable as a class action. Class counsel has established that all of the requirements of Rule 23 have been fully satisfied. Contrary to the assertions of the objectors, class counsel have demonstrated that they are adequate class representatives. Thus, I find that class certification in this action is proper and will be granted. I turn now to an analysis of the settlement terms.

#### **B. *The Nature of the Claims and Difficulties of the Litigation***

The amended complaint makes two general claims. First, that the defendant directors failed to maximize value in the sale of Talley and did not adequately pursue other value-maximizing alternatives, all in breach of their duties under *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986). Second, that the disclosures made in the Schedule 14D-9 and otherwise in connection with the merger were incomplete, false and misleading, in violation of the directors' fiduciary duties.

#### *1. The Revlon Claims*

It is clearly the law of Delaware that there "is no single blueprint" that a board authorizing a sale of the corporate enterprise must follow to fulfill its fiduciary duties. *Barkan,* 567 A.2d at 1286. " Rather a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule." *Id.* (citing *Unocal Corp. v. Mesa Petroleum Co .,* Del.Supr., 493 A.2d 946, 954-55 (1985)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                   Page 11

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
(Cite as: Not Reported in A.2d)

The record before the Court quite strongly suggests that, even assuming that the Talley/Carpenter merger implicates the duties discussed in *Revlon* and other similar cases, the Board of Directors informed themselves adequately and acted reasonably in connection with the sale of the Company. Thus, they would appear to be entitled to the protection of the business judgment rule. *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994) (stating that in the context of a change of control directors must act in accordance with their fundamental duties of care and loyalty).

The Board began the process of exploration in March when the directors unanimously voted to retain an investment banker to furnish strategic financial advice to the Company. J.P. Morgan was chosen for this role by a committee of three outside directors and was instructed to examine all alternatives, including "a sale, merger, consolidation, joint venture, or any other business combination or extraordinary transaction, in one or a series of transactions, involving all or a material portion of the stock, assets, or business of the Company."

**\*12** Between March and June, J.P. Morgan performed a detailed review and, at meetings held in June and July, outlined the various available strategic alternatives, including a sale of the Company, in whole or in pieces. At the July Board meeting, the Talley directors, including Rockow and Craig, considered an offer from Carpenter to purchase only Talley's steel subsidiary. At the meeting, the Board, with the advice of J.P. Morgan, determined that it was not in the best interests of Talley and its stockholders to sell the steel business alone. This decision was based, among other things, on the tax liability of approximately $30 million that would have resulted from a sale of the steel subsidiary and the inability of Talley to replace the cash flow that would be lost from the sale of that subsidiary. At the end of these meetings, the Board of Directors unanimously determined to pursue a sale of the Company as a whole as the best way to maximize shareholder value.

This conclusion was reaffirmed in September, before the Board approved the Carpenter offer, when Admiral Foster asked J.P. Morgan to perform a liquidation analysis of the value, on an after tax basis, to be obtained from a sale of the subsidiaries on an individual basis. This analysis, which is unchallenged, demonstrated that the Carpenter offer provided greater value. As Admiral Foster testified:

> [A]fter J.P. Morgan's analysis, it was evident that while individually some of these numbers look attractive, when you look at the whole package on an after tax basis it was not an alternative which would maximize shareholder value. It was considerably less than the $12 per share that was on the table.

Moreover, discovery showed that the consideration the Board obtained was the highest obtainable in the circumstances. Carpenter was unwilling to go higher, and no one else came close to meeting the Carpenter offer. Once the terms of the agreement with Carpenter were announced, no one emerged with a higher offer. Craig, in his interview, stated that he was unaware of anyone prepared to offer more. The Objectors offer no evidence of any higher alternative transaction. FN5 Indeed, Alissa, in his first draft federal complaint takes full credit for the merger and claims that its terms were very beneficial to the Talley stockholders.

> FN5. Objectors do suggest that a sale of the Company in pieces would have yielded greater value, but this suggestion is made without analysis, is contrary to all the record evidence and would appear to be utterly untenable.

Considering all of the circumstances, it seems likely that the so-called *Revlon* claim asserted in the amended complaint was not meritorious, or, to put it differently, that the director defendants would have been entitled to the protection of the business judgment rule and would have succeeded in their defense of that claim. This conclusion is not altered by any argument advanced by the Objectors. Specifically, I reject as lacking in any foundation in the record the Objectors' arguments that: (i) the Talley directors solicited and approved the Talley/Carpenter merger agreement to further their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

own interest in continued indemnification; (ii) greater value could have been achieved by selling the Company in pieces; or (iii) the $12 per share price paid in the merger was improperly diminished by the putative value of claims arising out of the Mallender severance settlement. FN6

> FN6. In this last regard, it is noteworthy that Craig and Rockow both expressed their approval of the financial aspects of that settlement and that neither Alissa nor Rockow chose to dissent from the merger or pursue their statutory appraisal remedy.

