# Tab 7

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Not Reported in F.Supp.2d, 2004 WL 1396269,
Fed. Sec. L. Rep. P 92,847
Briefs and Other Related Documents
Related Andrews Newsletter Articles
United States District Court,D. Delaware.
In re: TYSON FOODS, INC. Securities Litigation
**No. Civ.A. 01-425-SLR.**

June 17, 2004.

John L. Reed , and Matt Neiderman , of Duane
Morris LLP, Wilmington, Delaware, for Lead
Plaintiffs.
Mark C. Gardy , and Karin E. Fisch , of Abbey
Gardy LLP , New York, New York and Michael H.
Schaalman , Cristina D. Hernandez-Malaby , and
Steven J. Berryman , of Quarles & Brady LLP,
Milwaukee, Wisconsin, of counsel.
Anthony W. Clark , and Robert S. Saunders , of
Skadden, Arps, Slate, Meagher & Flom, LLP,
Wilmington, Delaware, for Defendants.
David F. Graham , Anne E. Rea , James W. Ducayet
, and Melanie E. Walker , of Sidley Austin Brown
& Wood LLP, Chicago, Illinois, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 22, 2001, the first of several class
actions were filed against Tyson Foods, Inc. ("
Tyson Foods"), Don Tyson, John Tyson and Les
Baledge alleging violations of Section 10(b) and
20(a) of the Securities Exchange Act of 1934, 15
U.S.C. § 78j and 78t and Rule 10b-5. (D.I.1) On
September 21, 2001 this court consolidated these
cases pursuant to the Private Securities Litigation
Reform Act, Pub.L. 104-67, 109 Stat. 737 (1995)
(codified at various sections of 15 U.S.C.), and
named, as lead plaintiffs, Aetos Corporation,

Pelican Limited Partnership, Stark Investments,
L.P., and Shepherd Investments International, Ltd.
(collectively the "Lead Plaintiffs").

On January 22, 2002, defendants moved for
dismissal of the complaint. On October 23, 2002,
following briefing and oral argument, the court
granted in part and denied in part defendants'
motion to dismiss, finding that two of the statements
by Tyson were potentially actionable under federal
securities law. (D.I. 25 at ¶ 14)

On October 6, 2003, the court certified this action
as a class action on behalf of all persons and entities
similarly situated who purchased securities in IBP,
Inc. ("IBP") on or before March 29, 2001, and
subsequently sold those securities during the period
from March 30, 2001 through June 15, 2001,
inclusive, and who sustained damages as a result of
such transactions. (D.I.139, 140) The court also
appointed Lead Plaintiffs as class representatives.

Presently before the court are the parties' cross
motions for summary judgment. (D.I.157, 161, 163)
Having reviewed the parties' briefs and heard oral
argument, the court concludes that defendants are
entitled to summary judgment for the reasons that
follow.

II. BACKGROUND

This case arises from events surrounding a merger
between two of the nation's largest protein
distributors. Tyson Foods is the nation's largest
poultry distributer and IBP is the nation's largest
beef and second largest pork distributor. The details
of that transaction are described in great detail in a
Chancery Court opinion in which the Chancery
Court found that IBP had not breached the parties'
agreements and that IBP was entitled to specific
performance. *In re IBP Shareholders Litigation,*
789 A.2d 14 (Del. Ch.2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 2

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

### A. IBP Auction

In July 2000, IBP management informed its board that it was interested in pursuing a leveraged buyout of IBP with the assistance of the investment bank Donaldson, Luftkin & Jenrette. Following negotiations, management and other investors (the "Buyout Group") agreed that the Buyout Group would purchase all of IBP's shares at $22.55 per share. *In re IBP Shareholders Litigation,* 789 A.2d at 25-27.

On November 12, 2000, Smithfield Foods, the nation's largest pork producer, made an unsolicited bid for IBP offering a stock exchange offer worth $25 per share to IBP shareholders. On November 24, 2000, defendants Don and John Tyson met with Bob Peterson and Richard Bond, IBP's Chief Executive Officer and President/Chief Operating Officer, to discuss the potential combination of Tyson Foods and IBP. *Id.* at 28-30. At that meeting, the representatives discussed the possibility that certain projections prepared in relation to the earlier management LBO (the "Rawhide Projections") may not be met.

**\*2** On December 4, 2000, Tyson Foods, contingent upon a quickly timed due diligence review, proposed to acquire IBP in a two-step cash and stock exchange valued at $26 per share. Tyson Foods and IBP executed a confidentiality agreement which stated that Tyson Foods could not rely on oral assurances that were not converted to written representations and warranties and expressly provided that IBP and its representative would have no liability from the use or accuracy of any non-public information provided to Tyson Foods through the course of due diligence (the "Confidentiality Agreement"). *Id.* at 31-32.

Tyson Foods began its due diligence process with IBP. During that review, Tyson Foods was informed that there had been fraud uncovered at DFG, an IBP subsidiary, and that there were serious business problems with that operating unit. Tyson Foods also learned that certain weather conditions were likely to have an adverse effect on IBP's abilities to meet its forecasts in the Rawhide Projections. *Id.* at 33-35.

In mid and late December 2000, IBP prepared and conducted an auction between Tyson Foods and Smithfield. The Rawhide Projections were updated for use in the final bidding. On December 28, 2000, Tyson Foods received IBP's updated projections which revised downward IBP's projected FY 2000 earnings by $70 million. Following receipt of these new projections, Tyson Foods raised its bid to $27 per share in cash. Following its $27 per share offer, Tyson Foods had two additional due diligence calls with IBP in which DFG's problems were discussed and Tyson Foods was informed that a restatement of financials may be required and that IBP may take an impairment charge. *Id.* at 37-39. Tyson Foods subsequently raised its bids to $28.50 and later to $30 per share in cash and stock. *Id.* at 22, 38-39. IBP accepted the latter offer.

On December 29, 2000, the Securities and Exchange Commission ("SEC") sent an email to IBP's special committee's outside counsel. That email contained a letter from the SEC to Bob Peterson commenting on the preliminary Rawhide Proxy as well as on IBP's financials. Inexplicably, the SEC letter was not forwarded to Tyson Foods until January 10, 2001. The SEC letter addressed a number of issues, including some already identified by Tyson Foods during the course of its due diligence review.

### B. Merger Agreement

On January 1, 2001, the parties entered into a merger agreement for the sale of IBP to Tyson Foods (the "Merger Agreement"). The Merger Agreement provided for an initial cash tender offer of $30 per share to be followed by an exchange offer of $30 in Tyson Foods stock for each IBP share. The cash offer period was scheduled to close no later than February 28, 2001. In the event the conditions to the cash offer were not met by that date, Tyson Foods would commence a cash election merger in which IBP shareholders could receive either cash, stock or a combination thereof in the amount of $30 per share.

**\*3** On January 12, 2001, the Tyson Foods board met and ratified management's decision to enter into

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                   Page 3

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

the Merger Agreement. The SEC letter was not disclosed to the board nor was a copy of the letter shown to any board member. That same day, a shareholder meeting was held and the Merger Agreement was ratified by the shareholders. The SEC letter was not disclosed to the shareholders. *Id.* at 43-45.

### C. Delays in Cash Offer

On January 16, 2001, Larry Shipley, IBP's Chief Executive Officer, informed Steve Hankins, Tyson Foods' Chief Financial Officer, that the earnings charge arising out of the issues at DFG might reach $50 million, that a restatement of 1999 earnings might be necessary, and than an impairment study had been commenced but not yet completed. *Id.* at 45. Hankins has testified that he concluded that IBP would have to restate the financials that had been warranted in the Merger Agreement. On January 17, Tyson Foods announced it was extending the cash offer period because the anti-trust waiting period had not expired. *Id.* The announcement did not mention the SEC letter, DFG or any potential violation of the Merger Agreement.

Later in January, Tyson Foods again extended the cash offer period on the basis that the offering documents incorporated the IBP's warranted financials which were potentially inaccurate. *Id.* at 45-46. Tyson Foods indicated it would delay closing the cash offer and commencing the exchange offer until after IBP had settled all outstanding issues with the SEC. *Id.* On January 25, 2001, IBP sent a letter to Tyson Foods disclosing that IBP earnings would be lowered to $47 million and that IBP was still considering whether a restatement of earnings would be necessary. *Id.* at 46.

During February, Tyson Foods became increasingly reticent about the IBP deal and began considering a way to negotiate a lower price. Tyson Foods' concern with the IBP deal was augmented by its own poor financial performance. *Id.* at 47-48. On February 22, 2001, IBP publicly reported that it would restate its financials in order to take an additional charge at DFG of $32.9 million and an

impairment charge at DFG of up to $108 million. On February 28, Tyson Foods terminated the cash tender. John Tyson publicly commented that Tyson Foods would "determine what effect these matters will have on our deal" once IBP had finished its work on its issues with the SEC. *Id.* at 46. By that time, Tyson Foods had also learned that IBP's earnings were far below the Rawhide Projections. *Id.* at 48.

In February, Tyson Foods had sought advice from two firms serving as outside counsel, Milbank, Tweed, Hadley & McCloy, LLP and Skadden, Arps, Slate, Meagher & From, LLP. (D.I.159, exs.25, 26) Millbank Tweed's qualified opinion letter indicated that Tyson Foods had the right to terminate based on IBP's allegedly inaccurate financial statements which breached IBP's representations and warranties. (D.I.159, ex. 27) Skadden Arps' opinion focused on renegotiation strategies and did not take a position on whether Tyson Foods may terminate. (D.I.159, ex. 28) The Skadden Arps opinion discussed possible causes of action that Tyson Foods might have, including fraud in the inducement and breach of warranty.

**\*4** Defendant Les Baledge, Executive Vice President and General Counsel for Tyson Foods, received the two opinion letters and advised Don and John Tyson, as well as other senior managers, that outside counsel had advised that Tyson Foods had grounds to terminate the transaction. Baledge did not indicate outside counsel's rationale nor did he provide the memoranda directly to Don Tyson or John Tyson. (D.I. 160, ex. B at 36, 79; ex. D at 89-93; ex. E at 121-23)

IBP began to sense that Tyson Foods wanted to renegotiate and realized that the deal may fall through altogether. *Id.* Tyson Foods' key management began slowing down the merger implementation process in an effort to provide Don Tyson and John Tyson some time to reconsider their position. On March 5, 2001, Dick Bond met with Don Tyson in an effort to alleviate Don Tyson's concerns. Bond and Don Tyson also subsequently spoke by phone. In these conversations the two discussed DFG, IBP's overall performance and a concern about mad cow disease

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

and hoof-and-mouth disease. Don Tyson did not raise concerns about the SEC letter. *Id.* at 48-49.

