Tab 9



Not Reported in F.Supp.

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162

United States District Court, S.D. New York.
LEBHAR FRIEDMAN, INC., a New York Corporation, Plaintiff,
v.
MOVIELAB, INC., a New York Corporation, Saul Jeffee, John J. Kowalak, S. Richard Di Bona, Norman W. Elson, Henry Mendler, Leonard P. Weg and Michael P. Mayer, Defendants.
**No. 86 CIV. 9965 (SWK).**

Jan. 13, 1987.

*MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.
**\*1** This is an action for preliminary relief brought by plaintiff to redress allegedly unlawful activities by the defendants in connection with their solicitation of defendant corporation's shareholder proxies by means of an allegedly materially misleading Proxy Statement, dated December 16, 1986.

*THE PARTIES*

Defendant, Movielab, Inc. ("Movielab") is a corporation organized and existing under New York State law, with its principal place of business at 619 West 54 Street in Manhattan. Movielab engages primarily in video post-production services. Movielab has also been involved in various commercial real estate transactions.

Movielab is a public corporation whose common stock is listed on the American Stock Exchange. As of December 15, 1986 there were 1,643,908 shares of Movielab stock outstanding, and as of May 28, 1986, there were 1,336 record holders of Movielab common stock.

Defendant Saul Jeffee is Chairman of the Board of Directors and President of Movielab. As of December 1, 1986, Jeffee was the beneficial owner of 671,858 shares of Movielab common stock, approximately 40.9 percent of all issued and outstanding shares. Defendant Leonard P. Weg is Vice President, Treasurer, and Secretary of Movielab and a member of Movielab's Board of Directors. Defendants John J. Kowalak, S. Richard DiBona, Norman W. Elson, Henry Mendler, and Michael Mayer are members of Movielab's Board of Directors.

Plaintiff Lebhar Friedman, Inc. ("Lebhar") is a corporation organized and existing under New York State law, with its principal place of business at 425 Park Avenue in Manhattan. Lebhar is the record and beneficial owner of Movielab common stock, and as of December 1, 1986 was the beneficial owner of 338,400 shares of Movielab common stock, approximately 20.6 percent of all shares issued and outstanding.

*FACTS*

On June 2, 1986, Lebhar wrote a letter to the Board of Directors of Movielab demanding that Movielab commence an action for rescission and damages against defendants Jeffee, Kowalak, DiBona, Elson, Mendler, Weg and certain other persons. FN1 In this letter, Lebhar alleged that these defendants had caused Movielab to sell substantially all of its assets without shareholder approval, in violation of Section 909 of the New York Business Corporation Law, and had also engaged in other transactions which wasted the company's assets and violated the directors' duties to Movielab's public shareholders. FN2

On June 25, 1986, defendant Jeffee informed Lebhar by letter that on June 19, 1986 the Movielab Board of Directors had appointed defendant Mayer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

to analyze the claims in Lebhar's letter and that Mayer had been authorized by the Board to retain independent counsel to assist him in his investigation.

In July, 1986, defendant Mayer retained as independent counsel the New York law firm of Kramer, Levin, Nessen, Kamin & Frankel to prepare an investigative report analyzing Lebhar's charges. Arthur H. Aufses is the Kramer Levin attorney who has been responsible for the investigation and preparation of the report.

**\*2** On October 31, 1986, the independent counsel informed plaintiff that its work on the report was " nearing its end" and that the report "will soon be submitted to the Board". During the first or second week in November the independent counsel began to write the report. On November 14, 1986, the independent counsel submitted a draft version of the report, at that time still devoid of legal conclusions, to Mayer. At some time during Thanksgiving week of 1986, the independent counsel submitted a second draft to Mayer. On some date in the middle of December, but after December 15, the independent counsel submitted a third draft to Mayer. Then, on January 1, 1987, the independent counsel submitted the final version of the report to Mayer. The final report was released to Movielab's Board members on January 7, 1987, on the eve of the evidentiary hearing before this Court.

The report discusses the Movielab business decisions challenged by Lebhar in their June, 1986 letter: the Technicolor sale, defendant Jeffee's employment contract, the Besega loans, the failure to lease the vacant office space, and the directors' fees. The report does not recommend a shareholder derivative suit based on Lebhar's dissatisfaction with these aspects of Movielab's conduct. The report does recommend, however, the following action by Movielab's Board: 1) reconsidering Jeffee's employment contract in light of Movielab's present financial difficulties; 2) addressing the issues of short and long term planning, including Lebhar's demand for liquidation of the company; 3) meeting more frequently; and 4) seeking individual Board members with relevant experience in videotape post-production and

commercial real estate, because although Movielab now engages almost exclusively in these areas, neither of these businesses is now represented on the Movielab Board.

Meanwhile, on December 16, 1986, Movielab's Board of Directors disseminated a Proxy Statement to the corporation's shareholders. The Proxy Statement is intended for use at a shareholder meeting to be held on January 13, 1987, the first such meeting within past 2 months. The agenda for the annual meeting-as set forth in the Proxy Statement-includes the election of a Board of Directors, and the slate of nominees provided in the statement consists of the incumbent directors. The Proxy Statement contains no reference to the existence of an investigation or report or the recommendations contained in the report.

*ALLEGATIONS*

Based on these facts plaintiff alleges that defendants will violate Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n , and the provisions of the Securities and Exchange Commission's Rule 14a-9, 17 CFR 240.14a-9, promulgated thereunder, if Movielab's shareholders' vote on the current Proxy Statement at the shareholder meeting on January 13, 1987. Plaintiff alleges that the Proxy Statement as issued is unlawful under § 14(a) and Rule 14a-9 because it does not disclose, at the very least, the recommendations of the report as they relate to the individual defendants. Plaintiff alleges that these recommendations are material facts which have been omitted, and which by their omission, rendered other statements in the Proxy Statement misleading.

**\*3** Plaintiff also alleges that defendants' actions described above with regard to the Proxy Statement-which plaintiff alleges are designed to mislead Movielab's shareholders and entrench the individual defendants in office-also constitute a breach of their fiduciary duty to the shareholders, and are, therefore, also prohibited under New York State law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

In response, defendants assert that they were not required to disclose the recommendations in the Proxy Statement because at the time that it was issued-December 16, 1986-these recommendations were not in existence, or at the very least defendants were aware of their existence.

### PRELIMINARY INJUNCTION

Plaintiff FN3 moves this Court for a preliminary injunction directing defendants, to: 1) refrain from violating the provisions of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n , and the provisions of Rule 14a-9 promulgated thereunder; 2) immediately file a corrective proxy statement with the Securities and Exchange Commission and immediately mail copies to Movielab's shareholders after such corrective proxy statement has been reviewed by plaintiff and this Court; 3) refrain from taking any steps to solicit or vote any proxies, consents, or authorizations with respect to the Movielab's Proxy Statement, dated December 16, 1986; 4) refrain from making any false or misleading public statements regarding Movielab or its directors; or 5) refrain from filing or disseminating any false or misleading proxy solicitation materials relating to the voting of Movielab common stock.

On December 31, 1986, Judge Leisure, acting as Part One Judge, granted a temporary restraining order on plaintiff's behalf. On January 8, 1987, this Court extended the temporary restraining order in order to maintain the status quo until disposition of the motion for preliminary injunction.

This Court held an evidentiary hearing on January 8, 1987. The Court heard testimony from Aufses. FN4 The Court also received pleadings, affidavits, and exhibits from both parties.

In order to obtain a preliminary injunction in this Circuit, a plaintiff must demonstrate both (a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor. *In re Feit & Drexler,*

*Inc.,* 760 F.2d 406, 415 (2d Cir.1986) ; *Kaplan v. Board of Education,* 759 F.2d 256, 259 (2d Cir.1985).

*Merits*

*Securities Claim*

Section 14(a) of the Securities Exchange Act of 1934 provides,

"It shall be unlawful for any person, by the use of mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 78l]."

**\*4** 15 U.S.C. § 78n.

Rule 14a-9 provides, in relevant part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to a material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Under Rule 14a-9 "[a] proxy solicitor's obligation to disclose is a continuing one". *Aegis v. Goldman,* 523 F.Supp. 1273, 1280 (S.D.N.Y.1981). Although a proxy solicitor is not required to disclose information in an original proxy which was either not in existence or of which the solicitor was unaware on the date that the proxy was issued,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

*Nemo    v.    Allen,*    466    F.Supp.    192,    195
(S.D.N.Y.1979), *see also Diamond v. Arend,* No.
84 Cr. 0751, *slip op.* at 13 (S.D.N.Y. November 17,
1976), if new information becomes available before
the shareholder vote which is material and whose
omission would render the existing statement false
or misleading, it is the solicitor's obligation to
disclose that information before the vote. *Aegis,*
523 F.Supp. at 1180. When requesting relief, it is
plaintiff's burden to demonstrate that defendant
proxy solicitor became aware of the information at
some time before the vote. *Nemo,* 466 F.Supp. at
195. (court refused to undo the results of a vote
based on a proxy statement which did not disclose
material information of which the defendant
corporation was not aware at the time it issued the
proxy, as plaintiff offered no proof that defendant
became aware of the information at any time before
the vote).

