# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **RICK HARTMAN,** individually and on behalf of all others similarly situated, | : | **C.A. NO. 05-403-(JJF)** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **PATHMARK STORES, INC.,** | : | |
| **WILLIAM J. BEGLEY, WARREN F.** | : | |
| **BRYANT, DANIEL H. FITZGERALD,** | : | |
| **EUGENE M. FREEDMAN, BRUCE** | : | |
| **HARTMAN, JAMES L. MOODY, JR.,** | : | |
| **EILEEN R. SCOTT, AND FRANK G.** | : | |
| **VITRANO,** | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

PRICKETT, JONES & ELLIOTT, P.A.
Elizabeth M. McGeever (#2057)
1310 King Street
Wilmington, DE 19801
(302) 888-6500
Attorneys for Plaintiffs

OF COUNSEL:
BERGER & MONTAGUE, P.C.
Sherrie R. Savett
Arthur Stock
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

BERGER & MONTAGUE, P.C.
Abbott A. Leban (Del. Bar No. 3751)
919 Market Street, Suite 425
Wilmington, DE 19801

James M. Orman
1845 Walnut Street, 15th Floor
Philadelphia, PA 19103
(215) 523-7800
Dated: September 20, 2005

## TABLE OF CONTENTS

I. NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Legal Standard: The Elements Of The Claims
           In The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Plaintiff Has Stated a Claim for Proxy Law
           Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    The Complaint Adequately Alleges Damages . . . . . . . . . . . . . . . . . . 12

      D.    The Complaint States Claims for Control
           Person Liability Against All Defendants . . . . . . . . . . . . . . . . . . . . . . 14

      E.    The Complaint Alleges Breach of Fiduciary Duties . . . . . . . . . . . . . 16

      F.    The Claims Are Individual and Not Derivative . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

### CASES

Agostino v. Hicks,
    845 A.2d 1110 (Del. Ch. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re: Anderson Clayton Shareholders Litig.,
    519 A.2d 669 (Del. Ch. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

In re: Anderson Clayton Shareholders Litig.,
    519 A.2d 680 (Del. Ch. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Branson v. Exide Electronics Corp.,
    645 A.2d 568 (Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Caruso v. Metex Corp.,
    1992 WL 237299 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Crescent/Mach I Partners, LP v. Turner,
    846 A.2d 963 (Del. Ch. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Daimler Chrysler AG Secur. Litig.,
    294 F. Supp. 2d 616 (D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Dura Pharmaceuticals v. Brouda,
    125 S. Ct. 1627 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Flake v. Hoskins,
    55 F. Supp. 2d 1196 (D. Kan. 1999) . . . . . . . . . . . . . . . . . . . . . . . 10, 11

GSC Partners CDO Funding v. Washington,
    368 F.3d 228 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Gerstle v. Gamble-Skogmo, Inc.,
    478 F.2d 1281 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gould v. American-Hawaiian S.S. Co. Inc.,
    535 F.2d 761 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Lipton v. News International,
    514 A.2d 1075 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Omnicare, Inc. v. NCS Healthcare, Inc.,
    818 A.2d 914 (Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Oran v. Stafford,
     226 F.3d 275 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Paramount Communications v. QVC Network,
     637 A.2d 34 (Del. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

In re: Reliance Secur. Litig.,
     135 F. Supp. 2d 480 (D. Del 2001) . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 15

Revlon, Inc. v. MacAndrews & Forbes Holdings,
     506 A.2d 173 (Del. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 16, 17

In re: Rockefeller Ctr. Props. Sec. Litig.,
     311 F.3d 198 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rosenblatt v. Getty Oil Co.,
     493 A.2d 929 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Scheuer v. Rhodes,
     416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Shaev v. Saper,
     320 F.3d 373 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

TSC Indus. Inc., v. Northway, Inc.,
     426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Thorpe v. Cerbco, Inc.,
     1993 WL 35967 (Del. Ch. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tooley v. Donaldson, Lufkin & Jenrette,
     845 A.2d 1031 (Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Tracinda Corp. v. Daimler Chrysler AG,
     364 F. Supp. 2d 3628 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

Tse v. Ventana Medical Systems, Inc.,
     297 F.3d 210 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re: Worldcom Inc. Secur. Litig.,
     294 F. Supp. 2d 392 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATUTES

15 U.S.C. §78n(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 U.S.C. § 78u-4(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

