Exhibit A

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 1

**H**

Motions, Pleadings and Filings

United States District Court, E.D. New York.
CARUSO, et al.
v.
METEX CORPORATION, et al.
**No. CV 89-0571.**

July 30, 1992.

Opinion

MISHLER, District Judge.

***1** This case involves the events surrounding the merger of two corporations, the Metex Corporation ("Metex") and Metropolitan Consolidated Industries ("Metropolitan"). The merger was effectuated by the Metex stockholders' approval of a proposal to exchange each individual share of Metex stock for 1.5 shares of Metropolitan stock. Plaintiffs, a class of individuals who were Metex shareholders as of January 16, 1989, claim that the shareholders approved the merger because they were induced by defendants' issuance of a materially false and misleading "Joint Proxy Statement/Prospectus" dated January 30, 1989 and a Supplement, dated February 23, 1989.

In the present action, all defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons stated herein, defendants' motion for summary judgment is granted in part and denied in part.

BACKGROUND

1. *Metex*

Metex was a Delaware corporation primarily engaged in the sale and manufacture of wire products, transformers for heavy duty motor controls and antenna systems. The crown jewel of the corporation was its antenna division, Dorne & Margolin ("D & M"), which, in 1988, had an operating income of $2,558,000 and net sales of $19,072,000. In the year prior to the merger, Metex, as a whole, had $28,503,000 in assets.

Before Metex merged into Metropolitan, it was a publicly held corporation with 389 shareholders and 1,359,029 outstanding shares of common stock. In 1986, Metex stock was traded on the American Stock Exchange for as much as $16.75 per share. By the end of 1988, the stock was trading at $16.16 per share.

2. *Metropolitan*

Metropolitan, now known as United Capital Corp. ("UCC"), was incorporated in the State of Delaware and was primarily engaged "in the business of investing in real estate properties." (Defendants' Ex. 1, p. 1). The corporation also managed some of its properties and financed various other real estate acquisitions. In 1987, Metropolitan had assets of $109,999,339.

At the time of the merger, Metropolitan had 9,863,225 shares of common stock outstanding. Approximately 80% of these shares (7,864,057), were not freely tradeable because they were restricted under SEC Rule 144. Prior to the merger, Metropolitan's stock was thinly traded. [FN1]

Metropolitan was controlled by defendant UCC [FN2], who owned 68% of the stock. UCC, in turn, was owned by two individuals, defendant Attilio F. Petrocelli, ("A.F.") Metropolitan's President and Chairman of its Board of Directors, and defendant Pearl Hack, the wife of defendant William Hack.

3. *Metropolitan's involvement with Metex*

Metropolitan first became a Metex shareholder in 1987. By 1989, Metropolitan owned approximately 42.7% (580,284 shares) of the outstanding shares of Metex stock. These shares were purchased primarily from present or former Metex directors or officers.

Several directors of Metropolitan became involved with Metex's internal operations. In 1987, A.F. became Chairman of the Metex Board of Directors, in addition to his role as Chairman of Metropolitan's Board. At the 1987 annual stockholders meeting, defendants Leonard Gubar ("Gubar") and Bernard Turiel ("Turiel"), two other members of Metropolitan's Board, were elected to the Metex Board of Directors. Gubar was general legal counsel to Metropolitan and Turiel was an attorney for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 2
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Metropolitan, A.F., and William Hack. A.F.'s brother, Anthony Petrocelli ("Anthony"), although not technically a Metropolitan director, became Metropolitan's official designee on Metex's Board.

*2 In March of 1988, Metropolitan offered to acquire Metex in a one to one stock merger. The Metex Board established a "Merger Evaluation Committee" ("Committee") to assess the fairness of the proposed merger. The Committee consisted of defendant Walter F. Gips, ("Gips") a non-management Metex director and Mason Carter ("Carter") and Robert Schaffhauser ("Schaffhauser"), two Metex directors with management responsibilities. To determine whether the Metropolitan offer was "fair," the Committee retained the firm of Bear Stearns to render a "fairness opinion."

Bear Stearns determined, in July of 1988, that the one to one stock exchange was unfair to Metex public stockholders. (Defendants' Ex. 13). Mark Lee, a Bear Stearns representative, presented this information to the Committee on July 15, 1988. The Committee reported the results of the "fairness opinion" to Metropolitan, who subsequently withdrew its merger proposal.

Although Bear Stearns had determined that the one to one stock exchange was insufficient, the Committee nevertheless "request[ed] that Bear Stearns advise it as to what it deemed to be an appropriate exchange ratio." (Defendants' Ex. 13, p. 2). The Committee instructed Bear Stearns to have this information available for the Committee meeting scheduled on July 21, 1988.

At the July 21 meeting, Mark Lee of Bear Stearns, in response to a question from Gips, stated that "he believed that the most appropriate [stock] exchange ratio was 1.5:1" (Defendants' Ex. 16, p. 2). The Committee determined, on the advice of counsel, that it "would not be violative of applicable law to provide the other members of the Board of Directors of the Corporation with copies of Bear Stearns' report." *Id.* This report concluded in pertinent part that:
> [b]ased upon the range of going-concern values for Metex ($19.25-$20.50 per share) and the range for Metropolitan ($12.70-$14.40 per share), the indicated exchange ratio should be 1.4 to 1.5 shares of Metropolitan for each share of Metex."

(Defendants' Ex. 15, p. 9).

A special meeting of the Metex Board of Directors was then held on August 26, 1988. During this meeting, A.F., in his capacity as Chairman of the Board and Chief Executive Officer of Metropolitan, proposed to the Metex Board a merger transaction whereby each share of outstanding Metex common stock would be converted into 1.5 shares of Metropolitan common stock. (Defendants' Ex. 18, p. 2). The Metex Board determined that the fairness of this proposal was to be determined by the Merger Evaluation Committee. Gips was now the sole member of the Committee. Carter and Schaffhauser had resigned from the Metex Board.

The Committee met on September 8, 1988, to determine the fairness of Metropolitan's new proposal. Bear Stearns presented a new report to the Committee which concluded that:
> [b]"ased on the range of implied values per share for Metex ($16.00-$16.25) and the above implied value for Metropolitan ($11.50), the indicated exchange ratio should be 1.4 shares of Metropolitan for each share of Metex."

*3 (Defendants' Ex. 22). The Committee determined that it would advise the Board of Directors that Metropolitan's new proposal was in the best interest of Metex stockholders.

One day later, on September 9, 1988, the Metex Board of Directors met to consider Metropolitan's 1.5:1 proposal. A.F., Gubar, Turiel, Anthony and Gips were the directors present at the meeting. Samuel Lieben and defendant Marvin Eiseman ("Eiseman") were absent. The Metex Board, in a unanimous vote, approved the plan to merge with Metropolitan.

A few weeks after the Metex Board approved the merger, Metropolitan announced that it was making a bid to acquire One Liberty Properties, Inc. ("OLP"), a real estate investment trust. Gips was concerned that the acquisition of OLP would lower the value of Metropolitan's stock. Bear Stearns shared Gips' discomfort with the plan to acquire OLP and as a result initially withdrew its preliminary opinion that the Metex/Metropolitan proposal was fair to Metex and its stockholders.

Gips convinced Bear Stearns to adhere to its initial view that the merger was fair by amending the merger proposal to build a price floor into the Metex/Metropolitan share exchange ratio. The price floor provided that each Metex share would be converted into the greater of either 1.5 shares of Metropolitan stock or the number of shares of Metropolitan stock having a market value of $12.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 3

Although Metropolitan eventually decided against the OLP acquisition, the parties agreed to retain the price floor provision. The revised Metropolitan proposal was accepted by the Metex Board of Directors during a meeting held on November 3, 1988.

On January 30, 1989, Metex and Metropolitan issued the Joint Proxy Statement/Prospectus. This document contained the details of the merger, each corporation's respective financial information and the endorsement of the Metex and Metropolitan Board of Directors. The Proxy vote was scheduled to occur on March 3, 1989.

However, on February 21, 1989, plaintiffs in the present action filed their initial complaint. Defendants responded by creating a Supplement to the Joint Proxy Statement which summarized some, but not all of the allegations contained in the complaint. This supplement was mailed to Metex stockholders on February 24, 1989. (Defendants' Reply Memo. p. 23).