### 2. The Disclosure Claims

**\*13** As a result of the litigation and the settlement, substantial supplemental disclosures were made to the Talley stockholders, both in the tender offer and the merger. The supplemental disclosure includes the September 25 Memorandum and other information about other possible bidders for Talley, including the dollar amounts of other proposals, together with the J.P. Morgan liquidation analysis of Talley. The disclosures made as a part of the settlement responded completely to the claims maintained by the plaintiffs in connection with their preliminary injunction application. Before agreeing to the settlement, the plaintiffs sought assurance from Alissa, Rockow and Craig that there were no other claims to litigate. Craig assured them there were none. Rockow avoided giving testimony and, in the end, communicated that he was "disinterested in the lawsuit or perpetuating the litigation." Alissa's counsel evidently had nothing to contribute beyond their complaint about the indemnification provisions of the merger agreement.

Alissa and Rockow now claim that there are other disclosure issues left to litigate. Even if these claims are asserted in good faith (and there is ample reason to doubt that they are), they do not appear to raise substantial, litigable issues. Without deciding the matter, there is at least a serious doubt that the Objectors' purported federal disclosure claims, if ever filed, would or could survive a motion to dismiss. Those claims appear to be no more than Delaware law based claims of waste or

mismanagement dressed up in the language of federal disclosure law, not actionable under federal law. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe,* the Supreme Court made clear that it will not countenance the federalization of state law claims of mismanagement or waste by reference to federal disclosure statutes or rules. *See also Field v. Trump,* 850 F.2d 938, 946 (2d Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989) (stating that allegation that management should have disclosed its purported failure to take steps to maximize value during the course of a tender offer was merely a state claim for breach of fiduciary duty).

These claims fare no better under Delaware law. It is well established that corporate directors need not "engage in self-flagellation ... implicating [themselves] in a breach of fiduciary duty from surrounding facts and circumstances prior to formal adjudication of the matter." *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 81 n. 1 (1992) (citation and internal quotation marks omitted). *See also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 145 (1997) ; *Brody v. Zaucha,* Del.Supr., 697 A.2d 749, 754 (1997). Objectors' asserted claims about Mallender's misconduct, the directors failure to rectify it and the allegedly improper payment to Mallender of $6 million in severance benefits all fall squarely in the category of "self-flagellation." None of the underlying allegations of misconduct has been the subject of a formal adjudication. Indeed, none of it has even been the subject of a filed complaint. In the circumstances, it seems clear that the plaintiffs' failure to file and prosecute a disclosure claim relating to such alleged misconduct is not a valid ground for objecting to the proposed settlement. FN7

> FN7. Of course, as Objectors' counsel conceded at the hearing, the accomplishment of the Talley/Carpenter merger has eliminated the standing of any former Talley stockholder to sue derivatively to recover any of the monies Objectors claim were improperly paid to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

Page 13

Mallender.

**\*14** For all of the foregoing reasons, and in the exercise of my independent business judgment, I conclude that the terms of the settlement are fair, reasonable and adequate to the Class. In doing so, I also take into consideration the inherent difficulties the plaintiffs would have faced in proving damages to the Class as a result of the defendants' alleged misconduct in light of the superior nature of the Carpenter proposal.

### 3. Issues of Federal/State Relation

Finally, I will comment briefly on Objectors' efforts to fit themselves into the paradigm discussed in *In re MCA, Inc. Shareholders Litig.*, Del.Ch., 598 A.2d 687 (1991), where claims arising out of the same nucleus of operative facts are pending in both state and federal court and a proposal is made to settle the state court action on terms which would preclude the litigation of the action pending in federal court. In that case, then Vice Chancellor (now Justice) Hartnett refused to approve a settlement where the state court claims being settled had little or no value, the terms of the settlement provided meager consideration to the class, and the federal claims had "at least arguable merit and therefore ... significant value." *Id.* at 690.

There are at least two notable differences between *MCA* and the situation presented here. First, the federal litigation was pending in *MCA* and is merely threatened here. This is a real difference. Because the Objectors have chosen not to initiate suit, there is no other forum available for the assessment of the merits of the federal claim asserted by them. Second, the federal claim asserted in *MCA* was for the alleged violation of a substantive federal tender offer rule having no Delaware state law correlative. Thus, the legal issues presented by that federal claim, while sharing certain factual predicates with the state law claims, were distinctly federal in nature. The "federal" claims the Objectors threaten to file are, by contrast, simple disclosure claims, akin to those alleged in the amended complaint in this matter and routinely considered by this Court.