On March 7, 2001, John Tyson sent a memorandum to all Tyson Foods employees stating that the company was still committed to the merger transaction. On March 13, however, John Tyson expressed concern to Bond regarding IBP's first quarter performance and that he wanted Bond's best estimates for IBP's performance for the remainder of the year. Bond sent estimates indicating a range between $1.80 and $2.47 a share, with a best estimate of $2.12. *Id.* at 49.

On March 13, 2001, IBP filed its restated warranted financials, which were consistent with its previous release regarding DFG. *Id.* On March 14, Tyson Foods issued a press release indicating that it was pleased that IBP had resolved most of its SEC issues. The press release also stated that Tyson Foods was continuing to look at IBP's business and its weak first quarter results. *Id.* On March 15, 2001, in-house counsel for Tyson Foods sent a letter to IBP which indicated Tyson Foods' sentiment that the merger transaction could proceed now that the SEC issues were resolved. *Id.* at 49-50.

On March 26, 2001, Tyson Foods and IBP representatives met to discuss the transaction. At that meeting, John Tyson suggested that the transaction be repriced to $27-28 per share. Bond suggested that only a $0.50 reduction would be appropriate, although Bond knew that a better approximation would be $28.50 per share. John Tyson privately told Bond that Don Tyson was nervous about the transaction and Peterson and Bond would need to help John Tyson firm up his father's support. *Id.* at 50.

On March 27, 2001, Merrill Lynch provided to Tyson Foods a revised valuation analysis of IBP which concluded that $30 a share was still a fair price, but provided an analysis to assist in renegotiating the transaction. The analysis was based upon pessimistic assumptions provided by Tyson Foods. *Id.*

C. Decision to Terminate

*5 On March 28, 2001, a meeting was called of senior management by Don Tyson. The meeting began by discussing the state of the economy generally and Tyson Foods' own performance. Don Tyson also expressed concern about IBP's poor performance and about mad cow disease. Don Tyson and a select group of his closest advisors then met privately to discuss how to proceed. John Tyson and other senior management were not present for this discussion. Don Tyson returned to the senior management meeting and announced that Tyson Foods should find a way to withdraw from the IBP merger. John Tyson then instructed Baledge to take the steps necessary to terminate the transaction. Neither Don Tyson nor John Tyson conveyed to Baledge the specific rationale discussed at the meeting for the decision. (D.I. 160, ex. E at 160-61; ex. B at 41) On March 29, 2001, Baledge sent a termination letter to IBP and issued a press release, to which the termination letter was attached. The attached letter from Baledge to Peterson and Smith stated:

On December 29, 2000, the Friday before final competitive negotiations resulting in the Merger Agreement, your counsel received comments from the Securities and Exchange Commission (" SEC") raising important issues concerning IBP's financial statements and reports filed with the SEC. As you know, we learned of the undisclosed SEC comments on January 10, 2001. Ultimately, IBP restated its financials and filings to address the SEC's issues and correct earlier misstatements. Unfortunately, we relied on that misleading information in determining to enter into the Merger Agreement. In addition, the delays and restatements resulting from these matters have created numerous breaches by IBP of representations, warranties, covenants and agreements contained in the Merger Agreement which cannot be cured.

Consequently, whether intended or not, we believe Tyson Foods, Inc. was inappropriately induced to enter into the Merger Agreement. Further, we believe IBP cannot perform under the Merger Agreement. Under these facts, Tyson has a right to rescind or terminate the Merger Agreement and to receive compensation from IBP. We have commenced legal action in Arkansas seeking such relief. We hope to resolve

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

these matters outside litigation in an expeditious and business-like manner. However, our duties dictate that we preserve Tyson's rights and protect the interests of our shareholders.

If our belief is proven wrong and the Merger Agreement is not rescinded, this letter will serve as Tyson's notice, pursuant to sections 11.01(f) and 12.01 of the Merger Agreement, of termination.

(D.I. 1, ¶ 25; D.I. 13 at 7). The press release stated:

Tyson Foods, Inc. announced today that it was discontinuing the Agreement and Plan of Merger between itself and IBP, Inc. The letter from Tyson General Counsel Les R. Baledge to Robert L. Peterson, Chairman and Chief Executive Officer of IBP and JoAnn R. Smith, Chairperson of the IBP Special Committee, is attached.

**\*6** John Tyson, Chairman and CEO, said, "While we continue to believe that the combination of IBP and Tyson would have created the premiere protein company in the world, we simply cannot endorse a decision to complete the transaction under the facts as we understand them today. My decision today was based on what I felt was in the best interest of our Company and its Shareholders."

(D.I. 1, ¶ 24; D.I. 13 at 6-7)

The press release was drafted by outside counsel who were not aware of the specific business motivations behind the decision to terminate. (D.I. 160, ex. U at 156-57; ex. Q at 113-14) The press release contained a quote attributed to John Tyson which was never made or expressly approved by him. (D.I. 169, ex. D at 47-49) Following issuance of the press release and attached termination letter, there was a swift decline in IBP shares. IBP closed on March 29, 2001, at $22.79 and reached a low of $15 per share on March 30. (D.I.160, ex. 34)

#### D. Litigation

As indicated in the above press release, Tyson Foods filed suit on March 29, 2001, seeking rescission or termination of the Merger Agreement. IBP filed suit seeking specific performance. On June 18, 2001, after extensive fact finding, the Chancery Court of the State of Delaware issued its

opinion finding against Tyson Foods and in favor of IBP. *In re IBP Shareholders Litig.,* 789 A.2d at 14. The Chancery Court ultimately reached five conclusions: (1) the Merger Agreement and related contracts were valid and enforceable; (2) Tyson Foods was contractually allocated certain financial risks under those agreements, including accounting issues at DFG, which could not serve as a basis for termination; (3) DFG-related issues before the SEC were not a permissible basis for termination; (4) IBP had not suffered a material adverse effect within the meaning of the agreement; and (5) IBP was entitled to specific performance. *Id.* at 23.

Following issuance of that opinion, Tyson Foods and IBP reached a settlement whereby the merger would be consummated and all claims against Tyson Foods, including shareholder claims, would be released. *In re IBP Shareholders Litig.,* 793 A.2d 396 (Del. Ch.2002) (denying vacatur), *aff'd,* 818 A.2d 145 (Del.2003). The Chancery Court approved the settlement on the condition that the federal securities claims, which were already being filed in this court, were excluded from the scope of the settlement.

Tyson Foods' shareholders also brought suit in derivative against the Tyson Foods directors for breach of fiduciary duty with respect to the events surrounding the merger. *Shapiro v. Allen,* Civ. No. 18967 (Del. Ch. Mar. 19, 2003). The Chancery Court, ruling from the bench following oral argument, dismissed the case in its entirety for failure to state a claim. *Id.*

#### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are '

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)).

**\*7** The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

Lead Plaintiffs assert that the March 29, 2001 press release and termination letter contained material misleading statements regarding IBP and Tyson Foods' decision to terminate the merger, and which had an adverse effect on the IBP stock price. Lead Plaintiffs allege scienter and primary liability on the part of each of the defendants, as well as controlling person liability on the part of defendants Don and John Tyson.

Lead Plaintiffs seek summary judgment on liability, arguing that the Chancery Court's opinion establishes each element of their § 10(b) and § 20(a) claims. (D.I.167) In Lead Plaintiffs' view, the sole remaining issue of fact to be resolved is damages. Don Tyson and John Tyson, in their motion for summary judgment, assert that Lead

Plaintiffs' claims of both primary and secondary liability fail for lack of the requisite scienter and participation in conduct which is actionable under federal securities law. (D.I.164) Baledge and Tyson Foods, in their motion for summary judgment, assert that Lead Plaintiffs' claims fail due to both scienter and loss causation. (D.I.162)

### A. Section 10(b)

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . .. any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (2004). Rule 10b-5, promulgated under § 10(b), makes it unlawful for any person " [t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security. " 17 C.F.R. § 240.10b-5(b) (2004).

Therefore, a claim for securities fraud under § 10(b) and Rule 10b-5, require proof of the following: "(1) that the defendant[s] made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant[s] acted with knowledge or recklessness and (5) that the plaintiff[s] reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996).

### 1. Made a Misrepresentation or Omission

**\*8** Don Tyson and John Tyson move for summary judgment on the issue of primary liability on the basis that Lead Plaintiffs have offered no evidence to support a finding of actionable conduct within the scope of primary liability under § 10(b) and Rule 10b-5. The court agrees.

Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

(1994). In *Central Bank,* the Supreme Court ruled that conduct outside the clear scope of § 10(b) is not actionable under implied remedies of secondary liability, such as aiding and abetting a primary violation. *Id.* at 191.

In determining whether a person has primary liability within the scope of this section, courts apply either the "bright line" test, *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) , or the "substantial participation" test, *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 n. 5 (9th Cir.2000). The Third Circuit has not yet determined which test should be applied. *See In re IKON Office Solutions, Inc.,* 277 F.3d 658, 667 n. 8 (3d Cir.2002) . Nevertheless, under either test defendants John Tyson and Don Tyson can not be held liable.

In the case at bar, the undisputed facts are that neither Don Tyson nor John Tyson made the statements for which liability is alleged. Under the bright line test, a defendant must actually make the false or misleading statement. *See Shapiro v. Cantor,* 123 F.3d 717, 720 (2d Cir.1997). Under the substantial participation test, there must be " substantial participation or intricate involvement" by the defendant in the drafting and preparation of the fraudulent statements "even though that participation might not lead to the actor's actual making of the statements." *Howard,* 228 F.3d at 1061. For example, where a statement is not directly made by the defendant but the defendant was substantially involved in the drafting and editing thereof, substantial participation has been found. *See, e.g., In re Software Toolworks Inc.,* 50 F.3d 615, 628 (9th Cir.1994).