Plaintiff has offered proof, in the form of sworn
testimony, that even if defendants were not aware of
the report's conclusions and recommendations FN5
when the proxy was issued on December 16, 1986,
they have become aware of the recommendations
before the shareholder vote has taken place.
Aufses testified that copies of the report in its final
form were sent to the Board members on the
evening of January 7, 1987. FN6 The shareholder's
vote is not scheduled to take place until January 13,
1987.

The report's recommendations are clearly material
information. A fact is material under Rule 14a-9 "
if there is a substantial likelihood that a reasonable
shareholder would consider it important in deciding
how to vote". *TSC Industries, Inc. v. Northway,
Inc.,* 426 U.S. 438, 449 (1976); *see GAF Corp. v.
Heyman,* 724 F.2d 727, 741 (2d Cir.1983)
(upholding use of this standard in a proxy case but
disagreeing with district court's application of it).
The report contains information regarding the
capabilities of Movielab's incumbent directors; the
report concludes that no one on the present Board is
experienced in the very areas in which the
corporation does business. Based on this
conclusion, the report recommends that the
Movielab Board should seek additional members
with relevant experience in, among other areas,

videotape post-production and commercial real
estate. The report also concludes that defendant
Jeffee's employment contract was reasonable at the
time it was negotiated. The report recommends,
however, that the Board reconsider Jeffee's contract
in light of newly available comparative data
regarding companies of Movielab's size and
Movielab's competitors in the industry. These
conclusions and recommendations are highly
relevant to Movielab's shareholders' decisions
whether to reelect the entire slate of incumbent
Board members presented in the Proxy Statement,
which includes Mr. Jeffee.

*5 The current omission of these material
recommendations from the Proxy Statement renders
the statement misleading. There is nothing in the
current statement which indicates that the
incumbent Board's qualifications to be the exclusive
directors of Movielab have been questioned, or that
Jeffee's salary has been questioned. Both have
been questioned by an independent neutral body
hired by the corporation to conduct an internal
investigation. The current Proxy Statement is,
therefore, misleading.

*State Claims*

Because plaintiff has met its burden of
demonstrating a likelihood of success on the merits
of its federal claim, the Court need not address the
merits of plaintiff's state claims.

*Irreparable Harm*

Where plaintiff seeks an injunction because of
defendant's violation of a statute, it need only show
that unless the injunction is granted, plaintiff will
suffer harm which cannot be repaired. *Studebaker
Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1962)
(Friendly, J.).

Plaintiff meets this burden. If this injunction were
not granted, Movielab's shareholders could elect a
Board of Directors based on misleading information
which has been presented to them in violation of the
securities laws. Courts recognize that the wrongful
positioning of corporate heads wreaks irreparable
harm on a corporation and its shareholders because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                       Page 5

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

it may require the unravelling of transactions wrongfully entered into. *See Calumet Industries, Inc. v. MacClure,* 464 F.Supp. 19, 28 (N.D.Ill.1978) ; *Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F.Supp. 787, 794 (S.D.N.Y.1978). The harm is particularly acute in this case because the directors who could be elected have been deemed unqualified to run the corporation without additional assistance.

*CONCLUSION*

For the foregoing reasons, plaintiff's motion for preliminary injunction is GRANTED, as modified. Defendants are (1) to refrain from taking any steps to solicit or vote any proxies, consents, or authorizations, with respect to the Proxy Statement; and (2) to file a corrective proxy statement with the Securities and Exchange Commission and mail such corrective statement to Movielab's shareholders prior to any future shareholders' meeting concerning the election of directors. Defendants' motion for a protective order is denied.

SO ORDERED.

FN1. This letter was not the first time Lebhar voiced its grievances against Movielab. In July 1985-approximately three months after it first purchased stock in Movielab-Lebhar brought a shareholder derivative and individual action against Movielab, its directors and others premised upon charges of waste and mismanagement as well as allegations that Movielab's directors had sold substantially all of the corporation's assets without shareholder approval in violation of § 909 of the Business Corporation Law. Lebhar sought the appointment of a temporary receiver for Movielab pursuant to CPLR § 6401.
On January 9, 1986, the Supreme Court, New York County (S. Schwartz, J.) rendered a memorandum decision, followed by a February 10, 1986 order, dismissing Lebhar's state court action and denying Lebhar's motion for appointment

of a temporary receiver. The Court held that Lebhar had improperly failed to serve a demand upon the Movielab Board of Directors pursuant to § 626(c) of the Business Corporation Law; that Lebhar had failed adequately to allege that such a demand would have been futile; and that Lebhar's claims of unlawful liquidation, misappropriation and waste were improperly pleaded as individual claims.
On May 29, 1986, the Appellate Division, First Department, unanimously affirmed the dismissal of Lebhar's action without opinion.
Movielab disclosed Lebhar's lawsuit, and the claims of waste and mismanagement asserted therein in the corporation's 1985 Annual Report on Form 10-K filed with the Securities and Exchange Commission in early June 1986.

FN2. Lebhar challenged these transactions:
1) Movielab's sale of all its film processing assets to Technicolor in 1984; 2) Jeffee's employment contract, which provides for a term of employment-at $175,000 per year (Jeffee waived the increase, which was to be effective January 1, 1986 to $200,000 per year)-and a lifetime consulting arrangement-at $100,000 a year-after that; 3) the Besega loans, which Jeffee secured for Movielab from the Besega Corporation in which he is a principal; 4) Movielab's decision not to lease vacant office space to Lebhar, and its failure to consummate a lease with another tenant; 5) Movielab's directors' fees.

FN3. A private cause of action is available to corporate shareholders under Section 14(a) to redress "deceptive or inadequate disclosure in proxy solicitations". *J.I. Case Co. v. Borak,* 377 U.S. 426, 431 (1964).

FN4. At this hearing Aufses provided copies of the final draft of the report, which had been mailed to the members of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 6

Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162
**(Cite as: Not Reported in F.Supp.)**

Movielab's Board of Directors on the previous evening, to plaintiff's and defendants' counsel. Defendants' counsel moved for a protective order barring disclosure of the contents of the report to plaintiff. Defendant alleged that such disclosure would constitute use of this Court as a means for producing discovery materials pertaining to the now dormant state action between the parties. The Court declined to rule on the protective order at that time.

FN5. Defendants were not required to disclose Lebhar's mere allegations. *See Markewich v. Adikes,* 422 F.Supp. 1144, 1146 (E.D.N.Y.1976).

FN6. It is, in fact, highly likely that Movielab's Board members were aware of the recommendations contained in the report before January 7, 1987. Aufses testified that Mayer, who is a member of the Board, had access to these recommendations immediately after New Year's day, 1987. Lebhar, however, has not demonstrated to this Court that Mayer shared this information with the rest of the Movielab Board. Because Movielab gained access to the information before the vote, this Court need not reach the issue of whether Mayer's knowledge should be imputed to the other Board members.

S.D.N.Y.,1987.
Lebhar Friedman, Inc. v. Movielab, Inc.
Not Reported in F.Supp., 1987 WL 5793, Fed. Sec. L. Rep. P 93,162

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 10

Westlaw.

Not Reported in A.2d                                                                                    Page 1

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

**H**
Not Reported in A.2d, 1999 WL 803974
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
William M. SKEEN and Jacqueline L. Skeen
Plaintiffs,
v.
JO-ANN STORES, INC., House of Fabrics, Inc.,
Alan Rosskamm, Brian P. Carney, David E. Bolen,
Jane A. Aggers, John W. Hermsen, R.N. Hankin
and H. Michael Hect, Defendants.
**No. Civ.A. 16836.**

Sept. 27, 1999.

Ronald A. Brown, Jr. , of Prickett, Jones, Elliott &
Kristol, Wilmington, Delaware; for Respondents.
Allen M. Terrell, Jr. , Srinivas M. Raju , and
Michael D. Allen , of Richards, Layton & Finger ,
Wilmington, Delaware; and David J. Hooker , Keith
L. Carson and Lisa R. Battaglia , of Thompson
Hine & Flory LLP, Cleveland, Ohio; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.
**\*1** The plaintiffs, who are former shareholders of
House of Fabrics, Inc. ("HF"), brought this class
action against HF and its seven former directors,
claiming that those directors (i) breached their
fiduciary duty of disclosure by omitting material
facts from an Information Statement disseminated in
connection with a proposed merger and (ii) violated
8 *Del. C.* §§ 251 and 262 by not mailing to the
shareholders in timely fashion the Information
Statement and the Notice of meeting at which HF
shareholders would vote on that merger.