This Action raises clear issues of federal securities and Delaware fiduciary law: whether the Board of Directors of a publicly traded corporation must consider, and inform the shareholders of, all reasonably available alternatives in a timely manner before the close of shareholder voting on a significant corporate transaction. In this instance, the Board of Directors of Pathmark Stores, Inc. ("Pathmark") sought a vote approving a change of corporate control but withheld information concerning an alternative cash out transaction, not subject to any material contingencies, that appeared to offer a higher price per share than the investor favored by the Board. The directors eventually acknowledged the importance of the alternative opportunity by updating the proxy statement, but did so too late for shareholders to consider the new information before the scheduled vote. The board did not postpone the shareholder meeting or make any effort to seriously consider or negotiate further with the competing bidder, claiming to be bound by a "force the vote" contractual provision. Plaintiff asserts that he and all other shareholders entitled to vote on the transaction were damaged by being denied the opportunity to consider relevant information before the vote.

## I. NATURE AND STAGE OF PROCEEDINGS

Plaintiff Rick Hartman filed the first and only Complaint in this action on June 15, 2005, and published a Notice of the Action, as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3) on June 16, 2005. Hartman sought appointment as lead plaintiff, and sought appointment of the undersigned counsel as Lead Counsel in this action by filing a timely motion on August 15, 2005. Id. The motion was unopposed. Plaintiff has not yet moved for class certification. Discovery in this case has

not commenced, and is now stayed pursuant to 15 U.S.C. § 78u-4(b)(3)(B). All
defendants have been served, and all have joined in the instant motion to dismiss. No
party has Answered the Complaint.

## II. SUMMARY OF ARGUMENT

(1)    This matter cannot be dismissed on the pleadings. Contrary to
Defendants' claims, Plaintiff pleads all elements of proxy violation and breach of
fiduciary duty: existence of duty, material breach of duty, and damage to plaintiff from
the breach.

(2)    Defendants' status as control persons of Pathmark, and their culpable
participation in Pathmark's alleged misconduct, is also properly pleaded and supported by
the record.

(3)    The Court must apply the Revlon standards in assessing the defendants'
actions, and there is ample basis for an ultimate finding that defendants did not properly
discharge those duties. Moreover, the action is direct, not derivative, as it concerns the
right of shareholders to vote in a shareholder election; the shareholders, not the
corporation, suffered from the breach; and plaintiff seeks recovery for himself and other
shareholders, not for the corporation.

## III. STATEMENT OF FACTS

The Plaintiff in this action, Rick Hartman, had been a shareholder of Pathmark at
all times relevant to this action. Complaint ¶ 6.[1] He seeks to represent a Class consisting
of all similarly situated Pathmark investors. ¶¶ 9-10. The Defendants are Pathmark, a

---

[1]    All "¶" references refer to the Complaint, D.I.1.

2

Delaware corporation that also operates grocery stores in this state, and the members of its Board of Directors. ¶¶ 7-8. The case concerns the process and the corporate disclosures that led to a shareholder vote approving a sale of effective control of the corporation.

Pathmark is a publicly traded company in the business of operating supermarkets in the Northeastern United States. Prior to the events at issue in this case, its shares were widely disbursed, with no entity owning more than 16.5% of outstanding shares. See May 6, 2005 proxy statement. D. I. 12, Rabinowitz Decl., Ex. A, at 57-58.[2] The company had been seeking a strategic corporate transaction, such as a merger or buy-out, beginning in the Summer of 2004. Ex. A at 14. On May 6, 2005, Defendants caused Pathmark to issue a Definitive Proxy Statement to shareholders of record as of May 6, 2005, seeking approval of a proposed transaction whereby The Yucaipa Companies LLC ("Yucaipa") would invest $150 million cash in Pathmark, in exchange for:

    a.    20,000,000 shares of Pathmark common stock;

    b.    Class A warrants to purchase 10,060,000 additional shares at $8.50 per share; and

    c.    Class B warrants to purchase 15,046,350 additional shares at $10.46 per share.

According to the Proxy Statement, using widely accepted methods of valuing warrants, Pathmark's financial advisor calculated that Yucaipa was paying an implied value of between $6.77 and $7.17 per share for the Pathmark common stock. ¶ 15.

The terms of this investment had been set forth in a Purchase Agreement between Yucaipa and Pathmark dated March 23, 2005, and were subject to approval of Pathmark

---

[2]    All references to Ex. __ refer to the Rabinowitz Declaration submitted with Defendants' motion.

shareholders. If shareholders approved this transaction (the "Yucaipa Transaction"), its consummation would result in Yucaipa owning between 40 and 60% of the outstanding shares of Pathmark, depending on whether Yucaipa exercised the warrants. The Yucaipa Transaction provided no direct payment to Pathmark's existing shareholders. ¶ 16; Ex. A at 31.