The annual stockholders meeting was held on March 3, 1989, four business days after the Supplement was mailed to the Metex Shareholders. A majority of the shares represented at the meeting (roughly 78% of the voting shares) cast their ballots in favor of the merger. [FN3] Metropolitan acquired 57% of Metex' public shares in exchange for approximately 11% of Metropolitan. The aggregate market value of the Metropolitan stock received by the Metex shareholders was about $9,345,000 or $12 per share.

*ALLEGATIONS IN THE COMPLAINT*

1. *Proxy Statements/Prospectus*

Plaintiffs' claim centers around Metex's alleged failure to disclose in its Proxy Statement/Prospectus that a group of investors offered to acquire a Metex subsidiary, D & M, for $18.5 million. The Second Amended Complaint alleges that because of this omission, the Proxy Statement/Prospectus was false and misleading in violation of various provisions of the Securities Acts of 1933 and 1934 and SEC Rules 10b-5 and 14-9(a).

***4** Plaintiffs also claim, among other things, that the aforementioned statutes and rules were violated because the Proxy Statement/Prospectus and Supplement: (1) failed to reveal that A.F. was paid an aggregate bonus of $765,200 in February 1989; (2) failed to reveal that Bear Stearns valued the Metex subsidiary "TPD" at $7,000,000; (3) Undervalued "Metex's real estate ... on it balance sheets." (Second Amended Complaint ¶ 42(c) p. 25); (4) deliberately misled stockholders by including the Bear Stearns fairness opinion which defendants knew was rendered without knowledge of the true value of the corporation; (5) falsely stated that for the period from March through August 1988, no inquiries or proposals regarding Metex were received from third parties." (Second Amended Complaint ¶ 49 p. 31); (6) failed to reveal that William "Hack and [A.F.] Petrocelli controlled most of the freely tradeable Metropolitan common stock, enabling them to manipulate the 'market value' of Metropolitan common stock at artificially high levels and use it as currency for acquiring Metex in the Merger." (Second Amended Complaint ¶ 52 p. 33-34); (7) misrepresented the benefits of Metex/Metropolitan merger by failing to reveal "Metropolitan's continuing problems and risks relating to the real estate limited partnership investments sold to its stockholders, and the subsequent conversion of the limited partners' interest into restricted shares of Metropolitan common stock without any of the limited partners' consent from October 1986 through May 1987." (Second Amended Complaint ¶ 51 p. 32); (8) failed to reveal that Metex earned approximately $700,000 in net income from D & M in the fourth quarter of 1988.

2. *Supplement*

Plaintiffs argue as a matter of law that a Supplement mailed only four business days before the proxy vote does not provide shareholders with reasonable notice of the matters contained therein. Moreover, plaintiffs allege that the Supplement was false and misleading, in violation of the aforementioned statutes and rules, because it stated that it was issued "By Order of the Board of Directors of Metex Corporation." (Defendants' Ex. 2, p. 3), whereas, in fact, the Board did not meet to affirm its ratification. Rather, the executive officers of Metex, principally A.F., had the authority to approve the Supplement in the same of the Metex Board.

3. *State law claims*

The Second Amended Complaint alleges that the individually named defendants violated their fiduciary duties to the corporation by knowingly approving a merger that undervalued the Metex stock. Furthermore, plaintiffs contend that Gips, as the sole member of the Merger Evaluation Committee, violated his fiduciary duty to the corporation by improperly furnishing the interested members of the Metex board with a copy of the Bear

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 4

Stearns fairness opinion.

Plaintiffs also maintain that defendants engaged in common law fraud and negligent misrepresentation, in violation of state law, when Metex issued a Proxy Statement/Prospectus that was allegedly false and misleading.

*DISCUSSION*

*5 Summary judgment is proper when no material questions of fact remain to be decided by the factfinder and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986); *Bernard v. Commerce Drug Co.*, No. 91-9060, 1992 WL 133258 at * 2 (2d Cir. June 17, 1992). The nonmovant's evidence is to be believed and all ambiguities and justifiable inferences to be drawn from the underlying facts should be resolved in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 196 S.Ct. 2505, 2513 (1986); *Banco Espanol De Credito v. Security Pacific National Bank*, Nos. 91-7563, 91-7571, 358, 359, 1992 WL 145169 at * 2 (2d Cir. June 24, 1992).

When the nonmovant bears the burden of proof on an issue, the movant can discharge the burden imposed by Rule 56 by showing that there is no proof to support the nonmovant's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. If the movant sustains its initial burden, the burden shifts to the nonmovant to produce evidence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).

1. *Alleged $18.5 million offer for D & M*

We find that there is a genuine issue of material fact in dispute as to whether defendants deliberately undervalued the Metex stock by failing to reveal that an offer of $18.5 million was made for D & M, a Metex subsidiary. The parties are in substantial disagreement about the events surrounding the alleged offer to purchase D & M.

D & M was originally a subsidiary of Dynaport Inc., which was acquired by Metex in January 1984 from Jordan Fishbane, Robert Melech, and Charles Levy. ("Fishbane group"). The Fishbane group were the former officers and managers of D & M.

It is undisputed that the Fishbane group, in conjunction with Gabelli-Rosenthal & Partners, Inc., ("Gabelli") a leveraged buyout firm, wrote a letter to the Metex Board of Directors on June 3, 1987, offering to purchase D & M for $14 million. (Plaintiffs' Ex. 2). This proposal was subject to due diligence and financing. There is substantial disagreement about the events that occurred subsequent to the letter of June 3.

a. *Plaintiffs' version*

The plaintiffs claim that A.F. and Furfaro, a Gabelli employee, had several telephone conversations and a lunch meeting, as a result of the June 3 letter, and finally agreed on an enhanced purchase price of $18.5 million for D & M. [FN4] A.F. was not eager to publicly announce the transaction, so he allegedly refused to issue a letter of intent memorializing the agreement.

However, Metex and the purchasing group signed a confidentiality/standstill agreement on August 19, 1987. This agreement provided that Metex would furnish the purchasing group with confidential information relating to D & M. In return, the purchasing group promised that it would not publicly disclose the $18.5 million buyout proposal. If the present deal for the D & M acquisition did not close within "a reasonable time," the agreement also provided that the purchasing group was prohibited from making any offers to acquire D & M or any other Metex asset or security for a two year period. (Plaintiffs' Ex. 3).

*6 On the following day, A.F. instructed Carter and Schaffhauser, members of the Metex Board, to meet personally with the purchasing group to discuss the details of the D & M acquisition. Plaintiffs claim that during this meeting, the operations of D & M were discussed in substantial detail. [FN5] (Plaintiffs' Memo. p. 18).

After the meeting, plaintiffs contend that the purchasing group, between August 20 and September 7, 1987, "worked hundreds of hours digesting and analyzing the information from Metex, on other due aspects of its diligence and on preparation of a comprehensive 'Deal Book'...." (Plaintiffs' Memo. p. 20). The "Deal Book" was designed to interest financial institutions in the D & M acquisition. The "Deal Book" indicated that the total cost to acquire D & M would be $20.4 million, $18.5 million in cash to Metex and $1.9 million in acquisition costs. It also stated that the purchasing group was seeking "to close this transaction by November 30, 1987." (Plaintiffs' Ex. 1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 5
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

After the "Deal Book" was issued, plaintiffs maintain that the purchasing group met with various financing institutions, including the Bank of New England and Fidelity, to discuss financing for the D & M acquisition. All of these institutions apparently expressed their interest in the deal and indicated that financing "was not a problem." (Plaintiffs' Memo. p. 20).

The purchasing group's due diligence continued into the middle of September and was nearly complete. The due diligence did not reveal any problems, (*e.g.* environmental), that would stand in the way of the acquisition. Murphy, a Gabelli employee, allegedly contacted the law firm of Kronish, Lieb, Weiner & Hellmans, the purchasing group's outside counsel, and asked them to be ready to finalize the D & M buyout agreements.

However, on September 17, 1987, plaintiffs claim that Metex officials informed the purchasing group that D & M was no longer for sale. This was because the financing necessary to effectuate the sale was not in place by the unwritten September 17, 1987 deadline. The purchasing group did not believe that any such deadline had been established.

On the following day, Gabelli employees prepared a letter to A.F. offering to purchase D & M for $18.5 million with no financing contingency. However, Mario J. Gabelli, a named partner in the firm, told his employees (Furfaro and Murphy) to issue the offer verbally, rather than in writing, because of A.F.'s instructions that no offers were to be made in writing.