Thus, the exclusive jurisdiction of the federal courts over claims brought under the 1934 Act would not, as a practical matter, preclude litigation of those disclosure claims in this Court.

For these reasons, I have neither occasion nor reason to withhold approval of the proposed settlement or to tailor the scope of the proposed release to preserve the Objectors' ability to proceed in another court. *MCA* does not hold or suggest otherwise. Indeed, in a subsequent decision in that matter, the Court approved a modified version of the same settlement (including a $2 million payment to the class) after it appeared that the federal district court had entered summary judgment in favor of the defendants, notwithstanding that an appeal was pending before the Ninth Circuit. *In Re MCA, Inc. Shareholders Litig.*, Del.Ch., Cons.C.A. No. 11740, Hartnett, V.C. (Feb. 16, 1993). Exercising his business judgment, then Vice Chancellor Hartnett found the terms of the settlement adequate, reasoning that the district court's entry of summary judgment showed that the federal claims "now have minimal economic value" and that, if he rejected the settlement, the $2 million benefit would be lost. *Id.* at 11-12.

### V. THE FEE PETITION

**\*15** Plaintiffs' counsel seek an award of attorneys' fees in the amount of $330,000.00, inclusive of expenses, for their efforts in prosecuting the litigation. They point out that they worked on a fully contingent basis and argue that the settlement achieved by them favorably resolves the issues raised in the amended complaint. Other than Alissa and Rockow, no member of the class has voiced any objection to the fee request.

The law in Delaware governing the award of attorneys' fees in corporate litigation is well established. Where litigation efforts on behalf of a corporation or its stockholders result in the creation of a common fund or the conferring of a benefit, the Court may, in its discretion, award fees and expenses. *Tandycrafts, Inc. v. Initio Partners*, Del.Supr., 562 A.2d 1162, 1164 (1989).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331
**(Cite as: Not Reported in A.2d)**

In determining the amount of fees to award, the courts have generally accorded the greatest weight to the benefit achieved as a result of the litigation. *In the Matter of the Appraisal of Shell Oil Co.,* Del.Ch., C.A. No. 8080, Hartnett, V.C., (Oct. 30, 1992); *In re Maxxam Group, Inc. Stockholders Litig.,* Del.Ch., C.A. No. 8636, Allen, C. (Apr. 16, 1987), slip op. at 31. Other factors considered are the time and effort applied to the matter by the plaintiffs' counsel and the difficulty of the litigation, the contingent nature of the retainer, and the standing of counsel. *Sugarland Indus., Inc. v. Thomas,* Del.Supr., 420 A.2d 142 (1980).

I am satisfied that the terms of the settlement requiring the publication and dissemination of the supplemental disclosure provided a substantial, although nonmonetary and unquantifiable, benefit to the members of the class. Indeed, the timely disclosure of the information in the supplement was presumably of greater value to the class than any potential award of damages based on the failure to disclose the same information, as such information is of the greatest utility when it is available in a timely manner to inform the stockholders' decision making process. Considering all the circumstances presented, I have no difficulty concluding that the disclosures made here constitute adequate consideration for the settlement of the claims asserted and adequately support the fee requested.

While not necessarily unusual for expedited corporate litigation of this type, the services rendered by plaintiffs' counsel were of high quality and, it is fair to say, could not have been rendered by lawyers inexperienced at prosecuting stockholder litigation. The action was prosecuted diligently, in the context of expedited proceedings designed to lead to a hearing on plaintiffs' motion for a preliminary injunction. Plaintiffs counsel, who together devoted in excess of 700 hours of attorney time to this matter, pursued their case vigorously and engaged in successful efforts to settle those claims which appeared meritorious. Their efforts were undertaken on a purely contingent fee basis, a factor which may justify a higher fee than would be awarded to an attorney who works on an hourly fee or modified hourly fee basis. *See Chrysler Corp. v. Dann,* Del.Supr., 223

A.2d 384, 389 (1966).

**\*16** For all of these reasons, I conclude that the fee sought is a reasonable one and should be allowed. I will also allow an award of expenses in the amount sought.

## VI. CONCLUSION

For all of the foregoing reasons, I will approve the settlement, award fees and overrule the objections. Counsel for plaintiffs should submit a form of order in conformity with this opinion.

Del.Ch.,1998.
In re Talley Industries, Inc. Shareholders Litigation
Not Reported in A.2d, 1998 WL 191939, 24 Del. J. Corp. L. 331

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.