The undisputed evidence in this regard is that Don Tyson and John Tyson had no involvement in the actual crafting of the language of the termination letter and press release. The termination letter, which contained the alleged actionable statements at issue, was signed solely by Baledge and crafted by him with the help of outside counsel. Consequently, Lead Plaintiffs' case fails under the Second Circuit's bright line test. Even under the substantial participation test, however, Lead Plaintiffs' theory falls short.

The crux of Lead Plaintiffs' argument is that Don Tyson and John Tyson should have been involved in the preparation and issuance of the press release, but instead went fishing. At oral argument, Lead Plaintiffs argue that this lack of participation amounts to recklessness. While recklessness may satisfy scienter, it does not relieve Lead Plaintiffs from the obligation to show participation in the conduct at issue here. Lead Plaintiffs' theory would, in effect, impose primary liability for substantial nonparticipation. If John Tyson and Don Tyson are liable for inaction, the remedy lies under state law. This, however, is not a theory upon which primary liability under § 10(b) and Rule 10b-5 may attach. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476 (1977). Consequently, with respect to defendants John Tyson and Don Tyson, the court finds they are entitled to summary judgment on the issue of primary liability.

### 2. Scienter

**\*9** Defendants assert that Lead Plaintiffs have failed to provide evidence showing that Baledge acted with scienter in issuing the termination letter containing the alleged misrepresentations. Scienter, of course, is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 426 U.S. 185, 193 n. 12 (1976). In the absence of indica of an intent to deceive by the defendant, scienter requires proof of the following: (1) highly unreasonable conduct which represents an extreme departure from the standards of ordinary care; and (2) a danger of misleading buyers which is known to the defendant or so obvious that the defendant must have known of the risk. *SEC v. Infinity Group Co.,* 212 F.3d 180, 192 (3d Cir.2000) . Highly unreasonable conduct is neither simple nor even inexcusable negligence. *See id.* Therefore, claims predicated upon "corporate mismanagement are not actionable under federal law." *In re Craftmatic Securities Litig.,* 890 F.2d 628, 638-39 (3d. Cir.1989).

Statements of opinion, if false, may form the basis for a securities fraud claim if made either knowingly or recklessly. *See Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.1985). A statement of opinion is

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

not actionable if it's proven to be inaccurate or if its falsity is the result of mere negligence. *Id.* Instead, only an opinion which "has been issued without a genuine belief or reasonable basis" is actionable. *Id. See also In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 (3d Cir.1993). It may be inferred that a statement of opinion is made without a genuine belief or reasonable basis where the defendant has notice of the unreliability of the underlying materials and fails to inquire further. *See id.* (quoting *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979)).

In its October 23, 2002 memorandum order denying defendants' motion to dismiss, the court found that two statements contained in the termination letter accompanying the press release were misrepresentations. (D.I. 25 at ¶ 14) Those statements were as follows:
 1. "Unfortunately, we relied on that misleading information in determining to enter into the Merger Agreement."
 2. "Consequently, whether intended or not, we believe Tyson Foods, Inc. was inappropriately induced to enter into the Merger Agreement."
(D.I. 25 at ¶ 12) While the court found these statements to constitute misrepresentations for the purpose of denying defendants' motion to dismiss, the court now reexamines these statements in light of a developed factual record and defendants' motion for summary judgment.

 a. "We relied on that misleading information"

The first statement contains both a statement of fact (Tyson Foods "relied") and a statement of opinion (IBP provided "misleading" information). With respect to the factual component, Lead Plaintiffs must show evidence that when Baledge asserted that "we relied" he acted with scienter, to wit, they must show either that Baledge intended to deceive the investing public or that his conduct was so reckless, with respect to the danger that the investing public might be misled, that his conduct borders on intentional. *See In re Ikon,* 277 F.3d at 672 n. 16. In either regard, the court finds that there is not sufficient evidence to support Lead Plaintiffs' claim of scienter.

*10 Lead Plaintiffs make eight factual allegations which they assert prove scienter on the part of Baledge: (1) Baledge participated in drafting and disseminating the March 29 press release and termination letter without asking for the rationale and circumstances behind senior management's decision; (2) Baledge authorized a suit to be filed with the intent of depressing the market price of IBP shares in the event Tyson Foods sought to reprice the transaction; (3) Baledge knew that Tyson Foods did not have sufficient facts to allege fraudulent inducement; (4) Baledge instructed outside counsel to draft a complaint without explaining the business rationale, information which he indisputably did not have, for filing suit; (5) Baledge did not inform Tyson Foods' board of the decision to terminate; (6) Baledge did not attend the meeting where the termination decision was made; (7) Baledge did not give Don Tyson the memoranda prepared by outside counsel addressing Tyson Foods' options for terminating the transaction; and (8) Baledge did not discuss or attempt to dissuade Don Tyson from the decision to terminate once it had been reached. (D.I. 167 at 45-46) If true, the only allegation to support a finding of scienter is Lead Plaintiffs' claim that Baledge filed suit in order to depress the market price of IBP. This allegation, however, is wholly without support in the record. The remaining factual allegations at most allege negligence and possible breaches of fiduciary duty, which plainly are not actionable under § 10(b) and Rule 10b-5. *See Santa Fe Industries,* 430 U.S. at 476; *In re Advanta Corp. Securities Litig.,* 180 F.3d 525, 540 (3d Cir.1999) ; *Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir.1978).

With respect to the opinion component of Baledge's statement, Lead Plaintiffs lack evidentiary support for their allegation that the statement was false. In order to prove falsity, Lead Plaintiffs must show that Baledge either did not have a genuine belief that the referenced IBP information was misleading or that under the circumstances his belief was unreasonable. There is no record support for the proposition that Baledge's belief was not genuinely held. Further, the undisputed fact that Baledge consulted with outside counsel supports the reasonableness of his belief. Although Tyson Foods

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

did not prevail on its claim in Chancery Court, that alone does not prove the unreasonableness of Baledge's belief. To the contrary, while the Chancery Court disagreed with Tyson Foods' interpretation of the relevant agreements, it specifically indicated that Tyson Foods' interpretation was reasonable. *See In re IBP,* 789 A.2d at 62; *Shapiro v. Allen,* Civ. No. 18967, at 77-78 (Del. Ch. Mar. 19, 2003). Where, as here, there is no indication of bad faith litigation, a party's statement of opinion as to the veracity of its asserted claims is not made false simply because it proves unsuccessful. As Lead Plaintiffs have not shown that the statement of opinion is actionable, they likewise cannot prove scienter.

b. "We believe Tyson Foods, Inc. was inappropriately induced."

**\*11** This statement expresses an opinion which, to be actionable, Lead Plaintiffs must prove both falsity and scienter. To prove falsity, Lead Plaintiffs must show that Baledge did not genuinely believe that Tyson Foods was inappropriately induced or did not have a good faith basis for that belief. As discussed above, it is insufficient proof for Lead Plaintiffs to allege merely that Tyson Foods was unsuccessful in the assertion of its claims in Chancery Court.

In their brief, Lead Plaintiffs do not allege that the facts support the conclusion that Baledge did not have a genuine belief in the truth of his statement but instead allege the unreasonableness of that belief. (D.I. 167 at 45-46) As proof of this unreasonableness of belief, Lead Plaintiffs rely on Baledge's absence from the meeting where the final decision on termination was reached. Arguably, under some circumstances, this may amount to a breach of the duty of care owed to Tyson Foods shareholders. It has no logical bearing, however, on the reasonableness of Baledge's belief that Tyson Foods was inappropriately induced. The facts and events forming the basis for that belief occurred well before the March 28, 2001 meeting. Moreover, Baledge's belief was supported by the qualified opinions of two outside law firms. In light of these facts, the court finds that there is not a genuine issue

of material fact as to the falsity of Baledge's statement of opinion.

c. Omission of Don Tyson's Motivations

Lastly, Lead Plaintiffs assert that Baledge's termination letter and press release were false because they failed to disclose Don Tyson's motivations for terminating the transaction. (D.I. 158 at 39) In order for an omission of fact to form the basis for a securities fraud violation, the speaker must have a duty to disclose the information. *See Chiarella v. U.S.,* 445 U.S. 222, 228 (1980). Omission of the subjective motivations of corporate decision makers does not render an honest transaction fraudulent under federal law. *See Biesenbach v. Guenther,* 588 F.2d 400, 402 (3d Cir.1978) (failing to disclose the "unclean heart" of a director is not actionable). FN1

> FN1. *See also Vaughn v. Teledyne, Inc.* 628 F.2d 1214, 1221 (9th Cir.1980) (" Corporate officials are under no duty to disclose their precise motive or purpose for engaging in a particular course of corporate action, so long as the motive is not manipulative or deceptive and the nature and scope of any stock transactions are adequately disclosed to those involved. "); *Alabama Farm Bureau Mut. Cas. Co., Inc. v. American Fidelity Life Ins. Co.,* 606 F.2d 602, 610 (5th Cir.1979) ("Section 10(b) and Rule 10b-5 were promulgated to prevent fraudulent practices in securities trading and trading on inside information.... They were not intended to require, under normal circumstances, the disclosure of an individual's motives or subjective beliefs, or his deductions reached from publicly available information.").

After determining that the IBP transaction was no longer in the company's best interests, Don Tyson instructed his son John Tyson who, in turn, instructed Baledge to exercise whatever legal rights may exist to terminate the transaction and to mitigate losses. The information upon which Don

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

Tyson relied in making his determination was publicly available, including economic conditions, industry specific conditions, and Tyson Foods' own economic performance. A reasonable investor could draw the conclusion from the termination letter and press release that Tyson Foods management, and by inference Don Tyson, viewed the IBP transaction as no longer in the company's best interests.

Further, the omission of the business rationale does not render the disclosure of Tyson Foods' legal rationale materially misleading. Business judgment necessarily underlies any decision by a company to exercise its legal rights. Lead Plaintiffs' argument, that it was misleading to a reasonable investor to omit the fact that business considerations were involved in the decision to terminate, lacks merit.