The defendants moved to dismiss all claims on the
grounds that the plaintiffs lack standing and that the
complaint fails to state a claim upon which relief

can be granted. In response, the plaintiffs filed a
cross-motion for the entry of summary judgment on
four of their disclosure claims. I conclude, for the
following reasons, that all the claims alleged in the
complaint are legally insufficient. Accordingly, the
motion to dismiss will be granted and the
cross-motion for summary judgment will be denied.

I. BACKGROUND

The pertinent facts are derived from the complaint.
HF, a Delaware corporation headquartered in
Sherman Oaks, California, is one of the largest
home sewing and craft retailers in the United States.
As of March 31, 1998, the record date for the April
21, 1998 shareholder meeting, HF had issued and
outstanding 1,216,817 shares of common stock that
were owned by thousands of public shareholders
located throughout the country. At the time of the
merger, HF's board of directors consisted of seven
members, all of whom are named as defendants.

On February 1, 1998, two years after HF had
emerged from bankruptcy, HF and FCA Acquisition
Corp., a wholly-owned subsidiary of Fabri-Centers
of America, Inc. ("FCA"), entered into a merger
agreement (the "Merger Agreement") which
provided for a two-step acquisition of HF by FCA
for $4.25 per share. The $4.25 acquisition price was
approximately 20% below HF's February 28, 1998
book value of $5.35 per share. The first step would
consist of a tender offer to acquire a majority or all
of HF's outstanding shares for $4.25 per share cash
(the "tender offer"). The second step would consist
of a "back-end" merger, in which each remaining
share would be converted into a right to receive
$4.25 in cash (the "Merger").

As a result of the tender offer, which commenced
on February 6, 1998 and closed on March 6, 1998,
FCA acquired 4,115,013 HF shares, representing
77.2% of HF's outstanding stock. The remaining
1,216,817 shares, representing about 22.8% of HF's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

outstanding shares, were not tendered. The plaintiffs, who were the beneficial owners of 3,000 HF shares held in street name, did not tender their shares or the 300 HF shares of which they were the record owners.

The day after FCA acquired 77.2% of HF in the tender offer, five of HF's seven directors resigned and were replaced by five FCA designees, all of whom were FCA senior officers. Mr. Alan Rosskam, FCA's Chairman and President, was named HF's CEO and a director. On March 10, 1996, the new HF board of directors announced that HF's headquarters would be relocated from Sherman Oaks, California to FCA's headquarters in Ohio. Two days later, FCA advanced funds to HF to repay HF's outstanding indebtedness to CIT Group/ Business Credit, Inc. (approximately $43 million against a $65 million line of credit), and as a result, FCA became HF's largest creditor.

**\*2** On or about April 1, 1998 the HF board of directors caused to be mailed an Information Statement together with a Notice (the "Notice") of a special shareholders meeting to be held on April 21, 1998, to consider and vote upon the Merger Agreement. Both the Notice and the Information Statement were dated April 1, 1998. The Information Statement disclosed that it "is dated April 1, 1998 and is first being mailed to stockholders on or about April 1, 1998." The HF shareholders voted to approve the Merger, which was consummated on April 21, 1998. The named plaintiffs accepted the $4.25 per share Merger consideration.

## II. THE CONTENTIONS

In their complaint the plaintiffs assert two claims. The first is that HF directors breached their fiduciary duty of disclosure by omitting to disclose material facts to HF shareholders in the Notice and Information Statement. Specifically, plaintiffs claim that six material facts should have been, but were not, disclosed: (i) the omission of FCA's business plan concerning how HF would be treated post-acquisition; (ii) the reason why HF's board had decided to sell the company to FCA; (iii) the HF

investment banker's fairness opinion; (iv) the company's earnings projections through 2003; (v) the most up-to-date available financial information; and (vi) the information concerning other offers to acquire HF.

The plaintiffs' second claim is that the mailing of the Notice and the Information Statement were untimely under 8 *Del. C.* § 251 and 262, which requires the mailing to be completed twenty days before the shareholders meeting, in this case (plaintiffs say) by April 1, 1998. The disclosure in the Information Statement that the mailing occurred "on or about" April 1, 1998, is claimed to be a tacit admission that the mailing had not been completed by April 1, 1998.

On their Rule 12(b)(6) motion, the defendants seek dismissal of both claims on four grounds. *First,* the defendants argue that the representative plaintiffs lack standing to assert their claims. *Second,* the defendants contend that the disclosure allegations fail to state claims upon which relief may be granted. *Third,* the defendants assert that even if the Information Statement omitted to disclose material facts, the exculpatory clause found in HF's Certificate of Incorporation bars the plaintiffs from recovering money damages. *Fourth,* the defendants argue that the complaint fails to state a cognizable claim for violations of 8 *Del. C.* §§ 251 and 262.

On their cross-motion the plaintiffs seek summary judgment on four of their six omitted disclosure claims.

The motion to dismiss and the cross-motion for summary judgment frame four issues: (1) Do the named plaintiffs have standing to maintain this class action? (2) Were any or all of the six disclosure omissions material to HF shareholders deciding how to vote on the merger? (3) If any of those omissions was material, does the exculpatory clause in HF's Certificate of Incorporation bar a recovery of money damages? (4) Did the disclosure that the HF board began mailing the Notice and Information Statement "on or about April 1, 1998" constitute an admission that defendants failed to notify shareholders in a timely way?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 3

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

**\*3** Only issues 1, 2, and 4 are addressed in this Opinion, because the Court's determination that the disclosure omissions are legally insufficient, obviates the need to address the plaintiffs' cross-motion for summary judgment or the defense that the exculpatory clause bars money damages.

### III. ANALYSIS

#### A. The Applicable Standards

The two motions before the Court-the defendants' motion to dismiss and the plaintiffs' cross motion for summary judgment-involve different standards. Each motion must be independently addressed, and the Court must apply the standard applicable to each. FN1

> FN1. *See Continental Airlines Corp. v. American Gen'l Corp.,* Del.Supr., 575 A.2d 1160, 1164 n. 5 (1990).

The standard on a motion under Rule 12(b)(6) is that a claim will be dismissed where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proven to support the claim. FN2 All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are unsupported by specific factual allegations will not be. FN3 In this regard the Court will consider on a Rule 12(b)(6) motion any documents that are incorporated into the complaint by reference. FN4

> FN2. *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

> FN3. *See supra* note 2; *see also In re Wheelabrator Technologies Inc. Shareholders Litig.,* Del. Ch., C.A. No. 11495, mem. op. at 4, Jacobs, V.C. (Sept. 1, 1992) (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988));

*see also Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1264 (1979).

> FN4. *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996).

To succeed on the motion under Rule 56 for summary judgment, the plaintiffs must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. FN5 All facts will be viewed in the light most favorable to the non-moving party, FN6 and summary judgment will be denied "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom." FN7

> FN5. *Emerald Partners v. Berlin,* Del. Ch., C.A. No. 9700, Steele, V.C. (Sept. 22, 1995), *rev'd on other grounds,* Del.Supr., 676 A.2d 902 (1995); *see also Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

> FN6. *Gilbert v. The El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990).

> FN7. *Seagraves v. Urstadt Property Co., Inc.,* Del. Ch., C.A. No. 10307, mem. op. at 7, Jacobs, V.C. (April 1, 1996).

#### B. The Standing Defense

The defendants first contend that the complaint must be dismissed because the representative plaintiff shareholders lack standing by reason of their having accepted the cash merger consideration. The plaintiffs respond that under clearly established Delaware law, shareholders who are misled into casting an uninformed vote retain the right to challenge a merger, even if they accept the consideration. The plaintiffs here claim that they were so misled.

The plaintiffs' position is correct. Only fully informed shareholders waive their right to challenge a merger by tendering their shares and accepting the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 4

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

merger consideration. FN8 Where, as here, the plaintiff shareholders claim that their approving vote was induced by misleading disclosures, their acceptance of the merger consideration will not bar a challenge to the transaction voted on. FN9 Specifically, because the plaintiffs claim that the directors breached their fiduciary duties by omitting to disclose material facts in the Information Statement, their acceptance of the Merger consideration will not bar their claim.

> FN8. *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 848 (1987).

> FN9. *Iseman v. Liquid Air Corp.,* Del. Ch., C.A. No. 9694, Berger, V.C. (Feb. 11, 1992); *see also Seigman v. Columbia Pictures Entertainment, Inc.,* Del. Ch., C.A. No. 11152, Harnett, V .C. (Jan. 12, 1993).

Having determined that the plaintiffs have standing to assert their claims, the Court next considers the legal sufficiency of those claims.

### C. *The Legal Sufficiency of the Claims*

1. The Claim That Defendants' Mailing "On or About April 1, 1998" Constitutes Untimely Disclosure Under §§ 251 and 262

**\*4** The defendants contend that the plaintiffs' " untimely mailing" claim based on 8 *Del. C.* §§ 251 and 262 must be dismissed as legally insufficient. The only factual basis for this claim (defendants argue) is an inference that the phrase in the Information Statement that the mailing occurred "on or about April 1, 1998," admits that not all of the notifications were mailed by April 1, 1998. The defendants respond that "*on or about* April 1, 1998" does not mean after April 1, 1998, and contend that this claim must be dismissed because the complaint pleads no facts that would support it.