The Purchase Agreement for the Yucaipa Transaction included a "force the vote" provision which precluded Pathmark's directors from deferring or cancelling the vote on the Yucaipa Transaction, even if they concluded that the Yucaipa Transaction was no longer in the best interest of shareholders. The Purchase Agreement also required that shareholders consider only the Yucaipa Transaction, and no alternatives, at the Special Shareholders Meeting. ¶ 17.

The Board of Directors of Pathmark recommended that shareholders vote for the Yucaipa Transaction. Voting was scheduled to take place at a special shareholders' meeting set for June 9, 2005, at corporate headquarters in Carteret, New Jersey. The Proxy Statement requested that votes be cast by mail, or in person at the meeting. Internet or telephone voting was not made universally available. To be considered, mailed proxies or revocations of proxies had to be <u>received</u> on or before June 9, 2005. ¶¶ 18-20.

The Proxy Statement contained a lengthy discussion of efforts that had been made in 2004 and 2005 to solicit a merger or other strategic transaction. Discussions with several bidders had been conducted over several months. The Proxy concluded that none

of the other bidders had made, or was likely to complete, an offer superior to the Yucaipa Transaction. ¶ 21.

Defendants caused Pathmark to issue amendments to the Proxy Statement that were filed with the Securities Exchange Commission on May 26, May 31, June 2, and June 3. The May 26 Amendment described a proposal from one unnamed bidder (the "May 19 offer") to purchase 100% of all shares of Pathmark common stock at $8.75 per share, subject to "confirmatory due diligence." That offer was rejected by the Board of Directors on May 24. The May 26 Amendment stated that the May 19 offer had been rejected, because inter alia, it appeared that financing could not be obtained by the buyer, and it appeared that the proposed transaction could not be completed for months. ¶ 22.

On June 1, 2005, the Board of Directors received a new proposal from the same bidder, open until June 8, offering $8.75 per share for all outstanding shares, no longer subject to any due diligence (the "June 1 offer"). That bidder revised its proposal while maintaining the price of $8.75 per share, by letters of June 2, 3, and 4, extending the time period through June 10. Unlike the Yucaipa Transaction, the June 1 offer, like the May 19 offer, would have resulted in cash payments to Pathmark stockholders. ¶ 23.

The Board of Directors did not disclose the existence of the June 1 offer to shareholders in either its June 2 or June 3 Amendments to the Proxy Statement, even though the June 2 amendment contained a purportedly updated discussion of the Board's reasons for rejecting the previous offer from the same bidder. Ex. D. The Board also determined that it would not change the date of the shareholder meeting to allow shareholders time to consider whether the June 1 offer represented a material change of

circumstances that might be relevant to the upcoming vote on the Yucaipa Transaction. It also declined to attempt further negotiations with either the June 1 bidder or Yucaipa. ¶ 24.

The Board disclosed the June 1 offer through an Amendment to the Proxy Statement filed with the SEC on June 7, just two days before the shareholder meeting. By that date, any mailed ballots would already have been cast, and revocations could not reasonably be expected to arrive before the shareholders' meeting. Thus, this notice was of little practical value to shareholders. The Board of Directors again determined <u>not</u> to postpone the vote, and <u>not</u> to change its recommendation in favor of the Yucaipa Transaction. ¶ 25.

On June 9, the shareholders' meeting was held. The Yucaipa Transaction was approved by the requisite shareholder vote, and the alternative cash-out proposal was effectively withdrawn. ¶ 26.

Plaintiff alleges that the Proxy Statement including all amendments through June 3 was materially misleading because it failed to disclose the alternative cash-out proposal, and that the June 7 Amendment was disseminated too close to the vote day to constitute an effective correction. ¶¶ 27-33 Defendants are liable both as director violators of proxy rules, and as control persons of Pathmark. ¶¶ 34-36. Plaintiff further alleges that the Defendants breached fiduciary duties by initially accepting a "force the vote" provision in the Yucaipa Transaction, and subsequently by continuing to recommend a favorable vote and declining to continue negotiations with either party, or inform shareholders of the latest cash-out proposal in a timely manner. ¶¶ 38-40.

6

# IV. ARGUMENT

## A.    Legal Standard:  The Elements Of The Claims In The Complaint

When reviewing a motion to dismiss, courts must "accept all allegations … as true and draw all reasonable inferences in favor of the non-moving party." GSC Partners CDO Funding v. Washington, 368 F.3d 228, 236 (3d Cir. 2004) (citing Oran v. Stafford, 226 F.3d 275, 279 (3d Cir. 2000)).  "A court may not dismiss the complaint unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief." GSC Partners, 368 F.3d at 236 (citing In re Rockefeller Ctr. Props. Sec. Litig., 311 F.3d 198, 215-16 (3d Cir. 2002)).  The Court must presume that the allegations in the Complaint are true, read the Complaint as a whole, and give Plaintiffs the benefit of every favorable inference that can be drawn from their allegations. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The Court may not consider matters extraneous to the pleadings with the limited exception of documents "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); GSC Partners, 368 F.3d at 236.