A meeting was subsequently held between Furfaro and A.F. on September 21, 1987. Furfaro communicated the offer to purchase D & M for $18.5 million, without a financing contingency. However, A.F. rejected the offer and told him that D & M was no longer for sale. He apparently made no reference to the purchasing group's alleged failure to adhere to a financing deadline of September 17, 1987.

b. *Defendants' Version*

The defendants claim that the purchasing group never made a formal offer to acquire D & M. Although the potential buyers put forth an $18.5 million dollar proposal, the purchasing group insisted that an offer could not be made until: (1) the purchasing group obtained sufficient financing, (2) Metex agreed to certain warranties and representations, including a warranty and indemnification agreement regarding certain environmental problems at D & M. A.F. informed the buyers that Metex would not consider any offer to acquire D & M that was subject to a financing contingency and required Metex to make certain warranties and representations.

*7 Moreover, A.F., Carter and Schaffhauser had reservations about dealing with the Fishbane group. They believed that as former employees of D & M, negotiations with the Fishbane group would send "mixed messages as to who would be running, controlling or owning the business...." (Defendants' Ex. 20, p. 82). Therefore, A.F. directed Carter and Schaffhauser to inform the purchasing group that if their financing was not established by September 17, 1987, Metex would refuse to consider their proposal.

Carter and Schaffhauser had their sole meeting with the purchasing group on August 20, 1987. The Metex officials informed the buyers that a formal offer had to be made on or before the next scheduled meeting of the Metex Board of Directors, which was September 17, 1987. In order to assist the purchasing group in meeting this deadline, Carter and Schaffhauser provided them with all of the documents that they requested, including financial statements, profits and loss statements and other materials relating to D & M.

On September 17, 1987, the Metex Board of Directors had not yet received any communications from the purchasing group. Carter then telephoned Furfaro and asked him about the status of the acquisition. Furfaro stated that the purchasing group needed more time to arrange the necessary financing. Metex refused to extend the deadline and told Furfaro that they would not longer consider the proposal.

The next day Murphy and Furfaro held a meeting with Mario Gabelli to inform him that Metex refused to consider the purchasing group's proposal because the financing had not been completed before the September 17, 1987 deadline. To salvage the deal, Murphy and Furfaro asked Gabelli to sign a letter offering to acquire D & M for $18.5 million cash with no financing contingency. The letter also stated that the offer was contingent on Metex's agreement to certain warranties, covenants and representations. Gabelli refused to sign the letter.

According to the defendants, Mario Gabelli could not make a binding offer without the written consent of Emery Rosenthal ("Rosenthal"), the other principal of the firm. Rosenthal apparently did not give his consent. Furthermore, the Gabelli firm's charter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 6

prevented it from investing more than $6 million dollars of its own funds in any single acquisition. (Defendants' Reply Memo. p. 8).

Nevertheless, Furfaro and Murphy met with A.F. on September 20, 1987. This was only the second meeting that occurred between Metex officials and the purchasing group. Furfaro and Murphy told A.F. that they were "ready, willing and able" to acquire D & M, provided that the necessary financing was obtained, the environmental problems were resolved and Metex made other warranties, covenants and representations. A.F. rejected their proposal and turned down the request to reopen discussions.

Metex did not believe that the purchasing group had the necessary financing to complete the transaction. Not only had Gabelli failed to contribute any of its resources, but the purchasing group had neglected to make arrangements with any other institution to obtain financing. Moreover, the defendants contend that the purchasing group "did not have a lawyer, and ... [did] not spend any money on legal fees or preparing contracts or documents." (Defendants' Memo. p. 37). The movants also believe that a deal could not have been executed even if the financing had been complete because of the purchasing group's demand that Metex provide an indemnity against environmental damage. At the outset of the discussions, Metex steadfastly refused to provide any environmental guarantees.

c. *Materiality*

***8** SEC Rule 14a-9, which implements Section 14(a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U.S.C. § 78n(a), prohibits "the solicitation of proxies by means of materially false or misleading statements." *Virginia Bankshares Inc. v. Sandberg,* 111 S.Ct. 2749, 2755 (1991). The Supreme Court has determined that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983 (1988), *quoting TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976). The Court further explained:

> "that to fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Basic* 485 U.S. at 231-32, 108 S.Ct. at 983, *quoting TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132.

It is well established, however, that omitted facts or information can be material, even if they are not "outcome-determinative."

> "[T]hat is, it need not be important enough that it 'would have caused the reasonable investor to change his vote." ... Rather, the information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder."

*Folger Adam Co. v. PMI Industries Inc.,* 938 F.2d 1529, 1533 (2d Cir.), *cert. denied,* 112 S.Ct. 587 (1991), *quoting TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132.

> "The Second Circuit has stated that since "materiality is a mixed question of law and fact, it is a question especially well suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir.1990), *modified on other grounds,* 938 F.2d 1528 (2d Cir.1991). The Supreme Court has also held that:
>
> [i]n considering whether summary judgment of the issue is appropriate, we must be in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."

*TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133.

"In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure." *Katz v. Pels,* 774 F.Supp. 121, 126 (S.D.N.Y.1991), *citing, Wilson v. Great American Industries, Inc.,* 855 F.2d 987, 994 (2d Cir.1988). [FN6]

***9** It is unclear, based on the facts as presented, whether the purchasing group made an offer to acquire D & M. However, since all ambiguities and justifiable inferences to be drawn from the underlying facts should be resolved in favor the nonmovant, we will assume that the purchasing group did make an offer to acquire D & M. We find that a reasonable jury could determine that the failure to reveal the $18.5 million offer for D & M in the proxy statement constituted an omission of a material fact on which a reasonable shareholder would rely. [FN7]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 7

The facts surrounding the alleged offer certainly altered the "total-mix' of information available to the shareholders. The $18.5 million dollar offer for D & M, a Metex subsidiary, was, according to the plaintiffs, approximately $2,200,000 or 13% more than the $16,300,000 that Metex received for the entire corporation after its merger with Metropolitan. [FN8] This Circuit has held that in determining whether an omission is material, "the shareholders appraisal of the stock's value is obviously 'important in deciding how to vote." *Mendell, supra* at 675.

Moreover, the Supreme Court explained in *Basic* that "[n]o particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material." 485 U.S. at 239, 108 S.Ct. at 987. Instead the court endorsed a fact-specific inquiry.

> "Whether merger discussions in any particular case are material therefore depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers and actual negotiations between principals or their intermediaries may serve as indicia of interest."

*Id.*

In the present case, Metex and the purchasing group engaged in direct negotiations, Metex furnished the buyers with a substantial amount of financial information, and the purchasing group allegedly obtained the financing necessary to acquire the subsidiary for $18.5 million. A reasonable shareholder would have considered the events surrounding the proposed acquisitions an important consideration in deciding whether to vote for the merger.

Disclosure of the information relating to the attempted acquisition of D & M "and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." Basic, 485 U.S. at 234, 108 S.Ct. at 985.

> "We have recognized time and again, a 'fundamental purpose' of the various Securities Acts, 'was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

*Id.* (citations omitted),

Defendants argue that even if the discussions regarding the acquisition of D & M were material in 1987, they were no longer material when the merger occurred in 1989. We find that the issue of whether the $18.5 million buyout proposal constituted "stale" information in 1989 is a factual question to be decided by the jury. The jury must determine whether an offer made in 1987 to acquire D & M for $18.5 million "would have assumed actual significance in the deliberations of the reasonable shareholder ..." when deciding whether to approve the merger in 1989. *Folger Adam Co.*, 938 F.2d at 1533.

***10** Movants rely principally on the case of *Ross v. A.H. Robins*, 465 F.Supp. 904, 908 (S.D.N.Y.), *rev'd on other grounds*, 607 F.2d 545 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175 (1980), for the proposition that "general financial information in a two-year old annual report may be stale and immaterial." However, *Ross* was simply referring to a different case, *Shahmoon v. General Dynamics Corp.*, [1973-1964] FED.SEC.L.REP. (CCH) ¶ 94308 at 95,038 (S.D.N.Y.1973), which held that two-year old information was "stale" and immaterial. In reality, *Ross* announced that when determining whether information is "stale" and immaterialL "no general rule of time can be applied to all circumstances." *Id.* Based on the factual circumstances found in *Ross*, the court held that a 1970 Annual Report may have been relied on by traders in 1974.