**\*12** The heart of Lead Plaintiffs' argument is revealed in their brief. They argue that
the entire process by which the termination decision was made and subsequently conveyed to the market was beyond reckless. Defendants must be held responsible for the consequences, whether intended or not, of their conduct. Each of the three individual defendants handled a massive corporate decision in so slipshod and haphazard a manner that was an extreme departure from the standards of ordinary care owed by top corporate executives.
(D.I. 167 at 44). At most, Lead Plaintiffs' allegations might amount to breaches of fiduciary duty owed to Tyson Foods shareholders; they do not, however, support a finding of securities fraud. *See In re Advanta Corp. Securities Litig.,* 180 F.3d at 540. As there was no duty to disclose Don Tyson's rationale, the failure to do so, even if intentional, does not amount to securities fraud.

Therefore, having found that Lead Plaintiffs have failed to adduce evidence in the record that Baledge's statements are actionable under § 10(b) and Rule 10b-5, the court finds that defendant Baledge is entitled to summary judgment.

### 3. Primary Liability of Tyson Foods

For a corporation to have primary liability under §

10(b) and Rule 10b-5, scienter must be present with respect to at least one of the officers or agents who made a false or misleading statement. *See Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir.2004) ; *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435 (9th Cir.1995) ; *United States v. LBS Bank-New York, Inc.,* 757 F.Supp. 496, 501 n. 7 (E.D.Pa.1990) ; *First Equity Corp. v. Standard & Poor's Corp.,* 690 F.Supp. 256, 260 (S.D.N.Y.1988) , *aff'd,* 869 F.2d 175 (2d Cir.1989). Having concluded that each of the individual defendants is entitled to summary judgment under § 10(b) and Rule 10b-5, as a matter of law, Tyson Foods can not be primarily liable and is entitled to summary judgment.

### 4. Loss Causation

In the alternative, defendants contend that Lead Plaintiffs have failed to furnish evidence that the alleged misrepresentations at issue are the cause of injury. An essential element of a claim of securities fraud arising under § 10(b) and Rule 10b-5 is that the defendants' act or omission is the cause in fact of plaintiff's loss. 15 U.S.C. § 78u-4(b)(4) (2004). Loss causation requires proof that, but for the defendant's wrongful conduct, the plaintiff would not have incurred injury. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 177 (3d Cir.2001). The loss causation element is derived from " 'standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." ' *Id.* (quoting *Bastian v. Petren Res. Corp.,* 892 F.2d 680, 685 (7th Cir.1990)). Nevertheless, as the price for securities on open markets is the function of numerous factors and participants, it is rarely possible to isolate a single event as the sole cause of a particular downturn or upturn in the security's price. Consequently, the law requires only that a plaintiff establish that defendant's wrongful conduct was a substantial factor in the market change. *See Semerenko v. Cendant Corp.,* 223 F.3d 165, 187 (3d Cir.2000). FN2

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

FN2. Alleging causation under a substantial factor theory is hardly a novel concept. *See* Rest. (2d) Torts § 431.

***13** Defendants contend that the analysis of Lead Plaintiffs' damages expert is insufficient proof of loss causation because it fails to identify what portion of the plaintiffs' economic loss is attributable to the alleged actionable statements and what portion is merely attributable to the termination announcement itself. "To satisfy the loss causation element, a plaintiff need not show that a misrepresentation was the sole reason for the investment's decline in value. Ultimately, however, a plaintiff will be allowed to recover only damages actually caused by the misrepresentation." *Robbins v. Kroger Properties, Inc.,* 116 F.3d 1441, 1447 n. 5 (11th Cir.1997). Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact. *See EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 884 (3rd Cir.2000). Where a plaintiff alleges a fraud-on-the-market theory based upon a public dissemination of misleading material facts, the causal nexus between the misleading statement and a plaintiff purchasing or selling that security may be presumed. *See Basic v. Levinson,* 485 U.S. 224, 242-47 (1988). As Lead Plaintiffs' theory does rest upon a fraud-on-the-market theory, the court finds that Lead Plaintiffs have met the loss causation element. FN3 Defendants, therefore, are not entitled to summary judgment on these grounds.

FN3. The court notes that defendants' criticism of Lead Plaintiffs' damages expert has merit as it relates to proving actual damages. The defendants' motion and the court's decision concern only the issue of proof of loss causation and, in that regard, the evidence is sufficient.

### D. Section 20(a)

Lead Plaintiffs allege that Don Tyson and John Tyson are also liable as controlling persons under § 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a (2004). To be liable under § 20(a), a plaintiff must prove the following: (1) the defendant is a controlling person within the meaning of the statute; (2) a primary securities violation by a third party within the gambit of defendant's control; and (3) culpable participation by the defendant. *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 888, 890 (3d Cir.1975) ; *In re Digital Island Sec. Litig.,* 223 F.Supp.2d 546, 560 (D.Del.2002). As the court has granted summary judgment as to primary liability of each defendant, there is not a predicate primary violation of federal securities law to sustain a claim under § 20(a). Further, the court also concludes that Don Tyson and John Tyson are entitled to summary judgment because Lead Plaintiffs have failed to demonstrate the requisite level of culpable participation.

Third Circuit precedent requires that a plaintiff prove culpable participation, i.e., "deliberate and intentional[ ]" action or inaction by the defendant " to further the fraud." *Rochez Brothers,* 527 F.2d at 890. Even if the issued statements constituted misrepresentations, where, as here, the undisputed facts are that Don Tyson and John Tyson did not participate in the drafting and release of the issued statements, did not dictate the specific content of the issued statements and did not review the content of the statements until they were publicly issued, Don and John Tyson cannot be said to have culpably participated. Lead Plaintiffs argue that this amounts to deliberate indifference. While deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another. *See Rochez Brothers,* 527 F.2d at 890. At most, the evidence of Don and John Tyson's conduct would amount to negligence in failing to oversee the actions of corporate officers but that, without more, does not sustain a finding of controlling person liability. Consequently, Don Tyson and John Tyson are entitled to summary judgment on Lead Plaintiffs' claim under § 20(a).

### E. Lead Plaintiffs' Motion for Summary Judgment

***14** Having concluded that defendants are entitled to summary judgment on each of Lead Plaintiffs' claims, Lead Plaintiffs' motion for summary judgment will be denied. (D.I.157)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2004 WL 1396269, Fed. Sec. L. Rep. P 92,847
**(Cite as: Not Reported in F.Supp.2d)**

V. CONCLUSION

For the reasons discussed above, the court will grant
defendants' motions for summary judgment
(D.I.161, 163) and deny Lead Plaintiffs' motion.
(D.I.157) An appropriate order shall issue.

ORDER

At Wilmington this 17th day of June, 2004,
consistent with the memorandum opinion issued this
same day;

IT IS ORDERED that:

1. The motions of defendants Don Tyson, John
Tyson, Les Baledge and Tyson Foods, Inc. for
summary judgment are granted. (D.I.161, 163)

2. Lead Plaintiffs' motion for summary judgment is
denied. (D.I.157)

3. The Clerk of the Court is directed to enter
judgment in favor of defendants John Tyson, Don
Tyson, Les Baledge and Tyson Foods, Inc. and
against Lead Plaintiffs.
10 NO. 5 Andrews Sec. Litig. & Reg. Rep. 5 10
NO. 5 Andrews Sec. Litig. & Reg. Rep. 5 10 NO. 5
Andrews Sec. Litig. & Reg. Rep. 5 Related
Andrews Newsletter Articles(Back to Top)10 NO. 5
Andrews Sec. Litig. & Reg. Rep. 5
D.Del.,2004.
In re Tyson Foods, Inc.
Not Reported in F.Supp.2d, 2004 WL 1396269,
Fed. Sec. L. Rep. P 92,847

Briefs and Other Related Documents (Back to top)

• 2004 WL 1125187 (Trial Motion, Memorandum
and Affidavit) Lead Plaintiffs' Opposition to
Defendants' Motion for Leave to File Sur-Reply
(May. 05, 2004)
• 2004 WL 869617 (Trial Motion, Memorandum
and Affidavit) Defendants' Consolidated Reply
Brief in Support of Their Respective Motions for
Summary Judgment (Apr. 05, 2004)
• 2004 WL 874829 (Trial Motion, Memorandum
and Affidavit) Defendants' Answering Brief in

Opposition to Lead Plaintiffs' Motion for Summary
Judgment (Mar. 22, 2004)
• 2004 WL 601957 (Trial Pleading) Lead Plaintiffs'
Opening Brief in Support of Their Motion for
Summary Judgment on Liability (Corrected
Version) (Feb. 26, 2004)
• 2004 WL 601956 (Trial Pleading) Defendants
Don Tyson and John Tyson's Brief in Support of
Motion for Summary Judgment (Feb. 19, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 8



Not Reported in A.2d                                                                                     Page 1

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

▷

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
In re WHEELABRATOR TECHNOLOGIES INC. SHAREHOLDERS LITIGATION.
**C.A. No. 11495.**

Submitted: June 1, 1992.
Decided: Sept. 1, 1992.

**\*\*783** Joseph A. Rosenthal and Kevin Gross , of Rosenthal, Monthait, & Gross, P.A. , Carolyn D. Mack , of Greenfield & Chimicles , Wilmington, Steven G. Schulman and Lee S. Shalov , of Milberg, Weiss, Bershad, Specthrie & Lerach ; Abbey & Ellis; Goodkind, Labaton & Rudoff; Law Offices of Joseph H. Weiss; and Law Offices of Curtis V. Trinko, all of New York City; and Schiffrin & Craig, Ltd., Chicago, Ill., for plaintiffs.
**\*\*784** David C. McBride and Bruce L. Silverstein , of Young, Conaway, Stargatt & Taylor, Wilmington, for defendants Wheelabrator Technologies, Inc. and the Individual defendants.
Henry E. Gallagher, Jr. , and John C. Kairis , of Connolly, Bove, Lodge & Hutz , Wilmington, and Ernest Summers, III , of Waste Management, Inc., Oak Brook, Ill., for defendant Waste Management, Inc.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.
\*1 Beginning on April 5, 1990, the plaintiffs, who are shareholders of Wheelabrator Technologies, Inc. ("WTI"), filed several shareholder class actions challenging a proposed merger between WTI and Waste Management, Inc. ("Waste"). Named as defendants were WTI, its board of directors, and Waste. The actions were later consolidated, and

the plaintiffs filed a Consolidated Amended Class Action Complaint on August 10, 1990. Following expedited discovery, the plaintiffs moved to preliminarily enjoin the merger. By Opinion dated September 6, 1990, the Court denied that motion. *In re Wheelabrator Technologies, Inc. Shareholders Lit.,* Del.Ch., Cons.C.A. No. 11495, Jacobs, V.C. (Sept. 6, 1990) ("*Wheelabrator 1* "). WTI's stockholders approved the merger the following day.