The plaintiffs respond that it may be inferred from the phrase mailed "on or about April 1, 1998," that

not all of the mailings had been completed by April 1, 1998 as was legally required. They further contend that on this motion all they need do to satisfy the requirements of notice pleading is inform the defendants that they are charged with failing to mail the Notice to all HF stockholders in a timely manner.

The defendants' position is, in my view, meritorious. The plaintiffs have not alleged that they or any other member of the class received an Information Statement postmarked after April 1, 1998. The use of the phrase "on or about April 1, 1998" may be inelegant, but that alone does not fairly permit an inference that the mailing of the Information Statements had not been completed by April 1, 1998.

### 2. The Disclosure Claims

The defendants next argue that the disclosure claims must be dismissed, because none of the omitted facts complained of was material. The defendants contend that the Information Statement disclosed facts that were adequate to enable HF shareholders to make a fully informed voting decision. The plaintiffs disagree. They argue that the omitted information was material, and further, that summary judgment should be granted in their favor on four of their disclosure claims.

It is well established that directors have a fiduciary duty to disclose fully and fairly all material facts within their control that would have a significant effect upon a stockholder vote. FN10 An omitted fact is material if a reasonable shareholder would consider it important in deciding how to vote. To say it differently, it must be substantially likely that the information would have been viewed by a reasonable investor as altering the "total mix" of available information. FN11 Determining materiality requires an assessment of what a " reasonable investor" would consider when making a decision to vote or exercise appraisal rights. FN12

> FN10. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 85 (1992).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

FN11. *Ibid.*

FN12. *Ibid.*

The duty to disclose, though highly important, is not all encompassing. "Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good ." FN13 Balanced against the requirement of complete disclosure is the pragmatic consideration that creating a lenient standard for materiality poses the risk that corporations will "bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking." FN14

FN13. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448 (1976).

FN14. *Ibid.*

**\*5** The disclosure claims are assessed in light of these standards.

### a) *The Omitted Disclosure of FCA Changes and FCA Plans*

The plaintiffs first contend that HF's directors failed to disclose a full explanation of (i) the changes made by FCA to HF after the tender offer closed and (ii) FCA's business plan regarding how HF would be treated after it was acquired. More specifically, the plaintiffs claim that the business reasons for replacing five of HF's directors with five FCA officers, for relocating HF headquarters from California to Ohio, and for FCA repaying the entire amount HF had borrowed from CIT Group, were not-but should have been-fully disclosed. The plaintiffs rely on *Cede & Co. v. Technicolor, Inc.* FN15 as support for their view that HF's stockholders needed that information, first to determine the going concern value of HF as of the Merger date, and then to compare that going concern value with the Merger price.

FN15. *Cede & Co. v. Technicolor, Inc.,*

Del. Ch., C.A. No. 7129, slip op. at 35-36, 57, Allen, C. (Oct. 19, 1990), *rev'd on other grounds,* Del.Supr., 684 A.2d 289 (1996).

The defendants argue that the plaintiffs have failed to plead facts that support a conclusion that FCA added value to HF before the Merger was consummated. The defendants contend that FCA's plan and a summary of its effects would be of no use to shareholders seeking to calculate the going concern of HF for the purposes of a later appraisal proceeding, because the values generated would have included synergies arising from the Merger, which cannot be considered in an appraisal.

I conclude that the plaintiffs have failed to plead facts showing why the omitted information would have been material to the stockholders' decision concerning how to vote. To establish materiality, it is not enough for plaintiffs to assert conclusorily that the omitted information might perhaps have been useful to shareholders. Rather, the plaintiffs must plead facts showing that the omitted information would have altered the "total mix" of information available to shareholders and would have been considered important to a reasonable shareholder deciding how to vote. The plaintiffs have not done that in connection with this claim.

### b) *The Omitted Disclosure of the Reasons for the Merger*

The plaintiffs next claim that the nine reasons recited in the Information Statement for why the HF board was recommending the Merger, were incomplete because the board's "true"-but undisclosed-rationale for approving the Merger would have been material to shareholders deciding how to vote.

The Information Statement recited the following nine reasons why the Merger was approved:
    (1) The financial condition and results of operations of the Company.
    (2) The projected financial results, prospects and strategic objectives of the Company, as well as the risks involved in achieving those results,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

prospects and objectives, including certain liquidity constraints which the Company may face in the absence of any new financing.

(3) The fact that the $4.25 per Share to be received by the Company's stockholders in both the Offer and Merger represents a substantial premium (approximately 33%) over the closing market price of $3.19 per Share on January 30, 1998 (the last trading day prior to the Board's approval of the Offer and the Merger); and the fact that the $4.25 per Share to be received by the Company's stockholders in both the Offer and the Merger represents a substantial premium (110%) over the average market price per Share during the 60-day period prior to the Board's approval of the Offer and the Merger.

**\*6** (4) The Board's view, after consultation with the management and F.M. Roberts, regarding the likelihood of the existence of other viable buyers on terms as favorable as those in the Offer and the Merger.

(5) The presentation to the Company's Board of Directors by representatives of DLJ and the opinion of DLJ that the $4.25 per Share in cash to be received by the stockholders of the Company pursuant to the Merger Agreement is fair to such stockholders from a financial point of view. The full text of the written opinion of DLJ, which sets forth assumptions made, procedures followed, matters considered and limits on the review undertaken, is attached as Annex E to this Information Statement. THE COMPANY'S STOCKHOLDERS ARE URGED TO READ THIS OPINION IN ITS ENTIRETY.....

(6) The availability of appraisal rights under Section 262 of Delaware Law for dissenting Shares.

(7) The terms and conditions of the Merger Agreement and the course of the negotiations resulting in the execution thereof.

(8) The possible alternatives to the Offer and the Merger, including the prospects of the Company going forward as an independent entity, the range of possible benefits to the Company's stockholders of such alternatives and the timing and the likelihood of actually accomplishing any of such alternatives.

(9) The likelihood that the proposed acquisition would be consummated, including the likelihood

of obtaining the regulatory approvals required pursuant to, and satisfying the other conditions to, the Offer and the Merger contained in the Merger Agreement, the experience, reputation and financial condition of the Parent and the risks to the Company if the acquisition were not consummated.

The plaintiffs do not claim that any of these disclosed reasons was false. Instead, they imply that the HF board had some other hidden reason for agreeing to the Merger, but they allege no facts to support that implicit, but conclusory, claim. Accordingly, the plaintiffs have failed to support their claim that the reasons disclosed in the Information Statement were "misleading and incomplete boilerplate."

### c) *The Omitted Disclosure Concerning DLJ's Fairness Analysis*

The plaintiffs next claim that the Information Statement should have disclosed the methodologies and analyses that Donaldson, Lufkin & Jenrette (" DLJ") used in arriving at its fairness opinion. The plaintiffs concede that the "disclosure of methodologies and analyses used by an investment banker have generally been held by the Court of Chancery not to be material." FN16 The plaintiffs argue, however, that the fact that HF was sold for 20% less than its book value is a circumstance so unusual that it required the disclosure of DLJ's methodologies and valuation analysis in this case.

> FN16. *In re Dataproducts Corp. Shareholders Litig.*, Del. Ch., C.A. No. 11164, slip op. at 16-17, Jacobs, V.C. (Aug. 22, 1991).

Again, I find this disclosure claim to be without factual or legal support. The plaintiffs cite no authority, nor proffer any logical reason to support their *ipse dixit.* The Information Statement included a summary of DLJ's fairness opinion. It also attached a copy of that opinion, which disclosed DLJ's assumptions and procedures and the matters it considered. Delaware law did not require further

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 7

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

disclosures on that subject.

#### d) *The Omitted Disclosure of HF Management's Five Year Projections*

**\*7** Based on similar reasoning, the plaintiffs claim that the board was legally required to disclose the five year projections that HF management had provided to DLJ in connection with DLJ's fairness opinion. The plaintiffs argue that those projections would have formed the basis for a discounted cash flow valuation that a reasonable stockholder could have used to evaluate whether or not to pursue a statutory appraisal.

I conclude that the plaintiffs have not alleged facts sufficient to support an inference that the projections would have been material to stockholders deciding how to vote. All the plaintiffs allege are conclusory statements that the projections might help explain why the Company was sold for 20% below book value, and would also be useful in a discounted cash flow valuation. Those bare assertions fall short of showing that the projections would alter the information mix already available to shareholders and become important to a reasonable shareholder's voting decision.