To state a claim for violation of the proxy statute, 15 U.S.C. §78n(a), "a plaintiff must allege that (1) a proxy statement caused a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. … An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Shaev v. Saper, 320 F.3d 373, 379 (3d Cir. 2003) (internal citations omitted).

7

To state a claim for control person liability, plaintiff must allege:

(1) a primary violation of the federal securities laws by a controlled person; (2) control of the primary violator by the defendant; and ¶ (3) that the controlling person was in some meaningful way a culpable participant in the primary violation.

Tracinda Corp. v. Daimler Chrysler AG, 364 F. Supp. 2d 362, 388 (D. Del. 2005). In this case, the primary violation consists of the issuance of initial and updated proxy statements. So the only area of control at issue is the control of significant corporate transactions and associated disclosures. Accordingly, "culpable conduct" means conduct violative of the statutory framework, and does not require evidence of fraudulent intent. See Shaev, 320 F.3d at 379 (no requirement to plead defendants' state of mind in proxy action); Tracinda, supra; In re: Reliance Secur. Litig., 135 F. Supp. 2d 480, 511 (D. Del 2001) (plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts" in a proxy violation action, quoting Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298 - 1301 (2d Cir. 1973)).

To state a claim for breach of fiduciary duty in connection with a corporate transaction that will result in a change of corporate control, plaintiffs must plead that defendants "allowed consideration other than the maximization of shareholder profit to affect their judgment ... to the ultimate detriment of its shareholders." Revlon, Inc. v. MacAndrews & Forbes Holdings, 506 A.2d 173, 185 (Del. 1986). "To state an actionable claim for breach of the duty to disclose on the basis of an omission, plaintiffs must plead (1) material, (2) reasonably available, (3) information that, (4) was omitted from the proxy materials." Crescent/Mach I Partners, LP v. Turner, 846 A.2d 963, 987 (Del. Ch. 2000).

8

**B.**    **Plaintiff Has Stated a Claim for Proxy Law Violations**

Unquestionably, Plaintiff has properly stated a cause of action for proxy law violations. Defendants' focus on materiality and on measure of damages, while arguably relevant at trial, do not provide a basis for dismissal.

The gist of the Complaint is that Proxy statement, as updated prior to June 7, was materially misleading for its failure to disclose the cash-out proposal, and the June 7 amendment was issued too close to the vote to act as a corrective disclosure.

The materiality of information omitted from a proxy statement is a mixed question of fact and law, which ordinarily cannot be resolved without a trial. TSC Indus. Inc., v. Northway, Inc., 426 U.S. 438, 450 (1976); Branson v. Exide Electronics Corp., 645 A.2d 568, 1994 WL 164084 at *3 (Del. 1994) ("allegations in a complaint which are sufficient to state a valid claim and which raise mixed questions of law and fact will withstand a Rule 12(b)(6) motion to dismiss"). "An omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote." Shaev v. Saper, 320 F.3d at 379. The unique circumstances of this case emphasize the fact-bound nature of the inquiry into materiality. The transaction that was subject to a shareholder vote, and the undisclosed alternative, were completely different. The Yucaipa Transaction provided no cash to existing shareholders, left them significantly diluted and valued share acquire by Yucaipa at $6.46 - $7.17 per share. By contrast, the undisclosed alternative would have provided immediate cash, offered shareholders substantially more per share than Yucaipa paid, but also eliminated the shareholders' stock holding. Whether the undisclosed offer would have been material to

9

a reasonable investor considering the Yucaipa Transaction is clearly a question of fact. Would the existence of a different bidder, willing to pay $8.75 per share cash, have any bearing on the desirability of an offer to pay about $7 per share for a smaller piece of the company? The case cannot be dismissed if a reasonable investor would have considered the information important. "Viewing all inferences in the light most favorable to plaintiffs, the Court is unable to conclude that the existence of other alternatives was immaterial." Flake v. Hoskins, 55 F. Supp. 2d 1196, 1226 (D. Kan. 1999) (denying dismissing of proxy claim in connection with shareholder vote on merger).