In fact, as plaintiffs observe, when *Basic* was remanded by the Supreme Court to the Sixth Circuit for further proceedings, *Levinson v. Basic*, 871 F.2d 562 (6th Cir.1989), the court found that it was improper to grant summary judgment on the materiality of statements made two years prior to a merger. Whether or not the proposed acquisition in the present case is "stale" or immaterial is an issue that cannot be resolved by summary judgment.

Defendants nevertheless argue that any defects in the Proxy Statement/Prospectus were cured by the Supplemental Proxy Statement. The Supplement was mailed to the Metex stockholders on February 24, 1989. (Defendants' Reply Memo. p. 23). The special meeting to vote on the merger was scheduled for March 3, 1989. This left only four business days for the Metex stockholders to receive the Supplement, digest the information contained therein, mail a new proxy to the corporation and have that proxy received and processed by Metex prior to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 8
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

March 3, 1989 special meeting. We find as a matter of law that the Supplemental Proxy Statement mailed to the Metex Shareholders only four business days before the proxy note did not give the shareholders reasonable notice of the matters contained therein.

"The value of a Supplemental Proxy Statement is particularly questionable where the statement is issued shortly before a shareholders' vote, giving voters limited time to evaluate the corrected statements." *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1076 (S.D.N.Y.1987). At least two courts have held that Supplemental Proxy Statements mailed to shareholders ten days before a proxy vote "does not constitute timely notice to the shareholders and cannot be an effective cure to the material omission." *Newgard v. Electro-Nucleonics Inc.,* [1976-1977 Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 95,805, 90,919 (S.D.N.Y.1976); *Franklin v. Ernst,* 571 F.Supp. 829, 837-38 (N.D.Ohio 1983) (Supplemental Proxy Statement mailed 10 days before the Proxy vote "was mailed too late to allow the brokers to mail the statements to the beneficial owners of the shares before the annual meeting").

***11** Several other courts have observed that a shareholder must be given reasonable time to digest the information contained in the Supplement. In *Camelot Industries Corp. v. Vista Resources Inc.,* 535 F.Supp. 1174, 1184-85 (S.D.N.Y.1982), the court held it was necessary to delay a proxy vote for ten days when a Supplemental Proxy Statement, correcting omissions in the initial Proxy, was mailed to the stockholders twenty days before the scheduled vote. Similarly, in *Whitman v. Fuqua,* 549 F.Supp. 315, 317 (W.D.Pa.1982), the court postponed a stockholders meeting set for January 19, 1982 until March 12, 1982, because the corporation issued a Supplemental Proxy Statement shortly before the scheduled Proxy vote. An analogous result was reached in *Howell v. Management Assistance Inc.,* 519 F.Supp. 83, 88 (S.D.N.Y.1981), *aff'd,* 685 F.2d 424 (2d Cir.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 138 (1982), where the court held that a Supplemental Proxy, mailed only five days prior to the Proxy vote, gave "reasonable notice to stockholders to permit any who wished to change their vote to do so ...," because the supplement stated that the polls would be kept open for an additional eight days to permit stockholders to "change proxies previously filed or re-submit new proxies until that date."

Although there are cases which hold that proxy statements mailed approximately two weeks before the scheduled vote provided the stockholders with reasonable notice, *See e.g., Abramson v. Nytronics, Inc.,* 312 F.Supp. 519, 523, 525-26 (S.D.N.Y.1970) (fourteen days); *Bolger v. First State Financial Services,* 759 F.Supp. 182, 197 (D.N.J.1991) (thirteen days); *D & N Financial Corp. v. RCM Partners Ltd.,* 735 F.Supp. 1242, 1253 (D.Del.1990) (twelve days), no court has ever held that a Supplemental Proxy Statement mailed merely seven days before the Proxy vote (four business days) furnishes a stockholder with sufficient notice to digest the information, and if necessary, change his vote.

The information contained in the Supplemental Proxy Statement was untimely and accordingly will not be considered by this court. [FN9]

2. *Failure to Disclose A.F.'s Bonus*

There is a genuine issue of material fact in dispute as to whether a reasonable jury could find that the failure to reveal A.F.'s $765,000 bonus in the Proxy Statement/Prospectus constitutes an omission of a material fact. This bonus was significantly larger than any other bonus that A.F. had received in the past. According to Schaffhauser, "[i]t was a bonus that was much larger than any bonuses that had previously been paid by Metex Corporation." (Plaintiffs' Ex. 15, p. 285).

Not only was the bonus unusually large, but the plaintiffs estimate that the bonus constituted approximately 9% of Metex' "pro forma working capital" and 12.5% of its pro forma September 30, 1988 net income (as disclosed in the Proxy Statement/Prospectus)." (Plaintiffs' Memo p. 64). We find that a reasonable jury could decide that A.F.'s undisclosed bonus constituted an omission of a material fact that "would have assumed actual significance in the deliberations of the reasonable shareholder." *Folger Adam Co., supra* at 1533.

3. *Failure to Disclose that Bear Stearns Valued Metex' TPD Division at $7,000,000.*

***12** There is a genuine issue of material fact in dispute as to whether Bear Stearns' $7,000,000 valuation of Metex' TPD division was a material fact that "would have assumed actual significance in the deliberations of the reasonable shareholder." *Folger Adam Co., supra* at 1253.

When a corporation discloses financial information that is likely to affect a shareholder's vote, the corporation is under a duty make such a disclosure

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"complete and accurate." *Roder v. Alpha Industries,* 814 F.2d 22, 26 (1st Cir.1987), *citing SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454 (1969). *See also Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1119 (D.R.I.1990) (When a corporation presents information regarding the value of its holdings, but omits "additional information that would have demonstrated the value of those holdings to have been much greater ...," the corporation has omitted a material fact that a reasonable shareholder may have considered important when determining how to vote.).

Although Metex disclosed that Bear Stearns found the merger exchange ratio to be fair to Metex shareholders, plaintiffs contend that the Metex stock was more valuable than the Proxy Statement/Prospectus revealed because of Bear Stearns' valuation of the TPD division at $7 million. We find that a reasonable jury could find that defendants' failure to reveal that the TPD division was valued at $7 million constituted an omission of a material fact.

4. *Failure to Disclose the "Fair Market Value" of Metex's Real Estate*

The Proxy Statement/Prospectus lists only the "book value" of Metex's real estate. Plaintiffs argue that the failure to list the "fair market value" of the Metex real estate, which is allegedly at least $2 million more than its "book value," was materially misleading to Metex stockholders.

As stated above, if a corporation discloses information that is likely to affect a shareholder's vote, such disclosure must be "complete and accurate." *See* p. 36 *supra.* In the case at bar, a reasonable jury could find that it was materially misleading to list only the "book value" of the Metex real estate, when the "fair market value" was considerably higher. As one commentator has noted, "basing the price on 'book value' [alone] is deceptively simple, and can lend itself to subtle manipulation by the board of directors. Although frequently used, 'book value' is more of an historical cost than [the] current value [or "fair market" value] concept...." Henn, *The Law of Corporations,* § 282 p. 561 (2d ed. 1970). By listing only the "book value" of the property when the company was allegedly aware of the higher "fair market value," a reasonable shareholder may have been misled about the true value of the Metex stock. We find that there is a genuine issue of material fact in dispute and will allow this claim to be decided by the jury.

5. *Inclusion of the Bear Stearns Opinion in the Proxy Statement/Prospectus*

***13** It is undisputed that Metex failed to notify Bear Stearns of the purchasing group's proposal to acquire D & M. As a result, plaintiffs contend that the fairness opinion underestimates the value of the Metex Stock. Since we assume, for purposes of this opinion, that the purchasing group offered to acquire D & M, the failure to reveal the $18.5 million dollar proposal may have lead a reasonable shareholder to cast his vote against the merger. At least one court has held that "allegations regarding misrepresentations as to the value of ... [a corporation's assets] and nondisclosure of limitations on the information underlying ... [a] fairness opinion implicate matters at the heart of the decision confronting shareholders." *Dowling, supra* at 1119.

There is a genuine issue of material fact in dispute as to whether inclusion of the purchasing group's proposal to acquire D & M in the Bear Stearns fairness opinion, "would have assumed actual significance in the deliberations of the reasonable shareholder." *Folger Adam Co., supra* at 1533.