The plaintiffs then filed a Second Amended Consolidated Class Action Complaint (the " complaint"), seeking declaratory relief and money damages, or, alternatively, rescission of the merger. On August 12, 1991, the defendants moved to dismiss the complaint pursuant to Chancery Court Rule 12(b)(6). The parties briefed that motion, and orally argued it on March 13, 1992. Thereafter, the parties submitted supplemental briefs at the Court's request. This is the Opinion of the Court adjudicating the defendants' motion to dismiss the complaint.

I. *PERTINENT FACTS* FN1

WTI is a publicly held Delaware corporation in the business of developing and providing refuse-to-energy services. Waste provides **\*\*785** international waste management services to commercial, industrial, and municipal customers.
In August, 1988, Waste acquired a 22% equity interest in WTI, and as a result, Waste became entitled to (and did) designate four of WTI's eleven directors.

Between December, 1989 and March, 1990, Waste decided that its best interests would be served by increasing its investment in WTI to a majority equity position. On March 23, 1990, principals of Waste and WTI met to discuss what ultimately became the merger agreement. On March 30, 1990, WTI's board of directors (excluding Waste's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 2

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
(Cite as: Not Reported in A.2d)

director-designees) unanimously approved the
merger agreement, under which Waste would
acquire an additional 33% of WTI's common stock
and become a 55% stockholder of WTI. The
acquisition would take the form of a stock-for-stock
merger of a Waste subsidiary into WTI. Each
share of WTI common stock would be converted
into .574 shares of newly issued WTI stock and
.469 shares of Waste common stock. That
exchange ratio would allow WTI's stockholders to
receive a 10% premium over the market value of
the WTI shares being given up in the merger. FN2
As part of the merger agreement, Waste and WTI
also executed five other separate agreements,
denominated "Ancillary Agreements." FN3

On July 30, 1990, WTI and Waste disseminated to
WTI's shareholders a joint proxy statement stating
that the boards of both corporations advocated
shareholder approval of the merger agreement as
outlined above. As earlier stated, a majority of
WTI's stockholders (excluding Waste) approved the
merger on September 7, 1990.

**786 After the merger two events transpired that
are subjects of the complaint. First, on November
17, 1990, WTI announced that it would write-off
approximately $40 million of merger-related
restructuring charges against its third quarter
earnings. As a result, WTI would report a $7.2
million third-quarter loss instead of enjoying a
$32.7 million gain. Second, in late December,
1990, Waste announced that its subsidiary, Waste
Management International, expected its 1990
revenues to be more than double the previous year's
level of $388 million. FN4

## II. THE CONTENTIONS

In their complaint the plaintiffs seek declaratory
relief and compensatory and/or rescissory damages,
or, alternatively, rescission of the merger. Count I
of the complaint alleges that WTI and its directors
breached their duty to make adequate disclosure to
WTI's shareholders by distributing a proxy
statement that was materially false and misleading
in various respects. Count II claims that WTI and
its directors, aided and abetted by Waste, breached

their duties under *Revlon, Inc. v. MacAndrews &
Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173
(1986) ("*Revlon* "), to maximize shareholder value
in the merger transaction. Count III charges that
WTI and its directors breached their duty of care to
WTI's shareholders by entering into the merger
agreement and recommending its approval by
shareholders. Count IV avers that WTI and its
directors, aided and abetted by Waste, breached
their duty of loyalty to WTI's shareholders.

*2 The defendants argue that the complaint (or
portions thereof) must be dismissed for the
following reasons: (a) the complaint fails to allege
any actionable disclosure violations; (b) therefore,
the shareholder vote approving the merger operated
as a fully informed ratification barring the plaintiffs'
other claims; (c) an exculpatory provision in WTI's
certificate of incorporation bars the plaintiffs'
money damage claims against WTI's directors for
breach of their *Revlon* duties and their duties of care
and disclosure; (d) as a corporate entity, WTI owed
no fiduciary duties to its shareholders, and cannot
be held vicariously liable for its directors' breaches
of fiduciary duty; (e) Waste owed no fiduciary
duties to WTI's shareholders, since it **787 was not
a majority stockholder before the merger; (f)
Waste's designees on the WTI board violated no
fiduciary duty because those directors did not
participate in the merger negotiations or
deliberations on WTI's behalf; and (g) WTI's
directors did not breach any duties prescribed by
*Revlon.* FN5

To succeed on this motion to dismiss, the
defendants must demonstrate that the plaintiffs are
not entitled to the relief they seek under any set of
facts that could be proven to support their claims.
*Rabkin v. Philip A. Hunt Chemical Corp.,*
Del.Supr., 498 A.2d 1099, 1104 (1985). In
applying this standard, the Court will draw all
reasonable inferences from the well-pleaded
allegations of the complaint, which, for purposes of
the motion, are taken as true. However, inferences
and conclusions of fact that are unsupported by
specific factual allegations will not be accepted as
true. *Grobow v. Perot,* Del.Supr., 539 A.2d 180,
187 n. 6 (1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 3

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

For the reasons explained below, I conclude that the motion to dismiss must be granted with respect to (i) all but one of the plaintiffs' disclosure claims, (ii) the *Revlon* claims, (iii) the claims against WTI other than for equitable fraud, (iv) the claims against Waste and its designees to the WTI board, and (v) the plaintiffs' money damage claims against WTI's directors for breach of the duty of care. In all other respects the motion will be denied. The Court addresses the plaintiffs' disclosure claims in Part III of this Opinion. In Part IV the Court treats the plaintiffs' *Revlon* claims, and in Part V it considers the arguments advanced separately on behalf of specific defendants. Finally, in Part VI the Court considers the defense based upon WTI's exculpatory certificate provision.

### III. THE DISCLOSURE CLAIMS

Since the legal sufficiency of the plaintiffs' disclosure claims determines whether the Court reaches the issue of shareholder ratification, those claims are addressed first. Had no disclosure claim survived, the Court would conclude (for present purposes) that the directors' actions were ratified by a fully informed shareholder vote. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985). Since **788 one disclosure claim does survive, the Court will not reach the ratification issue.

*3 With one new addition (and a few new twists), the plaintiffs' disclosure claims are identical to those earlier presented on the preliminary injunction motion. Thus, the plaintiffs repeat their claim that the proxy statement was false, misleading, and incomplete in its disclosures relating to comparable transactions and companies and the adequacy of the premium received by shareholders ("the comparables"); the Ancillary Agreements and their value to WTI; the financial condition of Waste, including potential material criminal and/or civil liabilities; and the merger negotiations and board deliberations. (*See* Sec.Am.Comp., ¶¶ 34(A)-(D).) The only new disclosure claim is that the proxy statement failed to disclose the $40 million merger-related charge against earnings that WTI announced approximately three months after the merger. (*See id.,* ¶ 34(E).)

To state a cognizable claim for breach of the duty of disclosure, the alleged disclosure violations must be material. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985). FN6 In *Wheelabrator 1,* the Court ruled that the plaintiffs would probably not succeed in establishing their disclosure claims, because the plaintiffs had not established the materiality of certain of the alleged improper disclosures, and the proxy statement itself negated certain of their other claims that material facts had been misrepresented or omitted. That preliminary ruling, to be sure, does not preclude the plaintiffs from realleging in their complaint their previously rejected claims. But, by the same token, neither does it preclude the Court from applying its previous analysis on this motion to dismiss (subject, of course, to the constraints governing Rule 12(b)(6) motions). Applying that selfsame approach, I conclude that the plaintiffs' disclosure claims, with one exception, fare no better now than they did before. FN7

**789 For the reasons now discussed, only one of the disclosure claims survives the dismissal motion.

### A. *Disclosures Concerning the "Comparables"*

In *Wheelabrator 1,* I concluded that the purpose of the proxy disclosures relating to the "comparables" was simply to recite the information and analysis that WTI's financial advisors had provided to the WTI board in connection with the merger. As thus viewed, those disclosures were not materially false or misleading. *See Wheelabrator 1, supra,* at 13-14. Despite that ruling, the plaintiffs argue that on this motion the Court must now credit their allegation that these disclosures were intended to persuade WTI's shareholders that the merger was a " good deal." (*See* Or.Arg.Tr. at 49-62.) I cannot agree. The Court based its earlier (preliminary) conclusion upon the express language of the proxy statement, which was-and still is-incorporated into the complaint by reference. *See supra* note 6. That proxy language plainly discloses that the purpose of these disclosures was to recount the investment bankers' presentations to the board. In my view, no reasonable shareholder could read the disclosure language as an advocacy statement. FN8

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

What the plaintiffs have done is mischaracterize in their complaint a particular fact disclosed in the proxy statement. Based on that mischaracterization the plaintiffs then claim that the fact was misleadingly disclosed. In such circumstances the Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegation that flows from it. Nothing plaintiffs have presented alters my previous evaluation of this disclosure claim.

B. *Disclosures Relating to the Ancillary Agreements*

**\*4** To support their disclosure claim relating to the Ancillary Agreements, the plaintiffs argue:

**\*\*790** Defendants have represented that the Ancillary Agreements were a "meaningful benefit" to WTI's shareholders. (Proxy at 29) The statement is misleading since defendants failed to clearly and candidly disclose the directors' failure to obtain any quantification of the benefits which would flow from said agreements, as well as several salient factors detracting from or refuting any such purported benefits. (Complaint ¶ 25) Again, once defendants chose to speak, they had a fiduciary duty to tell the whole truth. Certainly some shareholders would find defendants' lack of valuation concerning the Ancillary Agreements as affecting the "total mix" of information in deciding whether to approve the proposed merger transaction.

(Pl.Ans.Br. at 38-39.)