#### e) *The Omitted Disclosure Concerning Up-to-Date Financial Information*

The plaintiffs next claim that the defendants did not, but should have, disclosed the most up-to-date financial statements available. The plaintiffs concede that the Information Statement did disclose all that which was required by SEC Regulations. They contend, however, that because the financials were for the fiscal year ending January 31, 1998, and because the Information Statement was dated April 1, 1998, HF could and should have disclosed more recent financial information.

The plaintiffs cite no support for their position that with respect to this subject Delaware should impose more stringent financial disclosure requirements than those presently mandated by the SEC under federal law. It also appears that the defendants did

disclose the most up-to-date financials that were available to it. FN17 Those disclosures, in the circumstances, were sufficient. The plaintiffs have presented no persuasive authority or argument why this Court should expand Delaware disclosure requirements beyond those presently mandated by Federal law.

> FN17. As defendants point out, the Company's next quarter ended on April 30, 1998. Therefore, the January 31, 1998 financial statement was the most recent available statement for inclusion in the Information Statement that was issued on April 1, 1998, almost 1 month before.

#### f) *The Omitted Disclosure Regarding The Other Offers HF Received*

Lastly, the plaintiffs claim that the Information Statement failed to adequately disclose other offers HF received during the year preceding the Merger. The Information Statement disclosed that "[t]he entity that had expressed interest prior to DLJ's engagement ultimately declined to make an offer for the Company ... Other parties contacted by DLJ did not return with proposals the Company wished to pursue." In these circumstances, the defendants argue, nothing more had to be disclosed.

I concur. Where an expression of interest does not lead to a firm offer, the board has no obligation to disclose the specifics of the expression. FN18 Moreover, shareholders are not entitled to a " play-by-play" description of merger negotiations. FN19 Under Delaware law, efforts by public corporations to explore a possible merger do not become a subject of mandated disclosure unless and until the firms have agreed on the price and structure of the transaction. FN20

> FN18. *In re KDI Corp. Shareholders Litig.,* Del. Ch. Consol. C.A. No. 10278, slip op. at 18, Berger, V.C. (Nov. 1, 1988).

> FN19. *TCG Sec. Inc. v. Southern Union Co.,* Del. Ch., C.A. No. 11282, slip op. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 8

Not Reported in A.2d, 1999 WL 803974
**(Cite as: Not Reported in A.2d)**

> 17, Chandler, V.C. (Jan. 31, 1990);
> *Arnold v. Society For Sav. Bancorp. Inc.,*
> Del. Ch. C.A. No. 12883, slip op. at 17,
> Chandler, V.C. (Dec. 15, 1993), *aff'd in
> part,* Del.Supr., 650 A.2d 1270 (1994).

> FN20.   *Bershadsupra* note 8 (citing
> *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493
> A.2d 929, 944 (1985).

**\*8** In this case, the entity that originally expressed
an interest in acquiring HF declined to make an
offer. Because no firm offer was made, the board
had no duty to disclose any of the specifics of HF's
negotiations with that entity. The other companies
did not make any proposals that HF wished to
pursue, and defendants were under no duty to
disclose those proposals either.

Because the Court concludes that the disclosure
claims are legally insufficient and must be
dismissed, it is unnecessary to address the plaintiffs'
motion for summary judgment respecting those
claims, or the defense that the exculpatory clause in
HF's charter bars a recovery of money damages
with respect to these claims.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to
dismiss is granted and plaintiffs' motion for
summary judgment is denied. IT IS SO ORDERED.

Del.Ch.,1999.
Skeen v. Jo-Ann Stores, Inc.
Not Reported in A.2d, 1999 WL 803974

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 11

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

**H**
Not Reported in A.2d, 2000 WL 238026, 26 Del. J.
Corp. L. 469

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
STATE OF WISCONSIN INVESTMENT
BOARD, on behalf of itself and all others similarly
situated, Plaintiff,
v.
William BARTLETT, Jay N. Cohn, Mark B.
Hirsch, Eugene L. Step, Richard C. Williams, and
Medco Research, Inc., Defendants.
**No. C.A. 17727.**

Feb. 24, 2000.

Stuart M. Grant , Cynthia A. Calder , Megan D.
McIntyre , John C. Kairis and Denise T. DiPersio
of Grant & Eisenhofer, Wilmington, DE, for
Plaintiff.
A. Gilchrist Sparks, III , Alan J. Stone , S. Mark
Hurd and Jessica Zeldin of Morris, Nichols, Arsht
& Tunnell , Wilmington, DE, of Counsel: James R.
Daly , Lee Ann Russo and Robert C. Micheletto of
Jones, Day, Reavis & Pogue, Chicago, IL, for
Defendants.

MEMORANDUM OPINION

STEELE , V.C.
*1 Plaintiff brings this action, on behalf of itself and
all others who own Medco common stock, to enjoin
a shareholder vote on the proposed merger between
Medco Research Inc. ("Medco") and King
Pharmaceuticals, Inc. ("King") and to enjoin the
merger's consummation.

Plaintiff's request for injunctive relief is based on
allegations of breaches of the fiduciary duties of
care, loyalty, and disclosure. In assessing the
viability of this claim, the Court of Chancery must
determine whether the plaintiff's has established (1)
a likelihood of success on the merits of its claims;
(2) imminent and irreparable harm if the vote and/or
merger are not enjoined; and that (3) in balance, the
plaintiff will suffer more if the vote and merger are
not enjoined than the defendants will suffer if they
are. I conclude that plaintiff does not meets its
burden.

This Court must defer to the discretion of the board
and acknowledge that their decisions are entitled to
the benefit of the business judgment rule where
plaintiff can not show that the board of directors, in
approving and recommending a merger agreement:
(1) failed to inform themselves adequately about the
merger negotiation process, the terms or the market
effect of the terms of the merger in a manner which
constitutes gross negligence; (2) did not maximize
the interests of the shareholders; (3) did not disclose
material information that would adversely effect the
ability of reasonable shareholders to make an
informed decision as part of the total mix of
information available to them.

Therefore, plaintiff's request for preliminary
injunctive relief is denied.

I. Background

A. The Parties

Plaintiff, State of Wisconsin Investment Board ("
SWIB"), is an investment manager for the
Wisconsin public employees retirement system.
SWIB holds 1,206,400 shares of common stock,
which comprises 11.5% of the outstanding shares of
Medco. Defendant Medco, a Delaware corporation,
is a pharmaceutical company specializing in
cardiovascular medicines and adenosine receptor
technologies. Defendant Richard C. Williams ("
Williams") is the Chairman of Medco's board of
directors. The remaining members of the board of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

directors are defendants, William Bartlett, Jay N. Cohn, Mark B. Hirsch, Eugene L. Step (collectively with Williams, the "Board").

Plaintiff brings this action requesting that this Court enjoin a shareholder vote on the proposed merger between Medco and King Pharmaceuticals, Inc. (" King") and enjoin the merger's consummation.

### B. Factual and Procedural Background

#### *1. Factual Background*

In 1996, amid concern for maintaining its growth and maximizing the value of its product pipeline, Medco began to explore the possibility of finding a merger partner. To assist in its effort, Medco retained Hambrecht & Quist, LLC ("H & Q"), an investment banking firm with considerable experience in the pharmaceutical industry and with Medco in particular.

In the early months of 1999, King approached Medco regarding the possibility of forming a business combination between the two corporate entities. The Medco board voted to appoint its Chairman, Williams, to represent Medco in the Medco-King merger negotiations. FN1

> FN1. Both plaintiff and defendants concede that Williams was to receive .75% of the aggregate value of the consideration to be paid to Medco in any strategic alliance involving Medco. Additionally, Williams was awarded 30,000 options for Medco's shares.

**\*2** After agreeing to approve a merger agreement, the Medco board, in a proxy statement dated January 5, 2000, recommended that shareholders vote for the Medco-King merger at the shareholders' meeting scheduled for February 10, 2000. Because of disputes plaintiff raised concerning omissions and mischaracterized statements contained in the original proxy solicitation, the Medco board issued a supplemental proxy on January 31, 2000 to supplement and/or correct the disclosures contained in the original proxy.

#### *2. Procedural Posture*

On January 11, 2000, plaintiff instituted this action to enjoin preliminarily the shareholder vote on the Medco-King merger and to enjoin the consummation of the merger. On January 12, 2000, this Court expedited proceedings given the February 10, 2000 shareholders' meeting. The Court held oral argument on February 9, 2000 and by written Order, enjoined and postponed the February 10, 2000 shareholder vote for at least fifteen days allowing a later vote if the parties so chose. FN2

> FN2. *State of Wisconsin Investment Board v. Bartlett, et al.,* Del. Ch., C.A. No. 17727, order, Steele, V.C. (Feb. 9, 2000).

### C. Contentions

Plaintiff requests injunctive relief based on allegations of corporate waste and breach of the fiduciary duties of care, loyalty, and disclosure.