Plaintiff does not assert that Defendants were obligated to offer shareholders an opportunity to vote on the cash-out proposal on June 9. The shareholder meeting scheduled for June 9 included only a vote on the Yucaipa Transaction and could not have been altered to permit a vote on the alternative in the time available. However, shareholders should have been informed that a solid alternative to Yucaipa existed. Had shareholders rejected Yucaipa, the Board of Directors would have been free to continue negotiations with Yucaipa (if it remained willing), with the alternative bidder, and with others, and might well have negotiated a deal better for shareholders than the Yucaipa Transaction that was accepted. Whether shareholders might have been influenced to reject Yucaipa had they known that another alternative had been offered to the Board of Directors cannot be resolved on a motion to dismiss the Complaint.

Defendants do not, and cannot, argue that there is no issue of fact as to whether the existing shareholders received adequate notice of the unconditional cash-out offer. Prior to June 7, shareholders were informed only of an offer that was subject to due

10

diligence confirmation, and were further informed that one reason the Board rejected that offer was that it "remained subject to the completion of Bidder No. 2's confirmatory due diligence." Ex. B at 3. Thus, a condition the Board itself had deemed sufficiently material to disclose to shareholders on May 26 no longer obtained by June 1. Nonetheless, the June 2 proxy again listed "Bidder No. 2's very limited due diligence," this time in the past tense, as a reason for rejecting its bid, without any mention of the fact that Bidder No. 2 had already determined it needed no further due diligence. Ex. D at 2. Since the May 26 statement that Bidder No. 2 required additional due diligence had not been corrected or updated, the proxy as a whole contained a false statement. Thus, the proxy as updated through June 2 created the misleading impression that Bidder No. 2's insufficient due diligence was a material factor in the Board's decision to reject it and terminate further negotiations. By June 2, that factor was of no relevance.[3] Put simply the shareholders had no knowledge of an unconditional cash-out offer before June 7. Whether the difference between a disclosed contingent offer and an undisclosed firm offer was material is a factual inquiry that cannot be resolved on the pleadings. E.g. Flake 55 F. Supp. 2d at 1226 (whether statement in proxy that bidder "might" make an offer, when the bidder had stated it "intended" to make an offer, was a material misrepresentation could not be resolved on the pleadings).

The remaining issue of fact is whether defendants discharged their statutory and fiduciary duties to provide material information in a timely manner by publishing a notice

---

[3]    Defendants sometimes argue that the only claimed proxy violation is the failure to update the May 6 proxy, which was not misleading when issued. In fact, the Complaint clearly pleads that the June 2 updated Proxy – that is, the Proxy including all updates through June 2 – was materially misleading on the date of its issuance. ¶ 24.

on June 7 of an offer received June 1, in advance of a shareholder vote for which proxies must be received by mail on or before June 9. The time line makes plain a material question of fact (even in the internet age) as to whether the timing of the notice was adequate. Caruso v. Metex Corp., 1992 WL 237299 (E.D.N.Y. 1992) at *11 ("[N]o court has ever held that a Supplemental Proxy Statement mailed merely seven days before the Proxy vote (four business days) furnishes a stockholder with sufficient notice to digest the information, and if necessary, change his vote. The information contained in the Supplemental Proxy was untimely and accordingly will not be considered by this Court."); In re: Anderson Clayton Shareholders' Litigation, 519 A.2d 669, 673, 678-9 (Del Ch. 1985) (proxy supplement describing new proposed merger issued May 29; shareholder vote on different proposal extended from June 3 to June 5; time to consider alternative was inadequate).

C.    **The Complaint Adequately Alleges Damages**

While the precise quantification of damages need not be pleaded, Plaintiffs' theory of damages is adequately presented in the Complaint. Plaintiff and all Class Members were deprived of adequate information on which to vote their proxies. Therefore, they approved a sale of a controlling interest in Pathmark at approximately $7.00 per share, without the knowledge that another bidder was willing to pay substantially more. They lost an opportunity to reject an existing transaction in favor of a different, seemingly more attractive alternative. This is the essence of "lost opportunity" damages that have been a foundation of proxy violation jurisprudence in this Circuit for 30 years. Gould v. American-Hawaiian S.S. Co. Inc., 535 F.2d 761, 781 (3d Cir. 1976);

12

cited with approval, Tse v. Ventana Medical Systems, Inc., 297 F.3d 210, 218-20 (3d Cir. 2002). In Gould, as here, the proxy statement failed to disclose an offer to the Board of Directors: in that case the offer was to pay a premium for the shares of certain shareholders. The lost opportunity consisted of the plaintiffs' pro rata share of the dollar value the bidder was willing to pay in total for all shares. Id. at 783. A more fully developed record will permit a comparable calculation in this case.