6. *Proxy Statement/Prospectus' Assertion That No Inquiries or Proposals Regarding the Acquisition of Metex Were Made From March Through August 1988.*

The plaintiffs claim that Metex stockholders were misled by the assertion in the Proxy Statement/Prospectus that "during the period of more than five months from the public announcement of the Initial Merger Proposal [March 18, 1988] ... to the execution of the [merger] agreement on September 23, 1988, no inquiries or proposals regarding Metex were received from third parties." (Defendants' Ex. 1, p. 20). In fact, plaintiffs contend that at least one letter, dated July 8, 1988, was mailed to Metex officials and offered to pay "at least $12 per share cash." (Second Amended Complaint ¶ 49 p. 31). Defendants have failed to discharge the burden imposed by Rule 56 of showing that there is no proof to support the plaintiffs' contention that the aforementioned statement was misleading. Therefore, summary judgment cannot be granted on this claim.

7. *The Value of Metropolitan's Stock*

Plaintiffs claim that the Proxy Statement/Prospectus

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 10
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

does not accurately reflect the true value of Metropolitan's stock. The first allegedly material omission concerns the facts surrounding the creation of Metropolitan. According to the plaintiffs, Metropolitan was organized in or about 1986 or 1987:

> "when approximately 60 real estate limited partnerships promoted by A.F. Petrocelli and defendant William Hack were "rolled up" into one entity (Metropolitan), and the limited partners' majority equity interests in the real estate were exchanged for a minority position in the common stock of Metropolitan.... In this way, William Hack and A.F. Petrocelli converted their minority equity interest in the real estate limited partnerships (generally 2%) into a 68% post-roll-up equity interest through UCC's 68% ownership of Metropolitan.
>
> ***14** In December 1987, UCC "exchanged its preferred stock in Metropolitan for 2,038,059 additional shares of Metropolitan common stock, using a valuation (determined arbitrarily by A.F. Petrocelli and William Hack) of $5.00 per Metropolitan share, only four months after Metropolitan had exchanged its common stock for the real estate interest of the former limited partners at a valuation (determined arbitrarily A.F. Petrocelli and William Hack) of $10.00 per Metropolitan share.... This was consistent with a pattern of stock exchanges in 1986 and 1987 where by defendants UCC, A.F. Petrocelli and William Hack consistently valued Metropolitan stock arbitrarily at $5.00 per share whenever it was issued in exchange for consideration given by entities controlled by them and at $10.00 per share whenever they were exchanging it for property owned by the powerless investors in their limited partnerships."

(Plaintiffs' Memo. p 6-7).

The plaintiffs maintain that from October 1986 through May 1987, many of the limited partners who owned shares of Metropolitan stock had these shares converted into restricted shares of common stock without their consent. Many of the limited partners whose shares were involuntarily converted either sued UCC, Hack and A.F., or threatened to engage in such litigation. (Second Amended Complaint ¶ 51 p. 33). The plaintiffs contend that the manipulation of the stocks and the resulting or threatened litigation should have been revealed in the Proxy Statement/Prospectus because it may have lowered the value of Metropolitan's stock.

The movants deny that A.F. and William Hack attempted to "squeeze out" certain limited partners. Rather, the defendants explain that in 1986 and 1987, Metropolitan stock was traded at approximately $10 per share. The Metropolitan stock that was given to the limited partners had a restriction which prohibited its sale for a two year period. Defendants acknowledge that certain of the limited partners complained about the illiquidity of the stock. (Defendants' Memo. p. 57). Consequenty, Metropolitan offered the dissatisfied limited partners an option to have their restricted shares brought back by the corporation at $5 per share. The defendants deny plaintiffs' allegation that there were unreported risks associated with the partnership investments sold to the Metropolitan stockholders.

The movants however, have failed to explain why the Proxy Statement/Prospectus fails to disclose the litigation involving the limited partners. "In the context of a vote on the merger of two companies, ... allegations and threats of litigation against one of the parties to a merger may be material as bearing on the future economic well-being of that company." Bolger v. First State Financial Services, 759 F.Supp. 182, 195 (D.N.J.1991).

We find that there is a genuine issue of material fact in dispute as to whether the Proxy Statement/Prospectus omitted material facts that a reasonable shareholder would have considered important in deciding how to vote when it failed to disclose the stock deals involving the limited partners and the ensuing litigation related thereto.

***15** The plaintiffs additionally claim that the Proxy Statement/Prospectus omitted material facts when it failed to reveal that William Hack and A.F. "controlled most of the freely tradeable Metropolitan common stock, enabling them to manipulate the "market value" of Metropolitan common stock at artificially high levels and use it as currency for acquiring Metex in the merger." (Second Amended Complaint ¶ 52 p. 33-34).

Although the Proxy Statement/Prospectus indicates that A.F. and Pearl Hack each owned 50% of UCC, which owned 68.2% of the outstanding shares of Metropolitan stock, [FN10] the defendants have put forth no proof to contradict plaintiffs' assertion that A.F. and the Hacks "manipulated the 'market value' of Metropolitan common stock at artificially high levels and use [d] it as currency for acquiring Metex in the merger." (Second Amended Complaint ¶ 52 p. 33-34). Therefore, a genuine issue of material fact exists and summary judgment will not be granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 11
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

8. *Failure to Reveal that Metex Earned Approximately $700,000 in the Fourth Quarter of 1988.*

The plaintiffs contend that the Proxy Statement/Prospectus omitted a material fact by failing to reveal Metex's 1988 fourth quarter results. Defendants maintain that the fourth quarter results were not detailed in the Proxy Statement/Prospectus because Metex's accounting firm, Arthur Andersen & Company, did not complete the fourth quarter audit until after the merger was completed.

The movants have sustained their burden of demonstrating that there is no proof to support the plaintiffs' argument that the fourth quarter results were available for inclusion in the Proxy Statement/Prospectus. No facts have been asserted by the plaintiffs to dispute this allegation. Summary judgment is granted on behalf of the defendants for this claim.

9. *State Law Claims* [FN11]

A federal court sitting in diversity must apply the choice-of-law rules of the state in which the court sits. *Arochem International, Inc. v. Buirkle,* Nos. 414, 91-7641, 1992 WL 147358 at * 4 (2d Cir. June 30, 1992). "New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation." *Walton v. Morgan Stanley & Co., Inc.,* 623 F.2d 796 n. 3 (2d Cir.1980); *See also CRTF Corp. v. Federated Dept. Stores,* 683 F.Supp. 422, 427 (S.D.N.Y.1988) ("[A] Federal Court sitting in the State of New York must apply the law of the state of incorporation in deciding a case involving the "internal affairs" of a foreign corporation."). Since Metex is incorporated in Delaware, the law of Delaware will apply.

Plaintiffs allege that all of the individually named director-defendants, except Walter F. Gips, breached their fiduciary duty of fairness to the Metex stockholders. Under Delaware law, the duty of fairness has two components, fair dealing and fair price. Fair dealing "focuses upon the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure and negotiation." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989). Included within the concept of fair dealing is the duty to fully disclose all material information that would have a significant effect on a shareholder's vote. Plaintiffs claim that the defendant-directors failed to disclose [FN12] material information relating to the merger with Metropolitan.

***16** The element of fair price "mandates that directors commit themselves, inexorably, to obtaining the highest value reasonably available to the shareholders ..." *Mills, supra* at 1280. The plaintiffs allege that the directors failed to uphold their fiduciary duty to obtain "for the shareholders the highest value reasonably available ..." for their stock. (Plaintiffs' Memo p. 70).

a. *Duty of Disclosure*

"Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote." *Stroud v. Grace,* 606 A.2d 75, 84 (Del.1992); *Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1059 (Del.Ch.1987) ("Shareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price."); *See also Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840, 846 (Del.1987) ( "[T]he defendants retain the burden of proving complete disclosure of all material facts relevant to the merger vote."). The board of directors also has a duty of "full disclosure in assessing the adequacy of proxy material under state law." *Stroud, supra* at 86; *Weinberger v. UOP, Inc.,* 457 A.2d 701, 708 (Del.1983). Delaware "require[s] proxy voters to have all material information reasonably available before casting their votes ... [to] insure that directors do not use their 'special knowledge' to their own advantage and to the detriment of the stockholders." *Stroud, supra* at 87; *quoting Weinberger, supra* at 71.