The flaw in this claim lies in its premise that the proxy statement did not "clearly and candidly disclose the directors' failure to obtain any quantification of the benefits which would flow from [the Ancillary Agreements.]" That premise is fatally undercut by the proxy disclosure that WTI's financial advisors "made no attempt to quantify the benefits which might be achieved pursuant to these agreement[s]." (Proxy St. at 39.) In addition, the second (and unstated) premise of the plaintiffs' disclosure claim-that a qualitative prediction must be quantified if it relates to value-is not supported by any authority cited to or located by this Court. *See In re Dataproducts Corp. Shareholders Lit.,* Del.Ch., C.A. No. 11164, Jacobs, V.C., Mem.Op. at

17-18 (Aug. 22, 1991). Accordingly, no further disclosure was required. *Wheelabrator 1, supra,* at 18 (citing *In re Genentech, Inc. Shareholders Lit.,* Del.Ch., Cons. C.A. No. 11377, Chandler, V.C., Mem.Op. at 21 (June 6, 1990)).

The plaintiffs also claim that the proxy statement misleadingly failed to disclose the value of certain "costs" to WTI associated with the Ancillary Agreements. One such claimed cost was WTI's having abandoned its international waste disposal business in exchange for an option to purchase shares of Waste Management International at a discount (which, plaintiffs contend, was less valuable). That cost, plaintiffs urge, was substantial and material, as evidenced by Waste's post-merger announcement (in December, 1990) that Waste Management International's revenues in 1990 would be twice the 1989 level. (Sec.Am.Comp., ¶¶ 25(A), 30.) Thus, plaintiffs conclude, WTI would have profited more by competing with Waste **\*\*791** Management International than by gaining the right to purchase its shares at a discount.

But the complaint does not allege that the directors knew of or attributed any specific dollar value to that Ancillary Agreement. Nor do plaintiffs cite authority for their unstated premise that the directors had a fiduciary or other affirmative duty to place a dollar value on that agreement when disclosing its terms. The proxy statement clearly disclosed that WTI would be giving up its international waste disposal business in exchange for the option. (*See* Proxy St. at 52.) So far as the complaint reveals, that disclosure provided the stockholders with essentially the same information that the directors had when they evaluated this particular agreement.

**\*5** The other alleged cost of the Ancillary Agreements was WTI's having taken over Waste's medical waste business, which (the plaintiffs allege) was unprofitable and politically unpopular. (Sec.Am.Comp., ¶ 25(B).) That claim labors under a similar infirmity, namely the implicit (and unsupported) assumption that the defendants had an underlying affirmative duty to place a dollar value on that "cost" and then disclose that value. Since

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

no such duty exists here, this claim also fails.

For these reasons the disclosure claims relating to the Ancillary Agreements are legally insufficient.

### C. *Disclosures Relating to Waste*

The plaintiffs next allege that the proxy statement failed to disclose certain information essential to determining Waste's value. They first allege that there were undisclosed "potentially material criminal and civil liabilities of Waste arising from its waste-handling activities." These included potential liabilities arising out of a contract between the United States Army and Chemical Waste Management (Waste's 78% subsidiary) that was being investigated by the Army and the Federal Bureau of Investigation. (Sec.Am.Comp., ¶ 26(B).) The complaint, however, alleges no facts from which one could infer that that information was material; it alleges only (and in conclusory terms) that the information was "potentially" material. (*Id.*)

The plaintiffs also claim that there were other inadequate disclosures relating to Waste, namely that the proxy statement (i) contained no projections of or other information about Waste's value, other than financial statements and valuations by Lazard and Salomon, which were based on public information (*see id.,* ¶ 26(A)); and (ii) falsely implied that Waste was financially robust and growing (*see **792 id.,* ¶ 26(C)). Once again, however, the plaintiffs have not coherently articulated a basis for imposing a duty to disclose information in addition to what was actually disclosed. Moreover, the proxy statement factually negates both disclosure claims. As noted in *Wheelabrator 1, supra,* at 16:
> [T]he record does not support the plaintiffs' claim that the Proxy disclosures concerning Waste are insufficient. The Proxy Statement contains detailed disclosures of Waste's business and management (Proxy St. at 79-80, 83-94), and of its historical financial data and pro forma financial statements. (*Id.* at 19-21, 62-63).

Since the plaintiffs have no new support for their

resurrected claims, those claims will be dismissed.

### D. *Disclosure Relating to the Post-Merger Restructuring Charge*

The plaintiffs do advance one new disclosure claim:
> On November 17, 1990, WTI announced its third quarter and nine-month financial results. WTI took a $40 million pretax restructuring charge related to the merger with Waste. According to WTI's Form 10-Q for the quarter ended September 30, 1990, the charge "reflects the anticipated costs of realigning the Company's operations to fully realize the potential benefits of the integration with [Waste], and includes employee severance, relocation and other related charges." This $40 million charge was sufficient to turn a $32.7 million quarterly gain from operations into a $7.2 million [sic] loss. The Proxy Statement, though it includes projections for WTI through December 31, 1990, makes no mention of a $40 million charge as a result of the merger.

*6 (Sec.Am.Comp., ¶ 29.)

This claim is deficient because the complaint does not allege that at the time of the merger WTI's directors knew or should have known that WTI would write off $40 million as a restructuring charge against earnings. The merger was approved on September 7, 1990, two months before WTI publicly filed its Form 10-Q disclosing that write-off. Even if that information were material, WTI's directors cannot be faulted for failing to disclose what (so far as the complaint reveals) was, at that point, unknown and unknowable. *In re Anderson, Clayton Shareholders Lit.,* Del.Ch., 519 A.2d 669, 693 (1986).

The plaintiffs insist that one can infer from the pleaded facts that the defendants knew or should have known about the restructuring**793 charge at the time of the vote on the merger. FN9 I cannot agree. The plaintiffs have pointedly *not* alleged that WTI's directors knew or could have known about the restructuring charge at that time, and the proxy statement itself specifically disclaimed any predictions of post-merger results. (*See id.* at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

15-18; Proxy St. at 18-19.) The plaintiffs cannot fill by inference a factual void they created in their own pleading. Therefore, this new disclosure claim will also be dismissed.

### E. *Disclosures Concerning the Merger Negotiations and Board Deliberations*

The one disclosure claim that the Court finds to be legally sufficient concerns the merger negotiations and WTI's board deliberations. The plaintiffs allege that Waste dictated the terms of the transaction to WTI's board, and that WTI and Waste engaged in only one day of negotiations. If true, that alleged fact contradicts the proxy statement disclosure that there were substantial merger negotiations that took place over the course of one week. (*See* Proxy St. at 30.) That disputed fact would also be material: it would create a doubt in the shareholders' minds whether the directors adequately represented the shareholders' interests during the negotiations. A substantial likelihood exists that a reasonable shareholder would find that fact important in deciding whether to vote for the merger. *Rosenblatt v. Getty Oil Co., supra.*

The defendants respond that the plaintiffs are simply pejoratively characterizing the events leading up to the merger, and that WTI's directors had no duty to adopt that sinister characterization and confess to the plaintiffs' charges of wrongdoing. That argument cannot succeed, because what the plaintiffs complain of is an omission to disclose a material *fact*. Although the apparent lack of factual support for this allegation gives me reason for concern, FN10 that concern **794 is not a valid basis to dismiss the claim at this procedural stage.

Since this disclosure claim is legally sufficient, the Court does not reach the issue of the effect of shareholder ratification. For present purposes the shareholder vote approving of the merger will not be presumed to have been fully informed. *See Smith v. Van Gorkom,* 488 A.2d at 890. Because shareholder ratification is the only defense that the defendants have interposed against the plaintiffs' duty of loyalty and duty of care claims against WTI's directors, *see supra* note 5, those claims will

survive this motion. FN11

### IV. THE REVLON CLAIMS

*7 The most problematic claims concern the alleged breach of the directors' so-called *Revlon* duty to maximize shareholder value in a sale of corporate control. The defendants urge dismissal of these claims, arguing that *Paramount Communications, Inc. v. Time Inc.,* Del.Supr., 571 A.2d 1140 (1989) ( "*Paramount* "), is the controlling authority for when *Revlon* duties attach, and that under *Paramount* no *Revlon* duties were triggered here.

The plaintiffs counter by arguing that *Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279 (1989) ("*Barkan* ") is the controlling authority, and that under *Barkan* the directors' *Revlon* duties were triggered and violated. The plaintiffs further contend that *Paramount* and *Barkan* are consistent, but that even if the Court finds to the contrary, the triggering requirements of *Paramount* were satisfied as well.

As for when *Revlon* duties are triggered, the Supreme Court's pronouncements in *Barkan* and *Paramount* are not easily reconciled, for they appear to flow from different premises. The premise of *Barkan* is that "the general principles announced in *Revlon* [and in other cited decisions] govern this case and every case where a fundamental change of corporate control occurs or is contemplated." 567 A.2d at 1286 (footnote omitted). Reasoning from that premise, the *Barkan* Court continued:

> This Court has found that certain fact patterns demand certain responses from the directors.... *Revlon* is merely **795 one of an unbroken line of cases that seek to prevent the conflicts of interest that arise in the field of mergers and acquisitions by demanding that directors act with scrupulous concern for fairness to shareholders....
> When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairnss demands a canvas of the market to determine if higher bids may be elicited. When, however, the directors possess a body of reliable evidence with which to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 7

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market.
*Id.* at 1286-87 (citations omitted).

Under *Barkan* it appears that a board becomes subject to *Revlon* duties whenever "a fundamental change of corporate control occurs or is contemplated," *id.* at 1286, and that the nature of those duties depends upon particular factual circumstances. *Barkan* holds that when only one bidder is present, the directors have a duty to be adequately informed of the value of their own company before committing it to a change-of-control transaction. If the directors act without that knowledge they breach that duty, unless they first conduct an auction or canvass the market.

The premise of *Paramount* appears more narrow. There the Supreme Court stated that *Revlon* duties arise when "the dissolution or break-up of the corporate entity [is] inevitable." 571 A.2d at 1150. The Supreme Court then described two circumstances where that event will generally occur:
**\*8** Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear breakup of the company. However, *Revlon* duties may also be triggered where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company.
*Id.* (citation and footnote omitted). Thus, *Paramount* suggests that *Revlon* duties arise only (i) in the two enumerated scenarios and (ii) in circumstances involving undefined "other possibilities."