#### *1. Plaintiff's Contentions*

Plaintiff contends it has satisfied each of the criteria set forth for the issuance of a preliminary injunction and is, therefore, entitled to relief. Plaintiff has asked this Court to assess the Medco-King merger in accordance with the "entire fairness" standard of review asserting that it has sufficiently rebutted the presumption that the Medco board's action are entitled to the protection of the business judgment rule. FN3

> FN3. *See Mills Acquisition Co. v. MacMillan, Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1989) (since the business judgment rule was sufficiently rebutted " the challenged transaction must withstand rigorous judicial scrutiny under the exacting standards of entire fairness.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

Plaintiff argues that a majority of Medco's directors are self-interested and not independent. It further asserts that no reasonably prudent business person of sound judgment would have negotiated and monitored the deal and then have structured it as Medco's board has done. The plaintiff asserts that it is manifest that the only explanation for the resulting deal is that the board either put its interest before that of the shareholders or acted grossly negligently by failing to monitor the transaction appropriately.

(1) *Plaintiff Claims Medco's Directors Breached their Fiduciary Duties as follows:*

(a) Disclosure

• They failed to disclose all information material to the shareholders' decision on the merger.

• There are outright falsehoods, misleading statements and omissions in both the original proxy solicitation and the supplemental disclosure that a reasonable investor would find material.

• The "corrective" supplemental disclosure fails to cure four "misdisclosures" about information necessary for shareholders to cast an informed vote.

(b) Care:

• The board did not adequately inform themselves of all information reasonably available in order to recommend this merger agreement.

• They appointed Williams as sole negotiator, with an improper financial incentive that created a conflict between his own interests and those of the shareholders and further compounded their error by negligently failing to supervise or oversee his actions.

**\*3** (c) Loyalty:

• The board allowed Williams to advance his own interests by structuring the merger to assure King the deal would become reality rather than on more favorable terms that would have tended to maximize shareholder value.

• Agreed to lock-up devices employed in the merger (collar, termination fee, no talk/no shop provision, stock option agreements) and allowed Williams to steamroll past other more favorable potential deals.

• The free rein given Williams resulted from a majority of the board's relationships and close ties with Williams which limited their independence and colored their interests.

(2) *The Medco Directors committed corporate waste by agreeing to Williams' fee arrangement in the merger.*

### 2. Defendants' Contentions

Defendants contend that plaintiff has not met the criteria for the issuance of a preliminary injunction. To the extent the original proxy solicitation left some room for confusion, defendant, without conceding error, submits that the supplemental proxy sent to shareholders adequately corrected any misdisclosures in the original proxy solicitation. In short, defendants contend that plaintiff's application should be denied for the following reasons:

(1) *No Likelihood of Success on the Merits*

• Medco's board is disinterested and independent.

• The board's process to approve the merger agreement was proper and they were adequately informed.

• The board engaged in a thorough and exhaustive search, with the assistance of H & Q, to identify possible alternatives for maximizing shareholder value.

• Williams kept the board well informed of all important developments.

• All facts alleged to have been omitted have either been deemed immaterial or were fully disclosed in the original proxy solicitation or supplemental proxy.

(2) *No Imminent Irreparable Harm*

• The supplemental proxy cured all deficiencies in the original proxy solicitation.

• Shareholders have neither been deprived of the opportunity to "shop" the company nor have the lock-up devices employed by Medco deterred other suitors.

(3) *Balance of Hardships Weighs Against Issuing a Preliminary Injunction*

• Enjoining this merger, after an exhaustive, diligent, but unsuccessful search for other partners, would cause Medco shareholders to lose their only opportunity to receive a premium on their shares.

• Medco's stock would decline if the merger were to be enjoined (potentially to a price below $20 per share).

• Medco would face significant risks if they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

remained as an independent, stand-alone company.

## II. Discussion

Plaintiff shareholder may obtain a preliminary injunction by establishing the following three elements: (1) a reasonable likelihood of success on the merits; (2) imminent, irreparable harm if an injunction is not granted; and, (3) the damage to plaintiff if the injunction does not issue outweighs the damage to defendants if injunction does issue. FN4 This test is stringent and the relief is extraordinary. After evaluating plaintiff's claims, I find that the circumstances surrounding the February 25, 2000 Shareholder Meeting and the proposed Merger do not warrant preliminary injunctive relief.

> FN4. *Mills Acquisition Co., infra* at 1278-79.

A. Reasonable Likelihood of Success on the Merits

1. Standard of Judicial Review

**\*4** Before evaluating the likelihood of plaintiff's success on the merits, it is essential to determine the appropriate standard of judicial review to assess whether the directors breached their fiduciary duties in the context of this merger. Plaintiff claims that the Medco board's actions are subject to the entire fairness standard on the basis of disloyalty and an abdication of directorial duty that amounts to gross negligence. FN5 Defendants claim that there is no evidence of self-interest that would justify depriving the Medco board of the protection of the business judgment rule and its presumption that directors act loyally.

> FN5. Plaintiff alleges that Williams, as sole director responsible for negotiating the merger, had financial interest in the merger and selectively "filtered" information to the remainder of the Medco

board. Furthermore, plaintiff alleges that the Medco board abdicated its directorial duties by permitting Williams to negotiate the merger with limited participation from the remaining Medco board members.

Directors have an unyielding fiduciary duty to protect the interests of the corporation and the shareholders alike. FN6 In the context of a merger, a breach of fiduciary duty analysis begins with the rebuttable presumption that a board of directors acted with care, loyalty, and in "good faith." Unless this presumption is sufficiently rebutted, raising a reasonable doubt about self-interest or independence, the Court must defer to the discretion of the board and acknowledge that their decisions are entitled to the protection of the business judgment rule. In order to require application of the entire fairness standard, the plaintiff has to show that a majority of directors have a financial interest in the transaction or a motive to entrench themselves in office through the merger. FN7

> FN6. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 360 (1993).

> FN7. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Plaintiff's allegations of self-interest do not meet the threshold necessary to rebut the presumption of the business judgment rule and require an analysis of the board's actions under an entire fairness standard. One director's alleged interest, as here in a fee related to consummation of the merger, related to his work and tied to overall enhancement in the value of the merger transaction is simply not enough to mandate strict scrutiny of the Medco board's actions. FN8 Plaintiff has only alleged facts concerning the financial interest at stake for Williams. Plaintiff offers nothing to indicate that Williams' interest was not aligned with that of the shareholders. While it may well be so that Williams would get nothing if no deal gets done, he has every reason to attempt to negotiate the highest consideration possible for Medco's shareholders. His stake rises with the value of the deal. Nothing about the directors' relationships to Williams

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 5

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

suggests their loyalty has been tainted or that they have an interest inconsistent with their duty of loyalty to Medco and its shareholders.

> FN8. *See Cede v. Technicolor, Inc.,* Del.Supr. 634 A.2d 345 (1993).

Whether or not the directors' actions constitute an abdication of directorial duty is a fact specific question. FN9 In other words, does the record indicate any self-interest or lack of independence on the part of the Medco board which caused them to delegate responsibility to Williams to negotiate the merger and to abandon any responsibility to review his work? The decision by the Medco board to delegate responsibility to Williams to negotiate the merger is "not an abdication of directorial authority merely because [it] limit[s] a board's freedom of future action." FN10 Rather, the decision by the Medco board to delegate responsibility to Williams can only be regarded as a valid exercise of business judgment. FN11 I do not find that the conclusory statements suggesting inferences proffered by plaintiff exhibit any aspect of self-interest or lack of independence that would support the imposition of the entire fairness standard. What the record actually shows is that: four of five directors had no economic interest in the outcome of the merger negotiations; they had no entrenchment motive; no evidence that Williams controlled any other directors through any power to affect their related or unrelated economic interests.

> FN9. *See Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 943 (1985) (finding that the directors delegation of responsibility to others is an exercise of business judgment)..

> FN10. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1214 (1996).

> FN11. Rosenblatt, infra at 943.

2. Did the Medco directors breach their duty of care by failing to inform themselves adequately?

*5 The plaintiff's allegations do not demonstrate that the Medco board failed to inform itself of all material facts concerning the proposed merger with King.

The parties genuinely disagree about the materiality of facts and the inferences to be drawn from those on which they do agree to be true and material. I can not discern from the bounty of facts presented by counsel what is and what is not truthful. What I can do is determine whether the members of the Medco board were adequately informed of all material information reasonably available prior to approving the merger agreement.

Based on the record before me, it is fair to say that there is substantial disagreement about the efforts taken by Medco's board to engage in discussions with other potential suitors and the efforts taken to inform the board of material facts concerning this merger. Amid concern of maintaining growth and maximizing the value of its product pipeline, the Medco board began efforts to find a suitable partner to form a business combination. While not every potential suitor either became the subject of intense scrutiny or implicated mutual due diligence, the Medco board could not invariably control whether or not potential suitors wished to negotiate. In its effort to "shop" the company, the Medco board retained H & Q to assist in finding a potential suitor. It bears noting that H & Q was intimately familiar with Medco's business resulting from providing investment banking advice earlier.