In this case, as the alternative cash-out bid was not "wholly speculative," and in fact had no material contingencies, the lost opportunity to reject the Yucaipa Transactions also is not wholly speculative. Expert testimony, based on evidence not yet in the record, will provide a basis for the precise calculation of damages, based on the reasonably attainable outcome of a properly completed bidding process for control of the company. One basis for such calculation would be the difference between the price per share shareholders effectively received for the dilution of stock the Yucaipa Transaction entailed ($6.77 - 7.17 per share), and the $8.75 per share that the cash-out bidder had offered. Discovery is likely to provide further information on the intentions of the competing bidders in the event that shareholders had rejected the Yucaipa Transaction.

Defendants' reliance on the outcome, although not the reasoning, of Tse should not sway the Court. Tse was decided on the basis of a complete evidentiary record on a motion for summary judgment, not a motion to dismiss, and the Court found that no evidence supported Plaintiffs' (properly pleaded) claims that shareholders, including plaintiffs would have voted against the proposed transaction had they been informed of the undisclosed information. Id. at 221. The undisclosed information at issue in Tse

13

consisted of compensation packages for executives, not an alternative corporate transaction; even if the undisclosed information had been known to shareholders, no plausible mechanism would transfer the amount to be paid to the executives to the shareholders.  Since disclosure of the compensation packages would not have indicated any willingness by any party to alter terms of the proposed transaction, any effect such a disclosure would have on the ultimate corporate reorganization, or the consideration to shareholders, was "wholly speculative."  Here, by contrast, the undisclosed information of a different offer was directly relevant to the question shareholders faced: was the Yucaipa Transaction the best opportunity the Board of Directors could negotiate?  The cash-out offer is direct evidence that a better opportunity existed.  Compare In re Daimler Chrysler AG Secur. Litig., 294 F. Supp. 2d 616, 627 (D. Del. 2000) (lost opportunity damages unavailable in the absence of evidence that any party was willing to pay a higher merger price).[4]

**D.** **The Complaint States Claims for Control Person Liability Against All Defendants**

As discussed above, the Complaint states a cause of action for proxy violations. The remaining questions are whether the individual defendants are properly alleged to

---

[4]    Defendants discuss the change in the price of Pathmark stock subsequent to the shareholder vote at great length.  As this information was not in the Complaint, it cannot be considered on a motion to dismiss.  GSC Partners, 366 F.3d at 236.  In any event, subsequent stock performance is of minimal relevance, as damages are ordinarily measured on the date of the malfeasance, not at some later date.  Where damages are based on a lost opportunity, there is no requirement or expectation that shareholders' investment have lost absolute value.  Because Dura Pharmaceuticals v. Brouda, 125 S. Ct. 1627 (2005), cited by defendants did not involve a lost opportunity, the loss causation discussion in that case is inapplicable.  Requiring pleading of damages in greater specificity would serve no purpose here, as defendants have demonstrated they understand the claimed damages.

14

control Pathmark, the primary violator, and if so, whether they participated in the violation in a meaningful way. Tracinda, supra. "Plaintiffs must show that defendants exercised control over the accused operations, but need not show that defendants exercised control over the specifically accused transaction or activity." Reliance, 135 F. Supp. 2d at 518. Because the alleged wrongdoing concerns a corporate transaction approved by the Board of Directors, and associated disclosures also alleged to be approved by the Board of Directors, ¶9, there is no question that control is properly alleged.[5] In re: Worldcom Inc. Secur. Litig., 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003). The only remaining question is whether the directors of Pathmark had any meaningful participation in the misconduct. The Complaint clearly alleges participation; in addition, the sparse record before the Court makes clear that all of the defendants, as members of the Board of Directors, were informed of the alternative proposal, and participated in the decision to reject it without informing shareholders in a timely manner. See Ex.7 at 2-3 (June 7 Proxy describes rejection of June 1 proposal by entire Board). As the June 1 proposal was communicated prior to the June 2 proxy update, the Complaint alleges a materially misleading published proxy, not merely a failure to update. All of the directors can fairly be charged with control over these fundamental corporate decisions, whether or not they actually exercised the control they possessed. In short, both the allegations and the evidence support the validity of control person claims against all individual defendants.

---

[5]      Defendants' citation to cases where directors were not alleged to control day-to-day activities of corporations, such as the calculation of loss reserves in consolidated financial statements, is inapposite.

15

Damages for breach of fiduciary duty claims can be calculated in the same manner as the proxy violation claims, discussed above.