To determine whether a director has satisfied the fiduciary duty of disclosure, "the question is one of materiality." Bershad, supra at 846; *Smith v. Van Gorkom,* 488 A.2d 858, 890 (Del.1985). Since we held above that there is a genuine issue of material fact in dispute as to the materiality of the omissions from the proxy statement, we decline to grant defendants' motion for summary judgment on this claim.

b. *Fair Price*

When a corporate board of directors authorizes management to engage in merger negotiations, the board has a fiduciary duty to maximize the value of the corporation "for the stockholders' benefit."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 12
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Revlon Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182 (Del.1986). There is a genuine issue of material fact in dispute as to whether the defendants undervalued Metex's assets when the corporation merged with Metropolitan.

c. *Business Judgment Rule*

The directors' actions are not insulated by the business judgment rule. This rule is a presumption which states "that in making a business decision the directors of a corporation [have] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Van Gorkom, supra,* at 872. The burden of rebutting this presumption is usually on the party challenging the board's decision. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984). However, if a party challenging the transaction is able to demonstrate that a majority of the voting members of the board of directors had a personal financial interest in the merger, the directors cannot be shielded by the business judgment rule and the burden of proving the fairness of the transaction shifts to the directors. *Aronson supra* at 812; *Weinberger, supra* at 703.

***17** In the present case, the business judgment rule does not apply because the plaintiffs have demonstrated that the merger was approved by a board composed of a majority of interested directors. The Court's holding in *Marciano v. Nakash,* 535 A.2d 400, 405 n. 3 (Del.1987), is not to the contrary.

*Marciano* holds that the business judgment rule applies even where a majority of the board has a financial interest in the transaction, providing that such transaction was "approv[ed] by the fully informed disinterested directors." *Id.* In the present case, Walter F. Gips, arguably the only disinterested director [FN13], admits that he was not advised of the purchasing group's proposal to acquire D & M when he voted in favor of the merger. [FN14] Since the disinterested directors were not "fully informed," the business judgment rule does not apply. [FN15]

d. *Walter F. Gips*

The plaintiffs claim that Gips breached his duty of loyalty to the corporation by providing the interested directors with copies of the Bear Stearns fairness opinion. We find that Gips has fulfilled his fiduciary duty to the Metex stockholders and accordingly grant his motion for summary judgment.

Gips, as the sole member of the Special Committee, was charged with making "a recommendation to the Board of Directors, as a whole, with respect to the fairness of said merger proposal to the Corporation and its stockholders...." (Gips Aff.Ex. A.). To fulfill this responsibility, Gips enlisted Bear Stearns to render an opinion as to the fairness of the proposed merger. The plaintiffs argue that Gips acted improperly by furnishing the board of directors with a copy of the Bear Stearns report.

It is clear that the a fiduciary duty cannot be violated by the mere transfer of a fairness opinion. Essentially, plaintiffs "ask this court to hold liable a diligent outside director, Gips, for informing his own board of a material factor in the proposed merger." (Gips' Reply Memo. p. 6 n. 2).

The board of directors, to fulfill their fiduciary responsibilities, must actively and directly oversee matters relating to the sale or merger of the corporation. *Mills, supra* at 1281. It is ironic that plaintiffs object to Gips' disclosure of the Bear Stearns report to the board, in light of their allegations that the other directors failed to disclose material information relating to the merger to the stockholders. One would imagine that if Gips had not turned the report over to the board, that plaintiffs would have argued that Gips violated his disclosure duty. We find that Gips simply fulfilled his fiduciary obligations and furnished the rest of the board with material information relating to the merger.

e. *Common Law Fraud and Negligent Misrepresentation*

"Under New York conflicts of law, a court must apply the ... law of the state having the most significant relationship with the occurrence and with the parties." *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.1988). Since all of the plaintiffs reside in New York and the defendants conduct significant business operations in this state, the law of New York will apply.

***18** A claim for common law fraud and negligent misrepresentation may be sustained when the plaintiffs have alleged sufficient fact to establish liability under the federal securities laws. *National Union Fire Insurance Co. v. Cooper,* 729 F.Supp. 1423, 1435 (S.D.N.Y.1989); *In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. 493, 519 (S.D.N.Y.1987); *Rush v. Oppenhemier & Co., Inc.,* 592 F.Supp. 1108, 1113 (S.D.N.Y.), *vacated in part on other grounds,* 596 F.Supp 1529 (S.D.N.Y.1984).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 13

Since there is a genuine issue of material fact in dispute as to whether defendants violated the federal securities law, summary judgment cannot be granted on this claim.

*CONCLUSION*

Defendant Walter F. Gips' motion for summary judgment is granted. We also grant defendants' motion for summary judgment on plaintiffs' claim that defendants deliberately withheld Metex's 1988 fourth quarter results. Defendants' motion for summary judgment is in all other respects denied.

*ORDER*

The Clerk of the Court is directed to enter judgment dismissing the complaint against the defendant Walter F. Gips and dismissing any claims based on paragraph 50 of the Second Amended Complaint.

The claims on which judgment is entered are separate and distinct as to the operative facts and theories of liability of the remaining claims. The issues presented for review on the claims in which summary judgment have been granted are not present in the remaining claims. There is no just reason for delay.

SO ORDERED.

FN1. No Metropolitan stocks were traded on 17 of the 60 trading days prior to the merger. (Plaintiffs' Ex. 6).

FN2. After the Merger, UCC changed its name to "BMG Equities Corp." and assigned the name "UCC" to Metropolitan.

FN3. In January 1989, shortly before the Merger, "Metropolitan borrowed ... $1,600,000 from Metex in order to pay the purchase price on the shares of Metex Common Stock acquired from Pearl H. Hack and Jeffrey Hack...." (Defendants' Ex. 1, p. 40.) The money that Metropolitan borrowed from Metex was used to purchase roughly 12.3% of Metex's outstanding stock.

FN4. Furfaro testified that he and A.F. "had some understanding that $18.5 million was the strike price. If I can reach that strike price, then we had a deal." (Plaintiffs' Ex. 12, p. 172-73).

FN5. Murphy, a Gabelli employee testified that Metex:

proceeded to have communications and conversations with our people.... They were very cooperative. They were being very friendly. There was nothing hostile about the relationship.
(Plaintiffs' Surreply Ex. 2, p. 130-31).

FN6. The plaintiffs have raised a genuine issue of material fact as to whether the defendants have negligently failed to adhere to the disclosure rules.

FN7. There is no merit to defendants argument that the "required element of causality is" lacking in this case. (Defendants' Reply Memo. p. 25-27). Where the proxy solicitation "was an essential link in the accomplishment of the transaction," it is unnecessary for the plaintiff to show that "the defect [in the proxy solicitation] actually had a decisive effect of the voting." *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384-85, 90 S.Ct. 616, 622 (1970); *See also Virginia Bankshares, supra* at 2762. Since Metropolitan owned 42.7% of the outstanding shares, the proxy solicitation was an "essential link in the accomplishment of the [merger]." *Mills, supra,* at 385.

FN8. Although defendants contend that the purchasing group's $18.5 million dollar proposal grossly overestimated the value of D & M, in September 1989, six months after the merger was completed, Metropolitan received several offers for D & M that ranged from $18 million to $25 million dollars. (Plaintiffs' Ex. 31, p. 76-77).

FN9. Since the Supplement was untimely, we do not address the merits of plaintiffs' other claims regarding the alleged inadequacy of the Supplement.

FN10. Page 10 of the Proxy Statement/Prospectus states that "[t]he market for Metropolitan Common Stock is thinly traded." (Defendants' Ex. 1, p. 10).

FN11. "A district court may exercise jurisdiction over pendent state claims "since the Securities Exchange Act's conferral of exclusive jurisdiction on federal courts ... for violations of that act permits adjudication of all related claims only in those courts."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967
**(Cite as: 1992 WL 237299 (E.D.N.Y.))**

Page 14

*National Union Fire Insurance Co. v. Cooper,* 729 F.Supp. 1423, 1435 (S.D.N.Y.1987) (citation omitted)."