The plaintiffs contend that *Paramount* and *Barkan* are reconcilable if *Paramount*'s "other possibilities" category is understood to include **\*796** *Barkan*'s formulation that *Revlon* duties arise whenever "a fundamental change of corporate control occurs or is contemplated." The plaintiffs' attempted

reconciliation is problematic. A "fundamental change of corporate control" need not involve the "dissolution" or "breakup" of a company. Moreover, *Paramount* expressly rejects the proposition that *Revlon* duties automatically arise whenever a corporate transaction "might be construed as putting a corporation either 'in play' or 'up for sale'" FN12-two situations arguably satisfying the *Barkan* "fundamental change of corporate control" standard. Because *Barkan* appears not to fit within *Paramount*'s categories, it would be difficult to conclude with confidence that the *Barkan* formulation was intended as one of *Paramount*'s "other possibilities."

It is, of course, possible that *Paramount* rejects the more generic *Barkan* formulation of when *Revlon* duties arise, and, thus, overrules *Barkan sub silentio* on that point. Absent a clear indication to that effect by our Supreme Court, however, I am not prepared to so conclude. *Paramount* gives no such clear indication; indeed, it does not even cite *Barkan*, a case the Supreme Court decided only three months earlier.

Fortunately, this case does not require the Court to reconcile the standard of *Paramount* with that of *Barkan*, for under either standard the plaintiffs have failed to plead a cognizable *Revlon* claim. The plaintiffs clearly have not satisfied the requirements of *Paramount*. FN13 And, even assuming (but without deciding) that *Revlon* duties were triggered under the *Barkan* standard, no facts are alleged that support a cognizable claim that those duties were breached here. That is, even if there occurred a "fundamental change of corporate control" FN14 that triggered *Revlon* duties under *Barkan*, the plaintiffs **\*\*797** have not alleged that WTI's directors were so uninformed about WTI's value that they violated their *Revlon* duties by not conducting an active survey of the market, or "market check."

**\*9** What the plaintiffs do allege is that WTI's directors failed to conduct a market check to assure themselves that there were no superior alternative transactions. (Sec.Am.Comp., ¶ 46.) That, without more, is insufficient. Under *Barkan* the plaintiffs must allege that WTI's directors did not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

have adequate information about the value of WTI. Here, the complaint says nothing about what the directors' did (or did not) know about WTI's value.

The plaintiffs stress that the complaint also alleges:
> The board of directors was not advised that it must, and did not, evaluate the adequacy of the merger. The board did not direct Lazard and Salomon to investigate and obtain the best available alternative transaction, limiting the advisors' role simply to determining whether the offer was "fair."

(*Id.,* ¶ 21(D); *see also id.,* ¶¶ 43, 46(A).) That allegation also does not address the directors' knowledge of WTI's value. Fairly read, it charges that WTI's board abdicated to its financial advisors the responsibility of evaluating the merger consideration, yet did not direct those advisors to investigate and obtain the best available alternative transaction. (*See* Pl. Ans. Br. at 68-69.) The focus of that allegation is upon the scope of the financial advisors' investigation, not upon the directors' knowledge of the company's value. While overseeing a faulty investigation might constitute a breach of other fiduciary duties owed by directors under more general principles, that conduct does not constitute a breach of *Revlon* duties as described in *Barkan.* FN15 Because the complaint fails to allege a breach of *Revlon* duties under the standards of either *Barkan* or *Paramount,* the plaintiffs' *Revlon* claims must be dismissed.

## **798 V. CLAIMS AGAINST PARTICULAR DEFENDANTS

The defendants next urge the dismissal of all claims against particular defendants. They contend that no claim is stated against (i) WTI, because a corporate entity owes no fiduciary duties to its shareholders and cannot be held vicariously liable for its directors' breaches of fiduciary duty; (ii) Waste, because it was not a fiduciary, and therefore owed no fiduciary duties to WTI's shareholders before the merger; and (iii) Waste's designees on the WTI board, because those directors did not participate in the merger negotiations or deliberations. I address each argument in turn.

First, while it is correct that the corporate entity as such is not a fiduciary to its stockholders and cannot be held liable to them on that basis, the corporation can be held liable in cases involving fraud or affirmative misconduct. *Gaffin v. Teledyne, Inc.,* Del. Ch., C.A. No. 5786, Hartnett, V.C., Mem.Op. at 6-7 (Oct. 9, 1987) (*citing Radol v. Thomas,* 6th Cir., 772 F.2d 244, 258 (1985), *cert. denied,* 477 U.S. 903 (1986) ; *Jordan v. Global Natural Resources, Inc.,* S.D.Ohio, 564 F.Supp. 59 (1983) ; *Bankers Securities Corp. v. Kresge Department Stores, Inc.,* D.Del., 54 F.Supp. 378 (1944)); *see also In re Dataproducts Corp. Shareholders Lit.,* Del.Ch., C.A. No. 11164, Jacobs, V.C., Mem.Op. at 13 (Aug. 22, 1991). A claim for equitable fraud is stated where a plaintiff alleges (a) a false representation (which may be negligent) by the defendant, (b) justifiable reliance by the plaintiff upon that representation, and (c) resulting damage. *Gaffin, supra,* at 7-8. Those allegations must be pleaded with particularity. Ch. Ct. Rule 9(b).

*10 The complaint here states a claim for equitable fraud against WTI. The disclosure claims found to be legally sufficient herein are levelled at (among others) WTI. (*See* Sec.Am.Comp., ¶¶ 27(D), 34(D)). The plaintiffs allege that WTI falsely represented that substantial negotiations took place, when in fact they did not. It also avers that the proxy statement was "false, misleading, and incomplete in its descriptions of the merger negotiations and board deliberations, which were material factors for shareholders in evaluating the recommendations of the board of directors and its financial advisors." (*Id.,* ¶ 27.) These allegations, fairly read, claim that the plaintiffs justifiably relied upon the misrepresentation when deciding to approve the merger. And in challenging the adequacy of the merger consideration, the complaint adequately alleges resulting damage. (*Id.,* ¶ 33.)

Second, it is correct that Waste owed no fiduciary duties to WTI's shareholders before the merger, and that Waste's designees **799 on WTI's board violated no fiduciary duties since they did not participate in the merger negotiations on WTI's behalf. Yet, those facts do not necessarily dispose of the plaintiffs' independent claim that Waste and

Not Reported in A.2d                                                                                          Page 9

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

its designees to WTI's board aided and abetted WTI's other directors in breaching their fiduciary duty to WTI's stockholders. To evaluate that latter claim a different analysis must be employed.

To state an aiding and abetting claim against a nonfiduciary, the complaint must allege (i) the existence of a fiduciary relationship, (ii) a breach of that relationship, and (iii) knowing participation by the defendant in the fiduciary's breach. *See Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987). Of particular pertinence here is that the complaint must contain factual allegations from which "knowing participation" can be reasonably inferred. *Weinberger v. Rio Grande Indus.,* Del.Ch., 519 A.2d 116, 131 (1986). The allegations in the complaint are wholly conclusory. (Sec. Am. Comp., ¶¶ 10, 11, 49, 61.) Where, as here, it is undisputed that Waste's designees played no role in negotiating or approving the merger, such minimalist pleading will almost certainly be fatal. *See Citron v. E.I. DuPont de Nemours & Co.,* Del. Ch., 584 A.2d 490, 499 & n. 12 (1990) ; *Greenfield v. Tele-Communications, Inc.,* Del. Ch., C.A. No. 9814, Allen, C., Ltr. Op. at 6-9 (May 10, 1989).

The facts asserted in the complaint do not state a case for knowing participation. Not only were the Waste designees uninvolved, but also Waste was not a majority stockholder when the merger was negotiated and, significantly, plaintiffs do not allege that WTI's board was in some fashion controlled by Waste. *See Deutsch v. Cogan,* Del. Ch., C.A. No. 8808, Hartnett, V.C., Ltr. Op. at 6 (Apr. 11, 1989). Instead, plaintiffs rely on conclusory charges that Waste "dictated" terms to a self-dealing WTI board, after having threatened to dispose of its 22% minority position in WTI if its terms were not met. (Sec. Am. Comp., ¶¶ 17, 19A, 19C.) These allegations, if true, lead to an inference of hard bargaining on the part of Waste-conduct in which Waste had every right to engage-not of complicity in whatever breaches of duty WTI's board may have committed. "Knowing participation" requires more. *See In re Shoe-Town, Inc. Stockholders Lit.,* Del. Ch., C.A. No. 9483, Chandler, V.C., Mem. Op. at 20 (Feb. 12, 1990) (knowing participation

sufficiently alleged where the defendant charged with aiding and abetting took an active role in advising the board, the buyer, and the special committee).

**\*11 \*\*800** For these reasons, all claims against WTI will be dismissed with the exception of the claim for equitable fraud. The claims against Waste and its designees on WTI's board will also be dismissed.

### VI. EFFECT OF EXCULPATORY CERTIFICATE PROVISION

On November 21, 1986, long before the events at issue, WTI will amended its certificate of incorporation pursuant to 8 *Del.C.* § 102(b)(7), to add a provision eliminating its directors' personal liability for money damages for specified breaches of fiduciary duty. That provision ("Article FOURTEENTH") tracks the language of § 102(b)(7) and pertinently states:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

(App. to Def. Op. Br., Exh. 3 at 3.) The defendants take the position that by virtue of Article FOURTEENTH, the plaintiffs' duty of care and duty of disclosure claims must be dismissed, as must their *Revlon* claims against WTI's directors, at least insofar as those claims seek monetary damages. FN16

The plaintiffs argue that the Court may not consider Article FOURTEENTH on this Rule 12(b)(6) motion, because the complaint does not plead or otherwise refer to that provision. There is authority to support this view. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V.C., Mem. Op. at 7

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 10

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

(Apr. 20, 1992); *see Rothenberg v. Santa Fe Pacific Corp.,* Del. Ch., C.A. No. 11749, Jacobs, V.C. (May 18, 1992). The defendants did not raise Article FOURTEENTH as an affirmative defense in their Rule 12(b)(6) dismissal motion. They contend, instead, that this Court may and should take judicial notice of WTI's certificate provision. Thus, the Court must **\*\*801** resolve a threshold issue: can it judicially notice the contents of a certificate of incorporation of a Delaware corporation on a Rule 12(b)(6) dismissal motion? Having reviewed the pertinent legal authorities and the parties' supplemental briefs, I conclude that it can.