The record does not provide any further insight about the extent of each suitors expressed interest in a potential business combination with Medco. If it did, this opinion would conceivably require more careful analysis than is reasonable and necessary given plaintiff's claims. What is apparent from the record is that Medco, with the experience and assistance of H & Q, aggressively sought out suitors who might benefit from Medco's existing drug pipeline and income stream. In fact, H & Q played an integral part in Medco's efforts to canvass the market to seek a more economically viable business combination.

Plaintiff contends that the Medco board acted with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
(Cite as: Not Reported in A.2d)

gross negligence in: (1) deterring potential suitors; (2) relying on the advice of its investment banker; (3) relying on the reports provided by Williams and Medco's own due diligence team; and (4) including a collar, termination fee, no talk/no shop provision, and a grant of a stock option to King FN12.

> FN12. The "lock-up" devices also included a "pooling of interests" tax accounting treatment that was subsequently rendered moot at oral argument.

Nothwithstanding plaintiff's allegations, it seems apparent to me that the evidence equally supports the view that Medco's board proceeded with the King merger because its efforts had failed to find a viable combination with other suitors. The proposed merger with King to Medco's shareholders appeared to be a viable and preferable option to going it alone. They considered the advice and assessment of the Medco due diligence team, reasonably relied upon their investment banker's advice and appropriately apprised the fear that appearing "over-shopped" could frustrate any deal.

**\*6** Plaintiff's more particularized basis for assessment of the board's actions stem from Medco's board's decision to have Williams negotiate the merger agreement while enjoying a financial incentive to bring about a deal and the board's alleged failure to monitor his actions. Plaintiff's theory has no support in our case law nor on those facts. This scenario is quite unlike *Macmillan*, FN13 upon which plaintiff primarily relies. In *Macmillan*, the negotiators were also active bidders. Williams neither had ties to King nor any other potential acquiror. His charge was to negotiate the best business deal he could consistently with the board's firm judgment that Medco could no longer go it alone. He undertook that mission incentivized by a fee tied to the best result he could obtain for all shareholders in a market where overshopping the company and its deleterious effect on its attractiveness had to be considered as well as the limited number of potential acquirors. Williams regularly briefed the board, Medco had its own due diligence team and Medco's investment bankers, no strangers to

Medco's market niche, rendered a fairness opinion on which the board relied.

> FN13. *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr. 559 A .2d 1261 (1989).

I conclude that Medco's board met its duty of care in proceeding with the King merger. Despite the material disputes of fact, I am confident that Medco's board adequately informed themselves of all material information necessary to execute the merger agreement.

3. Did the board breach their duty of loyalty by not acting in the best interests of the shareholders?

The underlying premise to establishing whether the Medco board breached their fiduciary duty of loyalty is: Did the board act in its members own independent conflicted self-interest or in the best interest of the shareholders? In other words, would the King merger maximize value to its shareholders?

In order for me to find that plaintiff would likely succeed at a trial on the merits on any breach of the fiduciary duty of loyalty, I would have to accept, as plaintiff suggests, the contention that the Medco directors acted in their own self-interest on the basis of their personal and/or business relationships with one another. FN14 Evidence of personal and/or past business relationships does not raise an inference of self-interest. As I stated earlier, the facts do not support a conclusion that the Medco directors acted inconsistently with what they believed to be the best interest of Medco shareholders.

> FN14. Plaintiff states that the both of the directors who voted to approve the merger, Bartlett and Hirsch, have business and/or personal relationships with Williams dating back to 1969.

"[T]he plaintiff alleges nothing about the genesis of this proposed merger, whether in negotiations or in the proposed terms, to lead me to conclude that the actions of the board as a whole (as well as the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 7

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

self-interest of the director-shareholders) were not in alignment with the interests of all [Medco] shareholders." FN15

> FN15. *In re IXC Communications, Inc., Shareholders Litig.,* Del. Ch., Consol. C.A. No. 17324 & C.A. No. 17334, Steele, V.C. (Oct. 27, 1999).

Plaintiff has attempted to demonstrate that the entire process by which Medco and King pursued this merger agreement was "tainted" by the directors' self-interest flowing from business dealings in the past with Williams who stood to gain personally if the merger with King became a reality. Moreover, plaintiff asks this Court to examine self-interest on the part of H & Q on the basis that it had done business with King in the past, wanted to keep them as a client and had to build an internal "firewall" separating employees who had worked for King apart from those advising Medco; the failure of the Medco board to conduct a market check; the failure of the Medco board to conduct independent valuations to assess the economic fairness of the King merger; the failure of the Medco board to negotiate an adequate and fair merger; and, by employing lock-up devices. FN16

> FN16. Lock-up devices employed include: no talk/no shop provision, termination fee, and a grant of stock option.

*7 I can not, on the basis of these allegations find that the board either willfully left itself uninformed in order to serve its "self-interest" or failed to act in "good faith and in the honest belief that the [merger] was in the best interests of the company." FN17 It is equally apparent to me that the board sufficiently complied with the "good-faith" standard set forth by this Court in *Aronson.* The efforts of the Medco board to give thorough consideration to the analysis prepared by H & Q, to complete due diligence of King, and to stimulate interest one last time regarding merger discussions with other suitors leads me to conclude that the directors were acting to benefit the economic interests of the shareholders. I can not reasonably conclude, solely

on the bases that Williams acted self-interestedly by receiving compensation for his efforts in negotiating a deal, that the goal of this strategic combination was anything other than an attempt to maximize the value of the interest of the corporation and shareholders.

> FN17. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

One can not plausibly contend, in light of the written and oral record, that the actions of the Medco board suggested disloyalty either to the corporation or its shareholders. The approval of the merger agreement and the recommendation to shareholders results from Medco board's best, informed judgment.

In light of this Court's inability to conclude that the facts now before it support breaches of either the duty of care or duty of loyalty, plaintiff's claims have no reasonable likelihood of success on the merits.

### 4. Duty of Disclosure

The "duty of disclosure" arises as a subset of a director's fiduciary responsibilities of care, loyalty, and "good faith." FN18 A board of directors seeking shareholder approval of a specific corporate action must disclose all material facts relating to the requested action so that shareholders can make an informed decision. FN19

> FN18. *Malone v. Brincat,* Del.Supr., 722 A.2d 5, 11 (1998).

> FN19. *Id.* at 12.

Medco issued a proxy statement soliciting shareholder approval for the merger with King. In the midst of allegations of false and misleading statements and omissions of material facts, Medco issued a supplemental disclosure to disarm the allegations surrounding the initial proxy. FN20

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
(Cite as: Not Reported in A.2d)

FN20. The Supplemental Proxy was issued January 31, 2000 to Medco's stockholders, a full ten days prior to the shareholders' meeting scheduled for February 10, 2000. Since that time, by Court Order, the February 10, 2000 shareholders' meeting was enjoined and postponed for fifteen days or until such later time as the parties agreed that the shareholders would have adequate time to assimilate the information necessary to cast an informed vote. *State of Wisconsin Investment Board, infra* at *7.

Arguably, in light of this Court's Order to enjoin and postpone the February 10, 2000 shareholders' meeting for fifteen days, the supplemental disclosure has provided sufficient time for shareholders to consider the disclosure, make an informed decision, and return the proxy card. Therefore, any disputes concerning the reasonableness of the time period to receive, consider, and act upon the supplementary proxy materials are moot.

The issue that lingers is whether the misdisclosures in the board's original proxy solicitation not cured by the supplement are material to the shareholders ability to make an informed decision as part of the " total mix" of information available to them. " Directors are required to provide shareholders with all information that is material to the action being requested and to provide a balanced, truthful account of all matters disclosed in the communications with shareholders." FN21

FN21. *Malone, infra* at 12 citing *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d 1050, 1056 (1996).

*8 The well-settled standard for materiality states:
An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote...It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the

circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable reasonable investor as having significantly altered the "total mix" of information made available. FN22

FN22. *Rosenblatt, infra* at 944 *quoting TSC Industries, Inc., v. North-way, Inc.,* 426 U.S. 438, 449.

This Court does not defer to directors' judgment about what information is material. It is a matter for the Court to determine from the record at the particular stage of a case when the issue arises. FN23

FN23. *In re Anderson, Clayton Shareholders Litig.,* Del. Ch., 519 A.2d 669, 675 (1986).

Plaintiff contends that the supplementary, corrective disclosure, while enriching the quality of information potentially available to the shareholder, fails to address its concern about the fairness of the merger approval and recommendation process utilized by the Medco board or the adequacy of the price. Specifically, plaintiff advances the notion that the Medco board's failure to disclose information surrounding the valuation methodologies employed by H & Q, the Fujisawa offer, and Medco's inability to find a potential suitor constitute breach of the directors' duty to disclose all material information necessary to provide a balanced, truthful account of the action being requested of the shareholders.