**E.      The Complaint Alleges Breach of Fiduciary Duties**

The proposed Yucaipa Transaction unquestionably triggered <u>Revlon</u> duties on the part of the Defendants. The Transaction allowed Yucaipa to acquire up to 60% of the common stock of Pathmark, without further action by the Board of Directors or shareholders by exercising the warrants it received. ¶ 16; Ex. A at 1-2. Accordingly, all of the criteria for triggering <u>Revlon</u> duties are present:

> Following such consummation, there will be a controlling stockholder who will have voting power to: (a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public shareholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; and (g) otherwise alter materially the nature of the corporation and the public stockholders' interests.

<u>Paramount Communications v. QVC Network</u>, 637 A.2d 34, 43 (Del. 1994). Yucaipa would have to exercise the warrants it received in order to achieve complete control. Since no action by the Board or stockholders was required for the exercise of warrants, the Board approved a change of control when it approved the Yucaipa Transaction.

In addition Plaintiff challenges the "defensive devices adopted by the board to protect the original [Yucaipa] transaction," <u>Omnicare, Inc. v. NCS Healthcare, Inc.</u>, 818 A.2d 914, 931 (Del. 2003): the "force the vote" provision that purportedly precluded the Board from postponing the shareholder vote to allow meaningful consideration of the alternative offer. For such a challenge, "the application of an enhanced judicial scrutiny test involves a judicial review of the substantive merits of the board's action." <u>Id.</u>, <u>citing</u> <u>Paramount</u>, 637 A.2d at 45. Where the measure adopted is "either preclusive or coercive.

16

… The Board must demonstrate that it has reasonable grounds for believing that a danger to the corporation and its stockholders exists if the merger transaction is not consummated." <u>Omnicare</u>, 818 A.2d at 932. Of course, the current record provides no information from which the Court could discern whether the Board perceived a danger to the corporation, or whether such a danger existed, or whether any such belief could be deemed reasonable.

To properly exercise their fiduciary duties, the members of the Board "have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders. The courts will apply enhanced scrutiny to ensure that the directors have acted reasonably." <u>Paramount</u>, 637 A.2d at 43; <u>see</u> <u>also</u> <u>Revlon</u>, 506 A.2d at 186. According to the updated proxy, the "force the vote" provision (assuming <u>arguendo</u> it is valid) meant that the only means available for the Board to achieve greater value for shareholders than Yucaipa offered would be to make all information available to voting shareholders, so that shareholders could choose to reject the offer with full knowledge of available alternatives. As has been discussed at length above, there is significant evidence that the directors did not act to maximize the value for shareholders when they declined to seriously consider, or permit shareholders to consider, the alternative bid. "The board does have a duty, at least when the transaction is as significant as one that requires a shareholder vote, to explore and evaluate alternatives." <u>In re: Anderson, Clayton Shareholders' Litig.</u>, 519 A.2d at 676. The Court cannot discharge its obligation to apply enhanced scrutiny by dismissing the action on the basis of the current record.

17

The alleged breach of fiduciary duty consisted of the Board first tying its own hands by accepting a "force the vote" provision that entailed dilution of existing shareholders in return for an investment at about $7 per share, and then declining to endorse, continue negotiations, or even inform stockholders on a timely basis of an alternative cash-out offer at $8.75 per share. The Board also apparently did not seriously consider whether, in light of the latest alternative offer, it should withdraw its favorable recommendation to shareholders, although this course of action was open to it, according to defendants' own proxy statements. Instead, in a proxy update of June 2, the Board repeated a no-longer-valid justification for approving the Yucaipa Transaction and ignoring the cash-out alternative. The effect of the directors' actions was to deprive shareholders of information relevant to their vote; and to favor Yucaipa's interest over that of the shareholders. The claim that defendants were "acting reasonably" as a matter of law, so that the Court can ignore its mandate to apply enhanced judicial scrutiny to a complete record, does not hold up. At a minimum, the Court may deny the instant motion, and examine the issue on a summary judgment motion following discovery.

## F.    The Claims Are Individual and Not Derivative

The breach of fiduciary duty claims in the Complaint are direct, and not derivative on behalf of the corporation. The gist of the fiduciary claims is that defendants' non-disclosures and the limitations defendants put upon themselves injured shareholders by denying them the opportunity to cast informed votes on the Yucaipa Transaction. "The right to vote stock is the individual right of the legal owner of stock. When the board of directors wrongfully interferes with or wrongfully impairs that right it violates individual

18

rights of shareholders." <u>Thorpe v. Cerbco, Inc.</u>, 1993 WL 35967, at *2 (Del. Ch. 1993),

<u>citing</u> <u>Lipton v. News International</u>, 514 A.2d 1075, 1079 (1986); <u>Rosenblatt v. Getty Oil</u>

<u>Co.</u>, 493 A.2d 929 (1985); <u>In re: Anderson Clayton Shareholders Litig.</u>, 519 A.2d 680,

681 (Del. Ch. 1986) ("these consolidated actions brought as class actions …").