FN12. The Delaware Supreme Court has expressed its preference for the term "duty of disclosure," rather than "duty of candor." *See Stroud v. Grace,* 606 A.2d 75, 84 (1992) ("[I]t is more appropriate for our courts to speak of a duty of disclosure based on a materiality standard rather than the unhelpful terminology that has crept into Delaware court decisions as a "duty of candor.").

FN13. There is some question as to Anthony Petrocelli's independence since he is A.F.'s brother and was Metropolitan's designee on the Metex Board.

FN14. *See* Gipps Reply Memo. p. 2 n. 1.

FN15. There is no merit to defendants' argument that the business judgment rule should apply merely because the merger was approved by an independent merger evaluation committee. The business judgment rule will not apply "where the special committee ... [was not] adequately informed about the fair value of the ... [corporation]." *In re Trans World Airlines, Inc. Shareholders Litigation,* No. Civ. 9844, 1988 WL 111271 at * & 7 (Del.Ch. Oct. 21, 1988).

Not Reported in F.Supp., 1992 WL 237299 (E.D.N.Y.), Fed. Sec. L. Rep. P 96,967

**Motions, Pleadings and Filings (Back to top)**

- 9:89cv00571 (Docket) (Feb. 17, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1993 WL 35967 (Del.Ch.), Fed. Sec. L. Rep. P 97,447, 18 Del. J. Corp. L. 1196

**(Cite as: 1993 WL 35967 (Del.Ch.), 18 Del. J. Corp. L. 1196)**

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Merle THORPE, Jr. and Foundation For Middle East Peace, a District of Columbia Corporation, Plaintiffs,
v.
CERBCO, INC., a Delaware Corporation, Robert W. Erikson, and George Wm. Erikson, Defendants.
**Civ. A. No. 11713.**

Submitted: Sept. 29, 1992.
Decided: Jan. 26, 1993.

****1197** Lawrence C. Ashby, Stephen E. Jenkins, Keith R. Sattesahn, and Richard D. Heins, Ashby & Geddes, Wilmington, of counsel: Joseph M. Hassett, George H. Mernick, III, Albert W. Turnbull, and Christopher P. Gilkerson, Hogan & Hartson, Washington, DC, for plaintiffs.

****1198** Howard M. Handelman, and John H. Newcomer, Jr., Bayard, Handelman & Murdoch, P.A., Wilmington, for CERBCO, Inc.

Michael Hanrahan, and April Caso Ishak, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for defendants Robert W. Erikson and George Wm. Erikson.

MEMORANDUM OPINION

ALLEN, Chancellor.

***1** This is a stockholders' action brought originally to enjoin the alleged usurpation of a corporate opportunity of CERBCO, Inc. The transaction attacked was one in which defendants Robert and George Erikson were to sell their CERBCO stock, which carried with it voting control of the company, for a 700% premium over the market price of the company's traded stock. It was alleged that the buyer did not in fact seek control over CERBCO but had originally sought to buy CERBCO's asset control over another entity. After the suit was initiated, the transaction was abandoned. Plaintiffs continue to litigate this central claim, asserting that the failure of defendants to seek to achieve for CERBCO itself the sale of the asset of CERBCO that the potential buyer was allegedly motivated to acquire, was injurious to CERBCO and all of its stockholders. *See* *Thorpe v. CERBCO, Inc.*, Del.Ch., 611 A.2d 5 (1991).

The pending motion for summary judgment is not addressed to this central claim, however. Rather it is addressed to a second claim purportedly asserted in Count II of the Second Amended and Supplemental Complaint. That claim alleges that the defendants were enabled to acquire voting control over CERBCO as a result of a 1982 stockholder vote held after the dissemination of false and misleading proxy solicitation materials. The 1982 vote amended the certificate of incorporation to authorize a recapitalization that permitted shareholders to exchange their voting stock for either new Class A or new Class B voting stock. Class A stock carries relatively weaker voting rights but greater rights to dividends than does the Class B stock. The Class B shares have the power to elect three of the four members of the CERBCO board of directors. As was expected (and the expectation was disclosed in the 1982 Proxy Statement) most shareholders accepted Class A shares, while Robert and George Erikson accepted Class B shares. On the completion of the recapitalization the Eriksons did not own a majority of the Class B shares, but over the intervening years, through the conversion of ****1199** other Class B shares to Class A stock, they have come to do so.

The claim that is the subject of this motion is the claim that the 1982 Proxy Statement was materially incomplete and misleading in that it, allegedly, failed:

> to inform [shareholders] in the proxy statement that the Eriksons apparently believed they had no fiduciary obligation to exercise their control for the benefit of CERBCO and all of its shareholders, but instead intended to grant themselves the right to use that control for their personal benefit.

Second Am.Cplt. ¶ 20. Plaintiffs seek to have the 1982 recapitalization rescinded. They allege that CERBCO shareholders could not have known until 1990, when the Eriksons allegedly used their control of CERBCO to attempt to seize the economic value of CERBCO's assets, of the alleged failure in 1982 to disclose their intention "to use control for their personal benefit. Thus, their suit is, they say, timely.

***2** Defendants have now moved for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 2
Not Reported in A.2d, 1993 WL 35967 (Del.Ch.), Fed. Sec. L. Rep. P 97,447, 18 Del. J. Corp. L. 1196
**(Cite as: 1993 WL 35967 (Del.Ch.), 18 Del. J. Corp. L. 1196)**

judgment on this claim. Their theory is predicated upon the uncontested fact that plaintiffs were not shareholders of CERBCO in 1982. They assert that this fact disables plaintiffs from litigating the propriety of disclosures made to stockholders at that time. [FN1] Plaintiffs answer that this fact will not alone support the relief that defendants' motion seeks because: (1) they have been injured and are threatened with future injury as a result of the alleged failure to disclose and that fact accords them standing; and (2) the wrong itself is a continuing one, in all events and they have a current interest in the continuing, planned effect of the 1982 fraud.

FN1. The parties have not raised and I do not address the question whether this allegation states a claim upon which relief could be granted. *See Weinberger v. United Financial Corp.,* Del.Ch., C.A. 5915, Hartnett, V.C. (Oct. 13, 1983), slip op. at 24 (complete candor does not require fiduciary to admit corrupt mental state; "self flagellation" not required). *Accord Ash v. LFE Corp.,* 525 F.2d 215, 220 (3rd Cir.1975); *Missouri-Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 873 (2d Cir.1974); *Bertoglio v. Texas International Co.,* 488 F.Supp. 630, 649 (D.Del.1980).

I.

At the outset the parties disagree on the question whether the claim that the 1982 proxy materials were false or misleading is a derivative or class claim. Defendants, originally at least, premised their argument that plaintiffs have no standing on the assertion that this claim was derivative in nature. In the event that it were so considered, the contemporaneous stockholding requirement of Section ****1200** 327 of the Delaware General Corporation Law would appear to preclude these plaintiffs from litigating Count II of their complaint. *See Newkirk v. W.J. Rainey, Inc.,* Del.Ch., 76 A.2d 121 (1950). The argument that the claim is a derivative one is premised on the assertion that what was allegedly not disclosed was an intention to use the power that the certificate amendment and recapitalization made possible, to deprive CERBCO of a corporate opportunity. Asserting that such a diversion would itself constitute a derivative wrong, plaintiffs invite the court to regard the voting allegations as extensions of that same type of claim. This reasoning is, in my opinion, mistaken.

The right to vote stock is the individual right of the legal owner of stock. When the board of directors wrongfully interferes with or wrongfully impairs that right it violates individual rights of stockholders. *See Lipton v. News International,* Del.Supr., 514 A.2d 1075, 1079 (1986); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985); *In Re Anderson Clayton Stockholders Litigation,* Del.Ch., 519 A.2d 680 (1986); *Freedman v. Restaurant Associates,* Del.Ch., C.A. 9212, Allen, C. (Oct. 16, 1987), [1987-88 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 97,221. The wrong is one suffered by all those who vote, but it is not a derivative wrong for that reason, but a direct one. It is analogous to the violation of a contract right. *Cf. Moran v. Household International Inc.,* Del.Ch., 490 A.2d 1059, 1070 *aff'd,* Del.Supr., 500 A.2d 1346 (1985).

Thus, I conclude that, since the claim of proxy non-disclosure is itself not a derivative claim, Section 327 of title 8 has no direct bearing on this motion. I turn then to consider defendants' further argument that plaintiffs have no standing to assert or litigate the existence of a disclosure wrong that may have occurred several years before plaintiffs acquired an interest in the company.