Rule 201(b) of the Delaware Uniform Rules of Evidence states:
> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Del. Unif.R.Ev. 201(b). The certificate of incorporation of a Delaware corporation falls within the ambit of that Rule. By law it is filed with, and is obtainable by resort to, the office of the Secretary of State of Delaware. *See* 8 *Del. C.* § 101. That office is located within the territorial jurisdiction of Delaware and is a source "whose accuracy cannot reasonably be questioned."

**\*12** The Court is not barred from taking judicial notice of a Delaware corporation's certificate of incorporation simply because the procedural setting is a motion to dismiss under Rule 12(b)(6). Judicial notice may be taken at any stage of the proceeding. Del.Unif.R.Ev. 201(f). The United States District Court for Delaware has specifically held that publicly filed documents (of which a certificate of incorporation is an example) are judicially noticeable on a motion to dismiss. *Diceon Electronics, Inc. v. Calvary Partners, L.P.,* D.Del., 772 F.Supp. 859, 861 (1991) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered."); *see also Southmark Prime Plus, L.P. v. Falzone,* D.Del., 776 F.Supp. 888,

891-92 (1991) ("[O]n a motion for judgment on the pleadings, as with motions to dismiss pursuant to Rule 12(b), the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate."). FN17

Having judicial noticed, and then considered, the contents of Article FOURTEENTH, I conclude as a matter of law that that Article bars the plaintiffs' duty of care claim insofar as it seeks **\*\*802** monetary damages against WTI's directors. *Rothenberg, supra,* at 9-10. However, because of Article FOURTEENTH's exceptions (which track those of § 102(b)(7)), that provision does not bar (a) the plaintiffs' duty of loyalty claims, (b) any claim that the directors derived an improper personal benefit from the merger, or (c) any claim that the directors' actions were not in good faith or involved intentional misconduct or knowing violations of law. FN18 *Id.* at 10 n. 6.

3

For the foregoing reasons, the pending motion to dismiss will be granted with respect to (i) the plaintiffs' disclosure claims, except for the claim relating to the merger negotiations, (ii) the *Revlon* claims, (iii) all claims against WTI except for the claims of equitable fraud, (iv) all claims against Waste and its designees to the WTI board, and (v) the plaintiffs' money damage claims against WTI's directors for breach of the duty of care. In all other respects the motion will be denied. Counsel shall submit a form of implementing order on notice.

> FN1. The facts are derived from both the complaint and the documents incorporated therein by reference.

> FN2. To support their claim that the merger price was unfair, the plaintiffs argue that the premium received by WTI's shareholders was only 4%. (*See* Sec.Am.Comp., ¶¶ 19(B), 33, 45(A), 55, 60.) The Court disagrees with the plaintiffs' analysis for the reasons stated in its earlier Opinion. *See Wheelabrator 1,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

*supra,* at 5 n. 2. That issue has no impact on the resolution of the pending motion, however.

FN3. The Ancillary Agreements are described in the preliminary injunction Opinion. *Wheelabrator I, supra,* at 6 n. 3. The terms of only two of those agreements are relevant on this motion. In one, Waste granted WTI an option to purchase 15% of the stock of Waste Management International, Inc. ("Waste Management International") at a discount from the fair market value of such stock at the time the option is exercised. (Waste Management International is a Waste subsidiary that owns most of Waste's interest in waste management service operations outside of North America.) In exchange for that option, WTI agreed to forego its own waste management service operations outside North America for ten years, and not to compete with Waste International in that particular market. In the other agreement, Waste gave WTI an option to purchase Waste's medical-waste disposal business at a 15% discount from fair market value.

FN4. Plaintiffs allege that this announcement evidences the harm caused to WTI by the Ancillary Agreement in which WTI agreed not to operate outside of North America for ten years. *See supra* note 3.

FN5. Notably, the defendants do not challenge the legal sufficiency of the plaintiffs' claims against WTI's directors for breach of their duties of care and loyalty. (*See* Def. Rep. Br. at 26 n. 12.) Rather, the defendants urge the dismissal of those claims solely on the basis of the affirmative defenses of shareholder ratification and WTI's exculpatory certificate provision.

FN6. The disclosure claims must also be validated by the contents of the disclosure

document. In evaluating the legal sufficiency of the plaintiffs' disclosure claims, the Court may consider the proxy statement, since it was specifically referred to and relied upon in (and is therefore deemed to be incorporated by reference into) the complaint. *Wiener v. The Southern Co.,* Del. Ch., C.A. No. 10525, Jacobs, V.C., Mem.Op. at 11 & n. 7 (Jan. 24, 1992) (and cases cited therein).

FN7. *See In re KDI Corp. Shareholders Lit.,* Del. Ch., Cons. C.A. No. 10278, Berger, V.C., Mem.Op. at 10-11 (Dec. 13, 1990) (The "disclosure claims ... were considered and rejected in connection with plaintiffs' motion for a preliminary injunction. Little more needs to be added in the context of this motion to dismiss.... Disclosure claims do not survive a motion to dismiss simply because they are inserted in the Complaint. There must be some basis from which this Court can infer that the non-disclosures were material....") (citations omitted).

FN8. The challenged proxy disclosures concerning the comparables are preceded by the following statement:
As described above ... Lazard Freres and Salomon Brothers delivered their written fairness opinions to the Board of Directors of WTI. In that connection, Lazard Freres and Salomon Brothers each conducted a review of certain financial information and discussed certain financial analyses prepared by them relating to WTI, [Waste] and the proposed transaction, and made a joint presentation concerning their review to WTI's Board of Directors, as further described below.
(Proxy St. at 37.)

FN9. Those facts are that the charge related directly to the merger, only a short period of time elapsed between the shareholders' approval of the merger and the disclosure of the restructuring charge, and that the magnitude of the charge itself

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

was such that WTI's directors knew or should have known about it at the time of the merger. (*See* Or. Arg. Tr. at 64-67.)

FN10. The Court rejected this claim at the preliminary injunction stage because it lacked sufficient record support. *Wheelabrator 1, supra,* at 16-17. At oral argument on the motion to dismiss, the Court asked plaintiffs' counsel whether, given that ruling, there was any evidentiary basis for this claim. (*See* Or. Arg. Tr. at 75.) Counsel responded that there was, citing the deposition of Mr. James Edward Koenig. The Court has reviewed that deposition, and continues to be of the view that on the present record the evidentiary support is scanty at best.

FN11. The defendants have raised WTI's exculpatory certificate of incorporation provision as a defense to the duty of care claims against WTI's directors, but only insofar as those claims seek money damages. These money damage claims are dismissed for the reasons discussed in Part VI of this Opinion.

FN12. *Paramount,* 571 A.2d at 1151.

FN13. Neither of the two *Paramount* scenarios for triggering *Revlon* duties are implicated here. The plaintiffs argue that this case falls under the first, *i.e.,* "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company." *Paramount,* 571 A.2d at 1150. However, Waste, not WTI, "initiated" the merger discussions and negotiations. (Am. Comp., ¶ 17). There was no "active bidding process" since there was only one bidder, and it is not altogether clear that the merger constituted a "sale" or "business reorganization," since WTI continues as a corporate entity and its public shareholders remained shareholders (albeit minority owners) of WTI after the merger. Finally,

there will be no "break-up of the company."

FN14. The defendants argue that no "change of corporate control" of WTI resulted from the merger, because Waste is a public company and the public shareholders of WTI became shareholders of Waste, another public company. As noted, I need not decide that issue here.

FN15. The plaintiffs' other fiduciary duty claims (Sec. Am. Comp., ¶¶ 54, 59.) survive this motion, even though they rest upon the same set of facts as the *Revlon* claims. *See supra* note 5. Thus, the practical result of dismissing the *Revlon* claim is that the plaintiffs will now be required to establish their fiduciary duty causes of action under a traditional analysis where they will bear the burden of establishing that the directors are not entitled to the presumptions of the business judgment rule.

FN16. Since the Court has determined that the *Revlon* claims must be dismissed on other grounds, *see supra* Part IV, it does not consider the effect of the exculpatory certificate provision on those claims.

FN17. Although Federal Court decisions interpreting Federal Rules of Civil Procedure are not binding, this Court accords them considerable weight when interpreting counterpart Chancery Court Rules. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1191 n. 11 (1988) ; *Moran v. Household Int'l., Inc.,* Del. Ch., 490 A.2d 1059, 1073, *aff'd,* Del.Supr., 500 A.2d 1346 (1985). Federal decisions interpreting counterpart Rules of Evidence are entitled to similar deference.

FN18. Nor does Article FOURTEENTH bar the plaintiffs' disclosure claims for monetary damages against WTI's directors, as the defendants urge. The defendants rely upon *In re Dataproducts Corp.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 13

Not Reported in A.2d, 1992 WL 212595, 18 Del. J. Corp. L. 778
**(Cite as: Not Reported in A.2d)**

*Shareholders Lit.,* Del. Ch., C.A. No.
11164, Jacobs, V.C., Mem.Op. at 12-13
(Aug. 22, 1991), where this Court found
that an exculpatory certificate provision
similar to Article FOURTEENTH barred
the plaintiffs' duty of disclosure claims for
monetary damages. The defendants'
reliance upon *Dataproducts* is misplaced,
because in that case:
the complaint [did] not allege that the
complained-of disclosure violations were
of the kind for which damages are allowed
under that certificate provision. Even
under liberal "notice pleading" standards
the complaint [could not] be fairly read to
charge the directors with having acted
intentionally or in bad faith, or with having
violated a fiduciary duty of loyalty (as
distinguished from the duty to exercise
appropriate due care).
*Id.* at 12. By contrast, the complaint here
specifically alleges that by virtue of the
nondisclosures WTI's directors "intended
to carry out ... a preconceived plan." (Sec.
Am. Comp., ¶ 33.) That is, the
complaint here (unlike that in *Dataproducts*
) alleges that the breach of the duty of
disclosure was an intentional violation of
the duty of loyalty. Thus, Article
FOURTEENTH does not bar the plaintiffs'
monetary damage claims against WTI's
directors for breach of their duty of
disclosure.

Del.Ch.,1992.
In re Wheelabrator Technologies Inc. Shareholders
Litigation
Not Reported in A.2d, 1992 WL 212595, 18 Del. J.
Corp. L. 778

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.