Applying the materiality standard, I conclude that the Medco board fully met its duty of complete disclosure. The corrective disclosure issued by Medco was designed to cure any complaints that the earlier information was misleading, incomplete, and/or susceptible to inconsistent interpretations.

I am not convinced that the alleged omissions represent information that a reasonable shareholder

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 9

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

would consider to have significantly altered the " total mix" of information made available.

Defendants first alleged omission regarding indications of interest from other potential suitors need not be disclosed as those discussions were preliminary in order to explore the possibility of a business combination that might lead to a merger agreement, and little more. I further find plaintiff's allegations regarding the omission of the Fujisawa offer to be without merit. The proxy fully discloses Fujisawa's all-cash offer. This interest is never hidden from the shareholders-only the details that made that option unlikely to bear fruit. One can not conclude that a failure to disclose the details of negotiations gone south would be either viably practical or material to shareholders in the meaningful way intended by our case law. The mere existence of unrequited attraction with other entities does not lead to acceptance of plaintiff's assertion of materiality-namely that shareholders would then know other deals *might be possible* and that there *might be better options* than the King merger agreement. FN24 The Medco board's judgment that it would have been futile to pursue the Fujisawa offer, in other words, is not a misleading partial disclosure denying shareholder's information on a " significant prospect," generally considered to be a material fact. FN25 The proxy disclosed the underlying material fact of the offer and the decision not to pursue it.

> FN24. *In re: Lukens Inc.,* Del. Ch., C.A. No. 16102, Lamb, V.C., 1999 Del. Ch. 233 (Dec. 1, 1999).

> FN25. *See In re the Walt Disney Co. Derivative Litigation,* Del. Ch., 731 A.2d 342, 376 (1998) aff'd. in part, rev'd in part and remanded, Del.Supr., No. 469, 1998 (Feb. 9, 2000).

**\*9** As for the alleged omission concerning the valuation methodologies employed by H & Q, I find that the Medco board adequately disclosed all relevant material information. FN26 The analyses applied by H & Q in developing its Fairness Opinion are adequate and appropriate and I do not

find anything unusual about their judgment that need be disclosed to the shareholders as part of their "total mix" of information. The proxy statements contained sufficient factual information from the H & Q investment bankers to assist the shareholders decision making.

> FN26. *In re 3 Com Corporation Shareholders Litigation,* Del. Ch., C.A. No. 16721, Steele, V.C., (Oct. 25, 1999).

I find that the dissemination of both the original proxy solicitation and the supplemental disclosure have enabled Medco shareholders to make an informed decision based upon material information necessary as part of the "total mix" of information available to them. Therefore, I conclude that the plaintiff can not satisfy its burden to establish that it is likely to succeed on the merits of its disclosure claims at trial.

### 5. Medco's Use of Lock-Up Devices

Delaware law permits lock-ups and related agreements "where their adoption is untainted by director interest or other breaches of fiduciary duty." FN27 Therefore, in the absence of breach of fiduciary duty in agreeing to the lock-up devices, these provisions are reviewable as business judgments and are, thus, granted deference. Neither the collar, termination fee, no talk/no shop provision, nor stock option agreements were used here as defensive mechanisms instituted to respond to a perceived threat from a potential acquirer making a competing bid for Medco.

> FN27. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 176 (1986).

### 6. Corporate Waste

Plaintiff asserts that the fee paid to Williams to negotiate the King merger amounts to corporate waste. Compensation to executives for their efforts on behalf of a corporation has consistently been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

approached in a corporate waste claim with caution by our courts ... "where, as here, there is no reasonable doubt as to the disinterest of ... the Board, mere disagreement cannot serve as grounds for imposing liability based an alleged breaches of fiduciary duty and waste." FN28

> FN28. *In re The Walt Disney Co. Derivative Litig.,* 731 A.2d at 364, *supra.*

As our Supreme Court recently stated:
> To rule otherwise would invite courts to become super-directors, measuring matters of degree in business decisionmaking and executive compensation. FN29

> FN29. *In re The Walt Disney Co. Derivative Litig.,* Del.Supr., No. 469, 1998, at 41 (Feb. 9, 2000).

I earlier explained the futility of plaintiff's assertion of lack of independence and self-interest on the part of the board apart from Williams. Williams' efforts as a negotiator brought consideration for the fee designed to incentivize his efforts for the corporation and its shareholders. There is no viable claim for corporate waste.

### B. Irreparable Harm

Plaintiff's contentions that the original proxy solicitation and the supplement disclosure omitted or mischaracterized material facts that deny Medco shareholders the opportunity to make a fully informed decision on the merger is without merit. Because the evidence at this stage makes it unlikely that the plaintiff can show at a hearing on the merits that the Medco board failed to provide the shareholders with all the information a reasonably prudent shareholder would find material in the total mix required in order cast an informed vote, plaintiff will not be subject to irreparable harm if the vote goes forward as scheduled.

**\*10** I recognize the irreversible harm which would occur by permitting a shareholder vote on a merger

to proceed without all material information necessary to make an informed decision. The Medco board, however, has presented the shareholders with an adequate supplementary disclosure, corrected to show all material information arguably absent from the original proxy solicitation and to allay concerns over misreadings which may be misleading. Plaintiff's second argument in support of its claim that a failure to enjoin the vote and the merger preliminarily would constitute, imminent irreparable harm is without merit. Plaintiff claims imminent and irreparable harm from being deprived of the opportunity to have Medco shopped. Medco's desire to form new alliances was well known in the pharmaceutical industry and its investment advisors, H & Q were familiar with the players. There is no record support for the speculation that any clause in the merger agreement deterred other ready, willing and able suitors. King's option is not preclusive and the agreement allowed Medco to follow up on any materializing superior proposal.

### C. Balance of Harm

The balance of the relative harm to Medco should the merger not go forward, versus the harm to shareholders should the merger be consummated will and should ultimately be determined by a fully informed shareholder voted on February 25, 2000.

The Medco board has evaluated the proposed merger with King. The proxy materials submitted to all shareholders sufficiently outline the efforts the board undertook in approving and recommending the merger agreement. The facts alleged do not persuade me that the board, either through gross negligence or through lack of loyalty to Medco's shareholders, manipulated the deliberative process in order to deprive the shareholders of a meaningful opportunity to approve or reject the Medco-King merger.

The shareholders, based upon the information available to them from all sources, should reject the merger if they believe that information supports the view that there exists better alternative business combinations in the marketplace than the King

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469
**(Cite as: Not Reported in A.2d)**

merger or that Medco's future lies in standing alone. They should vote for the merger if they believe the information available supports the conclusion that the King merger is the only viable option likely to enhance, in any meaningful way, shareholder value. Now that it is clear to me that there has been no showing of a likelihood of success on the merits of the disclosure claims, the shareholders it seems to me, are the better judges of whether their interests would be harmed or enhanced by this merger. Should the merger vote be enjoined on this record, the harm to Medco and its shareholders caused by depriving the shareholders of an opportunity to decide on the King merger outweigh the harm to plaintiff by denying its application to enjoin both the vote and merger preliminarily.

### D. Supplemental Issue

On February 17, 2000, plaintiff filed a second motion for preliminary injunction, obviously after the Court's ruling postponing the vote and before the Court could issue an opinion following the hearing on the first motion for preliminary injunction.

**\*11** The second motion focuses on the timing of the shareholder vote and the "ramifications of the date on which the Medco Stockholders Meeting" was to be rescheduled. The plaintiff alleges that the Medco board never met to consider the financial consequences of the particular rescheduling date nor did they solicit or receive any advice on the financial consequences. The plaintiff believes the date chosen to be financially disadvantageous to the stockholders and to Medco and by failing to acknowledge this and act accordingly by rescheduling the vote and/or by withdrawing their recommendation for the merger, the Medco directors have failed in the execution of their duty to make an informed judgment.

Plaintiff requests mandatory injunctive relief before all the factual circumstances assumed by them can be determined. The plaintiff wishes me to order the board to meet and communicate to the shareholders whether the merger "is still in the best interests of" Medco shareholders. The basis for calculating the

terms of exchange for the shares has not changed and the voting shareholders presumably know those terms and can vote accordingly. The board set a date consistent with the Court Order. The shareholders may not in fact approve the merger on February 25th. If they do not, plaintiff's renewed motion for injunctive relief will be moot. I note, interestingly, that plaintiff's first motion and the consequences flowing from it are in part responsible for the changing financial picture described by plaintiff but none of this argument appeared in the first hearing or in the written papers. No hearing will be scheduled for a preliminary injunction on these grounds for the reasons stated elsewhere in this Opinion as well as for the reasons stated in this section.

### III. Conclusion

Plaintiff's request for preliminary injunction is hereby *denied* with respect to the shareholder vote and *denied* with respect to the merger.

IT IS SO ORDERED.

Del.Ch.,2000.
State of Wisconsin Inv. Bd. v. Bartlett
Not Reported in A.2d, 2000 WL 238026, 26 Del. J. Corp. L. 469

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.