     The Supreme Court has recently explained that claims of this nature must be

brought as direct actions. As Defendants concede, <u>Tooley v. Donaldson, Lufkin &</u>

<u>Jenrette</u>, 845 A.2d 1031 (Del. 2004) provides the analytical framework:

> We set forth in this Opinion the law to be applied henceforth in
> determining whether a stockholder's claim is derivative or direct. That
> issue must turn <u>solely</u> on the following questions: (1) who suffered the
> alleged harm (the corporation or the suing stockholders, individually?),
> and (2) who would receive the benefit of any recovery or other remedy
> (the corporation or the stockholders, individually?)

<u>Id</u>. at 1033 (emphasis in original).

Each of the fiduciary allegations concerns harm to shareholders individually.    The

Defendants' refusal to postpone the vote, and continuation of their favorable

recommendation, deprived the <u>shareholders</u>, not the corporation, of the opportunity to

consider the new information concerning a competing bid before voting.    Similarly, the

Defendants' decision not to negotiate with the alternative bidder deprived <u>shareholders</u> of

a better opportunity.    There is no allegation that the corporation would be better or worse

off following a cash-out merger rather than a recapitalization; it is entirely plausible that

the best offer for shareholders might not be ideal for the corporation, if, for example, it

would result in the corporation being heavily in debt.

     The recovery Plaintiff seeks, money damages to himself and other shareholders as

of the record date, obviously inures to the benefit of the shareholders and not to the

corporation. This reflects the nature of the alleged misconduct: Defendants are alleged to have breached their duty of loyalty to pre-transaction shareholders, by favoring the interests of Yucaipa. ¶40. As a result of the alleged misconduct, Yucaipa is currently the 30% equity owner of Pathmark. It would make no sense to order Defendants to pay additional damages to Yucaipa to compensate pre-existing shareholders for the damage the Defendants caused by favoring Yucaipa. Clearly, an award to the corporation would represent further unjust enrichment of Yucaipa. The existing shareholders, not the corporation, must benefit from the recovery. See Tooley at 1039 ("There is no derivative claim asserting injury to the corporate entity. There is no relief that would go [to] the corporation. Accordingly, there is no basis to hold that the complaint states a derivative claim").[6]

## CONCLUSION

The series of proxy updates in this case, including the June 7 update that was received too late to be considered by shareholders, support the allegations in the Complaint that Defendants breached their statutory and fiduciary obligations by withholding material information concerning an alternative corporate opportunity from shareholders evaluating the Yucaipa Transaction. The issues of corporate disclosure and directorial duty in this case are not susceptible to resolution on the basis of an unanswered Complaint. Defendants' motion to dismiss must be denied.

---

[6]    Defendants' reliance on Agostino v. Hicks, 845 A.2d 1110, 1123 (Del. Ch. 2004) is unavailing, as in Agostino, the Complaint alleged that an alternative transaction would have maximized the return to the corporation's assets. Here, by contrast, plaintiffs allege that considering the alternative transaction would have enabled shareholders to maximize their own return on their individual investments.

20

PRICKETT, JONES & ELLIOTT, P.A.

Elizabeth M. McGeever (Del. Bar No. 2057)
1310 King Street, P.O. Box 1328
Wilmington, DE 19899-1328
(302) 888-6500
(302) 658-8111 (Fax)

**OF COUNSEL:**

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Arthur Stock
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4636 (Fax)

        and

**BERGER & MONTAGUE, P.C.**
Abbott A. Leban (Del. Bar No. 3751)
919 Market Street, Suite 425
Wilmington, DE 19801
(302) 571-8626
(302) 571-8602 (Fax)

        and

James M. Orman
1845 Walnut Street
15th Floor
Philadelphia, PA 19103
(215) 523-7800
(215) 523-9290 (Fax)

Dated: September 20, 2005

pathmark.wpd                                21

## CERTIFICATE OF SERVICE

I, Elizabeth M. McGeever, hereby certify that on this 15th day of August, 2005, I electronically filed the foregoing BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> William M. Lafferty, Esquire
> Morris Nichols Arsht & Tunnell
> 1201 N. Market Street
> Wilmington, DE 19801

_Elizabeth M. McGeever_
Elizabeth M. McGeever (#2057)