II.

*3 Plaintiffs claim first that they have rights of their own to litigate this claim as persons who will be injured by the final step in the asserted scheme that started with the 1982 vote. I conclude that while plaintiffs may have standing to complain about any breach of duty that occurs while they are shareholders, they have no direct right to be awarded judicial relief for these 1982 acts. [FN2] I conclude ****1201** as well that plaintiffs have no standing to assert this claim as successors in interest to whomever owned their stock at the time of the vote on the 1982 certificate amendment.

FN2. This holding does not, of course, address questions of what constitutes relevant and admissible evidence of such legal claims as plaintiffs do have standing to assert. Rather I here hold that plaintiffs have no standing to prove a violation of a duty in 1982 as a premise for the granting of relief for such breach.

In support of their assertion that, as present stockholders, plaintiffs have standing to litigate the quality of the 1982 proxy solicitation materials, they offer a theory that they characterize as "continuing wrong." The idea is that the 1982 failure to disclose defendants' subjective intent or understanding was part of a continuing scheme that has (only recently)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 3
Not Reported in A.2d, 1993 WL 35967 (Del.Ch.), Fed. Sec. L. Rep. P 97,447, 18 Del. J. Corp. L. 1196
**(Cite as: 1993 WL 35967 (Del.Ch.), 18 Del. J. Corp. L. 1196)**

resulted in injury to CERBCO and thus is a matter that impacts upon plaintiffs, as current shareholders.

This theory is unavailing to confer standing upon plaintiffs to litigate a class action claim seeking relief for a 1982 proxy wrong, since what is at issue on this motion to dismiss that claim is not the capacity of the corporation to recover any loss that may (recently) have been occasioned by defendants' actions. That is the derivative claim. What is at issue here is the ability of the shareholders individually to enforce rights allegedly violated in 1982. Insofar as 1982 acts may in fact be relevant in some way to the claimed derivative injury, evidence of them should, other considerations of evidence law aside, be admissible. *See* n. 2 *supra.* But to admit that those acts might have evidentiary value with respect to a derivative claim is quite different from saying that those 1982 acts can themselves be a source of liability to these plaintiffs.

Nor is there authority to accord stockholders' standing to plaintiffs in their capacity as successors to the earlier holders of the stock. It has been held that those owning shares at the time of the proxy wrong are the persons who possess rights arising from any disclosure violations and that their successors do not. *See* Schwartzman v. Tennaco Mfg. Co., 319 F.Supp. 1278 (D.Del.1970).

Indeed, regardless of the theory asserted, plaintiffs are able to cite no case under the law defining the duties of corporate directors, or under Section 14(a) of the Securities Exchange Act of 1934, 15 USCA § 78n (1991), in which one who has become a shareholder after allegedly defective proxy solicitation materials were distributed and the vote taken, has been accorded standing to litigate the quality ****1202** of the disclosures in that proxy statement. Nor has our own research uncovered such a case. [FN3]

FN3. In one case a representative plaintiff who was a shareholder at the time of the distribution of one of two proxy statements, both of which "allegedly suffered from the same material omissions" was permitted to attack the adequacy of both. *See Zell v. Intercapital Income Securities, Inc.,* 459 F.Supp. 819 (N.D.Cal.1978); *rev'd on other grounds,* 675 F.2d 1041 (9th Cir.1982).

But our search has uncovered a number of instances in which courts have declined to permit one who acquires ownership of shares after a corporate vote has been taken, to challenge the quality of the disclosures made in soliciting proxies for that vote. For example, in the case of *Smillie v. Park Chemical Co.,* 466 F.Supp. 572 (E.D.Mich.1979), a shareholder plaintiff brought an action seeking to rescind corporate action taken in the years 1973-1976, on the grounds that the proxy solicitations in these actions violated Section 14(a) by failing to disclose certain material facts regarding the company. The district court stated: "[I]t is undisputed that plaintiff ... did not even own voting stock in 1973, 1974, or 1975. Clearly, she lacks standing to sue for alleged proxy violations occurring during those years. *See, Wulc v. Gulf Western Industries Inc.,* 400 F.Supp. 99, 103-04 (E.D.Pa.1975)." *Smillie,* at 575. The *Wulc* case involved a suit under Section 14(a) brought by the holder of stock options. In denying the plaintiff standing to pursue the proxy disclosure claim, the court explained:

> ***4** As the Court stressed in *Mills [v. Electric Auto-Lite,* 396 U.S. 375, 381 (1964) ], § 14(a) was intended to protect corporate suffrage and thus "promote the free exercise of the voting rights of stockholders." Thus, to have standing under § 14(a), the plaintiff is required to be a shareholder with voting rights in order to establish a nexus with the statute.

*Wulc,* 400 F.Supp. at 104. [FN4]

FN4. The decided cases all go the same way: a shareholder plaintiff must have owned shares at the time of alleged proxy violations in order to have standing to sue under Section 14(a). *See, e.g., In re Penn Central Sec. Lit.,* 347 F.Supp. 1327, 1342 (E.D.Pa 1972); *Murray v. Hospital Corp. of America,* 682 F.Supp. 343, 348 (M.D.Tenn.1988) ("plaintiffs who are not shareholders with voting rights at time of alleged violation lack standing ... under § 14(a)"); *Werfel v. Kramarsky,* 61 F.R.D. 674, 677- 78 (S.D.N.Y.1974) (denying holder of warrants standing because plaintiff had no voting rights); *District 65, UAW v. Harper & Row Publishers,* 576 F.Supp. 1468, 1486 (S.D.N.Y.1983) (claim dismissed because plaintiffs not shareholders at the time of purported solicitation); *Daly v. Neworld Bank for Savings,* C.A. No. 87-0996-Mc, 1988 U.S.Dist. LEXIS 15642 (D.Mass. July 19, 1988) (dismissing claim because plaintiff failed to adequately plead that proposed class members owned stock at time of solicitation); *Gabrielson v. BancTexas*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Page 4
Not Reported in A.2d, 1993 WL 35967 (Del.Ch.), Fed. Sec. L. Rep. P 97,447, 18 Del. J. Corp. L. 1196
**(Cite as: 1993 WL 35967 (Del.Ch.), 18 Del. J. Corp. L. 1196)**

> *Group, Inc.,* 675 F.Supp. 367 (N.D.Tex.1987) (stating in dicta that "14(a) was intended to benefit only ... individuals whose proxies were actually solicited to approve ... a particular transaction"); *See also,* Louis Loss, Fundamentals of Securities Regulation, at 297 (2d ed. Supp.1992); 1 Thomas Hazen, The Law of Securities Regulation, at 659 (Prac.Ed.1990).

****1203** A similar result obtains under Section 12 of The Securities Act of 1933, 15 USCA 77l (1991), where plaintiffs who have acquired stock from one who bought pursuant to a prospectus are not accorded a right to assert a claim that the prospectus was in some respect false or misleading. *See, e.g., Collins v. Signetics Corp.,* 605 F.2d 110, 113-14 (3rd Cir.1979).

I find this absence of precedent, in the circumstance, to be fatal to plaintiffs' ability to litigate a claim that arose years before they became stockholders. The Delaware precedents that plaintiffs do cite (*e.g., Maclary v. Pleasant Hills, Inc.,* Del.Ch., 109 A.2d 830 (1954); *Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219 (1953)) are not helpful to them. Those cases deal with the question when does a transaction occur or close for Section 327 purposes. Plainly under the reasoning they employ the relevant "transaction" here was completed when the vote was held or, at the latest, when the recap was effectuated. The effects of an act can ripple through decades. But that fact does not mean that the act itself continues for Section 327 purposes so as to entitle later purchasers of the stock to sue on earlier wrongs. Therefore, plaintiffs can draw no comforting analogy to these cases. In no sense were plaintiffs shareholders when the wrongs they purport to allege in Count II occurred.

Plaintiffs' rights are fully protected if the claims that they bring relating to the alleged misuse of power are fairly adjudicated. Their claim, in addition, to change through rescission the nature or structure of the enterprise in which they invested, however, is one that has not been recognized by the law. The motion to dismiss this claim will therefore be granted.

Not Reported in A.2d, 1993 WL 35967 (Del.Ch.), Fed. Sec. L. Rep. P 97,447, 18 Del. J. Corp. L. 1196

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.